UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,
                    Plaintiff,                          CASE NO.: 2:05-CV-40263

vs.                                                     HON. STEPHEN J. MURPHY III
                                                        MAG. JUDGE STEVEN D. PEPE

CHARLES C. CONAWAY, and
JOHN T. McDONALD, JR.
                    Defendants.
_____/


**ORDER DENYING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT (DKT. #62 AND 63)**


**I.      Introduction**

        Plaintiff Securities and Exchange Commission ("SEC") brought this lawsuit against

Defendants on August 23, 2005, alleging violations of Section 10(b) and Rule 10b-5 of the

Securities Exchange Act of 1934 ("Exchange Act") (Dkt. #1).  On July 11, 2008, Defendants

filed their motions for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. #62 and 63).  All

matters were referred with the consent of the parties pursuant to 28 U.S.C. §636(c)(1), including

the entry of judgment.  Oral Argument on these motions was held on December 18, 2008.  For

the reasons stated below, Defendants' motions are **DENIED** in their entirety.

**II.     BACKGROUND FACTS**

        **A.      Kmart's Liquidity Problem**

        Kmart experienced a problem with liquidity between August 2001 and its bankruptcy

filing in January 2002.   In the years leading up to the 2001 problem, Kmart lost much of its

1

market share to rivals Wal-Mart and Target.  Over the same period, Kmart's lenders steadily

reduced the amount they would allow the company to borrow.  The credit facility Kmart utilized

to finance its annual holiday season inventory allowed Kmart to borrow only $1.7 billion in 2000

and $1.6 billion in 2001, (Dkt. #67, Ex. Y at 13) down from $2.5 billion in 1999. (Dkt. #67, Ex.

Z at 21)

      Beginning in the third quarter of 2001 (August, September, October of their January 31

Fiscal Year), Kmart's Chief Operating Officer directed a series of inventory purchases that

exceeded the company's operating plan by some $850 million. (Dkt. #67, Moreland Dep. at 161,

Ex. P; Ex. DD)  Neither Kmart's Board nor Defendant Charles C. Conaway, Kmart's Chairman of

the Board and Chief Executive Officer, authorized the these actions. (Dkt. #67, Adamson Arb. at

824-25, Ex. A) In fact, Conaway's contemporaneous notes described the purchases as "Totally

unacceptable" and "Reckless." (Dkt. #67, Ex. EE at 5 (emphasis in original))  Kmart's

management recognized that the company's existing sources of liquid capital would not be

enough to meet the company's day-to-day needs for running the business.  In preparing for the

impending crisis, Assistant Treasurer Mark Moreland generated a series of forecasts projecting

that Kmart's cash needs in October and November would exceed its available borrowing

capacity. (Dkt. #67, Ex. BB at 2)[1]  By late August, Moreland's forecasts showed a looming

deficit of hundreds of millions of dollars. (Dkt. #67, Ex. CC)  And on September 11, the

projected deficit reached $1 billion. (Dkt. #67, Ex. GG)  Moreland provided the forecasts to

Defendant John T. McDonald, then Kmart's Treasurer and subsequently Kmart's Chief Financial

---

    [1] Defendants challenge the admissibility of various of the Moreland deposition exhibits.
Those objections are provisionally decided below in discussing the documents more specifically.

Officer, who circulated them to Conaway and other senior officers. (Dkt. #67, Moreland Dep. 151, Ex. P; McDonald Dep. 52-54, Ex. O)

Under Conaway's direction, Kmart took a number of steps to avoid becoming illiquid during the third and fourth quarters of 2001. These steps included reducing future inventory purchases, delaying scheduled capital expenditures, and efforts to negotiate sale-leaseback transactions. (Dkt. #67, Moreland Dep. 56, Ex. P; McDonald Dep. 10, Ex. O)  In addition, Kmart began a program to delay payments to its vendors. (Dkt. #67, Moreland Dep. 257, Ex. P; Conaway Dep. 93, Ex. H)  The delays were implemented using two methods. The first was to modify the software in Kmart's accounts payable system to add a fixed number of days to the scheduled payment date for each invoice. (Dkt. #67, Archambeau Dep. 16-21, Ex. C; Ex. AA) This measure, known as the "AP system changes," ("AP System") was implemented in stages starting on August 14, 2001. (Id.)  The practice of payment delays remained in effect until after the January 2002 bankruptcy filing. (Dkt. #67, Archambeau Dep. 22-23, Ex. C)  Conaway authorized the AP System changes (Dkt. #67, Conaway Dep. 87-90, Ex. H), and McDonald instructed his subordinates to implement them. (Dkt. #67, Gilbert Dep. 19-23, Ex. I)

By Labor Day 2001, when it became evident that the AP System changes were insufficient to get Kmart through its liquidity problem, a second method of delaying vendor payments was developed.  Moreland named the second initiative "Project SID" (for "slow-it-down"). (Dkt. #67, Moreland Dep. 62-64, Ex. P)  Defendants referred to it as "prioritizing vendor invoices" or "slow pay to vendors." (Dkt. #67, Conaway Dep. 70-71, Ex. H; McDonald Dep. 55-56, Ex. O)  In Project SID, instead of delaying payments on all invoices, Moreland selected approximately one-third of the invoices due to be paid each vendor and

3

delayed the payment on those invoices for an additional 30 days. (Dkt. #67, Ex. FF)  The
selection of invoices was designed to mislead vendors into thinking individual payments had
simply been "hung up in processing" rather than intentionally withheld. (Dkt. #67, Moreland
Dep. 68-69, Ex. P)  Conaway and McDonald received a detailed briefing on Project SID shortly
after Labor Day 2001. (Dkt. #67, Moreland Dep. 62-66, Ex. P; Gilbert Dep. 65-66, Ex. I)
Project SID was a time-consuming effort that required daily monitoring with multiple large-scale
computer runs.  In addition, the selection of invoices for non-payment had to be carefully
tailored, because major vendors threatened to withhold shipments, and did withhold them, unless
they were paid. (Dkt. #67, Archambeau Dep. 28-43, Ex. C)  The Defendants instructed Moreland
to make sure that only a "very limited" number of people were aware of the effort. (Dkt. #67,
Moreland Dep. 70, Ex. P)  Their concern, as expressed to Moreland, "was that if vendors
understood that there was a liquidity crisis occurring, that they may not ship goods; and it could
cause . . . a very bad public relations issue with the company." (Dkt. #67, Moreland Dep. 70, Ex.
P)

    According to Moreland, Conaway instructed him to implement Project SID "as soon as
possible." (Dkt. #67, Moreland Dep. 76, Ex. P; McDonald Dep. 53-54, Ex. O)  The Project SID
payment delays began on September 19, 2001 (Dkt. #67, Archambeau Dep. 62, Ex. C) and
continued until Kmart's January bankruptcy filing, with a two week suspension of the program
from December 7 - December 20. (Dkt. #67, Archambeau Dep. 130-31, 183-84, Ex. C)  At its
peak, Plaintiff contends Project SID resulted in vendor payment delays of over $800 million,
according to a contemporaneous spreadsheet maintained by Moreland, who managed the
program on a day-to-day basis. (Dkt. #67, Ex. YY at 6)  Between the AP System changes and

4

Project SID, Kmart held back over $1 billion in vendor payments for much of October and November 2001. (*Id.*)

**B.     Project eLMO**

Concurrent to the AP and SID projects, Kmart instituted Project eLMO, which converted Kmart's two separate accounts purchasing systems – "hard line" products (such as electronics) and "soft line" products (such as apparel) – into a single unified system. (Dkt. #1, ¶ 25, Dkt. #63, Gilbert Dep. 113, 136, Dkt. #67, Austin Dep. 12-15, Ex. D; Archambeau Dep. 108-10, Ex. C) According to Plaintiff, Project eLMO had no effect on Kmart's ability to pay its vendors, (Dkt. #67, Austin Dep. 37-38, 50-52, Ex. D; Archambeau Dep. 105, 111, Ex. C) but was used to mislead vendors about the liquidity problem.  Conaway and McDonald allegedly directed the development of "talking points" for Kmart employees to use during calls with vendors.  The "talking points" suggested that Project eLMO generated software errors in the accounts payable system that had created a backlog of approximately 750,000 invoices, which needed to be cleared by hand. (Dkt. #67, Moreland Dep. 283-85, Ex. P; Ex. LL; McDonald Dep. 108-10, Ex. O; Ex. MM; Gilbert Dep. 98-99, Ex. I)

Defendants told the story about the alleged glitch with Project eLMO not only to Kmart's vendors[2], (Dkt. #67, Sabony Dep. 72-73, 78-81, Ex. S; Ex. TT; Levin Dep. 30-31, Ex. L; Ex. PP;

---

[2] McDonald told one major Kmart factor that Kmart's $8-10 million in late payments to that factor were the result of Project eLMO and that Kmart had no problem with its liquidity. (Dkt. #67, Sabony Dep. 73, 78-81, Ex. S; Ex. TT at 2-4).  In November 2001, the CEO of Sunbeam wrote to Conaway and asked for his assistance in resolving the $9.5 million in past due invoice payments Kmart owed Sunbeam. (Dkt. #67, Ex. OO)  Conaway's response falsely blamed Project eLMO for the delayed payments. "I apologize for the breakdown we have had on our hard lines and soft lines integration. It has been a minor disaster." (Dkt. #67, Levin Dep. 31, Ex. L; Ex. PP)

Bram Dep. 27-28, Ex. G) but also on the November 27 conference call ("the conference call") to securities analysts and the investing public. (Dkt. #67, Ex. V at 18-20, 25, 28-29)

The payment delays caused angry vendors and factors to demand payment and (Dkt. #67, Gilbert Dep. 88-101, Ex. I) some major vendors, including Black & Decker, 3M, AC Delco, and General Electric, to stop shipment of their products altogether. (Dkt. #67, Ex. RR)

### C.      Communications with the Board

Conaway, who served as Chairman of the Board, and McDonald both had regular direct contact with Kmart's Board.  In mid- to late-August 2001, Kmart's senior management received a series of liquidity forecasts Assistant Treasurer Mark Moreland prepared at McDonald's direction showing that the Company was facing cash needs that could exceeded its borrowing capacity by up to $1 billion. (Dkt. #67, Ex. CC, GG)  McDonald presented these forecasts to Conaway and the other members of the Executive Leadership Team. (Dkt. #67, McDonald Dep. 52, Ex. O)  This information, however, was not communicated to Kmart's Board. (Dkt. #67, Adamson Dep. 35, 39-41, 49, Ex. B)  Between September and November 2001, the Defendants regularly reported to the Board on how they were managing Kmart's liquidity problem without mentioning that they implemented programs to systematically delay payments to vendors. (Dkt. #67, Adamson Dep. 42-43, Ex. B)  The Monthly Board packages circulated before each meeting omitted any direct reference to the delay tactics, focusing instead on other actions used to deal with liquidity problems: (I) shifting capital expenditures to the fourth quarter; (ii) attempting to negotiate sale-leaseback transactions; and (iii) refinancing the Company's revolving credit facility. (Dkt. #67, Ex. HH at 20-21, KK at 30-31, QQ at CC96862)

On October 12, 2001, Conaway informed the Board that Kmart was successfully

handling its liquidity requirements by negotiating improved payment terms from its vendors. "We have made significant progress on several of our working capital initiatives. Our efforts to work with our vendor partners on terms changes have been successful. Our A/P leverage ratio has improved dramatically from 33% in July to 42% in September." (Dkt. #67, Ex. JJ at 2)

On December 20, 2001, Conaway assured the Board that "we are comfortable with our working capital position going into fiscal year 2002." (Dkt. #67, Ex. UU at 2)  And on January 3, 2002, less than three weeks before Kmart's bankruptcy filing, McDonald told the Board "that we have sufficient funds and available lines of credit to continue to carry out our strategies." (Dkt. #67, Ex. VV)  Throughout this period, Defendants never informed Kmart's Board of the payment delays on past-due vendor invoices.

Kmart's Board was acutely interested in the Company's liquidity in the third and fourth quarters of 2001. (Dkt. #67, Adamson Dep. 21-22, Ex. B)  James Adamson, the Chairman of the Board's Finance Committee testified that Kmart's Board was never made aware of, and never would have approved, the program to systematically delay vendor payments. (Dkt. #67, Adamson Dep. 70-72, Ex. B; Adamson Arb. 836-37, Ex. A; Stallkamp Arb. 462-63, Ex. T)  Thomas Stallkamp, Board member on the Finance Committee, asked Conaway directly in the Fall of 2001 about rumors that Kmart's vendors were not being paid on time.  Conaway told Stallkamp that the delays were caused by "a problem with some system called the eLMO system that . . . had stopped paying for a short period of time but that had been repaired." (Dkt. #67, Stallkamp Arb. 459-61, Ex. T; Adamson Dep. 83-84, Ex. B)

**D.     SEC Filing**

According to Defendants, by the time the Form 10-Q was filed, the cash crunch was over, Kmart had passed its peak borrowing date and had posted record Thanksgiving-weekend sales with forecasts of significant liquidity to continue through the holiday season. (Dkt. #63, McDonald Dep. 215-16, Ex. P, Boyer Dep. 266-67, Ex. H, See Archambeau Dep. 118-19, Ex. I; "Incremental Cash Need and Revolver Impact," Ex. Q; Kmart Corp. Third Quarter 2001 Financial Review, at CC-0709807-09, Ex. R)  It was Defendants' expectation in late November 2001 that Project SID would not need to be reinstituted. (Dkt. #62, Moreland Dep. 370, Ex. A; Archambeau Dep. 153, Ex. I.)

In-house General Counsel, Janet Kelley, and an outside auditor from PricewaterhouseCoopers LLP, Joseph Murphy, provided oversight on the accuracy and completeness of Kmart's public SEC filings. Plaintiff contends that Conaway and McDonald had direct responsibility for ensuring that Kelley and Murphy were apprised of major business developments that could affect Kmart's SEC filings.  This obligation was memorialized in the Management Representation letter that both Defendants signed on November 27, 2001 in connection with the Form 10-Q(3) filing. "The interim consolidated financial statements . . . include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Company is subject." (Dkt. #67, Ex. SS at 1)  According to Murphy, this letter required the disclosure of a material liquidity event occurring during the reporting period. (Dkt. #67, Murphy Dep 46-47, 126-27, Ex. Q)

Despite this requirement, in the fall of 2001, no one apprised Kelly or Murphy of the liquidity crunch and the delay of $1 billion in vendor payments. (Dkt. #67, Kelley Dep. 44-48,

Ex. K; Murphy Dep. 127-30, Ex. Q)  On two different occasions in November or December of

2001, Kelley asked McDonald about rumors that vendors were not being paid on time.

McDonald responded with the Project eLMO talking point, "we had some problems with a

system called eLMO." (Dkt. #67, Kelley Dep. 51-54, Ex. K)

     **E.**    **The Conference Call**

On November 27, 2001, Conaway and McDonald hosted Kmart's public conference  call

with Wall Street securities analysts, investors, and the investing public to discuss the Company's

third quarter 2001 financial results.   During the conference call, Conaway and McDonald on

four separate occasions suggested that the vendor complaints stemmed from Project eLMO

"systems integration problems," never mentioning the liquidity problem or either program to

delay vendor payments.

For example, McDonald told the analysts that the "issues related to (Kmart's) accounts

payable system."  (Dkt. #67, Ex. W at 28-29, Ex. MM)  McDonald further explained:

> Part of that integration that we internally call eLMO was
> and is the implementation of the new accounts payable
> system. This system implementation did have some issues
> along the way. And as of today, the majority of the issues
> related to our accounts payable system . . . have been
> resolved. We're nearly caught up concerning our
> processing.

(Dkt. #67, Ex. V at 18)

Conaway repeated McDonald's eLMO excuse:

> [W]e're executing a major integration of hard lines and soft lines
> systems and distribution centers. . . . We've clearly (caused) some
> systems issues, as John [McDonald] mentioned. During our
> accounts payable conversion, certain invoices involved with the
> integration were dropped and has clearly caused some confusion.

9

(Dkt. #67, Ex. V at 20; Ex. W at 31).  Conaway also said that "as many are aware of our accounts payable issue, we had 750,000 checks backlogged at the end of October. . . . As of today, all issues related to our accounts payable system have been fixed and all of our vendors are current on their accounts." (Dkt. #67, Ex. X at 22-23)

Two individuals on the conference call, Eric Beder, a securities analyst with Ladenberg Thalmann, and Maurice Sabony, a representative of Milberg Factors, were extremely interested in learning as much as they could about the state of Kmart's liquidity in advising their investor clients. (Dkt. #67, Beder Dep. 36-40; 62-67, Ex. F; Sabony Dep. 91-92, Ex. S)  Both men were left with the impression that the Defendants' references to "systems integration problems" related to Project eLMO, the same story they had each heard over the prior weeks. (Dkt. #67, Beder Dep. 49-52, 56-57, 64, Ex. F; Sabony Dep. 97-98, Ex. S)

Towards the end of the conference call Eric Beder redirected the attention back to the subject of vendor payments.  Mr. Beder asked, "[I]n terms of the vendors and the payables . . . what has been the biggest problem with the vendors? . . ."  Conaway again alluded to Project eLMO's "systems integration problems" and offered that they had been fixed: "[L]ike we said, right now, system[']s fully integrated. And it's working fine." (Dkt. #67, Ex. V at 28-29)  McDonald repeated that eLMO's system integration issues had been repaired. "We're fully caught up at this point, as I said. . . . I don't see any further integration issues as relates to the . . . vendors." (Dkt. #67, Ex. V at 29).

During the conference call, Conaway referred to the vendors who were not being paid as "a lot of noise from a small group of suppliers" that Kmart had ceased doing business with. (Dkt. #67, Ex. V at 29).  While McDonald noted that outstanding vendor accounts were "nearly caught

up"(Dkt. #67, Ex. V at 18) and later "fully caught up" (Dkt. #67, Ex. V at 29), Plaintiff contends

that the company was still withholding over $1 billion from vendors under Project SID and the

AP System. (Dkt. #67, Ex. YY at 6-7)

  **F.**  **Kmart's Quarterly SEC Filing on Form 10-Q(3)**

  On the same day as the conference call, Kmart filed its quarterly Form 10-Q(3) with the

SEC. (Dkt. #67, Ex. Y)  This was made available to the public electronically, but counsel at the

December 18 hearing did not know if it was released prior to the conference call.  Plaintiff does

not dispute any of the figures contained in this report but contends that certain portions of the

narrative in the Management's Discussion and Analysis ("MD&A") section of the  were

misleading.  Compared to the third quarter of 2000, the consolidated balance sheets of the 2001

10-Q  showed an increase of 62% of long term debt due within one year and an increase of 28%

in trade accounts payable.  Total current liabilities for the third quarter of 2001 were nearly 18%

above October 31, 2000 where assets were up only 5.3%   As required by SEC regulations, the

MD&A section of the filing included a discussion of  Kmart's liquidity. (Reg. S-K, Item 303(a),

(b) (17 C.F.R. §§ 229.303(a), (b))  It revealed working capital of $4,096 million for 2001,

$344,000.000 (about 8% ) below the $4,400 million for October 31, 2000.  It revealed $1.46

billion in borrowings under its $1.6 billion revolving credit sources, up 6.5 %, or $90,000,000

from the $1.37 billion of October 31, 2000.  Yet, the discussion in the MD&A did not make any

specific reference to Kmart's third quarter liquidity problems, nor the delay of what Plaintiffs

contend were over $1 billion in payments to its vendors on October 31, 2001, nor that the

payment delays would continue into the Company's fourth quarter that began November1.

Defendant McDonald signed the Form 10-Q(3) and oversaw its preparation. (Dkt. #67, Conaway

Dep. 213-15, Ex. H)  While Conaway had signed the second quarter Form 10-Q(2), he denied

ever seeing, reviewing or discussing the third quarter document. (Dkt. #67, Conaway Dep.

212-14, Ex. H)

Plaintiff contends that the 10-Q(3) included two statements that, given Kmart's financial

condition, were materially misleading and that both Defendants knew the statements were

inaccurate.  The opening sentence of the 10-Q(3) read, "Our primary sources of working capital

are cash flows from operations and borrowings under our credit facilities." (Dkt. #67, Ex. Y at

13).  Plaintiffs contend that the statement did not inform the investing public that Kmart relied

on deliberately delaying vendor payments as a source of liquidity in the third and into the fourth

quarters.  The closing sentence of the discussion also implied that all was well with the

company's cash flows: "We believe that future operating cash flows and our financing

arrangements . . . will be sufficient to meet our liquidity needs." (Dkt. #67, Ex. Y at 14).  An

investor reading Kmart's liquidity discussion would have the impression that there was no

financial turmoil affecting Kmart in the third and entering the fourth quarter of their fiscal year.

### G.    The Bankruptcy

In 2001, Kmart faced the double burden of repaying its borrowings under its $1.6 billion

revolving credit facility, as well as what the SEC contends was approximately $1 billion in

delayed vendor invoices. (Dkt. #67, Ex. YY at 7).  Kmart's inability to do so was due in part to

the overbuy, the recession and weak sales following 9-11.  By November 8, Jeffrey Boyer, the

then Chief Financial Officer, warned Conaway that Kmart needed a "fundamental restructuring

of (its) financing structure" and "may need to plan for (a) bankruptcy filing." (Dkt. #67, Ex. NN

at SEC118207).  Conaway's response included discharging Mr. Boyer from Kmart the next day

12

and installing Treasurer McDonald, whom he had hired the prior year, as the new CFO.

Conaway had worked with McDonald for many years at CVS and had recruited McDonald as

Kmart's Treasurer from Familymeds.com, where McDonald served as CFO. (Dkt. # 67, V, p. 1,

Exhibit X, p.2) Conaway had been CFO of CVS prior to joining Kmart. (Conaway's Deposition,

Dkt. #67, Ex H, pages 7-8)

In late November, effective in December 2001, Kmart suspended Project SID for two

weeks, but continued to withhold vendor payments it had delayed under the AP System changes.

(Dkt. #67, Archambeau Dep. 22-23, 183-84, Ex. C) During the period leading up to the

bankruptcy filing Plaintiff's expert, Robert P. Peak, estimates that Kmart never had less than

$300 million in past due vendor invoice payments outstanding. (Dkt. #67, Ex. YY at 6)[3] By

December 20, 2001, Kmart was unable to reduce its outstanding credit facility borrowing below

$1 billion. (Dkt. #67, Ex. YY at 3) The company's financial condition continued to deteriorate,

and on January 22, 2002, Kmart filed for bankruptcy.

## III.   ANALYSIS

### A.   Standards Of Review

---

[3] Plaintiff's expert, Robert Peak, relied on the Native Electronic Excel Spreadsheets (Appendix C to his report, found at Dkt. 84, Attachment 1, Appendix C). Plaintiff has moved for admission of Plaintiff's Exhibit 233, Native Electronic Excel Spreadsheets purportedly prepared by Kmart's 2001 Assistant Treasurer, Mark Moreland, or alternatively to reopen the discovery for a continued deposition of Mr. Moreland related to proposed Plaintiff's Exhibit 233 (Plaintiff's Exhibit 233(Duplicate)). Defendants have filed a vigorous opposition to this motion which will he heard on an expedited basis. For purposes of this decision on Defendants' motions for summary judgment, and subject to a determination on the government's motions (Dkt. # 80 & # 81), it is provisionally determined that Plaintiff's Exhibit 233 would be found admissible under Fed. R. Evid 803(6). Regarding Defendant's objection to Mr. Peak relying on the Liquidity Cushion Forecast (Exhibit 20 to the Moreland Deposition) for deriving his $300 million figure, see footnote 5 below.

13

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

14

**B.    Factual Analysis**

Defendants contend that they are each entitled to summary judgment on all counts: (1) for an alleged primary violation of Section 10(b) of the Securities Exchange Act of 1934; (2) for alleged aiding and abetting of Kmart's violations of Sections 10(b) and 13(a) of the Securities Exchange Act of 1934; and (3) on the request for disgorgement.

**(1) Count 1 Primary Liability**

In order to hold Defendants liable under Section 10(b), the SEC must establish that Defendants (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) in connection with the purchase or sale of securities. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 571 (6th Cir. 2008). Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of securities.

The requisite scienter, element (3), can be shown by either direct or indirect proof that the Defendants:

> (a) . . . employ[ed] any device, scheme, or artifice to defraud,
>
> (b) . . . ma[de] any untrue statement of a material fact or . . . omit[ted] to state a material fact necessary in order to make the statements made . . . not misleading, or
>
> (c) . . . engage[ed] in any act, practice, or course of business which operate[d] or would operate as a fraud or deceit . . . in connection with the purchase or sale of any security.

Rule 10b-5 [17 C.F.R. § 240.10b-5].

Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). In the Sixth Circuit "recklessness" satisfies the

15

scienter requirement. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681-82 (6th Cir. 2004); *In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 (6th Cir. 1979). Recklessness is defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care with the danger of that conduct obvious to any reasonable person. *PR Diamonds*, 364 F.3d at 681 (quoting *Mansbach*, 598 F.2d at 1025).

A statement or omission regarding scienter is "material" if "there is a substantial likelihood that a reasonable shareholder would consider it important;" stated differently "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The determination as to which inferences a reasonable shareholder would draw "requires delicate assessments" and as such should be made by the trier of fact. *Brewer v. Lincoln Intern. Corp.*, 148 F. Supp. 2d 792, 803 (W.D. Ky. 2000) (quoting *TSC Industries v. Northway, Inc.*, 426 U.S. 438 at 450 (1976)).

**(2) McDonald's Count 1 Primary Liability Regarding the 10Q(3)**

Count One alleges a"primary" violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 related to statements made in the MD&A of Kmart's 10-Q(3) and at a conference call related to the release of the 10-Q(3) to the public. The purpose underlying the Management's Discussion and Analysis Section ("MD&A") of the Form 10-Q disclosure is "to give the investor the opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company." SEC Rel. No. 33-6835, at 4 (May 18, 1989). McDonald contends he cannot be found primarily liable for

16

securities violation related to the 10-Q(3).

Plaintiff asserts that the MD&A portion Kmart's Form 10-Q(3) made two misleading statements that establish liability under Rule 10b-5.  First is the statement that Kmart's "primary sources of working capital are cash flows from operations and borrowings under our credit facilities." (Dkt. #67, Ex. Y at 13)  Plaintiff contends this is misleading without mentioning that Kmart, by delaying payment from vendors, had a third source of working capital in its stretching payments to its vendors.  The second challenged statement in the MD&A of the 10-Q(3) is "[w]e believe that future operating cash flows and our financing arrangements . . . will be sufficient to meet our liquidity needs." (Dkt. #67, Ex. Y at 14)

Defendant McDonald contends that the 10-Q(3) did not mislead investors in the MD&A because the numbers in Kmart's financial statements were correct and because the crisis was, in his view, resolved by November 27 when the 10-Q(3) was filed.  He contends that neither challenged statement constitutes a Rule 10b-5 violation.  Defendant McDonald also maintains that the delay in paying vendors had no impact on Kmart's amount of working capital (which is defined as current assets minus current liabilities) shown on its balance sheet because the increase in cash from stretching paying vendors was offset by an increase in accounts payable.[4] As noted below this argument misconstrues Plaintiff's contention regarding the sources of

---

[4] The same could be said of the two primary sources of working capital that were identified in the MD&A.  Increases in cash from "cash flows from operations" is offset by decreases in the "Merchandise inventories" and increases in cash from "borrowings under [Kmart's] credit facilities" is offset by increases in "Long-term debt due within one year."  Kmart's 10-Q(3) includes a discussion of a 364 day bank loan as part of the analysis of liquidity and working capital and such borrowings were identified as a primary source of working capital.  Yet, such borrowings from banks have no aggregate effect on the total amount of working capital any more than "stretching vendors," because any increase in cash is offset by an increase in debt.

17

working capital.

Plaintiff also disputes the premise that the liquidity crisis was resolved by the end of November 2001.  Plaintiff points out that Kmart was nearly 1 billion behind on vendor payments at the end of November. (Dkt. #67, Peak Rpt., at 6, Ex. YY)  In addition, Kmart's liquidity issues caused it to draw on its line of credit to pay vendors, which increased its outstanding short-term debt at a time of the year it would ordinarily be paying down the credit line. (Dkt. # 67, Carmichael Rpt. ¶ 41, Ex. XX)  Plaintiff also notes that Kmart's liquidity problem continued into fourth quarter with the AP System continued and Project SID reinstituted after a two week suspension in early December . (*Id.*)

 Plaintiff also responds that correctly reporting Kmart's financial numbers did not end the Defendants' obligations to provide a thorough analysis of the company's financial health, including disclosure of the material liquidity crisis history, even if it been favorably resolved during the reporting period. (Dkt. #67, Backman Dep. 266-67, Ex. E)  They argue the purpose of the MD&A is to show the trends and directions of a company's financial situation that the numbers on a fixed date (*e.g.* October 31, 2001) do not reveal.

As for Defendant McDonald's contention regarding working capital, it misapprehends the nature of the alleged misrepresentation contained in the 10-Q(3).  The misrepresentation is not that the total amount of working capital for August, September and October (Q-3) was increased or "puffed up" by any misrepresentation.  Kmart said "[o]ur primary ***sources*** of working capital  are cash flows from operations and borrowing under our credit facilities." (Emphasis supplied.)  Sources of working capital include sources of current assets in comparison with current liabilities.  Mark Moreland, an Assistant Treasurer at Kmart, prepared various

18

documents at the request of Mr. McDonald including certain documents for the Executive

Leadership Team's meeting of October 4, 2001. (Moreland Deposition, 151- 221, Dkt. 84,

Attachment 3) [5] The Liquidity Cushion Forecast for October 4, 2001, show that adding 10 days

to paying "Hardline Vendors" amounted to $300 million and was part of the "systematic cash

flow management changes" Kmart had instituted. (Moreland Deposition Exhibit 20, and Peak'

Report (Dkt. 67, Exhibit YY, p. 5)  Plaintiff's expert Robert Peak indicates the Kmart cash flow

impact from Project SID on October 31 was $927 million in addition to whatever the exact

_____

[5] Defendants are challenging the admissibility of these documents as business records.
Mr. Moreland testified that these "ELT" (Executive Leadership Team) documents were prepared
by him or persons under his direction and control, at or about the time the data is intended to
depict from the ordinary records of the business. (Moreland Deposition at 161, Dkt. 84,
Attachment 3)  The documents were relied on by Mr. Moreland in his responsibilities in treasury
at Kmart, and he expected others who received the documents to rely in them for accuracy. (*Id.*
at 151-62.)  For purposes of these motions only, it is provisionally determined that the Liquidity
Cushion Forecast, Exhibit 20 to the Moreland Deposition, which Mr. Moreland testified was
prepared for and at the request of Mr. McDonald for the Executive Leadership Team meeting of
October 4, 2001, is admissible as a business record under Fed. R. Evid. 803(6).  Defendant's
arguments concerning its reliability as an estimate, and the objections to Robert Peak's
inappropriate use of this estimate as a static and constant figure, while in fact the AP System
slow pay amounts varied with what differing bills for hardline vendors happened to come due for
any five or ten day period, are arguments more suitably directed to the weight to which the
document should be given, and the credibility of Mr. Peak's repeated use of it.  Were this a case
involving the need to show a specific $300 million slow pay benefit for a specific five day
period, Defendants' objection would have more weight.  The issue is the extent to which Kmart
was systematically delayed payments of hundreds of millions of dollars in payments to its
vendors under the AP System and Project SID to avoid a liquidity crisis that could not be
adequately met from sales and borrowings from its revolving lines of credit.  Even if the effect of
the AP System was disregarded, Robert Peak's Report shows a Cumulative Cash Flow Impact
from Project SID of $927 million on October 31, 2001, and $735 million on November 27, 2001.
(Dkt. 67, Exhibit YY, p. 6)  Even without the $300 million attributed to the AP System delays in
payment,  Kmart's total net borrowing for  October 31, 2001, including Project SID, were $2,626
million and 2,063 million for November 28, 2001, (*Id*. at 7)  compared to total net borrowings in
2000 of $ 1,760 million and $1,232 million for October 31 and November 28, 2000, respectively.
These figures alone could be used by a jury to determine that the MD&A was misleading
and incomplete.  (Dkt. #67, Peak Rpt., at 6, Ex. YY)

amount of cash retained by the 14 day payment slowdown of the AP System. (Dkt. 67, Exhibit YY, p. 6)  Mr. Conaway admitted at his deposition that stretching vendors was a "part of a working capital component." (Dkt. #67, Conaway Dep. 210, Ex. H)

The evidence in the record could be found by a reasonable juror to indicate that stretching vendor payments was a primary source for Kmart of a current asset (additional cash) during the third quarter of 2001.  Thus, a reasonable fact finder could conclude that the challenged sentence in order not to be misleading should have included stretching vendors as a third primary source of working capital.  Accordingly, there is a disputed issue of material fact on whether the statement  "[o]ur primary source of  working capital  are cash flows from operations  and borrowing under our credit facilities" is a knowing or a reckless misrepresentation of fact.

Regarding the second challenged statement that "[w]e believe that future operating cash flows and our financing arrangements . . . will be sufficient to meet our liquidity needs", a reasonable juror, based upon the submissions of Plaintiff, could determine that this statement was a misrepresentation because in the third quarter and going into the fourth quarter Kmart could not meet its liquidity needs solely from operating case from sales and borrowings from its revolving credit facilities, and needed in addition two systems to delay payments to vendors to meet its liquidity needs.

McDonald next contends that there is no evidence in the record to support a conclusion he had the requisite scienter for liability under Section 10(b).  McDonald notes that he became Kmart's CFO only three weeks before the filing of Kmart's 10-Q(3), and that he inherited the 10-Q(3) and the financial responsibilities from Jeffrey Boyer.  As a result, McDonald did not

prepare the 10-Q(3) and argues that there is no evidence he even understood the 303(b) disclosure requirements, or that he discussed the disclosure obligations with anyone.  McDonald also claims that nothing in the record indicates that he knew that Project eLMO was simply a cover story for the vendor payment delays, or that he knew the statement that vendor payments were almost caught up was untrue.

The SEC responds with an array of evidence implicating McDonald in a conscious scheme to hide the vendor payment delays from the public.  While McDonald was only CFO for three weeks by the end of November, evidence in the record suggests he, as Treasurer of Kmart since 2000,  was right in the middle of the vendor payment slowdown efforts. (See, e.g., Dkt. #67, Gilbert Dep. 19-23, 65-66, 98-99, Ex. I; Moreland Dep. 62-66, 70, 283-85, 288 Ex. P; McDonald Dep. 108-10, Ex. O)  The evidence suggests he was in regular contact with Assistant Treaturer Mark Moreland concerning the two slow pay systems and their economic impact on Kmart's liquidity. This evidence could be interpreted to suggest that he and Conaway worked together to conceive of the scheme, the cover-up and the pattern of deception from its very beginning.  Apparently he and Mr. Conaway concocted the phony "talking points" to placate disgruntled vendors calling about late payments including the fabricated story about 750,000 invoices that had to be cleared by hand. (Moreland Dep. 283-85, Ex. P; Ex. LL; McDonald Dep. 108-10, Ex. O; Ex. MM; Gilbert Dep. 98-99, Ex. I;  Austin Dep. 45-47, Ex. D; Archambeau Dep. 115-18, Ex. C; Gilbert Dep. 104, Ex. I)  Moreover, the SEC disputes McDonald's claim that he was unfamiliar with the disclosure obligations in the 10-Q(3), pointing out that McDonald himself testified that he was familiar with the requirements of 10-Q filings. (Dkt. # 67, McDonald Dep. 213, Ex. O)

21

Defendant McDonald's motion for summary judgment regarding Kmart's Form 10-Q(3) for 2001 is DENIED.

**(3)  McDonald's Count 1 Primary Liability Regarding the Conference Call:**

Defendant McDonald contends that the representation at the November 27, 2001, conference call that Kmart was caught up or  "nearly caught up" on vendor payments was true as demonstrated by the testimony of Mr. Moreland.[6]  McDonald also argues that Defendants raised the subject of Project eLMO during the conference call on a subject unrelated to Kmart's inability to pay its vendors. (Dkt. #62, McDonald Br. 21-22)

Plaintiff asserts that McDonald's explanation to analysts at that day's conference call that eLMO difficulties caused the vendor payment delays was an outright lie.  Against a backdrop of vendor and others' concerns about Kmart's delays in payment to its vendors, Conaway stated that "certain invoices involved with the integration were dropped and has clearly caused some confusion." (Dkt. #67, Ex. V at 20; Ex. W at 31)  McDonald said, "[p]art of that integration that we internally call eLMO was and is the implementation of the new accounts payable system. This system implementation did have some issues along the way.  And as of today, the majority of the issues related to our accounts payable system . . . have been resolved." (Dkt. #67, Ex. V at 18)  Two of the investors were left with the distinct impression that Project eLMO caused the delay in payments in vendors. (Dkt. #67, Beder Dep. 49-52, 56-57, 64, Ex. F; Sabony Dep. 97-98, Ex. S)  Mr. Beder testified that Kmart's inability to pay vendors on time was "material"

---

[6]Conaway is challenging the SEC's claim of his primary liability regarding Kmart's issuance of the 10-Q(3) because he did not sign it, and claims not to have had any involvement in its preparation and did not see it before it was filed.   He is not moving for summary judgment with respect to the November 27 conference call as is McDonald.

and "a major negative." (Dkt. #67, Beder Dep. 84-85, Ex. F)  Beder also noted that if Kmart's liquidity problems were made known to him, he would have communicated that information to the investing public. (Dkt. #67, Beder Dep. 85, Ex. F)

Project eLMO had been a central feature in the "talking points" developed for Kmart employees to use during calls with vendors. These "talking points" were based on the falsehood that Project eLMO generated software errors and backlogs in the accounts payable system that had to be cleared by hand. (Dkt. #67, Moreland Dep. 283-85, Ex. P; Ex. LL; McDonald Dep. 108-10, Ex. O; Ex. MM; Gilbert Dep. 98-99, Ex. I)

Thus, a reasonable juror could conclude that Mr. McDonald was reiterating a form of this contrivance at the conference call with the intent to further the coverup of the scheme to intentionally delay vendor payments to deal with the liquidity problem.  His statements could be found to be representations that glitches in paying vendors were related to the Project eLMO software causing the delay in payment to vendors because random invoices were "dropped." (Dkt. #67, Ex. V at 20)  There is also sufficient evidence for a reasonable trier of fact to find that the delays were not a result of Project eLMO and that the Defendants use of this story was a knowing falsehood. (Dkt. #67, Austin Dep. 37-38, 50-52, Ex. D; Archambeau Dep. 105, 111, Ex. C, Nagler Dep. 88-91, Ex. R)  Thus, there exists a genuine issue of material fact exits as to how their statements on Project eLMO were construed and what the speakers intended.  The reasonableness of this impression is a question for the trier of fact.

For the reasons stated in this and the preceding section, McDonald's motion for partial summary judgment on Count 1 is DENIED.

23

### (4)   Conaway's Count 1 Primary Liability Regarding the 10-Q(3):

Conaway, for his part, argues that he cannot be found liable under Rule 10b-5(b)[7]

---

[7] The complaint alleges Conaway violated subparts (a) and (c) of Rule 10b-5, as well as
subpart (b) of the Rule (Dkt. # 1, ¶ 43.) That paragraph reads:

> 43. In the manner described in paragraphs 1 through 42, Conaway and McDonald,
> in connection with the purchase or sale of securities, knowingly or recklessly, by
> the use of means or instrumentalities of interstate commerce or of the mails,
> directly or indirectly (a) employed devices, schemes or artifices to defraud; (b)
> made untrue statements of material facts or omissions of material facts necessary
> in order to make the statements made, in the light of the circumstances under
> which they were made, not misleading; or (c) engaged in transactions, practices or
> courses of business which operated or would operate as a fraud or deceit upon
> persons in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
> and Rule 10b-5 [17 C.F.R. § 240.l0b-5] promulgated thereunder.

Mr. Conaway  moved  "for partial summary judgment as to the MD&A" (Dkt. # 63, p. 3) He did
not specifically address summary judgment under subparts (a), (b) or (c) of Rule 10b-5.

Plaintiff's counsel argues that because Mr. Conaway did not move for summary
judgment on Plaintiff's Rule 10b-5(a) and (c) claims related to the MD&A, he has conceded
sufficient facts exist for those to go to the jury.  Mr. Conaway's counsel counters that his
challenge "as to the MD&A" was not so limited  –  "Mr. Conaway moved for summary
judgment on the SEC's entire claim based on the MD&A." (Dkt. #70, p.4,  fn. 4)  According to
counsel for Mr. Conaway, the reason he did not move for summary judgment on subparts (a) and
(c) was because he believed Plaintiff waived those claims (I) by arguing in its response to
McDonald's motion to dismiss (Dkt. #10) that its claim was based on misrepresentations and
omissions; and (ii) Judge Gadola's ruling was premised on Plaintiff's allegations of
misrepresentations and omissions. Mr. Conaway's counsel claims to have proceeded with
discovery on the understanding that the claim was for subpart (b) only.

A party moving for summary judgment may do so on all or part of any claim and, if
summary judgment is not rendered on the whole action, "the court should, to the extent
practicable, determine what material facts are not genuinely at issue." Fed. R. Civ. P. 56(a),
(d)(1).  In the earlier motion to dismiss decided by Judge Paul Gadola, only one of Plaintiffs'
allegations had to satisfy the Rule10b-5 pleading standard in order to survive dismissal of the
Complaint.  *Bovee v. Coopers & Lybrand C.P.A.,* 272 F.3d 356, 362 (6th Cir.2001).  This does
not preclude the Plaintiff from seeking discovery and submitting proofs on Rule 10b-5(a) and (c)
claims if, after discovery, the proofs are sufficient.  "Misrepresentations and omissions" can
make out not only (I) a claim of making an " untrue statement of a material fact or to omit to
state a material fact necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading" ( Rule 10b-5(b)),  but under
appropriate circumstance can also be part of a claim that (ii) the defendant additionally contrived
"[a] device, scheme, or artifice to defraud" (Rule 10b-5(a)); or (iii) also "engage[d] in [an] act,
practice, or course of business which operates or would operate as a fraud or deceit upon any

because he did not review or sign the 10-Q(3).[8]  Conaway testified that he had not read any draft

of the 10-Q, let alone the MD&A (Dkt. #70, Ex. B, p. 212-13).

Conaway's argument that he is not primarily liable for the MD&A is based on an overly

restrictive interpretation of the antifraud provisions of the Exchange Act, which is not supported

by Supreme Court precedent.  The Supreme Court understood the provisions to:

> . . . embrace a 'fundamental purpose…to substitute a philosophy of
> full disclosure for the philosophy of caveat emptor and thus to
> achieve a high standard of business ethics in the securities
> industry.'

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) (citing *SEC v. Capital Gains*

*Research Bureau*, 375 U.S. 180, 186 (1963)).  Congress enacted Section 10(b) of the Exchange

Act with the intent that it "be construed 'not technically and restrictively, but flexibly to

effectuate its remedial purposes.'"  *Id*.; *see also City of Monroe Employees Retirement System v.*

---

person, in connection with the purchase or sale of any security" (Rule 10b-5(c)).

The forensic questioning in Mr. McDonald's memorandum on his motion to dismiss (Dkt. 10. At p. 10)("Is Mr. McDonald supposed to have employed a scheme to defraud, or made untrue statements, or engaged in fraudulent transactions? Count One does not say.") is not to be treated as an interrogatory on which a limited response would ordinarily limit a Plaintiff's claim. There is no indication that Defendants framed any interrogatories or requests for admissions to narrow the scope of Plaintiff's Rule 10b-5 claim.

While it is determined that the Plaintiff did not waive its Rule 10b-5(a) and (c) claims in the briefings on the motion to dismiss, Mr. Conaway's claims that his current motion challenged any liability under Section 10(b) is a somewhat different assertion than wavier – that he is entitled to summary judgment because of the Plaintiff's failure to present any arguments or assertions under Rule 10b-5(a) or (c) ). Obviously, his summary judgment challenge could have addressed this in the primary brief and not solely in a footnote I the reply.  This issues is too important to be resolved on footnotes.  Accordingly, at this time, Defendants' motion for summary judgment is denied on the SEC's claims under Rule 10b-5(a) and (c). In fairness to Defendants and to the Court, the SEC shall submit a brief on or before April 10, 2009, detailing its claim against each Defendant under Rule 10b-5(a) and (c) ).

[8]This argument is not available to McDonald because he did sign the 10-Q(3) Form.

*Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005); *Scholnick v. Schecter*, 752 F. Supp. 1317, 1321 (E. D. Mich. 1990).

The Sixth, Second, Ninth and Tenth Circuit Courts of Appeal accept the rule that primary liability can attach to a defendant for misrepresentations and omissions even in situations when a defendant did not personally communicate those misrepresentations directly to investors or the public. *City of Monroe*, 399 F.3d at 686 n. 29; *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996).

Courts have found that vicarious liability can attach where one is "sufficiently responsible for speech such that he could properly be said to have made the false statement." *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006); *SEC v. First Jersey Securities*, 101 F.3d 1450, 1471 (2d Cir. 1996); *Scholnick*, 752 F. Supp. at 1321.

Conaway seeks to benefit from an argument more suitable for someone outside of the managerial machinations, such as an outside auditor. Conaway, however, as Kmart's Chief Executive Officer, had a direct and immediate fiduciary duty to Kmart's shareholders that carried with it the duty to speak truthfully on material matters and to correct untruths where he found them. *Cf. Shapiro v. Cantor*, 123 F.3d 717, 721-22. (2d Cir. 1997) (outside auditor who did not issue an opinion owed no fiduciary duty to the public and was therefore not liable for silence in the face of a material omission). At a minimum, the evidence is such that a reasonable juror could conclude that: Mr. Conaway was a principle architect of the two schemes to stretch vendor payments to ease the liquidity problem; he was an active and knowing participant in keeping this secret except for a limited number of Kmart employees; he fostered the misleading Project

26

eLMO coverup story and the false "talking points"; and that after CFO Jeffrey Boyer was discharged for highlighting liquidity problems Mr. Conaway put in his place Kmart's Treasurer McDonald whom he had brought to Kmart, and whom he had reason know would be a team player on keeping Project SID and the AP System under wraps.  Such a juror could conclude that Defendant Conaway knew or should have known that the use of Project SID and the AP System to deal with Kmart's third quarter liquidity problem would not find expression in the 10-Q(3) prepared under McDonald's watch, and that investors would be deprived of "the opportunity to look at the company through the eyes of management" regarding the systematic and extensive plan to stretch vendor payments.

Conaway argues that *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998), and *SEC v. Kushner*, 417 F. Supp. 2d 326 (S.D.N.Y. 2006) support his motion.  *Wright*, however, is a PSLRA case that involve a secondary actor accounting firm and it turned on reliance, an essential element of a private securities action that does not apply to fraud actions brought by the Commission.  *S.E.C. v. KPMG LLP,* 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006).  "[A] secondary actor cannot incur primary liability under the [Exchange] Act for a statement not attributed to that actor at the time of its dissemination*." Wright,* 152 F.3d at 175.  "Here, we confront alleged fraud by accountants – secondary actors who may no longer be held primarily liable under [Section] 10(b) for mere knowledge and assistance in the fraud." *Id.* at 176." *Wright* distinguished its case involving a private securities action against a secondary actor from an SEC action against high-ranking corporate insider such as *SEC v. First Jersey Securities,* 101 F.3d 1450 (2nd Cir.1996).  *First Jersey* stated that "[p]rimary liability may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the

27

fraud and assisted in its perpetration." *Id.* at 1471 (citation omitted). It held that the chief executive and sole shareholder of a discount broker-dealer who had "hands-on involvement in the pertinent decisions" that facilitated a fraudulent scheme in which securities were sold at excessive markups could be held primarily liable under Section 10(b). *Id*. at 1472. The broker-dealer executed the fraud by not disclosing to its customers either the nature of the market for the securities or its own control of that market. *Id.* at 1471. The *Wright* court clearly stated that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to investors for primary liability to attach." *Wright*, 152 F.3d at 175; *KPMG,* 412 F. Supp. 2d at 349, 373-74. *Wright* therefore does not support Conaway's motion.

Similarly, in *Kushner,* an SEC action, defendant Angel was a director and consultant, not an officer of the corporation. He gathered certain documents for the accountant and delivered others to the CEO, but was found not primarily liable because he "had literally no involvement in the falsifications. He did not prepare the financial figures, did not assist in the preparation of these figures, did not review these figures, and had no responsibility or authority to take any such steps or actions." *Kushner*, 417 F. Supp. 2d at 332.[9] The same cannot be said of Mr. Conaway

---

[9] *SEC v. Power*, 525 F. Supp. 2d 415 (S.D.N.Y. 2007), decided a year after *Kushner* distinguished it as follows:

> Power has cited Mills [on motion to dismiss] . . . and Kushner [on summary judgment] . . . to support his argument that he cannot be held primarily liable for misstatements here. Mills turned on the failure to allege any facts indicating that the defendants 'personally knew of, or participated in, the fraud . . . . 'Kushner . . . turned on the failure to adduce . . . evidence that the defendants [were] 'centrally involved in the planning and execution of the fraudulent schemes.'

*Power*, 525 F. Supp. 2d at 420. The court denied Power's motion to dismiss based on allegations in the complaint that Power "oversaw and directed" fraudulent acts sufficient to show primary liability for the false statements in the company's public filings even without his signature.

who was a chief architect of the AP System delay and Project SID, the coverup and eLMO

fabrications, the discharge and replacement as CFO of Boyer with McDonald, and as CEO had

obligations to the investing public. While he signed the 10-Q(2), he did not sign and denies

reading the 10-Q(3) before it was filed.  Yet, there is sufficient circumstantial evidence from

which a reasonable juror could conclude that Conaway's course of actions contributed to

the10Q-(3) –  prepared under the new CFO McDonald –  not disclosing the AP System delay and

Project SID and the MD&A not adequately disclosing how Kmart was dealing with its liquidity

problem in the third quarter of 2001.  There is also sufficient circumstantial evidence from which

a reasonable juror could conclude that Conaway, who had the 10-Q(3) in his packet of materials

prior to the November 27 conference on the day the 10Q(3) was filed and released, and who

knew the significance of the AP System delay and Project SID to Kmart's getting through the

third quarter of 2001, and the related importance of keeping this information secret, had

reviewed the 10-Q(3) and its MD&A prior to facing questions from investment analyst and

factors at that conference. [10]

     Conaway also cites the Sixth Circuit decision in citing *Fidel v. Farley*, 392 F.3d 220, 235

---

[10] McDonald also testified that the Form 10-Q(3) was circulated to the Executive
Leadership Team, before it was signed and filed. (Dkt. #67, McDonald Inv. Tr. 412, Ex. N) and
that the pre-filing circulation of the 10-Q(3) included Conaway. (Dkt. #67, McDonald Dep.
193-94, Ex. O)  Further, McDonald testified that he and Conaway used a "call-book" to prepare
in advance for the conference call.  The 10-Q(3) was the principal documentary basis for the call
and the Plaintiff states that the 10-Q(3) was attached to the call-book script. ("Using a prepared
script [Ex. W] (with the 10-Q(3) attached) Conaway led the conference call and was by far the
principal spokesman." Dkt. #67, p. 27))  Conaway also signed Kmart's 10-Q(2) in the prior
quarter and had been a CFO of CVS, a public company, just prior to joining Kmart in May 2000.
(Dkt. #67, Conaway Dep. 7-8, 216, Ex. H)  McDonald's testimony and the investor call book
raise a genuine issue of fact as to the truth of Mr. Conaway denial that he reviewed the 10-Q(3)
before it was publicly filed.

(6th Cir. 2004). (Dkt. #63, Defendant Conaway brief at 10)  Conaway, however, had a much greater role in the misstatements than the defendants in *Farley,* who were outside auditors. Furthermore, the Sixth Circuit based its decision on an affirmative statement by the auditors that the financials were unaudited and no opinion was rendered on those unaudited statements.  The Form 10-Q(3) contains no such disclaimer section.

By limiting his motion to the statements in the MD&A, this Court is not limited in its analysis to the events of late November 2001.  To evaluate the involvement of Mr. Conaway and his possible  impact on the MD&A of the 2001 10-Q(3), a fact finder can look at a continuum of events including Mr. Conaway's central role as Kmart's CEO, his involvement in hiring and promoting McDonald at a critical time, his knowledge of Kmart's liquidity crisis, his involvement in the slow pay practices to manage the liquidity crisis, his efforts to restrict information concerning this and to deceive disgruntled vendors and others questioning the vendor payment problem, and his statements made during the conference call.  Regarding this last event,  Mr. Conaway as Kmart's CEO was to be "stage center" in that conference call facing a critical audience and knowing that he  was likely to be seen in the eyes of the investing public as speaking that day in tandem with the release of Kmart's 10-Q(3) and its MD&A. The purpose of the conference call was to announce and review Kmart's financial performance in the third quarter in conjunction with the 10-Q(3)'s release.  A reasonable fact finder could conclude that Mr. Conaway, a sophisticated corporate executive with former CFO experience, would have wanted to have had some familiarity with the contents of the document 10-Q(3) and its MD&A, particularly in light of the fact that he had been provided one or two copies of the 10-Q(3) prior to the conference call.  A reasonable fact finder could conclude that Mr. Conaway did not want

30

to make any statements inconsistent with the MD&A, and that with his knowledge of the efforts

to restrict information concerning the slow pay devices being used at Kmart in the third quarter

of FY 2001, he would have had reason to review the MD&A narrative on liquidity to assure

himself there were no leaks or slip ups in the 10-Q(3) or in the conference call.

While Mr. Conaway's simple argument that he did not sign or read the 10-Q(3) before it

was filed is appealing, there are genuine issues of material fact in dispute and considering all of

the evidence and circumstances, it is found that the evidence, looked at in a light most favorable

to the Plaintiff, would support a jury finding the following:

> Conaway authorized, oversaw, and directed the implementation of a course of
> conduct to achieve the singular purpose of concealing Kmart's deteriorating
> financial condition from the Board of Directors and Kmart shareholders and
> vendors.

> At the helm of one of the largest retailers in America, Mr. Conaway was
> responsible for the company's accountability even if he did not personally prepare
> the Form 10-Q(3).

> Conaway and his select team created a strategy involving the AP System and
> Project SID to cope with the liquidity crisis in the third quarter of FY 2001 and to
> conceal the crisis and the mechanisms for dealing with it from the Board, the
> shareholders, and from their vendors and analysts and other participants on the
> November 27 conference call. (Dkt. #67, McDonald Dep. 35-37, 107-09, 114,
> 122, 141-44, Ex. O McDonald Dep., Ex. O)

> CEO Conaway orchestrated a fraudulent and elaborate scheme to stretch
> payments to vendors, coverup and provide false information to conceal that
> scheme, and that his actions were central in the perpetration of that scheme and
> contributed to the material misstatements and omissions in the MD&A section on
> liquidity in the Kmart 10-Q(3) for 2001.

> CEO Conaway did the above with the requisite scienter to find primary liability
> under Section 10(b) of the Exchange Act and SEC Rule 10b-5.

(Dkt. #67, McDonald Dep. 35-37, 107-09, 114, 122, 141-44, Ex. O McDonald Dep., Ex. O)

In light of these factual questions, Mr. Conaway's motion for partial summary judgment

on Count 1 is DENIED.

### (6) Counts 2 and 3.

Count 2 alleges that defendants aided and abetted Kmart's violation of Section 10(b) of the Exchange Act and Rule 10b-5, and Count 3 alleges that defendants aided and abetted Kmart's violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-13 promulgated thereunder, 17 C.F.R. §§ 240.12b-20 and 240.13a-13.  Counts II and III are expressly based on the MD&A, and not on the conference call. (Compl. ¶¶ 46 (Count II) and 49 (Count III))

In addition to the argument that Kmart did not commit a violation of Section 10(b) or Rule 10b-5, Defendants argue that Kmart did not violate Section 13(a) or Rules 12b-20 and 13a-13.  For reasons note above, although there are substantial disputed issues of fact, a reasonable jury could find that Kmart in its MD&A violated Rule 10b-5 and Section 10(b) of the Exchange Act.

For corporations subject to periodic reporting requirements of Section 13(a) of the Exchange Act there is a violation if one or more of the corporation's required filings (such as a Form 10Q ) is materially inaccurate, or that the corporation failed to "add material information that was necessary to make the required statements or reports, in light of the circumstances in which they were made, not misleading." *SEC v. Coffman*, 2007 WL 2412808 at *11 (D. Colo., Aug. 1, 2007).  Section 229.303(b) of Item 303 detailing the periodic financial reporting requirements specifies the discussion and analysis required in reports filed for "interim periods,"

32

such as a Form 10Q.[11]  Consistent with the purpose underlying MD&A of allowing investors "to

look at the company through the eyes of management" (SEC Rel. No. 33-6835, at 4, Ex. AAA),

management must discuss and analyze particular aspects of the company's financial condition --

liquidity[12], capital resources, results of operations, off-balance-sheet operations and contractual

obligations -- insofar as needed to enable a reader to assess "material changes" that have

occurred in those items (1) since the beginning of the current fiscal year, or (2) since the

corresponding interim period in the company's previous fiscal year.  *Id.* at Section 229.303(b)(1)

and (2).  *See also* Instruction 3 to Paragraph (b) of Item 303.

      Defendants contend that there were no "material changes" requiring discussion in the

_____

[11] Regulation S-K identifies the specific disclosure requirements in an issuer's MD&A.
17 C.F.R. § 229.  Items 303(a) and (b) of that Regulation address liquidity. Under Item 303(a) an
issuer must

> Identify any known trends or any known demands, commitments,
> events or uncertainties that will result in or that are reasonably
> likely to result in the registrant's liquidity increasing or decreasing
> in any material way. If a material deficiency is identified, indicate
> the course of action that the registrant has taken or proposes to take
> to remedy the deficiency. Also identify and separately describe
> internal and external sources of liquidity, and briefly discuss any
> material unused sources of liquid assets.

17 C.F.R. § 229.303(a).  Item 303(a)(1) requires issuers to "identify and separately describe
internal and external sources of liquidity, and briefly discuss any material sources of liquid
assets." 17 C.F.R. § 229.303(a)(1).  While Item 303(a) generally applies only to annual filings on
Form 10-K, Item 303(b), Interim periods, specifies that the MD&A in a quarterly Form 10-Q(3)
"shall include a discussion of material changes in those items specifically listed" in Item 303(a).
17 C.F.R. § 229.303(b).  Item 303(b)(1) also requires that the quarterly MD&A "discuss any
material changes in financial condition" from the end of the previous fiscal year and
year-over-year. 17 C.F.R. § 229.303(b)(1).

[12]  The instructions to Item 303(a) define liquidity as "the ability of an enterprise to
generate adequate amounts of cash to meet the enterprise's need for cash."  17 C.F.R. §
229.303(a), Instr. 5.

33

MD&A.  Further on the issue of what was material, Defendants submit that no reasonable shareholder or investor could have found it significant that Kmart lacked the funds to pay its debts as they came due and delayed over $1 billion in payments owed to its vendors.  Indeed, neither PriceWaterhouseCoopers nor the SEC, both intimately aware of the requirements of Item 303,  identified any material differences between Kmart's 2000 and 2001 10-Q filings.

The factual footing to Kmart's premise is called into question by the deposition testimony of Plaintiff's expert, Douglas Carmichael.  He testified that Kmart's liquidity crisis was material both quantitatively and qualitatively.  He also noted that Defendants efforts to conceal the liquidity crisis reflect adversely on Kmart's management integrity, which is also pertinent to materiality. (Dkt. #67, Carmichael Rpt. 16-18, Ex. XX, *Basic v. Levinson*, 485 U.S. at 231-32.)

Defendants' alleged misrepresentations and omissions did not just occur on November 27, 2001 – they spanned a period of some five months, from August 2001 to January 2002.  The Defendants told the same contrived story about Project eLMO over and over to Kmart's vendors, General Counsel and outside auditor (Dkt. #67, Levin Dep. 31, Ex. L; Ex. PP; Sabony Dep. 73, 78-81, Ex. S; Bram Dep. 27-28, Ex. G, Adamson Dep. 83-84, Ex. B; Stallkamp Aff. 2, Ex. U; Stallkamp Arb. 459-61, Ex. T, Kelley Dep. 51-54, Ex. K, Murphy Dep. 127-30, Ex. Q)  A trier of fact may properly regard the Defendants' pattern of deception as evidence of their intent to deceive the investing public on the conference call and in the 10-Q(3), although the conference call is not directly involved in Counts 2 and 3.   *In re Qwest Comm. Intern. Sec. Litigation*, 387 F. Supp. 2d 1130, 1147 (D. Colo. 2005).   Conaway testified at his deposition that Project eLMO was the cause of  payment delays and that the basis for this assertion was a discussion between himself and Kmart's head of apparel merchandising, Lorna Nagler. (Conaway Dep. 126-27, 129,

34

Ex. H)  Ms. Nagler, however, testified that she never told Conaway that Project eLMO caused

Kmart's vendor payment delays, because Project eLMO was not the cause. (Nagler Dep. 14-19,

Ex. R)

Defendants agree that the 2001 third quarter liquidity problem facing Kmart was a crisis

requiring extraordinary measures to avoid insolvency. (Dkt. #67, Conaway Dep. 24-25, 29, 33-

38, 61-62, 89-90, 209-10 Ex. H; Ex. II at 1, McDonald Dep.  37-38, 53-55, 126, 209, Ex. O)  The

Defendants' expert Gerald Backman conceded in his deposition that a material liquidity event

must be disclosed under Item 303. (Dkt. #67, Backman Dep. 346-47, Ex. E)

The materiality of Kmart's reporting violations is a matter for the jury.  *See TSC*

*Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 at 450 (1976).  There is basis in the record for

the jury to find that the omissions and misstatements in the 10-Q(3) were material both

quantitatively and qualitatively.  A liquidity crisis that prompted Kmart's management to

withhold over $1 billion in vendor payments just months before the company's bankruptcy filing

is large enough that the jury may reasonably find it to be material.  Clearly a discussion of

Kmart's liquidity crisis would have been material to a reasonable investor.  The SEC's expert

Douglas Carmichael will testify that the payment delays were also material because of the strain

on Kmart's relationships with its vendors. (Dkt. #67, Carmichael Rpt. 18, Ex. XX; Stallkamp

Arb. 459-60, Ex. T)  Defendants' expert Avram Tucker confirmed that the wearing away of

vendor confidence in Kmart was one of the factors leading to Kmart's bankruptcy. (Dkt. #67,

Tucker Rpt. 48-49, Ex. ZZ)(citing SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir. 1974)).  The

increased liquidity problem in the third quarter and the extraordinary means of coping with it in a

web of delays and deceptions could be found to be a material change since the beginning of the

current fiscal year or since the corresponding interim period in the company's previous fiscal year.

 While there are multiple disputed issues of fact, for reasons similar to why a reasonable jury could have found that the MD&A involved false and misleading statements and did not adequately reveal that Kmart's AP System and Project SID were a primary means for Kmart to cope with its liquidity crisis in the third quarter of FY 2001, such a jury could find that Kmart in the third quarter of FY 2001 faced material changes in liquidity and in means of coping with the liquidity crisis since the beginning of the current fiscal year or since the corresponding interim period in the company's previous fiscal year.  Thus, a reasonable jury could find that Kmart violated  Section 13(a) and Rules 12b-20 and 13a-13 in their 2001 10-Q(3).

### (7) Aiding and Abetting

"A person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *SEC v. Washington Co. Util. Dist*., 676 F.2d 218, 224 (6th Cir. 1982)

As noted in the preceding section a reasonable jury could find that the liquidity crisis in the third quarter of FY 2001 and the slow pay means of dealing with it were material changes since the beginning of FY 2001 or since the third quarter of FY 2000.   In addition, based on the facts discussed above with regard to Defendants Conaway and McDonald a reasonable  jury could find that:

> Each of these two Defendants was a central player orchestrating Kmart's withholding payments from vendors to deal with Kmart's liquidity crisis in the third quarter of FY 2001;

36

These two Defendants the Defendants limited the number of people who were made aware of the nature and scope of the liquidity crisis and of the extraordinary means of dealing with it;

These two Defendants devised a deceptive and contrived explanation involving Project eLMO and "talking points" to deceive vendors, Directors, Kmart's general counsel and external auditor  and the investing public;

These two Defendants had corporate fiduciary obligations as well as obligations under the federal securities laws to provide accurate information to Kmart's Board, general counsel, auditor, and the investing public;

These two Defendants by their actions and inactions contributed to the MD&A on liquidity in Kmart's 2001 10Q(3) being false and misleading in that it included one or more materially inaccurate statements.

These two Defendants by their actions and inactions contributed to the MD&A on Liquidity in Kmart's 2001 10Q(3) being false and misleading in that it failed to "add material information that was necessary to make the required statements or reports, in light of the circumstances in which they were made, not misleading."

Each of these two Defendants had a general awareness that his role was part of an overall activity that was improper;

Each of these two Defendants knowingly and substantially assisted in Kmart's violation of Section 10(b) of the Exchange Act and Rule 10b-5;

Each of these two Defendants knowingly and substantially assisted in Kmart's violation of  Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13;

Alternatively, if the actions of either Defendant is not found to be knowing and intentional, each of these two Defendants could be found by reasonable juror to have acted recklessly in that their acts and omissions constitute highly unreasonable conduct and an extreme departure from the standards of ordinary care with the danger of their conduct resulting in a violation of Sections 10(b) and 13(a) of the Exchange Act being obvious to any reasonable corporate CEO or CFO in a similar situation.

Defendants argue that the Sixth Circuit requires "actual knowledge" to find liability on

an aiding and abetting claim.  Plaintiff submits that the evidence of Defendants' scienter is sufficient to go to the jury under either standard.  In support Plaintiff relies on the Court's Sept. 29, 2006, Order denying the Defendants' Rule 12 motions on the aiding and abetting claims, which held that the complaint sufficiently alleged that Conaway "knew or was reckless in not knowing" that Kmart's MD&A was false and misleading and Defendant McDonald "was generally aware of the improper activity." (Dkt. # 24, 9/29/06 Order, pp. 9, 11-12).  As such, they may be held liable for aiding and abetting Kmart's reporting violations arising out of the 10-Q(3) filing.

On the element of knowledge, a trier of fact could find that Defendants knowingly provided substantial assistance to Kmart's disclosure violations.  They were the chief decision makers regarding Kmart's liquidity crisis and the response to it.  They authorized the program of delaying vendor payments, and actively concealed the program. (Dkt. #67, Moreland Dep. 70, Ex. P)  The filing was prepared in accordance with what was known to be the Defendants' desires not to divulge the liquidity crisis or Kmart's slow pay response.

Accordingly, Defendants motions for summary judgment under Counts 2 and 3 are DENIED.

### (3) Disgorgement

It is Plaintiff's position that Defendants' motion for summary judgment on the SEC's disgorgement remedy is premature, because as a general matter, disgorgement is a remedy designed to deprive a defendant of "ill-gotten gains." *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985).  In ordering disgorgement, courts have not required the Commission to determine the exact amount of the defendant's ill-gotten gains, rather, "disgorgement need only be a reasonable

38

approximation of profits causally connected to the violation." *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). As long as the measure of disgorgement is reasonable, courts have held that the wrongdoer should bear the risk of any uncertainty. *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995).

The Court's decision whether to order disgorgement, and in what amount, is a fact intensive one that many courts suggest should be considered only after a finding of liability. *See, e.g., SEC v. Buntrock*, 2004 WL 1179423 at *3 (N.D. Ill. 2004) ("[T]he defendants challenge the SEC's 'pleading' of the disgorgement remedy, that challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violation."); *SEC v. First Pacific Bancorp.*, 142 F.3d 1186, 1190 (9th Cir. 1998) (disgorgement ordered after summary judgment in favor of SEC); *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080 1087-88 (D.N.J. 1996) (disgorgement decided after summary judgment); *SEC v. Rogers*, 2000 U.S. App. LEXIS 11830, at *4 (9th Cir. 2000) (disgorgement considered after entry of consent judgment).

Despite courts' reluctance to rule on disgorgement at preliminary stages of cases, Defendant Conaway contends that none of his compensation was "causally connected" to the alleged fraud. (Dkt. #70, Exs. Y, Z, AA.) "Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (internal citations omitted). Similarly, Defendant McDonald argues that his salary and his retention loan forgiveness were contractual entitlements not related to any asserted misstatements or omissions in the MD&A or in the November 27, 2002, conference call.

Plaintiff asserts that it is premature to address the disgorgement issue, and that usually

39

discovery and argument on disgorgement is done after a finding  liability.  Yet, it points to the April 22, 2008, affidavit of Kmart Director Thomas Stallkamp,  who states that had he known that Mrssrs. Conaway and McDonald presented misleading information concerning Kmart's financial condition, including its liquidity and its reasons for delayed vendor payment, during the November 27, 2001 conference call for investors and analysis, and to the Kmart Board of Directors, and that Mr. Conaway lied to him personally, he would have recommended that the Kmart Board of Directors take punitive or disciplinary action against them. (Dkt. #67, Stallkamp Aff. 2, Ex. U)  James Adamson, the Chairman of the Board's Finance Committee testified that Kmart's Board would never would have approved  the program to systematically delay vendor payments. (Dkt. #67, Adamson Dep. 70-72, Ex. B; Adamson Arb. 836-37, Ex. A )  Undertaking such a program and keeping it from the Board, outside auditor, and in house General Counsel are acts that could reasonably lead to a adverse employment action.  While somewhat thin, Mr. Stallkamp affidavit and other circumstantial facts creates a genuine issue of material fact on the SEC's entitlement to disgorgement as a remedy.

Defendants counter that July 25, 2005, Kmart Creditors Trust Arbitration Panel Chaired by George Pratt unanimously ruled in Mr. Conaway's favor with full knowledge about the AP System and Project SID, and they argue that neither Defendant had any of their compensation limited even after the alleged wrongdoings became known in 2001.  While this evidence may not be admissible before a jury on the merits, it does seem to have a legitimate significance on the issue of disgorgement.

Maintaining a fraudulent scheme so that one may continue to reap the benefit of a salary or other employment related benefits is enough to support a disgorgement order.  *See, e.g., SEC*

40

*v. First Pac. Bancorp*, 142 F.3d 1186, 1992 (9th Cir. 1998) (affirming disgorgement order when defendant's fraud extended life of bank from failure and allowed defendant, as Chairman of the Board, CEO , and corporate counsel to continue drawing "hundreds of thousands of dollars in salaries, commissions, and consulting, management and legal fees"); *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005) (ordering disgorgement of half of salary for one when fraud delayed the collapse of a church).  While it is a issue of material fact to be determined at trial, had the stretching of vendors been disclosed or had it not occurred, Kmart might have been forced into bankruptcy earlier and Defendants tenure with the corporation shortened substantially as in *First Pac. Bancorp* and *Church Extension of the Church of God* .

This evidence provides a basis for the SEC to seek disgorgement of the Defendants' compensation and McDonald's retention loan forgiveness after the vendor payment delays were put in place. The Court's consideration of the appropriate amount of disgorgement will turn on facts presented at trial, and Defendants will be free to question Mr. Stallkamp during the remedies phase of trial. *See, e.g., SEC v. Penn Central Co.*, 450 F. Supp. 908, 916 (E.D. Pa. 1978) (denying summary judgment as to disgorgement of compensation related to securities violation on ground that relief should be reserved for trial).

Defendants' motions for summary judgment on disgorgement are denied.

For the above stated reasons Defendants motions for summary judgment are **DENIED**

Date: March 31, 2009                                        s/Steven D. Pepe_____
Ann Arbor, Michigan                                        United States Magistrate Judge

41

Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 31, 2009 .

s/Jermaine Creary
Deputy Clerk