UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,
        Plaintiff,                      CASE NO.: 2:05-CV-40263

vs.

                                          MAGISTRATE JUDGE STEVEN D. PEPE

CHARLES C. CONAWAY
        Defendant.
_____/

**MEMORANDUM OPINION GRANTING PLAINTIFF'S MOTION
TO ADMIT EXHIBIT 233 AT TRIAL (Dkt. #81) AND DENYING DEFENDANT'S
MOTION TO EXCLUDE EXHIBITS 20, 233, AND 289A AT TRIAL (Dkt. # 98)**

Plaintiff United States Securities and Exchange Commission (the "SEC") moved for a ruling that SEC Trial Exhibit 233, an electronic data file in Excel format created by Kmart's former Assistant Treasurer Mark Moreland, has been properly authenticated and is admissible as a record of regularly conducted activity under Fed. R. Evid. 803(6). Defendant Charles Conaway sought a ruling to exclude SEC Trial Exhibits 20, 233, and 289A on the grounds that the exhibits are too unreliable and do not satisfy the business record exception to the hearsay rule (Dkt. # 98). On April 13, 2009, a telephonic hearing was held on Plaintiff's motion to admit Exhibit 233. At that April 13 hearing, this Court provisionally ruled that Exhibit 233 was admissible as a business record under Fed. R. Evid. 803(6) based on the declaration under Fed. R. Evid. 902(11) of its one time custodian and creator, Mark Moreland. This Court directed the parties, however, to resume the deposition of Mr. Moreland and report on his testimony concerning the creation and maintenance of Exhibit 20 and 233. The parties took Mr.

1

Moreland's deposition on April 23, 2009, at which Plaintiff, over defense counsel's objection, produced proposed Exhibit 289A that Mr. Moreland created shortly before the deposition. A second hearing on SEC Trial Exhibits 20, 233, and 289A was held in person on May 11, 2009.

Because these are critical evidence for the SEC to establish the scope of Kmart's slow paying of vendors in the third quarter of 2001, an opinion is warranted to supplement the reasons given on the record on May 11 for admitting these exhibits. For the following reasons and those stated on May 11, the SEC's motion to admit SEC Trial Exhibit 233 at trial was **GRANTED** and Conaway's motion to exclude Exhibits 20, 233, and 289A was **DENIED**. At trial, after the videotaped deposition of Mark Moreland was played, Plaintiff's SEC Trial Exhibits 20, 233, 289 and 289A used in that deposition were admitted on May 15.

## I.   BACKGROUND

Exhibit 233 is an electronic spreadsheet in Excel format labeled "PROJECT SID MASTER TRACKING DOCUMENT." Exhibit 20 is a series of documents entitled "Liquidity Cushion Forecast." Plaintiff's Exhibit 289 is a printed copy of a version of Exhibit 233 which was used in Mark Moreland's June 27, 2007, deposition, before Exhibit 233 was located and obtained from Sears Holding Company, which took over Kmart after its reorganization. Both Exhibit 20 and Exhibit 233 were created and used by Mr. Moreland in the third and fourth quarters of 2001 in connection with his management of Project SID, Kmart's systematic program of deselecting invoices to delay payments to Kmart's vendors. Exhibit 289A is a modified version of Exhibit 233 reproducing certain data on the first summary page from historical data existing on subsequent pages of Exhibit 233. These data had been erased by Mr.

Moreland at some point before he left Kmart.[1]  In late April 2009, the SEC asked Mr. Moreland to created a modified Exhibit 289A from Exhibit 233 by reinstating certain embedded formulas into columns on the summary page one that he had earlier omitted. This modification thus added information about Kmart's payment to hardline vendors from subsequent pages to the spreadsheet's summary page.  Mr. Moreland also embedded a new formula not used in 2001 that added a summary column of the aggregate outstanding late payments by date held up under Project SID.  This column increased with delayed and overdue payments withheld under Project SID and decreased as those delayed payments were eventually paid.  The SEC used Exhibits 20, 233, and 289A at trial to prove the timing and the magnitude of the vendor payment delays under Project SID, as well as to establish Conaway's understanding of the financial context affecting Kmart in the third quarter of 2001.

Mr. Conaway objected to each of these documents as inadmissible hearsay, claiming that none qualify for the business record exception under Fed. R. Evid. 803(6).

**II.    ANALYSIS**

The SEC has sufficiently established that Exhibit 20 and 233 qualify as business records. In his June 27, 2007, and April 2009, depositions, Mr. Moreland testified at length regarding the creation and review of the Exhibit 233 (the "SID Master Tracking Document").  Exhibit 233 was created by Mr. Moreland over the Labor Day weekend of 2001, and revised by him on a daily basis until early December 2001. (Moreland April 23, 2009, Deposition at 25) Mr. Moreland

---

[1] While the exact circumstances of the deletions was not discussed, this document was used by Mr. Moreland and others to forecast the future liquidity status of Kmart in the Fall of 2001. Thus Exhibit 233 was necessarily used as a historical record. As a result, past data could be deleted without the data used for the current forecasting being affected.  Also, the deleted data was derived from data in later pages of Exhibit 233 which was not deleted or modified.

3

used it in managing Project SID by tracking Kmart's program for delaying vendor payments to assure Kmart maintained a liquidity cushion. (*Id*. at 48)  It was a project assigned to him at a September meeting with Messrs. McDonald and Conaway. (*Id*. at 47)  Mr. Moreland described how he prepared the spreadsheet from source data that included daily cash flow projections generated within Kmart's Treasury department and Mr. Moreland's own database of delayed vendor invoices. (Moreland June 27, 2007, Deposition at 217-18)  Mr. Moreland developed the spreadsheet contemporaneously with the vendor payment delays. (*Id.* at 218).  He regarded the spreadsheet as part of the "SID infrastructure." He relied on it "to manage the amount of payables that had to be held on a daily basis" in order to keep Kmart from becoming insolvent. (*Ibid.*).  Mr. Moreland also used the SID Master Tracking Document to brief his supervisor John McDonald, as well as other Kmart executives. (*Id.* at 218-19).  And Mr. Moreland confirmed that he generated reports from the SID Master Tracking Document "on a regular basis" for the group of executives – John McDonald, Cecil Kearse, Jeff Stark and occasionally Scott Gilbert – who worked on Project SID. (Moreland April 23, 2009, Deposition at 44).  This group met roughly weekly. (*Id.* at 45)  While Exhibit 233 was not created to provide an audit quality trail of data on Project SID, it was an estimate used for forecasting that he and other executives relied upon. (*Id.* at 45)  He spend about one third of this time working on Project SID, and he believed Exhibit 233 accurately reflected what happened with Project SID.  (*Id.* at 47 & 49)  He noted it was "directionally accurate, meaning plus or minus 10%." (*Id.* at 65-66)

      Mr. Moreland also testified at length on the creation of Exhibit 20.  The October 4, 2001, Liquidity Cushion Forecast lists eleven changes that Kmart made to its Accounts Payable system to delay vendor payments and it estimates the liquidity savings attributable to each. (*Id.* at14)

The total of all eleven AP system and other listed payment delays is $511 million. (*Id.* at 20-21) These estimated savings were apparently separate from the Project SID delays and savings. Mr. Moreland prepared the document for Mr. McDonald for presentation to Kmart's Executive Leadership Team, including Conaway, on or about October 4, 2001. (*Id.* at 9-10) Because of the liquidity crisis, the management of payables was an important, high-profile concern within Kmart's executive ranks. (*Id.* at 17-19) Mr. Moreland, whose job as Assistant Treasurer was "to manage the liquidity of the corporation," (*Id.* at 16) knew that Mr. Conaway and others would be relying on his figures. (*Id.* at 19) The two $150 million estimates for each of the 5 day AP Systems delays were "top line estimates" or "a ballpark calculation" not meant to be exact, but they represented "the best estimate [Kmart] could make at the time i.e. down the middle." (*Id.* at 14-15) They were done by him "[e]stimating based on what a day of payables is worth to the corporation" – $ 30 million (*Ibid.*) Mr. Moreland considered Exhibit 20 to be a "realistic estimate" when he made it, and he expected the Executive Leadership Team to rely on it, and at the time of his deposition he continued to have confidence in its accuracy. (*Id.* at 21-22)

      Based on this record, the SEC has satisfied for Exhibits 233 and 20 the test for business records under Fed. R. Evid. 803(6). *See United States v. Baker*, 458 F.3d 513, 518 (6th Cir. 2006). Mr. Moreland's work in managing Kmart's vendor payment delays was "a regularly conducted business activity" at least from September 2001 to January 2002. *Id*. The effort involved hours of work every single day and was authorized by the company's Treasurer McDonald and Chief Executive Officer Conaway. The SID Master Tracking Document and Liquidity Cushion Forecast were "kept in the regular course" of Kmart's business during that period. *Id*. It was Mr. Moreland's "regular practice" to maintain the documents and to generate

5

reports from them, which he used both for his own work and to brief his superiors. *Id*. It was a "business duty" of Mr. Moreland to make and regularly maintain records of this type in order to "to manage the amount of payables that had to be held on a daily basis" in order to keep Kmart from becoming insolvent. (Moreland Dep. at 218). The SID Master Tracking Document and Liquidity Cushion Forecast were also made by a person "with knowledge," as Mr. Moreland had detailed knowledge of the underlying vendor payment delays and their impact on Kmart's liquidity. *Baker*, 458 F.3d at 518.

Defendant contends the SID Master Tracking Document constitutes double hearsay. Yet, the underlying data from which the spreadsheet was created came from Kmart's internal financial records prepared in the ordinary course of business. *See United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008) (noting that double hearsay becomes an issue in a business record when record relies on information collected by someone outside the company). Further, because the SID Master Tracking Document is itself a business record, the SEC is not required to excavate and produce all the original source data that went into its creation. *See Peirick v. Ind. University-Purdue Univ. Indianapolis Ath. Dep't.* No. 03-1965, 2005 U.S. Dist. LEXIS 32479 (S.D. Ind. June 27, 2005) (rejecting argument that witness summaries within administrative review constituted double hearsay), *vacated in part on other grounds*, 510 F.3d 681 (7th Cir. 2007). Defendant's reliance on *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627 629-30 (2d Cir. 1994), is misplaced, as the Second Circuit found a business record inadmissible based on evidence suggesting the proffered document was not prepared in the ordinary course of business, rather than any suggestion that it constituted double hearsay.

Defendants also challenge the SID Master Tracking Document and Liquidity Cushion

6

Forecast as unreliable.  Yet, indicia of reliability do exist.  Mr. Moreland testified that he prepared both documents in order to perform his assigned duties, and described his use of the documents in managing vendor payments and briefing his supervisors.  (*See, e.g.,* June 2007 Moreland Dep. at 218-220; April 2009 Moreland Dep. at 14-21).  Any inconsistencies that do exist between the SID Master Tracking Document and Liquidity Cushion Forecast and other evidence in the case could be argued to the jury and considered as part of the weight of the evidence.  The SEC does not present the SID Master Tracking Document or Liquidity Cushion Forecast as a basis for auditing every penny withheld from Kmart's vendors, but rather as a measure of the scale and magnitude of the program.  These documents were developed as estimates and were relied upon by top management to forecast liquidity of Kmart in the fall of 2001.  The SID Master Tracking Document was considered accurate within a plus or minus of 10%.  There is no reason to believe that any more accurate documents exist to reflect the magnitude of a covert program authorized under the direction of Treasurer McDonald and CEO Conaway.  It would be ironic indeed, if Mr. Conaway, who authorized and directly or indirectly relied on estimates prepared by Mr. Moreland in 2001as part of an extraordinary covert operation, could in 2009 be spared from confronting those documents in his trial based on their "unreliability."

      The SEC offers both exhibits to prove Mr. Conaway's state of mind by establishing what he understood Kmart's financial condition to be during the third quarter of 2001.  For this purpose, their being business records or being precisely accurate is not a necessary condition so long as Mr. Conaway saw or became aware of the information concerning these devices for delaying payments to vendors.  There is circumstantial evidence that Mr. Conaway reviewed

Exhibit 20 at the October 4, 2001, Executive Leadership Meeting.  Thus, this forms a basis from which a jury could conclude that Mr. Conaway was aware that two AP Systems 5 day delays was of an order of magnitude of upwards of $300 million. The regular or weekly summary reports that Mr. Moreland generated for the SID working group of executives – John McDonald, Cecil Kearse, Jeff Start and occasionally Scott Gilbert – revealed hundreds of millions of additional payment delays attributable to Project SID to maintain Kmart's liquidity in the Fall of 2001. Because the liquidity problem at Kmart was regularly discussed at the weekly Executive Leadership Team meetings, chaired by Mr. Conaway and frequently attended by Treasurer McDonald and by Cecil Kearse, a  jury could conclude that at one or more of these discussions of how to deal with Kmart's liquidity problems, some reference to the magnitude of prioritizing invoices (Project SID) was discussed prior to November 27, 2001.[2]  Mr. McDonald's or Mr. Kearse's knowledge of the aggregate dollar impact of managing invoices would have been based in significant part on summary reports generated by Mr. Moreland from Exhibit 233 that were provided to these two individuals.

With respect to Exhibit 289A, Mr. Conaway is correct that the spreadsheet cannot qualify as a business record because Mr. Moreland created the exhibit in April 2009, over seven years after the events at issue.  The document, however, is derived from and modifies the business record Exhibit 233.  Mr. Moreland created the spreadsheet in connection with his April 23, 2009 deposition.  In that deposition, he explained how he generated the summary fields and

---

[2] This is not the only evidence of Mr. Conaway's knowledge of the magnitude of prioritizing invoices.  Upon his cross examination an October 27, 2001, email was introduced from CFO Jeff Boyer to CEO Conaway that referred to the "noise level" coming from the vendors and their factors and the need "to work down our nearly $800 million in past due invoices." (Plft. Exhibit 76).

calculations from Exhibit 233 which is an admissible business record. Much like a witness can authenticate a photograph not taken at the time of the event in dispute by describing its differences or even drawing in where a vehicle or person was, Mr. Moreland summarized various pages in Exhibit 233 onto the first summary page of Exhibit 233 and than added a summary aggregate column of the total outstanding value of prioritizing invoices as of various specific dates to create Exhibit 289A. This sort of summary calculation is permissible under Fed. R. Evid. 1006. It is also significant, that one of the primary objections about Exhibit 233 is that it uses as Kmart's projected 2001 receipts (i.e. dollar amounts for merchandise received) in the absence of project SID historical data from 2000, which defendant contends was a unique and atypical year. Yet, the most significant column on Exhibit 289A is the aggregate summary column, and that column can be derived from *actual 2001 data* up until early December where forecasted data began being utilized. This gives the most significant data on Exhibit 289A up to early December 2001 additional reliability.

     Mr. Conaway's counsel cross-examined Mr. Moreland at his deposition concerning the preparation of this exhibit and its contents. While there was some surprise that this exhibit had been created by Mr. Moreland without defense counsel's notice prior to the April 23, 2009, deposition, it is the type of exhibit that Mr. Moreland could have been asked to derive from the data in Exhibit 233 at his deposition or at trial had he testified live. Defense counsel had all of the underlying data available from April 23 until the start of trial and hearing on this motion held May 11, 2009. They have not demonstrated any errors in Mr. Moreland's calculations, nor any other showing of prejudice that would warrant excluding this as a summary trail exhibit. Exhibit 289A was deemed admissible as a trial exhibit.

Accordingly, Plaintiff's motion to admit Exhibit 233 into evidence at trial was **GRANTED**. Defendant's motion to exclude Exhibits 20, 233 and 289A was **DENIED**. Plaintiff's Exhibits 233, 289 and 289A were admitted at the end of Mr. Moreland's testimony on May 15, 2009.

Date: June 8, 2009                           s/Steven D. Pepe
Ann Arbor, Michigan                          United States Magistrate Judge


Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 8, 2009 .

                                             s/Jermaine Creary
                                             Deputy Clerk