UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                                          )
U.S. SECURITIES & EXCHANGE                 )
COMMISSION,                                          )
                                                          )        Civil Action No. 05-CV-40263
                              Plaintiff,               )
                                                          )        Magistrate Judge
              v.                                        )        Steven D. Pepe
                                                          )
CHARLES C. CONAWAY,                        )
                                                          )
                              Defendant.             )
_____)

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM
IN SUPPORT OF ITS REQUEST FOR REMEDIES**

                                        Alan M. Lieberman
                                        Robert I. Dodge
                                        Richard B. Skaff
                                        Attorneys for Plaintiff
                                        U.S. Securities and Exchange Commission
                                        100 F Street, N.E.
                                        Washington, DC  20549-4030
                                        (202) 551-4474 (Lieberman)
                                        Fax:  (202) 772-9245 (Lieberman)
                                        liebermana@sec.gov

Local Counsel:

Ellen E. Christensen
Office of the United States Attorney
  for the Eastern District of Michigan
211 West Fort St.
Suite 2001
Detroit, MI 48226
(313) 226-9112

July 30, 2009

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

   1.  Conaway's Violations ...................................................................................... 3

   2.  Conaway's Culpable Mental State .................................................................. 4

   3.  Conaway's Compensation and Ill-Gotten Gains ............................................ 7

SUMMARY OF PROPOSED REMEDIES ................................................................... 9

LEGAL STANDARDS AND ARGUMENT ............................................................... 10

   1.  Burden of Proof ............................................................................................ 10

   2.  Injunction, Officer-Director Bar, Disgorgement, and
       Civil Money Penalty .................................................................................... 10

       a.  Permanent Injunction Against Committing Future
           Violations of the Securities Laws ............................................................ 10

       b.  Public Company Officer and Director Bar .............................................. 14

       c.  Disgorgement and Prejudgment Interest ................................................ 15

       d.  Civil Money Penalty ............................................................................... 18

CONCLUSION ............................................................................................................ 20

## TABLE OF AUTHORITIES

### CASES

*Rowe v. Maremont Corp.*, 850 F.2d 1226 (7th Cir. 1988)............................................15, 16

*SEC v. AMX International*, 872 F. Supp. 1541 (N.D. Tex. 1994) .....................................16

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994) ........................................................10

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)..............................................................11, 16

*SEC v. Bocchino*, 2002 WL 31528472 (S.D.N.Y. Nov. 8, 2002).....................................17

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) ...............................................................11

*SEC v. First City Finance Corp.*, 890 F.2d 1215 (D.C. Cir 1989) .............................15, 16

*SEC v. First Finance Group of Texas*, 645 F.2d 429 (5th Cir. 1981)...............................9

*SEC v. First Jersey Sec. Corp.*, 101 F.3d 1450 (2d Cir. 1996)........................................15

*SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004) ........................................................9

*SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211 (E.D. Mich. 1991),
     aff'd, 12 F.3d 214 (6th Cir. 1993) .......................................................................16

*SEC v. Gruenberg*, 989 F.2d 977 (8th Cir. 1993) .......................................................10

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) .........................................................11

*SEC v. Hughes Capital*, 124 F.3d 449 (3d Cir. 1997) ....................................................16

*SEC v. Hughes Capital*, 917 F. Supp. 1080 (D.N.J. 1996)  ........................................15, 16

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) .......................................................10

*SEC v. Levine*, 517 F. Supp. 2d 121 (D.D.C. 2007) .........................................................14

*SEC v. Lipson*, 278 F.3d 656 (7th Cir. 2002).................................................................15

*SEC v. Lorin*, 76 F.3d 458 (2d Cir. 1996).......................................................................16

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ..........................10, 15

*SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996)...............................................................9

*SEC v. Musella*, 818 F. Supp. 600 (S.D.N.Y. 1993).........................................................16

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ..................................................................14, 16

*SEC. v. Randy*, 38 F. Supp. 2d 657 (N.D. Ill. 1999)..............................................11, 16, 17

*SEC v. Robinson*, 2002 WL 1552049 (S.D.N.Y. , Jul 16, 2002) ....................................16

*SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974) ...............................................................10

*SEC v. Thomas James Associates*, 738 F. Supp. 88 (W.D.N.Y. 1990)...........................16

*SEC v. Thorn*, 2002 WL 31412439 (S.D. Ohio, Sept. 30, 2002).....................................16

*SEC v. Wolfson*, 2008 WL 4053027 (10th Cir. Sept. 2, 2008) ........................................10

*SEC v. Youmans*, 729 F.2d 413 (6th Cir. 1984)...........................................................9, 11

*Steadman v. SEC*, 450 U.S. 91 (1981) ...............................................................................9

## STATUTES

### Exchange Act

Section 10(b)….. …………[15 U.S.C. § 78j(b)]...............................................................18
Section 21(d)(1)…………..[15 U.S.C. § 78u(d)(1)] ...............................................9
Section 21(d)(3)(A)……… [15 U.S.C. § 78u(d)(3)(A)] ...............................................17
Section 21(d)(2)…………...[15 U.S.C. § 78u(d)(2)] ...............................................13, 19
Section 21(d)(3)(B)(i)……..[15 U.S.C. § 78u(d)(3)(B)(i)] ...............................................18
Section 21(d)(3)(B)(ii)……[15 U.S.C. § 78u(d)(3)(B)(ii)] ...............................................18
Section 21(d)(3)(B)(iii)…… [15 U.S.C. § 78u(d)(3)(B)(iii)]...............................................18, 19
Rule 10b-5……………… [17 C.F.R §240.10b-5]. ...............................................18

IRS… [17 U.S.C. § 201.600(b)] ...............................................17

## OTHER AUTHORITIES

H.R. Rep. 98-355 (1983) reprinted in 1984 U.S.C.C.A.N. 2274.......................................15

H.R. Rep. 101-616 (1990) reprinted in 1990 WL 256464 (Leg. Hist.) .............................18

S. Rep. 101-337 (1990) reprinted in 1990 WL 263550 (Leg. Hist.)..................................18

# INTRODUCTION

The jury found the defendant Charles Conaway liable for a fraud that stretched over four months, involved intricate planning, and violated his fiduciary responsibilities to Kmart and its shareholders. The defendant's conduct was premeditated and directed toward a single end:  misleading the public about Kmart's financial condition.  At the heart of the fraud was a prolonged sequence of lies, those told by the defendant and those that he directed others to tell. Taken together, they present overwhelming evidence of Conaway's culpable state of mind.

The defendant's fraud was, at least for him, highly profitable.  Conaway received some $8,885,003 in payments from Kmart that, but for his fraudulent conduct, he either would not have received or would not have been allowed to keep.  The prejudgment interest on those ill-gotten gains amounts to an additional $4,795,571[1], for total ill-gotten gains related to the fraud of some $13,680,574.  And this largesse represents only a fraction of the total compensation Conaway received during his brief and disasterous tenure at Kmart.  For nineteen months of work Conaway was paid some $23.5 million.

If Conaway's fraud was richly rewarding for him, it was devastating for Kmart, its employees, and its shareholders.  Even if the fraud may not have caused Kmart's bankruptcy, there is ample evidence that the fraud contributed to it.  And there is no question that the fraud prevented investors from anticipating the filing and avoiding the loss of their investments.  These repercussions were felt disproportionately by citizens of Michigan, many of whose livelihoods and retirements, directly or indirectly, were tied to Kmart's fortunes.

---

[1]     The prejudgment interest calculation is based on the Internal Revenue Service rates of interest on tax underpayments and refunds.  The calculation is attached as Ex. J.

In his testimony before this Court, Conaway demonstrated no remorse and accepted no responsibility for his conduct and the harm it caused.  With stunning nonchalance, Conaway shifted the blame entirely to a revolving cast of scapegoats:  a dozing Board of Directors that "didn't care" [Conaway, 5/27/09 am at 103-04, 126, 131]; Chief Financial Officer Jeffrey Boyer, who should have reminded his boss of his disclosure obligations, yet was fired immediately after suggesting that Conaway tell the Board the truth about Kmart's financial condition and Project SID [Conaway, 5/27/09 pm at 173, *et seq*.]; the Controller, General Counsel, and Disclosure Committee who should have taken the fall for the incomplete and misleading MD&A disclosure, even though they prepared the document in conformity with Conaway's wishes [Conaway, 5/27/09 pm at 213, 230-33]; the mysteriously vindictive Kmart vendors who remained eerily silent in the face of Kmart's refusal to pay them and yet, inexplicably, attacked the CEO personally when the company went through its routine annual process of  weeding out the least important 25% [Conaway 5/27/09 pm at 161]; Eric Beder, the analyst who must have confused Conaway on the conference call with his "unclear" question, despite the seamless constancy between Conaway's "impromptu" answer and his prepared script [Conaway, 5/27/09 pm at 222-23, 5/28/09 pm at 208]; and Wayne Hood, the Prudential analyst who brought an otherwise healthy company to its knees simply by suggesting the possibility of bankruptcy in an analyst report [Conaway 2/13/08 dep. at 262-67]

The SEC does not ask that Conaway be penalized for failed marketing strategy, negligence, or poor business judgment.  Rather, he should be penalized for intentionally lying, and causing others to lie, about Kmart's financial condition.  Even if the remedies imposed by this Court cannot redress the financial loss that Conaway caused, they must

be commensurate with the brazenness of his deception and the magnitude of the harm. The remedies must stand, categorically, for the principle that those responsible for the governance of companies that rely on U.S. national markets to raise capital from the public will be held accountable for fraudulent conduct.

## STATEMENT OF FACTS

### 1.   Conaway's Violations

In early September 2001, defendant Conaway confronted a decision critical to Kmart's survival.  Early in the company's third quarter an inventory overbuy in excess of $850 million threatened Kmart's liquidity.  The stress on Kmart's daily operating cash flow was exacerbated by the September 11 attack and the stillbirth of Kmart's Blue Light Always marketing strategy.  Conaway knew from early in the third quarter that Kmart would need extraordinary measures to weather the looming liquidity crisis.

Conaway had two essential options -- one candor, the other deception.  The first would have entailed early and full disclosure to Kmart's Board of Directors, vendors, and bankers.  It would have required forging true partnerships with these constituents, each of whom had a stake in Kmart's survival, to guide the company through its liquidity challenge.  Conaway chose deception over candor.  When Kmart needed forthright leadership, Conaway set the company on a course of lies and half-truths that ultimately led to the largest retail bankruptcy filing in U.S. history to that time.

Kmart's Form 10-Q, filed while the liquidity crisis was still ongoing, was required to include a complete and accurate discussion of Kmart's liquidity and financial condition during the quarter.  Prepared in accordance with Conaway's directive to suppress any disclosure of the crisis, however, the Form 10-Q misled the investing public into

believing that all was well with the company's cash flow.  The document included no disclosure of the liquidity crisis or the fact that Kmart had delayed over $1 billion in vendor payments in an effort to survive it.  Indeed, the only affirmative statements in the MD&A on liquidity were positive.

During the November 27, 2001, third quarter conference call, the scripted remarks that Conaway and his lieutenant McDonald read anticipated that the company would have to address market rumors about Kmart's vendors not being paid.  Those remarks laid the blame firmly, and falsely, on Project eLMO.  When analyst Eric Beder asked Conaway a follow-up question on the market rumors Conaway continued the deception.  He attributed the payment delays to Project eLMO and the complaints to a small group of vendors that Kmart had stopped doing business with.  His deception had immediate consequences.  Taken in by the ruse, the next day Mr. Beder reiterated his "Buy Rating" for Kmart's stock.  [SEC Ex. 175 at 2]  Readers of his November 28 report were left with no idea of the liquidity crisis that had gripped the company and would result in the company's bankruptcy less than two months later.

### 2.    <u>Conaway's Culpable Mental State</u>

Conaway knew exactly what he was doing.  In response to the inventory overbuy that even he described as "reckless" [SEC Ex. 188], Conaway instructed Kmart's treasurer John McDonald to devise a system for withholding vendor payments to avoid a liquidity deficiency.  The system, known as Project SID, was approved by Conaway and implemented in mid-September.  [SEC Ex. 11; Moreland 6/27/07 dep. at 68]  Conaway received formal liquidity forecasts from McDonald at least weekly.  [Moreland 6/27/07 dep. at 88-90]  Conaway knew the liquidity challenge caused in part by the overbuy was

more severe than the usual seasonal crunch and considered the liquidity crisis to be among his top priorities. [Conaway 2/13/07 dep. at 26] Conaway knew that without extraordinary measures Kmart's Treasury department was forecasting a $900 million deficit by mid-October. [SEC Ex. 15]

Conaway knew that Merchant Workbench had been disabled to prevent vendors from tracking their invoices. [Kearse 5/20/09 pm v.1 at 49; Conaway 2/13/08 dep. at 122] In order to deflect the complaints of vendors who called to complain about not being paid, Conaway instructed McDonald to draft talking points falsely blaming Project eLMO. [SEC Ex. 35; McDonald 5/28/09 pm at 270] He knew that Project eLMO was not the true reason for the payment delays. [Kearse, 5/20/09 pm v.1 at 6-7, 45; Conaway 2/13/08 dep. at 236-37] He lied to the CEO of Sunbeam about Kmart's delinquent payments to that vendor and denied three times under oath that the letter containing the lie was his. [SEC Ex. 107,108; Conaway 2/13/08 dep. at 169-71, 5/27/09 pm at 162-63, 5/28/09 am at 9-11]

When Conaway's Chief Financial Officer Jeffrey Boyer warned him during their November 8 one-on-one meeting that Kmart's past due payables balance and liquidity stress had become acute, requiring that the company explore a new financing structure and, more important, make full disclosure to the Board, Conaway fired him the very next day. [SEC Ex. 97 at JNB23; Boyer 7/19/07 dep. at 167-78]

The evidence establishing Conaway's actual knowledge of the liquidity crisis facing Kmart, Project SID, and the cover-up of the crisis is voluminous and essentially unanswered. Conaway's denials on the core issues are refuted by every other witness who testified at trial. Lorna Nagler was emphatic that, despite Conaway's effort to use

her as an alibi, she never told him that Project eLMO threatened the success of Blue Light Always or interfered with the payment of vendor invoices.  [Nagler 4/18/08 dep. at 14-19]  Thomas Stallkamp refuted Conaway's contention that by September 2001 the Board was briefed on Project SID, the inventory overbuy, and its impact on Kmart's liquidity.  [Stallkamp 5/18/09 am v.2 at 33-34, 38-39, 44-46, am v.3 at 6-7]  John McDonald testified to Conaway's participation in the development of the talking points.  [McDonald 5/28/09 pm at 270]  Cecil Kearse testified that he knew Project eLMO was not the cause of the vendor payment delays and believed, based on meetings and conversations, that Conaway knew this as well.  [Kearse 5/20/09 am v.3 at 27, pm v.1 at 6-7, 45]  Mr. Kearse also testified that everyone on the Executive Leadership Team knew that Merchant Workbench had been shut down and why.  [Kearse 5/20/09 pm v.1 at 49]

Perhaps most tellingly, Conaway's trial testimony was directly contradicted by testimony that he gave in 2003 and 2005 in connection with other proceedings.  With respect to Conaway's letter to Sunbeam's Jerry Levin, Conaway admitted in 2003 that, notwithstanding his denial on the stand of ever having seen the document, he did write the Levin letter and even explained in some detail what he hoped to accomplish by doing so.  "I was writing him to communicate to him of what I thought was going to be the resolution. . . . I was just trying to communicate to him where we were and when we thought we would be caught up."  [Conaway 1/23/03 dep. at 443]

Conaway also contradicted himself with respect to the preparation of the Project eLMO talking points.  At trial, he maintained that he had "no idea in totality what vendors were told" and assumed "anything that we put in a talking point would be truthful."  [Conaway 5/28/09 pm at 254-55]  In 2005, however, Conaway admitted that

6

he "approved the course of conduct" of "providing the explanation [to vendors] that the reason for the slow payments was a computer mistake" even though the payments had been intentionally delayed.  [Conaway 2/10/05 dep. at 236-37]

### 3.  Conaway's Compensation and Ill-Gotten Gains

While others lost everything, Conaway profited handsomely from his nineteen-month tenure at Kmart.  According to Kmart's public filings, Conaway's compensation from May 2000 to March 2002 amounted to some $22,512,362.  [Ex. A at 71]  This does not include the additional $12,692,950 in stock options and restricted stock grants [id.] he received, and which presumably lost most or all of their value in the bankruptcy.  Even excluding the stock options and restricted shares, Conaway's pay package worked out to approximately $1.2 million for each month of work at Kmart.  Despite his having led the company into bankruptcy, Conaway apparently found this compensation package inadequate to his needs.  Following his termination, Conaway filed a claim against the trustee for his bankrupt former employer demanding an additional $19,635,003.  [Ex. I] Conaway later settled this claim for a payment of approximately $1 million [Conaway 2/13/08 dep. at 271], bringing his total Kmart compensation to around $23.5 million, excluding stock and options, for nineteen months of work.

Of the $23.5 million that Conaway received from Kmart, at least $8.9 million represents payment that he would not have received but for the fraud for which the jury found him liable.  It is this $8.9 million, plus interest, that the SEC seeks to recover in its disgorgement claim.[2]

---

[2]     The Court should not consider the attorneys' fees and associated expenses paid to defend Conaway in this and prior actions as an offset against his ill-gotten gains.  Although discovery has not been taken on this point, the SEC understands that Conaway's defense costs have been borne by Kmart's directors' and officers' liability insurance carrier.  [*See* Ex. D at 4-5 (providing for indemnification)]

Under the terms of Conaway's amended Employment Agreement [Ex. C at 3], Conaway in May 2001 received a $5,000,000 "Executive Loan" payment, repayable in 2006.  Under the terms of the Agreement, if Conaway were to be fired from Kmart on a "not for cause" basis, the loan repayment obligation would be forgiven.  In addition, Kmart would have to pay Conaway a "grossed-up" amount to cover all federal and state income tax liability associated with the loan forgiveness.  [Ex. C at 3-4; Ex. B; Ex. D at 2-3]

Following the bankruptcy filing, Kmart's Board of Directors voted to terminate Conaway's employment as of March 11, 2002.  [Ex. D]  At that time, the Board did not know that Conaway and his subordinates had systematically concealed from them the full magnitude of Kmart's liquidity crisis.  The Board did not know that Conaway and his subordinates had instituted the Accounts Payable System changes and Project SID, which delayed over $1 billion in vendor payments.  And the Board did not know that Conaway and his subordinates were using Project eLMO as a fictitious cover story to conceal the payment delays.

Believing their CEO had been honest with them, the Board did not fire Conaway for cause.  [Ex. D at 1]  As a result, Conaway's obligation to repay his $5 million loan was immediately forgiven.  In addition, Kmart made a supplemental payment of $3,885,003 to cover the associated tax liabilities.  [Ex. D at 2-3]

Had Conaway not engaged in the fraud for which the jury found him liable, he would not have received, or been allowed to keep, the $8.9 million.  Conaway could not have deceived the investing public without at the same time deceiving Kmart's Board, which was appointed to protect the shareholders' interests.  Had the Board -- and the

investing public -- been told the truth about the crisis and the actions taken in response to it, including the vendor payment delays and the Project eLMO lie, they would likely have terminated Conaway for cause and denied him the $8.9 million payday.  Indeed, after an internal investigation revealed Conaway's fraudulent conduct to the Board in November 2002, the Board determined that grounds existed to terminate Conaway for cause and took affirmative steps to try to recover the money, including authorizing a committee of creditors to proceed with an arbitration claim.  [Ex. H; Ex. I at 50-51]

## SUMMARY OF PROPOSED REMEDIES

The SEC seeks two types of relief:  The first is a set of measures that will protect the public from Conaway's potential wrongful activities in the future.  The second consists of monetary remedies that will hold Conaway financially responsible for the consequences of his actions.

Specifically, the SEC requests an order and final judgment:

(1)     permanently enjoining Conaway from any further violations of the securities laws;

(2)     permanently barring Conaway from serving as an officer or director of a public company (the "O&D Bar");

(3)     requiring Conaway to disgorge the full amount of his $8,885,003 in ill-gotten gains, with prejudgment interest of $4,795,571, for a total of $13,680,574;

(4)     requiring Conaway to pay a civil penalty in an amount equal to his $8,885,003 in ill-gotten gains; and

(5)     prohibiting Conaway from seeking or accepting any payment, reimbursement, or indemnification from any third party for any portion of the penalty.

## LEGAL STANDARDS AND ARGUMENT

### 1.    Burden of Proof

In an SEC enforcement action, the SEC need prove the elements of its case only "by a preponderance of the evidence, and may use direct or circumstantial evidence to do so." *SEC v. Ginsburg,* 362 F.3d 1292, 1297 (11th Cir. 2004*); SEC v. First Fin. Group of Texas*, 645 F.2d 429, 434 (5th Cir. 1981); *SEC v. Moran*, 922 F. Supp. 867, 888 (S.D.N.Y. 1996).  This standard applies to remedies as well as liability.  *Steadman v. SEC*, 450 U.S. 91, 103 (1981) (upholding preponderance-of-the-evidence standard in an SEC administrative proceeding).

### 2.    Injunction, Officer-Director Bar, Disgorgement, and Civil Money Penalty

#### a.    Permanent Injunction Against Committing Future Violations of the Securities Laws

Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] authorizes the Court, upon a "proper showing," "to enjoin" any "acts or practices constituting a violation of any provision under this title [or] the rules or regulations thereunder."  As the Sixth Circuit noted in *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984), "injunctions based upon the securities laws are primarily intended to protect the investing public from future misconduct."  729 F.2d at 415  Because the basis "is statutory rather than equitable, the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief."  *Id*.  Proof of irreparable harm and inadequacy of legal remedies need not be shown.  *Id.*

The test for whether an injunction should be issued is "whether the SEC [has] shown a reasonable and substantial likelihood that [the defendant], if not enjoined, would

violate the securities laws in the future." *Youmans*, 729 F.2d at 415.  A likelihood of future violations exists where, as here, the violations were stopped only by Kmart's bankruptcy filing.  *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972) (inference of future violations was "particularly appropriate" where defendants did not attempt to cease their violations until an investigation began).

Injunctions are an important tool for enforcement of securities laws.  As stated in *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974), "[t]he SEC cannot keep constant surveillance over" a defendant.  An injunction ensures that a defendant will be careful to avoid future violations.  The overwhelming weight of authority, including in the Sixth Circuit, supports issuing injunctions against future violations of the securities laws. *Youmans*, 729 F.2d at 415; *SEC v. Wolfson*, 2008 WL 4053027, at *4 (10th Cir. Sept. 2, 2008); *SEC v. Fehn*, 97 F.3d 1276, 1296 (9th Cir. 1996); *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C. Cir. 1994); *SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Keller Corp.*, 323 F.2d 397, 402 (7th Cir. 1963).

The standards for a statutory injunction are well-established.  "Once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief."  *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982).  In predicting the likelihood of future violations, the Court "must assess the totality of the circumstances surrounding the defendant and his violation," including "the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve

him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations."  *SEC v. Holschuh*, 694 F.2d at 144. *Accord SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978); *SEC. v. Randy*, 38 F. Supp.2d 657, 672 (N.D. Ill. 1999).   No single factor by itself is determinative.  *SEC v. Youmans*, 729 F.2d at 415.

Each of these factors militates in favor of an injunction against future violations. Conaway joined Kmart at 39 and is still only in his late 40's, younger than most CEO's of Fortune 500 corporations.  In the context of his former position, Conaway's age would place him at the beginning of a career, not the end. He has an MBA and an undergraduate degree in accounting, and he has spent his career in upper management at public companies.  The potential is not remote that Conaway could return to a senior management role in either a public or private company.

 Conaway's actions in fraudulently concealing Kmart's liquidity crisis were sustained and premeditated; and his involvement in the scheme was intimate.  Conaway commissioned Project SID and authorized its implementation with the full knowledge that it was designed to conceal the true reason for Kmart's payment delays. Conaway's public statements -- from his quote to the New York Times on November 8, 2001, that "Kmart is not short of cash" [Def. Ex. 23] to his false response to Eric Beder's direct question on the November 27 earnings release conference call -- were uniformly deceptive.  From the inception of the crisis in August 2001 through his testimony in the trial before this Court, Conaway's story never changed:  Kmart had plenty of cash to run its daily operations; Project eLMO did, in fact, cause the vendor payment delays; and the

vendor complaints came exclusively from a small group that had been cut by Kmart. Even Kmart's own employees were fed the same misinformation.  [SEC Ex. 232]

Conaway directly approved the false eLMO cover story and its mass distribution to the merchant group. [McDonald, 5/28/09 pm at 269-70]  He was the only witness who testified that the eLMO cover story was not false.  [Gilbert, 5/13/09 pm v.1 at  75-77; pm v.2 at 3-5; Archambeau, 5/13/09 pm v.2 at 80-81; Nagler, 4/18/08 dep. at 14]  Even Cecil Kearse admitted the falsity of the eLMO talking points.  [Kearse, 5/20/09 pm v.1 at 45]

Conaway fed the Project eLMO lie to Jerry Levin, the Chairman and CEO of Sunbeam [SEC Ex. 108]  He lied to the Board regarding the overbuy and eLMO [Stallkamp, 5/18/09 am v.3 at  36-42].  He lied to Kmart's shareholders [SEC Exs. 57, 231].  His testimony in other proceedings contain these same falsehoods, except on the two occasions when either by accident or design he gave patently self-contradictory testimony on these issues.

In his deposition taken in this case and again at trial, Conaway testified that the letter to Sunbeam's CEO citing Project eLMO as the reason for Kmart's late payments was not his, that he had nothing to do with the letter's preparation, and the "informal" tone confirmed he had not written it.  [Conaway 5/27/09 pm at 162-63, 5/28/09 am at 9-11]  In his 2003 bankruptcy deposition, however, Conaway testified to his practice of dictating letters such as this from the field and gave a detailed explanation of what he had intended to convey to Mr. Levin, never mentioning the "informal" tone of the letter.  To the contrary, he embraced and defended the letter.  [Conaway 1/23/03 dep. at 437-43]

Despite his denials under oath in his February 13, 2008, deposition and his testimony at trial, Conaway conceded under oath in 2005 that he authorized Kmart

employees to tell vendors that their payments were delayed because of problems caused by the eLMO conversion project, when he knew that not to be true. [Conaway 2/10/05 dep. at 236-37]

Conaway's testimony at trial revealed that he is utterly without remorse or any sense of personal accountability.  At no point in the proceeding did he allow even a glimmer of regret for anything he had done at Kmart.  Everything improper that happened there, from the vendor payment delays to the Project eLMO lies to the lack of proper disclosure, was the fault of someone else.  Indeed, so pristine is Conaway's regard for his own conduct that he may have set a new record for audacity in 2002 when he filed a $19 million claim against the company that he had just led into bankruptcy.

### b.    Public Company Officer and Director Bar

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] authorizes the Court to prohibit a defendant from serving as an officer or director of a publicly held company.  The statute provides:

> [T]he court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 10(b) of this title . . . from acting as an officer or director of any issuer . . . if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

[15 U.S.C. § 78u(d)(2)]  This section applies to Conaway because he was found liable for violating Section 10(b) of the Exchange Act and Rule 10b-5.  In assessing unfitness to serve as an officer or director, courts typically consider:  (1) the "egregiousness" of the violations; (2) the likelihood that the misconduct will recur; (3) the defendant's "role" or position when he engaged in the fraud; (4) the degree of scienter; (5) the defendant's economic stake in the violation; and (6) the defendant's "repeat offender" status.  *See*

14

*SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995); *SEC v. Levine*, 517 F. Supp. 2d 121, 145 (D.D.C. 2007).

Five of the six factors weigh heavily in favor of barring Conaway from holding an officer or director position in a public company. Conaway's systematic concealment of Kmart's financial condition was egregious because it blinded the company's owners -- its public shareholders -- from a known threat to the company's very survival. Even after the Chief Financial Officer Boyer warned that Kmart may need to plan for a bankruptcy filing, Conaway maintained the public deceit that all was well. And when the bankruptcy came, the company's blindsided shareholders saw their investments vanish. Because Conaway shows no remorse or even recognition of the nature of his wrongful acts, the Court must presume his misconduct will recur. Conaway's role in the fraud was not that of a subordinate following someone else's orders. Conaway gave the orders. And anyone who failed to toe the line -- Boyer, for example -- risked an unceremonious dismissal. Conaway's level of scienter, as detailed above, was complete. And he had an $8.9 million economic stake in maintaining the deception.

The SEC therefore requests that the Court impose a permanent O&D bar.

### c.      Disgorgement and Prejudgment Interest

Congress has expressly recognized the Commission's right to disgorgement of ill-gotten gains. "Once the equity jurisdiction of a Court has been invoked on a showing of a securities violation, the Court possesses the necessary power to fashion an appropriate remedy. Thus, the Commission may request that the Court order certain equitable relief, such as the disgorgement (giving up) of illegal profits." H.R. Rep. 98-355, at 7 (1983) reprinted in 1984 U.S.C.C.A.N. 2274, 2280.

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. Hughes Capital*, 124 F.3d 449, 455 (3d Cir. 1997) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir 1989)). "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103-04 (2d Cir. 1972). *See also SEC v. Lipson*, 278 F.3d 656 (7th Cir. 2002*); Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir. 1988); *SEC v. Randy,* 38 F. Supp.2d 657, 673-74 (N.D.Ill. 1999).

Calculation of the defendant's economic gain need not be exact (although in this case it is), and determination of the appropriate amount is left to the sound discretion of the trial court. "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged. . . . The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation.' . . ." *SEC v. First Jersey Sec. Corp.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996) quoting *SEC v. Patel,* 61 F.3d 137, 139, 140 (2d Cir. 1995)).

"[A]ll doubts concerning the determination of disgorgement are to be resolved against the defrauding party." *SEC v. Hughes Capital*, 917 F. Supp. 1080, 1085 (D.N.J. 1996), quoting *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991), aff'd, 12 F.3d 214 (6th Cir. 1993). "Where disgorgement calculations cannot be exact, 'any risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Robinson,* 2002 WL 1552049 at *7, quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). *Accord SEC v. First City Fin. Corp.*, 890 F.2d at

1232.  *See also Rowe v. Maremont Corp*., 850 F.2d 1226 (7th Cir. 1988); *SEC v. Randy*, 38 F.Supp.2d 657 (N.D.Ill. 1999).

A defendant cannot avoid disgorgement by claiming he lacks funds.  *SEC v. Thorn,* 2002 WL 31412439 at *3 ("Financial hardship does not preclude the imposition of an order of disgorgement.").  "Nor may a securities law violator avoid or diminish his responsibility to return his ill-gotten gains by establishing that he is no longer in possession of such funds due to subsequent unsuccessful investments or other forms of discretionary spending."  *SEC v. Thomas James Associates*, 738 F. Supp. 88, 94 (W.D.N.Y. 1990).  *Accord  SEC v. AMX Int'l*, 872 F. Supp. 1541, 1544 (N.D. Tex. 1994). Nor can a defendant avoid disgorgement by claiming it would diminish his income or his standard of living.  *SEC v. Musella*, 818 F. Supp. 600, 602 (S.D.N.Y. 1993).

The Court should add prejudgment interest to the disgorgement amount.  *SEC v. Blatt,* 583 F.2d at 1335 (disgorgement is "the amount with interest by which the defendant profited from his wrongdoing").  Most courts use the interest rate applied by the Internal Revenue Service for unpaid balances.  *SEC v. Randy*, 38 F.Supp.2d 657, 674 (N.D.Ill. 1999*);  SEC v. Bocchino*, WL 31528472, at *3 (S.D.N.Y. Nov. 8, 2002) ("the district court generally calculates prejudgment interest by using the Internal Revenue Service rates for underpayment of taxes under 17 U.S.C. § 201.600(b)").

In this case, Conaway received $8.9 million in debt forgiveness and direct payment in March 2002 as a direct result of his fraud.  A fundamental aspect of Conaway's scheme to conceal Kmart's liquidity crisis was that he could not lie to the investing public without telling the same lies to the Board of Directors, and *vice versa*. Had Conaway revealed the truth about Kmart's financial condition on November 27,

2001, to the public and to the Board, he would likely have been terminated for cause, the repayment obligation on his Executive Loan would not have been forgiven, and he would have received no "gross-up" for taxes.

Conaway's fraud therefore generated an immediate $8,885,003 in ill-gotten gains. By virtue of the time value of money, that benefit has increased over the past seven years to $13,680,574, using the standard IRS interest rates.  [Ex. J]

### d.    Civil Money Penalty

Congress incorporated penalties into the securities laws when it enacted the Securities Law Enforcement Remedies Act of 1990 (the "Remedies Act").  The Remedies Act is now codified at Section 21(d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)].  In enacting the Remedies Act, Congress explained its purpose in careful and succinct terms.  Congress gave the Commission authority to seek civil penalties in part because it considered the existing remedy of disgorgement to be insufficient.  "Since disgorgement merely requires the return of wrongfully obtained profits, it does not impose any meaningful economic cost on the law violator.  The Committee, therefore, concluded that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise would provide great financial returns to the violator."  S. Rep. 101-337 (1990) *reprinted in* 1990 WL 263550 (Leg. Hist.).  The House Report struck the same chord. "Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engaging in securities fraud."  H.R. Rep. 101-616 (1990) *reprinted in* 1990 WL 256464 (Leg. Hist.).

18

The Remedies Act provides for three penalty tiers. In the absence of fraud, a first tier penalty applies. [15 U.S.C. § 78u(d)(3)(B)(i)] A second tier penalty applies where the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." [15 U.S.C. § 78u(d)(3)(B)(ii)] A third tier penalty applies where the violation involved "fraud, deceit, manipulation . . ." and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." [15 U.S.C. § 78u(d)(3)(B)(iii)]

Defendant Conaway qualifies for a third tier penalty. In finding him liable under Section 10(b) of the Exchange Act and Rule 10b-5, the jury determined that his conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." [15 U.S.C. § 78u(d)(3)(B)(ii) & (iii)] And because the nature of Conaway's fraud was to conceal Kmart's financial condition from the investing public less than two months before the company was forced into bankruptcy, his actions "created a significant risk of substantial losses" to the company's shareholders. The maximum amount of a third tier penalty is the greater of $120,000[3] per violation or "the gross amount of pecuniary gain" received by the defendant "as a result of the violation." [15 U.S.C. § 78u(d)(3)(B)(iii)] Because the $8.9 million economic gain Conaway received from his fraud is so disproportionate to the statute's $120,000 base figure, the penalty should be measured by his economic gain. If the jury's verdict in this case is to have a true deterrent effect against future instances of corporate fraud, the Court should impose a penalty of $8,885,003.

---

[3]      The statutory text of Exchange Act Section 21(d)(3)(B)(iii) provides for a maximum third tier penalty of the greater of $100,000 or the gross amount of pecuniary gain. [15 U.S.C. § 78u(d)(3)(B)(iii)] The $100,000 figure, however, is periodically adjusted for changes in the Consumer Price Index. For violations occurring after February 2, 2001, the adjusted penalty amount is $120,000. SEC Release No. 33-7946 (Feb. 2, 2001) (Ex. K).

## **CONCLUSION**

The jury verdict in this case was based on substantial evidence.  It was not

equivocal, ambivalent, or the product of compromise.  Conaway managed Kmart by

deception and violated his fiduciary duty to the company's shareholders and employees.

He shows no remorse for his actions.  He continued his evasion of responsibility right

through the trial of this case.  The remedies recommended above are warranted.


Dated: July 30, 2009                                   /s Alan M. Lieberman
                                                       Alan M. Lieberman
                                                       Robert I. Dodge
                                                       Richard B. Skaff
                                                       Attorneys for Plaintiff
                                                       Securities and Exchange Commission
                                                       100 F St. N. E.
                                                       Washington, D.C. 20549-4030
                                                       Tel. 202.551.4474 (Lieberman)
                                                       Fax. 202.772.9245 (Lieberman)
                                                       liebermana@sec.gov


Local Counsel:
Ellen E. Christensen
Office of the United States Attorney
for the Eastern District of Michigan
211 West Fort St.
Suite 2001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 30th day of July, 2009, a copy of the foregoing

Memorandum in Support of Plaintiff's Request For Remedies was served on the

following parties via the Court's Electronic Filing System:

Scott Lassar
Hille R. Sheppard
Melanie Walker
Sidley Austin Brown & Wood LLP
One South Dearborn Street
Chicago, Illinois 60603


<u>s/  Alan M. Lieberman</u>

**U.S. SECURITIES AND EXCHANGE COMMISSION v.**
**CHARLES C. CONAWAY, C.A. No. 05-CV-40263**


**SEC MEMORANDUM IN SUPPORT OF ITS REQUEST FOR REMEDIES**


**INDEX TO EXHIBITS**

A       FY 2002 Kmart Form 10-K excerpt

B       May 30, 2000, Conaway Employment Agreement

C       May 15, 2001, Conaway Employment Agreement Amendment

D       Mar. 11, 2002, Conaway Separation Agreement

E       Mar. 11, 2002, Canceled Promissory Note

F       July 30, 2002, Conaway bankruptcy claim

G       Feb. 11, 2003, Board minutes

H       Feb. 24, 2003, Board minutes

I       Feb. 27, 2003, Kmart bankruptcy disclosure statement excerpt

J       Computation of Prejudgment Interest

K       SEC Release No. 33-7946 (Feb. 2, 2001)

L       Conway 2/13/08 deposition transcript excerpt

M       Conaway 1/23/03 deposition transcript excerpt

N       Conaway 2/10/05 deposition transcript excerpt

O       Boyer 7/19/07 deposition transcript excerpt

P       Moreland 6/27/07 deposition transcript excerpt

Q       Nagler 4/18/08 deposition transcript excerpt

# Exhibit A

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>k74348e10vk.txt
<DESCRIPTION>ANNUAL REPORT FOR FISCAL YEAR ENDED 01/29/03
<TEXT>
<PAGE>
```

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

```
<Table>
 <C>  <S>
  [X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE
       SECURITIES EXCHANGE ACT OF 1934
       FOR THE FISCAL YEAR ENDED JANUARY 29, 2003



                                OR



  [ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
       SECURITIES EXCHANGE ACT OF 1934
       FOR THE TRANSITION PERIOD FROM        TO        .
</Table>
```

COMMISSION FILE NO. 1-327

KMART CORPORATION
(Exact name of registrant as specified in its charter)

```
<Table>
<S>                                      <C>
          MICHIGAN                                  38-0729500
```

```
(State or other jurisdiction of incorporation       (I.R.S. Employer Identification No.)
             or organization)
```

```
 3100 WEST BIG BEAVER ROAD -- TROY, MICHIGAN                  48084
   (Address of principal executive offices)                (zip code)
</Table>
```

                    REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE
                                   (248) 463-1000

      SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE SECURITIES EXCHANGE ACT
                                     OF 1934:

```
<Table>
<Caption>
            TITLE OF EACH CLASS                 NAME OF EACH EXCHANGE ON WHICH REGISTERED
            -------------------                 ----------------------------------------
<S>                                             <C>
                 None                                        None
</Table>
```

      SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE SECURITIES EXCHANGE ACT
                                     OF 1934:
                          COMMON STOCK, $1.00 PAR VALUE
                                (Title of Class)

     Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes [X]     No [ ]

     Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of the Registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K.  [X]

     Indicate by check mark whether the Registrant is an accelerated filer (as
defined in Exchange Act Rule 12b-2) Yes [X]     No [ ]

     The aggregate market value of voting stock including Common Stock held by

non-affiliates of the Registrant July 31, 2002 was $361,914,618.

     As of March 14, 2003, 519,211,986 shares of Common Stock of the Registrant
were outstanding.
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
<PAGE>


                                    PART I


ITEM 1. BUSINESS

HISTORY

     Kmart Corporation is the nation's third largest discount retailer and the
sixth largest general merchandise retailer. Kmart Corporation ("Kmart," "we,"
"us" or "our") was incorporated under the laws of the State of Michigan on March
9, 1916, as the successor to the business developed by its founder, S.S. Kresge,
who opened his first store in 1899. Kresge was the first retailer to launch a
newspaper advertising program to entice shoppers to its stores. After operating
Kresge department stores for over 45 years, our store program commenced with the
opening of the first Kmart store in March 1962. In 1977, Kresge Corporation
officially changed its name to Kmart. In 1991, Kmart opened the first Kmart
Supercenter in Medina, Ohio, offering a full-service grocery along with general
merchandise twenty-four hours a day, seven days a week. To further expand the
reach of the company, in December 1999, Kmart, with its investment partners
launched a new internet presence, BlueLight.com which operates an e-commerce
site. Shoppers now know the site as www.kmart.com. Kmart continues to be the
leading print promotional retailer, with weekly circulars reaching more than 70
million households. Our principal executive offices are located at 3100 West Big
Beaver Road, Troy, Michigan 48084.

     Our website address is www.kmart.com. We make available free of charge
through our website our annual report on Form 10-K, quarterly reports on Form
10-Q, current reports on Form 8-K and all amendments to those reports as soon as
reasonably practicable after such material is electronically filed with or
furnished to the Securities Exchange Commission.

ITEM 11. EXECUTIVE COMPENSATION

       The following table sets forth information concerning total compensation
paid to Kmart's current Chief Executive Officer during fiscal 2002 and the four
other most highly compensated executive officers of Kmart who served in such
capacities as of January 29, 2003 (the "named executive officers") for services
rendered to Kmart during each of the last three fiscal years, if applicable.
Pursuant to SEC rules, the table also sets forth

                                      71

<PAGE>

information concerning the compensation of former executive officers of Kmart
who are also deemed by SEC rules to be named executive officers for fiscal 2002.

<Table>
<Caption>

| | | ANNUAL COMPENSATION | | | LONG-TERM COMPENSATION | | |
| | | | | | SECURITIES UNDERLYING | RESTRICTED STOCK | ALL OTHER |
| NAME AND PRINCIPAL POSITION(1) | YEAR(2) | SALARY(3) | BONUS(4) | OTHER ANNUAL COMPENSATION(5) | OPTIONS(6) | AWARDS(7) | COMPENSATION(8) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| J. Day......................<br>   President & Chief<br>   Executive Officer | 2002 | $  634,123 | $2,275,000 | $853,538 | $          0 | $          0 | $   75,917 |
| A. Koch....................<br>   Chief Financial Officer | 2002 | $1,526,651(9) | 0 | 0 | 0 | 0 | 0 |
| E. Stenger.................<br>   Treasurer | 2002 | $1,461,514(9) | 0 | 0 | 0 | 0 | 0 |
| R. Hutchison...............<br>   Executive Vice President<br>   Chief Restructuring Officer | 2002<br>2001 | $  475,000<br>     18,142 | $  250,000<br>          0 | $376,503<br>        0 | 0 | 0 | $      972 |
| M. Macik...................<br>   Executive Vice President<br>   Human Resources | 2002 | $  346,117 | $  425,000 | | | | $   86,018 |
| C. Conaway.................<br>   Former Chief Executive<br>   Officer | 2002<br>2001<br>2000 | $  187,500<br>  1,475,000<br>    943,056 | 0<br>0<br>$8,087,890 | $ 51,203<br>  238,559<br>  446,938 | 0<br>$4,000,000<br>  4,000,000 | 0<br>0<br>4,692,950 | $9,040,016<br>  2,042,200<br>          0 |
| J. Adamson.................<br>   Non-executive Chairman;<br>   Former Chief Executive<br>   Officer | 2002 | $1,334,281(10) | 0 | $318,794<br>        0 | 0 | 0 | $  354,624 |

```
</Table>
```

---------------

    (1) Mr. Conaway's employment was terminated effective March 11, 2002; Mr.
        Adamson returned to his position as non-executive Chairman effective
        January 17, 2003.

    (2) Mr. Day's employment commenced effective April 9, 2002; Mr. Macik had
        retired from Kmart in 2000 and returned to employment effective April 8,
        2002; Mr. Hutchison's employment commenced effective January 21, 2002; Mr.
        Koch and Mr. Stenger began providing services to Kmart during March 2002;
        Mr. Conaway's employment commenced effective May 30, 2000; Mr. Adamson's
        service as CEO commenced effective March 11, 2002. During Mr. Macik's prior
        employment with Kmart, he was not an executive officer.

    (3) Includes amounts deferred during fiscal years 2000 and 2001 under Kmart's
        Management Deferred Compensation and Restoration Plan, which was closed to
        new deferrals effective January 22, 2002.

    (4) Mr. Day's bonus consists of a signing bonus of $775,000 and a payment of
        $1,500,000 in respect of payments and benefits foregone from Mr. Day's
        previous employer; Mr. Macik's 2002 bonus consists of a $425,000 signing
        bonus; Mr. Hutchison's bonus consists of a $250,000 signing bonus.

    (5) The dollar amounts under "Other Annual Compensation" include: Reimbursement
        of Housing and Temporary Living Costs plus associated tax gross-up -- Mr.
        Day -- $154,438 (2002); Mr. Hutchison -- $143,009 (2002); Mr.
        Conaway -- $109,197 (2001), $414,076 (2000); Mr. Adamson -- $248,904
        (2002); Non-Business Use of Company Plane plus associated tax
        gross-up -- Mr. Conaway -- $23,409 (2002), $97,838 (2001); Car Allowance
        plus associated tax gross-up -- Mr. Conaway -- $15,178 (2002); Tax gross-up
        associated with bonus -- Mr. Day -- $616,900 (2002); Mr.
        Hutchison -- $232,100 (2002). The value of perquisites and other personal
        benefits not specified in this footnote did not exceed 25% of the value of
        the total perquisites and other personal benefits reported.

    (6) No stock options were granted in fiscal year 2002.

    (7) As of January 29, 2003, none of the named executive officers held any
        restricted stock. All shares of restricted stock held by Mr. Conaway were
        cancelled in connection with the termination of his employment.

72

<PAGE>

  (8) The dollar amounts for fiscal year 2002 set forth under "All Other
     Compensation" include: Value of Life Insurance Premiums -- Mr. Day -- $917;
     Mr. Macik -- $1,115; Mr. Hutchison -- $972; Mr. Conaway -- $307; Mr.
     Adamson  -- $2,645; Reimbursement of Legal Fees -- Mr. Day -- $75,000; Mr.
     Macik -- $4889; Mr. Adamson -- $352,024; Other Compensation -- Mr. Macik
     received $70,159 in fiscal year 2002 under a prior severance agreement and
     $9,855 under the Supplemental Pension Plan; in connection with his
     termination of employment, Mr. Conaway received a $4,039,709 severance
     payment and his $5 million retention loan was to be forgiven (See, however,
     the discussion of Mr. Conaway's separation agreement at "Former Executive
     Officer Services, Employment and Separation Arrangements -- Charles
     Conaway -- Separation Agreement").

  (9) Amounts represent fees paid or payable by Kmart to Alix Partners LLC
     (formerly JA&A Services, LLC), Mr. Koch's and Mr. Stenger's employer,
     attributable to their services rendered to Kmart (see "Executive Officer
     Employment Arrangements -- Albert Koch and Edward Stenger"). Such amounts
     do not include reimbursement of business expenses incurred by Messrs. Koch
     and Stenger in connection with the performance of their services to Kmart.

(10) Includes fees paid to Mr. Adamson for the period February 1, 2002 through
     March 11, 2002 pursuant to the terms of his services agreement. See "Former
     Executive Officer Services, Employment and Separation Arrangements -- James
     Adamson -- Services Agreement."

OPTION GRANTS IN FISCAL YEAR 2002

    No stock options were granted to the named executive officers during fiscal
year 2002.

OPTION EXERCISES AND VALUES FOR FISCAL YEAR 2002

    The table below shows the number of exercisable options held by each of the
named executive officers at January 29, 2003. None of the options held by the
named executive officers are "in-the-money". None of the named executive
officers exercised stock options during fiscal year 2002.

<Table>

```
<Caption>
                                            NUMBER OF UNEXERCISED OPTIONS
                                                     AT 1/29/03
NAME                                        EXERCISABLE/NONEXERCISABLE
----                                        ----------------------------
<S>                                         <C>
J. Day.....................................          0/0
A. Koch....................................          0/0
E. Stenger.................................          0/0
R. Hutchison...............................          0/0
M. Macik...................................     105,100/0
C. Conaway.................................          0/0
J. Adamson.................................      24,300/0
</Table>
```

# Exhibit B

**Exhibit 10**

EXECUTION COPY

# EMPLOYMENT AGREEMENT

AGREEMENT, made and entered into by and between KMART CORPORATION, a Michigan corporation (together with its successors and assigns permitted under this Agreement, the "Company"), and CHARLES C. CONAWAY (the "Executive").

## WITNESSETH:

WHEREAS, the Company desires to employ the Executive and to enter into an agreement embodying the terms of such employment (this "Agreement") and the Executive desires to enter into this Agreement and to accept such employment, subject to the terms and provisions of this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt of which is mutually acknowledged, the Company and the Executive (individually a "Party" and together the "Parties") agree as follows:

Confidential Treatment
Requested by Kmart Corp.

1.   Definitions.

(a) "Affiliate" of a person or other entity shall mean a person or other entity that directly or indirectly controls, is controlled by, or is under common control with the person or other entity specified.

(b) "Base Salary" shall mean the salary provided for in Section 4 below or any increased salary granted to the Executive pursuant to Section 4.

(c) "Board" shall mean the Board of Directors of the Company.

(d) "Cause" shall mean:

(i)   the Executive is convicted of a felony involving moral turpitude or any other felony if in the case of such other felony the Executive is unable to show that he (A) acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and (B) had no reasonable cause to believe his conduct was unlawful; or

(ii)   the Executive engages in conduct that constitutes willful gross neglect or willful gross misconduct in carrying out his duties under this Agreement, resulting, in either case, in material harm to the Company, unless the

**K 128566**

SEC00460947

Executive believed in good faith that such act or nonact was in or not opposed to the best interests of the Company.

(e) A "Change in Control" shall have the meaning set forth in Section 2.6 of the Company's 1997 Long-Term Equity Compensation Plan as in effect on the date hereof.

(f) "Committee" shall mean the Compensation and Incentives Committee of the Board or any other committee of the Board performing similar functions.

(g) "Constructive Termination" shall mean a termination of the Executive's employment at his initiative as provided in Section 11(d) below within one year following the occurrence, without the Executive's prior written consent, of one or more of the following events:

(i) any failure to make timely and full payment of amounts required to be paid under this Agreement, or a reduction in the Executive's then current Base Salary or Target Bonus or the termination or material reduction of any employee benefit or perquisite enjoyed by him (other than as part of an across the board reduction in employee benefits applicable to all executive officers of the Company);

(ii) the failure to elect or reelect or appoint the Executive to any of the positions described in Section 3 below or removal of him from any such position;

(iii) a material reduction or material adverse change in the Executive's responsibilities, duties, authority, or any reduction in title, as provided herein, including, without limitation, the appointment of any person to an executive position at the Company that is co-equal with or senior to that of the Executive or any transfer of material responsibilities of the Executive to a subsidiary which has substantially the same effect as such an appointment, or after the Effective Date, the failure to offer to appoint or continue the Executive as Chairman and Chief Executive Officer of any company which becomes a successor of the Company by reason of a Change in Control, and as the Chairman and senior executive officer of the ultimate parent company which is within the same controlled group of corporations, within the meaning of Section 414 of the Internal Revenue Code of 1986, as amended, and which directly or indirectly controls the Company, or the assignment to the Executive of duties which are materially inconsistent with his duties or which materially impair the Executive's ability to function as the Chairman and Chief Executive Officer of the Company;

(iv) the relocation of the Company's principal office to a location more than 35 miles from Troy, Michigan; or

**Confidential Treatment Requested by Kmart Corp.**

**K 128567**

2

NY—446135.2

(v)   the failure of the Company to obtain the assumption in writing of its obligation to perform this Agreement by any successor to all or substantially all of the assets of the Company on or prior to a merger, consolidation, sale or similar transaction, as provided in Section 17 below.

(h) "Disability" shall mean the Executive's inability to substantially perform his duties and responsibilities under this Agreement by reason of any physical or mental incapacity for a period of 180 consecutive days.

(i) "Effective Date" shall mean the date the Executive executes this Agreement, as provided in Section 2 below.

(j) "Previous Employer" shall mean CVS Corporation, a Delaware corporation.

(k) "Severance Period" shall mean the period during which the Executive is receiving severance payments (or in respect of which a lump-sum severance payment is made) pursuant to Section 11(d) below.

(l) "Stock" shall mean the Common Stock of the Company.

(m) "Subsidiary" shall mean any corporation of which the Company owns, directly or indirectly, more than 50% of the outstanding securities then entitled to vote.

(n) "Target Bonus" shall mean the Executive's annual target bonus opportunity, as a percentage of Base Salary, as provided for in Section 5 below, or any increased annual target bonus opportunity approved by the Committee.

(o) "Term of Employment" shall mean the period specified in Section 2 below.

2.      Term of Employment.

Confidential Treatment
Requested by Kmart Corp.

The Company hereby employs the Executive, and the Executive hereby accepts such employment, for the period commencing on the date he executes this Agreement (the "Effective Date") and ending on the fifth anniversary of the Effective Date (the "Term of Employment"); provided, however, that the Term of Employment shall be automatically extended for an additional year on the fourth anniversary of the Effective Date and on each anniversary of the Effective Date thereafter, unless written notice of non-extension is provided by either Party to the other Party at least 180 days prior to the applicable succeeding anniversary date.

**K 128568**

3.      Position, Duties and Responsibilities.

(a) During the Term of Employment, the Executive shall be employed and serve as the Chairman of the Board and Chief Executive Officer of the Company (or such other position or positions as may be agreed upon in writing by the Executive and the Company) and be responsible for the general management of the affairs of the Company.

3

SEC00460949

The Executive shall promptly be elected by the Board to be a member of the Board. During the Term of Employment, the Company shall nominate the Executive for re-election as a director at each annual meeting of shareholders coinciding with the expiration of his term as a director and recommend him for re-election. If elected by the shareholders, he shall serve as a member of the Board during the Term of Employment. The Executive, in carrying out his duties under this Agreement, shall report to the Board.

(b) The Executive shall perform such duties and carry out such responsibilities incident to his position as may be determined from time to time by the Board, which shall be consistent with the duties and responsibilities customarily performed by persons in a similar executive capacity. The Executive shall devote substantially all of his business time, attention and skill to the performance of such duties and responsibilities, and shall use his best efforts to promote the interests of the Company. The Executive shall have all authority commensurate with such position, including, without limitation, authority for decisions on hiring and terminations of Company personnel. The Executive shall not, without the prior written approval of the Board, engage in any other business activity which is in violation of policies established from time to time by the Company.

(c) Anything herein to the contrary notwithstanding, nothing shall preclude the Executive from (i) serving on the boards of directors of a reasonable number of other corporations or the boards of a reasonable number of trade associations and/or charitable organizations (subject to the reasonable approval of the Board), (ii) engaging in charitable activities and community affairs, and (iii) managing his personal investments and affairs, provided that such activities do not materially interfere with the proper performance of his duties and responsibilities as the Company's Chairman and Chief Executive Officer.

4.   Base Salary.

Confidential Treatment
Requested by Kmart Corp.

During the Term of Employment, the Executive shall be paid an annualized Base Salary, payable in accordance with the regular payroll practices of the Company, of $1,400,000. The Base Salary shall be reviewed no less frequently than annually for increase in the discretion of the Board and/or the Committee. The Base Salary, including any increase, shall not be decreased during the Term of Employment. The Base Salary shall not be required to be deferred by the Executive under any Company plan or program.

**K 128569**

5.   Annual Incentive Awards.

During the Term of Employment, the Executive shall have an annual target bonus opportunity of at least 125% of his then-current Base Salary under the Company's Annual Incentive Bonus Plan or any successor plan (the "Target Bonus"), payable if the performance goals established by the Committee for the relevant year are met. If performance goals established by the Committee for a particular year are not met, the Executive shall receive a lesser amount as determined in accordance with guidelines established by the Committee, consistent with the guidelines applicable to the Chief

4

SEC00460950

Executive Officer as a senior executive of the Company. Notwithstanding the foregoing, the Executive shall receive a guaranteed bonus of $1,750,000 for the fiscal year beginning February 1, 2000 without proration for the partial year of service from the Effective Date through January 31, 2001. Payment of the annual bonus shall be made at the same time that other senior-level executives receive their incentive awards. The Executive shall participate in the Company's Management Stock Purchase Plan.

6.    Long-Term Incentive Programs.

(a) General.  During the Term of Employment, the Executive shall be eligible to participate in the long-term incentive programs of the Company, with any awards under such programs to be in the sole discretion of the Committee. In any event, he shall be entitled to the awards described in Sections 6(b) below.

(b) Stock Option Awards.

Confidential Treatment
Requested by Kmart Corp.

(i)     As of the Effective Date, the Company shall grant the Executive a 10-year option to purchase an aggregate of 1,500,000 shares of Stock (the "New Option"), which may be granted under the terms of the Company's stock option plans, or outside the terms of such plans, with terms and conditions consistent in all respects with the provisions of this Agreement and otherwise substantially the same as those granted under the Company's stock option plans. The exercise price per share of the New Option shall be equal to the closing price on the New York Stock Exchange of the Stock on the last trading day immediately preceding the Effective Date. The New Option shall become vested and exercisable in two equal installments on the first and second anniversaries of the Effective Date, provided the Executive is employed by the Company on each such date, except as otherwise provided in Section 11 hereof. Notwithstanding anything to the contrary in this Section 6(b) or in the Company's stock option plans, if the Executive violates the provisions of Section 12 below, the New Option shall immediately terminate.

(ii)    The Company will recommend to the Board of Directors of Bluelight.com, Inc. that the Executive be granted a 10-year option to purchase 250,000 shares of Bluelight.com common stock, with an exercise price equal to the fair market value of a share of Bluelight.com common stock on the date of grant and with other terms comparable to the grants of options for Bluelight.com common stock previously granted to other senior executives of the Company under the Bluelight.com, Inc. 1999 Equity Incentive Plan. The grant will be subject to the approval of the Bluelight.com., Inc. Board of Directors.

(iii)   During the Term of Employment, the Executive will have an annual opportunity to be granted an option (the "Annual Option") for shares of Stock at a target level value of 400% of Base Salary, based upon the achievement of performance goals established by the Committee. The determination of the value of the Annual Option will be determined using the valuation method

**K 128570**

5

NY—446135.2

employed by the Committee generally with respect to annual option grants to other senior executives of the Company.

7.  Employee Benefit Programs.

Confidential Treatment
Requested by Kmart Corp.

During the Term of Employment, the Executive shall be entitled to participate in all employee pension and welfare benefit plans and programs made available to the Company's senior-level executives or to its employees generally, as such plans or programs may be in effect from time to time, including, without limitation, pension, profit sharing, savings and other retirement plans or programs, medical, dental, hospitalization, short-term and long-term disability and life insurance plans, accidental death and dismemberment protection, travel accident insurance, and any other pension or retirement plans or programs and any other employee welfare benefit plans or programs that may be sponsored by the Company from time to time, including any plans that supplement the above-listed types of plans or programs, whether funded or unfunded. Without limiting the generality of the foregoing, the Executive shall be offered the opportunity to elect life insurance coverage on terms substantially comparable to those offered under the Company's Estate Enhancement Program for Directors, subject to terms and conditions of such program.

8.  Reimbursement of Business and Other Expenses; Perquisites; Vacations.

(a) The Executive is authorized to incur reasonable expenses in carrying out his duties and responsibilities under this Agreement and the Company shall promptly reimburse him for all business expenses incurred in connection with carrying out the business of the Company, subject to documentation in accordance with the Company's policy. The Company shall pay all reasonable legal and financial advisor expenses incurred in connection with the preparation of the Executive's employment arrangements with the Company.

(b) During the Term of Employment, the Executive shall be entitled to participate in all of the Company's executive fringe benefits in accordance with the terms and conditions of such arrangements as are in effect from time to time for the Company's senior-level executives.

(c) The Company acknowledges its obligation to provide the Executive with transportation during the Employment Period that provides him with security to address bona fide business-oriented security concerns, and shall, at Company expense (except as provided below), make available to the Executive and his family Company or other private aircraft for business and personal use at his discretion, provided that any such personal use shall be limited to travel within the United States. The Executive shall pay the Company the standard Company charges for personal use of such aircraft. It is recognized that the Executive's travel by Company aircraft is required for security purposes and, as such, will constitute business use of the aircraft.

**K 128571**

6

NY—446135.2

SEC00460952

(d) The Executive shall relocate his permanent residence from Rhode Island to Michigan. The Executive shall be entitled to a reimbursement payment from the Company equal to his relocation expenses (determined in accordance with the Company's relocation policy) incurred in connection with the Executive's relocation and to the extent not covered thereby will reimburse him for any loss up to an aggregate of $1 million on the sale of his East Greenwich, Rhode Island properties, subject to providing reasonable documentation thereof. The Company shall pay the Executive an additional payment in an amount such that the net amount retained by the Executive, after deduction for all federal, state and local income tax and any employment tax on the reimbursement payments, shall equal the amount of the reimbursement payment.

(e) The Executive shall be entitled to a reimbursement payment from the Company equal to any reasonable expenses incurred by the Executive for temporary housing for the Executive and his family in the Troy, Michigan area for a period of up to six months following the Effective Date.

(f) In all events, during the Term of Employment, the Company shall:

(i)     make available to the Executive a car and a driver for his use in Michigan;

(ii)     reimburse the Executive for personal financial (including tax) counseling (other than legal fees) by a firm or firms to be chosen by the Executive, such reimbursement to be no more than the amount authorized under Company policy in effect from time to time; and

(iii)     provide the Executive with a residential security system in his residence in the Detroit metropolitan area and pay the maintenance of such system including the monthly service charges.

(g) The Executive shall be entitled to four weeks paid vacation per year.

9.     Sign-On Award. As of the Effective Date, the Executive shall be awarded as a sign-on award of 200,000 shares of Stock free of all restrictions.

**Confidential Treatment
Requested by Kmart Corp.**

10.     Buy-Out Provisions

The following payments and benefits are provided to the Executive in consideration of his substantial loss of compensation rights from the Previous Employer in connection with entering into this Agreement. Among such lost rights are those pursuant to the following plans and programs of the Previous Employer: the Long Term Plan, the Long Term Preferred Plan, the Long Term Incentive Plan, the Long Term Restricted Stock Plan, the Retention Bonus Plan and the Supplemental Executive Retirement Plan.

**K 128572**

7

NY—446135.2

**Confidential Treatment**
**Requested by Kmart Corp.**

(a) <u>Cash Payment</u>.  In consideration of the Executive foregoing payments and benefits that would otherwise become due to him under the plans and programs of the Previous Employer, the Executive will be entitled to a cash payment of $5,000,000, payable in installments as follows:

(i)      The first installment, of $2,500,000, shall be paid on the second day following the Effective Date.

(ii)      The remaining $2,500,000 shall be payable in four equal installments of $625,000 each on the second, third, fourth and fifth anniversaries of the Effective Date, provided the Executive is employed by the Company on each such date, except as otherwise provided in Section 11 hereof.

(b) <u>Stock Award</u>.  In consideration of the Executive foregoing payments and benefits that would otherwise become due to him under the plans and programs of the Previous Employer, the Executive shall be awarded 303,000 shares of Stock free of all restrictions as of the Effective Date.

(c) <u>Option Grant</u>.  In consideration of the Executive foregoing certain rights to which he would otherwise be entitled under stock options granted to him under the plans and programs of his Previous Employer. as of the Effective Date, the Company shall grant the Executive a 10-year option to purchase an aggregate of 2,500,000 shares of Stock (the "Replacement Option"), which may be granted under the terms of the Company's stock options plans, or outside the terms of such plans, in either event, on terms consistent with this Agreement and otherwise consistent with the provisions of the Company's Stock Option Plans.  The exercise price per share of the Replacement Option shall be equal to the closing price on the New York Stock Exchange of the Stock on the last trading day immediately preceding the Effective Date.  The Replacement Option shall vest in four equal installments on the second, third, fourth and fifth anniversaries of the Effective Date, provided the Executive is employed by the Company on each such date, except as otherwise provided in Section 11 hereof.  Notwithstanding anything to the contrary in this Section 10(c) or in the Company's stock option plans. if the Executive violates the provisions of Section 12 hereof, the Replacement Option shall immediately terminate.

(d) <u>Restricted Stock Award</u>.  In consideration of the Executive foregoing certain rights to which he would otherwise be entitled under restricted stock granted to him under the plans and programs of his Previous Employer, as of the Effective Date, the Company shall grant the Executive 615,000 restricted shares of Stock (the "Restricted Stock").  Shares of the Restricted Stock shall become vested, and the forfeiture and transfer restrictions thereon shall lapse, in two equal installments on the dates immediately prior to the fourth and fifth anniversaries of the Effective Date, provided the Executive is employed by the Company on each such date, except as otherwise provided in Section 11 hereof.  Notwithstanding anything to the contrary in this Section 10(d), if the Executive violates the provisions of Section 12 hereof, all unvested shares of Restricted Stock shall be immediately forfeited.

**K 128573**

8

SEC00460954

Confidential Treatment
Requested by Kmart Corp.

(e) <u>Retention Bonuses</u>.   In consideration of the Executive foregoing certain payments and benefits that would otherwise become due to him under the plans and programs of his Previous Employer, the Company shall provide the Executive with a retention bonus arrangement providing for an aggregate $10,000,000 in retention bonus payments contingent upon the continued employment of the Executive by the Company, except as otherwise provided in Section 11 hereof, to be paid on a pro-rata annual basis from the first through the fifth anniversary of the Effective Date, with such amounts payable in each installment 50% in cash and 50% in shares of Stock (valued at the fair market value on the date of payment (using the closing price on the immediately prior trading date)), that will be free of restrictions on the date of payment.

(f) <u>SERP</u>. In consideration of the Executive foregoing benefits that would otherwise become due to him under the plans and programs of his Previous Employer, the Company shall provide the Executive with a pension arrangement providing for the accrual of retirement benefits payable at age 55 that are substantially equivalent in the aggregate to the benefits the Executive would have been entitled upon retirement at age 55 under the Supplemental Executive Retirement Plan of his Previous Employer, as in effect on the date hereof, offset by the benefits payable under such plan of the Previous Employer (including any underlying qualified plan), as well as under any comparable supplemental or qualified plan established by the Company.

(g) <u>Offset and Reduction</u>.   Notwithstanding the provisions of Sections 10(a)-(e) above, in the event that the Previous Employer accelerates the vesting of any stock options, restricted stock, equity compensation, incentive compensation, retirement benefits or there is otherwise a material increase in the payments, rights or benefits that were expected to be forfeited as a result of termination of employment with his Previous Employer prior to becoming vested from those communicated to the Company by the Executive and his representatives prior to the Effective Date, the Company shall be entitled to offset the value of such increase, on a benefit by benefit basis (e.g., adjustment in the amount of retention bonus received from the Previous Employer shall result in an offset to the amount payable under Section 10(e) above), from the benefits payable to the Executive under the provisions of Sections 10(a)-(e) above (using the same methodology as employed by the Company in establishing such benefits); <u>provided</u>, <u>however</u>, that any such reduction shall not include the intrinsic value of stock options to the extent that such value is attributable to any time period to exercise stock options that is not made available to the Executive by the Previous Employer.  As a condition of the Executive's rights under this Section 10, the Executive shall be required to provide (i) written evidence satisfactory to the Company of all rights and benefits of his Previous Employer to which this Section 10 relates and (ii) a written representation satisfactory to the Company that there has not been any increase as described above, within 90 days following the Effective Date.

(h) <u>Forfeiture of Certain Payments</u>.   Notwithstanding any provisions of this Agreement to the contrary, in the event that, prior to the first anniversary of the Effective Date, (i) the Executive shall give notice of his voluntary termination of employment pursuant to Section 11(f) below (or shall so terminate without giving notice) or (ii) the Company shall terminate the employment of the Executive for Cause, pursuant

9

NY—446135.2

K 128574

to Section 11(c) below, then the Executive shall immediately forfeit the payments and awards made pursuant to Sections, 9, 10(a) and 10(b) hereof. In this regard, within 15 days of such termination, the Executive shall be required to (a) repay to the Company $2,500,000 in cash, together with interest accrued at an annual rate of 6.5% and (b) return to the Company 503,000 shares of Stock, or the cash equivalent of such shares of Stock based on the closing trading price of the Stock on the New York Stock Exchange on the trading date immediately prior to the date of repayment.

11.  Termination of Employment.

Confidential Treatment
Requested by Kmart Corp.

(a) Termination Due to Death. In the event the Executive's employment is terminated due to his death, his estate or his beneficiaries as the case may be, shall be entitled to:

(i)      Base Salary through the date of death;

(ii)     a pro rata annual bonus for the year in which the Executive's death occurs, based on the Target Bonus for such year, payable in a single installment promptly after his death;

(iii)    the balance of any annual or long-term cash incentive awards (if any) earned (but not yet paid) pursuant to the terms of the applicable programs;

(iv)     any restricted stock award outstanding at the time of his death shall become fully vested and any forfeiture provisions set forth in the relevant restricted stock agreement based on the continued employment of the Executive shall immediately lapse;

(v)      any outstanding stock option or other equity award at the time of death shall become fully vested, and his estate shall have the right to exercise any such award for the lesser of (a) 12 months from the date of death or (b) the remainder of the full original term of the option (notwithstanding any contrary provision of any plan or agreement);

(vi)     any amounts earned, accrued or owing to the Executive but not yet paid under this Agreement, including, without limitation, any amounts not yet paid under Section 10(a)(ii) above; and

(vii)    other or additional benefits in accordance with applicable plans and programs of the Company.

(b) Termination Due to Disability.  In the event the Executive's employment is terminated due to his Disability, he shall be entitled in such case to the following:

(i)      Base Salary through the date of termination;

**K 128575**

10

NY—446135.2

Confidential Treatment
Requested by Kmart Corp.

(ii) through the Company's long-term disability plans or otherwise, an amount equal to 60% of the Base Salary for the period beginning on the date of termination through the Executive's attainment of age 65;

(iii) the annual bonus for the year in which termination due to Disability occurs, based on the Target Bonus for such year, payable in a single installment promptly following termination due to Disability;

(iv) any restricted stock award outstanding at the time of his termination due to Disability shall become fully vested and any forfeiture provisions set forth in the relevant restricted stock agreement based on the continued employment of the Executive shall immediately lapse;

(v) the balance of any annual or long-term cash incentive awards (if any) earned (but not yet paid) pursuant to the terms of the applicable programs;

(vi) any outstanding stock option or other equity award at the time of termination due to Disability shall become fully vested, and he shall have the right to exercise any such award for the lesser of (a) 12 months from the date of Disability or (b) the remainder of the full original term of the option (notwithstanding any contrary provision of any plan or agreement);

(vii) any amounts earned, accrued or owing to the Executive but not yet paid under this Agreement, including, without limitation, any amounts not yet paid under Section 10(a)(ii) above;

(viii) continued participation to the extent provided in medical, dental, hospitalization and life insurance coverage and in all other employee welfare plans and programs in which he was participating on the date of termination for the period of the Disability or until he attains age 65, if earlier; and

(ix) other or additional benefits in accordance with applicable plans and programs of the Company.

In no event shall a termination of the Executive's employment for Disability occur unless the Party terminating his employment gives written notice to the other Party in accordance with Section 24 below.

(c) Termination by the Company for Cause.

(i) A termination for Cause shall not take effect unless the provisions of this paragraph (i) are complied with. The Executive shall be given written notice by the Board of the intention to terminate him for Cause, such notice (A) to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed termination for Cause is based and (B) to be given within six months of the Board learning of such act or acts or

11

NY—446135.2

K 128576

Confidential Treatment
Requested by Kmart Corp.

failure or failures to act. The Executive shall have 10 days after the date that such written notice has been given to the Executive in which to cure such conduct, to the extent such cure is possible. If he fails to cure such conduct, the Executive shall then be entitled to a hearing before the Board. Such hearing shall be held within 15 days of notice to the Company by the Executive, provided he requests such hearing within 10 days of the written notice from the Board of the intention to terminate him for Cause. If, within five days following such hearing, the Executive is furnished written notice that, the Board has determined, by majority vote at a meeting of the Board duly called and held as to which termination of the Executive is an agenda item, that grounds for Cause on the basis of the original notice exist, he shall thereupon be terminated for Cause.

(ii)     In the event the Company terminates the Executive's employment for Cause, he shall be entitled to:

(A)  Base Salary through the date of the termination of his employment for Cause;

(B)  the balance of any annual or long-term cash incentive awards (if any) earned (but not yet paid) pursuant to the terms of the applicable programs;

(C)  any amounts earned, accrued or owing to the Executive but not yet paid under this Agreement; and

(D)  other or additional benefits in accordance with applicable plans or programs of the Company.

(d) Termination Without Cause or Constructive Termination.

(i)     A Constructive Termination shall not take effect unless the provisions of this paragraph (i) are complied with. The Company shall be given written notice by the Executive of the intention to terminate his employment on account of a Constructive Termination, such notice (A) to state in detail the particular act or acts or failure or failures to act that constitute the grounds on which the proposed Constructive Termination is based and (B) to be given within six months of the Executive learning of such act or acts or failure or failures to act. The Company shall have 30 days after the date that such written notice has been given to the Company in which to cure such conduct, to the extent such cure is possible.

(ii)     In the event the Executive's employment is terminated by the Company without Cause, other than due to Disability or death, or in the event there is a Constructive Termination, the Executive shall be entitled to:

(A)     Base Salary through the date of termination of the Executive's employment;

**K 128577**

12

NY—446135.2

SEC00460958

Confidential Treatment
Requested by Kmart Corp.

(B)    Base Salary, at the monthly rate in effect on the date of termination of the Executive's employment (or in the event a reduction in Base Salary is the basis for a Constructive Termination, then the Base Salary in effect immediately prior to such reduction), payable each month for a period of thirty-six months following the date of termination (the "Severance Period"); provided that the Executive and the Company may agree that the Company shall pay him the present value of such salary continuation payments in a lump sum (using as the discount rate the Applicable Federal Rate for short-term Treasury obligations as published by the Internal Revenue Service for the month in which such termination occurs);

(C)    pro-rata annual bonus for the year in which termination occurs, based on the Target Bonus for such year, payable in a single installment promptly following termination;

(D)    an amount equal to one-twelfth (1/12) of the Target Bonus amount for the year in which termination occurs, payable each month over the Severance Period, provided that the Executive and the Company may agree that the Company shall pay him the present value of such bonus amount in a lump sum (using the discount referred to in Section 11(d)(ii)(B) above);

(F)    the balance of any annual or long-term cash incentive awards earned (but not yet paid) pursuant to the terms of the applicable programs;

(G)    any restricted stock award outstanding at the time of such termination of employment shall become fully vested, and any forfeiture provisions set forth in the relevant restricted stock agreement based on the continued employment of the Executive shall immediately lapse;

(H)    any outstanding stock option or other equity award at the time of termination shall become fully vested, and he shall have the right to exercise any such award for the remainder of the lesser of (a) 36 months from the date of termination or (b) the full original term of the option (notwithstanding any contrary provision of any plan or agreement);

(I)    any amounts earned, accrued or owing to the Executive but not yet paid under this Agreement, including, without limitation, any remaining amounts not yet paid under Section 10(a)(ii) or 10(e) above;

(J)    continued participation in all medical, dental, hospitalization and life insurance coverage and in other employee welfare benefit plans or programs in which he was participating on the date of the termination of his employment until the end of the Severance Period; provided that the Company's obligations under this clause (ix) shall be reduced to the extent that the Executive receives similar coverage and benefits under the plans and programs of a subsequent employer; and provided, further, that (x) if the Executive is precluded from continuing his participation in any employee benefit plan or program as provided in this clause (ix) of this Section 11(d), he shall be

13

K 128578

provided with the after-tax economic equivalent of the benefits provided under the plan or program in which he is unable to participate for the period specified in this clause (ix) of this Section 11(d), (y) the economic equivalent of any benefit foregone shall be deemed to be the lowest cost that would be incurred by the Executive in obtaining such benefit himself on an individual basis, and (z) payment of such after-tax economic equivalent shall be made quarterly in advance; and

(K)   other or additional benefits in accordance with applicable plans and programs of the Company.

(e) <u>Termination of Employment Following a Change in Control.</u>

If, within two years following a Change in Control, the Executive's employment is terminated without Cause or there is a Constructive Termination, the Executive shall be entitled to the payments and benefits provided in Section 11(d) above, provided that all cash payments provided therein shall be paid in a lump sum without any discount. In addition, immediately following a Change in Control, all accrued or earned amounts that are not otherwise vested, as well as all options, restricted stock and other equity-based awards in which he is not yet vested, shall become fully vested, including, without limitation, the Executive's accrued benefits under any supplemental retirement plan maintained by the Company. All accrued benefits under such plans shall be paid as a lump-sum cash payment.

**Confidential Treatment
Requested by Kmart Corp.**

(f) <u>Voluntary Termination.</u>

In the event of a termination of employment by the Executive on his own initiative, other than a termination due to death or Disability or a Constructive Termination, the Executive shall have the same entitlements as provided in Section 11(c)(ii) above for a termination for Cause. A voluntary termination under this Section 11(f) shall be effective upon 30 days' prior written notice to the Company and shall not be deemed a breach of this Agreement.

(g) <u>Payment Following a Change in Control.</u>

In the event that the termination of the Executive's employment is for one of the reasons set forth in Section 11(e) above and the aggregate of all payments or benefits made or provided to the Executive under Section 11(e) above and under all other plans and programs of the Company (the "Aggregate Payment") is determined to constitute a Parachute Payment, as such term is defined in Section 280G(b)(2) of the Internal Revenue Code, the Company shall pay to the Executive, prior to the time any excise tax imposed by Section 4999 of the Internal Revenue Code ("Excise Tax") is payable with respect to such Aggregate Payment, an additional amount which, after the imposition of all income and excise taxes thereon, is equal to the Excise Tax on the Aggregate Payment. The determination of whether the Aggregate Payment constitutes a Parachute Payment and, if so, the amount to be paid to the Executive and the time of payment pursuant to this Section 11(g) shall be made by an independent auditor (the "Auditor") jointly selected by the Company and the Executive and paid by the Company.

14

NY—446135.2

**K 128579**

The Auditor shall be a nationally recognized United States public accounting firm which has not, during the two years preceding the date of its selection, acted in any way on behalf of the Company or any Affiliate thereof.  If the Executive and the Company cannot agree on the firm to serve as the Auditor, then the Executive and the Company shall each select one accounting firm and those two firms shall jointly select the accounting firm to serve as the Auditor.

(h) No Mitigation; No Offset.

In the event of any termination of employment under this Section 11, the Executive shall be under no obligation to seek other employment and there shall be no offset against amounts due the Executive under this Agreement on account of (i) any remuneration attributable to any subsequent employment that he may obtain except as specifically provided in this Section 11 or (ii) any claims the Company may have against the Executive.

**Confidential Treatment Requested by Kmart Corp.**

(i) Nature of Payments.

Any amounts due under this Section 11 are in the nature of severance payments considered to be reasonable by the Company and are not in the nature of a penalty.

(j) Exclusivity of Severance Payments.

Upon termination of the Executive's employment during the Term of Employment, he shall not be entitled to any severance payments or severance benefits from the Company, other than as provided herein, or any payments by the Company on account of any claim by him of wrongful termination, including claims under any federal, state or local human and civil rights or labor laws, other than the payments and benefits provided hereunder, except for any benefits which may be due the Executive in normal course under any employee benefit plan of the Company which provides benefits after termination of employment.

(k) Non-competition.

The Executive agrees that any right to receive the severance payments and benefits hereunder will cease if the Executive breaches the provisions of Section 12(a) below.  The Executive agrees that any violation of the provisions of Section 12(a) below will result in the immediate forfeiture of any severance payments or benefits hereunder and any rights to exercise or receive stock options or restricted stock.  The foregoing is in addition to the rights of the Company under Section 10 (g) and 10(h) above.

(l) Release of Claims.

As a condition of the Executive's entitlement to any of the severance rights and benefits provided in this Section 11, the Executive shall be required to execute and honor a release of claims in the form set forth in Exhibit A hereto, subject to such

15

NY—446135.2

**K 128580**

changes consistent with the intent of such release as may be necessary to reflect changes in law.

(m) Termination at Will.

Notwithstanding anything herein to the contrary, the Executive's employment with the Company is terminable at will with or without Cause; provided, however, that a termination of the Executive's employment shall be governed in accordance with the terms hereof.

Confidential Treatment Requested by Kmart Corp.

12. Restrictive Covenants.

(a) Non-Compete. By and in consideration of the substantial compensation and benefits to be provided by the Company hereunder, and further in consideration of the Executive's exposure to the proprietary information of the Company, the Executive agrees that he shall not, during the Term of Employment and for the duration of the Severance Period, but in any event for a period of at least eighteen months following termination of employment for any reason, directly or indirectly own, manage, operate, join, control, be employed by, or participate in the ownership, management, operation or control of or be connected in any manner, including, but not limited to, holding the positions of officer, director, shareholder, consultant, independent contractor, employee, partner, or investor, with any Competing Enterprise; provided, however, that the Executive may invest in stocks, bonds, or other securities of any corporation or other entity (but without participating in the business thereof) if such stocks, bonds, or other securities are listed for trading on a national securities exchange or Nasdaq National Market and the Executive's investment does not exceed 1% of the issued and outstanding shares of capital stock, or in the case of bonds or other securities, 1% of the aggregate principal amount thereof issued and outstanding. "Competing Enterprise" shall mean and be limited to the following entities, including successors thereto: Albertson's Inc., American Retail Group, Inc., American Stores Company, Carrefour sa, Kohl's Corporation, The May Department Store Company, Montgomery Ward & Co., Inc., J.C. Penny Company, Royal Ahold, Safeway, Inc., Sears, Roebuck and Co., Service Merchandise Company, ShopKo Stores, Inc., Supervalue Inc., Target Corp., The Home Depot, Inc., Toys R Us Inc., TJX Companies, Inc., and Wal-Mart Stores, Inc. The Parties agree that the foregoing list of entities shall be amended (by written action pursuant to Section 20 hereof) from time to time, if necessary, to include any additional entity that, following the date hereof, becomes an owner and operator of retail stores selling general merchandise that is national or international in scope and is of a nature similar to the companies listed above.

(b) Nonsolicitation. By and in consideration of the substantial compensation and benefits to be provided by the Company hereunder, and further in consideration of the Executive's exposure to the proprietary information of the Company, the Executive agrees that he shall not, during the Term of Employment and for the duration of the Severance Period, but in any event for a period of at least eighteen months following termination of employment for any reason, without the express prior written approval of the Company, (i) directly or indirectly, in one or a series of transactions,

16

K 128581

SEC00460962

**Confidential Treatment**
**Requested by Kmart Corp.**

recruit, solicit or otherwise induce or influence any proprietor, partner, stockholder, lender, director, officer, employee, sales agent, joint venturer, investor, lessor, supplier, customer, agent, representative or any other person which has a business relationship with the Company, or had a business relationship with the Company within the 24 month period preceding the date of the incident in question, to discontinue, reduce or modify such employment, agency or business relationship with the Company, or (ii) employ or seek to employ or cause any Competing Enterprise to employ or seek to employ any person or agent who is then (or was at any time within six months prior to the date the Executive or the Competing Enterprise employs or seeks to employ such person) employed or retained by the Company.

(c) <u>Confidential Information</u>. During the Term of Employment and at all times thereafter, Executive agrees that he will not divulge to anyone (other than the Company or any persons employed or designated by the Company) any knowledge or information of any type whatsoever whether of a confidential nature or otherwise relating to the business of the Company or any of its subsidiaries or affiliates, as well as any information of a confidential nature obtained from customers, clients or other third parties, including, without limitation, all types of trade secrets (unless readily ascertainable from public or published information or trade sources) and confidential commercial information, and the Executive further agrees not to disclose, publish or make use of any such knowledge or information without the prior written consent of the Company.

(d) The Executive agrees that any breach of the terms of this Section 12 would result in irreparable injury and damage to the Company for which the Company would have no adequate remedy at law; the Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive. The terms of this paragraph shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages. The Executive and the Company further agree that the provisions of the covenant not to compete are reasonable. Should a court or arbitrator determine, however, that any provision of the covenant not to compete is unreasonable, either in period of time, geographical area, or otherwise, the parties hereto agree that the covenant shall be interpreted and enforced to the maximum extent which such court or arbitrator deems reasonable.

(e) The provisions of this Section 12 shall survive any termination of this Agreement and the Term of Employment, and the existence of any claim or cause of action by the Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the covenants and agreements of this Section.

13.   <u>Stock Ownership</u>.   At all times following the fifth anniversary of the Effective Date, the Executive agrees to use his reasonable best efforts to maintain

17

ownership of Stock (including shares of restricted stock) with a fair market value (disregarding any restrictions) equal to at least 400% of his then-current Base Salary.

14.   Registration Statements.   As soon as practicable after the Effective Date (but in no event later than the applicable vesting or exercise dates), the Company shall file and keep effective a registration statement on Form S-8 (or other applicable registration statement) with respect to the stock options, restricted stock and awards of stock hereunder, except to the extent covered by a comparable registration statement under the Company's stock incentive plans.

15.   Indemnification.

<strong>Confidential Treatment<br>Requested by Kmart Corp.</strong>

(a) The Company agrees that if the Executive is made a party, or is threatened to be made a party, to any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), other than a Proceeding brought on behalf of the Previous Employer relating to the Executive's employment agreement with the Previous Employer, by reason of the fact that he is or was a director, officer or employee of the Company or is or was serving at the request of the Company as a director, officer, member, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether or not the basis of such Proceeding is the Executive's alleged action in an official capacity while serving as a director, officer, member, employee or agent, the Executive shall be indemnified and held harmless by the Company to the fullest extent legally permitted or authorized by the Company's certificate of incorporation or bylaws or resolutions of the Company's Board of Directors or, if greater, by the laws of the State of Michigan against all cost, expense, liability and loss (including, without limitation, attorney's fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by the Executive in connection therewith, and such indemnification shall continue as to the Executive even if he has ceased to be a director, officer, member, employee or agent of the Company or other entity and shall inure to the benefit of the Executive's heirs, executors and administrators. The Company shall advance to the Executive all reasonable costs and expenses incurred by him in connection with a Proceeding within 20 days after receipt by the Company of a written request for such advance.  Such request shall include an undertaking by the Executive to repay the amount of such advance if it shall ultimately be determined that he is not entitled to be indemnified against such costs and expenses.

(b) Neither the failure of the Company (including its board of directors, independent legal counsel or stockholders) to have made a determination prior to the commencement of any Proceeding concerning payment of amounts claimed by the Executive under Section 15(a) above that indemnification of the Executive is proper because he has met the applicable standard of conduct, nor a determination by the Company (including its board of directors, independent legal counsel or stockholders) that the Executive has not met such applicable standard of conduct, shall create a presumption that the Executive has not met the applicable standard of conduct.

<strong>K 128583</strong>

NY—446135.2

(c) The Company agrees to continue and maintain a directors and officers' liability insurance policy covering the Executive to the extent the Company provides such coverage for its other executive officers or former officers.

16.   Effect of Agreement on Other Benefits.

Except as specifically provided in this Agreement, the existence of this Agreement shall not prohibit or restrict the Executive's entitlement to full participation in the employee benefit and other plans or programs in which senior executives of the Company are eligible to participate.

**Confidential Treatment
Requested by Kmart Corp.**

17.   Assignability; Binding Nature.

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs (in the case of the Executive) and assigns. No rights or obligations of the Company under this Agreement may be assigned or transferred by the Company except that such rights or obligations may be assigned or transferred pursuant to a merger or consolidation in which the Company is not the continuing entity, or the sale or liquidation of all or substantially all of the assets of the Company, provided that the assignee or transferee is the successor to all or substantially all of the assets of the Company and such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law. The Company further agrees that, in the event of a sale of reorganization transaction as described in the preceding sentence, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder. No duties or obligations of the Executive under this Agreement may be assigned or transferred by the Executive other than his rights to compensation and benefits, which may be transferred only by will or operation of law, except as provided in Section 23 below.

18.   Representations.

The Company represents and warrants that it is fully authorized and empowered by action of the Board to enter into this Agreement and to deliver and hold open the accompanying offer letter, and that the performance of its obligations under this Agreement will not violate any agreement between it and any other person, firm or organization.

19.   Entire Agreement.

This Agreement contains the entire understanding and agreement between the Parties concerning the subject matter hereof and supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the Parties with respect thereto; provided, however, that this Agreement shall not supersede any separate written commitments by the Company with respect to indemnification.

**K 128584**

19

NY—446135.2

20.   Amendment or Waiver.

No provision in this Agreement may be amended unless such amendment is agreed to in writing and signed by the Executive and an authorized officer of the Company. No waiver by either Party of any breach by the other Party of any condition or provision contained in this Agreement to be performed by such other Party shall be deemed a waiver of a similar or dissimilar condition or provision at the same or any prior or subsequent time. Any waiver must be in writing and signed by the Executive or an authorized officer of the Company, as the case may be.

**Confidential Treatment
Requested by Kmart Corp.**

21.   Severability.

In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

22.   Survival.

The respective rights and obligations of the Parties hereunder shall survive any termination of the Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

23.   Beneficiaries/References.

The Executive shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable hereunder following the Executive's death by giving the Company written notice thereof.  In the event of the Executive's death or a judicial determination of his incompetence, reference in this Agreement to the Executive shall be deemed, where appropriate, to refer to his beneficiary, estate or other legal representative.

24.   Governing Law/Jurisdiction.

This Agreement shall be governed by and construed and interpreted in accordance with the laws of Michigan without reference to principles of conflict of laws.

25.   Resolution of Disputes.

Any disputes arising under or in connection with this Agreement shall, at the election of the Executive or the Company, be resolved by binding arbitration, to be held in Detroit, Michigan in accordance with the rules and procedures of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. All costs and expenses of any arbitration or court proceeding (including fees and disbursements of counsel) shall be borne by the respective Party incurring such costs and expenses, but the Company shall reimburse the

20

NY—446135.2

**K 128585**

SEC00460966

Executive for such reasonable costs and expenses in the event he substantially prevails in such arbitration or court proceeding. Notwithstanding the foregoing, following a Change of Control, all reasonable costs and expenses (including fees and disbursements of counsel) incurred by the Executive pursuant to this Section 25 shall be paid on behalf of or reimbursed to the Executive promptly by the Company; provided, however, that no reimbursement shall be made of such expenses if and to the extent the arbitrator(s) or the court determine(s) that any of the Executive's litigation assertions or defenses were in bad faith or frivolous.

26.  Notices.

Any notice given to a Party shall be in writing and shall be deemed to have been given when delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested, duly addressed to the Party concerned at the address indicated below or to such changed address as such Party may subsequently give such notice of:

Confidential Treatment
Requested by Kmart Corp.

If to the Company:    Kmart Corporation
3100 West Big Beaver Road
Troy, MI 48084-3163

Attention: General Counsel

If to the Executive:    Charles C. Conaway
15 Signal Ridge Way
East Greenwich, RI 02818

27.  Withholding.

All amounts required to be paid by the Company shall be subject to reduction in order to comply with applicable Federal, state and local tax withholding requirements.

28.  Headings.

The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

**K 128586**

NY—446135.2

SEC00460967

29.     Counterparts.

This Agreement may be executed in two or more counterparts.


IN WITNESS WHEREOF, the undersigned have executed this Agreement on the dates provided below.

KMART CORPORATION

By: _____
Warren F. Cooper

May 25, 2000

**Confidential Treatment Requested by Kmart Corp.**

EXECUTIVE

_____
Charles C. Conaway

May 30, 2000

**K 128587**

22

NY—446135.2

SEC00460968

# Exhibit C

AMENDMENT
TO
EMPLOYMENT AGREEMENT

This FIRST AMENDMENT TO THE EMPLOYMENT AGREEMENT, made and entered into by and between KMART CORPORATION, a Michigan corporation (together with its successors and assigns permitted under this Agreement, the "Company"), and CHARLES C. CONAWAY (the "Executive") effective as of the 15th day of May 2001.

WHEREAS, the Executive has entered into an employment agreement with the Company, dated as of May 30, 2000 (the "Employment Agreement"), pursuant to which the Executive serves the Company as its Chief Executive Officer and Chairman.

WHEREAS, the Company has determined that it is appropriate and in the best interests of the shareholders of the Company to provide the Executive with additional incentive compensation opportunities based on the achievement by the Company of certain pre-established performance goals;

WHEREAS, the Employment Agreement may be amended by the written agreement of the parties; and

WHEREAS, the Company and the Executive now wish to amend the Employment Agreement to reflect the additional incentive compensation opportunities.

NOW, THEREFORE, in consideration of the premises and the mutual agreements hereinafter contained, the parties do hereby amend the Employment Agreement as follows, effective as of the date hereof:

1. A new item (iv) shall be added at the end of Section 6(b) of the Employment Agreement to read as follows:

"(iv) <u>Performance Option Grant</u>. On May 15, 2001 (the "Grant Date"), the Committee granted to the Executive a 10-year option to purchase an aggregate of 2,500,000 shares of Stock (the "Performance Option"). The exercise price per share of the Performance Option shall be equal to $10.15 per share, the fair market value of the Stock on the Grant Date. The Performance Option shall be divided into three tranches, with each tranche being subject to the performance requirements described below:

# Trust Exhibit
# 1335

K-53572
CONFIDENTIAL TREATMENT
REQUESTED BY KMART CORP

(1)    The performance requirement with respect to the first tranche, covering 1,250,000 shares of Stock under the Performance Option, shall be based upon the Company's achieving a target level of earnings per share to be established by the Committee in consultation with the Executive within 6 months of the Grant Date, which target must be attained by the Company for any four consecutive fiscal quarters of the Company ending on or before January 31, 2004;

(2)    The performance requirement with respect to the second tranche, covering 750,000 shares of Stock under the Performance Option, shall be based upon the Company's achieving the "Inventory Turnover" target established and administered by the Committee for purposes of the Company's Long-Term ELT Performance Share Plan for the performance period ending as of January 31, 2004; and

(3)    The performance requirement with respect to the third tranche, covering 500,000 shares of Stock under the Performance Option, shall be based upon the Company's achieving the "Customer Super Service Index" target established and administered by the Committee for purposes of the Company's Long-Term ELT Performance Share Plan for the performance period ending as of January 31, 2004.

In the event of any merger, reorganization, consolidation, recapitalization, stock dividend, stock split, reverse stock split, spin-off or similar transaction or other change in corporate structure affecting the calculation of earnings per share, or any other performance objective established hereunder, such adjustments and other substitutions shall be made to the performance requirements established hereunder as the Committee in its sole discretion deems equitable or appropriate.

Any tranche of the Performance Option for which the applicable performance requirement shall have been satisfied shall become vested and exercisable in three equal installments, each relating to one third of the number of shares covered by such tranche, on each of January 31, 2004, 2005 and 2006, provided the Executive remains employed by the Company on the applicable vesting date. Notwithstanding the failure to satisfy the requirements set forth in the preceding sentence:

(a)    In the case of a termination of employment that occurs on or prior to January 30, 2004, all tranches of the Performance Option shall also become vested and exercisable if, under the circumstances of the Executive's termination of employment or if there is a Change in Control, any other options then held by him become vested and exercisable, or would have become vested and exercisable if such options were not then already vested and exercisable, in accordance with the provisions of Section 11 hereof (an "Acceleration Event"); and

(b)    In the case of an Acceleration Event that occurs after January 30, 2004 and prior to January 31, 2006, any tranche of the Performance Option as to which the applicable performance requirement has been satisfied as of January 31, 2004 shall also become vested and exercisable.

2

NY—560554.3

K-53573
CONFIDENTIAL TREATMENT
REQUESTED BY KMART CORP

All tranches of the Performance Option, for which the applicable performance requirement shall not have been satisfied as of January 31, 2004 shall nevertheless become vested and exercisable on the ninth (9th) anniversary of the Grant Date, provided the Executive remains employed by the Company on such date (notwithstanding the provisions of Section 11 hereof, which shall not apply after January 31, 2004 to accelerate the vesting of any particular tranche of the Performance Option to the extent the performance conditions relating to such tranche were not satisfied as of January 31, 2004, except in the circumstances set forth in Section 11(e)). Notwithstanding anything to the contrary in this Section 6(b) or in the 1997 Plan, if the Executive violates the provisions of Section 12 hereof, the Performance Option shall immediately terminate."

As soon as practicable following the date hereof, the Company and the Executive will enter into a stock option agreement with terms and conditions consistent in all respects with the provisions of this Section 6(b)(iv) and this Employment Agreement and otherwise substantially the same as nonqualified stock options granted under the of the Company's 1997 Long-Term Equity Compensation Plan, as amended (the "1997 Plan").

Such option shall be issued either under the terms of the 1997 Plan or outside the terms of the 1997 Plan, in which case the Company will take all necessary actions to file, on or before the first anniversary of the Grant Date, and to keep effective, a registration statement on Form S-8 covering the sale of Stock by the Company pursuant to the exercise of the Performance Option.

      2.  A new subsection (c) shall be added at the end of Section 6 of the Employment Agreement to read as follows:

      "(c)  <u>Executive Loan</u>. As soon as practicable following the effective date hereof, the Company will provide the Executive a loan in the principal amount of $5,000,000 (the "Loan") that shall be due and payable on February 1, 2006 and that shall bear interest at the minimum rate necessary on the date the loan is extended to avoid imputation of tax under Section 7872 of the Internal Revenue Code of 1986, as amended. The Company and the Executive will enter into a full recourse, unsecured promissory note with respect to the Loan, with customary terms and conditions consistent in all respects with the provisions of this Section 6(c). Interest on the Loan accruing during the term of the Loan shall be compounded annually and shall be deferred until January 31, 2006.

The outstanding principal and accrued interest under the Loan shall automatically and without further action on the part of the Company or the Executive be forgiven in full by the Company, provided the Executive remains employed by the Company through January 31, 2006. All principal and accrued interest on the Loan shall also be forgiven, without further action on the part of the Company or the Executive, upon the earlier to occur of the following prior to February 1, 2006: (i) the Company's delivery to the Executive of a notice of non-extension pursuant to Section 2, hereof, or (ii) the Executive's termination of employment from the Company under any circumstance that results in acceleration of vesting prior to the scheduled vesting date of any stock options

3

NY—560554.3

K-53574
CONFIDENTIAL TREATMENT
REQUESTED BY KMART CORP

then held by the Executive pursuant to the provisions of Section 11 hereof ( the applicable event being a "Loan Forgiveness Event").

In the event of Executive's termination of employment prior to January 31, 2006 under circumstances not constituting a Loan Forgiveness Event, unpaid principal and accrued interest under the Loan shall be repayable in full upon such termination in accordance with the terms of the promissory note and any cash compensation then owed to the Executive by the Company may be offset against any amounts then owed by the Executive to the Company with respect to the Loan; provided, however, that in the event there is any dispute between the Company and the Executive as to whether the underlying circumstances of termination constitute a Loan Forgiveness Event, no offset shall be applied by the Company until such dispute has been finally resolved in accordance with the provisions of Section 26 hereof.

The Executive shall be solely responsible for his personal tax liability arising as a result of the Loan and any forgiveness of principal or interest under the Loan. Notwithstanding the foregoing, in the event that the Internal Revenue Service determines at any time that principal or interest under the Loan should be taken into account as taxable income by the Executive at the time it is entered into, any resulting tax, including any resulting state and local taxes (collectively "Associated Taxes"), and any related interest and penalties, will be either paid by the Company or advanced to the Executive, at his election, when due. In addition, the Company shall make additional payments to the Executive to hold him harmless from: (i) any tax liabilities attributable to its payment of any related interest and penalties (but not of the Associated Taxes), and (ii) any imputed income associated with interest-free component of the Executive's repayment obligation referred to in the next succeeding paragraph (the "Hold Harmless Payments").

Should the Company wish to contest, together with the Hold Harmless Payments the accelerated inclusion of such income, then the Executive shall reasonably cooperate with the Company as to such contest, and the Associated Taxes, and any amounts due with respect to related interest and penalties, may be paid by the Company or, at his election advanced to the Executive, at such later time as is agreed to by the Executive, together with the Hold Harmless Payments. Any such Associated Taxes shall be repaid by the Executive to the Company (without interest), either at the time the Loan is otherwise repayable by the Executive, or at the time such loan is forgiven in accordance with this Section 6(c), whichever is applicable. Any such Hold Harmless Payments shall be the sole responsibility of the Company."

     3.  Defined Terms used herein and not otherwise defined in this Amendment shall have the same meaning as when used under the Employment Agreement.

     4.  Except as amended and modified hereby, the terms of the Employment Agreement shall remain in full force and effect.

4

NY—560554.3

**K-53575**
CONFIDENTIAL TREATMENT
REQUESTED BY KMART CORP.

IN WITNESS WHEREOF, the parties hereto have entered into the First Amendment to Employment Agreement as of the day and year first written above.

EXECUTIVE

Charles C. Conaway

KMART CORPORATION

By:
Title:

5

NY—560554.3

K-53576
CONFIDENTIAL TREATMENT
REQUESTED BY KMART CORP

# Exhibit D

<u>**EXECUTION COPY**</u>

<u>SEPARATION AGREEMENT</u>

This Agreement ("Agreement"), dated as of March 11, 2002, by and between Kmart Corporation (the "Company"), and Charles C. Conaway (the "Executive").

<u>W I T N E S S E T H</u>:

WHEREAS, the Executive is the Chief Executive Officer and a director of the Company; and

WHEREAS, the Executive and the Company have previously entered into that certain Employment Agreement, dated as of May 30, 2000, as amended (the "2000 Employment Agreement") and the Amended and Restated Employment Agreement, dated as of January 21, 2002 (the "2002 Employment Agreement");

WHEREAS, in recognition of the fact that court approval of the 2002 Employment Agreement will not be obtained by March 24, 2002, the Company has agreed to rescind the 2002 Employment Agreement with the Executive's consent, such rescission to be effective upon execution of this Agreement, and the Company has agreed to withdraw its pending request for court approval of such agreement not later than March 20, 2002;

WHEREAS, the Company acknowledges and agrees that, under the 2000 Employment Agreement, the Executive has the right to terminate his employment in a "Constructive Termination" (as such term is defined under the 2000 Employment Agreement);

WHEREAS, the Executive has advised the Company that he intends to give proper written notice of his election to terminate his employment by reason of a Constructive Termination under the 2000 Employment Agreement;

WHEREAS, the Company has agreed to waive its right to have the Executive work until the end of the Constructive Termination notice period, and any related cure rights, and any related cure rights, and, accordingly, will terminate the Executive's employment without Cause effective as of the close of business on March 11, 2002; and

WHEREAS, the Executive and the Company have mutually agreed to enter into this Agreement in order to fully set forth all of their respective rights and obligations upon and following the Executive's termination of employment from the Company.

**KP 030781**
Confidential Treatment
Requested by Kmart Corp.



PLAINTIFF'S
EXHIBIT
289
tabbies

CC-0831808

NOW, THEREFORE, in consideration of the premises and of the releases, representations, covenants and obligations contained herein, the parties hereto agree as follows:

1. <u>Termination of Executive's Employment</u>. The Executive's employment with the Company and all of its subsidiaries and affiliates shall terminate as of the close of business on March 11, 2002 (the "Termination Date"). The Executive shall resign as a member of the Board of Directors of the Company (the "Board") as of the Termination Date. The Executive agrees to execute any and all documents and take any and all actions as may be reasonably requested by the Company to effectuate any of the foregoing.

2. <u>Severance Payments</u>. Subject to Section 5(a) below, the Company agrees:

(a) to pay the Executive his base salary through the Termination Date and reimburse the Executive for any reasonable unreimbursed expenses in accordance with Company policy, which amounts shall be payable as soon as practicable following the Termination Date; and

(b) on the Termination Date, pursuant to the Order of the Bankruptcy Court, dated January 25, 2002, approving the Motion for Order filed January 22, 2002 with the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") requesting authorization, *inter alia*, to continue to pay severance benefits in accordance with Paragraph 36 thereof (the "Wage Motion"), to pay the Executive, in one lump sum, by wire transfer of immediately available Federal funds to an account designated by the Executive, severance in an aggregate amount of $4,039,708.93; <u>provided</u>, that such payment shall be subject to all applicable federal, state and local withholding taxes, in accordance with the Company's ordinary payroll practices.

3. <u>Loan Forgiveness</u>. The Company hereby acknowledges that, in accordance with the terms of that certain Promissory Note, dated May 30, 2001 (the "Promissory Note"), as a result of the Executive's termination of employment with the Company, the outstanding principal and accrued interest has been forgiven as of the Termination Date, and contemporaneously with the execution of this Agreement and delivery by the Executive of the Release referred to in Section 5(a) hereof, the Company shall return the Promissory Note to the Executive marked "Cancelled".

4. <u>Additional Obligations of the Company</u>. In consideration of the Executive's execution and compliance with the terms and conditions of this Agreement, and subject to Section 5 below, the Company agrees:

(a) in connection with the forgiveness of the Loan, to pay to the Executive an amount equal to $3,885,003 in respect of the additional payment to cover all applicable federal, state and local income and excise taxes payable by the Executive on

359680-New York Server 5A - MSW

2

KP 030782
Confidential Treatment
Requested by Kmart Corp.

CC-0831809

account of the forgiveness of the Loan and the payment described in this Section 4(a), which amount shall be payable promptly following the expiration of the Revocation Period, in one lump sum by wire transfer of immediately available Federal funds to an account designated by the Executive.

(b)   to continue, until March 11, 2003, the participation of the Executive in all medical, dental, hospitalization and life insurance coverage and in other employee welfare benefit plans or programs in which he was participating on the Termination Date; provided that the Company's obligations under this Section 4(a) shall terminate as of the date the Executive receives similar coverage and benefits (and the Executive shall be obligated promptly to inform the Company of his receipt of such coverage and benefits);

(c)   to continue, until September 11, 2002, to provide to the Executive, or reimburse the Executive for, such personal and residential security measures as are in place with respect to the Executive as of the Termination Date;

(d)   to reimburse the Executive up to a maximum of $75,000 for legal expenses incurred by him with respect to the negotiation and preparation of the 2002 Employment Agreement and this Agreement;

(e)   to provide the Executive with the use of the Company's standard senior executive professional outplacement assistance for a period of six months following the Termination Date; and

(f)   until September 11, 2002 or, if sooner, until he is again employed on a full-time basis, to make available to the Executive, at times and locations reasonably acceptable to the Company, appropriate Company personnel to provide the Executive administrative support services relating to phone, calendar, correspondence, travel arrangements and email.

The Company acknowledges and agrees that nothing in this Agreement shall adversely affect the Executive's rights with respect to his vested benefits under any tax-qualified retirement plan of the Company.

5.   Executive Releases.   The two releases described below may be referred to herein individually as a "Release" and collectively as the "Releases."

(a)   Contemporaneously with the execution of this Agreement and as a condition to receiving and/or retaining the payments and benefits provided for under Sections 2 and 3 hereof, the Executive shall execute the Covenant Not To Sue and Release of Liability in the form attached hereto as Exhibit A.

(b)   As a condition to receiving and/or retaining the payments and benefits provided for under Section 4 hereof, (a) the Executive shall have executed, on or following the date on which an order of the U.S. Bankruptcy Court approving this Agreement becomes a final order, the Covenant Not To Sue and Full and Complete

3

359680-New York Server 5A - MSW

KP 030783
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL                                                      CC-0831810

Release of Liability attached hereto as Exhibit B ("Release B") and (b) seven days shall have passed following such date (the "Revocation Period") without Release B having been revoked.

6.  Indemnification.

(a)  The Company agrees that if the Executive has been or is made a party, or has been or is threatened to be made a party, to any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), other than a Proceeding brought on behalf of the Previous Employer (as defined in the 2000 Employment Agreement) relating to the Executive's employment agreement with the Previous Employer, by reason of the fact that he is or was a director, officer or employee of the Company or is or was serving at the request of the Company as a director, officer, member, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether or not the basis of such Proceeding is the Executive's alleged action in an official capacity while serving as a director, officer, member, employee or agent, the Executive shall be indemnified and held harmless by the Company to the fullest extent legally permitted or authorized by the Company's certificate of incorporation or bylaws or resolutions of the Company's Board of Directors or, if greater, by the laws of the State of Michigan against all cost, expense, liability and loss (including, without limitation, attorney's fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by the Executive in connection therewith, and such indemnification shall continue as to the Executive even if he has ceased to be a director, officer, member, employee or agent of the Company or other entity and shall inure to the benefit of the Executive's heirs, executors and administrators.  The Company shall advance to the Executive all reasonable costs and expenses incurred by him in connection with a Proceeding within 20 days after receipt by the Company of a written request for such advance.  Such request shall include an undertaking by the Executive to repay the amount of such advance if it shall ultimately be determined that he is not entitled to be indemnified against such costs and expenses.

(b)  Neither the failure of the Company (including its board of directors, independent legal counsel or stockholders) to have made a determination prior to the commencement of any Proceeding concerning payment of amounts claimed by the Executive under Section 6(a) above that indemnification of the Executive is proper because he has met the applicable standard of conduct, nor a determination by the Company (including its board of directors, independent legal counsel or stockholders) that the Executive has not met such applicable standard of conduct, shall create a presumption that the Executive has not met the applicable standard of conduct.

(c)  The Company agrees to continue and maintain a directors and officers' liability insurance policy covering the Executive to the extent the Company provides such coverage for its other executive officers or former officers.  Without limiting the generality of the foregoing, the Company agrees that the Executive shall be afforded the benefit of any greater protections (with respect to, for example, funding

4

KP 030784
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL  CC-0831811

arrangements and the maintenance of post-termination coverage) as may be implemented from time to time with respect to the Company's officers and/or directors.

7.   Executive Cooperation.

(a)   For no additional compensation, the Executive agrees to reasonably cooperate with the Company and any of its subsidiaries and affiliates on such matters as are reasonably requested of the Executive with respect to any management transition matters or any legal or administrative proceeding, governmental investigation or similar matters involving the Company or any of its subsidiaries or affiliates.  Such cooperation shall include all reasonable assistance that the Company or any of its subsidiaries or affiliates determine is necessary, including, but not limited to, meeting or consulting with the Company, its subsidiaries and affiliates and their counsel and their designees, reviewing documents, analyzing facts and appearing or testifying as a witness or interviewee or otherwise.  The Executive agrees that he will provide such assistance and cooperation in the manner and at the locations as shall be reasonably requested by the Company; provided, however, that the Company shall use its best efforts to request such assistance at reasonable times so as not to interfere with his obligations resulting from employment activities following his termination of employment from the Company.  The Executive shall be entitled to reimbursement, upon receipt by the Company of suitable documentation, for reasonable and necessary travel and other expenses which the Executive may incur at the specific request of the Company and as approved by the Company in advance.

(b)   In the event that counsel for the Company reasonably determines that the Company's and the Executive's interests in any proceeding, investigation or similar matter described in Section 7(a) are potentially diverse such that it would not be appropriate for counsel for the Company to also represent the Executive because of applicable conflict of interest rules, the Executive shall be entitled to retain separate counsel and the Company shall reimburse the Executive (on an after-tax basis) for all reasonable attorney's fees and expenses incurred by the Executive with respect to such proceeding, investigation or similar matter.

8.   Press Release.  The Company shall consult with the Executive prior to issuing a press release concerning the termination of the Executive's services to the Company.  The Executive shall not issue a press release concerning the termination of his services to the Company without the content thereof being approved by the Company.

9.   Restrictive Covenants.

(a)   Non-Compete.  By and in consideration of the substantial compensation and benefits to be provided by the Company hereunder, and further in consideration of the Executive's exposure to the proprietary information of the Company, the Executive agrees that he shall not, for a period of at least 12 months following the Termination Date, directly or indirectly own, manage, operate, join, control, be employed by, or participate in the ownership, management, operation or control of or be connected

5

KP 030785
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL                                                                                 CC-0831812

in any manner, including, but not limited to, holding the positions of officer, director, shareholder, consultant, independent contractor, employee, partner, or investor, with any Competing Enterprise; provided, however, that the Executive may invest in stocks, bonds, or other securities of any corporation or other entity (but without participating in the business thereof) if such stocks, bonds, or other securities are listed for trading on a national securities exchange or Nasdaq National Market and the Executive's investment does not exceed 1% of the issued and outstanding shares of capital stock, or in the case of bonds or other securities, 1% of the aggregate principal amount thereof issued and outstanding. "Competing Enterprise" shall mean and be limited to the following entities, including successors thereto: Albertson's Inc., American Retail Group, Inc., American Stores Company, Carrefour sa, Kohl's Corporation, The May Department Store Company, Montgomery Ward & Co., Inc., J.C. Penny Company, Royal Ahold, Safeway, Inc., Sears, Roebuck and Co., Service Merchandise Company, ShopKo Stores, Inc., Supervalue Inc., Target Corp., The Home Depot, Inc., Toys R Us Inc., TJX Companies, Inc., and Wal-Mart Stores, Inc.

(b)  Nonsolicitation.  By and in consideration of the substantial compensation and benefits to be provided by the Company hereunder, and further in consideration of the Executive's exposure to the proprietary information of the Company, the Executive agrees that he shall not, for a period of at least 12 months following the Termination Date, without the express prior written approval of the Company, (i) directly or indirectly, in one or a series of transactions, recruit, solicit or otherwise induce or influence any proprietor, partner, stockholder, lender, director, officer, employee, sales agent, joint venturer, investor, lessor, supplier, customer, agent, representative or any other person which has a business relationship with the Company, or had a business relationship with the Company within the 24-month period preceding the date of the incident in question, to discontinue, reduce or modify such employment, agency or business relationship with the Company, or (ii) employ or seek to employ or cause any Competing Enterprise to employ or seek to employ any person or agent who is then (or was at any time within six months prior to the date the Executive or the Competing Enterprise employs or seeks to employ such person) employed or retained by the Company.

(c)  Confidential Information.  Commencing on the Termination Date, Executive agrees that he will not divulge to anyone (other than the Company or any persons employed or designated by the Company) any knowledge or information of any type whatsoever whether of a confidential nature or otherwise relating to the business of the Company or any of its subsidiaries or affiliates, as well as any information of a confidential nature obtained from customers, clients or other third parties, including, without limitation, all types of trade secrets (unless readily ascertainable from public or published information or trade sources) and confidential commercial information, and the Executive further agrees not to disclose, publish or make use of any such knowledge or information without the prior written consent of the Company.

(d)  Non-Disparagement.  The Executive agrees that he will not, at any time in the future, in any way disparage the Company, or any of its subsidiaries or

6

KP 030786
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL                                                                 CC-0831813

affiliates, or any of their respective current and former officers, directors or employees, verbally or in writing, or make any statements to the press or to third parties that may be derogatory or detrimental to the good name or business reputation of any such entity or person. Likewise, the Company will direct its directors and senior executive officers to not, at any time in the future for so long as such director or senior executive officer continues to be associated with the Company in such capacity, in any way disparage the Executive, verbally or in writing, or make any statements to the press or to third parties that may be derogatory or detrimental to the Executive's good name or business reputation. Nothing in this Section 9(d) shall preclude the parties from responding truthfully to inquiries made in connection with any legal or governmental proceeding pursuant to subpoena or other legal process or from responding truthfully to any public statement made by the other party hereto. Without intending to limit the remedies available to the parties hereto, in the event that either party breaches the provisions of this Section 9(d), nothing in this Section 9(d) shall be construed to limit the non-breaching party's ability to respond to statements made by the breaching party.

(e)   The Executive agrees that any breach of the terms of this Section 9 would result in irreparable injury and damage to the Company for which the Company would have no adequate remedy at law; the Executive therefore also agrees that in the event of said breach or any reasonable threat of breach, the Company shall be entitled to an immediate injunction and restraining order to prevent such breach and/or threatened breach and/or continued breach by the Executive and/or any and all persons and/or entities acting for and/or with the Executive. The terms of this Section 9 shall not prevent the Company from pursuing any other available remedies for any breach or threatened breach hereof, including, but not limited to, remedies available under this Agreement and the recovery of damages. The Executive and the Company further agree that the provisions of the covenant not to compete are reasonable. Should a court or arbitrator determine, however, that any provision of the covenant not to compete is unreasonable, either in period of time, geographical area, or otherwise, the parties hereto agree that the covenant shall be interpreted and enforced to the maximum extent which such court or arbitrator deems reasonable.

(f)   The existence of any claim or cause of action by the Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the covenants and agreements of this Section 9.

10.   Consultation with Counsel. The Company has advised the Executive to consult with an attorney of his choosing prior to signing this Agreement. The Executive represents that he understands and agrees that the Executive has the right and has been given the opportunity to review this Agreement and, specifically, the Releases, with an attorney. The Executive further represents that he understands and agrees that the Company is under no obligation to offer the Executive this Agreement, and that the Executive is under no obligation to consent to the Releases, and that the Executive has entered into this Agreement freely and voluntarily.

KP 030787
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL                                                              CC-0831814

11.   <u>Enforcement</u>.  It is the desire and intent of the parties that the provisions of this Agreement and the Releases shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  In the event that any one or more of the provisions of this Agreement or the Releases shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remainder of this Agreement and/or the Release shall not in any way be affected or impaired thereby.  Moreover, if any one or more of the provisions contained in this Agreement or the Releases is held to be excessively broad as to duration, scope, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent compatible with applicable law.

12.   <u>Entire Agreement</u>.  Subject to Section 17, this Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter contained herein and supersedes all prior agreements, arrangements and understandings, written or oral, between the parties including, but not limited to, the 2000 Employment Agreement, the 2002 Employment Agreement and any other agreements, resolutions, authorizations, policies and practices of the Company regarding expense reimbursement, indemnification, security and other matters concerning the Executive's employment with and service as a director of the Company (the "Other Agreements").

Subject to Section 17, the Executive acknowledges that, except with respect to vested benefits to be provided under the tax-qualified retirement plans of the Company in which the Executive was participating as of the Termination Date, the payments and benefits to be paid and provided under this Agreement are in lieu of and in full satisfaction of any amounts that might otherwise be payable under any agreement, contract, plan, policy or practice, past or present, of the Company, or of their subsidiaries or affiliates, including, but not limited to, the Employment Agreement, the 2002 Employment Agreement and the Other Agreements.

13.   <u>Notices</u>.  For the purposes of this Agreement, notices, demands, and all other communications provided for hereunder shall be in writing and shall be deemed to have been duly given when hand delivered or (unless otherwise specified) when mailed by United States certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:              Charles C. Conaway

                                  c/o Stephen T. Lindo, Esq.
                                  Willkie Farr & Gallagher
                                  787 Seventh Avenue

                                  New York, NY  10019-6099

KP 030788
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL                                                   CC-0831815

|                      |                                      |
|----------------------|--------------------------------------|
| If to the Company:   | Kmart Corporation                    |
|                      | 3100 West Big Beaver Road            |
|                      | Troy, MI 48084-3163                  |
|                      | Attention: Secretary                 |
|                      | (with a copy to the attention        |
|                      | of the General Counsel)              |
|                      |                                      |
| with a copy to:      | Stuart N. Alperin, Esq.              |
|                      | Skadden, Arps, Slate, Meagher &      |
|                      | Flom LLP                             |
|                      | Four Times Square                    |
|                      | New York, NY  10036-6522             |

or to such other address as any party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

14.   Amendment.  No provision of this Agreement may be modified or discharged unless such modification or discharge is authorized and agreed to in writing, signed by the Company and the Executive.  No waiver by either party of any breach by the other party of any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of any other provision or condition at the time or at any prior or subsequent time.  This Agreement and the provisions contained in it shall not be construed or interpreted for or against either party because that party drafted or caused that party's legal representative to draft any of its provisions.

15.   Captions.  The captions used in this Agreement are for convenience only and shall not change the substance of the provisions herein.

16.   Applicable Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan, applied without reference to principles of conflicts of laws.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

17.   Approval of Agreement.  The Company represents and warrants that all requisite approvals of the Board to enter into this Agreement have been obtained. Notwithstanding anything in this Agreement to the contrary, the effectiveness of this Agreement is subject to the approval of the United States Bankruptcy Court having jurisdiction over the Company and its bankruptcy case.  The Company shall use its reasonable best efforts to seek Bankruptcy Court approval of this Agreement and to obtain a Bankruptcy Court order approving this Agreement as soon as practicable following the execution of this Agreement, such order and the supporting motion or motions to be in form and substance reasonably satisfactory to the Executive.  If this Agreement is not approved by the Bankruptcy Court, (a) the provisions of this Agreement

9

359680-New York Server 5A - MSW

KP 030789
Confidential Treatment
Requested by Kmart Corp.

CC-0831816

(other than Sections 1, 2, 3, 5(a), 8, 9 and 18) shall be null and void, (b) the Executive's consent to this Agreement shall be deemed revoked and (c) all rights both parties may have had prior to entering into this Agreement shall be fully reserved, including, without limitation, rights under the 2000 Employment Agreement, subject to offset for amounts received pursuant to Section 2.

18.    Upon execution of this Agreement by the Company and the Executive, the 2002 Employment Agreement is hereby revoked and rescinded in its entirety.

19.    This agreement may be signed in counterparts and delivered by facsimile, each of which will be deemed an original but all of which together shall constitute one and the same instrument.

359680-New York Server 5A - MSW

**KP 030790**
Confidential Treatment
Requested by Kmart Corp.

CONFIDENTIAL

CC-0831817

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of March 11, 2002.

KMART CORPORATION

By: *[signature]*
Title: *[signature]*

Agreed and Accepted:

*[signature]*
Charles C. Conaway

**KP 030791**
**Confidential Treatment**
**Requested by Kmart Corp.**

CONFIDENTIAL                                        CC-0831818

# Exhibit E

MAR. -11' 02 (MON) 10:12                          TEL:248 643 3100                          P. 001

```
·· CONFIRMATION REPORT ··

TRANSMISSION
TRANSACTION(S) COMPLETED


NO.  DATE/TIME      DESTINATION              DURATION  PGS    STATUS  MODE

540  MAR. 11 10:12  912127289635            0° 00' 50"  002    OK     N ECM
```

# PROMISSORY NOTE

**May 30, 2001**                                                            **$5,000,000**

FOR VALUE RECEIVED, the undersigned Charles C. Conaway (the "Executive/Maker) promises to pay Kmart Corporation at 3100 West Big Beaver Road, Troy, Michigan 48084 (the "Company"), or at such other place as the holder hereof may designate in writing, the principal sum of $5,000,000.00 which has been loaned to the Executive/Maker by Company in accordance with the following:

This note shall be due and payable on February 1, 2006 and shall bear interest at the minimum rate necessary to avoid imputation of tax under Section 7872 of the Internal Revenue Code of 1986, as amended. Interest on this note shall accrue during the term and shall be compounded annually and shall be deferred until January 31, 2006.

The outstanding principal and accrued interest hereunder shall automatically and without further action on the part of the Company or the Executive/Maker be forgiven in full by the Company, provided the Executive/Maker remains employed by the Company through January 31, 2006. All principal and accrued interest on this note shall also be forgiven, without further action on the part of the Company or the Executive/Maker, upon the earlier to occur of the following prior to February 1, 2006: (i) the Company's delivery to the Executive/Maker of a notice of non-extension pursuant to Section 2 of the Employment Agreement dated May 30, 2000, as amended (the "Employment Agreement"), or (ii) the Executive/Maker's termination of employment from the Company under any circumstance that results in acceleration of vesting prior to the scheduled vesting date of any stock options then held by the Executive/Maker pursuant to the provisions of Section 11 of the Employment Agreement (the applicable event being a "Loan Forgiveness Event" as defined in the Employment Agreement.)

Confidential Treatment
Requested by Charles Conaway

CC 0000101

# PROMISSORY NOTE

**May 30, 2001**                                                                 **$5,000,000**

FOR VALUE RECEIVED, the undersigned Charles C. Conaway (the "Executive/Maker)
promises to pay Kmart Corporation at 3100 West Big Beaver Road, Troy, Michigan 48084 (the
"Company"), or at such other place as the holder hereof may designate in writing, the principal
sum of $5,000,000.00 which has been loaned to the Executive/Maker by Company in accordance
with the following:

This note shall be due and payable on February 1, 2006 and shall bear interest at the
minimum rate necessary to avoid imputation of tax under Section 7872 of the Internal
Revenue Code of 1986, as amended. Interest on this note shall accrue during the term
and shall be compounded annually and shall be deferred until January 31, 2006.

The outstanding principal and accrued interest hereunder shall automatically and without
further action on the part of the Company or the Executive/Maker be forgiven in full by
the Company, provided the Executive/Maker remains employed by the Company
through January 31, 2006. All principal and accrued interest on this note shall also be
forgiven, without further action on the part of the Company or the Executive/Maker,
upon the earlier to occur of the following prior to February 1, 2006: (i) the Company's
delivery to the Executive/Maker of a notice of non-extension pursuant to Section 2 of
the Employment Agreement dated May 30, 2000, as amended (the "Employment
Agreement"), or (ii) the Executive/Maker's termination of employment from the
Company under any circumstance that results in acceleration of vesting prior to the
scheduled vesting date of any stock options then held by the Executive/Maker pursuant
to the provisions of Section 11 of the Employment Agreement (the applicable event
being a "Loan Forgiveness Event" as defined in the Employment Agreement.)

In the event of Executive/Maker's termination of employment prior to January 31, 2006
under circumstances not constituting a Loan Forgiveness Event, the unpaid principal and
accrued interest under the note shall be due and payable in immediately available funds
on the date of the Executive/Maker's termination of employment.    Any cash
compensation then owed to the Executive/Maker by the Company may be offset against
any amount then owed by the Executive/Maker to the Company with respect to this
note; provided, however, that in the event there is any dispute between the Company and
the Executive/Maker as to whether the underlying circumstances of termination
constitute a Loan Forgiveness Event, no offset shall be applied by the Company until
such dispute has been finally resolved in accordance with Section 26 of the Employment
Agreement.

This note shall be construed and enforced in accordance with the internal laws of the State of
Michigan, and the Company may exercise any right or remedy in connection herewith in the

**Confidential Treatment**
**Requested by Charles Conaway**

CC 0000102

SEC00073486

State of Michigan Court of Oakland County, Michigan or the United States District Court in Detroit, Michigan, and Executive/Maker hereby consents to the jurisdiction of such courts.

The Executive/Maker of this note hereby waives notice and consents to any and all extensions of this note or any part hereof without notice, and hereby waives demand, presentment for payment, notice of nonpayment and protest, and any and all notices of whatever kind or nature, and the exhaustion of legal remedies with respect hereto.

If any term or provision of this note, or the application thereof to any party or circumstance, shall to any extent be deemed invalid or unenforceable, the remainder of this note, the application thereof to any party or circumstance other than that as to which it is deemed invalid or unenforceable, shall not be affected thereby, and each term and provision of this note shall be enforced to the fullest extent permitted by law.

       IN WITNESS WHEREOF, the undersigned Executive/Maker has hereunto set his hand and seal on this 30th day of May, 2001.

Cancelled

Charles C. Conaway

Cancelled effective 3/11/02

James E. Defebaugh, Senior
Vice President

**Confidential Treatment
Requested by Charles Conaway**

CC 0000103

SEC00073487

# Exhibit F

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FORM B10 (Official Form 10)

| UNITED STATES BANKRUPTCY COURT<br>NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION | | PROOF OF CLAIM<br>Chapter 11 |
|---|---|---|

In Re Kmart Corporation, et al.  |  Case Numbers 02-B02472 through 02-B02498

**Name of Debtor:**
KMART CORPORATION

**Case Number:** 02-02474

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

CHARLES C. CONAWAY
ATTN: STEPHEN T. LINDO, ESQ.
C/O WILLKIE FARR & GALLAGHER
787 SEVENTH AVENUE
NEW YORK, NY 10019-6373

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

**If address differs from above, please complete the following:**

Creditor Name:

Address:

City/St/Zip:

Telephone: #

This Space is for Court Use Only

Account or other number by which creditor identifies debtor:

Check here if ☐ replaces ☐ amends  this claim  a previously filed claim dated _____

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other (see attached Exhibit A)

- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Your SS #:: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)                    (date)

**2. Date debt was incurred: see attached Exhibit A**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:**  $ see attached Exhibit A
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff). See attached Exhibit A.
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other _____

Value of Collateral: See attached exhibit A.

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**6. Unsecured Priority Claim.**
☒ Check this box if you have an unsecured priority claim.
Amount entitled to priority $ see attached Exhibit A
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier –11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,100 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. See attached Exhibit A.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**RECEIVED**
JUL 30 2002
7/30/02
TRUMBULL SERVICES COMPANY
38498

Date
7/26/02

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):

Charles C. Conaway

**Exhibit A to**
**Proof of Claim re: Kmart Corporation, *et al.* (the "Debtors")**

## 1. Basis for Claim:

Charles C. Conaway (the "Claimant") asserts the following claims (collectively, the "Claim") against the debtor listed on the attached proof of claim (the "Debtor"):

A.    Any and all claims arising out of and/or relating to, among other things, the Separation Agreement (the "Separation Agreement"), dated as of March 11, 2002 by and between Kmart Corporation (the "Company") and the Claimant, and the Employment Agreement, dated as of May 30, 2000, as amended on May 15, 2001 and during November, 2001 (the "Employment Agreement" and, together with the Separation Agreement, the "Agreements"), by and between the Company and the Claimant.

B.    Any and all claims for damages arising out of the rejection and/or termination of the Agreements pursuant to section 365 of the Bankruptcy Code or otherwise.

C.    Any and all claims, rights and/or remedies the Claimant may have outside of the Agreements, including, but not limited to, claims for indemnification, contribution, rescission, breach of contract, fraud, specific performance, misrepresentation, reimbursement and/or subrogation, related to or arising from transactions by or among or involving Claimant, the Debtor and/or any of its respective affiliates, successors, predecessors or assigns, arising as a matter of law or equity based upon or relating to, among other things, the relationship of the Claimant and the Debtor, including, but not limited to, Claimant's service on the Debtor's Board of Directors, and including, without limitation, Claimant's rights under the Debtor's organizational documents, including but not limited to, the Debtor's certificate of incorporation, and any amendments and/or restatements thereof, by-laws and applicable state or other law and any other applicable agreements or instruments, including, but limited to, the Agreements. To the extent that the Debtor's primary and/or excess directors and officers liability insurance policy or policies may constitute property of the Debtor's estate, which Claimant does not concede, Claimant may also be entitled to indemnification as an insured person covered under such policy or policies.

D.    Any rights, claims and/or remedies Claimant may have outside of the Agreements, including but not limited to, claims for indemnification, contribution, rescission, breach of contract, fraud, specific performance, misrepresentation, reimbursement and/or subrogation, related to, arising from or on account of any and all past, present or future litigations in which the Debtor and/or any of its affiliates, successors, predecessors or assigns is or may become a party in interest (whether named or unnamed) and any claims asserted in connection therewith.

1058916.5

## 2. <u>Date Debt was Incurred</u>:

The claims relating to the Employment Agreement were incurred as of May 30, 2000, the date of the Employment Agreement, and thereafter. The claims relating to the Separation Agreement were incurred as of March 11, 2002, the date of the Separation Agreement, and thereafter. The date or dates upon which claims relating to indemnification outside of the Agreements were incurred are undetermined at this time.

## 4. <u>Total Amount of Claim at Time Case was Filed</u>:

Claimant has a Claim of not less than $19,635,003 plus other undetermined amounts. Claimant asserts a Claim in an as yet undetermined amount including, but not limited to, the following:

A. Under § 6(c) of the Employment Agreement, the Claimant remains entitled to payments on a fully grossed up basis to cover applicable federal, state, and local income and excise taxes relating to the forgiveness of the principal or interest under a certain loan which was set by the Separation Agreement to $3,885,003; and

B. Pursuant to § 11(d)(ii)(C) of the Employment Agreement, the Claimant is owed an amount equal to three-twelfths (3/12) of the Claimant's target bonus for the year of termination (the "Target Bonus") of $1,750,000, pursuant to § 5 of the Employment Agreement, which is equal to $437,500; and

C. Pursuant to § 11(d)(ii)(D) of the Employment Agreement, the Claimant is owed an amount equal to one-twelfth (1/12) of the Claimant's Target Bonus each month over a three year period, which is equal to $5,250,000 in the aggregate and is payable over three years or as a lump sum discounted to present value; and

D. Pursuant to §§ 11(d)(ii)(F) and (G) of the Employment Agreement, the Claimant is entitled to the vesting of all outstanding Company stock options and restricted stock of the Company, and has the right to exercise his options through March 11, 2005; and

E. Pursuant to § 11(d)(ii)(H) of the Employment Agreement, under §§ 10(a)(ii) and 10(e) of the Employment Agreement, the Claimant is entitled to $6,500,000 in cash and $4,000,000 in shares of stock of the Company; and

F. Under § 11(d)(ii)(I) of the Employment Agreement, the Claimant is entitled to continued participation in the Company's health and welfare benefit plans through March 11, 2005 or, if the Claimant is precluded from continued participation in such plans, an after-tax amount equal to the cost of obtaining the benefits otherwise available under the plans individually, such amount payable in quarterly advances; and

G. Under § 10(f) of the Employment Agreement, the Claimant is entitled to certain retirement benefits; and

H.  Pursuant to § 15 of the Employment Agreement, the Claimant has the right to continued indemnification by the Company for any liability he may have incurred by reason that he was director, officer, or employee of the Company; the Company is also required to maintain a directors and officer's liability insurance policy covering Claimant to the extent that they provide such coverage for other current or former officers; and

I.  Pursuant to § 11(d)(ii)(J) of the Employment Agreement, the Claimant remains entitled to certain other benefits that have not yet been determined in accordance with applicable plans and programs of the Company.

## 5 & 6. Classification of Claim

The Claim is secured to the extent of any set-off, counterclaim, credit or lien. The balance of the Claim is unsecured. The extent of any set-off, counterclaim or credit is undetermined at this time.

To the extent that any portion of the Claim is entitled to administrative priority status under Section 507 of the Bankruptcy Code, the Claimant claims the maximum amount allowed by law. The filing of this proof of claim shall in no way be deemed a waiver of Claimant's right to assert that any or all of the amounts owed under the Agreements are entitled to administrative priority status.

## 8. Supporting Documents:

The Claimant believes that the Debtor has copies of the documentation supporting the Claim, including the Employment Agreement and the Separation Agreement. Copies of each and any other relevant materials will be provided upon reasonable request.

**Note:** Claimant reserves the right to amend and/or supplement this proof of claim at any time and in any manner, and to file additional proofs of claim for additional claims which may be based on the respective rights and obligations arising under the Agreements, in the event that the Employment Agreement or the Separation Agreement is rejected or assumed and/or assigned pursuant to section 365 of the Bankruptcy Code or is otherwise terminated. In addition, Claimant reserves the right to attach or bring forth additional documents supporting its claims and additional documents that may become available after further investigation and discovery. Claimant further reserves the right to file proofs of claim for administrative expenses, other claims entitled to priority, proofs of interest and proofs of claim against other parties, including but not limited to affiliated debtors in possession.

**Note:** The filing of this proof of claim shall not constitute: (a) a waiver or release of the rights of Claimant against Debtor or any of its affiliated debtors and debtors in possession, or any other person or property; (b) a waiver of Claimant to contest the jurisdiction of this Court with respect to the subject matter of the claims set forth herein; any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Claimant; or (c) an election of remedies or choice of law.

# WILLKIE FARR & GALLAGHER

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

July 29, 2002

**VIA FEDERAL EXPRESS**

Kmart Corporation, et al.
c/o Trumbull Services, LLC
Griffin Center
4 Griffin Road North
Windsor, CT 06095

Re:     Kmart Corporation, et al. (the "Debtors"), case nos. 02-02462 through 02-02499

Dear Sir or Madam:

Enclosed for filing are original proofs of claim against certain of the above-referenced Debtors on
behalf of Charles C. Conaway.  Please enter each of the proofs of claim in the relevant above-
referenced chapter 11 cases.

Also enclosed are duplicate copies for each proof of claim.  Please time and date stamp each copy and
return them to me in the enclosed self-addressed, stamped envelope.

Thank you for your cooperation.

Sincerely,

Michael Handler

cc:  Stephen T. Lindo (w/o enclosures)
     David Rubinsky (w/o enclosures)


Enclosures

# Exhibit G

4028  2/11/03

# MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
## OF KMART CORPORATION
### February 11, 2003

A meeting of the Board of Directors of Kmart Corporation (the "Company") was held, pursuant to written notice, at 10:00 a.m. on Tuesday, February 11, 2003 at the offices of Skadden Arps Slate Meagher & Flom LLP in New York, NY.

Members of the Board participated in the meeting as follows: James Adamson, Lilyan Affinito (by conference telephone), Richard Cline (by conference telephone), Willie Davis (by conference telephone), Joseph Flannery, Robert Kennedy, Robin Smith (by conference telephone), Thomas Stallkamp (by conference telephone) and Richard Statuto. The following Company personnel were also in attendance for all or part of the meeting: Julian Day, Jim Defebaugh, Michelle Gluck, Jim Gooch, Ron Hutchison, Al Koch, Mike Macik, Lori McTavish and Ted Stenger.

Also in attendance for all or part of the meeting were: Jack Butler, David Friedman, Keith Krakaur, Colleen Mahoney, Amy Sabrin, Chuck Smith and Chuck Walker of Skadden Arps Slate Meagher & Flom LLP, outside counsel to the Company ("Skadden Arps"); Ken Tuchman of Dresdner Kleinwort Wasserstein, Inc. ("DrKW"); Seth Farber, Frederick Kanner and Stuart Hirshfield of Dewey Ballantine LLP, counsel to the outside directors; and Walter Carlson and Scott Lassar of Sidley & Austin, counsel to Chuck Conaway.

Mr. Adamson presided and Mr. Defebaugh acted as secretary of the meeting. Mr. Adamson called the meeting to order.

Upon motion duly made and seconded, the minutes for the Board of Directors' meetings of January 13, January 17, January 23 and February 3, 2003 were approved by unanimous consent.

<u>Business Update</u>

Mr. Day updated the Board on operations including, among other things: comparable store sales; Joe Boxer brand sales; in-stock levels; and inventory turns. Mr. Day also updated the Board on the current status of the Fleming relationship, including advising: that management reviews daily reports on the status of the transition and will continue to monitor on a daily basis; that the fifty-eight highest volume food and consumables vendors will be converted to direct sourcing and self-distribution by the Company by the end of the current week; and that the Company is continuing to negotiate a transition agreement with Fleming.

Mr. Hutchison updated the Board on the going-out-of-business sales at the closing stores ("GOB Sales"), noting: that approximately $300 million of merchandise had already been sold at the GOB Sales, which is approximately twelve percent over plan;

**Confidential Treatment**
**Requested By Kmart**

K-CON 000001

4029 2/11/03

that pharmacy customer scripts have been sold and transferred to other retailers; and that the Company was also planning to sell fixtures from the closing stores.

Mr. Day reviewed with the Board the recent restructuring in the Store Operations area noting, among other things: that the number of regions had been reduced to seven; that each of the regions now had more autonomy, responsibility and accountability from a profit and loss point of view; and that the positions leading each of the regions had been elevated to corporate officer positions, with the title of Regional Vice President.

Mr. Day also advised the Board of the Company's key contracts which have yet to be assumed or rejected including, among others: General Electric Leasing, Kodak, American Greetings and Meldisco.

<u>Financial Review</u>

Mr. Koch reported on preliminary January 2003 month and year-end results including, among other things: recent performance measures; preliminary profit and loss statement; sales and comparable store sales; gross margin; SG&A; balance sheet; inventory; in-stock; cash flow; and liquidity. Mr. Koch advised the Board that there was nothing in the financial review which should cause any concern with respect to the five year business plan previously approved by the Board. Mr. Koch similarly stated that there was nothing regarding accounting matters to be reviewed by the Company, including a potential LIFO adjustment and asset impairment charge, which should cause any concern with respect to the five year business plan.

<u>Plan of Reorganization</u>

Mr. Butler updated the Board on the status of the Company's efforts to obtain the endorsement of the statutory committees in the Chapter 11 case of the plan of reorganization and associated disclosure statement previously approved by the Board (the "Plan"). Mr. Butler advised the Board that comments on the Plan had been received from the committees and distributed a revised draft of the Plan to the Board, blacklined to show changes from the draft originally filed with the Court. Mr. Butler reviewed the more significant changes. Mr. Butler stated he was hopeful of obtaining the committees' endorsement of the Plan prior to the upcoming Court hearing.

Mr. Butler reviewed with the Board a draft of the Company's presentation to be made at meetings with the statutory committees following the Board meeting, reviewing, among other things, matters relating to: recent developments; store closings; claims update; case development and administrative matters; fee summary; and matters to be addressed at the February 25th and 26th Court hearings.

Mr. Hutchison updated the Board on the status of the exit financing, including plans regarding rating agency meetings. Mr. Hutchison advised the Board that everything was on track to complete the financing in conjunction with the Company's planned emergence from Chapter 11 at the end of April.

**Confidential Treatment
Requested By Kmart**

<u>Compensation and Incentives Committee Report</u>

Mr. Kennedy reported on a meeting of the Compensation and Incentives Committee held the previous Friday, advising that the Committee had approved management's recommendations with respect to a three percent adjustment in the Company's management salary grade and compensation structure and a three and one-half percent merit increase in the compensation budget for 2003.

Ms. Sabrin and Messrs. Krakaur, Smith and Walker joined the meeting.

Mr. Butler advised the Board that the lawyers representing Chuck Conaway, former Chief Executive Officer, had requested that the Board provide them the opportunity to address the Board regarding Mr. Conaway's stewardship of the Company.

Messrs. Carlson and Lassar joined the meeting.

<u>Stewardship Review</u>

Messrs. Carlson and Lassar addressed the Board regarding Mr. Conaway's position relative to the characterization of the termination of his employment with the Company. Mr. Lassar stated that a determination by the Board that Mr. Conaway's termination was "for cause" would have dire consequences for Mr. Conaway's career. Mr. Carlson stated that, in his opinion, the standard of conduct required to meet the definition of a for cause termination under Mr. Conaway's contract was a very high one that could not be met under the facts and circumstances. Messrs. Carlson and Lassar answered questions posed by Mr. Butler.

Messrs. Carlson and Lassar left the meeting.

Ms. Sabrin reported at length to the Board on the findings of Skadden, Arps with respect to certain aspects of Mr. Conaway's stewardship of the Company including, among other things, issues relating to: an $850 million excess inventory purchase in the fall of 2001; Project "Slow it Down," relating to payments to vendors in the fall of 2001; the shut-down of vendor access to the Company's "Merchant Workbench" system and the use of the "Project eLMO" explanation to the vendors in connection therewith; liquidity; debt covenants; the termination of employment of former Chief Financial Officer Jeff Boyer; the hiring and firing of Mark Schwartz, former President and Chief Operating Officer; and the 2001 executive retention loan program.

Messrs. Butler and Kanner discussed the requirements under Mr. Conaway's contract with the Company with respect to the Board's determination relative to the characterization of the termination of his employment with the Company, together with various alternatives the Board had in connection with this determination. Ms. Sabrin and Messrs. Butler, Kanner, Krakaur, Smith and

**Confidential Treatment
Requested By Kmart**

4031 2/11/03

Walker answered numerous questions from the Board, and a lengthy discussion ensued.

<u>Executive Session</u>

The Board deliberated at length regarding the determination to be made relative to the characterization of the termination of Mr. Conaway's employment with the Company.  The Board, after reviewing and considering the statements of counsel for Mr. Conaway, the evidence presented by counsel for the Company, and the advice of its own counsel, decided that, while the Board had serious concerns with Mr. Conaway's behavior as CEO, it wanted its counsel to consult with counsel familiar with Michigan law and Mr. Conaway's employment agreement before making a final determination.

The meeting was adjourned at approximately 4:00 p.m.

J. E. Defebaugh
Secretary

**Confidential Treatment
Requested By Kmart**

K-CON 000004

# Exhibit H

4032  2/24/03

## MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
## OF KMART CORPORATION
### February 24, 2003

A meeting of the Board of Directors of Kmart Corporation (the "Company") was held, pursuant to written notice, at 4:30 p.m. on Monday, February 24, 2003 by conference telephone.

Members of the Board participated in the meeting as follows: James Adamson, Lilyan Affinito, Richard Cline, Willie Davis, Robert Kennedy, Thomas Stallkamp and Richard Statuto. Directors Joseph Flannery and Robin Smith were unable to participate in the meeting. The following Company personnel were also in attendance for all or part of the meeting: Jim Defebaugh, Ron Hutchison and Mike Macik.

Also in attendance for all or part of the meeting were: Peter Atkins, David Friedman, Amy Sabrin and Chuck Smith of Skadden Arps Slate Meagher & Flom LLP, outside counsel to the Company ("Skadden Arps"); Seth Farber of Dewey Ballantine LLP and Walter Connolly of Foley & Lardner, counsel to the outside directors.

Mr. Adamson presided and Mr. Defebaugh acted as secretary of the meeting. Mr. Adamson called the meeting to order.

### Stewardship Review

Ms. Sabrin reviewed the background and the content of the draft language previously provided to the Board regarding the stewardship of the Company by Chuck Conaway, former Chief Executive Officer, and the characterization of the termination of his employment. Ms. Sabrin and Messrs. Connolly, Farber and Smith answered numerous questions from the Board and the Board deliberated at length regarding the draft language. Following discussion and agreement on certain changes to the language, and upon motion duly made and seconded, the Board unanimously approved the inclusion of the language attached as Exhibit A in the amended disclosure statement to be filed by the Company in the Chapter 11 case.

The meeting was adjourned at approximately 5:00 p.m.

J. E. Defebaugh
Secretary

**Confidential Treatment
Requested By Kmart**

Exhibit A

Text of Proposed Disclosure Statement Insert:

In addition, testimony was taken from former Chief Executive Officer Charles C. Conaway on January 22 and 23, 2003 at a deposition attended by Skadden and representatives of the Statutory Committees. Following that deposition, on February 11, 2003, Skadden provided further information to the Board of Directors regarding the results of its investigation into Mr. Conaway's stewardship of the Company. On that same day, counsel to Mr. Conaway made a presentation to the Board of Directors on Mr. Conaway's behalf. Following these presentations, the Board of Directors concluded that there is credible and persuasive evidence to support a finding that Mr. Conaway engaged in conduct that should support the commencement of Trust Claims against Mr. Conaway and which may also be subsumed within the contractual definition of "cause" as that term is defined in the termination provisions of Mr. Conaway's prior employment agreement with the Company.

Among other matters, the Board of Directors concluded that there is credible and persuasive evidence that Mr. Conaway participated in the implementation of a program to systematically suspend vendor payments in an effort to avert an undisclosed potential liquidity crisis in the fall of 2001; Mr. Conaway was aware that Kmart personnel were taking steps to preclude vendors from learning the actual reasons why they were not being paid, and failed to act to prevent it; Mr. Conaway failed to disclose to Kmart's outside directors and others significant information pertaining to the nature and extent of the Company's liquidity problems during the third and fourth quarters of fiscal year 2001; Mr. Conaway failed to perform his duties as Chief Executive Officer to adequately supervise and direct other Company executives who reported directly or indirectly to him; and Mr. Conaway permitted Company executives to receive millions of dollars in retention loans and other payments that they would not have received had all material information been disclosed.

In completing its examination of Mr. Conaway's stewardship of the Company, the Board of Directors reaffirmed its earlier direction that the Company not obtain approval from the Bankruptcy Court of any employment-related agreements with Mr. Conaway and that the Company demand repayment of special retention loans paid to all special loan recipients including Mr. Conaway. The Board of Directors also reaffirmed its earlier conclusion that the appropriate mechanism for pursuing whatever remedies that the Debtors may have against Mr. Conaway and other subjects of Trust Claims is through the Kmart Creditor Trust established in Article XI of the Plan, particularly in light of the Board of Directors' prior direction that all information developed in connection with the internal investigations conducted during 2002 and 2003 under the supervision of the Audit Committee of the Board of Directors be made available to the trustee of the Kmart Creditor Trust as provided for in the Plan for further action on any and all legal theories that the Trustee independently determines are appropriate and desirable to pursue.

**Confidential Treatment
Requested By Kmart**

K-CON 000006

# Exhibit I



IN THE UNITED STATES BANKRUPTCY COURT **EOP**   FEB 2 7 2003
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 02-02474 |
|  | ) |  |
| KMART CORPORATION, et al., | ) | (Jointly Administered) |
|  | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Hon. Susan Pierson Sonderby |

## DISCLOSURE STATEMENT WITH RESPECT TO
## FIRST AMENDED JOINT PLAN OF REORGANIZATION
## OF KMART CORPORATION AND ITS AFFILIATED
## DEBTORS AND DEBTORS-IN-POSSESSION

John Wm. Butler, Jr.
J. Eric Ivester
Mark A. McDermott
Samuel S. Ory
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM (ILLINOIS)
333 West Wacker Drive
Chicago, Illinois  60606-1285
(312) 407-0700

Attorneys for Debtors and Debtors-in-Possession

Dated: February 25, 2003

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

FEB 2 6 2003

KENNETH S. GARDNER, CLERK
PS REP. - RD

8894

## F.    The Accounting, Stewardship and Related Investigations

### 1.    Introduction

On January 12, 2002, the Debtors received a copy of an anonymous letter addressed to the Securities and Exchange Commission ("SEC"), dated January 9, 2002. The letter purported to be from Kmart employees who alleged that they had been directed to make improper accounting entries in the books and records of the company. On January 14, 2002 – one week after the Debtors had retained the law firm of Skadden, Arps, Slate, Meagher and Flom LLP ("Skadden") to advise it in connection with a possible restructuring, and eight days before the Debtors filed petitions for protection under Chapter 11 the board of directors instructed Skadden, under the supervision of the Audit Committee, to conduct an internal investigation into the allegations contained in the letter (the "Accounting Investigation"). The goal was to review accounting matters raised by the anonymous letter and other issues identified in the course of such an inquiry, with the intent of completing such an investigation prior to the company's filing of its Form 10-K Annual Report for Fiscal Year 2001, which it did on May 15, 2002.

Subsequent to January 2002, and continuing until as recently as the month of February, 2003, the Debtors, Skadden, members of Kmart's board of directors, the Statutory Committees and certain of their members, selected media outlets and certain government entities received more than 70 additional anonymous letters relating allegations of misfeasance and malfeasance by past management. Skadden was directed by the Audit Committee to investigate the allegations contained in these letters, as well as other matters that came to Skadden's attention during the course of the inquiry. This phase of the inquiry, which was taken up following the substantial completion of the Accounting Investigation, was denominated the "Stewardship Investigation".

At the same time, the SEC and the United States Attorney's Office for the Eastern District of Michigan ("USAO"), aided by the Federal Bureau of Investigation and a federal grand jury, opened inquiries into events that occurred at the Debtors leading up to the filing of the petitions (the "Government Inquiries"). The board directed the company and Skadden to cooperate fully with the SEC and USAO investigations. To facilitate this cooperation, the company, through its counsel, entered into confidentiality agreements with the SEC and the USAO.

In June 2002, the Debtors consulted with the three Statutory Committees regarding the conduct and completion of the Investigations (as defined below). Thereafter, with the approval of the board of directors, the Debtors invited legal counsel and forensic accounting professionals retained by the three Statutory Committees (the "Professional Advisors to the Committees") to participate on a joint interest basis in the Investigations, subject to a confidentiality agreement among all the participating parties. With the support of the Debtors and the Statutory Committees, that agreement was incorporated in an order of the Bankruptcy Court entered September 4, 2002 (the "Order"). The Order also recognized the confidentiality agreements between the Debtors and the SEC and the USAO. Pursuant to that agreement and that Order, the Professional Advisors to the Committees were given substantial, confidential access to investigatory materials, participated in witness interviews and depositions, and reviewed documents collected in the course of the Investigations.

### 2.    Scope and Conduct of the Investigations

In the conduct of the Accounting and Stewardship Investigations, including with respect to all matters authorized by the Order and in connection with responding to Government Inquiries (collectively the "Investigations"), the Audit Committee and Kmart management have given Skadden unfettered access to the Company's employees and records and directed the Company's management to cooperate fully and to assist in the Investigations. Neither the board nor management limited the scope of the Investigations in any way.

As of January 24, 2003, Skadden, assisted by forensic accountants from the firms of Chicago Partners, LLC, and Ten Eyck Associates Inc., have conducted more than 570 interviews of current and former Kmart employees; have collected, reviewed and analyzed in excess of 1.5 million pages of documents, including accounting records, audit work papers, company policies and electronic mail; and have processed more than 620,000 pages of documents for production in response to subpoenas and voluntary requests for documents from the SEC, the USAO and the U.S. House of Representatives.

Generally, the allegations that were the subject of the Investigations pertained to the following subjects, among others:

-- The accuracy of representations made by former management to the board of directors, vendors and the public concerning the financial condition of the Debtors in 2001

-- The payment of retention loans and retention bonuses to Kmart managers in late 2001

-- The recording of vendor allowances (also known as vendor rebates or vendor credits)

-- Management of inventory and inventory accounting

-- Relations with Kmart vendors, including whether certain employees received improper payments from vendors

-- Hiring practices implemented by former management

-- Abuse of corporate aircraft privileges and other corporate perquisites

-- Certain aspects of the Debtors' operations in the Caribbean

The Order also authorized the issuance of subpoenas pursuant to Bankruptcy Rule 2004. Accordingly, the Debtors issued subpoenas for testimony and documents to 20 former Kmart employees and three third-party witnesses. In addition, the Statutory Committees issued subpoenas to three directors. The table below identifies those deponents and the dates on which their depositions occurred or are scheduled to occur.

| Deponent | Former Title(s) | Date(s) Deposition Occurred or is Scheduled to Occur |
|---|---|---|
| Al Abbood | Divisional Vice President, Food and Consumables; Vice President, grocery, merchandising and Procurement   Fleming | November 12, 2002 |
| James B. Adamson | Director, Chief Executive Officer | February 21, 2003 |
| Jeffrey Boyer | Chief Financial Officer | December 17, 2002, January 20, 2003 |
| Ronald J. Chomiuk | Senior Vice President, Pharmacy Operations; Vice President, General Merchandise Manager, Drugstore Businesses; Divisional Vice President, Health and Beauty Care; Director of Pharmacy Operations and Consumables, Super K Divisional | December 6, 2002 |
| Charles C. Conaway | Chief Executive Officer | January 22-23, 2003 |
| Timothy M. Crow | Senior Vice President, Human Resources Operations | December 18, 2002 |
| Hector Dominguez | Senior Vice President, Super Kmart Centers; Regional Manager, Western Divisional | December 18, 2002 |
| Richard H. Donckers | President, Retail Strategies International | December 5, 2002 |
| Anthony B. D'Onofrio | Executive Vice President, Systems Capability and Chief Supply Chain Officer | February 27-28, 2003 |
| Michael K. Frank | Senior Vice President, General Merchandise Manager, Food and Consumables | December 12, 2002 |
| Mark Glover | Vice President, Replenishment | December 2, 2002 |
| Brett Green | Director, General Compensation | December 10, 2002 |
| Joseph Hofmeister | Divisional Vice President, Toy & Hobbies Department; Divisional Vice President, Celebration; Merchandise Manager, Sporting Goods. | December 17, 2002 |
| John Iaciofano | J.L. Lucas Associates, Inc. | December 16, 2002 |
| Cecil B. Kearse | Executive Vice President, Merchandising | December 6, 2002 |
| Robert D. Kennedy | Director | February 13, 2003 |

42

| Deponent | Former Title(s) | Date(s) Deposition Occurred or is Scheduled to Occur |
|---|---|---|
| John T. McDonald, Jr. | Executive Vice President, Chief Financial Officer, Vice President and Treasurer | December 5, 2002, January 6, 2003 |
| Enio A. Montini, Jr. | Vice President, General Merchandise Manager, Drug Stores | December 16, 2002 |
| David W. Montoya | Senior Vice President, Specialty Operations, Executive Vice President, Store Operations | December 4, 2002 |
| John P. Owen | Senior Vice President, General Merchandise Manager, Hardlines | December 12, 2002 |
| David P. Rots | Executive Vice President, Chief Administrative Officer; Executive Vice President, Human Resources and Administration | January 15, 2003 |
| Mark S. Schwartz | President and Chief Operating Officer; Executive Vice President, Store Operations | January 7-8, 2003 |
| Thomas Stallkamp | Director | February 27, 2003 |
| Jeffrey G. Stark | Vice President, Pricing; Vice President of Finance; Merchandise Controller | November 22, 2002 |
| H. Richard Troy, Jr. | Buck Consultants, Inc. | December 12, 2002 |

One witness – Mr. Rots – asserted his Fifth Amendment right not to testify in response to any and all questions posed by counsel for the Debtors and the Committees. Mr. Rots also refused to produce documents on the basis that to do so could incriminate him. Three other witnesses – Messrs. Montoya, Hofmeister, and Montini – interposed Fifth Amendment objections with respect to questions on specific topics.

As the Rule 2004 depositions of former management were nearing completion, the Debtors' Statutory Committees began depositions of certain members of the Kmart board of directors in order to determine whether and to what extent the board was apprised of certain events and activities that occurred at the company, among other matters. Pursuant to a protocol established between Skadden and the Statutory Committees, and in accordance with the Order, counsel for the Statutory Committees are taking the lead in examining individual directors, and Skadden is participating in those examinations, which are among the final steps in the Investigations. The deposition of one director, Robert Kennedy, took place on February 13, 2003. The deposition of James Adamson took place on February 21, 2003 and the deposition of Thomas Stallkamp is scheduled to occur on February 27, 2003.

The period for completion of the Investigations was extended to the first quarter of 2003 due in part to the letter writers' insistence on remaining anonymous. While the authors often provided useful and constructive information to the Investigation, they failed to respond to several appeals from

Skadden, the Company and the USAO to come forward with "audit trails," audiotapes and videotapes that they purported to possess substantiating their sometimes vague or cryptic allegations. These appeals were made through electronic mail, at company assemblies, and in Court filings and Court hearings. The letter writers, moreover, were invited at their option to provide information and records either to the company's new compliance officer, independent outside counsel, or the government, and were given assurances from the company and the USAO that there would be no retaliation against anyone for coming forward. Indeed, in cooperation with the USAO, one such appeal was made as recently as the week of January 12, 2003 via company-wide e-mail. Notwithstanding these assurances, and notwithstanding warnings by the USAO that the withholding of such evidence, if it exists, could constitute obstruction of justice or violate other applicable laws, these appeals have gone unheeded. Had such records been provided, and had the letter writers come forward to elaborate on the allegations, the Investigations would have been substantially expedited and the cost greatly reduced. It would still be of tremendous assistance to the investigators if the letter writers were to proffer their documents and information at this time.

    3.    *Results.*

        *a.*    *Potential Legal Claims*

The Debtors, after consultation with their Statutory Committees, have determined that a Creditors' Litigation Trust (the "Trust") is the preferred available mechanism for resolving any legal claims that may arise out of the Investigations. As part of the Plan, the trustee of the Trust would be charged with responsibility for determining which claims to pursue and litigating such claims. Pursuant to the Plan, the Debtors will share with the trustee evidence gathered and certain work product developed during the Investigations, as more specifically set forth in the Trust Agreement. As noted above, certain investigatory work is continuing, and nothing herein is intended to limit in any way the causes of action that may exist or that the trustee may bring.

Based on evidence developed to date in the Investigations, the Debtors believe that the estates may have, inter alia, legal claims against certain former officers on grounds that they were grossly derelict in performing their duties to the company, its associates, its vendors, and its investors. These would include, without limitation, such claims as breach of the fiduciary duties of due care, loyalty and candor, gross negligence, and certain bankruptcy-related causes of action.

In addition, evidence developed during the Investigations indicates that the Debtors' estates may have claims for breach of contract and related misconduct against certain third party vendors who purported to provide consulting services to Kmart.

It cannot be predicted at this date which claims the trustee will determine exist or would choose to pursue. Nor can the outcome of any such litigation be foreseen. Nor would it be in the estates' interest at this juncture to lay out a road map for potential defendants by providing a detailed report of the evidentiary basis for such claims. However, consistent with their obligations under Section 1125 of the Bankruptcy Code, Skadden has reported to the Debtors that credible and persuasive evidence adduced to date supports the following findings, among others:

    --    Beginning in September 2001, in an effort to avert a potential liquidity crisis, former management of Kmart undertook a program known internally as "Project Slow It

Down", or "Project SID", pursuant to which payments to vendors were systematically deferred or reduced; vendors were purposefully denied access to computerized accounts payable records; and deceptive responses were given to vendors who inquired concerning the reasons they were not being paid.

-- In October and November 2001, when the Compensation and Incentives Committee of the board of directors was asked to approve a \$24 million retention loan program for senior executives, management failed to disclose to the committee certain information that the committee believes would have been material to its decision making. Further, the retention loan and bonus program implemented by former management in December 2001 deviated in certain significant respects from the program that the committee had approved. In addition, management created purported committee documents that varied materially from the loan program documents submitted to the committee for approval, and these documents were inserted in the Company's official board files after-the-fact. Finally, in the course of the present Investigations, certain former employees acted to intentionally withhold information from Skadden relating to the retention program.

-- Former senior managers frequently imposed gross margin and vendor allowance target numbers on Kmart's merchandising personnel, while being warned repeatedly that the numbers imposed from the top were unattainable. Certain employees were demoted or transferred when they resisted a manager's demand to incorporate numbers they believed to be unrealistic into the company forecasts and financial reports. As a result of the "top down" imposition of numbers in this manner, a substantially inflated forecast was submitted to the board during the fourth quarter of 2001, at the time the Compensation and Incentives Committee was considering final approval of the retention loan program.

-- With respect to the booking of vendor payments and allowances, the evidence disclosed that:

     -- In 2001, the Kmart merchant community was under extraordinary pressure from senior managers to record incremental allowances, i.e., allowances that were in excess of the plan for the year.

     -- The Investigations identified at least \$92 million in allowances recorded during the first three quarters of 2001 that were questionable, in that there were failures to have appropriate signed documentation in place or adequate records demonstrating that the allowances were collectible, or were other indicia that the allowances otherwise failed to comply with Kmart's then-existing policies.

     -- The company's net loss for fiscal year 2001 was overstated by approximately \$78 million due to vendor allowances that were prematurely recorded in Kmart's fiscal year 2000 fourth quarter results.

     -- One substantial up-front payment from a vendor was improperly recorded and required a significant adjustment of the Company's financial statements for the

second and third quarters of 2001, due to the existence of an undisclosed side agreement with the vendor.

As accounting issues related to allowances and vendor payments were identified in the course of the Investigations, disclosure on appropriate restatements were made in the Company's public filings, as discussed in detail below.

-- In the summer of 2001, a former senior executive directed initiatives that resulted in the excessive purchases of inventory without sufficient analysis and oversight, and without appropriate consultation with the merchant community or Kmart's treasury officials. These purchases, which together amounted to approximately $850 million, substantially contributed to Kmart's liquidity crisis in the fall of 2001.

-- In 2000-2001, former management hired numerous personnel into the company without completion of formal applications, submission of background information, or interviews by appropriate personnel. Certain former managers often dictated the terms and compensation packages to be offered to these individuals, without consulting Human Resources officials. As a result, their compensation packages far exceeded not only Company norms but also the compensation they had received from previous employers. Many of these hires proved unqualified for their positions and ultimately were terminated.

-- One former executive received a substantial improper payment from a consultant to the Company.

-- Former management in 2001 authorized the expenditure of $12 million to purchase corporate aircraft, notwithstanding that moneys for the purchase were not included in the Company's capital budget. Some former executives also abused an already generous corporate aircraft policy by masking personal travel as store visits and by loading aircraft with Kmart personnel who otherwise had no need to travel, in order to avoid having personal travel expenses imputed to their incomes.

### b.    Terminations

As noted above, through the Investigations, the Debtors discovered information showing that certain former managers were responsible for misfeasance and malfeasance, and/or violated Company policy, in connection with the events that were the subject of the Investigations. All individuals so identified either already had been terminated, or were terminated as a result of the investigatory findings.

### c.    Retention Loans

A major subject of inquiry in the Investigations was the Company's retention loan programs. In November 2000, the Compensation and Incentives Committee of the Kmart board unanimously approved the Executive Leadership Team Retention Program (the "2000 Retention Program"). Under the terms of the 2000 Retention Program, seven senior executives each received an up-front cash payment, a grant of restricted stock (including an opportunity to earn additional performance-based

46

restricted shares of Kmart's common stock subject to the attainment of applicable performance goals), and enhanced protection in the event of a change-in-control, among other benefits. In return for these benefits, the recipients committed to stay at Kmart for four years and executed Confidentiality, Non-Competition and Non-Solicitation Agreements. If, under certain specified circumstances, a recipient departed the company prior to four years, he or she would be obligated to repay the cash payment.

In May 2001, the Compensation and Incentives Committee also approved a special, one-time long-term compensation award for former Chief Executive Officer Charles C. Conaway. Mr. Conaway's award consisted of a $5 million dollar cash loan and a performance option grant in return for a commitment to stay at the company.

In December 2001, former management of the Debtors implemented another retention program pursuant to which a total of $23.89 million was paid to 24 senior managers in the form of forgivable loans (the "2001 Retention Program"). The 2001 Retention Program covered two groups of executives: CEO direct reports and key Executive Vice Presidents ("EVPs") (Tier A) and other EVPs and Senior Vice Presidents ("SVPs") (Tier B). With respect to Tier A recipients who participated in the 2000 Retention Program, the 2001 Retention Program provided that the special restricted stock grant under the 2000 Retention Program would be converted into a four-year forgivable cash loan, and the existing share performance restricted stock award opportunity would be converted into stock options with performance vesting. Tier B of the 2001 Retention Program was directed at other EVPs and SVPs, none of whom participated in the 2000 Retention Program. Tier B provided for a three-year forgivable cash loan. Pursuant to the terms of the loan agreements, the loans, otherwise forgivable, would be due and owing upon termination of employment "for cause", as defined in each agreement.

The table below identifies those individuals who received Tier A and Tier B retention loans; the amount of the loan; and the date they were separated from the Company.

| LOAN RECIPIENT | AMOUNT OF LOAN(S) | LAST POSITION | DATE OF SEPARATION |
|---|---|---|---|
| Charles C. Conaway | $5 million | Chief Executive Officer | March 11, 2002 |
| Mark S. Schwartz | $3 million | President and Chief Operating Officer | January 15, 2002 |
| Anthony B. D'Onofrio | $2.5 million | Executive Vice President, Global Systems Capability and Chief Supply Chain Officer | March 25, 2002 |
| Cecil B. Kearse | $2.5 million | Executive Vice President, Merchandising | May 31, 2002 |
| John T. McDonald | $2.5 million | Chief Financial Officer | March 11, 2002 |
| David P. Rots | $2.5 million | Executive Vice President, Chief Administrative Officer | March 11, 2002 |

47

| LOAN RECIPIENT | AMOUNT OF LOAN(S) | LAST POSITION | DATE OF SEPARATION |
|---|---|---|---|
| Hector Dominguez | $750,000 | Senior Vice President, Super Kmart Centers | February 4, 2002 |
| Enio A. Montini, Jr. | $750,000 | Senior Vice President, General Merchandise Manager, Drugstore | May 10, 2002 |
| David W. Montoya | $750,000 | Senior Vice President, Specialty Operations | March 22, 2002 |
| Lorna E. Nagler | $750,000 | Senior Vice President, General Merchandise Manager, Apparel | April 8, 2002 voluntary separation |
| John P. Owen | $750,000 | Senior Vice President, General Merchandise Manager, Hardlines | March 22, 2002 |
| Gregg S. Treadway | $750,000 | Executive Vice President, Store Operations | May 6, 2002 |
| William Wulfers | $750,000 | Divisional President, Southeast | May 10, 2002 |
| Paul Springthorpe | $700,000 | Senior Vice President, Distribution Operations | May 10, 2002 |
| Timothy M. Crow | $640,000 | Senior Vice President, Human Resources | April 8, 2002 |
| Leo Anguiano | $500,000 | Senior Vice President, Asset Protection | March 25, 2002 |
| Michael K. Frank | $500,000 | Senior Vice President, General Merchandise Manager, Food and Consumables | May 10, 2002 |
| Janet Kelley | $500,000 | Executive Vice President, General Counsel | January 15, 2003 |
| Douglas Meissner | $500,000 | Divisional President, West | January 17, 2003 |
| Paula Paquette | $500,000 | Senior Vice President, General Merchandise Manager, Hardlines and Home | January 17, 2003 |
| Paul J. Hueber | $400,000 | Senior Vice President, Operations Administration | October 7, 2002 |

48

| LOAN RECIPIENT | AMOUNT OF LOAN(S) | LAST POSITION | DATE OF SEPARATION |
|---|---|---|---|
| Michael S. Jardina | $400,000 | Divisional President, Super K | May 11, 2002 |
| Mariana Keros | $400,000 | VP, Trend and Product Development | January 17, 2003 |
| John Foster | $300,000 | Senior Vice President, Real Estate Management | May 10, 2002 |
| Leland M. Viliborghi | $300,000 | Regional Vice President | January 17, 2003 |

As discussed above, credible and persuasive evidence developed during the Investigations showed that the 2001 Retention Program for Tier A and B recipients, as implemented by former management, varied in certain key respects from the program that the Compensation and Incentives Committee was asked to approve. Moreover, information was not made known to the outside directors that they believe would have been material to their decision-making at the time the program was approved.

Moreover, after implementing the 2001 Retention Program for Tier A and B recipients, former management undertook to provide bonuses to certain so-called "Tier C" and "Tier D" executives below the Senior Vice President level. This program was partially implemented prior to the filing of the Chapter 11 petitions. It was not, however, approved by the Compensation and Incentives Committee. When the board, through the Investigations, discovered the existence of the Tier C and D program, the program was promptly cancelled and the Company obtained repayment from all bonus recipients.

No Tier A or Tier B loan recipient is still employed by the Company. Three former employees, Janet Kelley, Lorna Nagler, and Leeland Viliborghi, have repaid their loans. On January 13, 2003, the board of directors authorized the Company to demand the return of the full loan amounts from any recipient who has yet to repay them, which the Company currently is undertaking to do. The mere fact that an individual received a loan or bonus, or that the Company demanded repayment, or the separation of an employee from the Company should not in and of itself be taken as indicia of wrongful conduct by any individual former employee.

On January 17, 2003, the Company announced that it had severed employment relationships with any remaining executives who received special retention loans in 2001. The executives involved were Janet Kelley, Mariana Keros, Douglas Meissner, Paula Paquette, and Leland Viliborghi. This action was taken by the Company as it began to implement a reorganized management structure and establish an emergence management team in anticipation of emergence from Chapter 11 reorganization on or about April 30, 2003. In connection with these separations, the Company acknowledged that, while these individuals had independently made substantial contributions to Kmart, the Company felt it was important to put the controversy surrounding employees involved in the special Retention Loan Program behind it as the Company prepared to emerge from Chapter 11. Subject to the repayment of any outstanding special retention loans and subject to findings that may be made in connection with

49

the Investigations, if any, the Company agreed to provide these five former executives with severance packages equivalent to either one or two years of base salary, which is subject to mitigation.

Moreover, on January 23, 2003, based on the investigatory results to date, the Company determined that the following loan recipients had engaged in conduct that would constitute a material breach of the termination "for cause" provisions of their employment agreements: Mark S. Schwartz, Anthony B. D'Onofrio, Cecil B. Kearse, John T. McDonald, David P. Rots, Enio A. Montini, Jr., David W. Montoya, John P. Owen, Timothy M. Crow, and Michael K. Frank. The Company is withholding a determination as to other individual recipients until completion of the Investigations.

In addition, testimony was taken from former Chief Executive Officer Charles C. Conaway on January 22 and 23, 2003 at a deposition attended by Skadden and representatives of the Statutory Committees. Following that deposition, on February 11, 2003, Skadden provided further information to the Board of Directors regarding the results of its investigation into Mr. Conaway's stewardship of the Company. On that same day, counsel to Mr. Conaway made a presentation to the Board of Directors on Mr. Conaway's behalf. Following these presentations, the Board of Directors concluded that there is credible and persuasive evidence to support a finding that Mr. Conaway engaged in conduct that should support the commencement of Trust Claims against Mr. Conaway and which may also be subsumed within the contractual definition of "cause" as that term is defined in the termination provisions of Mr. Conaway's prior employment agreement with the Company.

Among other matters, the Board of Directors concluded that there is credible and persuasive evidence that Mr. Conaway participated in the implementation of a program to systematically suspend vendor payments in an effort to avert an undisclosed potential liquidity crisis in the fall of 2001; Mr. Conaway was aware that Kmart personnel were taking steps to preclude vendors from learning the actual reasons why they were not being paid, and failed to act to prevent it; Mr. Conaway failed to disclose to Kmart's outside directors and others significant information pertaining to the nature and extent of the Company's liquidity problems during the third and fourth quarters of fiscal year 2001; Mr. Conaway failed to perform his duties as Chief Executive Officer to adequately supervise and direct other Company executives who reported directly or indirectly to him; and Mr. Conaway permitted Company executives to receive millions of dollars in retention loans and other payments that they would not have received had all material information been disclosed.

In completing its examination of Mr. Conaway's stewardship of the Company, the Board of Directors reaffirmed its earlier direction that the Company not obtain approval from the Bankruptcy Court of any employment-related agreements with Mr. Conaway and that the Company demand repayment of special retention loans paid to all special loan recipients including Mr. Conaway. The Board of Directors also reaffirmed its earlier conclusion that the appropriate mechanism for pursuing whatever remedies that the Debtors may have against Mr. Conaway and other subjects of Trust Claims is through the Kmart Creditor Trust established in Article XI of the Plan, particularly in light of the Board of Directors' prior direction that all information developed in connection with the internal investigations conducted during 2002 and 2003 under the supervision of the Audit Committee of the Board of Directors be made available

50

to the trustee of the Kmart Creditor Trust as provided for in the Plan for further action on any
and all legal theories that the Trustee independently determines are appropriate and desirable to
pursue.

> d.    *Disclosures Pertaining to the Company's Financial Results for FY
> 2001*

Over the course of the Investigations, the Debtors developed information concerning
the accounting for certain transactions affecting the previously- filed financial statements of the
Company. Based in part on this information, Kmart made certain disclosures in its public
filings, and restated certain interim period financial results for 2001, as follows:

--    On May 15, 2002, Kmart filed its Annual Report on Form10-K for the fiscal year ended
      January 30, 2001, reporting that (1) an adjustment should be made to previously
      reported quarterly results with respect to the accounting for up-front consideration in a
      transaction from a vendor which more appropriately should have been deferred and
      recognized over the life of the contract and (2) the recording of additional general
      liability reserves in the fourth quarter of 2001 was more appropriately designated as a
      second quarter event. The first item resulted in a net reduction to operating results in
      the second quarter of $42 million ($28 million after-tax), and an increase in third
      quarter operating results of $15 million ($10 million after-tax). The second item
      increased general liability reserves in the second quarter, rather than the fourth quarter,
      by approximately $167 million ($112 million after-tax).

--    Also, in its Annual Report on Form 10-K for the fiscal year ended January 30, 2001,
      Kmart observed that embedded in an accounting change adopted in the fourth quarter of
      the 2001 fiscal year was an adjustment for an indeterminate amount of supplemental or
      "incremental" allowances that were initially recorded in the first three quarters prior to
      having been documented, or otherwise deemed appropriate, pursuant to Kmart's
      historical policy. As reported by Kmart, during the fourth quarter of fiscal 2001, Kmart
      adopted a new accounting policy effective as of February 1, 2001, for interim financial
      reporting only, requiring that the cost recoveries from vendors be recognized only when
      a formal agreement for such amount has been obtained and the underlying activity for
      which the amount was provided has been performed.

--    Kmart reported further developments in its Investigation in the Company's Form 10-Q
      for the period ended July 31, 2002, filed on September 16, 2002. In particular, the
      Company reported that it had learned that certain vendor allowances had been
      prematurely recorded in Kmart's fiscal year 2000 fourth quarter results, and to a lesser
      extent, in other prior fiscal periods, and that the Vendor Allowance Tracking ("VAT")
      agreements with vendors relating to these transactions did not in all cases reflect certain
      existing oral understandings or separate written agreements with such vendors. As a
      result, Kmart noted that its net loss for fiscal year 2000 was understated by
      approximately $38 million ($26 million net of tax), while the net loss reported for fiscal
      year 2001 was overstated by approximately $78 million (both before and after taxes).
      (The net loss for fiscal year 2000 was increased by $14 million, based on further review
      of certain allowances in connection with the Quarterly Report on Form 10-Q for the 13-

# Exhibit J

# U.S. Securities and Exchange Commission

## Division of Enforcement

## Prejudgment Interest Report

### Charles Conaway - Prejudgment Interest

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| Violation Amount | | | | $8,885,003.00 |
| 04/01/2002-06/30/2002 | 6% | 1.5% | $133,275.04 | $9,018,278.05 |
| 07/01/2002-09/30/2002 | 6% | 1.5% | $135,274.17 | $9,153,552.22 |
| 10/01/2002-12/31/2002 | 6% | 1.5% | $137,303.28 | $9,290,855.50 |
| 01/01/2003-03/31/2003 | 5% | 1.25% | $116,135.69 | $9,406,991.19 |
| 04/01/2003-06/30/2003 | 5% | 1.25% | $117,587.39 | $9,524,578.58 |
| 07/01/2003-09/30/2003 | 5% | 1.25% | $119,057.23 | $9,643,635.81 |
| 10/01/2003-12/31/2003 | 4% | 1% | $96,436.36 | $9,740,072.17 |
| 01/01/2004-03/31/2004 | 4% | 1% | $97,400.72 | $9,837,472.89 |
| 04/01/2004-06/30/2004 | 5% | 1.25% | $122,968.41 | $9,960,441.30 |
| 07/01/2004-09/30/2004 | 4% | 1% | $99,604.41 | $10,060,045.71 |
| 10/01/2004-12/31/2004 | 5% | 1.25% | $125,750.57 | $10,185,796.28 |
| 01/01/2005-03/31/2005 | 5% | 1.25% | $127,322.45 | $10,313,118.73 |
| 04/01/2005-06/30/2005 | 6% | 1.5% | $154,696.78 | $10,467,815.51 |
| 07/01/2005-09/30/2005 | 6% | 1.5% | $157,017.23 | $10,624,832.74 |
| 10/01/2005-12/31/2005 | 7% | 1.75% | $185,934.57 | $10,810,767.31 |
| 01/01/2006-03/31/2006 | 7% | 1.75% | $189,188.43 | $10,999,955.74 |
| 04/01/2006-06/30/2006 | 7% | 1.75% | $192,499.23 | $11,192,454.97 |
| 07/01/2006-09/30/2006 | 8% | 2% | $223,849.10 | $11,416,304.07 |
| 10/01/2006-12/31/2006 | 8% | 2% | $228,326.08 | $11,644,630.15 |
| 01/01/2007-03/31/2007 | 8% | 2% | $232,892.60 | $11,877,522.75 |
| 04/01/2007-06/30/2007 | 8% | 2% | $237,550.46 | $12,115,073.21 |
| 07/01/2007-09/30/2007 | 8% | 2% | $242,301.46 | $12,357,374.67 |
| 10/01/2007-12/31/2007 | 8% | 2% | $247,147.49 | $12,604,522.16 |
| 01/01/2008-03/31/2008 | 7% | 1.75% | $220,579.14 | $12,825,101.30 |
| 04/01/2008-06/30/2008 | 6% | 1.5% | $192,376.52 | $13,017,477.82 |
| 07/01/2008-09/30/2008 | 5% | 1.25% | $162,718.47 | $13,180,196.29 |
| 10/01/2008-12/31/2008 | 6% | 1.5% | $197,702.94 | $13,377,899.23 |
| 01/01/2009-03/31/2009 | 5% | 1.25% | $167,223.74 | $13,545,122.97 |
| 04/01/2009-06/30/2009 | 4% | 1% | $135,451.23 | $13,680,574.20 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| 04/01/2002-06/30/2009 | $4,795,571.19 | $13,680,574.20 |

# Exhibit K

## U.S. Securities and Exchange Commission

### Final Rule:
### Adjustments to Civil Monetary Penalty Amounts

SECURITIES AND EXCHANGE COMMISSION

17 CFR Part 201

[Release Nos. 33-7946; 34-43897; IA-1921; IC-24846]

Adjustments to Civil Monetary Penalty Amounts

AGENCY: Securities and Exchange Commission

ACTION: Final rule

SUMMARY: This rule implements the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, which requires that the Commission adopt a regulation adjusting for inflation the maximum amount of civil monetary penalties under the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Investment Advisers Act of 1940.

EFFECTIVE DATE: February 2, 2001.

FOR FURTHER INFORMATION CONTACT: Richard A. Levine, Assistant General Counsel at (202) 942-0890, or Scot E. Draeger, Attorney, Office of the General Counsel at (202) 942-0852.

SUPPLEMENTARY INFORMATION:

### I. Background

This regulation implements the Debt Collection Improvement Act of 1996 ("DCIA").[1] The DCIA amended the Federal Civil Penalties Inflation Adjustment Act of 1990 ("FCPIAA")[2] to require that each federal agency adopt regulations at least once every four years, adjusting for inflation the maximum amount of the civil monetary penalties ("CMPs") under the statutes administered by the agency.[3]

A civil monetary penalty ("CMP") is defined in relevant part as any penalty, fine, or other sanction that: (1) is for a specific amount, or has a maximum amount, as provided by federal law; and (2) is assessed or enforced by an agency in an administrative proceeding or by a federal court pursuant to federal law.[4] This definition covers the monetary penalty provisions contained in the statutes administered by the Commission.

The DCIA requires that the penalties be adjusted by the cost-of-living adjustment set forth in Section 5 of the FCPIAA.[5] The cost-of-living adjustment is defined as the percentage by which the U.S. Department of Labor's Consumer Price Index[6] ("CPI") for the month of June for the year

preceding the adjustment exceeds the CPI for the month of June for the year in which the amount of the penalty was last set or adjusted pursuant to law.[7] The statute contains specific rules for rounding each increase based on the size of the penalty.[8] Agencies do not have discretion in whether to adjust a maximum CMP, or the methods used to determine the adjustment. Although the DCIA imposed a 10 percent maximum increase for each penalty for the first adjustment pursuant thereto, which adjustment was made in 1996, that limitation does not apply to the adjustments subsequently made.

The Commission administers four statutes which provide for civil monetary penalties: the Securities Act of 1933; the Securities Exchange Act of 1934; the Investment Company Act of 1940; and the Investment Advisers Act of 1940. Penalties administered by the Commission were first adjusted by rules effective December 9, 1996.[9] The DCIA requires the civil monetary penalties to be adjusted for inflation every four years. Therefore, the Commission is directed by statute to increase the maximum amount of each penalty by the appropriate formulated amount.[10]

Accordingly, the Commission is adopting an amendment to 17 CFR 201 to add section 201.1002 and Table II to Subpart E, increasing the amount of each civil monetary penalty authorized by the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Investment Advisers Act of 1940. The adjustments set forth in the amendment apply to violations occurring after the effective date of the amendment.

The amendment also provides for a revision to 17 CFR 201.1001 to clarify the time period for which the new adjustments to the civil monetary penalties will govern, and a revision to correct a typographical error in the earlier rule. The chart[11] accompanying the 1996 adjustments erroneously stated the amount of the CMP for a violation of 15 U.S.C. 78u(d)(3) by a natural person. The correct amount of the CMP for that violation is $5,500, not $5,000.

## II. Summary of the Calculation

To explain the inflation adjustment calculation for CMP amounts that were last adjusted in 1996, we will use the following example. Under the CMP provisions, as amended in 1996, the Commission may impose a maximum CMP of $1,100,000 for certain insider trading violations by a controlling person. First, we determine the appropriate CPI for June of the calendar year preceding the year of adjustment. Because we are adjusting CMPs in 2001, we use the CPI for June of 2000, which was 516.5. We must also determine the CPI for June of the year the CMP was last adjusted for inflation. Because the Commission last adjusted CMPs in 1996, we use the CPI for June of 1996, which was 469.5.

Second, we calculate the cost-of-living adjustment or inflation factor. To do this we divide the CPI for June of 2000 (516.5) by the CPI for June of 1996 (469.5). Our result is 1.10 (*i.e.*, a 10 percent increase).

Third, we calculate the raw inflation adjustment. To do this, we multiply the maximum penalty amounts by the inflation factor. In our example, $1,100,000 multiplied by the inflation factor of 1.10 equals $1,210,000.

Fourth, we round the raw inflation amounts according to the rounding rules in Section 5(a) of the FCPIAA. Since we round only the increased amount, we calculate the increased amount by subtracting the current maximum penalty amounts from the raw maximum inflation adjustments.

Accordingly, the increased amount for the maximum penalty in our example is $110,000 (*i.e.*, $1,210,000 less $1,100,000). Under the rounding rules, if the *penalty* is greater than $200,000, we round the *increase* to the nearest multiple of $25,000. Therefore, the maximum penalty increase in our example is $100,000.

Fifth, we add the rounded increase to the maximum penalty amount last set or adjusted. In our example, $1,100,000 plus $100,000 yields a maximum inflation adjustment penalty amount of $1,200,000.[12]

### III. Related Matters

#### A. Administrative Procedure Act - Immediate Effectiveness of Final Rule

To issue a final rule without public notice and comment, an agency must find good cause that notice and comment are impractical, unnecessary, or contrary to public interest.[13] Because the Commission is required by statute to adjust the civil monetary penalties within its jurisdiction by the cost-of-living adjustment formula set forth in Section 5 of the FCPIAA, the Commission finds that good cause exists to dispense with public notice and comment pursuant to the notice and comment provisions of the Administrative Procedure Act ("APA").[14] Specifically, the Commission finds that because the adjustment is mandated by Congress and does not involve the exercise of Commission discretion or any policy judgments, public notice and comment is unnecessary.

Under the DCIA, agencies must make the required inflation adjustment to civil monetary penalties: (1) according to a very specific formula in the statute, and (2) within four years of the last inflation adjustment. Agencies have no discretion as to the amount or timing of the adjustment. The regulation and amendments discussed herein are ministerial, technical, and noncontroversial. Furthermore, because the regulation and amendments concern penalties for conduct that is already illegal under existing law, there is no need for effected penalty parties to have thirty days prior to the effectiveness of the regulation and amendments during which to adjust their conduct. Accordingly, the Commission believes that there is good cause to make this regulation and amendments effective immediately upon publication.

#### B. Regulatory Flexibility Act

A regulatory flexibility analysis under the Regulatory Flexibility Act ("RFA") is required only when an agency must publish a general notice of proposed rulemaking for notice and comment.[15] As already noted, notice and comment are not required for this final rule. Therefore, the RFA does not require a regulatory flexibility analysis.[16]

#### C. Cost-Benefit Analysis

The Commission considers generally the costs and benefits of its rules and regulations. The regulation and minor amendments merely adjust civil monetary penalties in accordance with inflation as required by the DCIA, and have no impact on disclosure or compliance costs. Furthermore, Congress, in mandating the inflationary adjustments, has already determined that any possible increase in costs is justified by the overall benefits of such adjustments.

The regulation and amendments are in the interest of the public and in

furtherance of investor protection. The benefit provided by the inflationary adjustment to the maximum civil monetary penalties is that of maintaining the level of deterrence effectuated by the civil monetary penalties, and not allowing such deterrent effect to be diminished by inflation.

### D. Paperwork Reduction Act

This rule does not contain any collection of information requirements as defined by the Paperwork Reduction Act of 1995 as amended.[17] Therefore, Office of Management and Budget review is not required.

### List of Subjects in 17 CFR Part 201

Administrative practice and procedure, Claims, Confidential business information, Lawyers, Securities

### Text of Amendment:

For the reasons set forth in the preamble, part 201, title 17, chapter II of the Code of Federal Regulations is amended as follows:

### PART 201 - RULES OF PRACTICE

### SUBPART E - ADJUSTMENTS TO CIVIL MONETARY PENALTIES

1. The authority citation for Part 201, Subpart E continues to read as follows:

Authority: Pub. L. No. 104-134, 110 Stat. 1321.

2. Section 201.1001 is revised to read as follows:

§ 201.1001 Adjustment of civil monetary penalties - 1996.

As required by the Debt Collection Improvement Act of 1996, the maximum amounts of all civil monetary penalties under the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Investment Advisers Act of 1940 are adjusted for inflation in accordance with Table I to this subpart. The adjustments set forth in Table I apply to violations occurring after December 9, 1996 and before February 2, 2001.

3. Table I to Subpart E for the entry 15 USC 78u(d)(3) is amended by revising "5,000" to read "5,500" in the last column.

4. Section 201.1002 and Table II to Subpart E are added following Table I to Subpart E to read as follows:

§ 201.1002 Adjustment of civil monetary penalties - 2001.

As required by the Debt Collection Improvement Act of 1996, the maximum amounts of all civil monetary penalties under the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Investment Advisers Act of 1940 are adjusted for inflation in accordance with Table II to this subpart. The adjustments set forth in Table II apply to violations occurring after February 2, 2001.

**Table II to Subpart E**

**Civil Monetary Penalty Inflation Adjustments**

| U.S. Code Citation | Civil Monetary Penalty Description | Year Penalty Amount Was Last Adjusted | Maximum Penalty Amount Pursuant To 1996 Adjustment | Adjusted Maximum Penalty Amount |
|---|---|---|---|---|
| Securities and Exchange Commission | | | | |
| 15 USC 77t(d) | For natural person | 1996 | $5,500 | $6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses or risk of losses to others | 1996 | 110,000 | 120,000 |
| | For any other person / substantial losses or risk of losses to others | 1996 | 550,000 | 600,000 |
| 15 USC 78ff(b) | Exchange Act / failure to file information documents, reports | 1996 | 110 | 110 |
| 15 USC 78ff(c)(1)(B) | Foreign Corrupt Practices - any issuer | 1996 | 11,000 | 11,000 |
| 15 USC 78ff(c)(2)(C) | Foreign Corrupt Practices - any agent or stockholder acting on behalf of issuer | 1996 | 11,000 | 11,000 |
| 15 USC 78u-1(a)(3) | Insider Trading - controlling person | 1996 | 1,100,000 | 1,200,000 |
| 15 USC 78u-2 | For natural person | 1996 | 5,500 | 6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses to others / gains to self | 1996 | 110,000 | 120,000 |
| | For any other person / substantial losses to others /gain to self | 1996 | 550,000 | 600,000 |

| | | | | |
|---|---|---|---|---|
| 15 USC 78u(d)(3) | For natural person | 1996 | 5,500 | 6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses or risk of losses to others | 1996 | 110,000 | 120,000 |
| | For any other person / substantial losses or risk of losses to others | 1996 | 550,000 | 600,000 |
| 15 USC 80a-9(d) | For natural person | 1996 | $5,500 | $6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses to others / gains to self | 1996 | 110,000 | 120,000 |
| | For any other person / substantial losses to others /gain to self | 1996 | 550,000 | 600,000 |
| 15 USC 80a-41(e) | For natural person | 1996 | 5,500 | 6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses or risk of losses to others | 1996 | 110,000 | 120,000 |
| | For any other person / substantial losses or risk of losses to others | 1996 | 550,000 | 600,000 |
| 15 USC 80b-3(i) | For natural person | 1996 | 5,500 | 6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses to | 1996 | 110,000 | 120,000 |

| | | | | |
|---|---|---|---|---|
| | others / gains to self | | | |
| | For any other person / substantial losses to others /gain to self | 1996 | 550,000 | 600,000 |
| 15 USC 80b-9(e) | For natural person | 1996 | 5,500 | 6,500 |
| | For any other person | 1996 | 55,000 | 60,000 |
| | For natural person / fraud | 1996 | 55,000 | 60,000 |
| | For any other person / fraud | 1996 | 275,000 | 300,000 |
| | For natural person / substantial losses or risk of losses to others | 1996 | 110,000 | 120,000 |
| | For any other person / substantial losses or risk of losses to others | 1996 | 550,000 | 600,000 |

By the Commission

_____

Jonathan G. Katz
Secretary

January 29, 2001

_____

### Footnotes

[1] Pub. L. No. 104-134, section 31001(s) (April 26, 1996).

[2] 28 U.S.C. 2461 (1990).

[3] An increased CMP applies only to violations that occur after the increase takes effect.

[4] 28 U.S.C. 2461(3)(2).

[5] Pub. L. No. 104-134.

[6] "Consumer Price Index" means the Consumer Price Index for all urban consumers ("CPI-U") published by the Department of Labor.

[7] 28 U.S.C. 2461(5)(b).

[8] 28 U.S.C. 2461(5)(a)(1) - (6).

[9] *See* 17 CFR 201.1001.

[10] The CPI-All Urban Consumers- for June of the year in which the penalties were last adjusted (June 1996) was 469.5. The CPI for June of the year preceding the proposed adjustments (June 2000) was 516.5. Therefore, the

Case 2:05-cv-40263-RHC   ECF No. 150   filed 07/30/09   PageID.6029   Page 118 of 168

inflation factor for the cost-of-living adjustment for penalties last amended in 1996 is 1.10 (i.e., an increase of 10 %).

[11] 17 CFR 201, Subpart E, Table I.

[12] When examining Table II to Subpart E of Part 201, you will notice that the operation of the statutorily mandated computation, together with rounding rules, does not result in any adjustment to certain penalties. These particular penalties (the ones for which no adjustment is being made in 2001) will be subject to slightly different treatment when calculating the 2005 adjustment. Under the statute, when we adjust these particular penalties in 2005, we will be required to use the CPI-U for June of the year when these particular penalties (the ones for which no adjustment is being made in 2001) were "last adjusted." When calculating the 2005 adjustment to the particular penalties not being adjusted in 2001, we will use the CPI-U for 1996 (the year that these particular penalties were last adjusted).

[13] 5 U.S.C. 553(b).

[14] 5 U.S.C. 553(b)(3)(B).

[15] 5 U.S.C. 603.

[16] 5 U.S.C. 601 - 612.

[17] 44 U.S.C. 3501 *et seq.*

*http://www.sec.gov/rules/final/33-7946.htm*

---

Home | Previous Page                                    Modified: 01/31/2001

# Exhibit L

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                     SOUTHERN DIVISION

4       ------------------------------)

5       SECURITIES AND EXCHANGE        )

6       COMMISSION,                    )

7                    Plaintiff,        ) CIVIL ACTION

8          -vs-                        ) No. 05-40263

9       CHARLES C. CONAWAY and         ) (PVG)

10      JOHN T. McDONALD, JR.,         )

11                   Defendants.       )

12      ------------------------------)

13          The videotaped deposition of CHARLES C.

14      CONAWAY, called for examination, taken pursuant

15      to the Federal Rules of Civil Procedure of the

16      United States District Courts pertaining to the

17      taking of depositions, taken before JOAN M.

18      BURKE, CSR No. 84-2259, at Securities and

19      Exchange Commission, 175 W. Jackson Blvd.,

20      Suite 900, Chicago, Illinois, on the 13th day

21      of February, 2008, at 9:31 a.m.

22

23

24

25

Charles C. Conaway                                                February 13, 2008

Chicago, IL

Page 2

```
1  APPEARANCES:
2  MR. ALAN M. LIEBERMAN,
3  MR. ROBERT I. DODGE, and
4  MR. DEAN M. CONWAY
5  U.S. Securities and Exchange Commission
6  100 F Street NE
7  Washington, DC 20549
8  (202) 551-4474
9     On behalf of the Plaintiff;
10 MR. SCOTT R. LASSAR, and
11 MS. HILLE R. SHEPPARD
12 Sidley Austin, LLP
13 One S. Dearborn Street
14 Chicago, Illinois 60603
15 (312) 853-7668
16    On behalf of the Defendant,
17    Charles C. Conaway;
18 MR. JOHN E. SYLVIA and
19 MS. JESSICA C. SERGI
20 Mintz, Levin, Cohn, Ferris, Glovsky and Popeo
21 One Financial Center
22 Boston, Massachusetts 02111
23 (617) 542-6000
24    On behalf of the Defendant,
25    John T. McDonald, Jr.
```

Page 3

```
1  APPEARANCES:  (Continued)
2
3  ALSO PRESENT:
4  MARVIN OLTMAN, Videographer
5
6  REPORTED BY: JOAN M. BURKE, C.S.R., R.P.R.
7        CERTIFICATE NO. 84-2259
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              INDEX
2  WITNESS:                    PAGES:
3  CHARLES C. CONAWAY
4  Direct Examination by Mr. Lieberman  throughout
5
6  EXHIBITS:
7  Plaintiff's Exhibit No. 107      158
8  Plaintiff's Exhibit No. 108      164
9  Plaintiff's Exhibit No. 185      276
10 Plaintiff's Exhibit No. 186      282
11 Plaintiff's Exhibit No. 192      296
12 Plaintiff's Exhibit No. 193      296
13 Plaintiff's Exhibit No. 194      296
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1        THE VIDEOGRAPHER:  We're now on the
2  record in the matter of Securities and Exchange
3  Commission versus Charles C. Conaway and John
4  T. McDonald, Jr.  Today's date is February 13,
5  2008.  The time is 9:32 a.m.
6        This is the video recorded
7  deposition of Charles C. Conaway and it's being
8  at the Securities and Exchange Commission at
9  715 West Jackson Boulevard, Suite 900, Chicago,
10 Illinois.  I'm the operator of this camera.  My
11 name is Marvin Oltman in association with
12 Alderson Reporting located at 1111 14th Street
13 Northwest, Washington D.C.  The court reporter
14 today is Joan Burke, also in association with
15 Alderson Reporting.
16        Will the attorneys please
17 identify themselves and the parties they
18 represent beginning with the party noticing
19 this proceeding.
20        MR. LIEBERMAN:  Alan Lieberman
21 representing the Securities and Exchange
22 Commission and with me are my colleagues Bob
23 Dodge and Dean Conway.
24        MR. LASSAR:  Scott Lassar and Hille
25 Sheppard for Mr. Conaway.
```

2 (Pages 2 to 5)

Charles C. Conaway                                    February 13, 2008

Chicago, IL

Page 22

1    going to generalize.
2        Q. All right. Well we'll --
3        A. And --
4        Q. I didn't -- frankly I didn't want you
5    to generalize. I thought that since you had a
6    particular view of this board that apart from
7    snoring and sleeping by some members you would
8    have examples you could give me of substantive
9    issues where they failed to serve the interest
10   of the shareholders of Kmart during your
11   tenure?
12       A. Again, I wouldn't want to do a -- a
13   broad speculation on that. So any individual
14   specific topics you want to talk about.
15       Q. Well, other than snoring and sleeping,
16   with the exception of Stallkamp, I assume they
17   didn't all sleep at the same time?
18       A. Yeah, actually at one particular time
19   they -- they did.
20       Q. Okay. How many board members were
21   there?
22       A. I don't know. I believe it was 11 or
23   12.
24       Q. And you and Mr. Stallkamp were the
25   only two in the room awake?

Page 23

1        A. I said I don't -- I don't remember Mr.
2    Stallkamp. I know John McDonald was awake
3    because he was trying to present financial
4    results. So in that particular time it was --
5    I was very disappointed because we had a new
6    C.F.O. who was trying to do the best that he
7    could and we had board members sleeping around
8    the table.
9        Q. Okay. All right. Well, when you said
10   to me that the board didn't fulfill its
11   functions, you mentioned two things, sleeping
12   and snoring and inattentiveness --
13           MR. LASSAR: Objection.
14           MR. LIEBERMAN:  Three things.
15           MR. LASSAR: Yeah.
16   BY MR. LIEBERMAN:
17       Q. Now, my question is other than those
18   three things, what did you have in mind when
19   you answered my question?
20       A. Again, if you want to go through
21   specifics, attentiveness would cover virtually
22   every topic that we covered at the board. It
23   was we were dealing, in my opinion, and I
24   publicly stated one of the more difficult
25   turnarounds in corporate America. We needed

Page 24

1    not only everyone's attentiveness, we need the
2    best talent that we could to help a brand new
3    C.E.O. who's never been in that position
4    before. That that did not happen.
5        Q. All right.
6        A. So I, you know, while you broad brush,
7    I want to make sure that you understand my
8    point. That was the basis of all the problems
9    in getting support from the board. If you're
10   not attentive, you -- you're not in a very
11   complex and difficult turn around, you're not
12   getting the type of support that you need.
13       Q. All right. So you didn't get support
14   from the board during your tenure, correct? Is
15   that your testimony?
16       A. Not to the level on -- on some items,
17   no.
18       Q. All right. Give me some of those
19   items that you didn't get support from the
20   board on during your tenure?
21       A. Support on particular issues?
22       Q. Whatever you had in mind when you just
23   testified to that?
24       A. Well, I -- you know, I'm not going to
25   go example by example. I can give you an

Page 25

1    example. There's plenty of examples.
2        Q. Give me -- give me three?
3        A. One of them was -- well, I won't give
4    you three; I'll give you one. One, a very
5    serious matter was we had a liquidity crunch
6    and we were trying to make sure that we had all
7    the appropriate alignment and plans in place in
8    September to address the liquidity crunch. And
9    we had a board review in September and as
10   opposed to helping and asking the type of
11   thoughtful questions and being supportive that
12   I would believe a board would be, um, their
13   only reaction was ah, well, um, just make sure
14   that, you know, we get the inventory level
15   down. And I felt that there was just an
16   overall general understanding once again of the
17   magnitude of the challenge around the
18   turnaround in which we faced and that they
19   didn't grasp it. And so I -- I -- that was
20   extremely unsupportive in a very -- a very
21   important time in the company.
22       Q. Okay. Now, you were at that meeting,
23   I take it?
24       A. Yes.
25       Q. Okay. Now, I think the September

7 (Pages 22 to 25)

Charles C. Conaway                                                 February 13, 2008

Chicago, IL

Page 26

1  meeting was right after September 11, the
2  horrible tragedy this country experienced.
3  That was -- so that board meeting was done by
4  telephone, correct?
5      A. Yeah, it had to be because of that.
6      Q. But there were other board meetings
7  where liquidity was an issue with the board and
8  you attended, correct?
9      A. Liquidity was discussed, sure.
10     Q. And would you agree that liquidity was
11 probably the number one concern in the third
12 quarter of 2001?
13     A. I wouldn't call it the number one, but
14 I would say it was -- it was clearly one of the
15 key priorities that we were focused on.
16     Q. And liquidity is a serious issue for a
17 company like Kmart; isn't it?
18     A. Liquidity is important to any company
19 no matter how small or how large.
20     Q. Incidentally, what -- the term
21 liquidity, what does it mean to you?
22     A. Liquidity to me means availability of
23 financial resources.
24     Q. For what purpose?
25     A. For whatever general purposes you

Page 27

1  might need them for.
2      Q. Doesn't liquidity also mean the
3  ability to instantly use money, the instant
4  available money, liquidity like cash? Isn't
5  that what liquidity means?
6      A. Cash can be a component of liquidity.
7  I don't -- I don't -- when you say liquidity I
8  don't -- it's not synonymous with cash either.
9  I mean --
10     Q. Well, I understand that. But it also
11 is synonymous with say money markets that can
12 be instantly liquidated and turned into cash;
13 isn't that true?
14     A. Yeah, but liquidity is much broader
15 than that.
16     Q. Okay. What else does it include?
17     A. It includes any -- any asset that you
18 can use to -- for -- again, for the financial
19 uses of -- and the purposes that you have.
20     Q. The liquidity crunch that you talked
21 about moments ago, what was that crunch? I
22 just want the short answer and we'll dig down
23 deep, but you give the kind of an answer that
24 you're comfortable with?
25     A. I'm sorry, you're going to have --

Page 28

1  what is the question again?
2      Q. I'm going to withdraw it because I've
3  got a sense that my next question will be a
4  long way from now. So let me try to break it
5  down.
6      A. Okay.
7      Q. What did you do -- I mean we agree
8  that liquidity was an important issue during
9  the third quarter. But when did you sense that
10 the board, as you put it, just wasn't getting
11 it and wasn't providing you support on
12 liquidity?
13     A. On liquidity?
14     Q. Yeah, on liquidity?
15     A. I didn't think it was just on
16 liquidity. It's broader than that.
17     Q. Well, understand that when I ask the
18 question, I listen to your answer and a lot of
19 times my next question draws on your answer. I
20 asked you for an example of where the board
21 didn't fulfill its function of support to you
22 and you said I'll give you one, liquidity.
23     A. Correct.
24     Q. All right. Okay. So my question to
25 you, Mr. Conaway, is when did you realize on

Page 29

1  this important issue during the third quarter
2  of 2001 liquidity that the board in your words
3  just wasn't getting it and giving you the
4  support you need?
5      A. As soon as I presented it to them.
6      Q. And what did you do about it to make
7  them get it?
8      A. I put it down in writing so that they
9  absolutely would get it.
10     Q. Okay. Now we have some documents
11 we'll show you that we think at least raise
12 that issue, but what -- what writings are you
13 talking about that you put down for the board
14 generally?
15     A. Well, I took the highly unusual step
16 to write a fairly lengthy letter post a board
17 meeting, which I don't recall ever doing
18 before, because they didn't get it. So again,
19 down in writing is -- is as to me, because over
20 and over again, when I told the board things,
21 they would never remember them. So this was my
22 attempt to say listen, these are the issues
23 that we have at hand.
24     Q. And Mr. Stallkamp didn't get it
25 either?

8 (Pages 26 to 29)

Charles C. Conaway                                          February 13, 2008

Chicago, IL

Page 118

1   one of the things when you stretch vendors they
2   don't generally like it. On the flip side, we
3   did other things which Kmart had done in the
4   past that we were eliminating that also upset
5   the supply.
6       Q. Those were the compliance issues that
7   you talked about?
8       A. Compliance income, yes, the entire
9   program. That would be one example of that.
10      Q. Yeah, but I'm talking about the vendor
11  community reaction to the stretching of
12  invoices in the third quarter 2001?
13      A. Yes.
14      Q. You knew it was widespread, correct?
15  Among the vendors?
16      A. Yeah. Yeah, I mean I don't -- I don't
17  know that, but yes.
18      Q. You knew that it was angry among the
19  vendors?
20      A. No. I didn't know it was angry.
21      Q. Okay. You knew that Scott Gilbert in
22  payables and his team was fielding calls every
23  90 seconds. They had a phone bank set up there
24  were so many irate vendors about this
25  stretching. You knew that, didn't you?

Page 119

1       A. No, I did not know that.
2       Q. So you chose a course of action over
3   the 500 million you said was available that put
4   your relationship with your vendors at risk,
5   didn't you?
6       A. I don't think put it at risk. Could
7   strain it.
8       Q. Well, there were vendors -- you knew
9   there were vendors that threatened not to ship,
10  didn't you?
11      A. There was vendors that threatened not
12  to ship all the time at Kmart.
13      Q. I understand that. I'm talking about
14  in the context of the third quarter of '01
15  because they weren't getting paid?
16      A. I knew of vendors that threatened not
17  to ship my entire 18 months at Kmart, so yes.
18      Q. Again, my question, during the third
19  quarter, during the stretching of invoices --
20      A. Yes.
21      Q. -- you were aware that vendors
22  threatened not to ship because of that
23  stretching of invoices during the third
24  quarter?
25      A. Yes.

Page 120

1       Q. Correct?
2       A. Yes.
3       Q. Did you communicate with vendors about
4   -- about what was going on with their payables?
5           MR. LASSAR: He personally?
6   BY MR. LIEBERMAN:
7       Q. Yes. Personally?
8       A. No.
9       Q. Okay. Now, can we agree that
10  Workbench is a, for want of -- it's a window
11  for vendors into Kmart so that -- not a
12  complete window, but a window where vendors can
13  log onto Workbench and find out what's going on
14  with their purchases and payments and invoices
15  and things of that nature? That's one of the
16  things they can do with Workbench?
17      A. Yeah, I don't know the totality of
18  what Workbench provides to vendors, but I do
19  know that it -- it is one of the systems that
20  they use to -- you know, to run their -- their
21  respective categories.
22      Q. Meaning the vendors?
23      A. Yeah, the vendors to -- right, to
24  share information.
25      Q. So, for example, if Sunbeam or ACDelco

Page 121

1   or one of your vendors wants to find out the
2   status of one of its invoices, asking you for
3   payment, it can log onto your Workbench system
4   and find out, correct?
5       A. I don't know if that's how it works or
6   not.
7       Q. I'm telling you that that's how it
8   works because we've gotten that testimony from
9   people responsible for it. Okay?
10      A. Okay. And I'm telling you I don't
11  understand the mechanics about --
12      Q. I understand you don't know the
13  mechanics. You don't know the logarithms, I
14  don't know the logarithms, I don't know the
15  software, I can't write the program, but I know
16  that if I log onto Workbench --
17      A. Yeah.
18      Q. -- I can see where my invoice is.
19      A. Okay.
20      Q. You didn't know that?
21      A. I didn't know any level of detail of
22  Workbench. I knew it was for vendors to be
23  able to look at their business. So whatever
24  components that is, sales, I don't -- I don't
25  know what was there. I never used Workbench so

31 (Pages 118 to 121)

Charles C. Conaway                                    February 13, 2008
Chicago, IL

Page 122

1   I couldn't tell you.
2       Q.  Okay.  So if Workbench is shut down,
3   the vendors don't have that window into their
4   business at Kmart, do they?
5       A.  Yeah, they would be missing that
6   source, yes.
7       Q.  Okay.  And you know that when --
8   Workbench was shut down?
9       A.  I know that Workbench was shut down,
10  yes.  I do know that it was shut down.
11      Q.  And do you remember the reason it was
12  shut down?
13      A.  I believe it was because of the volume
14  of calls someone had made a decision to turn it
15  off.
16      Q.  The volume of calls from vendors who
17  were --
18      A.  Yes.
19      Q.  -- unhappy about their payables?
20      A.  Yes.
21      Q.  Okay.  And how did you learn about
22  that?
23      A.  It came up in a conversation.  Cecil
24  Kearse brought it up when he was in -- he was
25  in my office and said that somebody had made a

Page 123

1   decision to turn off Workbench and that we
2   should turn it back on.  I said of course.
3       Q.  Why did he want to turn it back on?
4   Did he tell you?
5       A.  Because the vendors needed to have
6   view of what was going on.
7       Q.  And you became aware at some point
8   maybe after the -- long after the fact that
9   Workbench was turned off shortly after that and
10  was kept off all the way through the
11  bankruptcy?
12      A.  No.  I didn't -- I had no knowledge of
13  that.
14      Q.  I know you've testified you had no
15  knowledge of that.  But you know that testimony
16  is out there from others that it was turned off
17  a second time and kept off?
18          MR. LASSAR:  Objection.
19  BY MR. LIEBERMAN:
20      Q.  You don't?
21      A.  No, I don't know what other people's
22  testimony is.  I've been asked did I know if it
23  was turned off a second time.  I just know my
24  own testimony.
25      Q.  Well, if it was turned off a second

Page 124

1   time -- if.  That's a hypothetical.  If it was
2   turned off a second time, and it was off all
3   the way through the bankruptcy, in other words
4   never turned back on so the vendors were
5   basically blind as to where their invoices were
6   --
7       A.  Mm-hmm.
8       Q.  -- that would have been contrary to
9   Cecil Kearse's wishes, correct, as far as you
10  knew?
11      A.  Yeah.  Yeah.
12      Q.  And contrary to your agreement with
13  Cecil's reasons for wanting to turn it back on?
14      A.  My agreement was just turn it back on.
15  Yeah.
16      Q.  Okay.  All right.  So -- so then
17  someone, not Cecil, and not you, took it upon
18  themselves to shut down Workbench?
19      A.  Mm-hmm.
20      Q.  Okay.  And you never heard about it?
21  Assuming it happened?  The second time?
22      A.  No, I never heard about it when I was
23  at Kmart, no.
24      Q.  All right.  But we can agree -- well
25  maybe you can't, that if Workbench is

Page 125

1   available, a vendor could see the reason why it
2   wasn't getting paid?
3       A.  I don't know if Workbench does that.
4   It doesn't surprise me if it does do that.  I
5   know it's a tool for suppliers.
6       Q.  All right.  Now, you said -- I think
7   you said that one of the initiatives or one of
8   the things that happened is eLMO caused the
9   vendors terms to go from 30 to 60 days?
10      A.  Softlines.
11      Q.  Softlines?
12      A.  Yes.
13      Q.  And that was intentional?
14      A.  Yeah.
15      Q.  Okay.  Fine.  That wasn't a glitch in
16  eLMO that caused that?
17      A.  No.
18      Q.  Okay.  That was an intended --
19      A.  Right.
20      Q.  -- function of eLMO?
21      A.  Yes.
22      Q.  And you don't -- when the vendors --
23  you knew that people in payables, the Gilbert
24  team for want of a better term, were receiving
25  calls from vendors asking why they weren't

Charles C. Conaway                                    February 13, 2008
Chicago, IL

Page 166

1   days.  Thanks for all your help."
2          And then you sign off with a
3   couple of niceties that you can read if you
4   want, but aren't germane to the questions I'm
5   going to ask you.  Did I read that paragraph
6   correctly?
7      A.  Yeah.
8      Q.  Okay.  Now, was it true that you
9   talked to Cecil and he said he was on top of
10  Sunbeam's issue?
11     A.  Again, I don't recall this letter, so.
12     Q.  Okay.  Could this letter go out
13  without your authority?
14     A.  Absolutely.  Sure.
15     Q.  Okay.  As a matter of fact, I think
16  you testified an earlier time that that was not
17  your signature, it was actually a stamp?
18     A.  Yeah, I would absolutely think that's
19  the stamp.
20     Q.  So somebody in your office is
21  authorized to communicate with the Chairman of
22  the Board and Chief Executive Officer of the
23  Sunbeam Corporation --
24     A.  Mm-hmm.
25     Q.  -- on a matter addressed directly to

Page 167

1   you?  They can do that on their own?
2      A.  Yeah.  I mean we had a -- there's --
3   one of the things that with the volumes of
4   communication I got with a $40 billion company
5   and, you know, the level of employees and
6   constituents I had to deal with is the
7   information flow is huge.  So one of the things
8   is to get information to people who can act on
9   it.  So more times than not I did not respond
10  to communications that were sent to me, whether
11  they were customers, or whether -- in some
12  cases when they were C.E.O.s of suppliers.
13  They would go to people who could resolve them
14  and there was a process for which.
15         Now, again, I don't recall this
16  so I can't tell you what happened in this
17  particular one, but that is not an unusual
18  process especially given my travel schedule
19  which most of the time -- excuse me -- I was
20  out in stores.
21     Q.  Did Marty Lyon put a stamp on this
22  letter and send it out?
23     A.  I -- I don't know.  I don't --
24     Q.  She typed it, didn't she?
25     A.  It appears because her initials are

Page 168

1   there, but I -- that's --
2      Q.  Did you know the procedure in your own
3   office for sending out correspondence to
4   chairmen of the board and chief executive
5   officers of -- of vendors?  Do you have any
6   procedure in place?
7      A.  The procedure in place is to get the
8   communication to the people who are closest to
9   the issues and respond.
10     Q.  So who got the communication closest
11  to the -- to the people closest to the issue?
12  Who did that?
13         MR. LASSAR:  In this particular case?
14  BY MR. LIEBERMAN:
15     Q.  Yes, in this particular case who did
16  that?
17     A.  Obviously I don't know because I
18  testified I don't recall doing this or seeing
19  this.
20     Q.  Is it your testimony that this letter
21  never came to you, Mr. Levin's letter never
22  came to you?
23     A.  No, that's not my testimony.  I don't
24  recall it.
25     Q.  Is it your testimony that you didn't

Page 169

1   see Exhibit 108 and approve it before it went
2   out?
3      A.  What is Exhibit 108?
4      Q.  The one that's right in front of you.
5   The one with your signature stamp on it?
6      A.  How do I see Exhibit 108, by the way?
7   Just for --
8      Q.  Plaintiff's Exhibit 108.  A yellow
9   sticker?
10     A.  Oh, I'm sorry.  I was looking at this
11  thing, S.E.C.  Oh, okay.  Excuse me?
12     Q.  Is it your testimony that you did not
13  see and approve this letter before it was sent
14  to Mr. Levin?
15     A.  My testimony is I don't recall seeing
16  it.
17     Q.  Now, who had the authority to put your
18  stamp on a letter?
19     A.  My assistant did.
20     Q.  Marty Lyon?
21     A.  Yeah.
22     Q.  Okay.
23     A.  Again, I can't tell you who had my --
24  name went out on a lot of things.  It went out
25  on employee communications that I never saw.

43  (Pages 166 to 169)

Page 170

1  So I know H.R. is an example.
2      Q.  H.R. has your stamp?
3      A.  I don't know if they have it.  I know
4  that they would stamp my name on a variety of
5  things.
6      Q.  Well, then where did they get the
7  stamp?
8      A.  I don't know.
9      Q.  Do people at Kmart have -- just have
10 the authority without your knowledge to use
11 your stamp?
12     A.  Without my knowledge?
13     Q.  Yeah?
14     A.  I know there's some communications
15 that I don't review that, yeah, they stamp my
16 name on it because they think it's appropriate
17 to come from me.
18     Q.  So you have -- you admit that the name
19 in the fullest sense of that term, your name is
20 critical to Kmart, correct?
21     A.  I don't know it's critical, but --
22 yeah.
23     Q.  Your name and reputation in a tough
24 time are critical to Kmart's success?
25     A.  I would -- I would think it's a

Page 171

1  component of the success.
2      Q.  And yet you had no control over who
3  was using your signature stamp?
4      A.  That's my testimony, and if it isn't
5  I can clarify it, I don't know who had my stamp
6  and who didn't have my stamp.
7      Q.  That's my point.  You had no control
8  over it?
9      A.  I have -- I don't have knowledge of
10 who had it, so.
11     Q.  Where is Marty Lyon today?
12     A.  I don't know.  I haven't spoken with
13 Marty in a very long time.
14     Q.  Okay.  All right.  Incidently, the
15 letter before I leave it, is it true what's
16 said in there?
17     A.  Again, I don't know the specifics with
18 -- with Mr. Lev -- you know, the Sunbeam
19 situation so I couldn't comment.
20     Q.  No, no, no.  I'm talking about the
21 communication back to Mr. Levin that is over
22 your signature, is that true what is being told
23 to Mr. Levin by -- by you?
24     A.  By me?
25     Q.  Yes, by you?

Page 172

1      A.  Again, I -- I don't know his
2  situation.  It could be, yes.
3      Q.  It could be true?
4      A.  Yes.  And I don't know about the 14
5  days either.
6      Q.  Okay.  So in other words, Mr. --
7  Sunbeam was not affected by any of the five
8  items that you listed first, it was only
9  affected by eLMO?
10     A.  No.  I didn't say that.  And by the
11 way, five isn't all inclusive either.  That's
12 your terminology.  You're framing things up as
13 five.
14     Q.  I am?
15     A.  So I want to be clear with my
16 testimony.
17     Q.  Well, then add to it.  I asked you for
18 the reasons.  I didn't give you a number.  You
19 gave me five.
20     A.  I said there was numerous other
21 policies and procedures of which I can't
22 recall.
23     Q.  Okay.  But the only one that affected
24 Sunbeam was eLMO?
25     A.  I don't know if that's the case.

Page 173

1      Q.  Well, if it's not, then that letter is
2  a lie, isn't it?
3      A.  It's inaccurate, yeah, I guess it
4  would be.
5      Q.  It's a lie, isn't it?  Yes?
6      A.  It's inaccurate.
7      Q.  It's a lie?
8      A.  Okay.  If you want to refer to it as a
9  lie, fine.
10     Q.  Incidentally, you testified earlier
11 that you don't recall any direct communications
12 with vendors during this period of time that
13 the liquidity crunch was on.  Did you
14 understand my question to mean only in the
15 third quarter?  Because this is clearly outside
16 the third quarter, it's November?
17     A.  I thought the communication period was
18 over the liquidity crunch.
19     Q.  It was.  I just want to make sure
20 that's the way you understood it?
21     A.  Yeah.  Yeah.
22     Q.  All right.  So and it's --
23     A.  And I'm defining liquidity crunch,
24 okay, as September, October, November.  So I
25 apologize --

Charles C. Conaway                                            February 13, 2008

Chicago, IL

Page 234

1      Q. The E.L.T. liquidity forecast, was
2   that one of the slides?
3      A. I don't recall that.  I don't recall
4   that.
5      Q. Did you discuss with this group or did
6   you disclose to this group that you were, as
7   you call it, stretching invoices of vendors
8   unilaterally, that is without telling them?
9      A. Oh, sure.
10     Q. So you --
11     A. Stretch receivables, yeah.
12     Q. No, without telling the vendors?
13     A. Yeah.  That's what stretching is.
14  Yes.
15     Q. I thought you could -- okay.  So
16  stretching means you don't tell, you don't
17  disclose?
18     A. Well, I don't know what the disclosure
19  component of it is, but stretching is you take
20  -- you take the terms.
21     Q. You take it from --
22     A. Versus a negotiated -- versus a
23  negotiated term change.
24     Q. Well, you can take the terms and then
25  tell the vendors you're taking them or you can

Page 235

1   take the terms and not tell them anything?
2      A. Correct.
3      Q. Or you can take the terms and tell
4   them it's because of an eLMO problem?  Right?
5      A. No.  I don't -- I don't know what your
6   point is.
7      Q. Okay.  The -- so you told these
8   hundreds or thousands of people at this Friday
9   meeting that you were stretching the vendors
10  and they understood that that meant you weren't
11  telling them about it, these weren't negotiated
12  terms, and you told them the magnitude of the
13  arrearage?
14     A. Yes.
15        MR. LASSAR:  Object to the form.
16  BY MR. LIEBERMAN:
17     Q. Is that correct?
18     A. We talked about -- here's the things
19  that I remember.  We talked about how many days
20  behind we were.  Okay.  We talked about what
21  vendors particularly by merchant if someone had
22  moved large terms with a large supplier, that
23  got put up.
24     Q. A negotiated change?
25     A. Yeah, a negotiated change.  And then

Page 236

1   we did talk about, yeah, vendors that we may
2   have payment issues with.  Yes.  I mean not --
3   again, not an exhaustive list of maybe three or
4   four.  And then --
5      Q. Three or four vendors that you had
6   payment issues with?
7      A. Yeah, and then it would be given to,
8   you know, people to resolve and then move --
9   and there were merchandising meetings -- just
10  so you know the process.
11     Q. Right.
12     A. Then there were merchandising and
13  operation meetings that followed those meetings
14  that had a lot of people in them also that I --
15  I generally didn't attend.
16     Q. So every -- this meeting was every
17  Friday?
18     A. Every Friday morning.
19     Q. Every Friday morning.  And at every
20  Friday morning meeting you discussed the
21  liquidity crunch and the magnitude of it?
22     A. I can't say every Friday morning.
23  Again, what I -- what I just reviewed would be
24  what was -- I recall being reviewed on a
25  consistent basis.

Page 237

1      Q. Did you use the words A.P. system
2   changes in describing what you had done to
3   extend or stretch terms?
4      A. No.  I don't -- no.
5      Q. Did you -- did you use the term
6   prioritizing invoices?
7      A. I don't recall.
8      Q. Do you know -- did you know the
9   mechanics of prioritizing invoices?
10     A. No.
11     Q. Do you know how many -- well, let me
12  just say this.  Mr. Gilbert, Mr. Moreland, Mr.
13  Archambeau have all testified, and this is a
14  rough paraphrase and the record will be the
15  record, but just so you understand where I'm
16  coming from --
17     A. Mm-hmm.
18     Q. -- have all testified that it was
19  virtually almost a full-time job for them to
20  number one, pull invoices so that -- so that
21  the vendors wouldn't get paid on time so that
22  the liquidity cushion could be maintained, and
23  that they were dealing with hundreds and
24  hundreds of calls a day of angry vendors.
25     A. Mm-hmm.

60  (Pages 234 to 237)

Charles C. Conaway                                                    February 13, 2008

Chicago, IL

Page 238

1      Q. They -- all three of them have
2   testified to that experience.  And there are
3   others in the company who dealt with it who
4   haven't testified who we may call in this
5   trial.
6      A. Okay.
7      Q. Do you have any knowledge of that?
8      A. Well, I think -- I have knowledge that
9   there were a lot of calls, that there were
10  calls.  Again, I don't know the magnitude.  So,
11  yes, I have knowledge on the call part.  I
12  think we talked about that before.
13     Q. Do you have -- Do you have knowledge
14  of how much effort and time and the mechanics
15  of what Archambeau and Gilbert and Moreland
16  were doing to, as you call it, prioritize
17  invoices?
18     A. I'm not even sure who Archambeau is.
19  So, no, I don't have the -- I don't have an
20  understanding of the mechanics.  I wouldn't
21  understand the effort involved either.
22     Q. Let's go to Mr. Boyer.  You had
23  one-on-one's with Mr. Boyer when he was the
24  C.F.O.; is that correct?
25     A. Yes.

Page 239

1      Q. You had those every week?
2      A. I don't know if they were every week,
3   but I mean we had them on a consistent with
4   every C.F.O., yes.
5      Q. Now, you -- you can accept this
6   because I'll represent it as an officer of the
7   court, I'm sure Scott Lassar will correct me if
8   I'm wrong, but you had a meeting with him on
9   November 8, 2001 when he was still the C.F.O.
10  It was a one on one, correct?
11     A. I don't recall that exact date, but.
12     Q. All right.  Do you recall following
13  that meeting contacting any board members
14  regarding Mr. Boyer's fitness to remain as
15  chief ex-- Chief Financial Officer of Kmart?
16     A. Yes.  If it was the -- if it was the
17  one on one that I recall.
18     Q. It is.
19     A. Okay.  Then, yeah, the -- right -- I
20  had told Jeff that obviously it was fairly
21  serious, his -- the points that he was making.
22  And that I told him I was going to have to talk
23  to the board and specifically that I would be
24  calling Jim Adamson who was the head of the
25  audit committee and Tom Stallkamp who was the

Page 240

1   head of the finance committee and that's
2   exactly what I did.
3      Q. And what -- what did you tell -- Did
4   you talk to Adamson and Stallkamp together or
5   separately?
6      A. I talked to Jim Adamson first and then
7   --
8      Q. On the phone?
9      A. Yes.  And then I talked to -- yeah.
10  On the phone.  He's not by me.
11     Q. Okay.
12     A. And talked to him about exactly what
13  Jeff had said.
14     Q. Okay.  And then you talked to
15  Stallkamp after that?
16     A. Yeah, right after that.
17     Q. Okay.
18     A. I had asked -- I had assumed -- well,
19  my plan was to talk to Stallkamp.  I asked Jim
20  if he felt that was appropriate and Jim said
21  yes.
22     Q. Okay.  Now, my question to you is as
23  near as you can recall, what did you tell Jim
24  Adamson about -- about Boyer and what did he
25  respond to you?

Page 241

1      A. I can recall.  It's pretty
2   straightforward.  Jeff had three significant
3   issues that he voiced to me.  One was, which I
4   reiterated to -- in the conversation to Jim --
5   Jim and also to Tom and then ultimately the
6   board.
7         first and foremost was that our
8   ind -- our auditor was not independent or
9   ethical.  Joe Murphy.  When asked why he could
10  come -- that's obviously a fairly strong
11  accusation and what, you know, what was behind
12  it and what was the evidence behind that, the
13  response was that he was personal friends and
14  went on vacation with Marty Welsh.  That was
15  the level of background between -- for him not
16  being independent and unethical.
17        Second thing was he still
18  believed even though we had gone through
19  numerous reviews including the last one which
20  he led and brought in an independent partner to
21  lead with him, that the vendor allowances were
22  still not correct.  That was the second
23  component.  And embedded in that was that Joe
24  Murphy wasn't independent or ethical.
25        And then third was that we

61 (Pages 238 to 241)

Charles C. Conaway                                                    February 13, 2008

Chicago, IL

Page 258

1    A. Well, I would assume if it's cash it's
2 available. Quickly.
3    Q. But that depends on your understanding
4 of that line item?
5    A. My --
6    Q. The balance sheet?
7    A. My understanding of a line item,
8 somebody puts cash down it's cash.
9    Q. Right.
10    A. I can get it. Okay. It doesn't get
11 any more liquid than that. It doesn't get any
12 -- it's cash. Just like on a personal basis if
13 I wrote down to get a loan and I put cash down,
14 it would be cash that I would have.
15    Q. If a C.P.A. who audits public
16 companies said that the cash on hand is not
17 available until the business closes for good
18 because of the nature of that line item, are
19 you in a position to dispute that?
20    A. No. I think I -- I'm telling you how
21 I view it.
22    Q. Okay.
23    A. And therefore how I could make
24 statements off of it.
25    Q. Okay. Fine.

Page 259

1    A. Cash is cash.
2    Q. But you could have been wrong?
3    A. I -- about that statement we have
4 plenty of cash?
5    Q. Right. No, the 300 million cash on
6 hand, that description, that line item?
7    A. I'm sorry, I saw -- the only comment
8 that I saw that I made that you read to me was
9 that we had plenty of cash.
10    Q. Okay. I'm referring specifically to a
11 statement that you made --
12    A. Okay.
13    Q. -- that -- and I don't have the
14 details with me now, but we'll find it when we
15 have to at trial, that Kmart and it was in
16 terms of the liquidity --
17    A. Okay.
18    Q. -- and ability to pay its bills had
19 $300 million cash on hand?
20    A. Okay.
21    Q. That's what you said?
22    A. Okay.
23    Q. And that's -- that's the statement
24 that I'm talking about.
25    A. Yeah. And I assume that statement is

Page 260

1 a hundred percent accurate.
2    Q. Okay.
3    A. I wouldn't have any reason to think
4 that --
5    Q. And your reason --
6    A. -- cash isn't cash.
7    Q. And your reason for saying that is to
8 convey what to the audience you said it to?
9    A. To state what our cash position is.
10    Q. Okay.
11    A. I would assume. Again, you're --
12 you're referencing a document that I don't have
13 so I can't give you the context in which I said
14 it. So I'm speculating at best.
15    Q. So your understanding of the cash on
16 hand is that if you wanted to you could get
17 that 300 million and do whatever you wanted
18 with it, pay the -- pay the vendors, do
19 whatever you wanted? That's what you
20 understood?
21    A. Yeah. That -- well, -- no, my
22 understanding is that it's just cash. So when
23 I say we have 300 million of cash on hand, that
24 when I look at the cash in the balance sheet
25 and how it's reported, if it said 300 million

Page 261

1 that you have 300 million cash. Or cash on
2 hand that they're one in the same.
3    Q. All right. Now, let's talk for a
4 minute about the bankruptcy.
5    A. Okay.
6    Q. Have you heard the term a perfect
7 storm used by anybody in the context of this
8 case?
9    A. Yeah.
10    Q. What's your understanding -- what are
11 the components of the perfect storm?
12    A. As it relates to this case?
13    Q. Yeah, we can start there.
14    A. Okay. I mean that was --
15    Q. I know it was a movie and a book, but
16 I think we're talking about Kmart.
17    A. Okay. I mean there were a number of
18 components that -- external as well as
19 internal, but a number of external components
20 that put the -- put the company in a position
21 where we had to look at what our strategic
22 alternatives were that put the situation from a
23 financial standpoint with the potential
24 inability to serve -- service its debts in the
25 future. And those items were of no particular

66 (Pages 258 to 261)

Charles C. Conaway                                         February 13, 2008

Chicago, IL

Page 262

1  order.  Again, it's been quite some time.
2         A report that came out in the
3  beginning of January that set off a series of
4  things related to our performance in that I
5  believe it was Wayne Hood was the analyst, and
6  he -- he talked about sometime in the future we
7  may look to do bankruptcy as one of the things
8  that could quote unquote help the company.
9  What that proceeded to do was to cause a -- the
10 proverbial run on our vendor allowances.  It
11 couldn't have come as a worst time because we
12 collect -- our year end is the end of January.
13 So we were collecting a significant portion of
14 those vendor allowances during that period of
15 time.  And literally the vendors day by day
16 continued to pull back on their vendor
17 allowances.  That was one issue.
18        The other -- the other issue
19 was the surety bond market evaporated.
20 Essentially we had -- and again I don't fully
21 understand the mechanics, but we would have
22 bonds in place that we would pay fees on that
23 we would need to post kind of on a state by
24 state basis for things like workers comp.  As
25 the Wayne Hood report spread, states were

Page 263

1  asking us to put cash in the bank.  We were not
2  able to do surety bonds.  That was another
3  component that came up.
4         And then overall the banking
5  situation had gotten very tight because it was
6  post Enron and that was -- that was another
7  component.  Within the surety bond there was a
8  number of things.  There was actually
9  healthcare, other states came to get money put
10 in for healthcare, but those were some of the
11 main components that came together.
12    Q.  Okay.  Wayne Hood was a stock analyst?
13    A.  Yeah, I believe so, yeah.
14    Q.  You believe that Wayne Hood's article
15 caused the vendors to pull back allowances?
16    A.  Absolutely.
17    Q.  If your -- if the vendor community,
18 whatever percentage of it is upset with you and
19 your slow pay and that you owe them assuming
20 that Jerry Levin's telling the truth, say 9.5
21 million, and we have a long list of documents
22 that we're going to put into this case through
23 other witnesses that demonstrate the magnitude
24 of this prioritizing invoices program you've
25 described, why would vendors pay you money when

Page 264

1  you owed them money?
2    A.  We didn't owe them money.
3    Q.  You didn't owe vendors money?
4    A.  At the end of November we were caught
5  up.
6    Q.  But they weren't paying allowances to
7  you all throughout that liquidity crunch, were
8  they?
9    A.  Sure they were.  Yeah.
10   Q.  So vendors were paying allowances --
11   A.  Sure.
12   Q.  -- even though you were stiffing them?
13   A.  You mean as we were stretching them.
14   Q.  Stretching them?
15   A.  Yes.
16   Q.  Okay.
17   A.  Yes, we stretched them and --
18 absolutely we had vendor allowances.  Now, just
19 mechanically a large portion comes up at the
20 end of the year.
21   Q.  You don't recall being told that
22 vendor allowances were materially behind the
23 previous year, that vendors were not paying
24 them?
25   A.  What time frame now?

Page 265

1    Q.  Third quarter 2001?
2    A.  Third quarter?
3    Q.  2001?
4    A.  So before October -- so sometime
5  before October?
6    Q.  No, in October?
7    A.  In October.
8    Q.  September, October, August, whatever
9  the third quarter is?
10   A.  I don't recall specific conversations.
11 I recall that vendor allowances were
12 continually under pressure.  It was every time
13 I -- every month I was at Kmart which is why we
14 were trying to get away from vendor allowances.
15   Q.  Didn't prioritizing invoices cause
16 more pressure than usual on vendor allowances?
17   A.  No.
18   Q.  Okay.  Now, you mentioned also I think
19 -- what impact did -- do you think the Wayne
20 Hood article or analysis had on the vendor
21 community?
22   A.  I -- I think it had a big impact.
23   Q.  You think it eroded -- do you think
24 the Wayne Hood -- you attribute to the Wayne
25 Hood article the erosion of confidence that the

67 (Pages 262 to 265)

Charles C. Conaway                                    February 13, 2008

Chicago, IL

Page 266

1  vendor community had in Kmart?  Do you
2  attribute that to the Wayne Hood article?
3      A.  Yes.  Absolutely.
4      Q.  Okay.  Well, what do you think about
5  the initiatives that you instituted in the
6  third quarter --
7      A.  Mm-hmm.
8      Q.  -- where you were stretching payments
9  where you had many, many, many vendors, and
10  we'll get testimony about this from others, who
11  were angry and upset and not being told the
12  truth about why they were being stretched and
13  then learned that they weren't being told the
14  truth.  Do you think that had any effect on
15  vendors' confidence in your integrity or the
16  company's integrity?
17      A.  I don't think it had anything to do
18  with the Kmart bankruptcy.  Absolutely not.
19      Q.  I didn't say that.
20      A.  Well --
21      Q.  You testified earlier --
22      A.  Yes.
23      Q.  -- that you attributed the erosion of
24  confidence by the vendor community in Kmart to
25  the Hood article which occurred in January 2,

Page 267

1  2002.  My question is do you think that the
2  conduct of the E.L.T. in the third quarter and
3  what you did with payables and the stories that
4  were told to the vendors had any impact on the
5  vendors' confidence in Kmart and you?
6      A.  I -- I have no knowledge that it did,
7  no.
8      Q.  All right.  Did --
9          There was another kind of
10  perfect storm in hindsight, wasn't there?  Let
11  me tell you what my components are and see if
12  you agree.  The launching of Blue Light Always,
13  what I call the overbuy, and 9/11.  That's a
14  confluence of three pretty major events that
15  occurred in the third quarter of 2001, isn't
16  it?
17      A.  Mm-hmm.  Yes.
18      Q.  All right.  And that made things
19  extremely difficult for liquidity in the
20  company in the third quarter of 2001, didn't
21  they?
22      A.  They were components that contributed
23  to our liquidity crunch during that period,
24  yes.
25      Q.  Okay.  Meaning no disrespect to the

Page 268

1  country or the victims, 9/11 is a pretty
2  singular event.  It doesn't occur every
3  quarter, thank goodness, correct?
4      A.  Thank goodness.
5      Q.  Okay.  All right.  With respect to the
6  bankruptcy, have any claims been made against
7  you personally by Kmart's trustee in
8  bankruptcy?
9      A.  Yes.
10      Q.  And the trustee in bankruptcy has made
11  claims to recover certain moneys from you?
12      A.  Yes.  Yes.
13      Q.  How much?  Roughly?
14      A.  I -- I don't know the exact amount.
15      Q.  I didn't ask the exact.  How much
16  roughly?
17      A.  I -- I don't know.  Actually I don't
18  know.
19      Q.  More than a million dollars?
20      A.  I believe it was more than a million
21  dollars.
22      Q.  More than 5 million?
23      A.  I don't know.
24      Q.  And has that claim been resolved?
25      A.  Yes.

Page 269

1      Q.  And how was it resolved?
2      A.  I was fully exonerated.
3      Q.  All right.  And let me ask you about
4  whether you made any claims in the bankruptcy
5  proceeding yourself?
6      A.  Made any -- I'm sorry, could you be
7  specific?  I'm not --
8      Q.  Yes.  Did you claim that you were owed
9  any money in the bankruptcy proceeding?
10      A.  That I was claimed -- I believe, yes.
11  Yes.
12      Q.  In other words, you wanted to recover
13  money in the bankruptcy?
14      A.  Yes.
15      Q.  And who filed that claim on your
16  behalf?
17      A.  My legal counsel.
18      Q.  And who was that?
19      A.  Same legal counsel that's here today.
20      Q.  Mr. Lassar?
21      A.  Yes.
22      Q.  Sidley Austin?
23      A.  Yes.
24      Q.  Law firm?
25      A.  Yes.

68 (Pages 266 to 269)

Charles C. Conaway                                           February 13, 2008

Chicago, IL

Page 270

1    Q.  And do you know how much you're
2    claiming?
3    A.  I believe it's a fairly large number
4    because it's -- it contains all the money that
5    I was owed at C.V.S. that I never got
6    compensated for when I left that company and
7    additional compensation, yes.  It's a pretty
8    large number.
9    Q.  But the money you -- the C.V.S. money
10   you're talking about you want Kmart to pay that
11   to you, correct?
12   A.  That was the terms of the employment
13   agreement of which I left C.V.S. for, yes.  I
14   had a livelihood there, so, yes.
15   Q.  So give me the magnitude of the claim
16   that Mr. Lassar filed for you in the bankruptcy
17   claim against Kmart?  Magnitude?
18   A.  Magnitude had to be at least $20
19   million.
20   Q.  Has that claim been resolved?
21   A.  Yes.
22   Q.  And how has a that resolved?
23   A.  I got a settlement.
24   Q.  How much?
25   A.  I don't know the exact amount.

Page 271

1    Q.  How about an inexact amount?
2    A.  I believe it was a million dollars or
3    somewhere in that -- it was stock so it's
4    something in that range, I believe.
5    Q.  What stock?
6    A.  I got paid stock.
7    Q.  Kmart stock?
8    A.  Yes.
9    Q.  Okay.  And you're saying when this was
10   paid to you the value of that stock was a
11   million dollars or less?
12   A.  I don't know if it was a million or --
13   you asked me to give you a directional on what
14   the level of compensation was.  It was
15   something in that area.
16   Q.  Million or less?
17   A.  No.  Approximately a million.
18   Q.  Okay.  Fine.
19   A.  If it was less or more, I -- I don't
20   know the exact number.
21   Q.  So on a $20 million claim you settled
22   for a million roughly?
23   A.  I believe -- something in that
24   magnitude, yes.
25   Q.  All right.  Now, that was a

Page 272

1    settlement.  That wasn't a trial in bankruptcy
2    court, right?
3    A.  No.  The trustees was a full
4    arbitration that I got exonerated from.
5    Q.  Okay.  No, I asked you the question,
6    the settlement on your claim was not a -- as a
7    result of a trial in bankruptcy court, it was a
8    negotiated settlement?
9    A.  Yeah, it was a settlement.  The
10   previous one was a full arbitration that went
11   all the way through to judgment.
12   Q.  Okay.  Now, -- Now, you were at Kmart
13   for 18 months?
14   A.  Approximately, yes.
15   Q.  And what was your -- do you know what
16   your annual salary was at Kmart?
17   A.  No, I don't.  I don't know, no.
18   Q.  Do you know what your total
19   compensation package was, the amount at Kmart
20   while you were there?
21   A.  No, I don't.
22   Q.  Now you were shown this in earlier
23   examination.  I've marked it as Plaintiff's
24   Exhibit 185.  It's a 10-K dated January 30,
25   2002, and it's not all the pages.  It's

Page 273

1    excerpts.  But I want to direct your attention
2    to Page 2 and the compensation there?
3    A.  I'm sorry, where's the date on this?
4    I'm sorry.
5    Q.  It is difficult it find.  It's on the
6    first page --
7    A.  I can't --
8    Q.  -- and it is just below the checked
9    box where it says Annual Report Pursuant to
10   Section 13 or 15 date.  Right at the top.
11   A.  I'm sorry, I'm still -- okay.  All
12   right.  Okay.  What page?  I'm sorry.
13   Q.  Second page.
14   A.  Okay.
15   Q.  All right.  Now, there is a schedule
16   under executive compensation and there is a
17   line, couple lines for C. Conaway, former chief
18   executive officer.  Correct?
19   A.  Mm-hmm.
20   Q.  Okay.  Do you agree that those numbers
21   are correct and accurately reflect your
22   compensation in 2001 and 2000 while you were at
23   Kmart?
24   A.  I -- I can't.
25   Q.  You can't?

69 (Pages 270 to 273)

# Exhibit M

1                    IN THE UNITED STATES BANKRUPTCY COURT

2                    NORTHERN DISTRICT OF ILLINOIS

3                         EASTERN DIVISION

4

5    In re:                      )

6    KMART CORPORATION, et al.,   ) No. 02 B 02474

7               Debtors.       )

8

9                    January 23, 2003,

10                   9:20 a.m.

11

12              The confidential videotaped deposition

13   of CHARLES CONAWAY resumed pursuant to adjournment

14   at Suite 1900, 333 West Wacker Drive, Chicago,

15   Illinois.

16

17

18

19

20

21

22

23

24

Page 343

1  PRESENT:
2
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP,
4  (1440 New York Avenue, N.W.,
5  Washington, D.C. 20005-2111,
6  202-371-7000), by:
7  MS. AMY SABRIN,
8  MR. GASTON F. dE BEARN,
9  MR. CHARLES F. WALKER,
10  MS. LAUREN LOEFFLER BERGEN,
11     appeared on behalf of the Debtor;
12
13  SIDLEY AUSTIN BROWN & WOOD,
14  (Bank One Plaza,
15  10 South Dearborn Street,
16  Chicago, Illinois 60603,
17  312-853-7272), by:
18  MR. SCOTT R. LASSAR,
19  MS. ERIN E. KELLY,
20     appeared on behalf of the Deponent;
21
22
23
24

Page 344

1  PRESENT: (Continued)
2     WINSTON & STRAWN,
3     (35 West Wacker Drive,
4     Chicago, Illinois 60601,
5     312-558-6332), by:
6     MR. MARK ROTERT,
7        appeared on behalf of the Unsecured
8        Creditors;
9     JONES, DAY, REAVIS & POGUE,
10     (51 Louisiana Avenue, N.W.,
11     Washington, D.C. 20001-2113,
12     202-879-3939), by:
13     MR. PETER J. ROMATOWSKI,
14     MR. R. CHRISTOPHER COOK,
15        appeared on behalf of the Financial
16        Institutions Committee;
17  ALSO PRESENT:
18     MS. LORI L. CLENDENING, KPMG;
19     MR. BILL FRANK, Legal Videographer,
20        Esquire Deposition Services.
21  REPORTED BY:  THERESA A. VORKAPIC,
22        C.S.R. No. 84-2589.
23        PAULINE M. VARGO,
24        C.S.R. No. 84-1573.

Page 345

1     THE VIDEOGRAPHER:  Good morning.  We are
2  going on the video record at 9:20 a.m. at the
3  beginning of videotape No. 1.  Here continues the
4  deposition of Chuck Conaway.
5     Will the reporter please swear the
6  witness in?
7        (WHEREUPON, the witness was duly
8        sworn.)
9        CHARLES CONAWAY,
10  called as a witness herein, having been previously
11  duly sworn and having testified, was examined and
12  testified further as follows:
13        EXAMINATION (Resumed)
14  BY MS. SABRIN:
15     Q.   Good morning, Mr. Conaway.
16        Mr. Conaway, how long, to your
17  knowledge, was the program of prioritizing vendor
18  payments, as you put it, in effect?
19     A.   I believe it would be through the period
20  primarily October through November.  It may have
21  been late September also, but my recollection is
22  October through November.
23     Q.   Of 2001?
24     A.   Yes.

Page 346

1     Q.   During that period, did you ever meet
2  with the individuals in the accounts payable
3  department who were overseeing this project?
4     A.   I don't recall meeting with people in
5  the accounts payable area.  I met with people in
6  the treasury area.
7     Q.   Do you know who Scott Gilbert is?
8     A.   Scott is the head of accounts payable.
9     Q.   Have you ever met him?
10     A.   Yeah, I met Scott before.
11     Q.   Do you remember a meeting in which you
12  congratulated him for his work in connection with
13  this project?
14     A.   I don't recall it, but it very well may
15  have happened.
16     Q.   Do you remember commending him at all in
17  any way?
18     A.   I tried to give people credit at every
19  chance I could.
20     Q.   Did you ever tell him he was the
21  franchise during this period?
22     A.   I don't recall that.
23     MS. SABRIN:  Could I have Exhibit 33?
24        (WHEREUPON, a certain document

Page 435

1     A.   No.  I don't recall making that
2  decision.
3     Q.   You don't recall that?
4     A.   No.
5     Q.   If witnesses testified that that
6  decision was made, would you say that they're
7  lying?
8     A.   I don't recall that we had any
9  conversation that that was the only communication
10  that we were going to do to vendors.
11     Q.   But it was one of the communications
12  that you were going to do to vendors regardless of
13  whether that was the real reason of whether they
14  were being paid?
15     A.   No, not regardless.  That was one of the
16  communications that needed to be done was that what
17  was happening around our systems issues and what
18  were we doing about it.
19     Q.   And it's your understanding that that
20  was an accurate explanation of why vendors were not
21  being paid during that whole period of time?
22     A.   It was an accurate if it applied for
23  that particular vendor.
24     Q.   And what if it didn't apply to a

Page 436

1  particular vendor?  What were they going to be told
2  about why they weren't being paid?
3     A.   I don't recall what the communications
4  was.
5     Q.   Did you ever communicate with a
6  particular vendor about why they weren't being
7  paid?
8     A.   I don't recall any specific
9  conversations with vendors during that period.
10     Q.   Did you ever correspond with vendors
11  about why they weren't being paid?
12     A.   I don't recall corresponding.
13     MS. SABRIN:  Could I have Exhibits 45 and 46?
14  BY MS. SABRIN:
15     Q.   Do you know who Jerry Levin is?
16     A.   I believe he is with I think Coleman.  I
17  think.
18     Q.   Sunbeam perhaps.
19     A.   Okay.
20     Q.   Does that refresh your recollection?
21     A.   It could be.
22     Q.   Regardless of whether you remembered the
23  name of the CEO of Sunbeam, do you remember
24  communicating with the CEO of Sunbeam about why

Page 437

1  they weren't being paid?
2     A.   No but I know Jerry Levin.
3     Q.   Did you have any conversations with
4  Jerry Levin about the fact that Kmart vendors were
5  not being paid?
6     A.   I don't recall.
7          (WHEREUPON, certain documents
8          were marked CC Exhibit Nos. 45 & 46,
9          for identification, as of 1/23/03.)
10          (WHEREUPON, the documents were
11          tendered to the witness.)
12  BY MS. SABRIN:
13     Q.   I'm handing the witness Exhibits 45 and
14  46.  Exhibit 45 is a November 12, 2001 letter to
15  Mr. Charles C. Conaway on Sunbeam letterhead from
16  Jerry W. Levin.
17          Would you review this letter and tell me
18  if it refreshes your recollection about whether you
19  ever communicated with vendors about why they were
20  not being paid?
21     A.   I don't recall this letter.
22     Q.   Do you recall learning that Kmart's
23  non-payment of Sunbeam was causing liquidity
24  problems at Sunbeam?

Page 438

1     A.   Again, I know Jerry and I don't recall
2  this conversation.
3     Q.   Exhibit 46 -- before we go to Exhibit
4  46, could you look at the last page of the letter
5  from Mr. Levin?  There is an attachment labeled
6  Sunbeam Corporation's accounts receivable.
7     A.   Uh-huh.
8     Q.   Were you aware that the total amount
9  that Kmart owed Sunbeam according to Sunbeam was
10  $25.6 million?
11     A.   I don't recall this letter, so I don't
12  recall that amount.
13     Q.   But independent of this letter, do you
14  recall knowing that there was --
15     A.   No.
16     Q.   -- an amount of that magnitude due and
17  owing to Sunbeam?
18     A.   Yeah, I don't.
19     Q.   Looking at the next exhibit, 46, which
20  is a November 13 letter from yourself it appears to
21  Mr. Levin, do you recall sending this letter?
22     A.   No.
23     Q.   Is that your signature on the letter?
24     A.   Yeah, it is.  I mean, that would be

Page 439

1  stamped. It doesn't look like I signed it, but,
2  yes.
3      Q.   What was your practice with respect to
4  letters that, excuse me, on which your signature
5  might have been stamped? Did you review their
6  substance or dictate it?
7      A.   I would dictate it. I would typically
8  be out in the field, so I wouldn't review it so I
9  would leave either -- probably a quick voicemail.
10     Q.   In this letter, you state that you
11  called Cecil and he's on top of your issue. "I
12  apologize for the breakdown we have had on our hard
13  lines and soft lines integration. It has been a
14  minor disaster. We should have all PO and invoices
15  fully caught up in the next 14 days."
16         Were you intending to imply that the
17  reason that he hadn't been paid was related to the
18  integration of the hard and soft lines?
19     A.   Yes, yes. That's implied in this
20  letter.
21     Q.   Yes. And how did you determine that
22  that was the reason that Sunbeam hadn't been paid?
23     A.   Put in context, the biggest issue that
24  we had that we couldn't get our arms around were

Page 440

1  around our systems issues, integration issues and
2  communications around terms. Everything from
3  whether it was data receipt, we changed from how we
4  were going to pay vendors from when they shipped an
5  invoice from the date of invoice to the date of
6  receipt. We changed that. We changed soft lines
7  to hard lines. In some cases, as I said, that was
8  a whole 60-day payment at that we just took on our
9  own as well as the inability to process
10  information, so there was at that host of things.
11        In my opinion, all right, and in the
12  opinion that we talked about at management, the
13  $800 million overbuy and liquidity associated with
14  that and the prioritizing of invoices that were
15  tied to that was one of a short duration that we
16  understood and that we could manage.
17        The bigger issue for us was the systems
18  issues in which we didn't fully understand the
19  implications of.
20     Q.   So it's your testimony that the systems
21  issues was more serious than the $800 million
22  inventory purchase in connection with causing
23  vendors not to be paid?
24     A.   Absolutely, in the long term, because we

Page 441

1  didn't understand what the solution to the systems
2  issues were.
3      Q.   What about during this two-month period
4  we're talking about?
5      A.   Yes.
6      Q.   That the system issue was a bigger
7  reason for the vendors not to be paid than the fact
8  that you had this liquidity crunch caused by the
9  $800 million inventory purchase?
10     A.   We had a liquidity crunch that -- we had
11  issues with vendors that would cause a variety of
12  issues as I mentioned earlier, and, yes, in my view
13  the biggest issue that we had ongoing with vendors
14  was going to be resolving these systems issues, and
15  the systems issues we didn't know what the answer
16  was and we didn't fully vent it out. As I told
17  you, we reviewed it later in December when we
18  really got our arms around it.
19     Q.   So you didn't vent it out until late
20  December.
21        My question to you at the start of this
22  conversation was what did you do to confirm the
23  accuracy that Sunbeam was not being paid due to the
24  systems problem?

Page 442

1      A.   I don't recall either one of these
2  letters so I couldn't comment on how I verified
3  that that was --
4      Q.   So you have no idea as you sit here
5  today whether, in fact, you verified the accuracy
6  of that statement?
7      A.   I don't recall these correspondence, so
8  I can't give any more details behind it.
9      Q.   If you go back to Mr. Levin's letter on
10  Page 2, he says: "As we a reach the key holiday
11  season, it is important that we manage our
12  respective businesses to avoid supply chain
13  interruptions."
14        What do you take that to mean?
15     A.   That we need to be able to on both ends
16  of our businesses be able to ship and receive and
17  have all of our systems fully operational as well
18  as any other issues so that we don't have
19  merchandise.
20     Q.   He was suggesting that Sunbeam would not
21  ship merchandise if whatever the problem was with
22  them not being paid wasn't straightened out; isn't
23  that correct?
24     A.   I can't infer what Jerry was talking

Page 443

1  about here, but given that he talks about supply
2  chain interruptions, it could be everything from
3  our systems issues to not getting paid.  It could
4  be either one of them.
5      Q.   When you wrote him your response, were
6  you intending to persuade him to not have any
7  supply chain interruptions?
8      A.   I was writing him to communicate to him
9  of what I thought was going to be the resolution,
10  and given the date of this letter, it's consistent
11  with what I know that we were absolutely through
12  and caught up with vendors by the end of November.
13  So 14 days, that would be approximately the 27th
14  and that would be consistent with that information.
15      Q.   As of November 13th, you believed that
16  within 14 days you'd be completely caught up?
17      A.   Absolutely.
18      Q.   And therefore you were trying to
19  communicate to him there was no reason not to ship
20  goods?
21      A.   I was just trying to communicate to him
22  where we were and when we thought we would be
23  caught up.
24      Q.   Do you remember communicating with any

Page 444

1  other vendors about the reasons why they were not
2  being paid?
3      A.   No.
4      Q.   I just want to make sure I understand
5  your testimony, and I'm going to be very clear
6  about this.
7          It's your testimony that as far as you
8  were aware there was no decision made at Kmart to
9  give vendors deceptive information about why they
10  were not being paid, specifically to tell them that
11  they were not being paid because of the systems
12  problem with eLMO, when, in fact, they were not
13  being paid due to the liquidity crunch?
14      A.   There was never any intent to give
15  deceptive information to vendors.
16      Q.   And it's also your testimony that there
17  was not a decision made to tell vendors that they
18  were not being paid due to the systems problem
19  irrespective of whether that was the reason they
20  were not being paid?
21      A.   No.  That was one of the issues that we
22  were going to talk to them about --
23      Q.   Was your answer yes or no that a
24  decision was not made to tell vendors that they

Page 445

1  were not being paid due to a systems problem when,
2  in fact, that wasn't the reason they weren't being
3  paid?
4      A.   I did not understand that that was the
5  only communication that was going out.  I know we
6  were talking to vendors regarding systems issues.
7      Q.   Let me ask it one more time.
8      A.   Okay.
9      Q.   And it's really a yes or no question.
10      A.   Okay.
11      Q.   Maybe I didn't phrase it as felicitously
12  as I should have, but let me try it one more time
13  and I'd appreciate a yes or no answer.
14      A.   Okay.
15      Q.   Is it your testimony that there was no
16  decision taken at Kmart to tell vendors that they
17  were not being paid because of a systems problem
18  regardless of whether the real reason that they
19  were not being paid was a systems problem?
20      A.   I was not aware, no.  No, I was not
21  aware that that was the only communication that was
22  going on.
23      Q.   You were aware that that was part of the
24  communication that was going on?

Page 446

1      A.   Yes.
2      Q.   That part of the communication was that
3  people should be told that it was due to a systems
4  problem when it wasn't?
5      A.   Not when it wasn't, but that we had
6  systems issues and communicate to vendors what
7  those systems issues were and when we thought they
8  would be resolved to the best of our ability.
9      Q.   And it's the best of your understanding
10  that that was an honest response about why they
11  weren't being paid during this entire two-month
12  period that vendors were not being paid timely?
13      A.   Yes.
14      Q.   Do you recall that the New York Times
15  published an article in late October about the fact
16  that vendors were complaining that Kmart was not
17  paying their invoices?
18      A.   I remember there was some media.  I
19  can't recall the specifics or the time.
20      Q.   Did you participate in conversations
21  about how the company should respond to the media?
22      A.   Yeah.  I would -- I would expect I
23  would.
24      Q.   Did you recall being interviewed by a

# Exhibit N

```
 1                         BEFORE AN

 2              AMERICAN ARBITRATION ASSOCIATION

 3                     ARBITRATION PANEL

 4   KMART CREDITOR TRUST,          )

 5                    Claimant,     )  AAA Matter Number:

 6        vs.                       )  54 116 Y 838 04

 7   CHARLES CHETWYNN CONAWAY,      )

 8                    Respondent.   )

 9   ----------------------------)

10   KMART CREDITOR TRUST,          )

11                    Claimant,     )  AAA Matter Number:

12        vs.                       )  54 116 Y 833 04

13   MARK STEVEN SCHWARTZ,          )

14                    Respondent.   )

15   ----------------------------)

16   KMART CREDITOR TRUST,          )

17                    Claimant,     )  AAA Matter Number:

18        vs.                       )  54 116 Y 832 04

19   DAVID P. ROTS,                 )

20                    Respondent.   )

21   ----------------------------)

22

23      THE VIDEOTAPED DEPOSITION OF CHARLES CONAWAY

24              February 10, 2005, 9:05 a.m.
```

Page 2

1   KMART CREDITOR TRUST,        )
2         Claimant,    ) AAA Matter Number:
3         vs.         ) 54 116 Y 835 04
4   DAVID W. MONTOYA,          )
5         Respondent.  )
6   -----------------------------)
7   KMART CREDITOR TRUST,        )
8         Claimant,    ) AAA Matter Number:
9         vs.         ) 54 116 Y 834 04
10  JOHN T. MCDONALD,          )
11        Respondent.  )
12  -----------------------------)
13  KMART CREDITOR TRUST,        )
14        Claimant,    ) AAA Matter Number:
15        vs.         ) 54 116 Y 836 04
16  ANTHONY B. D'ONOFRIO,        )
17        Respondent.  )
18        The videotaped deposition of CHARLES
19  CONAWAY, taken before LINDA SNODGRASS SABOR, a
20  Notary Public within and for the County of Cook,
21  State of Illinois, and a Certified Shorthand
22  Reporter, CSR No. 84-1850, of said state, at
23  Suite 3500, 77 West Wacker Drive, Chicago, Illinois,
24  on the 10th day of February, 2005, at 9:05 a.m.

Page 3

1   PRESENT:
2
3       JONES DAY,
4       (77 West Wacker Drive,
5       Chicago, Illinois  60601,
6       Phone 312/782-3939), by:
7       MR. RICHARD A. CHESLEY and
8       MR. GREGORY S. OTSUKA,
9          -and-
10      JONES DAY,
11      (51 Louisiana Avenue, N.W.,
12      Washington, D.C.  20001,
13      Phone 202/879-3939), by:
14      MR. JONATHAN BERMAN,
15         appeared on behalf of the Claimant;
16
17      SIDLEY AUSTIN BROWN & WOOD LLP,
18      (10 South Dearborn Street,
19      Chicago, Illinois  60603,
20      Phone 312/853-7668), by:
21      MR. SCOTT R. LASSAR,
22         appeared on behalf of Respondent
23         Charles Chetwynn Conaway;
24

Page 4

1   PRESENT:  (Continued)
2
3       PEARCE FLEISIG, LLC,
4       (Court Plaza North,
5       25 Main Street,
6       Hackensack, New Jersey  07601,
7       Phone 201/342-3400), by:
8       MR. RANDY T. PEARCE,
9          appeared on behalf of Respondents
10         David P. Rots and Anthony B. D'Onofrio;
11
12      MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC,
13      (One Financial Center,
14      Boston, Massachusetts  02111,
15      Phone 617/542-6000), by:
16      MS. MCKENZIE WEBSTER,
17         appeared on behalf of Respondent
18         John T. McDonald.
19
20
21
22
23
24

Page 5

1   ALSO PRESENT:
2
3       MS. MELISSA KIBLER KNOLL,
4          Mesirow Financial Consulting, LLC.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20  VIDEOGRAPHED BY:  BRIAN FALK, Legal Videographer.
21
22
23  REPORTED BY:  LINDA SNODGRASS SABOR, RMR, CRR,
24         CSR No. 84-1850.

Page 234

1  vendors -- particularly, I remember on the
2  compliance program, which was something that we were
3  essentially totally re-engineering where they were
4  getting -- they felt like they were getting hit for
5  unnecessary fees.  It was about $180 million worth
6  of income when I came into the business.  We got it
7  down to 80 and made a commitment to the vendors to
8  get it down to zero.
9       So there was a lot of communications that
10  vendors didn't believe that, you know, things were
11  happening and how they would have it happen.
12       This was clearly one of them, and I would
13  say that it was more than normal.
14     Q.  When you -- when these vendors would
15  complain that they were not being paid timely, what
16  explanation would they receive for this?
17     A.  I don't know the exact explanation that
18  they would receive in every case, but we did a
19  communication to communicate on one of the issues we
20  had which was our Elmo systems issues.
21       This was a wide spread -- probably one of
22  the bigger integration issues that we had in the
23  company.
24       During the same period of time it kept us

Page 235

1  from being able to process invoices for a big
2  segment of the vendor community, and it was
3  something that we didn't have our arms around about
4  how long it would last.
5       So we did -- I know we did communicate
6  that point.
7       I can only assume that -- in stretching
8  vendors, we didn't tell vendors that we were
9  stretching them.  I mean, that's -- that is
10  something that I would assume did not happen.
11     Q.  So even though some vendors were -- had
12  their terms deliberately stretched, they were never
13  told that their terms were being deliberately
14  stretched because of a cash problem?
15     A.  No.  I mean, the one thing that we looked
16  at -- that I continually looked at from my level was
17  payable terms and where we were relative to
18  competition.
19       At no time during this period did we even
20  get competitive with our best competitors.
21     Q.  Not exactly the question.
22       For a vendor where you had made a
23  deliberate decision that you would stretch out that
24  vendor's payment -- time of payment, did you ever

Page 236

1  tell that vendor we have deliberately stretched out
2  your time of payment?
3     A.  No.  Like I said, to the best of my
4  understanding is, no, we didn't tell vendors that
5  we're stretching you and you're getting prioritized,
6  no.
7     Q.  And for some vendors they were told that
8  their -- that Kmart's failure to pay on time was a
9  result of a computer problem relating to the Elmo
10  system?
11     A.  Yes.
12     Q.  Were there vendors where you knew you had
13  done it on purpose, and you told them it was a
14  computer mistake?
15     A.  I would assume that's the case.  I don't
16  know that as a fact, but I would assume that's the
17  case.
18     Q.  Did you approve that course of conduct?
19     A.  I approved the course of conduct of
20  prioritizing invoices and stretching them within the
21  limits of what we thought was appropriate given the
22  competitive targets.
23     Q.  And providing the explanation that the
24  reason for the slow payments was a computer mistake?

Page 237

1     A.  Yes.
2     Q.  Was it important to the company to
3  prioritize the invoices?
4     A.  Yes.  I think it was, yes.  It was
5  important to get additional payables management and
6  that was one component of it, yes.
7     Q.  Was it necessary to slow pay suppliers in
8  order to get through the peak liquidity crunch
9  period?
10     A.  I think it was a key component.  I don't
11  have a detailed understanding to say accurately
12  whether it was absolutely necessary to do it but
13  that was a very key component of it as I mentioned
14  earlier.
15     Q.  Did you communicate to the board your
16  decisions about deliberately slow paying suppliers?
17     A.  I don't recall deliberately talking to
18  them about prioritizing invoices.  I don't recall
19  talking to the board in general about that.
20       We talked at every board meeting about
21  here is our forecast, how many days behind we were
22  in that forecast so that they could accurately
23  understand how far behind we were and accurately
24  understand liquidity in its totality.

Page 238

1    And then I clearly believed the board
2  knew -- specifically Tom Stallkamp knew with the
3  one-on-one meeting that I had with Tom.
4      Q.   When was that one-on-one meeting?
5      A.   That was towards the beginning of
6  November, I believe.
7      Q.   That was after the slow pay program was
8  already in effect, correct?
9      A.   Yes.  Yes.
10      Q.   And how did it come about that you and
11  Mr. Stallkamp talked about that policy?
12      A.   Well, I wanted to talk to Tom.  He was
13  the chairman of our finance committee, as we
14  mentioned earlier.  And I wanted to talk to Tom to
15  see if he had any questions, see if he had any
16  concerns because Jeff had -- we had just exited the
17  business with Jeff.
18      Jeff -- I encouraged Jeff, as well as all
19  of my CFOs, to have one-on-one meetings not only in
20  person but to keep pretty constant contact with both
21  the head of the finance committee, head of the audit
22  committee.
23      Jeff did that, had one-on-ones, had
24  direct meetings.  I know he had direct meetings with

Page 239

1  Tom as well as talked to Tom literally on a weekly
2  basis, from my understanding of feedback with Tom.
3      Sat down.  It was a breakfast meeting.
4  Told Tom where we were, when we thought we were
5  caught up, which was going to be in a matter of a
6  week so, our most latest view of where we were.
7      And, you know, the feedback I got from
8  Tom was, well, you know, we're doing -- compared to
9  his past experience, it was much worse than what he
10  did at Chrysler.
11      And I remember the conversation because,
12  you know, it struck me how Tom went through exactly
13  what they did in Chrysler and, you know, had this
14  big warehouse with a bunch of checks, and that was
15  essentially the component of the meeting.  And we
16  talked about, okay, what are we going to do for
17  vendor relations going forward.
18      I talked to him about some of the plans.
19  We were going to try to establish some
20  organizational structure around vendor
21  communications for the future and some of the
22  initiatives that we had that, you know, we were
23  going on within the business.
24      Q.   Who first brought up the subject of

Page 240

1  vendors being slow paid at your meeting with
2  Mr. Stallkamp?
3      A.   I don't know -- it was just a one-on-one
4  conversation.  We were talking about the liquidity
5  of the company, so.
6      Q.   Well, who first raised the issue that
7  suppliers were complaining about not being paid?
8      A.   I'm sorry.  Are you talking about Tom
9  now?
10      Q.   In your meeting with Mr. Stallkamp, yes.
11      A.   I don't know who brought it up.
12      I know that -- yeah, we talked about --
13  not only did we talk how many days behind that there
14  were vendors, we actually listed vendors.  And I
15  remember specifically recalling in one board meeting
16  where we talked about, you know, here is four or
17  five vendors that we're working with right now that,
18  you know, we're going to resolve but, just so you
19  know, we've got issues with them and we're working
20  with them.
21      I don't recall -- I'd assume Tom did but
22  I don't recall how the conversation progressed.
23      Q.   Before mid November did you speak to any
24  of the board members about your decision to slow pay

Page 241

1  suppliers?
2      A.   Not on an individual basis and not to the
3  best of my recollection talking to them about
4  prioritizing invoices.
5      Q.   If not on an individual basis on a group
6  basis ever?
7      A.   No.
8      Q.   Okay.  We talked earlier about the
9  testing you did for the BlueLight Always program and
10  that was testing which you told us began in January
11  of 2001.
12      A.   Yeah.  Well, January/February.  I can't
13  be -- I don't know exactly but early, yeah.
14      Q.   Was there a particular person responsible
15  for overseeing the testing to make sure that you
16  were getting good testing data?
17      A.   You know, in a company this big, I know
18  it sounds -- 250,000 people, it sounds convenient
19  and it sounds easy to say this is the person who's
20  responsible for this.  This is the person
21  responsible for that.
22      Unfortunately, in a large organization,
23  it rarely works that way. Collaboration is paramount
24  to execute on even the smallest initiative, yet

# Exhibit O

```
                                                    Page 1
  1              UNITED STATES DISTRICT COURT

  2              EASTERN DISTRICT OF MICHIGAN

  3     --------------------------x

  4     SECURITIES AND EXCHANGE     :

  5     COMMISSION,                 :

  6            Plaintiff,           :

  7                 v.              :   Case No.

  8                                 :   4:05CV40263

  9     CHARLES C. CONAWAY AND      :

 10     JOHN T. McDONALD, JR.,      :

 11            Defendants.          :

 12     --------------------------x

 13                        New York, New York

 14                        Thursday, July 19, 2007

 15     Video Deposition of

 16            JEFFREY N. BOYER, called for

 17     examination by counsel for plaintiff, pursuant

 18     to notice, at the offices of Schulte Roth

 19     & Zabel, 919 Third Avenue, New York, New York,

 20     commencing at 8:30  a.m., before Marie Foley,

 21     RPR, CRR and Notary Public in and for the

 22     State of New York, when were present on behalf

 23     of the respective parties:

 24

 25
```

Jeffrey N. Boyer                                                    July 19, 2007
New York, NY

```
                                    Page  2                                        Page  4
 1   APPEARANCES:                            1         C O N T E N T S
 2   On behalf of Plaintiff:                 2
 3     ALAN M. LIEBERMAN, ESQUIRE            3   EXAMINATION BY:          PAGE
 4     DEAN M. CONWAY, ESQUIRE               4    Mr. Lieberman      9/333/360
 5     ROBERT I. DODGE                       5    Mr. Lassar         181/356
 6     United States Securities and Exchange 6    Mr. Sylvia         288/358
 7     Commission                            7
 8     100 F Street, N.E.                    8   BOYER DEPOSITION EXHIBITS:     PAGE
 9     Washington, D.C.  20549-4030          9    (Boyer Exhibits No. 72, 75,
10     (202) 551-4474                       10     77-80, 86, 90, 91, and 93-95
11     liebermana@sec.gov                   11     were not entered.)
12                                          12    No. 66  Document SEC00125157 - '159   6
13   On behalf of Defendant Charles C. Conaway: 13  No. 67  Document SEC00125207 - '242  6
14     SCOTT R. LASSAR. ESQUIRE             14    No. 68  Document SEC00126096      6
15     HILLE R. SHEPPARD, ESQUIRE           15    No. 69  Document SEC00822303 - '307   6
16     Sidley Austin, LLP                   16    No. 70  Document SEC00126106      6
17     One South Dearborn                   17    No. 71  Document K 191568 - '588    6
18     Chicago, Illinois  60603             18    No. 73  Document SEC00058077      6
19     (312) 853-7668                       19    No. 74  Document SEC00058068      6
20     slassar@sidley.com                   20    No. 76  Document SEC00120271 - '273   6
21                                          21    No. 81  Document SEC00597990 - '992   6
22                                          22    No. 82  Document SEC00125080      6
23                                          23    No. 83  Document SEC00125081 - '082   6
24                                          24    No. 84  Document SEC00125083 - '084   6
25                                          25    No. 85  Document SEC00058154      6
```

```
                                    Page  3                                        Page  5
 1   APPEARANCES (cont.):                    1   BOYER DEPOSITION EXHIBITS (Cont'd):  PAGE
 2                                           2    No. 87  Document SEC00058155      6
 3   On behalf of Defendant John T. McDonald: 3    No. 88  Document SEC00125085      6
 4     JOHN F. SYLVIA, ESQUIRE               4    No. 89  Document SEC00124390 - '391  6
 5     McKENZIE WEBSTER, ESQUIRE             5    No. 92  Document SEC00125243 - '280  6
 6     Mintz Levin Cohn Ferris Glovsky and Popeo, PC  6  No. 96  Document SEC00120274 - '276  6
 7     One Financial Center                  7    No. 97  Document INVEXH-00000665      6
 8     Boston, Massachusetts  02111                        - '691
 9     (617) 542-6000                        8
10     jsylvia@mintz.com                     9    No. 99  Document SEC00120268      6
11                                          10   DEFENDANT DEPOSITION EXHIBITS:    PAGE
12   On behalf of The Witness:              11    (Defendant Exhibit No. 9 was
13     MARTIN L. PERSCHETZ, ESQUIRE         12     not entered.)
14     Schulte Roth & Zabel, LLP            13    No. 6   Document CC-0010456     185
15     919 Third Avenue                     14    No. 7   Document CC-0859790     187
16     New York, New York  10022            15    No. 8   Document CC-0959313     190
17     (212) 756-2000                       16    No. 10  Jeffrey Boyer's Deposition  202
18     martin.perschetz@srz.com                        transcript 2/14/02
19                                          17
20   Also Present:                          18    No. 11  2-page e-mail string 11/5/01  303
21     Nicholas Guzman, Videographer        19    No. 12  E-mail string 11/7/01    308
22                                          20    No. 13  Document SEC00119312     313
23                                          21    No. 14  Document SEC00119313     313
24                                          22    No. 15  Document CC-0322074 - '076  323
25                                          23       and CC-0616922
                                            24    No. 16  Document CC-1029351     327
                                                    (Exhibits Retained)
                                            25
```

Alderson Reporting Company
1-800-FOR-DEPO

Jeffrey N. Boyer                                                    July 19, 2007
New York, NY

Page 166

1    Q.  Well, what were your concerns
2  regarding board that caused you to list the
3  board of directors of Kmart under the
4  credibility heading?
5    A.  I had felt personally that I had
6  been developing better credibility with the
7  board, with some of the meetings and calls
8  that we've had, instituting the October call,
9  and I was concerned that working through
10  these issues, these financing issues, would
11  lessen the credibility that I would have with
12  the board because certain things that they
13  weren't aware of could be -- they could be
14  made aware of.
15    Q.  I'm still not understanding why
16  that's a credibility issue.  I mean, certain
17  financing things, I don't know what you're
18  talking about.
19    MR. PERSCHETZ:  I'm sorry,
20    what's the question?
21    MR. LIEBERMAN:  I don't know
22    what he's talking -- I don't
23    understand what he means by certain
24    financing things.
25    MR. PERSCHETZ:  Wait a minute.

Page 167

1  I'm sorry, I didn't hear --
2  BY MR. LIEBERMAN:
3    Q.  Would you explain to me what you
4  mean by certain financing things that caused
5  you concern for your personal credibility
6  with the board?
7    A.  If we have to put in an alternative
8  financing plan, you're going to have to
9  discuss with the board why that is.
10    Q.  But why is that?  Why does that
11  raise a concern in your mind regarding
12  credibility with the board?
13    A.  The board is under the understanding
14  that the capital structure, the financial
15  structure we had was appropriate, and we're
16  going to come back and say it's not
17  appropriate, have to tell them why it's not
18  appropriate.
19    Q.  Let me stop you there.
20    Why is it not appropriate?
21    MR. PERSCHETZ:  No, stop.  Can
22  he please complete his answer?
23    MR. LIEBERMAN:  He sure can.
24  A.  Now I'm lost again.
25    MR. PERSCHETZ:  Let's have the

Page 168

1  question read back and let's have the
2  answer and let's not interrupt the
3  witness.
4    (The requested portion of the
5  record was read by the Court
6  Reporter.)
7    A.  Tell them why it's not appropriate,
8  which means getting into funding sources,
9  such as Project SID.
10    Q.  Well, you say funding sources such
11  as Project SID.
12    What else hadn't the board been told
13  about funding sources, to your knowledge?
14    MR. LASSAR:  Objection.
15    MR. SYLVIA:  Objection.
16    MR. LASSAR:  Misrepresents the
17    record.
18    MR. LIEBERMAN:  Well, he said
19    such as Project SID.
20  BY MR. LIEBERMAN:
21    Q.  I assume your reason for saying it
22  was they hadn't been told about Project SID,
23  and I want to know what else they hadn't been
24  told about.
25    MR. LASSAR:  Objection;

Page 169

1  misstates the record, and it's
2  leading.
3    A.  I don't believe that the board had a
4  full understanding, a complete understanding
5  of the -- all the elements of Project SID.
6    Q.  Well, they were told about the
7  sale-leaseback program.  They saw that as a
8  short-term action listed in your package,
9  right?
10    A.  Yes.
11    Q.  They were told about the reduction
12  in inventory plan, correct?
13    A.  Yes.
14    Q.  We saw that listed.
15    They were told about the
16  renegotiation of the 364 day revolver,
17  correct?
18    A.  Yes.
19    Q.  But those board packages, at least
20  that I showed you, didn't mention SID at all,
21  did they?
22    A.  Some of the board packages talked
23  about accounts payable and cash management,
24  which is a euphemism for some elements of
25  SID.

43 (Pages 166 to 169)

Page 170

1    Q.  Now, we went through those numbers,
2  and we went through the reasons why account
3  payables go up.
4        Remember that line of questioning?
5    A.  Yes.
6    Q.  Do you want to go back and revisit
7  that?  Is there something about that that
8  I'm misunderstanding, in your view?
9        MR. SYLVIA:  Objection.
10        MR. PERSCHETZ:  Objection.
11    A.  I'm talking broadly about my sense
12  of communications with the board, that the
13  board did, in fact, have some sense of it,
14  but it wasn't clear enough for them, and my
15  goal in this was to have a conversation with
16  the board that would clarify all elements of
17  our cash management system, including Project
18  SID.
19    Q.  So the board had some sense at the
20  fact -- of the fact that the company was
21  unilaterally not paying its vendors on time?
22    A.  I didn't say that.
23    Q.  Did they?  Did the board have some
24  sense of that?
25    A.  I don't know what the board had a

Page 171

1  sense of or didn't have.
2    Q.  I understand that.  Based on your
3  experience as the CFO who attended board
4  meetings, who met with McDonald, who talked
5  with board members, did you believe they had
6  a sense of that?
7    A.  I did not have that conversation or
8  discussion with the board members.
9    Q.  In any communications, did you
10  believe that the board had a sense that Kmart
11  was unilaterally not paying its vendors on
12  time as part of its cash management program
13  in the third quarter?
14    A.  I would say --
15    Q.  Only your knowledge.
16    A.  My knowledge of that, no, the board
17  did not have a sense of that.
18    Q.  Now, when you're talking about
19  credibility with the board, is -- is any of
20  that encompassed in what you were concerned
21  about with board credibility?
22    A.  Well, if we have to go through a
23  discussion of refinancing the company,
24  putting in a secured financing facility,
25  they're going to ask why is that necessary,

Page 172

1  why is -- why aren't you guys -- what's
2  changed from the last time we talked.  Then
3  you have a credibility -- anybody having that
4  conversation could have a credibility issue.
5    Q.  Okay.  Now let's go down to the next
6  bullet which is develop financing contingency
7  plan.  The first sub... listing under there, can
8  you read it, please?
9    A.  (As read)  "Fundamental
10  restructuring of financing structure."
11    Q.  What are you referring to there?
12    A.  There's two parts to that question.
13  One is that there are many broad things you
14  can do to restructure your financing, and to
15  a certain degree, that's unknown.  You go out
16  to see the banks, you have that conversation
17  with them.
18        The other part of the structure was
19  there was a in-going or a current idea that
20  it could be done through the secured
21  financing.  So the certain level, you go in
22  there saying I'm not certain exactly what we
23  need.  I don't think this is the right
24  structure, the right way to handle it.  I
25  think we can go and get secured financing,

Page 173

1  the revolver.  Let's go talk to the bank, but
2  the fundamental restructure, the financing
3  restructure, really encompasses, just broadly
4  speaking, let's look at everything we do,
5  let's talk to the banks about it, and
6  possibly there's a role in there for secured
7  financing.
8    Q.  Read the next entry under that
9  heading.
10    A.  (As read)  "May need to plan for
11  bankruptcy filing."
12    Q.  Why did you include that on your
13  implications/next steps for your one-on-one
14  with Mr. Conaway?
15    A.  I thought it was important that we
16  talk about the seriousness of the situation
17  and my assessment and that, as a part of our
18  overall financing contingency plan, one
19  option you've got to consider is a worst case
20  option, including a possible plan for
21  bankruptcy.
22    Q.  The next item that you have on this
23  page, would you read it, please?
24    A.  (As read)  "Discuss issues with the
25  board at the November board meeting."

Jeffrey N. Boyer                                                                    July 19, 2007
New York, NY

Page 174

1    Q.  And what issues are you referring to
2  there?
3    A.  We've got regular scheduled board
4  meetings.  There was one coming up some time
5  in November, and I thought it was important
6  for us to cover with them many of the
7  elements that are on this page, the financing
8  contingency plan, the cash flow situation,
9  any covenant issues, to have that discussion
10 with the board.
11   Q.  I want to understand your -- your --
12 a little better your concern about what needs
13 to be told to the board regarding what we've
14 called SID, to save us all some breath.
15       At this point in time, you have an
16 idea the magnitude of SID in the range of
17 $800 million; is that correct?
18   A.  Yes.
19   Q.  And you made that known to Mr.
20 Conaway, correct?
21   A.  Yes.
22   Q.  Was your need to discuss that with
23 the board only tied to the fact that you
24 might have to discuss restructuring of
25 financing --

Page 175

1        MR. LASSAR:  Object.
2    Q.  -- or did you feel that there was a
3  need to disclose that to the board
4  absolutely, regardless of other issues?
5        MR. LASSAR:  Objection.
6    A.  Well, I -- I -- I don't recall in
7  this context with what I'm looking at.
8        I recall in context of the financing
9  program.
10   Q.  So you were generally comfortable
11 with the note -- did you believe the board
12 knew that there was an $800 million issue
13 with SID at this time, November 8?
14   A.  That the board was aware of that?
15   Q.  Yeah.
16   A.  I did not believe the board was
17 aware of that.
18   Q.  Are you familiar with the concept of
19 cash on hand?
20   A.  Yes.
21   Q.  Are you familiar with the concept of
22 cash on hand in the retail business, in
23 Kmart's business?
24   A.  Yes.
25   Q.  Did -- on any given day of the third

Page 176

1  quarter, did -- did Kmart have cash on hand?
2    A.  Yes.
3    Q.  Explain very briefly what cash on
4  hand is.
5    A.  Cash on hand is really the
6  accumulation of all of the different cash
7  drawers in all the stores across the U.S., as
8  well as probably some element of cash in the
9  cash management system, that being the amount
10 that's floating through or flowing through to
11 the banks and things, that there's a certain
12 amount of cash that is in the infrastructure
13 that has to be there to do sales transactions.
14   Q.  Did you know how much cash on hand
15 that Kmart had on any given day during the
16 third quarter?
17   A.  I know primarily by looking at Ks
18 and Qs that it was several hundred million
19 dollars that Kmart would have at any point in
20 time cash on hand.
21   Q.  All right.  Well, was that 700 --
22 several hundred million cash on hand that
23 Kmart had at any given time used by you or
24 Mr. McDonald or any people responsible to --
25 to address the liquidity issue in the third

Page 177

1  quarter that we've been discussing?
2    A.  No.
3    Q.  Why not?
4    A.  Cash on hand is necessary as part of
5  the underlying infrastructure necessary to --
6  to do transactions.  You couldn't pull it
7  out 'cause you couldn't do trans -- you
8  wouldn't have the cash to do transactions
9  with customers.
10   Q.  Okay.  Now, following your meeting
11 with Mr. -- Mr. Conaway on November 8 where
12 you reviewed with him your talking points,
13 which we've marked as Exhibit 97, what --
14 what was the next event that occurred at
15 Kmart that you can recall?
16   A.  Next event was actually a meeting in
17 the afternoon with Mark Schwartz.
18   Q.  And who was at that meeting?
19   A.  Just Mark Schwartz and myself.
20   Q.  And what was the substance of that
21 meeting?
22   A.  That was to discuss the 2002 and
23 longer term plan.
24   Q.  And you were the only two that
25 attended that meeting?

45  (Pages 174 to 177)

Jeffrey N. Boyer                                                July 19, 2007
New York, NY

Page 178

1    A. Yes.
2    Q. And how long did the meeting last?
3    A. Oh, I'd say, roughly, about an hour.
4    Q. And after that, what was the next
5  event?
6    A. The next event was the next day,
7  which was Friday the 9th.
8    Q. And what event was that?
9    A. That event was when I was
10  terminated.
11   Q. Tell us how that came about; what
12  you were told, who was at the meeting, how
13  long it lasted.
14   A. Relatively early in the morning,
15  7:30, eight o'clock in the morning, Dave
16  Rots, Janet Kelley, Lori McTavish came into
17  my office, and we had a short conversation
18  about my employment at Kmart.
19   Q. And what did they say to you?
20   A. They indicated that Chuck didn't
21  consider me a team player anymore and in -- I
22  call -- I recall those words.  I don't recall
23  the exact words, but really my employment
24  wasn't going to continue there.  I agreed
25  that if Mr. Conaway didn't want me on his

Page 179

1  team, I understand that's his choice.  We had
2  a discussion about my departure.
3    Q. Did you get any -- did Mr. Conaway
4  mention to you at any time during your
5  meeting with him on November 8 that you were
6  going to be terminated?
7    A. No.
8    Q. Did you have any discussions with
9  Mr. Conaway on November 9, after you were --
10  after your meeting where you were advised you
11  were going to be terminated?
12   A. No.
13   Q. Did you ever get any other
14  explanation or reason as to why you were
15  terminated other than that you're not a team
16  player?
17   A. I did not.
18   Q. Now, based on your position as chief
19  financial officer and your understanding of
20  the cash situation, SID and all the other
21  components we talked about, in the third
22  quarter of 2001, if you take the SID program
23  out that we've discussed, what was the
24  liquidity situation of Kmart in the third
25  quarter of 2001?

Page 180

1    A. Excluding SID, the company would not
2  have enough money to pay its -- its vendors.
3  So it didn't have any liquidity.  It was out
4  of money.
5    MR. LIEBERMAN:  I think we've
6  completed the direct examination.
7    MR. PERSCHETZ:  Would this be a
8  good time for a lunch break?
9    THE VIDEOGRAPHER:  The time is
10  12:39 p.m., and we're off the record.
11   (Luncheon recess was taken.)
12   THE VIDEOGRAPHER:  This begins
13  tape number 4 in the videotape
14  deposition of Jeffrey N. Boyer on July
15  19, 2007.  The time is 1:31 p.m.
16   We're back on the record.
17  EXAMINATION BY COUNSEL FOR THE DEFENDANT
18  BY MR. LASSAR:
19   Q. Good afternoon, Mr. Boyer.  I'm
20  Scott Lassar.  I represent Chuck Conaway in
21  this matter.
22   Mr. Boyer, at Kmart, you were the
23  chief financial officer, correct?
24   A. Correct.
25   Q. And that is -- you also held that

Page 181

1  position at Sears when you left Sears?
2    A. Correct.
3    Q. And you went from Sears to Kmart?
4    A. Yes, correct.
5    Q. And you are currently a chief
6  financial officer?
7    A. Yes.
8    Q. And as the chief financial officer
9  in a company, all the other financial people
10  in the company report up through you;  is
11  that true?
12   A. Not necessarily.
13   Q. Is that you -- well, was that the
14  case at Kmart?
15   A. No.
16   Q. Who didn't report up through you?
17   A. John Stark and all his merchandising
18  finance folks did not report to me.
19   Q. Was he on a dotted line to you?
20   A. He was on a loose dotted line to me.
21   Q. And as the -- the CFO at Kmart, did
22  you have the primary contacts with the -- the
23  finance committee, the audit committee of the
24  board of directors?
25   A. Yes, I did.

46  (Pages 178 to 181)

# Exhibit P

Mark Moreland                                          June 27, 2007
                        Washington, DC

                                                          Page 1

              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - - - x
SECURITIES AND EXCHANGE          :
COMMISSION,                      :
                                 :
         Plaintiff,              :
                                 :
             v.                 : Case No. 4:05CV40263
                                 :
CHARLES C. CONAWAY AND          : Volume I
JOHN T. MCDONALD, JR.,          :
                                 :
         Defendants.            :
- - - - - - - - - - - - - - - x

                                   Washington, D.C.

                             Wednesday, June 27, 2007

Video Deposition of

         MARK MORELAND, called for examination by

counsel for Plaintiff, pursuant to notice, at the

Offices of the United States Securities and Exchange

Commission, 100 F Street, N.W., Washington, D.C.,

commensing at 10:05 a.m., before Barbara A. Huber,

Notary Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Mark Moreland                                          June 27, 2007
Washington, DC

---

Page 2

```
1   APPEARANCES:
2     On behalf of Plaintiff:
3       ALAN M. LIEBERMAN, ESQUIRE
        DEAN M. CONWAY, ESQUIRE
4       ROBERT I. DODGE
        United States Securities and Exchange Commission
5       Division of Enforcement
        100 F Street, N.E.
6       Washington, D.C. 20549-4030
        (202) 551-4474
7       liebermana@sec.gov
8     On behalf of Defendant Charles C. Conaway:
9       SCOTT R. LASSAR, ESQUIRE
        HILLE R. SHEPPARD, ESQUIRE
10      SHARLENE P.B. HOBSON, ESQUIRE
        Sidley Austin, LLP
11      One South Dearborn
        Chicago, Illinois 60603
12      (312) 853-7668
        slassar@sidley.com
13
      On behalf of Defendant John T. McDonald, Jr.:
14
        JOHN F. SYLVIA, ESQUIRE
15      McKENZIE WEBSTER, ESQUIRE
        Mintz Levin Cohn Ferris Glovsky and Popeo, PC
16      One Financial Center
        Boston, Massachusetts 02111
17      (617) 542-6000
        jsylvia@mintz.com
18
      On behalf of The Witness:
19
        PAUL A. LEDER, ESQUIRE
20      RICHARDS KIBBE & ORBE, LLP
        Portrait Building
21      701 8th Street, N.W.
        Washington, D.C. 20001-3727
22      (202) 261-2985
        pleder@rkollp.com
```

---

Page 3

```
1    APPEARANCES (cont.):
2      Also Present:
3        Stephen C. Nurse, Videographer
         Shelley Sanders, Videographer
4        Roman Goldstein, Intern
5
6
7                  *  *  *  *  *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

---

Page 4

```
1            C O N T E N T S
2   EXAMINATION BY:                    PAGE
3     Counsel for Plaintiff         8
4
5
6
7   PLAINTIFF'S DEPOSITION EXHIBITS:      PAGE
8    (Plaintiff's Exhibits No. 37 - 40, 42 - 44,
       54 - 56, and 60 were not entered.)
9
     No.  4 - Document SEC00870812 - SEC00870818   7
10
     No.  5 - Document SEC00337841 - SEC00337846   7
11
     No.  6 - Document SEC00870238 - SEC00870241   7
12
     No.  7 - Document SEC00126628 and SEC00126632
13         and 126630                  7
14   No.  8 - Document SEC00126629        7
15   No.  9 - Document SEC00126626 and SEC00126624   7
16   No. 10 - Document SEC00126618 and SEC00126617   7
17   No. 11 - Document SEC00499297        7
18   No. 12 - Document SEC00126622 and SEC00126620   7
19   No. 13 - Document SEC00117992 - SEC00117993   7
20   No. 14 - Document SEC00487610 - SEC00487658   7
21   No. 15 - Document SEC00120639 and SEC00120665
           and SEC00120667             7
22
```

---

Page 5

```
1   PLAINTIFF'S DEPOSITION EXHIBITS (Con't):    PAGE
2   No. 16 - Document SEC00118003 and SEC00118001    7
3   No. 17 - Document SEC00480692 - SEC00480698     7
4   No. 18 - Document SEC00117996 - SEC00117997     7
5   No. 19 - Document SEC00117999        7
6   No. 20 - Document SEC00118005 - SEC00118007     7
7   No. 21 - Document SEC00118016        7
8   No. 22 - Document SEC00118018        7
9   No. 23 - Document SEC00118021        7
10  No. 24 - Document SEC00118017        7
11  No. 25 - Document SEC00118019 - SEC00118020     7
12  No. 26 - Document SEC00118027        7
13  No. 27 - Document SEC00125304 - SEC00125337     7
14  No. 28 - Document SEC00487680        7
15  No. 29 - Document SEC00118026 and SEC00118028    7
16  No. 30 - Document SEC00118029        7
17  No. 31 - Document SEC00118030 and SEC00118024
           and SEC00118025             7
18
    No. 32 - Document SEC00118042 and SEC00118040
19         and SEC00118037             7
20  No. 33 - Document SEC00118043 and SEC00118041
           and SEC00118038             7
21
    No. 34 - Document SEC00400653 and SEC00400654    7
22
```

Alderson Reporting
1-800-FOR-DEPO

Mark Moreland                                                    June 27, 2007
Washington, DC

Page 66

1    A   No.
2    Q   And approximately how long did the
3 meeting last?
4    A   As I recall, it was about 30 minutes.
5    Q   And did you have Exhibit 11 with you?
6    A   Yes, I did.
7    Q   How many copies did you have?
8    A   I had three copies.
9    Q   And what did you do with the three
10 copies during the meeting?
11   A   I provided copies to Mr. McDonald and
12 Mr. Conaway.
13   Q   Now, after you provided the copies, as
14 best as you're able to recall, what was said at
15 the meeting, and by whom?
16   A   As I recall, I described the document
17 and the activities the document describes to
18 Mr. Conaway and Mr. McDonald.  And we had a
19 discussion on those topics.
20   Q   Let's look at the second arrow under
21 "concept."  You talk about or you write there
22 about the system's deselection of invoices.

Page 67

1       What -- what does that mean?
2       What did you mean when you wrote that?
3    A   The design that Mr. McDonald had
4 requested that I produce in implementing this
5 project was to ensure that all vendors received
6 checks, albeit the checks be -- would be smaller
7 than they would normally receive.  And how that's
8 executed in a large company is individual
9 invoices would not be paid.  So a vendor, for
10 example, may -- again, a very large company -- a
11 vendor on a given week may have a thousand
12 invoices paid on one check.
13      Deselection of invoices means that
14 certain of those invoices were selected not to be
15 paid.  So the vendor's receiving, instead of a
16 thousand -- a payment for a thousand invoices, a
17 payment for 900 of them.
18   Q   Was there any -- and did you explain
19 this at the meeting?
20   A   Yes, I did.
21   Q   Was there any reaction to it from
22 Mr. Conaway?

Page 68

1    A   I recall Mr. Conaway being very
2 supportive of that design.
3    Q   All right.  Was anything said by
4 Mr. Conaway that allows you to understand why he
5 was supportive of that design?
6    A   I recall Mr. Conaway was supportive
7 because it would not be obvious to the vendors
8 what was happening.
9    Q   Now, indeed, would you read that second
10 sentence of that second bullet point from the
11 system's deselection?  And read it down to the
12 word "workbench."
13   A   Okay.  The sentence says, The system's
14 deselection of these invoices will occur at the
15 very last step of the check run; therefore,
16 vendors will not have visibility to the hold via
17 merchant workbench.
18   Q   Okay.  What did you mean when you wrote,
19 Vendors will not have visibility?
20   A   It means that it would not be clear to
21 the vendors what was happening to their payments.
22   Q   Now, read the last sentence of that

Page 69

1 bullet point.
2    A   The last sentence says, It will appear
3 as if the invoice simply got hung up in
4 processing.
5    Q   Was that truly what happened, based on
6 your project SID process, that it got hung up in
7 processing?
8    A   That's correct.
9    Q   No, I mean is that what happened, it got
10 hung up in processing?
11   A   Umm -- if -- if your question is did it
12 systematically not occur in the normal AP
13 processing, that is not the case.
14   Q   Well, what I'm trying to understand is
15 you talk about, in -- in the beginning of that
16 bullet point, you talk about the system's
17 deselection of invoices.
18      Is that the same thing as an invoice
19 simply getting hung up in processing?
20   A   No.  The -- the system that was put into
21 place caused it to get hung up.
22   Q   The system being SID?

18 (Pages 66 to 69)

Mark Moreland                                                      June 27, 2007
                              Washington, DC

---

Page 70

1      A   That's correct.
2      Q   Okay.  And did -- you just -- was it --
3   did you discuss why it was important that vendors
4   not have visibility as to what was really
5   happening to their invoices?
6      A   Yes, we did.  The general conversation
7   was around keeping this effort on a -- you know,
8   on a very limited basis, as far as people being
9   aware of it.
10     Q   And why's that -- why was that viewed as
11  important?
12     A   As I recall, the concern was that if the
13  vendors understood there was a liquidity crisis
14  occurring, that they may not ship goods; and it
15  could cause a -- a very bad public relations issue
16  with the company.
17     Q   All right.  Now, what about the vendors
18  that agreed to extend payment terms in the days
19  payable initiative you described that was
20  initiated in the beginning of 2001, the first two
21  quarters, were those vendors exempt from SID?
22     A   No, they were not.

---

Page 71

1      Q   Now, do you recall anything else about
2   the meeting, as you sit here, that stands out one
3   way or the other to you as to what was said among
4   you?
5      A   I do.
6      Q   And what is that?
7      A   I recall as we were breaking up from the
8   meeting, I was uncertain if this was a proper
9   activity to be undertaking.  And I did, as we were
10  leaving, make an offhand comment that at least
11  what we were doing was not -- was not illegal.
12  Both Mr. Conaway Mr. McDonald chuckled at that
13  statement.  And they said that this is something
14  that every LBO does.
15     Q   Did you have an understanding what an
16  LBO -- what LBO refers to?
17     A   Yes, I do.
18     Q   What do those initials stand for?
19     A   It stands for leverage buyout.
20     Q   Was this a -- was this situation
21  confronting Kmart a leverage buyout?
22     A   No, it was not.

---

Page 72

1      Q   Did vendors agree to have their invoices
2   deselected by SID?
3      A   They did not.
4      Q   Were they told that their invoices, to
5   your knowledge, were being deselected by SID?
6      A   They were not.
7      Q   Was SID part of the days payable
8   initiative that you described, where the buyers of
9   Kmart would negotiate with vendors?  Was SID part
10  of that project?
11     A   No, it was not.
12     Q   Okay.  What was done with the Exhibit
13  11, if anything, as the meeting broke up?
14     A   I recall Mr. McDonald taking a document
15  from Mr. Conaway and saying that he did not need
16  to have it.
17     Q   And did he take it back from
18  Mr. Conaway?
19     A   Yes, he did.
20         MR. LIEBERMAN:  I -- I have a note from
21  the videographer that states that there's only
22  five minutes left on the tape.  And he requests we

---

Page 73

1   take a break to change the tape.  And we'll do
2   that.
3         VIDEOGRAPHER:  Going off the record.
4   The time is 11:23:42.
5            (Recess)
6         VIDEOGRAPHER:  This marks the beginning
7   of tape two of the video deposition of Mr. Mark
8   Moreland.  We're going back on the record.  The
9   time is 11:33:15.
10  BY MR. LIEBERMAN:
11     Q   Mr. Moreland, I learned from the
12  gentleman doing the videography work that because
13  you were looking in my direction, which is not
14  apparent on the video; but for people viewing it,
15  you were looking at me as I was asking you a
16  question.  And you were answering.  And the mike
17  was on the wrong side of your tie, so your voice
18  levels were in and out.
19         But now I hope we've cured that.  You've
20  switched the mike on your tie over to my side.
21  But as much as possible, try to look into the --
22  into the camera, since I'm not on camera and

---

                                          19 (Pages 70 to 73)

Mark Moreland                                                    June 27, 2007
                          Washington, DC

| Page 74 | Page 76 |
|---|---|

Page 74

1  jurors might be wondering why you're looking off
2  to the side.
3          At the meeting involving SID, where you
4  showed Mr. Conaway and Mr. McDonald Exhibit 11,
5  that you had prepared, was there a discussion
6  among any of the four initiatives to generate cash
7  that you described earlier?
8          And just to refresh:  The allowances,
9  future receipt cutbacks, capital expenditure
10  cutback, and the sale lease-back program, did you
11  discuss those four possibilities for generating
12  cash during this meeting where you discussed SID?
13     A   I don't recall discussing those.
14     Q   Okay.  Did Mr. Conaway question at all
15  the -- the need for SID that you had outlined?
16     A   He did not.
17     Q   Did he say anything to you that caused
18  you to conclude that he was unaware of -- of the
19  issue that SID was intending to address?
20         MR. SYLVIA:  Objection.  Lack of
21  foundation.
22  BY MR. LIEBERMAN:

Page 75

1     Q   Did he?
2          You may answer.
3     A   Can you please restate the question?
4     Q   Yeah.
5          Did he say anything to you that
6  suggested he needed to be brought up to speed to
7  understand why you were making a proposal like SID
8  to him?
9     A   He did not.
10     Q   Okay.  Did --
11         (Interruption)
12         MR. LIEBERMAN:  That's -- we're going to
13  have to -- all right.  We'll let the phone finish
14  ringing.  I apologize to everyone.  We're in a
15  conference room, and someone decided to call it.
16  Just take it off the receiver, Paul.  Thanks.
17  BY MR. LIEBERMAN:
18     Q   Okay.  Now, when you left the meeting
19  with Mr. Conaway and Mr. McDonald that you've just
20  been describing, did you have any understanding
21  regarding the status of what you called project
22  SID?

Page 76

1     A   My understanding was that it had been
2  approved.
3     Q   And why did you have that understanding?
4  What was your basis for that?
5     A   Mr. Conaway and Mr. McDonald asked me to
6  get it into place as soon as possible.
7     Q   Now, what did you do to get project SID
8  into place as quickly as possible?
9     A   I began to work with the accounts
10  payable department to build the system that would
11  make this work.
12     Q   And who in the accounts payable
13  department did you work with on this project?
14     A   Both Scott Gilbert and Bill Archambeau.
15     Q   And you've already told us what
16  Mr. Gilbert's title was.
17         Who is Mr. Archambeau?
18     A   Mr. Archambeau works in the accounts
19  payable department.  And, as I recall, he was
20  predominantly oriented towards the computer
21  systems the company used to administer its
22  accounts payable systems.

Page 77

1     Q   And what did you need the accounts
2  payable group and the persons of Gilbert and
3  Archambeau to do in order to implement SID as you
4  outlined it?  What did you need from them?
5     A   The accounts payable group would provide
6  me a daily file of the checks to be cut.  And then
7  I would feed back to them a file of invoices that
8  would be held.
9     Q   And how was it determined what invoices
10  would be held?  Who made that determination?
11     A   I did, with input from the working group
12  we discussed earlier.
13     Q   That included Mr. Kearse, Mr. Jellinek,
14  Mr. McDonald?
15     A   That's correct.
16     Q   And -- and what were the criteria?
17         What were the -- the factors that
18  determined whether a -- an invoice would be
19  deselected by accounts payable?  How did you
20  decide?
21     A   There was initial discussions with the
22  group regarding which types of vendors, and in

20  (Pages 74 to 77)

Mark Moreland                                      June 27, 2007
                        Washington, DC

Page 78

1  certain cases particular vendors, that would not
2  be included in the process.  And apart from those
3  that would be excluded, all vendors were -- were
4  part of the process.
5      Q    Well, was -- was your -- once all
6  vendors were part of the process, what criteria
7  were used to deselect invoices within that vendor
8  group that were part of the process?  Was it
9  random or --
10     A    It was random and based on dollar
11 volume, dollar size.
12     Q    And why was dollar size relevant?
13     A    The larger the invoices, the more cash
14 that was delayed in being paid.
15     Q    All right.  So what -- so this concept
16 of accounts payables that you told us about --
17 which is basically a source of cash; is that
18 correct?  You told us that?
19     A    That's correct.
20     Q    This SID program is causing that to
21 grow, the cash available?
22     A    That's correct.

Page 79

1      Q    Okay.  Why were certain vendors exempt
2  from SID?
3      A    There were certain vendors that were
4  deemed to be too sensitive to not pay on a timely
5  basis.  Ones that I recall specifically were
6  transportation of our -- the trucking companies
7  the company did business with.  And I believe
8  there were other companies.  And I recall that
9  Fleming, which was our company's provider of a lot
10 of the food items the company stocked, was exempt
11 initially.
12     Q    When you say trucking companies, you
13 mean the folks that -- that delivered the
14 inventory?
15     A    Right.  They were excluded from the
16 process.
17     Q    And you said Fleming had provided the
18 food.
19          Any others you can recall were exempt?
20     A    There were a numbers of vendors
21 excluded.  I don't recall particularly all the --
22 the list of vendors.

Page 80

1      Q    How many vendors, if you can recall --
2  give us as good a number as you can -- did Kmart
3  have during 2001?
4      A    I don't believe I could give you a good
5  answer to that.  It was -- I believe there's
6  thousands of vendors.
7      Q    Okay.  And of that community of
8  thousands of vendors, what -- roughly what
9  percentage was impacted by SID at one time or
10 another?
11     A    I would say the majority of vendors were
12 impacted.  And certainly the majority of the
13 dollars being paid were impacted at some point.
14     Q    All right.  We'll get to some documents
15 a little later that we can get a little more
16 specific with.  But I just want to get kind of an
17 overview now.
18          How did you manage this system, keep all
19 these components straight under project SID, you,
20 personally?
21     A    There was a -- a database I maintained
22 and a series of Excel files I maintained to

Page 81

1  administer the daily flow of these files back and
2  forth from accounts payable, and also to, on a
3  daily basis, re-forecast the cash flow balances.
4      Q    Now, how long was -- when SID was
5  instituted shortly after this meeting around Labor
6  Day of '01, how long was it functioning, SID?
7      A    As I recall, SID functioned through
8  early December.
9      Q    Pretty much as you've just outlined it,
10 the basics of it?
11     A    The basics of it, yes.
12     Q    Okay.  And how much of your time was
13 devoted to SID, your duties and responsibilities?
14     A    During that period, the majority of my
15 time was spent administrating the system or
16 re-forecasting cash balances.
17     Q    Directly related to what?
18     A    The -- the cash forecasts were
19 reflective of the daily activity generated out of
20 the SID process.
21     Q    Okay.  And had -- had you -- had that --
22 that been your duties before SID was instituted?

21 (Pages 78 to 81)

Mark Moreland                                                 June 27, 2007
Washington, DC

Page 82

1       A    The concept of forecasting cash was the
2    frequency and the daily nature of the forecasts
3    were unusual.
4       Q    Well, what about deciding what checks --
5    what invoices to pull, what invoices to pay and
6    how -- did you do that every day, during SID?
7       A    Yes, I did.
8       Q    And what -- you know, what volume of
9    checks are we talking about? Three? Four? Ten?
10   Fifty? Hundreds?
11      A    The system was, again, designed at the
12   invoice level. And it was thousands of invoices.
13      Q    That you personally deselected?
14      A    Yes.
15      Q    On a daily basis?
16      A    Yes. The only clarification is I -- I'm
17   not sure if every day had a thousand invoices or
18   not, but in total it was thousands of invoices.
19      Q    Did you consider this, based on your --
20   when you signed on to treasury, part of your
21   ordinary duty and responsibility?
22      A    No, I did not.

Page 83

1       Q    Okay. When you say it took a majority
2    of your time when SID was functioning, what do you
3    mean by majority? Fifty percent? Fifty-one
4    percent? Or more?
5       A    It would vary from time to time. I
6    would anticipate it would be in the two-thirds
7    over that time period.
8       Q    And how much interaction did you have
9    with Mr. Gilbert or Mr. Archambeau during the life
10   of SID?
11      A    I generally talked to them or e-mailed
12   them on a daily basis.
13      Q    Was anybody else involved in -- other
14   than accounts payable -- in managing SID, or
15   helping you to implement SID?
16      A    As far as the mechanics of the system
17   and as far as implementing the system, those were
18   the major players.
19      Q    Okay. Now, apart from deselecting
20   invoices, did SID have any other component?
21      A    It did.
22      Q    And -- and how would you describe that?

Page 84

1       A    This system, SID, or the -- the
2    database, would work at a invoice level. There
3    were system changes that occurred in the accounts
4    payable system or the systems and processes around
5    accounts payable that were also instituted, such
6    as not mailing checks for an additional day or
7    two, and delaying check runs a day or two, things
8    of that nature, to generate additional cash.
9       Q    And that was part of the SID program?
10      A    It was part of doing payables even more.
11      Q    To address the liquidity situation
12   you've been describing?
13      A    That's correct.
14      Q    And generate more cash for the company
15   during the quarter?
16      A    That's correct.
17      Q    Okay. Was that an ordinary action to
18   take, as you understood it, to manage cash:
19   Making systems changes?
20      A    The -- as I mentioned earlier, it's
21   normal to attempt to gain a day or two off the
22   payables process. The degree to which the

Page 85

1    payables system was modified -- and as a system it
2    means systems and processes around accounts
3    payable -- was, in my mind, unusual.
4       Q    And given the degree and scope of SID,
5    was SID, in your mind, ordinary and usual, or
6    unusual?
7       A    It was unusual.
8       Q    All right. Now, you -- you've told us
9    about the group that Mr. McDonald set up and often
10   you met.
11          Are you familiar with the -- the term
12   "ELT"?
13      A    I am.
14      Q    And what do those initials stand for?
15      A    They stand for executive leadership
16   team.
17      Q    And during 2001, did you know the
18   members -- who the members of the executive
19   leadership team were?
20      A    I did.
21      Q    And who were they?
22      A    I'll go from memory here, obviously. It

22 (Pages 82 to 85)

Mark Moreland                                          June 27, 2007
Washington, DC

Page 86

1  was a large group.  It was Mr. Conaway; Mr. Boyer,
2  who was the CFO at the -- at that time, and then
3  later Mr. McDonald; Randy Alen; David Rots; I
4  believe his name is Tony D'Onofrio, but it may be
5  a wrong first name; Cecil Kearse.  That would
6  be -- I think that's a fairly representative list.
7       Q   Were you a member of the executive
8  leadership team?
9       A   I was not.
10      Q   When Mr. McDonald was treasurer of the
11 company, was he a member of the executive
12 leadership team?
13      A   I don't know if he was formally a member
14 of the ELT at that point.
15      Q   Now, you mentioned a Mr. Boyer.
16          Is that Jeffrey Boyer?
17      A   That's correct.
18      Q   And what was his title when he was at
19 the company during this period of time?
20      A   He was CFO, chief financial officer.
21      Q   So he held the position at Kmart that --
22 that you now hold at your private company in

Page 87

1  Portland, Oregon, correct?
2       A   That is correct.
3       Q   All right.  So the description you gave
4  us of -- of where you fit in the hierarchy at your
5  company is where Mr. Boyer fit or the CFO fits in
6  Kmart; is that correct?
7       A   By and large, yes.
8       Q   Okay.  Now, you -- you stated that
9  Mr. McDonald became a member of the executive
10 leadership team; is that correct?
11      A   That is correct.
12      Q   Okay.  And when did that occur and why?
13      A   As he was promoted to CFO during the
14 third quarter -- or during -- actually, during the
15 fourth quarter, he moved into that team.
16      Q   Fourth quarter of -- of what year?
17      A   2001.
18      Q   And so he became CFO.
19          What became of Mr. Boyer?
20      A   Mr. Boyer left the company.
21      Q   Okay.  Did you prepare any documentation
22 for Mr. McDonald's use during the third quarter of

Page 88

1  2001 regarding the liquidity situation you've been
2  describing in SID and the credit revolver?
3       A   I produced a large volume of materials
4  for Mr. McDonald during that period.
5       Q   All right.  And -- and would you
6  describe the materials you produced?
7       A   They were --
8       Q   Or is that too -- is that too general a
9  question?
10      A   It's a fairly general question --
11      Q   All right --
12      A   -- yes.
13      Q   -- well, then let me -- let me -- let me
14 back off it and -- and go at it a different way
15 and -- and make it easier for all of us.
16          The -- do you know -- well, when you
17 prepared documents, did you prepare forecast
18 documents for Mr. McDonald to show him where --
19 what the impact of and cash needs were on the
20 credit revolver?
21      A   Yes, I did.
22      Q   And how often did you prepare those

Page 89

1  forecasts?
2       A   During this period, they were performed
3  at least on -- on a weekly basis.
4       Q   Were they prepared more frequently than
5  that at times, if you know?
6       A   Yes, they were.
7       Q   And who prepared those forecasts?
8       A   It'd be either myself or perhaps members
9  of my team working on those forecasts.
10      Q   All right.  And what members of the
11 team?  The names.
12      A   Predominantly, Tom Solecki or Ken
13 Andrysiak.
14      Q   Okay.  And they operated under your
15 direction and control, correct?
16      A   That's correct.
17      Q   Okay.  And what did you do with these
18 forecasts when you got them, or when you prepared
19 them?
20      A   They were -- I -- I used them on a daily
21 basis to continuously re-project our cash balances
22 for the holiday season.

23 (Pages 86 to 89)

Mark Moreland                                    June 27, 2007
                    Washington, DC

Page 90

1    Q   Did you do -- did you provide them to
2  any -- anyone?
3    A   I did.
4    Q   Who did you provide them to?
5    A   Provided them to Mr. McDonald.
6    Q   Did Mr. McDonald ever tell you what
7  his -- he used them for?
8    A   Mr. McDonald relayed that there's a
9  certain set of documents that were con -- as I
10 understand, consistently provided to the executive
11 leadership team.
12   Q   Okay.  And Mr. McDonald told you that?
13   A   Yes, he did.
14   Q   All right.  So when you prepared these
15 documents, you prepared them for your own use in
16 performing your functions; is that correct?
17   A   Correct.
18   Q   And you intended others to rely on them,
19 as well; is that correct?
20   A   That's correct.
21   Q   And what were the source documents that
22 you used to prepare these forecasts?

Page 91

1        And we'll look at a few, so we all have
2  an understanding of what we look like.  But I
3  just, again, want to get some overview.
4        What were the source documents you used
5  to prepare these forecasts that you gave to
6  Mr. McDonald for his use with the ELT?
7    A   There were a number of different source
8  documents used for those forecasts.  I'll name
9  them for ease.  One would be what the term -- the
10 company termed the Makoro forecast or a merchant
11 forecast, where the buyers are projecting both
12 revenue and inventory purchasing levels.  And
13 that -- that system I believe was on a weekly
14 basis.  There was revolver balance information I
15 obtained from either Cathy Askins or her group.
16   Q   Go ahead.
17   A   There was purchase order management
18 system data I received.  The accounts payable data
19 files I mentioned earlier were a part of that.
20 And the database and Excel files I managed were
21 also part of that.
22   Q   And you prepared these documents in the

Page 92

1  course of your duties as assigned by Mr. McDonald
2  during this third quarter?
3    A   That's correct.
4    Q   And you produced these documents on a
5  regular basis, sometimes daily, at least once a
6  week; is that correct?
7    A   That's correct.
8    Q   And in addition to using them for your
9  use, you intended others to rely upon them; is
10 that correct?
11   A   That's correct.
12   Q   And the documentation that you used as
13 sources were documents maintained in the regular
14 and ordinary course of Kmart's business; is that
15 correct?
16   A   By and large.  Again, I mentioned the AP
17 files that are -- I would say are not normal
18 course of business.
19   Q   All right.  But they were then used to
20 run the business during this third quarter?
21   A   That's correct.
22   Q   Okay.  And these doc -- the source

Page 93

1  documents you used and the documents that you
2  prepared for ELT were -- were documents that were
3  current documents as the events were happening; is
4  that correct?
5    A   That's correct.
6    Q   Okay.  Now, after -- and what did you do
7  with the documents that you -- you prepared for
8  Mr. McDonald on a weekly or daily basis for his
9  use with ELT?  Did you maintain them somehow
10 electronically?
11   A   I believe I would have maintained
12 versions of those files on my computer.
13   Q   Okay.  Now, what was the -- the daily --
14 the weekly or sometimes daily document you've been
15 describing that forecasts cash need?  What was it
16 designed to tell someone looking at it?
17   A   It was designed to incorporate the
18 projects that were underway, and show the
19 resulting liquidity status of the company.
20   Q   By status, is one of the -- one of the
21 points of status the cushion that you described?
22   A   That's correct.

24 (Pages 90 to 93)

# Exhibit Q

Lorna E. Nagler                                                    April 18, 2008

Minneapolis, MN

                                                                      Page 1

 1
                    UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION
 3
       _____
 4
     SECURITIES AND EXCHANGE COMMISSION,
 5
                      Plaintiff,
 6
       vs.                              CIVIL ACTION NO:
 7                                      05-40263
     (PVG)(SDP)
 8   CHARLES C. CONAWAY and
     JOHN T. McDONALD, JR.,
 9
                      Defendants.
10
       _____
11
12
13
14          VIDEOTAPED DEPOSITION OF LORNA E.
15   NAGLER, taken pursuant to Notice of Taking
16   Deposition, and taken before Candace A.
17   Kolehma, a Registered Professional Reporter and
18   Notary Public in and for the County of Ramsey,
19   State of Minnesota, at 50 South Sixth Street,
20   Minneapolis, Minnesota, on April 18, 2008,
21   commencing at 9:07 a.m.
22
23
24
25

Lorna E. Nagler

April 18, 2008

Minneapolis, MN

Page 2

```
1              I N D E X
2    PAGE
3    EXAMINATION BY MR. DODGE          5
4    EXAMINATION BY MR. LASSAR         21
5    EXAMINATION BY MR. DODGE          76
6    EXAMINATION BY MR. LASSAR         92
7    EXAMINATION BY MR. DODGE          95
8
9    EXHIBIT 76              21,77
10   EXHIBIT 77              27,79
11   EXHIBIT 78              29,81
12   EXHIBIT 79              32,84
13   EXHIBIT 72              35,85
14   PLAINTIFF'S EXHIBIT 150         37,86
15   EXHIBIT 80              43
16   EXHIBIT 81              47
17   EXHIBIT 82              51,76
18   EXHIBIT 83              58
19   EXHIBIT 84              64
20   EXHIBIT 85              67
21   EXHIBIT 86              72
22   EXHIBIT 87              93
23
24   OBJECTIONS      9,11,25,41,42,46,49,52-58
25              61,66,69,71,73,82,83,85,91
```

Page 3

```
1    APPEARANCES:
2         ROBERT I. DODGE and ALAN M. LIEBERMAN,
3    Attorney at Law, U.S. SECURITIES   & EXCHANGE
4    COMMISSION, 100 F ST., N.E., Washington, DC
5    20549-4030, appeared representing the Plaintiff
6    Securities and Exchange Commission.
7         SCOTT LASSAR and SHARLENE HOBSON,
8    Attorney at Law, SIDLEY AUSTIN, LLP, One
9    South Dearborn, Chicago, Illinois 60603,
10   appeared representing Defendant Conaway.
11        JOSEPH P. CURTIN, Attorney at Law,
12   MINTZ LEVIN COHN FERRIS GLOVSKY and POPEO,
13   PC, One Financial Center, Boston,
14   Massachusetts  02111, appeared representing
15   Defendant McDonald.
16        PETER W. CARTER, Attorney at Law,
17   DORSEY & WHITNEY, 50 South Fifth Street,
18   Suite 1500, Minneapolis, Minnesota
19   55402, appeared representing the Witness,
20   Lorna Nagler.
21        Also present:  John Mulcahey,
22   videographer.
23              -   -   -
24        NOTE:  The Original deposition
25   transcript will be filed with Attorney Dodge
```

Page 4

```
1    as the taking party, pursuant to Rule 30.06 as
2    revised July 1, 1985.
3              -   -   -
4         WHEREUPON, the following proceedings
5    were duly had:
6         THE VIDEOGRAPHER:  We are now on the
7    record in the matter of the Securities and
8    Exchange Commission versus Charles C. Conaway
9    and John T. McDonald, Jr.  Today's date is April
10   18, 2008.  The time is now 9:07 a.m.  This is
11   the video-recorded deposition of Ms. Lorna
12   Nagler being taken at Dorsey Whitney, 50 South
13   sixth Street, Minneapolis, Minnesota 55437.  I
14   am the camera operator.  My name is John
15   Mulcahey, in association with Alderson
16   Reporting, located at 1111-14th Street,
17   Northwest, Washington D.C.  The reporter is
18   Candace Kolehma, also in association with
19   Alderson Reporting.
20        Will the attorneys please identify
21   themselves and the parties they represent,
22   beginning with the party noticing this
23   proceeding?
24        MR. DODGE:  My name is Robert Dodge.
25   I'm with the plaintiffs Securities and Exchange
```

Page 5

```
1    Commission, and with me at counsel's table is Al
2    Lieberman.
3         MR. LASSAR:  Scott Lassar with Sharlene
4    Hobson, representing Mr. Conaway.
5         MR. CURTIN:  Joe Curtin from Mintz
6    Levin, representing John McDonald.
7         MR. DODGE:  Peter Carter from Dorsey
8    and Whitney, representing the witness.
9         THE VIDEOGRAPHER:  Will the court
10   reporter please administer the oath?
11        LORNA E. NAGLER,
12        A Witness in the above-entitled
13   proceeding, after having been first duly sworn,
14   testified under oath as follows:
15             EXAMINATION
16   BY MR. DODGE:
17   Q.  Good morning, Ms. Nagler.
18   A.  Good morning.
19   Q.  For the record, will you please state your full
20      name?
21   A.  Lorna Elizabeth Nagler.
22   Q.  And are you currently employed?
23   A.  I am.  Yes, I am.
24   Q.  Where is that?
25   A.  I am president and CEO of Christopher and Banks.
```

2 (Pages 2 to 5)

Lorna E. Nagler                                                    April 18, 2008

Minneapolis, MN

Page 6

1  Q. And what sort of business is Christopher &
2     Banks?
3  A. It's a women's retail specialty company.
4  Q. And can you give me some sense of the size, how
5     many stores?
6  A. Yes.  We have 850 stores across the country
7     under three divisions, Christopher & Banks, C.J.
8     Banks, and Acorn.
9  Q. And what's the annual revenue?
10 A. About 600 million.
11 Q. And you're the chief executive officer and
12    president?
13 A. Yes.  Correct.
14 Q. Today we're going to be talking about events
15    that took place in 2001.
16    Where were you employed in 2001?
17 A. At Kmart.
18 Q. And what was your position there?
19 A. In 2001, I was the senior vice president over
20    apparel and jewelry.
21 Q. And will you describe your responsibilities in
22    that position, please?
23 A. Sure.  I was responsible for approximately about
24    eight billion -- the corporate -- excuse me.
25    The company's sales.  I had a responsibility for

Page 7

1     all product sales, marketing for all of those
2     categories, kids, men's, women's, intimate,
3     jewelry.  I had approximately six or seven vice
4     presidents reporting to me.
5  Q. Okay.  So just so that I understand, Kmart is a
6     big company, lots of different product lines, is
7     that right?
8  A. That's correct.
9  Q. And you were responsible for clothing?
10 A. All clothing for all genders and sizes, as well
11    as jewelry, accessories, intimate apparel.
12 Q. And what -- what percentage of Kmart's total
13    business did that represent?
14 A. At that time, I think it was eight billion out
15    of 35-36 billion.
16 Q. So something less than a quarter?
17 A. That sounds right.
18 Q. Who did you report to in that position?
19 A. Cicil Kearse.
20 Q. What was his title?
21 A. I believe he was president of the merchandising.
22 Q. Are you familiar with the terms that were used
23    at Kmart, hardlines and softlines?
24 A. I absolutely am, yes.
25 Q. Will you please describe what those two mean?

Page 8

1  A. Sure.  I was the softlines, which is all the,
2     like I say, intimate apparel, all outside
3     clothing, really anything to do with, you know,
4     wearing apparel.  Except for jewelry, which was
5     considered softlines, and everything else was
6     hardlines, so toys, books, furniture, would be
7     considered hardlines, electronics, et cetera.
8  Q. Okay.  So just for my understanding then, would
9     it be fair to generalize to say that softlines
10    essentially dealt with apparel and hardlines
11    with everything else?
12 A. Yes.  There were some exceptions, but that's a
13    pretty generally true statement.
14 Q. And your area of responsibility was?
15 A. All -- really, all of softlines.
16 Q. Are you familiar with the expression Blue Light
17    Always?
18 A. Yes, I am.
19 Q. And what was Blue Light Always?
20 A. Blue Light Always was a new marketing program
21    that was put in place towards the middle, maybe,
22    of 2001, which really meant to be a --
23    everyday low pricing strategy, similar to what
24    Wal-Mart did in their stores.
25 Q. So this was a business strategy that was put in

Page 9

1     place at Kmart?
2  A. That's correct.
3        MR. LASSAR:  Object to the form.
4  BY MR. DODGE:
5  Q. You can go ahead and answer.
6  A. Yes.
7  Q. Now, are you familiar with the term eLMO,
8     e-L-M-O?
9  A. Yes.
10 Q. Or Project eLMO?
11 A. Yes.
12 Q. And what was that?
13 A. Project eLMO was the initiation of merging
14    hardlines and softlines reporting systems to one
15    common platform.
16 Q. And when you say "reporting systems", what does
17    that mean?
18 A. Day-to-day running of the business, sales,
19    inventory, how a merchant runs their business
20    every single day.
21 Q. Are you discussing the computer systems relating
22    to those or something else?
23 A. It can be computer systems.  It's how the
24    information is -- was formatted.  It could have
25    been hard -- hard-printed reports or -- but it

3  (Pages 6 to 9)

Lorna E. Nagler

Minneapolis, MN

April 18, 2008

| Page 10 |
| --- |

1    was the forum in which that information was used
2    to manage the day-to-day running of the
3    business.
4    Q.  Okay.  So Project eLMO, did that convert the
5        softline systems into the hardline systems or
6        the hardline systems into the softline systems
7        or merge the two together in some other way?
8    A.  It was trying to merge softlines into hardlines,
9        which most of the Kmart's business, which you
10       can tell from my earlier statement, was hardline
11       driven, so they were trying to go to a common
12       platform.
13   Q.  And the common platform would have been?
14   A.  More hardlines driven.
15   Q.  And what was -- excuse me.  What was your role
16       in the Project eLMO conversion?
17   A.  Well, since I was the champion of the softline
18       business, my team, it was really my team
19       underneath me, were partners to try and figure
20       out how do we make that system work, because
21       there are a lot more nuances to a softlines
22       business than a hardlines business, so it was
23       our intent to make sure that the system was
24       going to be robust enough for us to run our
25       business, because it had more nuances and

| Page 11 |
| --- |

1    complexities than a hardline system.
2    Q.  So if someone described you as the main user who
3        was responsible for eLMO, would that
4        characterization be something you'd agree with?
5            MR. CARTER:  Objection.  You can
6        answer.
7            THE WITNESS:  Me myself, no.  My entire
8        team?  Yeah.  My buyers, my assistants, my
9        divisionals, they would be the main users.
10   BY MR. DODGE:
11   Q.  Okay.  Was Project eLMO a significant --
12       significant part of your work in late 2001?
13           MR. LASSAR:  Object to the form.
14           THE WITNESS:  It was a big project,
15       because any time you undertake a systems
16       conversion, it is an overwhelming task, so it
17       was a big part of what my team spent a lot of
18       time on, to ensure that we got the kind of
19       system that would allow us to run our business
20       day in, day out.
21   BY MR. DODGE:
22   Q.  And what about personally?  What percentage of
23       your time in the second half of 2001 was devoted
24       to issues related to Project eLMO?
25   A.  I would -- it's hard to put a percentage, but I

| Page 12 |
| --- |

1    did, because of the frustrations of making sure
2    that our voice and softlines was heard, you
3    know, I would attend task force meetings,
4    committee meetings.  It's really hard at this
5    point for me to put a percentage of time that I
6    spent on it.
7    Q.  Okay.  Would you say that it was something that
8        you paid attention to, Project eLMO?
9    A.  Absolutely.
10   Q.  It was important to your business?
11   A.  It was important because, again as I said, if we
12       didn't raise our voice strong enough we would
13       get a symptom that wouldn't allow us to be able
14       to look at the level of detail of business that
15       we needed to run our business, so we had to be
16       pretty diligent about trying to make sure that
17       my team, who was much more informed, had a
18       senior person there to champion their issues and
19       concerns.
20   Q.  Okay.  Now, you've mentioned a couple of times
21       "issues and concerns".
22           Will you tell me just in a little more
23       detail what specifically some of those were?
24   A.  Sure.  If you think about how an apparel
25       business runs versus hardlines, there's a lot

| Page 13 |
| --- |

1    more complexity for tracking product.  For
2    instance, there's seasonality, there's color,
3    there's fabric, there's silhouette.  All of
4    those things, different than if I'm buying -- if
5    I'm the Coke buyer, I only have one flavor, I
6    only have one size, and I don't have the
7    seasonality, so how you manage this versus all
8    those other level of details for softlines, two
9    very different ways to manage the business, so
10   if the business -- if the system didn't give me
11   that level of detail, I wouldn't be able to run
12   my business.
13   Q.  Okay.  So I -- I don't work in retail, so my
14       knowledge is somewhat less than yours --
15   A.  Right.
16   Q.  -- so the next question might sound kind of
17       basic, but when you said if the system doesn't
18       give you "that kind of detail."  I'd like to get
19       a more basic understanding of --
20   A.  Sure.
21   Q.  -- what that means for someone who's not
22       immersed in the retail business.
23   A.  Sure.  If I'm buying -- if I'm a buyer and I'm
24       buying knit tops, you'd want to know short
25       sleeve knit tops, from long sleeve knit tops,

Alderson Reporting Company
1-800-FOR-DEPO

Lorna E. Nagler                                                    April 18, 2008

Minneapolis, MN

Page 14

1    solid, print, pattern, cotton, knit top, so all
2    those variables are important, because when you
3    mark down a short sleeve top is different than
4    when you mark down a long sleeve top, based on
5    climate, so if you only got it at the knit top
6    level, you wouldn't be able to make a right
7    business decision.
8    Q.  Okay.  So am I correct in understanding that the
9    focus of your answer is on the sorts of reports
10   that you were getting or you would be getting
11   after the eLMO conversion?
12   A.  Yes.  And how you'd be able to see those reports
13   on a daily basis.  Sales, inventory, in
14   performance, you know, of your inventory levels.
15   Q.  Okay.  Now, did Project eLMO to your knowledge
16   have any impact on how Kmart paid your vendors?
17   A.  My recollection is it had nothing to do with
18   anything with the payment; all about the
19   reporting of the business.
20   Q.  I'm going to focus the next series of questions
21   really on the second half of 2001, and
22   particularly the third quarter of 2001.
23       During that time period, were you aware of
24   any problems with the Project eLMO
25   implementation that prevented Kmart from paying

Page 15

1    its invoices on time?
2    A.  No.
3    Q.  If a problem like that had come up that affected
4    softline vendors, is that the kind of thing that
5    would have been brought to your attention?
6    A.  Absolutely.
7    Q.  And had that come up and been brought to your
8    attention, what sorts of actions would you have
9    taken?
10   A.  Well, certainly, you know, payment of vendors is
11   real critical for the life blood of having
12   product come in, so my -- my concern on eLMO was
13   all about making sure I had the right reporting,
14   but certainly sensitivity to vendors being paid
15   is a critical issue, absolutely.
16   Q.  Were you aware of any problem, still during the
17   same time period, the second half of 2001, any
18   problem with the Project eLMO implementation
19   that created a backlog of 750,000 invoices that
20   couldn't be paid on time?
21   A.  Not connected to eLMO.  There were certainly
22   issues with product -- with invoices not being
23   paid.
24   Q.  But were you aware of any problem like that that
25   was triggered by anything relating to Project

Page 16

1    eLMO?
2    A.  No.
3    Q.  And again, had something like that happened,
4    would it have been brought to your attention?
5    A.  Absolutely.
6    Q.  And would you still remember it today if that
7    had happened?
8    A.  I believe I would.  It's pretty critical.  If
9    vendors aren't being paid and it was connected
10   to that system, I believe I would have
11   remembered it.
12   Q.  Are you aware of any problem with Project eLMO
13   that forced Kmart to work through a manual
14   process to release inaccurately termed invoices?
15   A.  Not in regards to eLMO, no.  I have no
16   recollection of that.
17   Q.  Is that the sort of thing that likely would have
18   been brought to your attention?
19   A.  Again, payment of vendors, you know, in a retail
20   business, if your suppliers aren't getting paid
21   it's going to come to my attention pretty darn
22   quickly.
23   Q.  In the second half of 2001, did you ever discuss
24   any concerns you had with -- any concerns you
25   had about Project eLMO with Kmart's CEO, Charles

Page 17

1    Conaway?
2    A.  Yes.
3    Q.  And what were those discussions about?
4    A.  Again, reinforcing what I've just told you
5    earlier about my concern that we were not going
6    to get the reporting for me to run my business
7    on a day-to-day basis and that I needed some
8    help and support to make sure that the things
9    that my team is asking for were put into the
10   system.
11   Q.  And how did those issues get resolved, if they
12   did?
13   A.  You know, we continued to work through, and I'm
14   pretty tenacious, so, you know, I kept
15   championing things and, you know, were stubborn
16   to say we were not going to compromise on the
17   things that we felt were critical to get out of
18   the system.
19   Q.  Now, the conversations that you had with Mr.
20   Conaway during this time period, did any of them
21   relate to problems around Project eLMO making it
22   difficult for Kmart to pay its vendors on time?
23   A.  I have no recollection of ever having that kind
24   of conversation with Chuck.
25   Q.  If you had had a conversation along those lines,

5 (Pages 14 to 17)

Alderson Reporting Company
1-800-FOR-DEPO

Lorna E. Nagler                                                        April 18, 2008
Minneapolis, MN

Page 18

1     is that a conversation you would have recalled?
2   A. Yes.  I did talk to him about eLMO, but not in
3     that regard.
4   Q. So did you ever tell -- did you ever tell
5     Mr. Conaway in words or substance that Project
6     eLMO was preventing Kmart from paying vendor
7     invoices on time?
8   A. No.
9   Q. Did you ever tell Mr. Conaway during this time
10    period that Project eLMO had created a backlog
11    of invoices that had to be processed manually?
12  A. No.
13  Q. Did you ever tell Mr. Conaway in words or
14    substance that Blue Light Always and the launch
15    of Blue Light Always for your side of the
16    business was in jeopardy because the eLMO
17    project made you unable to process invoices for
18    vendors?
19  A. Again, no.
20  Q. Is there any doubt in your mind about whether
21    you said that to Mr. Conaway?
22  A. No doubt.
23  Q. Did you ever tell Mr. Conaway in words or
24    substance that your support of Blue Light Always
25    and the launch of Blue Light Always on your part

Page 19

1     of the business was in jeopardy if Kmart did not
2     get the eLMO system integration issues
3     corrected?
4   A. No.
5   Q. Did you ever tell Mr. Conaway in words or
6     substance that you could not process invoices
7     because of Project eLMO?
8   A. No.
9   Q. Is there any question in your mind about whether
10    you said that to Mr. Conaway?
11  A. No.
12  Q. Are you familiar with the expression "payment
13    terms" to vendors?
14  A. Yes.
15  Q. And what is -- walk me through, just describe
16    the concept.  Payment terms, what are they?
17  A. Well, how many days, dating, what kind of -- any
18    discounts.  In my business, I had letters of
19    credit or 30-60 days terms.
20  Q. So for softline vendors, was there a standard or
21    a typical set of payment terms for softline
22    vendors?
23  A. It depended who -- we did a lot of private
24    label, which would have been done on our own
25    letter of credit.  We had branded vendors, like

Page 20

1     a Hanes or Wrangler Jeans that had much shorter,
2     like 30 days, but the majority of softline
3     vendors were 60-day payments terms as the
4     majority.
5   Q. Now, when Project eLMO was implemented, were
6     there any systematic changes in softline vendor
7     payment terms that came about as a result of
8     Project eLMO?
9   A. No.
10  Q. If that sort of thing had been part of Project
11    eLMO, is that the kind of thing that would have
12    been brought to your attention?
13  A. I mean, payment terms are set.  You know.  You
14    wouldn't have changed payment terms because of a
15    system.  Payment terms are negotiated and I
16    don't have any recollection that eLMO had
17    anything to do with changing payment terms for
18    vendors.
19       MR. DODGE:  Those are all my questions.
20    Thank you.
21       Do you want to take a short break to get
22    yourself organized or are you okay?
23       MR. LASSAR:  I don't think we need to,
24    do you?
25             EXAMINATION

Page 21

1   BY MR. LASSAR:
2   Q. Ms. Nagler, I'm Scott Lassar and I represent
3     Chuck Conaway.  I want to follow-up with a few
4     questions about Project eLMO.
5       Were you involved in discussions regarding
6     the designing of the project?
7   A. What do you mean by "design"?
8   Q. Well, before the project was implemented to
9     decide how it was going to be carried out.
10  A. I would answer that and say the criteria of what
11    we were looking for, that's not the design, but
12    what do I need from a business standpoint?  We
13    were able to -- you know.  I was part, with my
14    team, to say what do we need from the system?
15  Q. I'm going to show you a document which we've
16    marked as Defendant's Exhibit 76, which is
17    stamped on the bottom SEC 874082 through 3992,
18    and do you recognize this document?
19  A. I'm sorry.  What page am I looking at?
20  Q. At the front.  Well, you can look at any page,
21    but starting with the front.
22  A. The front --
23       MR. CARTER:  Why don't you just page
24    through the whole document?
25       THE WITNESS:  Okay.

6 (Pages 18 to 21)