## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 05-40263 |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE STEVEN |
| CHARLES C. CONAWAY and JOHN T. McDONALD, JR., | ) ) | D. PEPE |
| | ) | |
| Defendants. | ) | |

_____

## DEFENDANT CHARLES C. CONAWAY'S MEMORANDUM IN OPPOSITION TO THE SECURITIES AND EXCHANGE COMMISSION'S <u>REQUEST FOR REMEDIES</u>

Scott R. Lassar (Admitted, E.D. Mich.)
Hille R. Sheppard (Admitted, E.D. Mich.)
Melanie E. Walker (Admitted, E.D. Mich.)
SIDLEY AUSTIN LLP
One Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

*Attorneys for Defendant Charles C. Conaway*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

CONCISE STATEMENT OF ISSUES PRESENTED .......................... vii

MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT ......................... ix

INTRODUCTION .............................................................................1

ARGUMENT ....................................................................................2

I.    DISGORGEMENT IS NOT APPROPRIATE BECAUSE MR.
CONAWAY DID NOT OBTAIN ANY "ILL-GOTTEN GAINS." ...............3

    A.    Mr. Conaway's Retention Loan Was Not An "Ill-Gotten Gain"
As A Matter Of Law .................................................................3

        1.    Mr. Conaway's receipt of the loan was not causally related
to the fraud. ...............................................................3

        2.    Mr. Conaway never received the tax gross-up and therefore
it cannot be disgorged as an "ill-gotten gain." .........................11

    B.    Kmart Could Not Have Fired Mr. Conaway For Cause And
Deprived Him Of The Retention Loan .................................................12

        1.    Kmart could not have fired Mr. Conaway for Cause:  that
issue was previously litigated in the Kmart Creditor Trust
arbitration and resolved in Mr. Conaway's favor. ....................12

        2.    Mr. Conaway's retention loan was forgiven automatically
as a matter of contract. ................................................16

        3.    Kmart expressly waived any right it had to fire
Mr. Conaway for Cause. ...............................................17

    C.    The SEC Cannot Prove That The Board "Would Have" Fired
Mr. Conaway For Cause ..............................................................21

i

D.  The SEC's Request For Prejudgment Interest Should Be Denied...................................................................................24

II.  THE SEC'S REQUEST FOR AN INJUNCTION SHOULD BE DENIED. .........................................................................24

A.  The Violation Was Not Egregious. ...................................26

B.  The Violation Was Isolated. .............................................33

C.  Mr. Conaway Acted At Most Recklessly, Not With A High Degree Of Scienter. ..............................................35

D.  Mr. Conaway Will Not Engage In Future Violations. .......37

E.  Mr. Conaway Is Not Required To Admit Wrongdoing. ....45

F.  Mr. Conaway's Current Employment, Age, And Health Do Not Support An Injunction. ...............................................47

III.  THE SEC'S REQUEST FOR AN OFFICER AND DIRECTOR BAR SHOULD BE DENIED. ..............................................49

IV.  THE SEC'S REQUEST FOR AN $8.9 MILLION PENALTY IS GROSSLY OUT OF LINE AND SHOULD BE DENIED. .........53

CONCLUSION ....................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aaron v. SEC,*
446 U.S. 680 (1980)..................................................................25

*Allstate Ins. Co v. Receivable Fin. Co. LLC,*
501 F.3d 398 (5th Cir. 2007) ................................................4, 20

*Analytical Surveys, Inc. v. Tonga Partners, L.P.,*
2008 U.S. Dist. LEXIS 75459 (S.D.N.Y. Sept. 29, 2008) ...........24

*Bates v. Township of Van Buren,*
459 F.3d 731 (6th Cir. 2006) .......................................................15

*Central Transport, Inc. v. Four Phase Sys., Inc.,*
936 F.2d 256 (6th Cir. 1991) .......................................................15

*Doe v. Nebraska,*
345 F.3d 593 (8th Cir. 2003) .......................................................20

*Matter of L&S Indus., Inc.,*
989 F.2d 929 (7th Cir. 1993) .......................................................15

*SEC v. Blatt,*
583 F.2d 1325 (5th Cir. 1978) .......................................................4

*SEC v. Caterinicchia,*
613 F.2d 102 (5th Cir. 1980) .......................................................48

*SEC v. Church Extension of the Church of God, Inc.,*
429 F. Supp. 2d 1045 (S.D. Ind. 2005).......................................10

*SEC v. Cohen,*
2007 WL 1192438 (E.D. Mo. April 19, 2007)...........................5, 9

*SEC v. Commonwealth Chem. Secs., Inc.*,
    574 F.2d 90 (2d Cir. 1978) ............................................................................25

*SEC v. Dibella*,
    2008 U.S. Dist. LEXIS 109378 (D. Conn. Mar. 13, 2008) ..............28, 34, 53

*SEC v. First City Fin. Corp., Ltd.*,
    890 F.2d 1215 (D.C. Cir. 1989) ............................................................3, 4, 12

*SEC v. First Pacific Bancorp*,
    142 F.3d 1186 (9th Cir. 1998) ....................................................................10

*SEC v. Freiberg*,
    2007 U.S. Dist. LEXIS 67900 (D. Utah Sept. 12,  2007) ......................35, 49

*SEC v. Freeman*,
    290 F. Supp. 2d 401 (S.D.N.Y. 2003) ........................................................34

*SEC v. Ingoldsby*,
    1990 U.S. Dist. LEXIS 11383 (D. Mass. May 15, 1990)......24, 35, 39, 45, 48

*SEC v. John Adams Trust Corp.*,
    697 F. Supp. 573 (D. Mass. 1988)..............................................................25

*SEC v. Johnson*,
    595 F. Supp. 2d 40 (D.D.C. 2009)...................................................34, 45, 55

*SEC v. Jones*,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007) ........................................................5, 9

*SEC v. Koenig*,
    532 F. Supp. 2d 987 (N.D. Ill. 2007).........................................................3, 56

*SEC v. MacDonald*,
    699 F.2d 47 (1st Cir. 1983)............................................................................4

*SEC v. McCaskey*,
    2001 U.S. Dist. LEXIS 13571 (S.D.N.Y. Sept. 6, 2001) ..............................35

*SEC v. Nat'l Student Marketing Corp.*,
    457 F. Supp. 682 (D.D.C. 1978)................................................................48, 49

*SEC v. Opulentica, LLC*,
    479 F. Supp. 2d 319 (S.D.N.Y. 2007) ............................................................4

*SEC v. Pardue*,
    367 F. Supp. 2d 773 (E.D. Pa. 2005)............................................................53

*SEC v. Patel*,
    61 F.3d 137 (2d Cir. 1995) ..........................................................................50

*SEC v. Quinlan*,
    2008 U.S. Dist. LEXIS 95789 (E.D. Mich. Nov. 7, 2008)....................25, 49

*SEC v. Ramoil Mgmt. Ltd.*,
    2007 U.S. Dist. LEXIS 79581 (S.D.N.Y. Oct. 25, 2007)............................56

*SEC v. Resnick*,
    604 F. Supp. 2d 773 (D. Md. 2009)................................................5, 7, 8, 20

*SEC v. Sargent*,
    329 F.3d 34 (1st Cir. 2003)..........................................................................24

*SEC v. Savino*,
    2006 WL 375074 (S.D.N.Y. Feb. 16, 2006) .............................................8, 9

*SEC v. Shah*,
    1993 U.S. Dist. LEXIS 10347 (S.D.N.Y. July 28, 1993)............................53

*SEC v. Snyder*,
    2006 U.S. Dist. LEXIS 81830 (S.D. Tex. Aug. 22, 2006).................... *passim*

*SEC v. Stanard*,
    2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009)...................52, 55, 56

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992)................................................................24, 25

*SEC v. Svoboda*,
    409 F. Supp. 2d 331 (S.D.N.Y. 2006) ........................................................35

*SEC v. The Better Life Club of Am., Inc.*,
    995 F. Supp. 167 (D.D.C. 1998)..............................................................3, 4

*SEC v. Todd*,
    2007 WL 1574756 (S.D. Cal. May 30, 2007) .................................4, 8, 45, 46

*SEC v. Youmans*,
    729 F.2d 413 (6th Cir. 1984) .................................................................25, 26

*SEC v. Yun*,
    148 F. Supp. 2d 1287 (M.D. Fla. 2001) ..................................................25, 48

## STATUTES AND REGULATIONS

15 U.S.C. § 77t(e) ....................................................................................49

15 U.S.C. § 78u(d)(2)................................................................................49

15 U.S.C. § 78u(d)(3)(B)(i) .......................................................................54

15 U.S.C. § 78u(d)(3)(B)(ii) ......................................................................54

15 U.S.C. § 78u(d)(3)(B)(iii) .....................................................................54

17 C.F.R. § 201.1002 ................................................................................54

17 C.F.R. § 229.401(f)(3) ..........................................................................25

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.  Whether the SEC's request for disgorgement of Mr. Conaway's retention loan should be denied where the loan was not an "ill-gotten gain" because:  (a) Mr. Conaway did not profit from the fraud and never received the tax gross-up on the loan; (b) contrary to the SEC's theory, Kmart could not have fired Mr. Conaway for Cause and deprived him of the retention loan because (i) in the Kmart Creditor Trust arbitration it was conclusively determined that there were no grounds to fire Mr. Conaway for Cause, (ii) the loan was automatically forgiven by operation of contract, and (iii) in the Separation Agreement Kmart gave up the right to fire Mr. Conaway for Cause; and (c) the SEC cannot sustain its burden of proving that Kmart would have fired Mr. Conaway for Cause.

2.  Whether the SEC's request for a permanent injunction should be denied where there is not a substantial likelihood that Mr. Conaway will engage in securities fraud in the future.

3.  Whether the SEC's request for a permanent officer and director bar should be denied where the SEC cannot show that Mr. Conaway is substantially unfit ever to serve as an officer or director of a public company.

4.  Whether the SEC's request for a $8.9 million penalty should be denied where Mr. Conaway did not obtain any ill-gotten gains from the fraud.  If the Court

should decide to impose a penalty, whether it should impose a penalty under Tier 2 rather than Tier 3 because the violation did not result in a significant risk of substantial losses to investors because there is no link between the fraud and Kmart's bankruptcy.

## <u>MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

*SEC v. Cohen*, 2007 WL 1192438 (E.D. Mo. April 19, 2007)

*SEC v. Dibella*, 2008 U.S. Dist. LEXIS 109378 (D. Conn. Mar. 13, 2008)

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989)

*SEC v. Ingoldsby*, 1990 U.S. Dist. LEXIS 11383 (D. Mass. May 15, 1990)

*SEC v. Johnson*, 595 F. Supp. 2d 40 (D.D.C. 2009)

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007)

*SEC v. Resnick*, 604 F. Supp. 2d 773 (D. Md. 2009)

*SEC v. Snyder*, 2006 U.S. Dist. LEXIS 81830 (S.D. Tex. Aug. 22, 2006)

*SEC v. Stanard*, 2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009)

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992)

*SEC v. Todd*, 2007 WL 1574756 (S.D. Cal. May 30, 2007)

*SEC v. Youmans*, 729 F.2d 413 (6th Cir. 1984)

## <u>INTRODUCTION</u>

The SEC asks that Mr. Conaway pay $22.5 million in disgorgement and fines in a case in which there is no accounting fraud, no one raised disclosure issues with Mr. Conaway, scienter is weak at best, and there are no ill-gotten gains. Not one nickel of Mr. Conaway's compensation was tied in any way to the alleged disclosure violations on November 27, 2001.

The SEC's attempt to characterize Mr. Conaway's retention loan as profit of securities fraud is so baseless and punitive that it constitutes prosecutorial misconduct.  Mr. Conaway received his retention loan before any of the events in this case occurred, and would have kept it even if none of the events had occurred. The retention loan was not profit of a fraud and thus cannot be the basis for disgorgement.

The SEC's abusive position is exacerbated by its incorrect and irresponsible assertion that Mr. Conaway was paid $3,885,003 in a tax gross-up on his retention loan, when exhibits that the SEC attaches to its own brief prove that Mr. Conaway never received any such payment.

Not finished, the SEC requests that the $8.9 million in "ill-gotten gains" be doubled as the amount of the fine, which otherwise would be a maximum of $120,000.  In fact, even that maximum penalty should not apply here.

The SEC's requests for a permanent injunction and a permanent officer and director bar also overreach.  Despite the SEC's efforts to portray this as a clear-cut case of securities fraud committed over a period of "four months," the jury found Mr. Conaway liable only for an isolated violation involving statements made on a single day with no corresponding financial statement fraud.  The SEC's evidence of Mr. Conaway's culpability was thin.  In order to obtain the injunctive relief it seeks, the SEC has the burden of proving – not just asserting through hyperbole and rhetoric – that there is a substantial likelihood that Mr. Conaway will violate the securities laws in the future.  The SEC cannot meet that burden:  far from being a substantial likelihood, there is no likelihood that Mr. Conaway will violate the securities laws in the future.

Given the weakness of its position, the SEC attempts to inflame this Court by repeated assertions that Mr. Conaway's conduct led to Kmart's bankruptcy.  Mr. Conaway will prove at the hearing that there is no link whatsoever.

The SEC's requested remedies should be denied.

## **ARGUMENT**

The SEC bears the burden of proving, by a preponderance of the evidence, that it is entitled to its requested remedies.  (SEC Br. (Dkt. 150) at 10.)  In determining whether the SEC has met its burden, the Court is bound by the jury's

2

verdict, but must make its own findings of fact on questions not resolved by the

jury.  *See, e.g.*, *SEC v. Koenig*, 532 F. Supp. 2d 987, 990, 992-93 (N.D. Ill. 2007)

(issuing findings of fact as to remedies).[1]

## I.   DISGORGEMENT IS NOT APPROPRIATE BECAUSE MR. CONAWAY DID NOT OBTAIN ANY "ILL-GOTTEN GAINS."

### A.   Mr. Conaway's Retention Loan Was Not An "Ill-Gotten Gain" As A Matter Of Law.

#### 1.   Mr. Conaway's receipt of the loan was not causally related to the fraud.

Disgorgement is improper and must not be ordered where the SEC fails to

establish that the funds it seeks to have disgorged were "causally related" to the

fraud at issue.  That is because disgorgement is a remedial measure – not a punitive

one.  *See, e.g.*, *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir.

1989) ("disgorgement may not be used punitively").  Accordingly, compensation

cannot be disgorged solely because the defendant violated the securities laws, or

because he made poor business decisions, or even because he breached his

fiduciary duties to the company.  "Because disgorgement is so specifically aimed

at ill-gotten profits, it is only to be exercised over property 'causally related to the

wrongdoing.'"  *SEC v. The Better Life Club of Am., Inc.*, 995 F. Supp. 167, 179

---

[1] Mr. Conaway's renewed motion for judgment as a matter of law and for a new trial is still pending.  For purposes of this memorandum, we assume a violation.

(D.D.C. 1998); *see also Allstate Ins. Co v. Receivable Fin. Co. LLC*, 501 F.3d 398, 413 (5th Cir. 2007) ("Because disgorgement is meant to be remedial and not punitive, it is limited to property causally related to the wrongdoing at issue."); *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983) (disgorgment can be ordered only for "profits and interest wrongfully obtained"); *SEC v. Todd*, 2007 WL 1574756, *18 (S.D. Cal. May 30, 2007) ("Disgorgement is intended to force a defendant to surrender his unjust enrichment.  It is not a punitive remedy."). Requiring disgorgement of any funds to which the defendant would be entitled irrespective of the fraud is punitive, and thus not properly the subject of a disgorgement order.  *See SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) ("Disgorgement is remedial and not punitive.  The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.  Any further sum would constitute a penalty assessment.").

The burden of establishing that funds sought to be disgorged derive from a securities violation rests squarely on the SEC.  *See First City*, 890 F.2d at 1232; *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007).  In its brief, the SEC asserts that "[a]ll doubts concerning the determination of disgorgement are to be resolved against the defrauding party."  (SEC Br. at 16.)  That assertion

elides a critical distinction:  Although the SEC need prove only a "reasonable

approximation" of the *amount* of a defendant's ill-gotten gains, any failure by the

SEC to prove the *existence* of ill-gotten gains causally related to the fraud is fatal

to its disgorgement claim.  *See, e.g.*, *SEC v. Jones*, 476 F. Supp. 2d 374, 386

(S.D.N.Y. 2007) (disgorgement would not be awarded where "the Commission

[was] unable to set forth any evidence of specific profits subject to disgorgement");

*SEC v. Resnick*, 604 F. Supp. 2d 773, 783 (D. Md. 2009) (denying disgorgement

where evidence was insufficient to demonstrate that defendant's salary was

causally related to unlawful conduct); *SEC v. Cohen*, 2007 WL 1192438, *21 (E.D.

Mo. April 19, 2007) (no disgorgement where the SEC had "not shown that

defendant obtained any ill-gotten gains or unjust enrichment from his actions").

    The SEC seeks to have Mr. Conaway's $5 million retention loan disgorged

as "ill-gotten gains."  The SEC has not – and cannot – establish, however, that Mr.

Conaway's receipt of his retention loan was in any way causally related to the

statements and omissions made on November 27, 2001.  To the contrary, the

retention loan was a component of Mr. Conaway's bargained-for compensation,

and was akin to salary.  The retention loan was granted to Mr. Conaway in May

2001 when his employment agreement was amended to ensure that he was made

whole for what he left on the table when he left his very lucrative position at CVS

to become CEO of Kmart.  (Arbitration Op. at 19-20 (Ex. 1).)  Mr. Conaway was

entitled to keep the retention loan provided he stayed at Kmart for a prescribed

period, or if any of a number of other circumstances occurred, such as if Mr.

Conaway was demoted.  (Amended Employment Agreement, ¶ 2 (Ex. C to SEC

Br.); Employment Agreement, ¶ 11 (Ex. B to SEC Br.).)  In such circumstances,

the loan was to be "forgiven in full" "automatically and without further action on

the part of the Company or the Executive."  (Amended Employment Agreement,

¶ 2.)  Critically, forgiveness of the retention loan was not contingent on any

benchmarks, including the things the SEC contends Mr. Conaway concealed on

November 27 – that is, Kmart's liquidity situation, the timeliness of its vendor

payments, and that its inventory purchases had deviated from plan.  The loan

would have been automatically forgiven by its terms regardless of whether Mr.

Conaway engaged in the fraud for which the jury found him liable.

Unable to link the retention loan to any aspect of the asserted securities

fraud, the SEC appears to argue that, had the Kmart Board known what Mr.

Conaway was doing, the Board might have punished him by making him pay back

the retention loan to which he was entitled.[2]  (SEC Br. at 18.)  Of course this does

---

[2] The SEC does not argue that Mr. Conaway should have been fired for Cause
because he committed securities fraud on November 27, 2001.  The SEC
presumably does not do so because the law is clear that disgorgement is available

not make the retention loan profit of a fraud.  Indeed, the SEC does not cite a

single case supporting disgorgement under these circumstances.  This is not

surprising, as the SEC's theory flies in the face of a long line of cases rejecting the

very argument the SEC makes here, and holding that contractually guaranteed

compensation, not contingent on any measure associated with securities fraud, is

not "ill-gotten" and thus cannot be subject to disgorgement.[3]

In *SEC v. Resnick*, 604 F. Supp. 2d 773 (D. Md. 2009), for example, the

SEC sought an order of disgorgement of a corporate officer's bonuses and salary

after the officer was found "to have participated in a fraudulent scheme to inflate

and overstate the financial results" of his employer.  *Id.* at 776.  The court found

disgorgement of the bonus appropriate because payment of the bonus was directly

based on the company's inflated earnings.  *Id.* at 783.  That was not true of the

---

only for profits that a defendant *obtains by virtue of having committed fraud*, as
when a defendant cooks the books and thus triggers a bigger bonus for himself, or
steals funds through a Ponzi scheme.  Disgorgement may not be had for funds –
such as Mr. Conaway's retention loan – that were not obtained by fraud.  That
someone might later have sought to *deprive* a defendant of those funds as a penalty
for having committed fraud does not support disgorgement.

[3] Notably, when the SEC settled with Mr. McDonald, it did not require
disgorgement of Mr. McDonald's retention loan, which was first awarded to him
on December 3, 2001, and then increased on January 15, 2002. (*See* Pl. Ex. 202
(attached as Ex. 2); Pl. Ex. 203 (attached as Ex. 3).)  This further underscores that
the SEC has concocted the theory that Mr. Conaway's retention loan was ill-gotten
when it plainly was not.

7

annual salary, however, which was "ordinarily" paid each year without regard to the company's earnings. *Id.* The court explained that "it is reasonable to assume that [the defendant] performed various functions of value to the company other than the fraudulent activities which inflated earnings." *Id.* In such circumstances, the salary was not "causally linked to his unlawful conduct," and thus could not be ordered disgorged. *Id.*

Salary also was found not to be subject to disgorgement in *SEC v. Todd*, 2007 WL 1574756 (S.D. Cal. May 30, 2007). In that case, the court recognized that, like Mr. Conaway, "Defendants did not profit from the reporting and books and records violations. They did not cash in stock options, nor otherwise exploit this supposed scheme." *Id.* at *18. Accordingly, the court found that the SEC's claim "lacks the requisite nexus between the supposed ill-gotten gains and the requested disgorgement. The SEC's position that Defendants should give up their salaries for the time at issue is untenable – it is basically a statement that because of several business decisions or errors, nothing else they did during that period matters. This is punitive." *Id.*

Likewise, the court in *SEC v. Savino*, 2006 WL 375074 (S.D.N.Y. Feb. 16, 2006), rejected the SEC's claim to disgorgement of a contractually guaranteed salary for the same reasons: "Because Savino's guaranteed salaried payment of

$750,000 in 1998 was not in fact commissions generated by the fraud, … this Court will not order disgorgement of his 1998 salary." *Id*. at *17; *see also SEC v. Cohen*, 2007 WL 1192438, *21 (E.D. Mo. Apr. 19, 2007) ("The SEC has not shown that defendant obtained any ill-gotten gains or unjust enrichment from his actions of falsifying the books and records concerning the Kaiser and Cuyahoga transactions.  Furthermore, the Court is not persuaded that defendant benefited through bonuses, salary, or stock sales….").

Similarly, in *SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007), the court found that the SEC's claim to disgorgement of the defendants' employment compensation could not survive summary judgment because the SEC had failed to establish that the compensation was causally related to the asserted fraud.  *Id*. at 386.  The *Jones* court expressly rejected the SEC's argument that the disgorgement claim could be maintained based on the same "evidence" on which the SEC seeks to rely in this case:  that the defendants' compensation "might have been affected" by the asserted securities fraud.  *Id.*; *compare* SEC Br. at 18 (asserting that Mr. Conaway "would likely have been terminated for cause" had he disclosed Project SID).

Because the retention loan constituted payment for services undisputedly performed by Mr. Conaway under his employment agreement with Kmart, there is

simply no causal relation between the loan and the asserted fraud.  In denying Mr.

Conaway's motion for summary judgment on the issue of disgorgement, this Court

surmised that, "had the stretching of vendors been disclosed or had it not occurred,

Kmart might have been forced into bankruptcy earlier and Defendants' tenure with

the corporation shortened substantially."  (R.86, 03/31/09 Mem. Op. at 41.)  The

SEC does not contend, however, that the fraud on November 27, 2001 artificially

prolonged Kmart's life.  Moreover, unlike the companies in the cases cited by the

Court, Kmart did not cease operations when it filed for bankruptcy, nor did the

bankruptcy mark the end of Mr. Conaway's employment.  Accordingly, the cases

relied on by the Court at the summary judgment stage are inapposite.  *See SEC v.*

*First Pacific Bancorp*, 142 F.3d 1186, 1992 (9th Cir. 1998) (affirming

disgorgement of compensation where "[t]he infusion of capital from the [securities

fraud] put off a bank failure and enabled the Bank to remain in operation for two

and a half more years.  During that time, [the defendant] engaged in what the

district court's findings characterized as 'milking the asset,' by paying himself

hundreds of thousands of dollars in salaries, commissions, and consulting,

management and legal fees"); *SEC v. Church Extension of the Church of God, Inc.*,

429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005) (ordering disgorgement of half of

defendants' salaries where "but for the securities violations, [the business] would

have collapsed earlier, so the violations enabled the defendants to continue their employment").

The SEC's speculative theory of disgorgement is unprecedented and contrary to law. Indeed, it is an obvious attempt to punish Mr. Conaway not because he benefited from fraud, but because the SEC believes he was paid too much for his time at Kmart. (*See* SEC Br. at 1.) It must be denied.

### 2. Mr. Conaway never received the tax gross-up and therefore it cannot be disgorged as an "ill-gotten gain."

The SEC also seeks disgorgement of a supposed $3.9 million tax gross-up on Mr. Conaway's retention loan. However, contrary to the SEC's repeated assertion, Mr. Conaway never received the tax gross-up, as the documents attached to the SEC's own brief plainly show. In the Separation Agreement, Kmart agreed to pay Mr. Conaway $3,885,003 to cover all taxes payable on account of the forgiveness of the loan. (Ex. D to SEC Br. at § 4(a).) That portion of the agreement, however, was subject to approval by the Bankruptcy Court. (*Id.* at § 17.) Kmart never sought Bankruptcy Court approval to pay the tax gross-up and never in fact paid it. (*See* Ex. H to SEC's Br; *see also* Ex. F to SEC's Br.)[4]

Indeed, the 2002 Form 10-K attached to the SEC's brief clearly establishes that, in

---

[4] As a result, Mr. Conaway did not actually receive $5 million. After taxes, he received $2,561,007.

2002, Mr. Conaway received only the salary he earned prior to his separation, the $5 million retention loan, and the $4,039,709 severance payment.  There is no mention of an additional $3,885,003 payment.  (Ex. A to SEC. Br. at 4.)

Mr. Conaway obviously cannot be ordered to disgorge as an "ill-gotten gain" a payment he never received.  To do so would be purely punitive and contrary to law.  *See First City*, 890 F.2d at 1231 ("disgorgement may not be used punitively").  The SEC's request for disgorgement of the tax gross-up constitutes either misconduct or recklessness and must be denied.

### B. Kmart Could Not Have Fired Mr. Conaway For Cause And Deprived Him Of The Retention Loan.

#### 1. Kmart could not have fired Mr. Conaway for Cause:  that issue was previously litigated in the Kmart Creditor Trust arbitration and resolved in Mr. Conaway's favor.

As explained in Part I.A, Mr. Conaway did not obtain any ill-gotten gains as a matter of law, and the SEC's request should be denied for that reason.  The SEC's theory is also barred for the independent reason that Kmart's Board could not have fired Mr. Conaway for Cause.  The SEC's disgorgement theory rests on its speculation that Kmart's Board would "likely" have terminated Mr. Conaway for Cause[5] had he not committed fraud on November 27.  But Kmart previously

---

[5] "Cause" was a defined term in Mr. Conaway's employment agreement.  Under that agreement, Mr. Conaway could only be fired "for Cause" if he was convicted

12

sought to terminate Mr. Conaway for Cause and was found not to have the right to do so.  In 2005, after a lengthy hearing involving 29 witnesses in which the inventory overbuy, Project SID, and Kmart's liquidity were squarely at issue, a panel of arbitrators issued a binding decision that Kmart had no right under the employment agreement to terminate Mr. Conaway for Cause because Mr. Conaway "acted at all times in good faith and in what he believed to be the best interests of Kmart."  (Ex. 1 at 9.)  The SEC may not now, in a truncated hearing with one witness, attempt to get around that binding decision.  Because Kmart already has been adjudicated to have had no right to terminate Mr. Conaway for Cause, the essential premise of the SEC's theory is fatally flawed.  The SEC's claim for disgorgement fails as a matter of law for this reason as well.

As part of its bankruptcy, Kmart assigned all of its causes of action against its former officers to the Kmart Creditor Trust, including any claim that Mr. Conaway should have been fired "for Cause."  The Trust filed an action against Mr. Conaway and several other former officers and Kmart's former auditor.  The claims against the individuals were sent to arbitration pursuant to their employment

---

of a felony or if he engaged in "conduct that constitutes willful gross neglect or willful gross misconduct in carrying out his duties under this Agreement, resulting, in either case, in material harm to the Company, unless the executive believed in good faith that such act or nonact was in or not opposed to the best interests of the Company."  (Employment Agreement at 1-2 (Ex. B to SEC Br.).)

contracts and divided into separate actions.  In the Trust's case against Mr. Conaway, the Trust argued, among other things, that Kmart had grounds to terminate Mr. Conaway for Cause and further that, as an equitable matter, he should not be allowed to keep his retention loan.  The Trust specifically argued that Mr. Conaway had concealed from the Board the inventory overbuy, Project SID, and the liquidity crunch in the third quarter of 2001.

The three member arbitration panel, chaired by the Honorable George C. Pratt, emphatically rejected the Trust's claims.  The panel found that Mr. Conaway "acted at all times in good faith and in what he believed to be the best interests of Kmart" (*id.* at 9), and that Mr. Conaway was fully entitled to forgiveness of the retention loan, which was "required" under his employment contract (*id.* at 21). Having heard testimony from Messrs. Stallkamp, Adamson, and a third Board member, Robert Kennedy, the panel further found that Mr. Conaway did not conceal relevant information from the Board of Directors.  (*Id.* at 18.)  Finally, the panel noted that Kmart chose not to try to fire Mr. Conaway for Cause, but rather gave up that right in the Separation Agreement that Kmart entered into with Mr. Conaway, which affirmatively stated that his employment was being terminated "without Cause" and which acknowledged forgiveness of the loan.  (*Id.* at 20-21.)

The arbitrators' judgment legally and finally determined – with full awareness of the overbuy, Project SID, and the liquidity crunch – that Mr. Conaway was not and could not have been terminated for Cause.  That finding followed zealous and thorough litigation of Kmart's claims by the Trust, which sought over $1.7 billion in damages.  (*Id*. at 2.)

The SEC's request for disgorgement of Mr. Conaway's retention loan is barred by that decision.  When a party's rights have already been adjudicated, the law does not permit those same rights to be re-adjudicated by another.  *See, e.g.*, *Matter of L&S Indus., Inc.*, 989 F.2d 929, 934 (7th Cir. 1993) (if the holder of a right asserts that right in litigation, "principles of preclusion would prevent [another] from subsequently asserting that same right"); *Bates v. Township of Van Buren*, 459 F.3d 731, 734 (6th Cir. 2006) (issue may not be relitigated where the later party is trying to assert "the same legal right" previously adjudicated) (applying Michigan law); *see also Central Transport, Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 259 (6th Cir. 1991) (arbitration decisions have preclusive effect). The SEC may not support its claim for disgorgement by relying on a purported right of Kmart to terminate Mr. Conaway for Cause that Kmart never had.  The disgorgement claim thus necessarily fails.

### 2. Mr. Conaway's retention loan was forgiven automatically as a matter of contract.

The SEC's theory fails for the additional reason that, even had Kmart sought to fire Mr. Conaway for Cause, it could not have deprived him of his retention loan. The Kmart Board replaced Mr. Conaway as Chairman of the Board on January 15, 2002, appointing Mr. Adamson to that position instead. That action constituted a loan forgiveness event under Mr. Conaway's employment agreement with Kmart, causing the loan to be automatically forgiven.[6] As a result, Mr. Conaway would have been entitled to keep the loan proceeds whether or not he

---

[6] Mr. Conaway's amended employment agreement, which set out the terms for his retention loan, states that he does not have to repay the loan and any accumulated interest in the case of a "Loan Forgiveness Event." (Amended Employment Agreement, §2(c) (Ex. C to SEC Br.).) Such an event is defined as a termination of employment that would cause Mr. Conaway's stock options to vest early. (*Id.*) Under his original employment agreement, if Mr. Conaway was constructively terminated, his stock options "at the time of termination [of employment] shall become fully vested." (Employment Agreement, §11(d)(ii)(H) (Ex. B to SEC Br.).) As a result, constructive termination was a "Loan Forgiveness Event" under Mr. Conaway's contract. The contract further defines "constructive termination" to include the removal of Mr. Conaway from his position as Chairman of the Board or Chief Executive Officer of Kmart. (*Id.*, §§1(g)(ii), 3(a).) Thus, when Mr. Conaway was replaced as Chairman on January 15, 2002, he was constructively terminated under his contract and his retention loan was automatically forgiven at that time. The arbitration panel found that this is exactly what had happened: "Conaway had clearly been subjected to a constructive termination, which by itself, under the original employment agreement, required forgiveness of the loan." (Ex. 1 at 21.)

16

was fired for Cause.  The loan forgiveness is not causally related to the fraud even under the SEC's convoluted theory of events.

### 3.    Kmart expressly waived any right it had to fire Mr. Conaway for Cause.

The SEC's claim further fails because Kmart gave up the right to terminate Mr. Conaway for Cause and expressly forgave the retention loan.  When Mr. Conaway resigned from Kmart in March 2002, he and Kmart entered into a Separation Agreement, which modified Mr. Conaway's original employment agreement.  In that Separation Agreement, both parties gave up rights and obtained benefits.  Among the provisions of the agreement, Kmart expressly waived any right to fire Mr. Conaway for Cause and expressly acknowledged forgiveness of the retention loan.  Kmart thereafter returned the promissory note marked "canceled."  (*See* Ex. E to SEC's Br.)  Mr. Conaway thus was entitled to keep the retention loan per his contract with Kmart.  Because Kmart gave up the right to fire Mr. Conaway for Cause in return for consideration, this also precludes the SEC from asserting now that the retention loan should be disgorged.

On March 11, 2002 – months after the Board had commenced the so-called "Accounting and Stewardship Investigation" into any possible improper conduct that may have been concealed from the Board or led to Kmart's bankruptcy – Kmart and Mr. Conaway negotiated and entered into the Separation Agreement.  In

that agreement, Kmart and Mr. Conaway "mutually agreed" to "fully set forth all of their respective rights and obligations upon and following the Executive's termination of employment from the Company."  (Separation Agreement, p. 1 (Ex. D to SEC Br.).)

In the Separation Agreement, Mr. Conaway agreed to release a number of claims he had against Kmart under his employment agreement.  (*Id*. at § 5(a).) Those relinquished claims included claims to money payments under the "buy-out provisions" of his original employment agreement, which were provided "in consideration of his substantial loss of compensation rights" from CVS. (Employment Agreement, § 10 (Ex. B to SEC Br.).)  In particular, the buy-out provisions gave Mr. Conaway a right to $2.5 million in four annual payments (*id.* at § 10(a)(ii)) and $4 million dollars in retention bonuses in four annual payments (*id.* at § 10(e)).  Mr. Conaway also relinquished claims to payments due because of his constructive termination when Mr. Adamson was appointed Chairman, namely a pro-rata bonus for the year he was terminated ($437,500) (*id.* at § 11(d)(ii)(C)) and a target bonus for three years (totaling $5,250,000) (*id.* at § 11(d)(ii)(D)).  In addition to giving up his monetary claims, which totaled more than $12 million, Mr. Conaway agreed to a one-year non-compete provision (*id.* at § 9(a)) and agreed to cooperate with Kmart's counsel in future litigation (*id.* at § 7).  Mr.

Conaway performed on these obligations, including by meeting with Kmart's counsel and testifying on Kmart's behalf.

In consideration for Mr. Conaway's substantial concessions, Kmart agreed to provide Mr. Conaway $4,039,708.93 in severance payments.  (*Id.* § 2(b).) Kmart also expressly agreed that Mr. Conaway had not been terminated for Cause. Instead, Kmart acknowledged that Mr. Conaway "ha[d] the right to terminate his employment in a 'Constructive Termination' under the 2000 Employment Agreement."  (*Id.* at  p. 1.)  The Agreement also expressly provided that, "as a result of the Executive's termination of employment with the Company, the outstanding principal and accrued interest [associated with the retention loan] has been forgiven," and the promissory note was returned to Mr. Conaway marked "cancelled."  (*Id.* at § 3.)  Kmart also agreed that the retention loan would be grossed up to cover Mr. Conaway's tax liability on the retention loan (*id.* at § 4(a)), although Kmart never performed on that obligation.

Mr. Conaway has performed his obligations under the Separation Agreement.  Kmart has thus received the benefit of its bargain with Mr. Conaway. Although the SEC attempts to evade the force of the contract with its assertion that, at the time the Separation Agreement was signed, "[t]he Board did not know that Conaway and his subordinates had instituted the Accounts Payable System

19

changes and Project SID," that assertion is beside the point.  (SEC Br. at 8.)  For one thing, it is incorrect:  the evidence demonstrates that the Board was fully aware of Project SID.  *See infra*, pp. 40-42.

More importantly, parties routinely enter into binding contracts with imperfect information precisely because they seek to have their rights and duties determined with certainty.  *See Doe v. Nebraska*, 345 F.3d 593, 603 (8th Cir. 2003) ("Contracting parties rarely, if ever, make their agreements with full knowledge of every relevant fact and every relevant consideration of law.  Instead, it is the office of the contract to allocate the risks of error between the parties.").  Here, the Board and Mr. Conaway did just that, expressly agreeing that the Separation Agreement would "fully set forth *all* of their respective rights and obligations."  (Separation Agreement, p. 1 (Ex. D to SEC Br.) (emphasis added).)

Because Kmart received substantial benefits from its agreement with Mr. Conaway, disgorgement of Mr. Conaway's benefits under the same agreement is improper.  *See, e.g.*, *Allstate Ins. Co. v. Receivable Finance Co., LLC*, 501 F.3d 398, 412 n.17 (5th Cir. 2007) (disgorgement is not an appropriate remedy where plaintiff "also received benefits from the settlements"); *Resnick*, 604 F. Supp. 2d at 783 (SEC not entitled to disgorgement of funds in exchange for which defendant had "performed various functions of value to the company").

### C.     The SEC Cannot Prove That The Board "Would Have" Fired Mr. Conaway For Cause.

The SEC's theory of disgorgement fails not only because Mr. Conaway's contractually guaranteed compensation was not "ill-gotten" as a matter of law, and because Kmart could not have fired Mr. Conaway for Cause.  It also fails as a matter of proof.  The SEC's theory that the Board would "likely" have fired Mr. Conaway for Cause is speculative and unsupported.  Not surprisingly, the SEC is unable to prove in its brief, and will be unable to prove through the testimony of a single Board member at the hearing, what the Kmart Creditor Trust was unable to prove in a lengthy arbitration:  that had Kmart's liquidity situation and the slow payment of vendors been disclosed on November 27, 2001, a majority of the Board would have voted to fire Mr. Conaway for Cause.  In this regard, it is important to keep in mind that the SEC has the burden of proof – $8.9 million in disgorgement cannot be awarded based on the unsupported speculation that *maybe* a majority of the members the Board would have voted to fire Mr. Conaway for Cause had Kmart made the disclosures the SEC contends it should have made.

Although this Court does not have the benefit of the full evidence adduced during the Kmart Creditor Trust arbitration, even the limited evidence adduced on this issue here tends to show just the opposite – that the Board would not have fired Mr. Conaway for Cause.  For one thing, on November 27, 2001, Kmart's

finances had settled.  Kmart had passed its peak borrowing date.  (Pl. Ex. 121.)  It had experienced a very good Thanksgiving sales weekend and was headed into its Christmas selling season.  (Ex. 4 at 94 (Tucker); Pl. Ex. 123.)  As of November 27, 2001, Kmart had $600 million available on its revolver and $400 million in cash on hand, which was a significant improvement from the end of the third quarter.  (Pl. Ex. 212.)  Kmart's best (most realistic) forecast was showing a $2 billion liquidity cushion by the end of December.[7]  (Ex. 5 at 211-12 (Tucker).)  In addition, all witnesses agree that Project SID was being wound down and would be concluded during the first week in December.  (Ex. 6 at 20-21, 39 (Gilbert); *id*. at 65, 72, 91 (Archambeau); Ex. 7 at 81 (Moreland).)  No one, at that time, expected Project SID ever to be restarted.  (Ex. 6 at 97-98 (Archambeau); Ex. 8 at 370 (Moreland).)  By all indications, on November 27, 2001, Kmart had weathered its third quarter liquidity crunch and was moving on with its business.  It is hard to believe that in the middle of a turnaround, with favorable projections for the future, Kmart would have taken the drastic step of firing its CEO.

Moreover, the Board members who have testified did not believe that Mr. Conaway's conduct met the definition of "for Cause."  Under his contract, Mr.

---

[7] Even though sales were off in December 2001, Kmart still achieved a $1 billion liquidity cushion by the end of that month.  (Ex. 5 at 212 (Tucker).)

Conaway *could not* be fired for "Cause" if he "believed in good faith that the act or nonact [for which the Board sought his termination] was in or not opposed to the best interests of the Company."  (Employment Agreement at 1-2 (Ex. B to SEC Br.).)  The two Board members who have offered opinions in this case have testified that Mr. Conaway always acted in the best interests of the Company.  Mr. Adamson agreed that "the decisions that [Mr. Conaway] made were made, as far as [he] could see, in the interests of Kmart and Kmart's shareholders."  (Ex. 9 at 108.)  Mr. Stallkamp likewise testified that he thought that Mr. Conaway believed his actions were in the best interests of the Company:

> Q.   Is it your view, though, that whether you agree or not with his decisions that every decision he made that Mr. Conaway made it because he thought it was in the best interests of Kmart?
>
> A.   Your questions relates to his intent you mean?
>
> Q.   Yes.
>
> A.   … I don't personally feel he did anything other than trying to pull out Kmart from the situation it was in.

 (Ex. 10 at 466-67.)  Where the only witness the SEC will put on in support of its disgorgement request has already said that Mr. Conaway was only trying to help the Company, the SEC has no ground to argue that the Board would have fired him for Cause.

**D.    The SEC's Request For Prejudgment Interest Should Be Denied.**

An assessment of prejudgment interest, like the disgorgement remedy, "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003).  Because Mr. Conaway received no ill-gotten gains from the fraud, there is no basis for assessing prejudgment interest.[8]

## II.    THE SEC'S REQUEST FOR AN INJUNCTION SHOULD BE DENIED.

The SEC's request for a permanent injunction should be denied.  "A permanent injunction is a drastic remedy and should not be granted lightly, especially when the conduct has ceased." *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992); *see also SEC v. Ingoldsby*, 1990 U.S. Dist. LEXIS 11383, at *4

---

[8] Even if this Court were to order disgorgement, it would not be required to assess prejudgment interest. *Sargent*, 329 F.3d at 41 & n.1.  "The decision whether to grant prejudgment interest is confided to the district court's broad discretion." *Id.* at 40 (citation and internal brackets omitted).  A variety of facts weigh heavily against an assessment of prejudgment interest here, including the speculative basis for the SEC's disgorgement request, the fact that Mr. Conaway gave up considerable compensation in the Separation Agreement with Kmart (which Kmart then breached), that he thus paid taxes on the loan, and the other equitable considerations discussed in Part II below.  *See id.* at 40-41 (affirming denial of prejudgment interest); *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 2008 U.S. Dist. LEXIS 75459, at *61 (S.D.N.Y. Sept. 29, 2008) (denying request for prejudgment interest).

(D. Mass. May 15, 1990) ("'an injunction is a drastic remedy, not a mild prophylactic'") (quoting *Aaron v. SEC*, 446 U.S. 680, 703 (1980) (Burger, C.J., concurring)). Because public companies must disclose injunctions that have been entered against their executives (*see* 17 C.F.R. § 229.401(f)(3)), an injunction has many of the same collateral consequences, and is the functional equivalent of, a permanent officer and director bar. *See SEC v. Quinlan*, 2008 U.S. Dist. LEXIS 95789, at \*35 (E.D. Mich. Nov. 7, 2008) ("The practical effect of such an injunction would work to stigmatize Defendant … [and] deprive him of any ability and opportunity to earn a living as an official or director throughout his life ….").

In order for an injunction to be imposed, the SEC has the burden of proving that there is a "reasonable and substantial likelihood that [the defendant], if not enjoined, [will] violate the securities laws in the future." *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984). As courts repeatedly have recognized, it is not enough for the SEC merely to point to a past violation and rest; instead, the SEC must present positive proof of a realistic likelihood of recurrence. *See, e.g., SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978); *Steadman*, 967 F.2d at 648; *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001), *vacated on other grounds by* 327 F.3d 1263 (11th Cir. 2003); *SEC v. John Adams Trust Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988).

25

The Sixth Circuit considers seven factors in determining whether injunctive relief is appropriate:  "(1) the egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances, if any, against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations, and (7) the defendant's age and health."  *Youmans*, 729 F.2d at 415.  In its brief, the SEC makes no serious attempt to address these factors, and points to no evidence showing that there is a substantial danger that Mr. Conaway will violate the securities laws in the future.  Nor has the SEC indicated that it intends to present any evidence whatsoever on this issue at the evidentiary hearing. In fact, an injunction is plainly inappropriate here.

## A.   The Violation Was Not Egregious.

This case does not involve a Ponzi scheme, insider trading, reported false revenues or false numbers of any sort, or a fraud spanning several quarters or years.  Rather, the SEC's claims related to insufficient detail in the Management's Discussion and Analysis ("MD&A") section of a single Form 10-Q issued on November 27, 2001, and two statements (one drafted for him and thoroughly vetted by other members of management, the other impromptu) on an hour-long

analyst conference call held the same day.  Notably, this is the only case in the

history of the SEC in which the Commission has accused an individual of fraud

based on statements in an MD&A absent any corresponding financial statement

fraud.  The SEC stipulated here that all of the numbers in the Form 10-Q, including

the figures showing Kmart's ending inventory balance and the amount it owed its

trade vendors, were entirely accurate.  The evidence that the two statements in the

Form 10-Q that the SEC challenged were false was thin at best.  And there was

substantial disagreement over whether the alleged omissions from the Form 10-Q

were even actionable as fraud.  Mr. Conaway was not on Kmart's Disclosure

Committee.  No one at Kmart, including the CFO, Controller, or General Counsel,

raised any disclosure issue with Mr. Conaway.  (*See, e.g.*, Ex. 11 at 229

(Noechel).) As for the conference call, Mr. Conaway disclosed an avalanche of

negative information on the call, which drove down Kmart's stock price.

Importantly, this is not a case involving fraud for personal gain.  Mr.

Conaway had no economic stake in the violation.  He sold no shares of Kmart

stock either before or after the alleged fraud.  Even the SEC concedes that Mr.

Conaway was one of Kmart's largest stockholders and incurred huge losses in

Kmart's bankruptcy.  (SEC Br. at 7.)  And, as set forth *supra*, Mr. Conaway had no

compensation tied to Kmart's third quarter results (which were accurate in any

event).  Rather, Mr. Conaway firmly believed that the slow payment of vendors was in the best interests of Kmart as a cheap and effective way to manage through a short-term liquidity crunch.  (Ex. 12 at 98 (Conaway).)  Indeed, the evidence established that slow pay was a common business practice to address the problems that Kmart was facing.  (*See* Ex. 13 at 235-36 (Boyer); Ex. 14 at 44-45 (Levin); Ex. 15 at 66-68 (Murphy); Ex. 16 at 82 (Bram); Ex. 17 at 97-98 (Beder); Ex. 18 at 42-43 (Kearse).)  Even Mr. Stallkamp has previously testified that unilateral slow pay is "a commonly practiced business tool" that has "almost become acceptable." (Ex. 19 at 138; *see also* Ex. 20 at 19-20 (Stallkamp).)[9]  And other members of Kmart's management agreed with Mr. Conaway that the slow payment of vendors was in the best interests of the Company.  For example, Cecil Kearse, who was Kmart's lead merchant and a member of the ELT, testified that slow pay "was in the best interest of Kmart and its shareholders."  (Ex. 18 at 43.)

This is not the sort of case that courts have found sufficiently egregious to support a permanent injunction.  *See SEC v. Dibella*, 2008 U.S. Dist. LEXIS 109378, at *42-49 (D. Conn. Mar. 13, 2008) (denying SEC request for injunctive relief and comparing cases in which injunctive relief was imposed); *SEC v. Snyder*,

---

[9] The Wall Street Journal recently reported that a number of large companies are unilaterally slow paying their suppliers in order to manage cash during the current credit crunch.  Serena Ng and Cari Tuna, *Big Firms Are Quick to Collect, Slow to Pay*, Wall St. J., August 31, 2009 (Ex. 21).

2006 U.S. Dist. LEXIS 81830, at *10 (S.D. Tex. Aug. 22, 2006) (case involving false and misleading Form 10-Q and insider trading "not so egregious as to support an award of permanent injunctive relief").

In its brief (at page 15), the SEC contends that the violation was "egregious" because the supposed concealment of Kmart's liquidity position on November 27 "blinded" the company's shareholders to the risk of bankruptcy.  However, the SEC has never contended that Kmart needed to disclose on November 27 that Kmart was headed into bankruptcy, and proffered no evidence that would support such a contention.  To the contrary, even Mr. Boyer testified that bankruptcy was at most a "remote" possibility.  (Ex. 13 at 272-74.)  Mr. Moreland testified that, as of December, Kmart was in the exact same position it would have been in if it had never slow paid its vendors – in other words, information regarding Kmart's past liquidity crunch, which was resolved, would not have been indicative of future liquidity.  (Ex. 8 at 405.)  Other evidence in the record supports Mr. Moreland's conclusion that the implementation of Project SID in the fall of 2001 did not have any lasting negative effect on Kmart's business.  (Ex. 14 at 60-61 (Levin) (Sunbeam continued to ship to Kmart because it was good business to do so); Ex. 6 at 40 (Gilbert) (vendor complaints went back to normal after vendors got money); *see also* Ex. 9 at 115-16 (Adamson) (noting that "vendors are usually pretty

compliant because they still want to work with Kmart going forward" in the context of cancelling orders entirely).)  And the SEC offered no evidence to counter Mr. Tucker's detailed analysis showing that Kmart reasonably expected to pay down its revolver and have excess cash by the end of the year.  (Ex. 5 at 236-37 (Tucker).)

Although the SEC asserts at various points in its brief that there is "ample evidence" that the fraud led to Kmart's bankruptcy in January 2002, it points to none.  In fact, it is difficult to conceive how the alleged disclosure violations on November 27, 2001 could possibly have caused Kmart to need to file for bankruptcy two months later.  To the extent the SEC means to say that the bankruptcy was caused by the liquidity crunch in the third quarter of 2001 and the slow payment of vendors, that theory also fails.  At the hearing, Mr. Tucker, who has been qualified as an expert by this Court, will testify that Kmart's bankruptcy was caused in large part by a combination of events that occurred in December 2001 and January 2002, were not foreseeable as of November 27, and were not connected to the events in the third quarter.  Mr. Tucker will further testify that even if Kmart had disclosed what the SEC contends it should have disclosed, that would not have alerted the public to the series of events that caused Kmart's bankruptcy in January.

Mr. Tucker will testify that Kmart's sales and earnings in December 2001 and January 2002 were well below plan, leading to a rapid decline in liquidity. Compounding this problem, the collapse of Enron in December 2001 led to turmoil in the surety bond market.  States began demanding hundreds of millions of dollars in cash to support pools for workman's compensation and other claims, which turned out to be a huge drain on Kmart's cash flow.  Also, on January 2, 2002, Prudential Analyst Wayne Hood issued a report suggesting that Kmart might be facing bankruptcy.  Shortly thereafter, on January 10, 2002, Kmart announced its poor December sales and that it did not expect to report positive earnings for fiscal year 2001.  The combination of these announcements resulted in an erosion in supplier confidence:  several suppliers tightened their credit limits, others stopped shipping to Kmart, and many withheld their previously committed allowance payments, another source of cash Kmart expected to have.  As one analyst at the time put it, "In a sense, the fear of Chapter 11 filing could make it a reality."[10]

---

[10] The SEC asks this Court to infer that the erosion of supplier confidence was caused by Project SID, not by these other events.  However, the SEC has not presented a shred of evidence that the vendors' reaction to these January events was any different than it would have been had the vendors not been slow paid months earlier.  In fact, it would be completely irrational for vendors to try to "punish" Kmart for the earlier slow pay by not paying allowances given their contractual commitments to do so and their business interest in maintaining Kmart – a major retailer – as a customer.  In contrast, it is not surprising that vendors would withhold payments if they believed that bankruptcy was imminent.

(*See also* Ex. 14 at 62-63 (Levin) (stating that if Kmart had disclosed that it was not paying its vendors because of a liquidity issue vendor panic would have driven the company into bankruptcy).)

Finally, because of volatility in the capital markets in the wake of Enron, coupled with Kmart's deteriorating financial condition, Kmart was unable to obtain a $500 million bridge loan it sought in mid-January.  Kmart believed this bridge loan would have kept it going long enough to get a secured lending facility in place and to avoid bankruptcy.  (*See* Ex. 9 at 135-36 (Moreland) (testifying that Kmart was unable to get bridge loan because Enron bankruptcy caused banks to be "skittish"); Ex. 22 at 884-85 (Adamson) (testifying that "had Enron not occurred, K-Mart probably would not have gone into bankruptcy"); Ex. 10 at 494-96 (Stallkamp) (testifying that Kmart was forced to file for bankruptcy because bridge loan did not come through and because of immediate liquidity crisis).)  Mr. Tucker will testify that Kmart's cash crunch during the third quarter, which the Company successfully managed through in part by slow paying vendors, is unrelated to these late December and early January events.  By November 27, 2001, the excess inventory purchase had been cured, Project SID was winding down, and Kmart

---

Moreover, even if Kmart had received all of the $275 million in vendor allowances it had anticipated, it still would have projected a liquidity deficit in January 2002.

was forecasting to have a $2 billion liquidity cushion by the end of December 2001.  Indeed, contemporaneous Kmart documents show that it was this "perfect storm" of events that led to Kmart's bankruptcy filing – not events from November.  (Pl. Ex. 127 (Kmart Board Package Dated January 14-15, 2002).)

The SEC's thinly disguised attempt to have this Court penalize Mr. Conaway for the fact that Kmart filed for bankruptcy under his watch should be rejected.

### B.     The Violation Was Isolated.

It cannot reasonably be disputed that the violation in this case was isolated, relating to statements on a single day.  The SEC does not – and cannot – point to any violations of the securities laws by Mr. Conaway either before or in the nearly eight years after November 27, 2001.  This weighs heavily against the imposition of an injunction.  *See Snyder*, 2006 U.S. Dist. LEXIS 81830, at *11 (declining to impose injunction where defendant was not accused of violating securities laws either before or after violation at issue).

In its brief, the SEC attempts to draw out the violation.  In the very first sentence of its brief, it states that the "jury found the defendant Charles Conaway liable for a fraud that stretched over four months."  (SEC Br. at 1.)  The jury found no such thing:  it found Mr. Conaway liable for statements made on a single day.

Although the SEC clearly disapproves of the business decision to slow pay vendors in order to manage through the third quarter cash crunch, referring to that course of action as "improper" (SEC Br. at 14), the SEC itself repeatedly has conceded that this case is not about whether it is appropriate to slow pay vendors and that the Commission does not have jurisdiction over such business decisions, which indisputably are not securities fraud.  (Ex. 23 at 27-28, 50-51 (SEC Opening Statement); Ex. 24 at 73-74 (SEC Closing Statement).)

In any event, even under the SEC's view, this case involves one course of conduct to conceal Kmart's cash crunch and resulting slow payment of vendors in the third quarter of 2001.  This is not a case of systematic or continuous securities laws infractions that would warrant a permanent injunction.  *See Dibella*, 2008 U.S. Dist. LEXIS 109378, at \*48 (declining to impose injunction:  acts related to one underlying fraud constituted isolated occurrence); *SEC v. Johnson*, 595 F. Supp. 2d 40, 44 (D.D.C. 2009) (declining to impose injunction:  defendant's conduct constituted "one ongoing 'incident,'" where the defendant undertook several discrete actions that were "all designed to achieve the same goal"). *Compare SEC v. Freeman*, 290 F. Supp. 2d 401, 406 (S.D.N.Y. 2003) (defendant's use of insider information to trade securities on eight occasions over two years was not an "isolated instance," but rather a "continuous and systematic pattern"); *SEC*

*v. Svoboda*, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006) (finding "systematic

wrongdoing" where defendant engaged in insider trading scheme for four years);

*SEC v. McCaskey*, 2001 U.S. Dist. LEXIS 13571, at *16 (S.D.N.Y. Sept. 6, 2001)

(defendant's conduct constituted "continuing course of wrongful conduct"

justifying a permanent injunction where the defendant traded stock to and from his

multiple accounts over seven months in order to inflate share price).[11]

> ### C.  Mr. Conaway Acted At Most Recklessly, Not With A High Degree Of Scienter.

Although for purposes of this remedies hearing we must accept that the jury

found Mr. Conaway acted with some degree of scienter, that alone is not sufficient

to support an injunction.  *See Ingoldsby*, 1990 U.S. Dist. LEXIS 11383, at *5; *see*

*also SEC v. Freiberg*, 2007 U.S. Dist. LEXIS 67900, at *68 (D. Utah Sept. 12,

2007) (denying injunction:  "the SEC has only definitively established that

[defendant] acted recklessly").

Mr. Conaway's conduct was at most reckless.  Every witnesses who was

asked testified that the two affirmative statements in the Form 10-Q challenged by

the SEC were accurate, and there was no reason for Mr. Conaway to think

otherwise.  (Ex. 8 at 465-66, 552; Ex. 18 at 34; Ex. 20 at 10-11; Ex. 12 at 66-67;

---

[11] The SEC baldly asserts that "the violations were stopped only by Kmart's
bankruptcy filing" (SEC Br. at 11), but this assertion does not withstand scrutiny.
The allegedly concealed information pertained solely to the third quarter of 2001.

Ex. 25 at 237-38; Ex. 5 at 218.)  As for the alleged omissions, there was

disagreement between two qualified experts regarding whether Kmart even had a

material liquidity deficiency during the third quarter and whether that liquidity

deficiency, the inventory overbuy, and the slow payment of vendors needed to be

disclosed.  Mr. Conaway, like the other witnesses who testified, knew that Kmart

had successfully managed through the short-term liquidity crunch caused by the

inventory overbuy, and that Kmart was nearly caught up with its vendors.  (Ex. 25

at 142, 192 (Conaway).)  What is more, prior to the institution of this action, no

one ever brought to Mr. Conaway's attention that Kmart should even consider

disclosing these items.  (*Id*. at 232-34 (Conaway); Ex. 13 at 278 (Boyer).)

With respect to the conference call, there was a legitimate reason for Project

eLMO to be discussed during that call.  It was a major initiative for Kmart – not

just an excuse for delays in vendor payments.  (Ex. 26 at 43-44 (Beder); Ex. 12 at

33-34 (Conaway).)  Moreover, the evidence was that the members of the Executive

Leadership Team believed that Project eLMO did cause some problems with

payables.  (Ex. 27 at 14-15 (Boyer); Ex. 25 at 159-61 (Conaway); Ex. 28 at 281-

82, 285 (McDonald); Ex. 29 at 36 (Kearse).)  Most importantly, it is beyond

dispute that Mr. Conaway was not trying to make the public believe that thousands

of vendors were having their payments delayed because of Project eLMO.  Mr.

Conaway made clear in the call that the eLMO conversion affected at most 230

vendors, and only those in softlines. (Def. Ex. 138 at 6.)

As for Mr. Conaway's response to Mr. Beder's question regarding the noise

from vendors, there was no evidence that Mr. Conaway was ever informed of the

volume of vendor complaints.  (Ex. 6 at 36 (Gilbert).)  In contrast, he had direct

knowledge of complaints from the 25% who had been cut.  (Ex. 25 at 166-68

(Conaway).)  The circumstances of this case do not support a permanent

injunction.

### D.    Mr. Conaway Will Not Engage In Future Violations.

Mr. Conaway will testify at the evidentiary hearing that he will not engage

in future violations of the securities laws.  We believe the Court will be persuaded

that if Mr. Conaway ever is an officer or director of a public company again, he

will be exceedingly cautious as a result of this experience.  Mr. Conaway fully

appreciates the importance of the federal securities laws and recognizes the

seriousness of the charges and verdict against him.  Mr. Conaway has suffered a

great deal of professional and personal harm as a result of these proceedings.

Because of the severe repercussions of the jury's verdict on his reputation, Mr.

Conaway has no expectation of ever working at a public company again, and

certainly not in a position in which he would have any responsibility for public

disclosures.  However, were he to be in a such a position, he would take great pains to ensure compliance with the securities laws and the SEC's rules and regulations.

In this regard, it is also important to note that several witnesses testified that Mr. Conaway always sought to get the accounting right at Kmart.  Janet Kelley, Kmart's General Counsel, testified that Mr. Conaway supported a restatement of Kmart's prior financial statements, despite the repercussions a restatement could have for the Company, if the CFO believed a restatement of Kmart's accounting for vendor allowances was necessary and appropriate.  (Ex. 30 at 99-102.)  Mr. Boyer similarly testified that Mr. Conaway supported the repeated reviews of Kmart's vendor allowance policy that he commissioned, as well as an unpopular initiative Mr. Boyer instituted to have sales people sign representation letters regarding allowance contracts.  (Ex. 13 at 183-91.)

In addition, Mr. Conaway will present three witnesses at the hearing who will testify to his integrity, both in the past and presently.  Chris Bodine, the former President of CVS, will testify that Mr. Conaway operated with the highest integrity while at CVS and that Mr. Conaway is a talented leader who could make valuable contributions in the future.  Tony Michaels, former CEO of Big Boy restaurants, sought Mr. Conaway's advice both while Mr. Conaway was at Kmart and afterwards.  Mr. Michaels will testify that Mr. Conaway counseled him to be

forthright in his business dealings.  John Foster is a former Kmart employee who has been Mr. Conaway's partner at Sabre Capital since 2002.  Mr. Foster also will testify as to Mr. Conaway's integrity.

Mr. Conaway's "assurances against future violations counsel[] strongly against the issuance of any injunction."  *Snyder*, 2006 U.S. Dist. LEXIS 81830, at *15; *see also Ingoldsby*, 1990 U.S. Dist. LEXIS 11383, at *7 (denying request for injunction based in part on finding that the defendant's assurances that he would not violate the securities laws in the future were "genuine and sincere").

The SEC suggests that Mr. Conaway cannot be believed, characterizing him in its post-trial brief as an "inveterate prevaricator."  (R.148 at 62.)  However, in its desperate attempt to paint Mr. Conaway as a liar, the SEC mischaracterizes the facts.  Moreover, none of the supposed lies to which the SEC points are securities fraud or indications that Mr. Conaway is going to commit securities fraud in the future.

The SEC first complains that Kmart lied to its vendors.  As an initial matter, the SEC's belief that companies typically go running out to their vendors to tell them that they are slow paying because of a liquidity crunch is completely divorced from reality.  Indeed, Mr. Levin, the CEO of Sunbeam, said precisely this, testifying that Sunbeam has "had our share of the check's in the mail excuses

through the years." (Ex. 14 at 45.) This is no evidence of disregard of the federal

securities laws. What is more, the SEC misrepresents the evidence regarding Mr.

Conaway's involvement with the eLMO talking points. (SEC Br. at 13.) The only

evidence is that Mr. Conaway was present when Mr. McDonald was told to work

with Mr. Moreland and Mr. Kearse to create talking points for Kmart's merchants.

(Ex. 29 at 25-26 (Kearse) (does not remember discussion of talking points with Mr.

Conaway); Ex. 28 at 246-51 (Conaway) (noting that while he was present for the

meeting discussing the need to create them, he never saw the talking points); *id.* at

269-70, 281 (McDonald); Ex. 27 at 253 (Boyer) (does not recall talking points

discussed at ELT meeting).)

     The SEC next asserts that Mr. Conaway lied to the Board regarding "the

overbuy and eLMO." (SEC Br. at 13.) However, the jury was not asked to and did

not find that Mr. Conaway lied to the Board.[12] In fact, the September Board

presentation plainly shows that Kmart's inventory was $800 million over plan. (Pl.

Ex. 67 at 29.) Mr. Conaway also testified that he informed the Board during the

September Board meeting that one of the steps to address the liquidity crunch

would be to manage its payables with vendors. (Ex. 12 at 116-19.) His testimony

---

[12] In contrast, the arbitration panel, which heard testimony from three Board
members, made a finding that Mr. Conaway had not misled the Board. (Ex. 1 at
18-19.)

was supported by the notes on his copy of the September Board package.  (Def. Ex. 119 at 20.)  Mr. Conaway further testified that in October the Board was kept up to date on how many days Kmart was behind with its vendors and on how many more days Kmart expected to need to delay payments.  (Ex. 25 at 139-41.)  Again, his testimony was supported by the notes on his copy of the October Board package.  (Pl. Ex. 27 at 2.)  Mr. McDonald's deposition testimony supported Conaway's recollection of the disclosures made to the Board.  (Ex. 31 at 164, 173-74.)

Mr. Stallkamp's testimony that he did not learn of the overbuy and the slow payment of vendors until much later completely lacked credibility.  Mr. Stallkamp admitted on cross-examination that he knew Kmart might stretch its vendors in order to get through the cash crunch.  (Ex. 20 at 19.)  He also admitted that when Mr. Conaway told the Board that Kmart would be caught up with vendors in two weeks, he may have been referring to slow pay.  (*Id.* at 35-36.)  Later during his testimony, Mr. Stallkamp said that he assumed Kmart was slow paying vendors.  (Ex. 32 at 10.)  Mr. Stallkamp also admitted that when he asked for a meeting with Mr. Conaway regarding Mr. Stallkamp's past experiences with slow payment of vendors, he knew that Kmart was stretching vendors.  (*Id.* at 33-34.)  "Stretching" vendors is a deliberate act, not a computer glitch.  The subject of that meeting was

not whether Kmart was slow paying its vendors; rather, Mr. Stallkamp wanted Mr. Conaway to know that "there's a right way and a wrong way to do slow pay." (Ex. 20 at 37 (Stallkamp).)

In fact, by all indications, Kmart's Board, in general, may not have heard the information that was provided to them.[13]  Several Board members slept during Kmart Board meetings. (Ex. 18 at 30 (Kearse); Ex 12 at 104 (Conaway); Ex. 28 at 279 (McDonald).)  Mr. Adamson testified that he did not ever listen to Kmart's analyst conference calls. (Ex. 9 at 138.)  Mr. Conaway has repeatedly testified that the Board could only absorb so much information before he lost their attention. (*See, e.g.*, Ex. 12 at 104, 125-26.)  In September 2001, Mr. Conaway took the extraordinary step of writing the full Board a letter, taking it to task for failing to focus on the priorities of Company. (Pl. Ex. 113; Ex. 12 at 125-26 (Conaway).)  In 2000, BusinessWeek Magazine identified the Kmart Board as among the worst in the country for the third time. (John A. Byrne, "The Best and Worst Corporate Boards," BusinessWeek, January 24, 2000 (Ex. 33).)  The Board's trustworthiness, when it comes to what they were and were not told, is remarkably low.

The SEC also makes much of Mr. Conaway's prior deposition testimony, searching for inconsistencies in ten days of testimony over seven years.  However,

---

[13] The September and October 2001 Board meetings were conducted over the telephone, not in person.

the SEC mischaracterizes that testimony.  With respect to the letter to Mr. Levin, Mr. Conaway testified in 2003 that he did not recall the letter, just as he did in this case and in every other deposition in which he has testified about the letter.  (Ex. 34 at 437; Ex. 35 at 2897; Ex. 36 at 165; Ex. 25 at 162.)  Mr. Conaway's testimony in this regard is consistent with the note on the top of the fax cover sheet, which shows that Mr. McDonald forwarded Mr. Levin's letter to Jeff Stark and asked Mr. Stark to respond.  (Pl. Ex. 107; Ex. 25 at 162 (Conaway).)  The fact that it was not until after his 2003 deposition that Mr. Conaway recognized that the letter did not appear to have been dictated by him is rather trivial.

Finally, contrary to the SEC's assertion, Mr. Conaway consistently and repeatedly has testified that he did not know that vendors were given the so-called "eLMO excuse" even when Project eLMO was not the reason the particular vendors' invoices were delayed.  Mr. Conaway testified in a deposition taken by the SEC in July 2002 that he did not know that vendors were being lied to.  (Ex. 37 at 161-62.)  He again testified several times in his deposition in 2003 that he did not know what all of the vendors were told, and that he did not know that the so-called "eLMO excuse" was being given to vendors when it was not true.  (Ex. 34 at 294-95, 337, 444-46.)  Mr. Conaway's prior testimony in this regard was entirely consistent with his testimony at the trial in this case.  (Ex. 25 at 159; Ex. 28 at

255.)  As this consistent line of testimony amply demonstrates, the SEC has taken

Mr. Conaway's 2005 deposition testimony out of context.[14]

Importantly, the SEC's suggestion that Mr. Conaway has attempted some

sort of continuous cover up of the slow payment of vendors and Kmart's liquidity

crunch in the fall of 2001 is completely belied by his deposition testimony over the

last seven years.  In his SEC deposition in 2002, Mr. Conaway candidly stated that

Kmart had a cash crunch in the fall of 2001 that it dealt with in part by

systematically prioritizing vendor invoices:  "[W]e had a cash crunch, and

November is always the tightest period.  That's historical.  We prioritized invoices,

meaning we had a system that looked at invoices, and, you know, what did we

really need, and what didn't we really need …."  (Ex. 37 at 118-19; *see also id.* at

131-32.)  In his deposition in 2003, Mr. Conaway again testified that Kmart "set up

a system to prioritize invoices" as a way to manage through the cash crunch caused

by the inventory overbuy.  (Ex. 34 at 284.)  And again in his arbitration deposition

---

[14] The SEC also refers to a quote attributed to Mr. Conaway in a New York Times article dated November 8, 2001, which the Court will recall discussed that Kmart was slow paying its vendors.  (SEC Br. at 12; Def. Ex. 23.)  The SEC did not charge Mr. Conaway with securities fraud based on that article.  This is not surprising, given that the article does not even purport to quote Mr. Conaway, but rather paraphrases a supposed statement by him.  In any event, the paraphrased statement was true:  Kmart had approximately $400 million cash on hand as of November 8 in addition to $382 million in borrowing capacity under its revolver. (Pl. Ex. 63.)

in 2005, Mr. Conaway testified that Kmart prioritized invoices in order to manage cash after the overbuy.  (Ex. 38 at 231-34.)  Mr. Conaway has never tried to hide that Kmart slow paid vendors during the fall of 2001 because of a cash crunch.

### E.    Mr. Conaway Is Not Required To Admit Wrongdoing.

The SEC states in its brief that an injunction is appropriate because Mr. Conaway failed to show any "remorse" during the trial.  (SEC Br. at 14.)  The notion that Mr. Conaway should be enjoined from future violations because he contested liability should be rejected.  Indeed, numerous courts have rejected this very argument by the SEC, recognizing that a defendant "has a right to vigorously contest the SEC's allegations and [is] not required 'to behave like Uriah Heep in order to avoid an injunction.'"  *Johnson*, 595 F. Supp. 2d at 45; *see also Ingoldsby*, 1990 U.S. Dist. LEXIS 11383, at *6 ("Absent a showing of bad faith, the defendant should not be prejudiced for presenting a vigorous defense and requiring the SEC to meet its proper evidentiary burden both at trial and at the injunctive relief stage of the judicial proceedings.").  It was wholly appropriate for Mr. Conaway to maintain that he did not commit securities fraud during the trial, and it continues to be appropriate given the pendency of his post-trial motions and appellate rights.  *See Todd*, 2007 WL 1574756, at *17; *Snyder*, 2006 U.S. Dist.

45

LEXIS 81830, at *15-16. Particularly given the weaknesses in the SEC's case, Mr. Conaway should not be penalized for exercising his legal rights.

The SEC also asserts that Mr. Conaway's supposed lack of remorse is evidenced by his having filed a claim in Kmart's bankruptcy in July 2002. (SEC Br. at 14.) The SEC's reference to Mr. Conaway's bankruptcy claim is a blatant and improper attempt to prejudice the Court. On the advice of counsel, Mr. Conaway filed the claim because Kmart had breached the terms of the Separation Agreement. Under Mr. Conaway's original contract, he was entitled to much more severance than he received under the Separation Agreement. However, Mr. Conaway never even received portions of the lesser, negotiated amount because Kmart immediately breached the Separation Agreement by not seeking to have it approved by the Bankruptcy Court, which it was required to do. (Separation Agreement, § 17 (Ex. D to SEC Br.).) Some of the negotiated severance – such as the tax gross-up on the retention loan – was subject to Bankruptcy Court approval. (*See id*. at §§ 4, 5(b), 17.) The fact that Mr. Conaway acted to preserve his legal rights has nothing to do with whether his assurances against future violations of the securities laws are sincere.[15]

---

[15] Mr. Conaway settled his claim after the arbitration panel ruled in his favor. That Mr. Conaway settled for $1 million on a $19 million claim is not an indication that his claim lacked merit. Rather, it is typical of bankruptcy settlements, in which

### F.     Mr. Conaway's Current Employment, Age, And Health Do Not Support An Injunction.

Mr. Conaway currently is part owner of a privately held business, has some investments in private ventures through Sabre Capital, and has engaged in some consulting work regarding retail and consumer products companies.  His current positions present no opportunities for future securities violations.  Mr. Conaway has no present intentions to work for a public company, and it is highly unlikely that a public company will hire him or appoint him as a director any time soon given the jury's verdict in this case.  The SEC's statement that "[t]he potential is not remote that Conaway could return to a senior management role in either a public or private company" (SEC Br. at 12) is frankly naïve.[16]

Nonetheless, a permanent injunction would be unfair and unfortunate.  Mr. Conaway is an extremely talented business man who has spent the past seven and a half years in the shadow of the events at Kmart.  An injunction would foreclose the possibility that Mr. Conaway could ever work for a public company again. Although Mr. Conaway does not presently intend to work for a public company,

---

creditors get cents on the dollar.

[16] The SEC's reference to Mr. Conaway possibly having a management role in a *private* company is improper.  The SEC does not have jurisdiction over private companies and cannot seek to have Mr. Conaway enjoined from working for a private company.

and the likelihood that he would be hired is indeed remote, it is possible, for
example, that one of the private ventures in which Mr. Conaway is involved will
go public and that Mr. Conaway will be asked to serve on the board of directors.
In such a position, Mr. Conaway would not have any direct responsibility over
public disclosures, but could offer valuable operational advice and counsel.

* * *

Courts routinely deny requests for injunctions in circumstances such as this,
where the SEC has not demonstrated that there is a substantial likelihood of future
violations of the securities laws.  *See SEC v. Caterinicchia*, 613 F.2d 102, 107 (5th
Cir. 1980) (affirming order denying SEC's request for injunction where district
court found that SEC failed to prove that defendant was "a bad character who was
likely to continue engage in unlawful practices if he thought he could get away
with it"); *Ingoldsby*, 1990 U.S. Dist. LEXIS 11383, at *5-8 (denying SEC's request
for injunction after finding that violation was isolated, not egregious, and
defendant's assurances against future violations were genuine and sincere); *Yun*,
148 F. Supp. 2d at 1294 (denying SEC's request for an injunction where violation
was isolated, defendants, while not admitting wrongdoing, acknowledged
importance of federal securities laws, and were unlikely to be in a position to
violate the securities laws again); *SEC v. Nat'l Student Marketing Corp.*, 457 F.

Supp. 682, 716 (D.D.C. 1978) (denying SEC's request for an injunction where SEC had "not demonstrated that the defendants engaged in the type of repeated and persistent misconduct which usually justifies the issuance of injunctive relief"); *see also Freiberg*, 2007 U.S. Dist. LEXIS 67900, at *68-69 (denying SEC's request for injunction and officer and director bar and rejecting argument that relatively young age of defendant supported imposition of injunction).  *See also infra*, p. 52-53 (citing cases denying requests for injunctions and officer and director bars). This Court should deny the SEC's request for a permanent injunction.

## III.   THE SEC'S REQUEST FOR AN OFFICER AND DIRECTOR BAR SHOULD BE DENIED.

Many of the same considerations lead to the conclusion that the SEC's request for an officer and director bar also should be denied.  At the time of Mr. Conaway's alleged violations in 2001, the federal securities laws authorized courts to bar a defendant from acting as an officer or director of a publicly traded company "if the person's conduct demonstrates substantial unfitness to serve as an officer or director."  15 U.S.C. §§ 78u(d)(2), 77t(e) (2001); *see also Snyder*, 2006 U.S. Dist. LEXIS 81830, at *18; *SEC v. Quinlan*, 2008 U.S. Dist. LEXIS 95789, at *28 (E.D. Mich. Nov. 7, 2008).

As the SEC states in its brief, courts typically consider six factors in assessing whether substantial unfitness has been established, many of which

overlap with the factors considered for whether an injunction is appropriate:  (1) the egregiousness of the violations; (2) the likelihood that misconduct will recur; (3) the defendant's role or position when he engaged in the fraud; (4) the degree of scienter; (5) the defendant's economic stake in the violation; and (6) the defendant's repeat offender status.  *See SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995).  While these factors are considered useful, a court need not apply all of these factors in a given case, nor is a court limited to these six.  *Id.* ("A district court should be afforded substantial discretion in deciding whether to impose a bar to employment in a public company.").  Moreover, courts should weigh the "loss of livelihood and the stigma attached to permanent exclusion from the corporate suite" against the likelihood of future misconduct.  *Id.* at 142.

The SEC has again failed to show that this requested relief is in any way appropriate under the circumstances of this case.  As set forth above, the violation was not egregious, Mr. Conaway did not act with a high degree of scienter, and he did not have an economic stake in the violation.

Mr. Conaway also is not a repeat offender.  Mr. Conaway never was accused of any wrongdoing in any of his positions with public companies prior to his tenure

at Kmart and, other than the SEC's claims in this case, has not been accused of any violations of the securities laws in the nearly eight years since he left Kmart.[17]

Finally, and most importantly, there is no likelihood that the alleged misconduct will recur.  All the SEC can say on this score is that because Mr. Conaway has not admitted to wrongdoing, "the Court must presume his misconduct will recur."  (SEC Br. at 15.)  As demonstrated above, this position is untenable.  The fact that Mr. Conaway exercised his legal right to contest the SEC's claims in this case – a case in which the SEC's evidence on several issues was thin at best – in no way shows that Mr. Conaway will engage in securities fraud in the future.  *See Snyder*, 2006 U.S. Dist. LEXIS 81830 at *24 (rejecting SEC's contention that defendant's "continuing refusal to acknowledge wrongdoing" demonstrated a likelihood of future violations).  Moreover, as set forth above, at the hearing, Mr. Conaway will testify that he will be exceedingly careful in the future.

---

[17] The fact that Mr. Conaway was CEO of Kmart also does not automatically weigh in favor of the imposition of an officer and director bar, and certainly is not sufficient alone to support the imposition of a bar.  Mr. Conaway necessarily relied on others to draft the Form 10-Q and conference call script and to consider disclosure issues.  This reliance on the judgment of others "at least mitigates the effect of his responsibility" as CEO.  *Snyder*, 2006 U.S. Dist. LEXIS 81830 at *21.

Courts routinely deny requests for officer and director bars in circumstances such as this.  For example, in *Snyder*, the former Chief Accounting Officer of Waste Management was found liable under Section 10(b) for filing a Form 10-Q that fraudulently overstated the company's earnings and for insider trading.  2006 U.S. Dist. LEXIS 81830, at *1-2.  The court denied the SEC's requests for an injunction and for an officer and director bar.  Although the court had to accept the jury's finding of scienter, the court found that the facts that the defendant was a first time offender, made sincere assurances against future violations, and had a reasonable basis for maintaining his innocence weighed against the imposition of injunctive relief.  *See id.* at *7-18.

The court denied the SEC's request for an officer and director bar for similar reasons in *SEC v. Stanard*, 2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009).  In that case, a CEO was found to have violated the anti-fraud provisions of the securities laws by engaging in sham transactions designed to smooth the company's financial results over time.  *Id.* at *80.  The court determined that an officer and director bar was not warranted because the defendant's violations, "while serious – are not, on the scale of things, 'egregious,'" the defendant was first time violator, and he did not benefit through bonuses, salary, or stock sales from the false accounting.  *Id.* at *92-93.

The SEC's request for a permanent officer and director bar here likewise should be denied. *See also Dibella*, 2008 U.S. Dist. LEXIS 109378, at *41 (denying requests for injunction and officer and director bar where "[t]he misconduct at issue in this case, which occurred ten years ago, was the first and only securities law violation" by the defendant); *SEC v. Pardue*, 367 F. Supp. 2d 773, 776-77 (E.D. Pa. 2005) (denying request for injunction and officer and director bar where "the evidence points to an isolated incident that is unlikely to be repeated by [defendant] in the future"); *SEC v. Shah*, 1993 U.S. Dist. LEXIS 10347, at *21-22 (S.D.N.Y. July 28, 1993) (denying request for officer and director bar where SEC failed to show that defendant would be "'substantially unfit' ever to serve as a director or officer of a public company").

## IV. THE SEC'S REQUEST FOR AN $8.9 MILLION PENALTY IS GROSSLY OUT OF LINE AND SHOULD BE DENIED.

The SEC's request that the Court impose an $8,885,003 civil money penalty is outrageous. The SEC's figure is derived from Mr. Conaway's $5 million retention loan plus the $3,885,003 tax gross-up that the SEC knows, or is reckless in not knowing, Mr. Conaway never received. Moreover, as demonstrated in Part I above, Mr. Conaway's retention loan was not a pecuniary gain resulting from the violation. Therefore, putting aside for the moment that a penalty of that amount would be grossly out of line with the conduct for which Mr. Conaway was found

liable, there is no legal basis for imposing a penalty of that amount.  Because Mr.

Conaway obtained no pecuniary gain as a result of the violation, the maximum

statutory penalty, even under Tier 3, is $120,000.

The SEC also is wrong that Tier 3 applies in this case.  Tier 1 penalties apply

to non-scienter based violations.  15 U.S.C. § 78u(d)(3)(B)(i).  Tier 2 penalties are

available if the violation involved "fraud, deceit, manipulation, or deliberate or

reckless disregard of a regulatory requirement," and may not exceed $60,000 in the

absence of pecuniary gain from the violation.  15 U.S.C. § 78u(d)(3)(B)(ii); *see

also* 17 C.F.R. § 201.1002 (setting forth maximum penalty amounts for violations

occurring after February 1, 2001).  Tier 3 penalties are available if the violation

involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a

regulatory requirement" and the violation "resulted in substantial losses or created

a significant risk of substantial losses to other persons," and may not exceed

$120,000 in the absence of pecuniary gain from the violation.  15 U.S.C.

§ 78u(d)(3)(B)(iii).

The SEC has not shown that Mr. Conaway's violations resulted in

substantial losses or created a significant risk of substantial losses to other persons,

and has indicated no intent to present such evidence at the hearing.  Instead, the

SEC falls back on its faulty premise that, had Mr. Conaway revealed on November

27, 2001 that Kmart had experienced a material liquidity deficiency during the third quarter that it resolved in part by slow paying its vendors, Kmart's shareholders somehow could have avoided losses in the bankruptcy.  As noted *supra* at pages 30-33, the bankruptcy was unrelated to the events in the fall.

What is more, to seek the maximum Tier 3 penalty in a case in which the potential harm to investors was at most remote and attenuated from the alleged fraud is wholly inappropriate.  As one court recently stated in rejecting the SEC's request to impose a Tier 3 penalty in a case involving financial statement fraud in one quarter, such a request under circumstances such as these "is just plain foolish":

> [T]o assess the *maximum* monetary penalty against [Defendant] – who received not a penny of gain for his violation of the Exchange Act when others have stolen and bilked investors out of millions of dollars (not to say billions in one recent highly publicized case in particular) – demonstrates the poor prosecutorial judgment of the Commission.

*SEC v. Johnson*, 595 F. Supp. 2d 40, 46 (D.D.C. 2009) (emphasis in original).

Accordingly, this Court should impose, at most, a penalty under Tier 2. "The Court has discretion in determining the appropriate amount of any penalty to impose under these provisions," and may choose not to impose any penalty. *Stanard*, 2009 U.S. Dist. LEXIS 6068, at *95 (refusing to impose a Tier 3 penalty);

*see also Snyder*, 2006 U.S. Dist. LEXIS 81830, at *37 (denying request for civil

penalties); *SEC v. Ramoil Mgmt. Ltd.*, 2007 U.S. Dist. LEXIS 79581, at *34-35

(S.D.N.Y. Oct. 25, 2007) (imposing less than maximum penalty).  The factors to

be considered in evaluating whether to impose a penalty and, if so, the appropriate

amount, include many of the same factors discussed above.[18]  Mr. Conaway

respectfully requests that the Court, in its discretion, deny the SEC's request for a

civil monetary penalty.[19]

---

[18] The factors to be considered in evaluating civil monetary penalties include:  "(1) the egregiousness of the violations; (2) a defendant's scienter; (3) the repeated nature of the violations; (4) a defendant's failure to admit wrongdoing; (5) whether a defendant's conduct created substantial losses or the risk of substantial losses to others; (6) a defendant's lack of cooperation with authorities; and (7) whether the penalty that would otherwise be appropriate should be reduced due to a defendant's demonstrated current and future financial condition."  *Stanard*, 2009 U.S. Dist. LEXIS 6068, at *96.

[19] The SEC further requests that this Court enter an order "prohibiting Conaway from seeking or accepting any payment, reimbursement, or indemnification from any third party for any portion of the penalty."  (SEC Br. at 9.)  Although Mr. Conaway does not expect to be indemnified by any third party if this Court orders a monetary penalty, the Court does not have the power to forbid reimbursement because that issue involves rights of parties not before the Court.  *SEC v. Koenig*, 532 F. Supp. 2d 987, 996 (N.D. Ill. 2007).

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendant Charles C. Conaway respectfully

requests that the Securities and Exchange Commission's Request For Remedies be

denied.

Dated:  August 31, 2009                       Respectfully submitted,

                                                              <u>s/Hille R. Sheppard</u>
                                                              Scott R. Lassar (Admitted, E.D. Mich.)
                                                              Hille R. Sheppard (Admitted, E.D. Mich.)
                                                              Melanie E. Walker (Admitted, E.D. Mich.)
                                                              SIDLEY AUSTIN LLP
                                                              One Dearborn Street
                                                              Chicago, Illinois  60603
                                                              (312) 853-7000

                                                              *Attorneys for Defendant Charles C. Conaway*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on August 31, 2009, I electronically filed the foregoing paper with the Clerk of the Court using the ECF filing system, which will send notification to the following:

| | |
|---|---|
| Ellen E. Christensen | Dean M. Conway |
| Alan M. Lieberman | Todd R. Mendel |
| John F. Sylvia | Jessica C. Sergi |
| Hille R. Sheppard | Steven C. Susser |
| McKenzie E. Webster | Richard B. Skaff |
| Robert L. Dodge | Joseph P. Curtin |

and I hereby certify that I have mailed the paper by first-class mail to the following non-ECF participants:

| |
|---|
| Reid A. Muoio<br>Securities and Exchange<br>Commission<br>100 F. Street, N.E.<br>Washington, D.C.  20549-4631 |

<u>s/Hille R. Sheppard</u>
Hille R. Sheppard (Admitted: E.D. Michigan)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000