UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE | ) | |
| COMMISSION, | ) | |
| | ) | Civil Action No. 05-CV-40263 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Steven D. Pepe |
| CHARLES C. CONAWAY, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

**PLAINTIFF SECURITIES AND EXCHANGE
COMMISSION'S REPLY MEMORANDUM IN
SUPPORT OF ITS REQUEST FOR REMEDIES**

Plaintiff Securities and Exchange Commission (the "SEC") submits this reply

memorandum in support of the SEC's request for remedies.

The SEC intends to stand, for the most part, on its opening brief on remedies.

The scope of this reply memorandum will be confined to specific issues relating to the

SEC's request for disgorgement.

**1.      The Amount of the SEC's Disgorgement Claim**

In seeking a disgorgement figure of $8,885,003, including an income tax "gross-

up" of $3,885,003, the SEC relied on the terms of the Separation Agreement between

Kmart and defendant Conaway as *prima facie* evidence that the gross-up amount had in

fact been paid.  Following up on the defendant's contention that he did not receive the

gross-up payment, we have checked with Kmart's former bankruptcy counsel and it now

appears that the payment was not made.  Accordingly, the SEC will reduce its

disgorgement claim from $8,885,003 to $5,000,000.  This will result in corresponding

reductions of the SEC's civil penalty request and prejudgment interest calculation.[1]

### 2.   <u>**Disgorgement is Appropriate.**</u>

The defendant's brief misconceives the factual and legal basis for the SEC's

disgorgement claim.  In seeking disgorgement of the defendant's retention payment, the

SEC does not, as a legal matter, step into the shoes of Kmart to assert the company's

contract or tort claims for the money.  Whether Kmart now has, or ever had, any

enforceable right to recover the retention payment is irrelevant to this proceeding.  The

only question for the Court is whether there is a causal connection between the

defendant's fraudulent conduct and the benefit he received when the repayment

obligation on his retention loan was forgiven.

On the facts, there is a direct causal relationship between the decision by Kmart's

Board to forgive the defendant's retention loan repayment obligation and the pattern of

lies and deception found by the jury.  As of November 27, 2001, the defendant had a

legal obligation to repay the retention loan with interest if certain conditions were not

met.  Four months later in March 2002, the Board affirmatively chose to forgive that

repayment obligation when it agreed that the defendant's termination would be on a not-

for-cause basis.  During this entire period, the Board had no idea that the defendant had

concealed the nature and magnitude of Kmart's liquidity crisis, or management's

response to it.[2]

---

[1]    The SEC now seeks a civil penalty of $5,000,000.  Prejudgment interest on the disgorgement figure of $5,000,000 amounts to $2,698,689.

[2]    The defendant's brief maintains that the Board effectively forgave the repayment obligation in January, not March, of 2002 when it decided to replace the defendant as Chairman.  Whether or not this is correct as a matter of contract interpretation, the timing is irrelevant to the SEC's disgorgement claim.  In January 2002, the Board was just as much in the dark as it would be two months later, in March.  At either

The $5 million retention loan payment was not salary.  Nor did it represent money to which the defendant would have been entitled irrespective of his fraud.  The payment was, at all relevant times, contingent on the Board not having grounds to terminate the defendant for cause.  At least as late as January 2002, and possibly as late as March of that year, the Board could have insisted on repayment of the retention loan.  The Board's subsequent actions -- determining that the termination should have been for cause and authorizing the creditors' committee to seek recovery of the payment -- reveal that the Board would not have allowed Conaway to keep the $5 million payment had the Board known of his fraud.  Because the retention payment is not in any respect analogous to salary, the cases cited in the defendant's brief dealing with disgorgement of salary payments[3] are not on point.

The SEC does not contend that Kmart's Board should have, or would have, sought to <u>punish</u> the defendant by demanding repayment of the retention loan payment.  The simple truth is that the defendant's legal right to keep the money was contingent on the Board not having grounds to terminate him for cause.  Unbeknownst to the Board, the defendant's actions in concealing the liquidity crisis both violated Section 10(b) of the Exchange Act and made it impossible for the Board to exercise its proper oversight role on behalf of Kmart's shareholders.  These facts created grounds for the Board to terminate the defendant for cause and thereby triggered the repayment contingency.

point, the Board's decision whether to forgive the repayment obligation would have been made differently had the Board been in possession of the relevant facts.

[3]      *SEC v. Resnick*, 604 F.Supp.2d 773 (D. Md. 2009); *SEC v. Todd*, 2007 WL 1574756 (S.D. Cal. May 30, 2007); *SEC v. Savino*, 2006 WL 375074 (S.D.N.Y. Feb. 16, 2006); *SEC v. Cohen*, 2007 WL 1192438, *21 (E.D. Mo. Apr. 19, 2007); *SEC v. Jones*, 476 F.Supp.2d 374 (S.D.N.Y. 2007).

The SEC's decision to settle its claims against former defendant McDonald without payment of disgorgement in no way forecloses the SEC from seeking disgorgement from Conaway.  As a subordinate officer, McDonald was less culpable than Conaway.  It is also not unusual for defendants who negotiate settlements with the SEC to receive more favorable terms than those who do not.  Further, unlike defendant Conaway, McDonald settled the claims brought by Kmart's creditors' trust on terms that included the repayment of his retention loan.  The SEC did not demand that McDonald repay the loan twice.

### 3.     The Arbitration Decision Involving Kmart's Creditors' Trust Has No Bearing on the SEC's Disgorgement Claim.

The SEC's disgorgement claim is in no way limited by the outcome of the creditors' trust arbitration against defendant Conaway, to which the SEC was not a party.  As a matter of law, the principles of claim or issue preclusion do not apply.  Indeed, we were unable to find any case in which a court even considered the possibility that the SEC could be precluded from enforcing the Exchange Act's antifraud provisions based on the result of an AAA arbitration to which it was not a party.

Claim or issue preclusion requires:  "(1) identity of issues; (2) actual litigation of the issue in the prior litigation proceeding; (3) the determination of the issue in the prior litigation or proceeding must have been a critical and necessary part of the judgment in the earlier proceeding; and, (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the early proceedings." *Artman v. Prudential-Bache Securities, Inc.*, 670 F. Supp. 769, 773 (S. D. Ohio 1987). Not one of these elements is met here.

In *Artman*, the district court severed non-arbitrable fraud claims arising under the Exchange Act while referring state law claims to arbitration pursuant to the customer's account agreement.  The courts have long recognized a strong federal interest in having claims arising under the antifraud provisions of the securities laws decided in federal court.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221-22 (1985); *Sterne v. Dean Witter Reynolds, Inc.*, 808 F.2d 480, 483 (6th Cir. 1987).  While both of these cases were decided before *Wilko v. Swan*, 346 U.S. 427 (1953), was overruled by *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989), the principle for which they are cited here survives the Supreme Court's decision in *Rodriguez*.[4]

As a factual matter, the Creditors' Trust arbitration did not address the disgorgement issue now before this Court.  The arbitration did not concern public disclosure of Kmart's liquidity crisis, and in particular did not address the liquidity discussion in Kmart's Form 10-Q(3) MD&A or the statements made on the November 27, 2001, earnings release conference call.  The vast majority of the arbitration decision centered on claims that were not remotely at issue in this action.  These included whether defendant Conaway breached his fiduciary duties to Kmart by:  (1) implementing Blue Light Always; (2) reducing Kmart's advertising; (3) retaining, promoting, and failing to supervise Mark Schwartz; (4) issuing retention loans to senior executives on the eve of bankruptcy; (5) not recommending that Kmart file for bankruptcy earlier than it did; and (6) making unnecessary capital expenditures.

---

[4]        *Artman* was decided in 1987, two years before the Supreme Court decided *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989), overruling its decision in *Wilko v. Swan*, 346 U.S. 427 (1953).  The Court in *Rodriguez de Quijas* held that an agreement to arbitrate all claims, including those arising under the federal securities laws, was binding and enforceable on the parties requiring district courts to refer all such cases to arbitration on all claims. The holding in *Rodriguez* is irrelevant to this case because the SEC is not a party to an arbitration agreement with Conaway or in privity with the Creditors' Trust; nor does the SEC's argument against preclusion here depend on *Wilko*.

To the extent that the arbitration touched on defendant Conaway's retention loan, the decision did <u>not</u> find that Conaway had appropriately disclosed the inventory overbuy, Project SID, and the liquidity crisis to the Board.  In this respect, the defendant's brief misrepresents the arbitration holding.  There is no finding in the decision that "Conaway did not conceal relevant information from the Board of Directors."  [Conaway Br. at 14]  What the arbitration panel <u>did</u> find was that Conaway's May 21, 2001, amended employment agreement was not rendered void *ab initio* by the nondisclosures because the events relating to the liquidity crisis "occurred later in the year, after the amended agreement had been executed."  [Arb. at 21 (Ex. 1)]

More to the point, the arbitration decision did not hold -- and could not have held -- that the forgiveness of the defendant's retention loan repayment obligation was causally unrelated to his fraud.  That issue was not before the panel, either directly or by implication.   And to the extent that the arbitration panel may have made findings of fact inconsistent with those made by the jury in this action, it is the jury's determination that must dictate the Court's imposition of the appropriate remedies.

### 4.      <u>The Defendant's Fraud Harmed Investors.</u>

The defendant's brief contends that his fraudulent concealment of Kmart's liquidity crisis and the actions taken in response did not harm shareholders because the company's bankruptcy was "not connected to the events in the third quarter."  [Conaway Br. at 30]  Given the magnitude of Kmart's liquidity crisis and the close proximity (seven weeks) of the bankruptcy filing to the defendant's fraudulent statements and omissions, the contention is, on its face, difficult to credit.

When a company the size of Kmart files for bankruptcy protection, there are any number of causes -- some longstanding, such as the steady erosion of Kmart's competitive position relative to Wal-Mart and Target; some specific to the liquidity crisis, which temporarily improved but never fully abated prior to the filing; and some last-minute shocks in December and January -- that all contributed to the company's eventual failure.  How to apportion the relative significance of each of these factors could occupy a team of experts indefinitely.  But that particular sideshow would be entirely irrelevant to the issue now before the Court.

Conaway's actions created a significant risk of harm to investors for the simple reason that Kmart was a materially weaker company in November 2001 than the public was led to believe.  Indeed, Kmart's financial condition was precarious enough that on November 8, its Chief Financial Officer Jeffrey Boyer warned Conaway of the need to prepare for a possible bankruptcy filing.  As the jury found, the defendant intentionally concealed this weakness from the investing public.  Had he been forthcoming, Kmart's shareholders could have exercised informed judgment regarding whether to hold their shares or limit their exposure by selling.  Instead, those who relied on Conaway's misrepresentations were left holding the bag on January 22, 2002, when Kmart went under.

## **CONCLUSION**

For the foregoing reasons, the SEC requests that the Court award the remedies set forth in its opening brief, as modified above.

Dated:  September 9, 2009                    Respectfully submitted,

  s/  Alan M. Lieberman
Alan M. Lieberman
Richard B. Skaff
Robert I. Dodge
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC  20549
(202) 551-4474 (Lieberman)
liebermana@sec.gov

Local Counsel:
Ellen E. Christensen
Office of the United States Attorney
 for the Eastern District of Michigan
211 West Fort St.
Suite 2001
Detroit, MI 48226
(313) 226-9112

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 9, 2009, I filed the foregoing document with
the Clerk of the Court using the Electronic Case Filing system, which will send
notification to all counsel of record.

<u>s/ Robert I. Dodge</u>
Robert I. Dodge
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC  20549-6030
(202) 551-4421
dodger@sec.gov

# EXHIBIT 1

AMERICAN ARBITRATION ASSOCIATION

-------------------------------------------------------X

KMART CREDITORS TRUST,

                Claimant,                 AAA No. 54 116 Y 838 04

   - against -

CHARLES CHETWYNN CONAWAY,

                Respondent.

-------------------------------------------------------X

**BEFORE:**   Marvin Ginsky, Arbitrator
              David Love, Arbitrator
              George C. Pratt, Chairman

## DECISION AFTER EVIDENTIARY HEARING

The panel would initially like to thank the able counsel on both sides for their thorough presentations and highly professional conduct throughout this long and difficult arbitration.

Kmart Creditors Trust ("the Trust"), as assignee of all of Kmart's causes of action against its former officials, commenced an action in the Oakland County Circuit Court for the State of Michigan against Kmart's former CEO and Board Chairman, Charles Chetwynn Conaway; former officers Mark Steven Schwartz, David P. Rots, David W. Montoya, John T. McDonald, and Anthony B. D'Onofrio; and Kmart's former auditor, Pricewaterhousecoopers LLP.  On motion of the individual defendants, the action was dismissed in favor of arbitration.  The Trust then sought to commence a single arbitration against the six individual defendants, but the AAA required that separate arbitrations be maintained.  The Trust's amended demand for arbitration against Conaway alone was dated June 17, 2004.  It incorporates by reference the Trust's 115-

1

page complaint in the state-court action. As its position has been modified and narrowed during the proceedings, the Trust now claims essentially that during the 20 months that Conaway served as CEO and Chairman of the Board at Kmart, he breached his fiduciary duties to the company by engaging in "numerous and repeated instances of negligence and gross mismanagement, all of which seriously damaged Kmart." Although the amended demand against Conaway alleges that the "Trust requests damages from the six respondents in an aggregate amount exceeding $200 million", the Trust claims in its post-hearing memorandum that Conaway caused Kmart to be damaged to the extent of approximately $1.7 billion dollars, consisting of

- $856 million for implementing Blue Light Always;
- $282 million for slashing Kmart's advertising;
- $65.5 million for retaining, promoting, and failing to supervise Mark Schwartz;
- $23.9 million for wasteful retention loans to senior executives on the eve of bankruptcy;
- $2.25 million for enhancements to Schwartz's loan;
- $401.3 million for Conaway's hiding Kmart's financial condition and failing to prepare Kmart for bankruptcy;
- $57.8 million for wasted capital expenditures; and
- $5 million for Conaway's own retention loan.

In the state-court complaint, the Trust also sought to recover its attorney's fees and expenses.

Conaway denies the Trust's claims and contends that most of the items the Trust complains of are not actionable because of the business judgment rule; that the Trust's

2

claim of damages for Conaway's not having suggested that Kmart consider bankruptcy six months earlier cannot succeed; and that Conaway is entitled to keep his $5 million retention loan.  Conaway seeks denial of the Trust's claims in every respect, plus an award of his attorney's fees and expenses in this arbitration.

After discovery, which included both extensive depositions and production of thousands of documents, the panel heard argument on Conaway's motion for summary judgment dismissing the claim, which motion the panel denied after oral argument.  At the evidentiary hearing, held on 14 days between May 2 and May 24, 2005, the panel heard testimony from 29 witnesses – 20 of them testifying live, and 9 by video-taped depositions.  The panel was also provided, and viewed privately, depositions of several other witnesses with supporting exhibits, which are all considered as part of the record. At the close of the hearing, counsel for both parties acknowledged that the panel had provided each side with a sufficient opportunity to present relevant evidence and that they had received a fair hearing.

The parties have submitted, and the panel has considered, in addition to the parties' post-hearing memoranda, extensive briefing on the motion for summary judgment and on the *in limine* motions.  Final arguments in the nature of summations were heard on July 6, 2005 after the panel had had an opportunity to read and analyze counsel's post-hearing memoranda.

## BACKGROUND

Kmart and its predecessor company, S.S. Kresge, have been in the retail business for over one-hundred years.  Kmart began operating as a discount department store in 1962.  Its headquarters are in Michigan.  Before the events giving rise to this arbitration, Kmart operated approximately 2,000 discount stores located in each of the 50 United States, Puerto Rico, the U.S. Virgin Islands, and Guam, and it employed more than 250,000 full- and part-time employees.  For the 1999 fiscal year (ending January 31, 2000), Kmart reported a net income of $403 million from sales of almost $36 billion dollars.  In 1989 Kmart was the world's largest discount retailer.  Its primary competitors, Wal-Mart and Target, however, were growing rapidly.  Wal-Mart passed Kmart in 1990 and by 1995 was three times Kmart's size.  While Kmart's sales were growing slowly from 1992 through 1999 at a compounded rate of 4% per year, Wal-Mart was growing at 15%, and Target at 14%.  As a result, during the 1990's, Kmart was steadily losing market share to both Wal-Mart and Target.

On May 30, 2000, Kmart hired Conaway as its CEO and Chairman of the Board. His mission was to turn Kmart around.  Conaway spent the first three months in his new position studying Kmart and its operations.  He then undertook a series of measures designed to improve Kmart's financial and competitive positions.  Some of them were successful – e.g. adopting numerous metrics to measure performance, improving the supply chain, improving Kmart's "in-stock" percentages, eliminating thousands of trailers containing obsolete merchandise that were behind stores and distribution centers, eliminating 1.6 million square feet of warehouse space, making unnecessary a proposed new $1.5 billion dollars warehouse, improving customer satisfaction, raising

4

employee morale, opening communications within the enterprise, and developing
Kmart's private-label brands such as Martha Stewart, Disney, and Joe Boxer.  On the
other hand, some of Conaway's decisions proved to be unsuccessful -- initiating Blue
Light Always (BLA), hiring Schwartz as President, and drastically cutting ROTO
advertising.

As of July 2001, a little over one year into Conaway's tenure, Kmart's stock price
was up and its same-store sales were 3.4% above the previous year.

Sometime in July, without Conaway's knowledge, Schwartz directed an increase
in inventory purchases of approximately $800 million over plan, a phenomenon referred
to at the hearing as an "overbuy" of inventory.  In perspective, this represented about
3% of Kmart's annual inventory purchases.  The reasons given for the increase were a
combination of the anticipated increased demand that would follow the proposed roll-out
of BLA in early September, and a desire not to be caught short in the holiday period as
had happened in the previous year.

Conaway learned of the overbuy in late August and recognized immediately that
it would cause problems with Kmart's liquidity.  A major concern of the Board's Finance
Committee was always the company's liquidity position – the amount of cash available
to meet anticipated obligations.  The Finance Committee wanted to maintain a liquidity
"cushion" of approximately $100 million.

Historically, the low point for Kmart's liquidity cushion always came in October,
after the inventory for the holiday season had been purchased, but before the increased
holiday sales had arrived.  Back in August, and before Conaway had learned about the
overbuy, Kmart had changed the alpha coding in its computer program that controlled

5

payments to vendors in order to bring Kmart's payment terms more in line with its competitors. This meant that payments to vendors would be made several days later than under the previous practice.

Faced with increased financial pressure from the overbuy and sharply reduced sales in the wake of the 9/11 tragedy, management turned its attention to coping with the liquidity crunch. Several possibilities were available – reduce purchases, slow-pay vendors, increase borrowing on the revolver, obtain a secured loan, defer capital expenditures, and perhaps others. To resolve the liquidity crunch, Conaway and the management team turned primarily to the two methods that were easiest and cheapest for working through the problem – reduce purchases, and slow-pay the vendors. The latter approach was referred to at the hearing as project SID (slow it down). Under project SID, a management committee would daily review upcoming payables in light of Kmart's current needs, and would select various vendors for delayed payments of their invoices. Overall, the average delay was between 2-7 days. Some delays were greater. Many vendors complained; some refused to make additional shipments until they were paid – a fact considered by the invoice-review group in determining what payments should and should not be made.

As a result of management's efforts to cope, the liquidity cushion at its lowest point went down to only $96 million, essentially holding to the $100 million mark. Management successfully worked through the inventory-liquidity problem so that by early December, it was able to terminate project SID, having brought the vendors back to being paid according to the new terms established under the alpha-coding adjustments.

6

At that point, Conaway and his management team looked forward hopefully toward the holiday season. The ensuing results, however, were disappointing – well below projections – and at the end of December, project SID was reactivated. Nevertheless, Kmart ended 2001 with some $700 million in cash.

In the last quarter of the fiscal year ending January 2002, a combination of events, characterized by Conaway as a "perfect storm", caused Kmart increasingly serious problems. The collapse of Enron in December generated extreme caution by bankers in their dealings with major corporations. The surety industry likewise tightened, threatening to revoke K-mart's bonds with various states for their worker's compensation obligations and various bonds K-mart had outstanding on pending litigation appeals. Those bonds would have to be replaced by cash, which would place even greater strain on Kmart's liquidity.

At the beginning of January, a stock analyst's report suggested that Kmart might be facing bankruptcy. Kmart also had difficulty in January collecting its vendor allowances, payments traditionally made by vendors in January of each year as rebates on purchases made during the previous year. Finally, despite a strong effort by James Adamson, a member of Kmart's board with excellent banking connections, Kmart was unable to obtain an additional loan to meet the crisis. The disappointing holiday sales, the lack of vendor allowances, the anticipated demands for cash in lieu of surety bonds, and the failure to obtain the additional loan, combined to force Kmart to seek bankruptcy protection under Chapter 11 on January 22, 2002.

Even before the bankruptcy, Schwartz was fired from the company. Soon after the filing Conaway was relieved of his duties and was replaced by Adamson as Interim

7

CEO and Chairman.   A separation agreement between Kmart and Conaway, dated March 11, 2002, ended Conaway's connection with Kmart.

During the Chapter 11 proceedings, Kmart's board authorized an Accounting and Stewardship Investigation, which ultimately noted that there might be "legal claims against certain former officers on the ground that they were grossly derelict in performing their duties to the Company..." including "such claims as breach of the fiduciary duties of due-care, loyalty and candor..."  As part of Kmart's reorganization plan, as approved by the Bankruptcy Court, there were assigned to the Trust "any and all Causes of Action of [Kmart] against any Person... arising out of the subject matter of the Investigation."

The state-court complaint filed against six former officers of Kmart and its auditor sets forth the Trust's claim against Conaway in this arbitration.  Some of those claims in the nature of corporate waste have been abandoned.  As a result of the hearing, the Trust now seeks to recover from Conaway on the claims specified earlier in this decision, which indicate a total damage to Kmart in excess of $1.7 billion dollars.


## DISCUSSION


It is not practical within the limits of this decision to discuss each of the issues litigated by the parties.  What follows represents what the panel deems to be the decisive considerations in this arbitration.  Still other issues that were presented during these proceedings have been considered and even though not specifically discussed have been resolved by the panel consistently with the conclusions reached.  One of the

8

parties has requested from the panel a reasoned award, so we will discuss briefly each of the Trust's specific claims for damages, as well as a few other issues that the parties have addressed.

As a result of our deliberations, we find, in summary, no basis to hold Conaway personally liable for Kmart's misfortunes. This is not a case of fraud, deliberate mismanagement, or corporate looting. The evidence shows that Conaway acted at all times in good faith and in what he believed to be the best interests of Kmart. He made a determined, albeit unsuccessful, attempt to accomplish what he was hired to do – to stop Kmart's long decline relative to its major competitors, to turn the company around, and to restore it to its former position as one of the nation's preeminent retailers.

As CEO and Chairman of a company with sales of $35 billion per year, Conaway was handsomely compensated, but his rewards were not out of line with those of top executives in other major corporations. No credible evidence has been presented of stealing corporate funds, of fraud, or even of neglect of duty or gross mismanagement. Some of Conaway's decisions did not work out well, but on the record before this panel, on all business matters for which the Trust seeks to recover, Conaway's conduct qualifies for protection under the business judgment rule, which is designed to insulate decisions of corporate officials from claims of liability based on hindsight evaluations of the results of those decisions.

We turn our attention, first, to the business judgment rule, and then, to the specific claims of damages advanced by the Trust.

9

A.    Business Judgment Rule

Conaway's primary defense to the claims that are advanced by the Trust in this arbitration is that the decisions he made as CEO and Chairman of Kmart are all protected by the business judgment rule, under which a corporate officer's or director's business decisions are insulated from personal liability unless it appears that the decision maker acted fraudulently, in bad faith, or without considering material information. The purpose of the business judgment rule, as contended by Conaway, is to insulate from judicial review, even those decisions that in hindsight turn out to be mistaken. The rule has been followed throughout the United States as a policy judgment to relieve courts of the burden of micro-managing, in retrospect, corporate business decisions, to relieve corporate officials from undue fear of personal liability, and to avoid chilling corporate innovation.

The Trust suggests that Michigan law, which applies in this case, adopts a different view from the rest of the country. It argues that a corporate officer can be held liable for ordinary negligence, a conclusion it draws from the language of MCLA Section 450.1541a(1)(b), which requires directors and officers to discharge their duties with the care an "ordinarily prudent person in a like position would exercise under similar circumstances." Michigan cases, however, have not applied the business judgment rule with the ordinary-negligence standard that the Trust seeks to invoke.

The Trust also seeks to neutralize the rule's application here by suggesting that Conaway did not sufficiently inform himself before acting and that he concealed relevant information from the Board of Directors, but the panel does not find that either of those contentions is sustained by the evidence. Accordingly, the panel has concluded in

10

general that Conaway's actions and decisions while CEO and Chairman of Kmart are insulated from personal liability under the business judgment rule.

### B.   BLA

One of the major failings during Conaway's tenure at Kmart was the Blue Light Always initiative.  This was a hybrid "everyday low price" (EDLP) program that Conaway designed to replace Kmart's traditional high/low pricing method.  Among his reasons for instituting the change to BLA were the facts that Kmart was losing ground in the market relative to Wal-Mart and Target;  that Conaway was hired to turn the company around; that Kmart's high/low pricing strategy relied excessively on ROTO advertising whose costs were increasing more rapidly than sales; and that among the major discounters, Kmart was the only one not using either a straight-EDLP or a hybrid-EDLP pricing method.

With the Board's approval, Conaway turned to BLA as a program to "change the way that Kmart goes to market".  Ultimately, approximately one month before the bankruptcy, in December 2001, Conaway abandoned the BLA initiative and returned to the traditional, high/low pricing program.

Under BLA, Kmart established consistently low prices on selected SKU's for commonly purchased, everyday items, aiming at drawing customers into the store.  It kept higher prices on other items that customers were expected to buy while shopping for the BLA merchandise.  In order to succeed in spite of the lower prices on some items, a "lift" [increase] of approximately 6% in the dollar volume of purchases was needed.  When that lift did not materialize, Kmart did not attain the gross-margin level it

11

might otherwise have achieved.  As a result, according to the Trust, Kmart was damaged by some $850 million.

The Trust attributes this damage to what it terms to be Conaway's reckless adoption of BLA.  It claims Conaway was grossly negligent by failing to gather sufficient information, failing to test the program, failing to heed available advice or hire experts, and failing to accept the on-going results as they appeared.  The Trust also claims that Conaway rashly increased the number of SKU's, went too far, too fast, and did so contrary to the Board's directions.  It points to previous tests of EDLP by Kmart and surveys that showed Kmart's customers to be more influenced by merchandise selection than by price, and it faults Conaway for having failed to anticipate his major competitors' reactions to the BLA initiative.

In response, Conaway argues that Kmart's high/low pricing was simply not viable as a long-term strategy.  He adopted BLA as a hybrid-EDLP strategy only after discussion with, and approval by, the Board.  According to Conaway's expert retailing witness, more testing was done for BLA than is often done by major retailers.  It was tried out in four test markets and then introduced slowly in the spring of 2001 with approximately 2000 SKU's.  By August, it had been increased to 18,000 SKU's (10% of the total inventory) and by September it was raised to 56,000 SKU's (28%).  Before the last increase was launched, results had been encouraging, albeit not spectacular.  Without extensive advertising on TV or elsewhere, BLA had been accompanied by a sales lift in July of 3.4%.  Everyone recognized that the needed change in customer perception of Kmart as a high-price store would require some time.  There was some testimony indicating that introducing a major change in strategy such as BLA might

12

require as much as two years to be completed.  Moreover, according to Conaway, some of the old tests that the Trust says he ignored were straight-EDLP tests that Conaway did not think were helpful for evaluating his hybrid approach.  Nor had the anticipated savings from reduced ROTO advertising and the modified supply-chain operations been factored in.

From the panel's perspective, the Trust's argument that Conaway rolled out BLA to 56,000 SKU's without informing the Board and against its direction is simply not sustained by the evidence.  While some Board members professed not have been informed of Conaway's plan, the documentary evidence is to the contrary.  Management periodically reported to the Board on the status of the program from its beginning.  In August, it reported its plan to roll-out in September to 45% of its SKU's.  Actually, management went only to 28%, or 56,000 SKU's.  At no time did any member of the Board object to Conaway's plan or suggest that he should stop BLA, or even slow it down.  In short, the Board approved – implicitly, if not expressly – not only of BLA in general, but also of management's implementation of the program.

The facts that BLA did not work out as expected, hampered significantly by the results of the 9/11 tragedy, and that it may have caused Kmart to lose substantial income, are insufficient reasons to hold Conaway personally liable for what, in retrospect, appears to be no more than an error in judgment, compounded in part, perhaps, by the economic fallout from a national disaster.  There is no question but that Conaway proceeded in good faith, applied his own knowledge and experience from the retail field, and took appropriate steps to introduce the BLA program.  Contrary to the Trust's argument, Conaway's actions and conduct with respect to BLA are protected by

13

the business judgment rule and cannot serve as a basis for holding Conaway personally responsible simply because the program did not succeed.

C.     Advertising

One of the benefits Conaway sought to achieve through BLA was a significant reduction in ROTO advertising costs, which in recent years had increased disproportionately to sales. Anticipating an extensive and successful roll-out of the BLA program in early September, with an accompanying increase in TV advertising, Conaway arranged to reduce by 40% - 50% the size of Kmart's weekly ROTO. In retrospect, the reduction proved to be too drastic, and with the abandonment of BLA in December, Kmart returned to its heavy reliance on ROTO advertising. The Trust contends that the effect of the reduction in advertising inflicted on Kmart damages from a loss in gross margin of $282 million, for which it seeks to hold Conaway personally responsible. In response, Conaway challenges the damage analysis of the Trust's witness, Gordman, pointing out that his analysis does not support a causal connection between decreased ROTO pages and reduced holiday sales.

The panel passes over the arguments over damage analysis, because it concludes that the decision as to what particular advertising strategy to adopt for Kmart falls squarely within the business judgment rule, given Conaway's good-faith conduct and devotion to the best interests of Kmart and its stockholders. The advertising mis-judgment cannot serve as a springboard for finding Conaway personally liable for Kmart's reduced sales and gross margin in the fourth quarter of 2001.

14

A.    Schwartz

The Trust asserts that Kmart was damaged in the sum of $65.5 million because Conaway hired Schwartz as President, permitted him to "run the store", and failed "to conduct reasonable supervision of him." Schwartz was a controversial figure – crude, abrupt, aggressive, and given to making quick, sometimes harsh decisions. Some employees feared or disliked him. Others admired his intelligence – possibly at the genius level – his devotion to Kmart's interests, his hard work, and his ability to get things done. Schwartz, however, was responsible for the $800 million inventory overbuy, which precipitated Kmart's liquidity crunch in the Fall of 2001. The Trust also points to several other actions by Schwartz, which, it argues, were rash or reckless, and which caused collectively the claimed damages to Kmart. Conaway is responsible, the Trust contends, because he failed to properly supervise and control Schwartz's actions.

The panel rejects the Trust's attempt to hold Conaway personally responsible for Schwartz's conduct. There was no evidence of a failure to supervise; on the contrary, there was ample evidence of continual close contact between Conaway and Schwartz. Conaway had no pre-Kmart relationship with Schwartz. Nothing in the evidence suggests any improper, self-serving purpose in retaining Schwartz as President of Kmart. As with the other claims that the Trust has advanced against Conaway related to his business decisions, the claim against Schwartz fails in light of the business judgment rule.

E.    Retention Loans to Senior Executives

The Trust seeks to recover from Conaway for the retention loans made to Schwartz and other senior executives, which were approved by the Compensation

15

Committee in October 2001, and the Board in November, but not paid until December. The Trust says the loans were wasteful and caused losses to Kmart of $23.89 million plus another $2.25 million in enhancements later granted to Schwartz. The Trust argues that there was no need for the retention loans, that there was no demonstrated danger of losing the top executives, and that the amounts of the loans were, in any event, excessive.

Conaway presented evidence, which the panel accepts, that given the circumstances in October, when Kmart was at the height of the liquidity pinch, BLA's dim performance and the then-obvious fact that year-end bonuses for executives would not be available, a retention-loan program arguably made good business sense. Initiative for the program seems to have come not from Conaway but from David Rots, Kmart's Chief Administrative Officer. The proposal was reviewed by Unifi Network, an outside consulting firm, and was submitted to and approved by both the Compensation Committee and the Board itself. In these circumstances, there is no basis for finding Conaway personally liable for the retention loans.

The Trust particularly condemns the loan given to Schwartz just weeks before he was fired from Kmart. Conaway acknowledges the anomaly of granting such a loan to the President when Conaway had already developed strong misgivings about Schwartz's performance. According to Conaway, however, given the circumstances at the time, granting retention loans to all senior executives except President Schwartz would have precipitated a crisis in the company at the critical holiday period. Conaway saw his choice to be either to grant Schwartz his loan along with the others, or to fire him outright. He concluded that an immediate firing would cause more harm to Kmart

16

than would the loan, which was a comparatively small amount in the overall picture of
Kmart's $35 billion in sales. Because there was no dishonesty, bad faith, or neglect or
disregard of responsibilities, neither a court nor an arbitration panel should inject itself
so deeply into the internal affairs and decision-making of a corporation as to impose
personal liability in this situation.

      F.    Bankruptcy

Considerable time and attention was focused at the hearing on the Trust's claim
that Kmart had entered the "zone of an insolvency" in the Spring of 2001, that Conaway
should have alerted the Board to Kmart's allegedly deteriorating financial situation, and
that Conaway should have recommended to the Board that Kmart file for Chapter 11
protection in August or early September 2001. According to the Trust, Conaway's
failure to so recommend bankruptcy to the Board caused the Company to "free fall" into
an unplanned bankruptcy in January 2002, inflicting damages on Kmart of over $400
million.

According to the Trust, between August and January 2001, Kmart was paying
preferred dividends, interest, rent on 800 dark and underperforming stores, and
judgments and settlements on public liability claims – all of which could have been
withheld under the protection of bankruptcy to the benefit of Kmart. The Trust's
argument on the bankruptcy issue is theoretical and complex. Moreover, it shifted
somewhat as the proceeding progressed.

In opposition, Conaway makes several arguments. Drawing on the business
judgment rule, he contends that bankruptcy is always a last resort, particularly for a
retailer such as Kmart. Conaway's expert, Hyman, viewed bankruptcy as an extreme

17

step that should occur only when virtually all hope is gone and the Company has exhausted its other remedies.  Board-member Adamson testified that if Conaway had recommended bankruptcy in August, he would have urged the Board to fire him.

Conaway also points out that the specific payments made by Kmart between August and January were all legitimate debts of the company, and that there is substantial doubt as to what would have happened had Kmart in the Fall suddenly stopped paying obligations such as rent and interest.  Furthermore, as previously indicated in this decision, in August, based on July's financial information, things were definitely looking up for Kmart; it was not the kind of picture to suggest a bankruptcy filing.  Moreover, Kmart's cash position after the holiday season was better than it had been in August or September.  Perhaps most telling, according to Conaway, the Trust's own expert , Zambelli, testified that Conaway's failure to recommend bankruptcy in August was not "outside of the norm".

The panel is not persuaded by the Trust's arguments on the bankruptcy issue. For a retailer, if bankruptcy occurred after mid-September at the latest, the critical holiday selling season would be substantially affected.  For Kmart, at that time, there appeared to be several means available for meeting the liquidity crunch – means that actually did prove to be effective through December.  Even if Conaway had suggested bankruptcy, the Board would have not have approved.  While the financial information supplied to the Board was optimistic, particularly in terms of projected sales growth, it did not reflect the deliberate deception that the Trust now suggests.  Moreover,  no one at Kmart suggested considering bankruptcy possibilities until Boyer did so in October, when it was too late to file without jeopardizing the holiday sales.

18

The panel is satisfied that Conaway acted in good faith and used every effort to bring Kmart through a difficult period. Indeed, he almost succeeded. No serious harm seems to have flowed from the bankruptcy having been "unplanned". In short, on this claim, the panel finds no basis for holding Conaway personally liable to the Trust.

### G.    Capital Expenditures

The Trust attacks several capital expenditures as unnecessary, most of them because they were later abandoned or written-off. These expenditures included mid-way tables ($100 million), building and expanding "Super Centers" and Caribbean stores ($200 million), and expenditures on stores that would be closed within a year ($58 million).

In opposition, Conaway relies on the business judgment rule and in addition argues that the trust failed to prove that when the expenditures were made, there was any abuse of business discretion. Moreover, according to Conaway, all of the expenditures were reviewed and approved by the Finance Committee of the Board. Based on the evidence, the panel concludes that under the business judgment rule, Conaway cannot be held personally liable for the identified capital expenditures.

### H.    Retention Loan to Conaway

Unlike the Trust's other claims, which all involve business decisions and consideration of the business judgment rule, the retention loan to Conaway must be measured by different standards. When Conaway originally negotiated his employment agreement with the Board's Compensation Committee, they worked under considerable

19

Case 2:05-cv-40263-RHC ECF No. 173 filed 09/09/09 PageID.8192 Page 30 of 33

time pressures and did not have the opportunity to resolve all issues. They agreed that in the future they would amend the agreement so that Conaway would have lost nothing by leaving his previous position with CVS. Toward the end of the first year, they addressed that promised amendment by entering into a formal amendment to Conaway's employment agreement on May 15, 2001.

Among other things, the amendment granted to Conaway a loan of $5 million payable in approximately five years with interest. The agreement provided, however, that the loan would be forgiven in full by the company if Conaway remained employed through January 31, 2006, or if the Company should give Conaway earlier written notice of non-extension of his contract, or if Conaway should be constructively terminated by the Company. As defined in the employment agreement, "constructive termination" included, *inter alia*, "a material reduction or material adverse change in [Conaway's] responsibilities, duties, authority". After Kmart filed for Chapter 11 in January 2002, the Board designated Adamson to function as Interim Chairman in place of Conaway. As of March 11, 2002, Kmart and Conaway entered into a separation agreement which recited Conaway's constructive termination and forgave Conaway's $5 million retention loan. Had Conaway been terminated "for cause", he would have been required to repay the loan.

The Trust attacks the loan, claiming that it was void as a matter of law, that there was ample cause for Conaway's termination, that the loan itself constituted corporate waste and lacked consideration, and that the separation agreement was never approved by the bankruptcy court.

Conaway's opposition to the Trust's claims is well-founded. The claims of corporate waste and absence of consideration lack substance. The Trust's suggestion that the May 21, 2001 agreement is void because Conaway had not disclosed the problems of the inventory overbuy, project SID, and the liquidity crunch, borders on the ludicrous because all of those events occurred later in the year, after the amended agreement had been executed. Even if the board might have been able to fire Conaway for cause, it did not do so. Instead, it acknowledged that his position had been constructively terminated and it affirmatively agreed to forgive the loan. Finally, whether the bankruptcy court approved the separation agreement is irrelevant, because Conaway had clearly been subjected to a constructive termination, which by itself, under the original employment agreement, required forgiveness of the loan.

There was some discussion at the hearing over whether, when it was considering the amendment to Conaway's employment agreement, the Compensation Committee had been advised about the Hewitt report, which hypothesized no need for additional compensation to Conaway. According to the Trust, if Conaway had concealed that report from the Compensation Committee, that would be a basis for undoing the amendment and its retention-loan provision. The flaws in this argument, however, are many. In the first place, the negotiations over Conaway's amended agreement were carried out by Rots, not Conaway. Conaway had never heard of the Hewitt report. The Compensation Committee hired its own outside compensation consultant, Frederick Cook, to advise about Conaway's compensation, and Cook had a copy of the Hewitt report and referred to it in his own report to the Compensation Committee. On these facts, there could be no basis to rescind the retention-loan provision of the amendment.

21

In short, the Trust's attacks on Conaway's retention loan have failed.  Conaway is entitled to keep the loan.

I.      Attorney's Fees and Expenses

None of the Trust's claims against Conaway has been sustained, so that Conaway is entitled to an award dismissing all of them.  As the prevailing party, and under the terms of his employment agreement, and since none of his assertions or defenses were in bad faith or frivolous, Conaway is also entitled to an award reimbursing him for the reasonable costs and expenses of this arbitration, including reasonable attorney's fees.  If the parties cannot agree on an appropriate amount to be included in the final award, Conaway may request the panel to determine the amount of attorney's fees and expenses by motion served and filed within 30 days of the date of this decision.  Upon receipt of such a motion, the panel will establish a response date, and later will determine whether a further hearing on the amount of the award will be necessary.

## CONCLUSION

The Trust has failed to meet its burden of establishing that, for any of the claims advanced in this arbitration, Conaway breached any of his obligations as Kmart's CEO and Chairman. Accordingly, the Trust's claims are dismissed, and Conaway is awarded his reasonable attorneys' fees and expenses, to be determined by agreement or further decision of this panel.

Dated:      July ___, 2005

_____
Marvin Ginsky
Arbitrator

_____
David Love
Arbitrator

_____
George C. Pratt
Chairman

FFDOCS1\640429.03

23