UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

vs.

CHARLES C. CONAWAY,
JOHN T. MCDONALD, JR.

        Defendants.

_____/

Case No.: 2:05-CV-40263

MAGISTRATE JUDGE STEVEN D. PEPE

> **Proof of Service**
>
> The undersigned certifies that a copy of the foregoing Memorandum Opinion was served on the attorneys of record herein by electronic means or U.S. Mail on **January 20, 2010.**
>
>         s/Kim Grimes
>         *Case Manager Supervisor*

MEMORANDUM OPINION ON DEFENDANT'S MOTION UNDER RULES 50(b) AND 59
FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.

*"The whole financial system is based on trust and belief that what people say is their word. So, without that, the system decays." -* Witness Eric Beder, equity analyst, (December 17, 2007, *at* TrDep00299.)

*"If they ask a question, yes. And you determine that you're not going to disclose the information to them, no, that's not disclosing. That's not lying." -* Defendant Charles C. Conaway, former Kmart CEO, (February 13, 2008, at TrDep00344.)

*"Corporate fraud is not usually begun by here's a bad guy in a company who does bad things . . . . Usually . . . companies . . . ultimately have problems with their financials. . . . [T]hen they hit a bump in the road, and within the company there is this mind-set of 'well this is a bump in the road and we'll just paper it over.' When it proves not to be a bump in the road but a chasm . . . it gets wider and wider and wider . . . . The corporate fraud cases – sometimes they're less greed than arrogance . . . . a lot of these people believe that it's absolutely impossible for them to fail."*

    - Kurt Eichenwald, Author of THE INFORMANT, A TRUE STORY (Broadway Books 2000) [1]

*CEO Charles Conaway characterized the August 2001 $850 million overbuy as a"bump in the road." (September 25, 2001, Voice Mail Blast to Kmart Employees  Plf. Exh. 318, at p. 89:18.) Later he also characterized Project eLMO as a bump in the road, but in truth it was the false cover story he used in the effort to paper over the liquidity crisis caused by the $850 million overbuy.  (November 27, 2001, Conference Call 1 Plf. Exh. 57. at p. 25.)*

    Following a three week trial, a jury of 10 determined that defendant Charles C. Conaway,

---

[1] National Public Radio, WEEKEND EDITION SUNDAY, September 20, 2009, "The Serious Story Behind The Informant," Liane Hanson Interview with Kurt Eichenwald. http://www.npr.org/templates/player/mediaPlayer.html?action=1&t=3&islist=true&id=10&d=09-20-2009, last visited September 20, 2009.

former CEO of Kmart Corporation, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, and in addition he aided and abetted  Kmart in its violation of Section 10(b) of the Exchange Act and Rule 10b-5, and in Kmart's violation of Section 13(b) of the Exchange Act and Rules 12b-20 and 13a-13.  Defendant has filed a motion under Federal Rules of Civil Procedure 50(b) for judgment as a matter of law or, in the alternative, under Rule 59 for a new trial.  Other than the finding of fact on one alleged misstatement for which it is determined there is insufficient evidence, **DEFENDANT'S MOTION IS DENIED** and the jury's verdict is upheld.

While arising in the same 2001 time frame as the securities fraud cases involving Enron and WorldCom, this case involving America's then third largest discount retailer presents less overt wrongdoings and no stock profiteering.  To understand the nature and validity of the Securities Exchange Commission's claims, a detailed presentation of the facts is required as set forth in Section I. Following the factual summary, this decision will address Mr. Conaway's legal claims in Section II  followed in Section III with an analysis of his claims  asserting insufficient evidence to uphold the jury's findings.

I.    **BACKGROUND FACTS**.                                                                    PAGE

A.    **Kmart's Liquidity Problem.**                                4

B.    **The Cover-Up Story: Project Elmo.**                         21

C.    **Communications with the Board**.                           25

D.    **Kmart's Quarterly SEC Filing on Form 10-Q(3).**            40

E.    **The Conference Call.**                                      42

**II. DEFENDANT CONAWAY'S LEGAL CHALLENGES:**                               PAGE

    **A.**    **Claim Three – Aiding and Abetting Kmart's Violation of Section 13(a)
of the Exchange Act .**

        1. Challenge to the Violation of Section 13(a) of the Exchange Act .    49

        2. Challenge to the Instruction on Item 303 of Regulation S-K.    57

        3. Jury Instructions.

                a.    Background Law.    60
                b.    Regulation S-K, Item 303.
                    (1.) *Did the Jury Instruction Confuse 303(b) with 303(a)
                    and not require a Change?*    62
                    (2.) *Must all Item 303 Disclosures Affect Future Operations?*  71
                    (3.) *Was the Instruction on Materiality Confusing?*  82

    **B.**    **Claim Two - Aiding and Abetting Kmart's Violation of Section 10(b)
of the Exchange Act .**

        1.    Jury Findings on Claim Two.    84

        2.    Challenge to Use of the MD&A as a Whole as the Statement
Underlying Section 10(b) and Rule 10b-5 Liability.    86

        3.    Challenge to the "implied representation theory of liability."    91

        4.    Challenge to Use of Regulation S-K Item 303 as a
Basis of  Section 10(b) and Rule 10b-5 Liability.    107

    **C.**    **Claim One – Defendant Conaway's Violation of Section 10(b)
of the Exchange Act .**    134

**III. DEFENDANT CONAWAY'S CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE.**

    **A.**    **Sufficiency of the Evidence Legal Standard.**    135

    **B.**    **Credibility Issues Regarding Defendant Conaway.**

        1.    Mr. Conaway's Involvement in Misleading Financial
Representations to the Board.    136

PAGE

    2.     <u>Mr. Conaway's Misleading Statements and Actions at Kmart.</u>
          a.     *The Growing Debt, Vendor "Noise" and Talking Points.*   140
          b.     The November 13 Levin Letter.   141
          c.     *Conaway Statement to the New York Times.*   142
          d.     Conaway's November 14 Voice Mail to his Employees.:   142
          e.     *Conaway's November 27 Meeting with Employees.*   143
          f.     *Conaway's November 27 Conference Call.*   144
          g.     *Conaway's Lies to his Board.*   146

    3.     <u>Mr. Conaway's Misrepresentations Under Oath.</u>   149

**C.**    **Challenge to Claim One - Primary Liability for a Violation of Section 10(b) and Rule 10b-5.**   164

**D.**    **Evidence in the Record Supporting the Jury's Finding that Charles Conaway Caused the Form 10-Q Violations.**   171

    1.     <u>Evidence that Charles Conaway Caused the Three Omissions:</u>   171

    2.     <u>Evidence that Charles Conaway Caused a Misstatement in the MD&A.</u>   183
          a. *Was there a Materially Misleading Statement ?*   184
          b. *Did Conaway Cause the Misstatement ?*   193

**E.**    **Were the Conference Call Statements of Mr. Conaway violations of Section 10(b) and Rule 10b-5.**   195

**F.**    **Evidence in the Record Supporting the Jury's Conclusion that Conaway Acted with Scienter.**   205

**G.**    **Conaway Aided and Abetted Kmart's Fraud and Disclosure Violations.**   208

**IV. CONCLUSION.**   210

# I.  BACKGROUND FACTS.

## A.  Kmart's Liquidity Problem.

Kmart experienced a liquidity crisis in the third quarter of 2001 of historic proportions caused in large part by an early $850 million inventory purchase above plan (the "overbuy"

(Gilbert, 5/13/09, at Tr00359-60; Moreland 6/27/07, at TrDep00016.)[2]  In the years leading up to

the 2001 problem, Kmart had lost much of its market share to rivals Wal-Mart and Target.

(Conaway 5/27/09, at p. Tr02021; Beder 12/17/07, at TrDep00301.)  Defendant Conaway was

hired by Kmart from CVS Corporation as a young, imaginative executive who could reverse the

troubles facing Kmart.  Further exacerbating Kmart's liquidity crisis in the third quarter of 2001

were the drop in sales after the September 11th terrorist attack and the launch of an unsuccessful

Blue Light Always program with its lower pricing on commonly purchased products that faltered

due to a cutback in advertising.[3]  (Conaway 5/28/09, at Tr02415-Tr02418.)

The overbuy began in the end of July or early August when Kmart's President and Chief

Operating Officer Mark Schwartz directed a series of inventory purchases that exceeded the

company's operating plan.  (Gilbert 5/13/09, at Tr00359; Moreland 6/27/07, at TrDep00016; Plf.

Exh. 8).   In the first week of August, Scott Gilbert, the Assistant Controller for Accounts

Payable, was informed of the overbuy by Assistant Treasurer Mark Moreland. (Gilbert 5/13/09,

at Tr00359.)  While first believed to be $400 million, the overbuy was later determined to be

$850 million.  (*Id*. at Tr00360; Moreland 6/27/07, at TrDep00056; Plf. Exh. 7.)

The Schwartz overbuy was not authorized by Defendant Conaway and was characterized

by him as being "reckless."  (Conaway 5/28/09, at Tr02407; Plf. Exh. 188, p. 3).  Mr. Conaway's

notes of August 30, indicate that Kmart's CFO Jeff Boyer was "blindsided" by the inventory buy

---

[2] Kmart was on a January 31 fiscal year, so the third quarter included August, September and October.

[3] Blue Light Always was an everyday low pricing  marketing strategy that was put place in the third quarter of 2001 for items consumers bought regularly, similar to what Wal-Mart did in their stores.

5

that was "totally unacceptable" to CEO Conaway who demanded to know "what underlined(happened) !"

(Plf. Exh. 188, p. 3, emphasis in original.) The overbuy had the effect of moving up Kmart's

peak borrowing date and "clearly magnified" the annual liquidity crunch that came in early

November when holiday merchandise was acquired and holiday sales had yet to materialize.

(Boyer 7/19/07, at TrDep00381; Conaway 2/13/08, at TrDep00330-31.)   Executive

Vice-President of Merchandise, Cecil Kearse, who worked at Kmart from to 1979 to 2002, was

so concerned about the negative trends that he spoke to Conaway to reign in President

Schwartz's continued buying activities, which strained relations between Kearse and Schwartz .

(Kearse 5/20/09, at Tr01051-52 and Tr01100-17.)

   In an August 17, 2001, letter to the Board of Directors, Mr. Conaway told the Board that

the second quarter ended with $283 million more inventory than the prior year due in large part

to efforts to improve in-stock position for his new BlueLight Always sales initiative  (Plf. Exh.

110.) In the July 9 Board package, there was a liquidity cushion forecast for the peak borrowing

date of November 9 at $207 million (Pft. Exh. 4, p. 2.)[4]  Noting decreases in capital expenditures

and revised accounts payable terms negotiated in the second quarter, Mr. Conway's August 17,

2001, letter to the Board estimated Kmart's liquidity cushion in early November's peak

borrowing period would increase "from $200 to nearly $600 million." (Plf. Exh. 110.)

   Taking the overbuy into account at a time when he thought it was only $ 400 million,

Assistant Treasurer Mark Moreland, generated a series of cash forecasts for the Finance

Committee of the Board  projecting that Kmart's cash needs in October and November would

---

[4] A liquidity cushion was the amount of credit still available to Kmart on its lines of
credit including its $1.6 billion bank revolver and its $175 million in letters of credit.  (Plf. Exh
63.)

6

exceed its available borrowing capacity by $135 million and he acknowledged that with such forecasts "the company would be illiquid." (Moreland 6/27/07, at TrDep00016, TrDep00037-38, & TrDep00040-41; Plf. Exh. 4, p. 2 & 4). This August 15 draft showing a $342 million deterioration in the liquidity cushion from plus $207 million to minus $135 million did not make it to the Finance Committee of the Board. (Moreland 6/27/07, at TrDep00040.)  An interim liquidity forecast draft showed instead of a negative $135 million, a positive $217 liquidity cushion as of November 8, or $10 million better than the July 17, 2001,  Board package forecast (Pft. Exh. 5, p .3.) The version that actually went to the Finance Committee of the Board, dated August 17, showed a $544 million liquidity cushion on November 9  (Plf.'s Exh. 6, pp. 2 & 4, Moreland 6/27/07, at TrDep00049-50.)  These data apparently supported the projected $600 million liquidity cushion in Mr. Conaway's August 17th letter to the Board.

Similar optimistic liquidity cushion forecasts were made by John McDonald and Charles Conaway in a September 10 power point presentation to bankers, including J P Morgan Chase which coordinated Kmart's $1.6 million credit revolver.  It showed "peak borrowings" for 2001 at $878 + $35 = $913 million against that $1.6 million revolver leaving a significant positive cushion whereas internal documents showed significant deficits even with a $600 million dollar "Reduction in Receipts" (i.e. receipt of new inventory) . (Compare Pft. Exh. 14, p. 44 to Exh. 12).

 In forecast scenarios Mr. Moreland prepared for Kmart's top officers on Kmart's Executive Leadership Team (the "ELT")[5] around this time, if sales were flat to the prior year

_____

[5] The ELT consisted of :Charles Conaway, CEO, Mark Schwartz President and Chief Operator Officer, Tony D'Onofrio, Head of Supply, Jeffrey Boyer, CFO (Treasurer Mark McDonald often attended ELT meetings and upon replacing Jeffrey Boyer as CFO became an

("Zero Comp Scenario") and nothing was done to deal with the liquidity crunch, Kmart exceeded its borrowing capacity by $122.7 million on October 3, and by $455 million on November 7 and would be "illiquid" (Plf. Exh 9; Moreland 6/27/07, at TrDep00058.)  Even if sales were up 8%, liquidity turned negative on October 10 (Plf. Exh. 7, at p. 1 a& 3.)  If sales were down 3% from the prior year the November 7 deficit would reach $641.8 million. (Plf. Exh. 10.)  With a $600 million reduction in future receipts of inventory, zero comp sales showed a liquidity deficit of $597 million on October 24. (Plf. Exh. 12 )  Negative 3% comparable sales forecast a deficit exceeding one billion dollars on that date.  (Plf. Exh. 16.)  The actual sales for Kmart in the third quarter were down 2.2% overall, down 1.5% for comparable stores, from the prior year.[6] These late August and September internal scenarios showed a looming deficit of hundreds of millions of dollars, while circulated internally to the Executive Leadership Team ("ELT") including Defendant Conaway, were not shared with the Board. (Moreland 6/27/07, at TrDep00034-35.)

--------

official member), David Montoya, Head of Operations, Cecil Kearse, Lead Merchant, Dave Rots,  Chief Administrative Officer and Randy Allen, Executive Vice President, Strategic Planning and Chief Information Officer. (Archambeau 5-13-09, pgs. 43-4, Kearse  page:lines 191:23 - 192:9,Moreland 4/23/09, page:lines 10:1-7 ) While Cecil Kearse indicated his belief that General Counsel Janet Kelly  was on the ELT, this appears not to be the case in light of evidence not available to the jury (Mr. Conaway expressed his regret at the hearing on remedies of not having had Chief Legal Counsel as part of the ELT during the third and fourth quarters of 2001. Conaway 9-16-09, at Tr03143-44).

[6] The Kmart Board materials show: August sales up 0.2% from the prior year with unit movement down 1.8%;  September sales were flat comparable to the prior year with unit movement down 4.1% in September due to the September 11th incident and reduction in advertising; November sales were down 2.6%  notwithstanding a good Thanksgiving week up 3.4%;  and the entire third quarter was down 2.2% overall and down 1.5% for comparable stores from the prior year.  (Plf. Exhs.  65, p. 22, 114, p. 4,183, p. 1, 121 at CC0098731 & CC0098734-35 .)

On September 14, 2001, Jeffrey Stark, Kmart's Merchandise Controller, sent a memo to Jeffrey Boyer, then Kmart's CFO, regarding the inventory forecast risk. (Plf. Exh. 260.) In it he stated that even with the forecasted 2.1% sales increase for the remainder of the quarter that still put Kmart with $980 million inventory above plan at the end of September and by $725 million inventory above plan at the end of October. He continued that if sales dropped 1.8% compared to the prior year, then the September number would climb to $1.1 billion above plan, and October would balloon from $725 million to $1.36 billion above plan. With flat sales the inventory overage to plan would be $1.1 billion for September and $1.3 billion for October. At that point the trend was not good, and the effects of the overbuy were not going to go away without work. (Kearse 5/20/09, at Tr01095.) With or without the forecasted 2.1% sales increase Kmart had an inventory problem. (*Id.* at Tr01096.)

The September Board package included an August Inventory Summary showing total inventory $825 million over "commitment" or plan. (Plf. Exh. 65 at p.29.) In his September 20, 2009, letter to the Board following the September telephonic Board meeting Mr. Conaway identified "canceling of receipts" and new accounts payable terms as means of managing liquidity, yet, he also noted Kmart's need for "an additional $500-800 million more inventory in the immediate term." (Plf. Exh. 113, p 2.) In his October 12, letter to the Board, Mr. Conaway noted ending September with $1.1 billion more merchandise than the prior year, up from the $283 million increase at the end of July noted in his August 17, 2001, letter to the Board. (Plf. Exh. 71, p.2.)

Conaway admitted that the overbuy had a negative impact on Kmart's working capital and liquidity, making management of the liquidity crisis a big issue for Kmart (Conaway

9

2/13/08, at TrDep00317-18; Conaway 5/28/09, at Tr02414-15) .  Obviously the actual sales decline for the third quarter made things worse.

After the overbuy, the issue of Kmart's liquidity was discussed at a majority of the weekly ELT meetings.  (Boyer 7/19/07, at TrDep00378; Gilbert May 13, 2007, at Tr01072; Conaway 2/13/08, at TrDep00319.) Treasurer John McDonald, not yet part of the ELT, attended many of these meetings and led the discussion on the handling of financing.  (Boyer 7/19/07, at TrDep00378.)  Kmart could have taken a number of steps to avoid becoming illiquid during that time frame  – reducing future inventory purchases, delaying scheduled capital expenditures, accelerating vendor allowances, and making efforts to negotiate sale-leaseback transactions. (Conaway 5/27/09, at Tr02078-81; 80-84; Boyer 7/19/07 at TrDep00378-79).  In his October 12 letter to the Board, Mr. Conaway estimated Kmart could immediately get $500 million in the September to November 2001 time frame if it needed to by such asset-based lending but that would require financial disclosures to the Board, banks and stock analyst who followed Kmart. (Conaway 2/13/08, at TrDep00320-22.)  Additionally, while the secured borrowing process could have been begun, it likely would have taken too long to prevent Kmart from becoming illiquid. (Moreland 6/27/07, at TrDep00101 & TrDep00137; Tucker 5/22/09, at Tr01674-76.) Mr. Conaway chose not to pursue that course of action.  (Boyer 7/19/07, at TrDep00385.) Some thought these methods were not chosen because none of them would provide sufficient cash to meet the liquidity needs of Kmart.  (Moreland 6/27/07, at TrDep00022.)   By late August or early September it be came apparent that efforts to increase collection of vendor allowances, cutting capital expenditures and reducing receipts of inventory, sale leaseback of stores were not going to be sufficient to deal with the $800 plus million overbuy cash problem. (Moreland

6/27/07, at TrDep00020-22.)

Thus, in addition to cutting future inventory receipts to deal with the liquidity problem, Mr. Conaway chose slow paying vendors beyond their negotiated payment terms.  This involved unilaterally initiating two programs – later identified as the AP System changes and Project SID (sometimes called the "Moreland process") – to delay payments to its vendors.  (Archambeau 5/13/09, at Tr00270; Conaway 2/13/08, at TrDep00322-24; Conaway 5/27/09, at Tr02084 & Tr02094. )  He ordered McDonald to slow pay  Kmart's vendors, specifically prioritizing vendor payments.  (McDonald 5/28/09 , at Tr02639-40 & Tr02660.)

Kmart chose not to pursue further negotiations on new terms with the vendors because the cash needs were significant and imminent leaving Kmart no time for such talks.  (Moreland 6/27/07, at TrDep00023.)  Efforts to negotiate longer payment terms, called the "working capital initiative," had been tried in the prior quarter with limited success and Kmart, in the short run, may have reached the limits of what was possible on better negotiated terms. (Id. at TrDep00099; Boyer 7/19/07, at TrDep00382-83; Archambeau, 5/13/09 at Tr00470-71.)  Also, if the liquidity crisis were known to the public there could possibly be a "classic run on the bank where everyone panics, and then – then you're out of money."  (Levin 9/11/07, at TrDep00175.)

According to Head Merchant Cecil  Kearse, in an effort to come into accord with a widespread industry practice, Kmart changed the start date for payment terms from when the order was placed to the date when the goods were received (hereinafter referred to as "extended dating").  (Kearse 5/20/0, at Tr01259.)  In addition, Gilbert was called to a meeting with Treasurer John McDonald and Moreland, and asked if there was anything accounts payable could do "to stretch payments" to vendors to help deal with the liquidity issue, which was at the

time considered a short term problem likely to be resolved by the end of September. (Gilbert 5/13/09, at Tr00360-61.) On August 7 he held another meeting with Jeff Stark, the Merchandise Controller or head of the merchants or buyers at Kmart, and worked out what vendors they could add days in the payment system to delay vendor payments beyond their agreed payment terms. (*Id.* at Tr00364-71.) An August 14 email from Stark to Gilbert confirmed adding "+4/5 days" to weekly paid vendors. (Plf. Exh. 159.) The written Vendor Authorization Forms Kmart had used to set payment terms were not modified to permit this change, nor were the vendors informed of these changes. (Archambeau 5/13/09, at Tr00475; Gilbert 5/13/09, at Tr00371 & Tr00378). This undisclosed, unilateral initiative to stretch vendors, known as the "AP System changes," was accomplished by modifying the software in Kmart's accounts payable system to add a fixed 4-5 days to the scheduled payment date for each invoice. (Gilbert 5/13/09, at Tr00359 & Tr00363; Archambeau 5/13/09 , at Tr00472-73; Moreland 4/23/09, at TrDep00145.) On September 5, Stark told Gilbert that John McDonald wanted another 5 days delay for daily pay vendors on top of the earlier August delays. (Gilbert 5/13/09, at Tr00381-82; Plf. Exh. 135.) Gilbert noted Kmart paid approximately $70-75 million to hardline vendors each day, so delaying payments five days saved approximately $300 million. (Gilbert 5/13/09, at Tr00373-75.) Moreland also estimated the amounts held back by the AP System changes were in the range of $300 million. (Plf. Exh. 20, at p. 3; Moreland 4/23/09 at TrDep00145-46.) After these two rounds of AP System changes, Gilbert in a September meeting with McDonald and Moreland in McDonald's office, was informed even with the AP System changes involving most of Kmart's hardline vendors "liquidity was getting more difficult" and he was asked whether AP could do anything more. (Gilbert, 5/13/09, at Tr00374.) Gilbert said that they could not go

12

further with the Alpha coding changes used in the AP System changes because there were limits. (*Id.* at  at Tr00374-5 & Tr00383-84. )

Conaway admits to authorizing the AP System changes stating that Kmart was paying its vendors too fast and they needed to slow it down to levels similar to the ones utilized by Kmart's competitors Target and Wal-Mart.  (Conaway 5/27/09, at Tr02034; Conaway 2/10/05, at TrDep00314.)   By adding days Kmart was essentially extending the "loans" they were getting from vendors. (Boyer 7/19/07, at TrDep00382; Moreland 6/27/07, at TrDep00011.)   Conaway felt that stretching vendors, or as he put it "managing payables," was essential for Kmart's turn around.  (Conaway 5/27/09, at Tr02083-84.)   Mr. Conaway testified that these AP System changes were started in late July or early August, were unrelated to the overbuy and were intended to be permanent. (Conaway 5/27/09 at Tr02084-85.)   McDonald described his involvement on the working capital initiative starting in October 2000 to get added payment days, and noted additional days were permanently added in August 2001 before they knew about the overbuy, although his testimony is not clear whether this referred to extended dating or the AP System changes. (McDonald 5/28/09, at Tr02652-53.)   Gilbert was clear that his meetings with McDonald and Moreland in early August to start the AP System changes was in response to the overbuy which was considered a "short term problem," although the AP System changes stayed in place into January 2002. (Gilbert 5/13/09, at  Tr00360-61, Tr00371 & Tr00378).

The AP System changes, however, were insufficient to get Kmart through its major liquidity problem. Thus, with Conaway's blessing, an additional method of delaying vendor payments was developed.  (Conaway 5/28/09, at Tr02429.)   The second method was dubbed "Project SID" (for "slow it down").  (Moreland 6/27/07, at TrDep00024.)   Conaway referred to it

13

as "prioritize invoices" or "slow pay vendors" claiming that while at Kmart he did not know it

by the term "SID." (Conaway 3/27/09, at Tr02094, Tr02097, Tr02132 1/23/2003, at

TrDep00310.) Yet Moreland testified that the week following Labor Day weekend 2001, he used

and distributed a prepared document stamped "confidential" entitled "Project SID Process

Overview" during a conversation he had with Defendant Conaway and Treasurer McDonald.[7]

(Plf. Ex. 11;  Moreland 6/27/07, at TrDep00023-24; McDonald 4/23/09, at  Tr02426-28;

Conaway 5/27/09, at Tr02426-29.) The conversation detailed Project SID's workings, where

instead of delaying payments on all invoices across the board like the AP System changes, an

accounts payables working group of Mr. Kearse, Mr. Jellinek and Mr. McDonald, in conjunction

with Mr. Moreland,  would select a number of the invoices due to each vendor – *e.g.* 25-30% of

that vendor's  invoices – for an additional 30 days delay in payment . (McDonald 5/28/09, at

Tr02641-43; Moreland 6/27/07, at TrDep00028-30; Moreland 4/23/09, at TrDep00150-51;

Gilbert 5/13/09, at Tr00387-38.)  The selection of invoices was designed to mislead vendors into

thinking individual payments had simply been "hung up in processing" rather than intentionally

withheld.  (Moreland 6/27/07, at TrDep00026.)  Invoices were to be selected based on dollar

amount, because the larger the invoices the more cash that was delayed being paid, with a

majority of the vendors and majority of dollars being affected at some point.  (*Id*. at

TrDep00029-30.)

Conaway was very supportive of Project SID because the mechanism of stretching

vendors would not be obvious to the vendors.  (*Id.* at TrDep00025-26.)  At the meeting Conaway

---

[7] Prior to the commencement of trial, co-defendant McDonald entered in a settlement agreement with the SEC.

approved Project SID and asked that it be put into place as quickly as possible.  (*Id.* at TrDep00028.)  McDonald and Conaway made it clear to Moreland that only a "very limited" number of people were aware of this new effort.  (*Id.* at TrDep00026.)  Their concern, as expressed to Moreland, "was that if vendors understood that there was a liquidity crisis occurring, that they may not ship goods; and it could cause . . . a very bad public relations issue with the company."  (*Id.* at TrDep00026-27.)

Other witnesses confirmed that Project SID was intended to be kept a secret from the majority of Kmart's employees, as it was only talked about behind closed doors.  (Lindsey 5/18/09, at Tr00638-29; see also  Moreland 6/27/07,  at TrDep00026 "very limited"; Gilbert 5/13/09 at Tr00392 "top secret"; Archambeau, 5/13/09, at Tr00487.)  Concerned about whether this undertaking was proper, Mr. Moreland commented at the September meeting "at least what we were doing was not -- was not illegal." Both McDonald and Conaway chuckled at his assertion replying that such a scheme is done in every LBO ("leveraged buyout").  (Moreland 6/27/07, at TrDep00027.) Before leaving the meeting Mr. McDonald took Conaway's copy of the "Project SID Process Overview" noting he "did not need to have it." (*Ibid.*) .

 The Project SID payment delays began on September 19, 2001 and continued through the fourth quarter, with a two week interruption of the program in mid-December.  (Plf. Exh. 170; Archambeau 5/13/09 at Tr00493 & Gilbert 5/13/09 Tr00442; Moreland 6/27/07 at Tr00463.)   Project SID was not a small undertaking, it was a time-consuming effort that required daily monitoring with multiple large-scale computer runs.  (Moreland 6/27/07, at TrDep00030; Archambeau 5/13/09 , at Tr00480-87.)  Gilbert, who was Assistant Controller for Accounts Payable in charge of account payable, described a typical day as getting into the office

at 6:30 a.m. to get work done before the vendors' calls began, prepare for the 9 a.m. meeting with Moreland and McDonald, handle calls all day after that meeting until early evening again trying to get his normal job functions done until 8 p.m. . (Gilbert5/13/2009, at Tr00357 & Tr00413.)  This pace was all of November, half of October and part of December and Mr. Gilbert attributes this as having contributed to his divorce. (*Id.* at Tr00414.) While a majority of vendors were affected by Project SID, certain vendors were excluded such as trucking companies who were deemed to be too "sensitive" for Kmart's operations.  (Moreland 6/27/07, atTrDep00029-30.)  Mr. Archambeau, who was in charge of each days computer check runs after getting from Moreland the list of invoices to be delayed, worked overtime, ten to twelve hour days minimum, weekends and holidays, not allowing anyone else in his department to perform the task because with the fewer people knowing about Project SID the easier it was to keep it under wraps.

(Archambeau, 5/13/09, at Tr00486-88.) Mr. Archambeau – who worked for Kmart since 1980, and at headquarters since 1982 –  felt that project SID was unethical, not done in the past and he was concerned for his staff. (*Id.* at Tr00487-88.) "This was totally out of the ordinary from anything we ever done in the past." (*Id.* at Tr00500.)  "It was not something we had particularly done in the past and to me holding vendor payment without their knowledge, it didn't seem to me fair, I guess is how I would have to explain it." (*Id.* at Tr00499.)

Scott Gilbert, who headed accounts payable, also noted that project SID "was something that has never been done before. And we -- it was just top secret." (Gilbert 5/13/2007, at Tr00392.)  Mr. Gilbert had 300 people under him, about 50-60 handling vendor calls about delayed payments. (*Id.* at Tr00417.)  Of these he only informed three or four "direct reports"

about Project SID and the AP System changes.

Daily invoices could range from 20,000 to 100,000, for Kmart's 5,000 plus vendors and at times under Project SID 80-90% of that day's invoices could be held back (Archambeau, 5/13/09, at Tr00490-91; Gilbert 5/13/09, atTr00429.) These payment delays were not small amounts, one $3.3 million payment to an important DVD supplier and $1.6 million to Pepsi, $2.9 million to Gillette were selected for delayed payment (Plf. Exh. 170; Archambeau, 5/13/09, at Tr00494.)  Plaintiff's Exhibit 170 is a two inch, two sided print, copy of the thousands of vendors involved.  Mr. Gilbert used a November 9 printout of a November 7, 2001, computer run showing $553,871,834 of $2,381,092,541 due, or 23.3% , being held back under Project SID on hardline invoices as of November 7, which was in addition to the $300 million being held back with the AP System changes and additional Project SID softline invoices being held back.  (Plf. Exh. 41, Gilbert 5/13/09, at Tr00394–98.)  Moreland's Project SID Master Tracking Document showed $700 million in both hardline and softline invoices being held back on November 7, in addition to the $300 million under the AP System changes. (Plf. Exh. 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163-64.)  As of November 7, the weighted days delay on all invoices was thus stretched to 43.5 days, compared to the usual 30 days payment cycle. (Plf. Exh. 41.)  Gilbert noted a similar $564 million on hardlines being held back from $2.5 billion invoices due on November 12 (22.4% of the total invoices), which again did not include the softline and AP System changes delayed payments. (Plf Exh. 288 ; Gilbert 5/13/09, at Tr00404.)  Moreland's Project SID tracking for November 12 showed $673 million being held back under SID for softline and hardlines, again separate from the $300 million under the AP System changes. (Plf. Exh. 289A and Plf. Exh. 20.)  Gilbert's and Moreland's figures for

17

November 27, 2001, were $283 million and $263 million under Project SID (Plf. Exh. 54 &
289A.)

   Kmart had an online vendor portal or "window" called Workbench, where its vendor
could log on and follow their invoice's payment history.  (Gilbert 5/13/08, at Tr00376-77;
Moreland 6/ 27/ 07,  at TrDep00087.)  Gilbert, concerned about vendor complaints likely to be
directed to his department, noted that through Workbench vendors could see the difference
between the payment dates and the agreed on due dates.  (Gilbert 5/13/08, at Tr00377.)
Moreland noted with Workbench vendors would have seen the large amount of payables getting
"hung up in processing."  (Moreland 6/27/07, at  TrDep00087.)  In September Kmart's President
Mark Schwartz shut down Workbench, and it remained down through January 2002. (Plf. Exh.
68; Gilbert 5/13/08, at Tr00378.)  It was shut down due to the volume of calls from unhappy
vendors.  (Conaway 2/13/08, at TrDep00332.)  After the shut down, instead of vendors having
access to their accounting information, they were greeted with a generic message stating the
system was down for maintenance.  (Plf. Exh. 68; Kearse 5/20/09, at Tr01158-59.)

   In the first week of November Gilbert was called to Mr. McDonald's office to attend a
meeting with Messrs Conaway, Moreland, Boyer and Kearse to discuss the slow pay of vendors.
(Gilbert 5/13/09 at Tr00445-46 .)  Mr. McDonald introduced Gilbert to Mr. Conaway as being in
charge of accounts payable and Mr. Conaway noted it was nice meeting him and  referred to him
as "a franchise."  (*Id*..) One suggestion made at that meeting on delaying payments was simply to
hold up mailing the checks but as Gilbert pointed out, in Mr. Conaway's presence, the vendors
would notice the dates of the checks and postmark two weeks later and they would immediately
know exactly what Kmart was doing.  (*Id*. at Tr00447.)

18

Although Kmart had a reputation for stretching vendors a few days (Stallkamp 5/18/09, at Tr00838 & Tr00848) and had, at times, delayed payments to vendors (Moreland 6/27/07, at TrDep00032), the liquidity crunch in the third quarter of 2001 was more severe than normal and it had never been done on such a scale before. (Kearse 5/20/09, at Tr01275.) Even Mr. Conaway acknowledged that he did not recall having to prioritize invoices to manage a liquidity crunch of the previous year or in his eight years at CVS Pharmacy. (Conaway 2/13/08, at TrDep00330-31.)

Mr. Archambeau's office was next to Mr. Gilbert's and he observed the situation with the vendors, their nearly "non-stop" calls and screaming which he described as "hectic,""stressful" and "pretty ugly." (Archambeau, 5/13/09, at Tr00498-99.) Mr. Gilbert had a white board in his office the entire length of one wall, approximately 12'-15' x 4'-5', covered with writing to record hot button issues such as when vendors were threatening to stop shipment. (*Id.* at Tr00498.) With vendors not being paid, friction between the vendors and Kmart reached a crescendo during the third quarter with vendors calling what was estimated to be every 70- 90 seconds demanding their money. (Gilbert 5/13/09, at Tr00411.)

Karen Lindsey, Treasurer McDonald's administrative assistant, testified that beginning in September 2001 and continuing into December, she started receiving phone calls from vendors complaining about late payments, though she had never received them before this time. (Lindsey 5/18/09 at Tr00645-46.) The calls to McDonald grew in number to the point that he did not return most of them. (*Id.* at Tr00646-47.)

On October 27, 2001, Kmart's then-CFO, Jeffrey Boyer, sent an e-mail to Conaway expressing his concern over the Company's financial situation. (Plf. Exh. 76; Boyer 7/19/07, at

19

TrDep00391-94.).  In it he noted that Kmart was scheduled to receive $900 million in inventory in the first week of November, and that it would not help the Project SID situation.  He stated that Kmart would not be able simultaneously to handle the new inventory and pay down the "nearly $800 million in past-due invoices" to manage the "noise level" coming from vendors. Sales shortfalls were compounding the cash crunch by "several hundred million" per month, which was based on actual sales reports, not forecasts.  Boyer ended the e-mail by saying that he was "very worried."

At its peak, Project SID resulted in vendor payment delays of over $790 million on October 31, 2001, according to a contemporaneous spreadsheet maintained by Assistant Treasurer Moreland who managed the program on a day-to-day basis.  (Plf. Exh. 289A; Moreland 4/23/09, at TrDep00164.)  Moreland testified that the AP System changes involved about another $300 million delayed vendor payments for the two separate 5 day extensions of hardline invoices. (*Id.* at TrDep00145-46; Plf's Exh. 20.)   Regarding these figures, Mr. Moreland was confident they were directionally accurate meaning plus or minus 10%. (*Id.* at TrDep00167 .)  Between the AP System changes and Project SID, Moreland's Master Tracking Document and the October 4 Cash Flow Management chart show Kmart held back $600 million in early October and over $1 billion in vendor payments from October 24 through November 7, 2001, Kmart's peak borrowing date.  (Plf. Exhs. 20, p. 3, & 289A). According to Moreland, SID was the "most significant short-term liquidity action the company undertook."  (Moreland 6/27/07, at  TrDep00082.)

Both of these programs strained relationships with vendors which raised concerns with Kmart's ELT that vendors may not pay year end allowances.  (Kearse 5/20/09, at Tr01074-75.)

20

This concern was compounded by Kmart not hitting its sales targets.  (*Id.* at Tr01075 & Tr01230.)  These allowance payments from vendors, which were based on meeting certain sales targets,  were important to Kmart's liquidity, and were a "huge part" of final profitability.  (*Id. at* Tr01074.)

### B.    The Cover-Up Story: Project eLMO.

With the growing pressure from vendors on the Kmart merchants (buyers) and accounts payable personnel working under Gilbert there was a desire to get out a consistent message that would allow Kmart to get to late November without creating additional questions or panic in the marketplace and without revealing cash flow problems or the intentional slow pay. (Kearse 5/20/09 at  Tr01140-41.).  Conaway, during a November 2 meeting with the ELT, had his secretary call McDonald to his office to discuss the development of Talking Points  which would create a consistent story Kmart could communicate to its vendors to explain away the payment delay.  (Plf. Exh. 35 & McDonald 5/28/09, at Tr02645-46.)  McDonald testified that he was called up to the office, took notes and "then I took that list, went downstairs to my office, told Mark Moreland, told him he had to meet with Cecil Kearse and they were to lay out what my discussion was with the four gentlemen upstairs" and thus from those notes the "AP System Issues Talking Points" (hereinafter "Talking Points")  were created.  (McDonald 5/28/09 pp. 269:11-16 & 280:17-20.)  Kearse testified that the concept of Talking Points was discussed with Mr. Conaway in early November, and while the draft of Talking Points was not circulated to the ELT, its basic concept was presented to and understood by "the leadership of our company." (Kearse 5/20/09 at Tr01140-Tr01143.)  Talking Points blamed the delay in vendor payments solely on a computer system called Project eLMO.  Project eLMO was an inventory control and

21

accounts payable system which in 2001 converted Kmart's two separate inventory systems –

"hardline" products (such as electronics) and "softline" products (such as apparel) – into a single

unified system.  Because the changes in eLMO involved adding softlines to the hardlines already

on the system, eLMO could not have affected payments on the larger volume hardline products.

(Gilbert 5/13/09, at Tr00424-26.)   The Talking Points asserted that Project eLMO encountered

computer software errors in the accounts payable "complex terming logic" which in turn created

a backlog of approximately 750,000 unpaid invoices which had to be manually processed.  (Plf.

Exh. 35. )  These 750,000 invoices allegedly affected were an arbitrary number made up by

McDonald who did some calculations on the back of an envelope, a number which was

significant, but not too large.  (Moreland 6/ 27/07,  at TrDep00087.)   Mr. Gilbert noted that

eLMO had no effect on payments of either softline or hardline vendors. (Gilbert 5/13/09, at

Tr00505-56. ) Mr. Archambeau,  whose department was largely responsible for the eLMO

conversion, acknowledged it was possible eLMO could cause a softline invoice not to get paid,

but he added that they implemented a control system of requiring vendors send a hard copy and

an electronic copy of invoices to avoid this problem. (Archambeau 5/13/09, at Tr00502 &

Tr00505–06.) He and Moreland, who did the initial draft from the working group of McDonald,

Kearse, and Jellinek, noted each of the Talking Points regarding eLMO causing delays in

payments were false, a fabricated "storyline" or script to tell the vendors.  (*Id*. at Tr0050610;

Moreland 6/ 27/ 07,  at TrDep00085-87.) The delays caused by the AP System changes and from

Project  SID were separate from the eLMO conversion which Archambeau believed  "was very

successful." (Archambeau 5/13/09, at Tr00522.)  Like Mr. Gilbert, Mr. Archambeau also

testified the conversion did not affect hard line vendors and thus could not cause any delays in

invoice payments on hardline invoices which were the majority of purchases.  (Archambeau 5/13/09, at Tr00505.)   While it was possible a softline invoice might slip through their controls during the eLMO conversion, if that occurred it was "very isolated." (*Id.* at Tr00505.)  The Talking Points refers to an extraneous purchase order of $109 million being generated by eLMO, but if that was not caught before delivery of the goods, it would not have affected vendor payments. (*Id.* at Tr00507; Gilbert 5/13/09, at Tr00428 &  Plf. Exh. 35.)  There was no documentary or other evidence of any vendor actually not being paid on time due to Project eLMO.

ELT member Cecil Kearse, who was involved in the creation of Talking Points, was reluctant to acknowledge that many statements contained in the Talking Points were not true. (Kearse 5/20/09 pp. 93-7.)  According to Kearse, the story was developed in order to "build a bridge from point A to point B [later identified as "November 2nd [until] late November"] without creating additional questions in the market place" and that "it was determined that not speaking to cash flow or slow pay would be the best course."  (Kearse 5/20/09, at Tr01138 & Tr01140.) Kearse testified that the eLMO story was "a small part, if not insignificant to the truth" and he acknowledged that cash flow was the real reason vendors were not being paid, not *eLMO. (Id.* at Tr01206-07.) Ultimately Mr. Kearse admitted that eLMO was "definitely not the reason why [vendors] weren't getting paid."  (*Id.)*

While Mr. Conaway denies calling McDonald to an ELT meeting to take notes regarding Talking Points, he admits a meeting with Boyer and Schwartz and Kearse, which McDonald joined, where Kearse wanted to talk about communication with vendors.  (Conaway 5/28/2009 at Tr02626-27.)  He acknowledge that his Outlook Calendar for November 2 shows an entry

23

"Vendor Talking Points w/ John, Cecil, Mark, Jeff." (*Id.* at Tr02627 & Plf. Exh. 190 at

November 2, 2001.)  While Talking Points clearly uses eLMO as the only reason for the vendors

being paid late, Mr. Conaway denied the ELT making a decision that eLMO would be the only

reason given to vendors for slow pay and he said anyone saying otherwise was lying.  (Conaway

1/27/03, at TrDep0030809.)

        Mr. Conaway testified that his belief that eLMO caused vendor delays came from  Lorna

Nagler, who was then Kmart's Senior Vice President of Apparel and Jewelry, who told him that

her part of BlueLight Always was in jeopardy because of eLMO and the "inability to process

invoices" for vendors and of the need to get "system integration issues corrected."  (Conaway

2/13/08, at TrDep00334-35, 5/27/09 at Tr02162-63.)  Ms. Nagler testified to the contrary.

(Nagler 4/18/08, at TrDep00349-51.)

        The payment delays caused angry vendors and factors (those who "fronted" money to

vendors and were assigned accounts payables for collection) to demand payment, some

threatened to stop shipments.  (Archambeau 5/13/09, at Tr00497.) Some major vendors,

including Black & Decker, 3M, AC Delco, and General Electric, did stop shipment of their

products.  (Plf. Exhs. 237, 238 & 257.)  Some vendors indicated that they would resume shipping

if their calls were returned, but communication to vendors was silent.   (Kearse 5/20/09, at

Tr01136.).

         The CEO of Sunbeam, Jerry Levin, after failing to reach Kearse called Conaway directly

to demand payment for $25 million worth of unpaid invoices. (Levin 9/11/07, TrDep00173.)

With no reply phone call from Conaway, Levin wrote a letter to him demanding payment which

letter indicated  he had been told the problem was due to "Kmart's accounts payable system

24

conversion." (Plf. Exh. 107.)  Without using the term "Project eLMO" Conaway's response letter referred to "the breakdown we have had on our hard lines and soft lines integration" to explain the reason for the delay of payment.  (Plf. Exh.108.)  Conaway testified that he did not write the letter, that most likely his secretary wrote it and used his signature stamp.  Yet during a 2003 deposition he testified that he had dictated the letter "from the field" which was typed by his secretary, his signature stamped and sent to Levin.  (Conaway 1/22/03, at TrDep00309-10.)

Maurice Sabony, a representative of Milberg Factors, was told on at least six occasions in October and November of 2001that the late payments were due to the Project eLMO glitch. (Sabony 2/28/08, at TrDep00200-12, specifically at  page:lines 63:6-64:10, 65:23-66:18, 69:4-73:25, 76:9-79:21, 79:22-81:2, 87:15-89:8.)  He received the Project eLMO excuse from three different people at Kmart, including Gilbert and McDonald, even after he expressed doubt that this was the real reason for the delays.  On November 29, 2001, he received a fax from a client that included a letter from Kmart explaining that the late payments were due to problems with the eLMO system.  (*Id*. at TrDep00217-19 & Plf. Exh. 196.)

## C.      **Communications with the Board**.

As noted above, in mid- to late-August 2001 Kmart's senior management received a series of liquidity forecasts Assistant Treasurer Moreland prepared showing that the company was facing cash needs that could exceed its borrowing capacity by up to $1 billion.  (Plf. Exhs. 4, 5, 6 &7).  McDonald  presented these forecasts to Conaway and the other members of the ELT. The cash needs caused by the overbuy was never communicated to the Board of Directors. (Moreland 6/27/07, at TrDep00055-56.)

On August 17, 2001, Conaway sent a letter to Kmart's Board, even though there was no

Board meeting scheduled for that month, as a response to the Board's request at the previous meeting for "more frequent financial reports." (Plf. Exh. 110.)   Board member Thomas Stallkamp testified that the statement in the letter regarding Kmart ending the second quarter with $283 million more inventory than the previous year was not unexpected, because increasing inventory was part of the business plan. (Stallkamp 5/18/09, at Tr00728.)   Yet, at that time, the Board had not been informed about the overbuy. (*Id.* at Tr00729.)   Stallkamp, who had served as President and Treasurer of Chrysler Corporation, also testified that his understanding of the phrase "revised accounts payable terms" was that Kmart had approached vendors to negotiate longer payment terms, not that it was done unilaterally or without vendor consent. (*Id.* at Tr00708 & Tr00730.)

Because of the importance of the changes Conaway was implementing, they had scheduled a two day gathering of the Board in September.   Mr. Conaway had been warned by Kmart's former CEO to keep the board packages manageable in size and to end the meetings by noon. (Conaway 5/27/09, at Tr02104-05.)   Conaway and others noted that two board members slept through meetings. (*Id.* at Tr02104.) Board member Stallkamp did not recall Board members sleeping during the meetings though he acknowledged it could have happened. (Stallkamp 5/18/09, at Tr00855.) The events of 9/11 forced the September Board meeting to be handled by telephone and cut the time down to its usual 3 hour time frame (Conaway 5/27/09, at Tr02106.)   As a result, on the inventory problem and its solution, it was thus necessary to give the Board "a shortened version of the strategy piece." (*Id*. at Tr02106.)   Mr. Conaway noted that he often did not have time to edit the Board package before it went out, and thus would make notes on his copy or a separate sheet of paper to make sure he covered additional points at the Board

26

meetings. (*Id*. at Tr02110 & 02121-22.)

Mr. Conaway contests that the Board was not informed about the actions taken to manage payables. He testified that at the telephonic September Board meeting the liquidity cushion forecast on the peak borrowing day was only $96 million, which compared to an August forecast to the Board of $544 million (Def. Exh. 119, p. 17, Conaway, 5/27/09 at Tr02113-14.) The first priority on the "Short Term Liquidity Actions" page, which was prepared by CFO Boyer, was cutting receipts of inventory by $600 million by October 3. (Def. Exh. 65, at p. 20; Conaway, 5/27/09, at Tr02114.) He discussed the other three listed Short Term Liquidity actions in the Board Package – shifting capital expenditures into the fourth quarter, getting a new 364 day revolver, and various sale-leasebacks that were planned. While not listed on the Board's Package page 20 on Short-Term Liquidity Actions, as were the other four items noted above, Mr. Conaway testified:

> The second most important thing we were doing was managing our payables, stretching our vendors.
> So, I wanted to make sure the board was aware of that, given the criticality of it. This particular that I talked about, that we had already extended dating. So, we had already took it dating, starting back in August. So, that had already occurred. We had taken them in two different series, one in the beginning of August, one toward the mid or late August. So, this was letting them know we had already pushed our suppliers in addition, and that's how we were going to run the business on top of what previous management had done.
> In total when we looked at it, we wanted to get about five days. The reality during this forecast was it was about three days. And we talked about how long it took to cycle through. So, we had already taken that action.
> And then we had to manage the payables, and what we figured at this time was another additional, on top of that, anywhere from an additional kind of three to four to five days. We weren't really sure, but we thought it would be probably be at its peak at least another five days.
> And that is indicated by the second point, that we are going to try to extend supplier terms wherever we can, but we've got to add on those additional three to five days no matter what, and we will continue to stretch vendors if we can't get, you know, terms.

27

And it's also not just terms. Again, we are managing days. It could be changing policies, as we spoke of earlier. But one way or the other, we had to add additional three to five days over what we had already adding, that we were going to do irrespective of the credit crunch. But because of this liquidity crunch, we had to add more days.

Q. And underneath that, what is your writing indicate you are telling the board?

A. Well, again the two biggest items, A, I wanted them to fully understand that we were managing payables, that we were stretching vendors and we were going to have to stretch them more. That was going to have to happen. The second key component which is the number one thing I said we were doing was this reduction in inventory receipts . . . .

*Id.* at Tr02116-17.

These assertions seem to discuss the efforts taken in the prior quarter to extend vendor terms through negotiations, and to extend dating of the payment period to begin running not from the date of the purchase order but from the date of receipt of the goods. Yet the "additional three to five days no matter what" seems possibly to refer to one of the two 5-day AP System additions to the hardline vendors that Moreland discussed as being unilaterally imposed. This testimony suggests that Mr. Conaway told the Board that in addition to extending payment terms through negotiations, when that failed Kmart would, if needed, unilaterally extend the payment terms ("it's also not just terms. Again, we are managing days. It could be changing policies.") Nothing in Mr. Conaway's testimony suggests he disclosed the 30 plus day delays of the Moreland plan for Project SID. Also, the handwritten notes Mr. Conaway made on his copy of the September Board package to remind him to discuss certain things only seem to support "extended dating" and "supplier terms" as well as "chasing receipts," i.e.

28

cutting the receipt of new merchandise.  (Def. Exh. 119,  at p. 20.)  These three

initiatives – negotiating better supplier terms, extending dating for payment to

date of receipt, and cutting future inventory purchases – likely could have been

discussed without any Board opposition, which the more aggressive means of

unilaterally stretching vendors would have drawn from Board member Stallkamp

who would have opposed such a move had it been raised.  (Stallkamp 5/18/09, at

Tr00741& 00781.)  There are no Conaway handwritten notes on page 20 of

Conaway's September Board package (Defendant's Exhibit 119)  indicating

unilaterally adding days without the vendor's consent.

Mr. Conaway also testified that he drew to the Board's attention to the overbuy noting

that the August Inventory Summary on page 29 of the Board Package showed a negative $825

million inventory  variance to "commitment" or plan.  (Conaway, 5/27/09 at Tr02122-23, Def.

Exh. 119 & Plf. Exh. 65, at p. 29.) He testified that when Board Member Stallkamp said the

Board was not informed about the overbuy until the November Board meeting, he was mistaken.

(*Id.* at Tr02123)   Mr. Conaway wrote a September 20 letter to the Board because of his

frustration with their lack of attentiveness and caring. (*Id.* at Tr02124-26.) In that letter he noted:

> I fully appreciate the sent of urgency on managing our liquidity. I am fully
> confident our recent extension of  Kmart's revolver (club deal), canceling of
> receipts, new accounts payable terms and reduced capital expenditures, we will
> insure liquidity. You have my assurance of monitoring this situation as my #1
> priority over the next 6-10 weeks.

Plf. Exh. 113.

While this September letter adds "new accounts payable terms" to the actions to deal with

liquidity, similar to Conaway's handwritten note "supplier term" on his page 20 of the

September Board package, this term seems to deal with bargained for terms and not the

unilateral AP System changes or Project SID. That was how Board member Stallkamp

interpreted "new accounts payable terms" in that letter . (Stallkamp 5/18/09, at Tr00754.)

Later in the September 20 letter after noting an "immediate term" need for "an additional

$500-800 million more inventory" he noted as one of the focuses for the Board:

> b. Manage all components of working capital given inventory needs, accounts
> payable, supplier terms, accounts receivable, and reducing capital expenditures to
> minimum levels.

He testified that liquidity being his "number one priority" was an exaggeration because

he thought the problem was "self -inflicted" and would be over in the next 6-10 weeks.

(Conaway, 5/27/09 at Tr02127.) [8]

When asked what " manage . . . account payables" in paragraph b. means, Mr. Conaway

responded:

> A. That means that we are going to continue to manage to a certain number as we
> run this business, until we get a good capital structure, separate and above from
> supplier terms, which is negotiated.

> Q. So, how do you manage to a certain number in addition to negotiating supplier
> terms?

> A. It's exactly what I explained. It's what we were doing. It is what I explained to
> them in the September Board meeting. You say I need to get to ten additional
> days, right. You manage to that number. And supplier terms are separate than
> that. If supplier terms can help you do that, that's great. That's why they are
> separate.

> Q. How do you get to that number in addition to negotiating?

---

[8] At his deposition, when asked if liquidity was the Executive Leadership Team's number
one priority, responded, "Again I can't say it's a number one priority, but it was one of the key
things we were focused on." (Conaway 2/13/08, at TrDep00319.)

A. You've got to stretch numbers, slow pay them, you know, pay them slower.

*Id*. at Tr02132.

While here "manage . . . accounts payables" is separated from managing supplier terms, the September 20 letter is less than clear that this refers to unilaterally adding days to vendor payment. The"ten additional days" he referred to at trial as being separate from "supplier terms" may refer to the 5 days + 5 days that were unilaterally added to hardline vendors under the AP System changes. While this statement may have been meant to suggest that Mr. Conaway told the Board about this unilateral move at the September Board meeting, that is a disputed fact with Board member Stallkamp denying being told that at the September Board meeting or in the September 20 letter. (Stallkamp 5/18/09 at Tr00740-41 & Tr00754055.)

In an October 12, 2001, letter Conaway informed the Board that Kmart's September sales were flat and its September inventory was up $1.1 billion from the prior year with "much of the inventory increase . . . due to our efforts to improve in-stock and support BlueLight Always" (Plf. Exh. 71.) Unlike the September 20 letter's statement of a need for "an additional $500-800 million more inventory in the immediate term", this letter notes the need to "reduce inventory by the end of the third quarter." (Compare Plf. Exh 112, p.2, Plf. Exh 68, p. 2.) The October letter makes no reference to the Schwartz August overbuy. The letter also states:

> We have made significant progress on several of our working capital initiatives. Our efforts to work with our vendor partners on terms changes have been successful. Our A/P leverage ratio has improved dramatically from 33% in July to 42% in September.

Board member Stallkamp testified that he understood this to mean that Kmart had been negotiating with vendors for longer terms, and there was no indication that the increased AP ratio was due to Kmart unilaterally delaying payments to vendors. (Stallkamp 5/18/09, at

31

Tr00771 & Tr00773-74.)

If CFO Boyer learned at the September Board meeting from what Mr. Conaway claims he told the Board that his page on "Short-Term Liquidity Actions" should have included stretching vendors or "managing payables,"  Mr. Boyer again failed to put that in the October 23 Board package which notes only shifting capital expenditures, sale-leaseback, and refinancing the credit revolver under Short Term Liquidity Actions. (Plf. Exh. 114, p. 30) Again, Mr. Stallkamp testified that neither that page of the Board package nor anything told the Board at their October meeting revealed that Kmart was unilaterally delaying payments . (Stallkamp 5/18/09, at Tr00779-80.)

At the October 23 telephonic Board meeting, in discussing his notes on his copy of the October Board package giving updates "on the previous September board package, " Mr. Conaway testified that the "33" referred to the 3 days  they were adding to the 30 day payable terms that he claims he had told the Board about at the September meeting. (Conaway 5/27/09, at Tr02143-44, Plf. Exh. 27, pg .2) The "38" included the 5 additional days added since that September Board meeting which  he "wanted to make sure" they were aware of in addition to what "I told them, you know, 30 days earlier."  (Conaway 5/27/09, at  Tr02144.)  The "41" referred to the need to add another 3 days.  "So I wanted them to absolutely know we had gone further than I had told them we were probably going to have to go in managing payables, and we still had farther to go as of this point."

 As with the September and October Board Packages, the November 20 Board presentation omitted any direct reference to the intentional vendor delay tactics or the August overbuy but it did note a 1.5% drop in comparable sales (2.2% down overall)  for the Third

32

Quarter and inventory being $600 million off plan (Pl. Exhs.121 Bates # CC 0096834-35, CC-0096841 &  CC-0096862.)

On November 8, 2001, CFO Boyer had a one-on-one meeting with Conaway lasting 90 minutes to two hours because he felt there were significant matters that needed to be discussed. (Boyer 7/19/07, at TrDep00395.)  Boyer wanted to highlight three issues – "financial performance of the company, the liquidity situation and the allowance issue."  (Boyer 7/19/07, at TrDep00409.)   Unlike his usual one-on-one meetings with the CEO, Mr. Boyer had prepared a 27 page Power Point presentation for this meeting to make sure he covered all of the important points. (Boyer 7/19/07, at TrDep00395.)  He thought it was important to talk about how serious the situation was and, as part of their worst-case scenario, discuss the possibility of bankruptcy. (*Id*. at TrDep00400.)  While disputed by Mr. Conaway, Mr. Boyer said he went through each slide of the PowerPoint presentation page by page with Mr Conaway to whom he gave a printed copy.  (*Id*. at TrDep00395.)

The  PowerPoint slide on Risk Profile for the fourth quarter noted that competitive pressures, the recession and reduced promotions could lead to flat comparable sales instead of the targeted increase of 4.2% over the prior year.  (Plf. Exh. 97, at JNB 000020)  His slides warn that inventory receipt forecasts were "[w]ay too high" in the forth quarter as happened in the third quarter, with a bottom line being a "[n]eed to 'plan for the worst and hope for the best'" and "[n]ot 'plan for the best and hope the worst doesn't happen.' " (*Id.* at  JNB 000022.)  His next slide on "Implications/Next Steps" warns that Kmart would not meet its financing covenants to the banks, its cash flow was "close to $500 million negative,"  leading to "Credibility" issues with the "Board, Rating Agencies, Banks and [Wall] Street." (*Id.* at  JNB

000023.) This led to a recommended need to develop financial contingency plans including a fundamental restructuring, a possible need to plan for bankruptcy, and the need to "[d]iscuss issues with the Board at the November Board Meeting."  When asked to explain why he had concern about credibility with the Board, Mr. Boyer noted that there were certain things related to financing the Board was not aware of.  (Boyer 7/19/07, at TrDep00398.)  The Board had an understanding that Kmart's capital/financial structure was appropriate, and if they were going to recommend an alternate financing plan, there would be a need get into funding sources and "have a conversation with the board that would clarify all elements of our cash management system, including Project SID." (*Id.* at TrDep00399.) Based on his attendance at Board meetings, he did not believe " that the board had a sense that Kmart was unilaterally not paying its vendors on  time as part of its cash management program in the third quarter?" (*Id.* at TrDep00399-400.) Assistant Treasurer Moreland had also testified that he did not believe the Board and Board Finance Committee were informed of Project SID.  (Moreland 6/ 27/ 07,  at TrDep00055 & TrDep00088-89.)   While his slide that noted the $500 million negative cash flow and "credibility" issues with the "Board, Rating Agencies, Banks [and the] Street" ended with "[d]iscuss issues with the Board at the November Board Meeting," Boyer admitted that he did not explicitly tell Mr Conaway that they had to tell the Board about stretching vendors. (*Id.* at TrDep00415.) When asked if he ever "told Mr. Conaway that the public needed to be told about stretching vendors?" he responded "The typical time that you would do that is in the preparation of a 10Q, and we  had not started the preparation of the 10Q yet." (*Ibid.*)

Boyer at the meeting also felt that it would be prudent to have a third analysis performed by an independent outside auditor on how Kmart had handled its vendor allowances, because he

felt the PriceWaterhouseCooper ("PWC")  review had its auditors reviewing their own work. (*Id.* at TrDep00409-10.) While Mr. Boyer did not outright question the integrity of PWC's lead Kmart auditor, Joe Murphy, he did have questions about Mr. Murphy's closeness to Kmart. When asked directly by Mr. Conaway if he had an issue with Mr. Murphy's integrity, Mr. Boyer said "no" but he thought it was difficult to audit your own work, and suggested an independent PWC quality review be done. While acknowledging that Mr. Conaway showed more interest in this part of the meeting than the discussion over the financials, Mr. Conaway did approve Mr. Boyer contacting Jay Henderson, a PWC partner in Chicago with whom Boyer once worked, with regard to Boyer's  suggestion for the quality review . (*Id.* at TrDep00411.)

Conaway testified that when he and Boyer met, Boyer never got past the Jim Adamson talking points which would have been the first 8 pages of the 27 page presentation. (Conaway, 5/28/09,  at Tr02510-13.)  Boyer then  raised the allowances issue again after several prior efforts including a PWC review that Boyer had earlier indicated satisfied him.   Mr. Conaway testified that Boyer's seemingly erratic, flip-flopping on the sufficiency of the PWC review on how Kmart  handled vendor allowances, his questioning the independence of Kmart's lead PWC auditor,  Joe Murphy, with no basis except that he vacationed with the former Kmart CFO,  and the suggestion of a "strategic bankruptcy," all of which made him realize he had to let Boyer go.(Conaway, 5/27/09,. at Tr02184-85.) Conaway checked with Jim Adamson, head of the Board's Audit Committee, who approved the firing and also with Thomas Stallkamp, head of the Board's Finance Committee. (*Id.* at Tr02188-91.)

Mr. Boyer was told the next day by Kmart's general counsel and others that he was fired. He had been with Kmart only since May 2001. (Boyer 7/19/07, at TrDep00377.)  Mr.  Stallkamp

testified that on a November 9, 2001, telephonic Board meeting, Mr. Conaway advised the Board

that Boyer was not a team player and was not working well with other members of management,

and that he had made what Mr. Conaway characterized as "ludicrous" statements about the

possibility of a "strategic bankruptcy." (Stallkamp 5/18/09, at Tr00790.)  Stallkamp was

concerned about the timing of the firing and that it may generate negative publicity, but

eventually the Board supported the decision because, as CEO, Conaway was the one with the

ultimate authority to fire Boyer.  (*Id*. at Tr00791-92.)  Mr. Stallkamp also noted that if Mr. Boyer

had "legitimate concerns about an actual need for a bankruptcy filing as opposed to a suggestion

to make  a strategic bankruptcy filing"  that would have "set off a lot more bells." and not been a

legitimate basis to fire Mr. Boyer.  (*Id.* at Tr00792-93.)

Mr. Conaway said he met with Mr. Stallkamp for breakfast in early November at which

time they discussed stretching vendors and he told him they would be caught up in two weeks

with vendor late payments . (Conaway 5/27/09, at Tr02145-46, see also Conaway 5/28/09, at

Tr02654-55.)   He said they discussed the "overbuy" and project eLMO . (Conaway 5/27/09, at

Tr02146.) Later in November at the regular in-person Board meeting, Mr. Stallkamp brought up

a vendor complaining about 30-60 days late payment, and Mr. Conaway told him they were

"going to be caught up in the next week or so with all the suppliers that we were, you know,

prioritizing invoices on or stretching." (Conaway 5/27/09, at Tr02145.) He denied telling Mr.

Stallkamp at that time or the Board that they were not stretching vendors or that the only reason

vendors were not being paid was because of Project eLMO. ( *Id.* at Tr02147-48.)  He also noted

that they talked about the number of days they were behind with venders "every time"  at of the

weekly ELT meetings and he scheduled separate meetings 3 or 4 times with just Mr. McDonald

and Mr. Moreland ( *Id.* at Tr02152-54.) Mr. Conaway later noted that he never knew what vendors were being told about Project eLMO and he never saw the Talking Points.  (*Id* at Tr02161-62.)

In contrast to Mr. Conaway's testimony, Board member Stallkamp said repeatedly that throughout this period, Conaway never informed Kmart's Board of the unilateral payment delays beyond terms  on vendor invoices even though Kmart's Board was acutely interested in the Company's liquidity in the third and fourth quarters of 2001.  (Stallkamp 5/18/09 at Tr00730-31 [August], Tr00740-41 [September],Tr00773-74 [October 12, 2001, letter, Plf. Exh. 180], Tr00779 [October Board package an meeting], Tr00798 [November Board meeting], Tr00803 [November breakfast meeting], Tr00807 [December breakfast meeting ].) When told in Conaway's August 17 letter to the Board that the inventory was increased for the BlueLight Always program and ""[r]elatedly, we have decreased capital expenditures and revised accounts payable terms to ensure appropriate liquidity," Mr. Stallkamp understood by this that "they would be approaching selected buyers to negotiate longer payment terms than the normal terms they had." (*Id*. at TR00730,  Plf. Exh 110)  Again in relation to Conaway's reference to "new accounts payable terms" dealing with liquidity in his September 20 letter to the Board, Mr. Stallkamp also understood that as "negotiating with the major vendors lengthening the payment terms." (*Id.* at TR00754, Plf. Exh. 113, p.1) Similarly, in the Conway  October 12 letter to the Board discussing "working capital initiatives", Mr. Stallkamp interpreted "[o]ur efforts to work with our vendor partners on terms changes have been successful" again referred to negotiated changes. (*Id.* at TR00769, Plf. Exh. 180, p.2)

Mr. Stallkamp, who chaired the Board's Finance Committee, expressed his concern about

the September Board package showing the liquidity cushion on the peak borrowing date had

fallen from the $544 million projection in the August Board package to $96 in September

because the Board had set a $100 million minium liquidity cushion (*Id.* at TR00739-40. The

transcript erroneously refers to 996, but the document shows it is $96 million)  He also noted that

the Board was not told of any negative liquidity scenarios that Kmart had run (*Id.* at Tr00737.)

Stallkamp testified that was never made aware of, and never would have endorsed, the programs

to systematically delay vendor payments because "[i]t's against everything I've been doing in

business. You need to communicate with people if you are changing contract terms."  (*Id.* at

Tr00740-41.)  He also would have expected to be told if any of the $96 million liquidity cushion

was based on funds past due to vendors because it was understood the liquidity cushion "was

after all of the payables were accounted for." (*Id.* at Tr00745.)

When he received the October 12 letter from Conaway referring to ending September

with $1.1 billion more inventory than the prior year, he thought it was related to BlueLight

Always and he was not told it was acquired without the approval of Mr Conaway. (*Id.* at

Tr00766-67; Plf. Exh.189.)  Similarly at the October Board Meeting it was not disclosed that this

$1.1 billion in inventory over plan had been acquired without Conaway's approval. (*Id*. at

Tr00778.)  The Board package on Short Term Liquidity Actions again did not disclose the

unilateral delay in vendor payments as a source of liquidity nor where they told that at the

meeting . (*Id*. at 152, Plf. Exh. 114, p. 31) Again he said he would not have approved of such an

action and would have been upset.  (*Id.* at Tr00781.)

The November Board Package showed that the $1.1 billion inventory over plan had been

cut to $600 billion over plan by the end of October ( *Id.* at 168, Plf. Exh. 121, at p. CC 0096841)

The day before the November Board  meeting, Conaway informed the Board Finance Committee
of the overbuy by President Mark Schwartz that was not approved by Mr. Conaway" (Stallkamp
5/18/09 , at Tr00797.)  This revelation upset the Board members so they asked for a private
meeting with Conaway after the Board dinner that evening.   Stallkamp's understanding for the
reasons the Board was not told about the overbuy sooner was Conaway's telling them that he had
not been aware of it in August, September or October.  (*Id.* at Tr00798.)

At a one-on-one breakfast meeting before the November Board meeting, Stallkamp had
asked Conaway directly about rumors that Kmart's vendors were not being paid on time.  The
New York Times on October 25 and November 8, 2001, had articles noting several
manufacturers were complaining about being paid late, some "by a week or more." (Def. Exh.
21-A and 22-A.)  Instead of disclosing any intentional late payments of vendors, Conaway
repeated the cover-up story to Stallkamp that the delays were caused by a glitch with the eLMO
system, but that it was unintentional and would be fixed.  (Stallkamp 5/18/09, at Tr00802-03.)
Mr. Stallkamp said he was reassured by this information as an explanation for he rumors
concerning Kmart and he had no reason to doubt Mr. Conaway.  (Id. at Tr00804. ) Mr. Conaway
repeated the eLMO explanation to the entire Board at the November Board dinner and a third
time to Stallkamp at a breakfast meeting in December – that it was a temporary problem that had
been fixed.  (*Id.* at Tr00805-07.)

In a December 20 letter to the Board, Conaway noted that inventory levels improved in
November to only $128 million above the prior year, compared to $300 million in October and
stated:

> Our initiatives to reduce inventory also were important to maintain our liquidity
> cushion.  As we have now passed our peak borrowing date and we have

renegotiated our short-term credit facility, we are comfortable with our working
capital position going into the fiscal year 2002.

Plf. Exh.183, p.2.

Mr. Stallkamp took the "working capital position" to be a reference to Kmart's liquidity, and

being unaware of the AP System changes that had not been ended and unaware of SID, that had

recently be restarted, he was comfortable with Kmart's liquidity position going into 2002 based

on what he had been given by Kmart's management. (Stallkamp 5/18/09, at Tr00812-13.)

### D.    Kmart's Quarterly Filing on Form 10-Q(3).

On November 27, 2001, Kmart filed its quarterly Form 10-Q(3) with the SEC.  (Plf. Exh.

209; Def. Exh. 5).  As required by SEC regulations, the Management's Discussion and Analysis

("MD&A") section of the filing needed to include a discussion of Kmart's liquidity, including

any material change such as a material liquidity event or deficiency that occurred during the

quarter.  (Reg. S-K, Item 303(a), (b) (17 C.F.R. §§ 229.303(a), (b); Carmichael 5/21/09, at

Tr01409-13.)  Kmart's 10-Q(3) MD&A section, however, omitted any reference to Kmart's

liquidity problems, the delay of $1 billion in payments to its vendors, or that the payment delays

had continued into Kmart's fourth quarter.  While Project SID was ended for a couple of weeks

in early December, and there were hopes that Kmart would get caught up with vendors, there

was other evidence that from September to the end of December that Kmart's vendors were not

paid in full, not even coming within 200 million dollars of paying the vendors in full.  (Gilbert

5/13/09 at  TR00464.)  Maurice Sabony of Milberg Factors testified to his vendors being owed

from $4.3 million to $10.5 million in November and December of 2001. (Sabony 2/28/08, at

TrDep00193 and Plf. Exh. 200.) While there was a dispute over whether the AP System changes,

estimated at $300 million, was intended to be temporary or permanent, it was not ended in 2001.

(Gilbert 5/13/09, at Tr00378; Archambeau 5/13/09, at Tr00512.)   Other than Mr. Conaway's testimony, there was no evidence that AP System changes were ever disclosed to or approved by the Board of Directors.

In the MD&A the company must also disclose its response to any material liquidity deficiency.  (Carmichael 5/21/09 , at Tr01403.)  Conaway received his MBA from the University of Michigan, and became CFO of both CVS Pharmacy and later its parent, Melville Corporation. (Conaway 5/27/09, Tr02009.) Melville changed its name to CVS Corporation where Conaway was promoted to served as CFO, COO and President.  (*Id.* Tr02009-10.)  At CVS as CFO he was responsible for and signed each 10Q and 10K.  (Conaway 5/28/09, at Tr02402-03.)  He was aware that liquidity needed to be discussed in the MD&A.  (*Id*.)  While Mr. Conaway had signed Kmart's second quarter Form 10-Q(2), he denied ever seeing, reviewing or discussing the third quarter document. (Stipulation # 6, Schedule A to Jury Instructions, Conaway 5/27/09, at Tr02232.)

CFO McDonald and Controller Richard Noechel signed the 10-Q(3). (Plf. Exh. 209.)  By November 2001, McDonald and Conaway had worked together when Conaway was President of CVS and McDonald helped Conaway restructure Melville Corporation.  (Conaway 5/28/09, at Tr02381-82.).  He was hired at Kmart by Conaway's CFO (Conaway 5/28/09, at Tr02404.)  In Conaway's Voice Mail to Kmart's employees in November 2001 announcing his new CFO  he noted their eight years together at CVS and he touted McDonald as his "right-hand person" when he was President of CVS and also his "right-hand person in helping restructure Melville Corporation." (Plf. Exh. 318, November 12, 2001, at. p. 6.)  Upon firing Boyer on November 9, 2001, Conaway replaced him immediately with Mr. McDonald.  (Plf. Exh. 116; Conaway

41

5/28/09, at Tr02514.)

The jury found two statements in the 10-Q(3) to be materially misleading:  The first being the opening sentence of the "LIQUIDITY AND FINANCIAL CONDITION" section of the 10-Q(3) which read, "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities."  (Plf. Exh.  209, p. 13; Verdict Form, Dkt. 129, at p. 1-2 &  9-10.)   The second sentence found materially misleading was "Inventory increased . . . due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position."  (*Id.* at 2 & 10.)    In addition, the jury found that the MD&A was misleading because it did not include three material omissions concerning events in the third quarter of 2001:

1. Kmart had a known material liquidity event;

2. Kmart had a material liquidity deficiency that involved the delay of vendor payments to remedy that deficiency;

3. The delay in vendor payments was a material change in an internal source of liquidity.

*(Id.*. at 3-6 & 10-12.)

The jury also found that each of omissions was required to be disclosed by Item 303 of Regulation S-K and that the failure to include each fact rendered the Management Discussion & Analysis section of the Form 10-Q materially misleading. (*Id.*)

### E.    The Conference Call.

In conjunction with the electronic filing of the Form 10-Q on November 27, 2001, CEO Conaway and CFO McDonald held a conference call with stock analysts, factors and other interested individuals.  Prior to the call McDonald called Moreland to see if Kmart would be completely caught up on SID by the time of the call and Moreland said it would not . (Moreland 6/27/07, at TrDep00091.)

42

Because of the importance of the call, a call book was prepared and distributed to Mr. Conaway enabling him to inform the listeners on the call as to Kmart's financial health.   Mr. Conaway identified  Defendant's Exhibit 115, a 48 page document, as the third quarter 2001 Conference Call Book. (Conaway 5/27/09, at Tr02211.) Mr. Conaway could not verify it was the complete call book but it was admitted with no objection. (*Id.* at  Tr02212.)  Mr. Conaway testified that the Form 10-Q was not part of that call book, that he did not review the 10-Q nor its MD&A prior to the conference call, and he had never before had a question at such conference calls on a MD&A. (*Id.* at Tr02212-13.)  Mr. Conaway also noted he would have received the conference call script, and he identified Defendant's Exhibit 138, a November 27, 2001, 8:23 a.m. version, as the script for the November 27 conference call which exhibit showed the call was to begin at 9:00 a.m..  (*Id.* at Tr02213; Def. Exh. 138.)  Defendant's Exhibit 138 was admitted.  On Cross examination, Mr. Conaway was given another copy of what purported to be the "3rd Quarter Conference Call Book." (Plf. Exh. 242.)   Mr. Conaway denied that this was the actual Conference Call Book because it had the transcript of the actual conference call at the beginning of the exhibit and thus at least that portion of the exhibit had to have been added after the call was completed and transcribed. (Conaway 5/28, 08 at Tr02519-20; Plf. Exh. 242.) Plaintiff's Exhibit 242 does have a copy of the Form 10-Q(3) included.  (Plf. Exh. 242,  at SE 00122357-76.)  Plaintiff's Exhibit 242 also contains a copy of the prior day's 2:45 p.m. draft of the conference call script with multiple handwritten omissions, changes and notations. (*Id.* at SEC 0012295-120051.)   While Mr. Conaway suggested that conference call script of November 27, 2001, 8:23 a.m. (Def. Exh. 138)  was the one he actually used, a comparison of the actual transcript of the conference call in Plaintiff's Exhibit 242 to Defendant's Exhibit 138 and also to

43

the later portions of Plaintiff's Exhibit 242, show without doubt that Mr. Conaway did not use

Defendant's Exhibit 138 during the conference call of November 27, but rather used the

conference call script in Plaintiff's Exhibit 242.[9]

During the conference call, Conaway and McDonald indicated on several occasions that

the vendor complaints on late pay stemmed from Project eLMO "systems integration problems"

as noted in boldface below:

McDonald:

> As we discussed last quarter, we are aggressively pursuing competitive
> payment cycles. This is not a blanket policy to extend terms. We are
> working with each vendor, partnering with them to create the right and the
> best relations for both parties.
>
> For background, on, March30, Chuck spoke to the vendor community about
> our strategy and how we were going to become  better partners.  For our part . . .
> [we] would clean up ours processes and flow and not  charge any vendor
> compliance fees, as our strategy is to give more business to fewer vendors so we
> can be more meaningful to each other.
>
> And after that was concluded, we were gong to come back to them and talk about
> competitive terms.  We want to develop a partnership with our key vendors who
> can offer the depth and breadth for our customers.  As a result, we have focused
> on developing stronger relationships with these vendors who can best serve
> Kmart's customers And we've cut approximately 25% of our entire vendor base
> from a year ago.

Plf. Exh. 57. at p. 17-18.

--------

[9] The reason this seems certain is that the handwritten changes and omissions in the 2:45 p.m. draft of November 26 script in Plaintiff's Exhibit 242 tracks the transcript of the actual conference call for both the Conaway and McDonald portions (Plf. Exh. 57), whereas Defendant's Exhibit 138 does not.  These changes never got made in Defendant's Exhibit 138 – the  November 27, 2001, 8:23 a.m. version.  Thus, it is the SEC's "3rd Quarter Conference Call Book" (Plf. Exh. 242), and not Defendant's Exhibit 138, that contains what appears to be the final script actually used in the conference call, and that Conference Call Book also contains the Form 10-Q(3).

As Chuck mentioned earlier, we're continuing to integrate our hard lines and soft line businesses as one.  Part of that integration[,] that we internally call eLMO[,] was and is implementation of the new accounts payables system.  **This system implementation did have some issues along the way.**  And as of today, the majority of the issues related to our accounts payable system had been – have been resolved. We're nearly caught up concerning our processing. And we doubt that we will have any other integration issues going forward.

*Id.* at 18.

Conaway:

Now that John has reviewed he progress we made on working capital, I want to review some facts so everyone is entirely clear [and] we can eliminate any misinformation that's clearly been circling in the marketplace.

First, Kmart is woefully [uncompetitive] on [terms], compared to competitive benchmarking.  That's a fact . . . .  Now, while we have a commitment to our supplier partners to continue to improve execution to fulfill our commitment, I can assure you, we expect nothing less than to be fully competitive on terms and costs from any vendor who deals with Kmart.

Second, we're executing a major integration of hard lines and soft lines systems and distribution centers.  I think you get an idea of the magnitude of this effort and the incredible opportunity it has.  **We've clearly [caused] some systems issues, as John  mentioned.  During our accounts payables conversion, certain invoices involved with the integration were dropped and has clearly caused some confusion.**  This was magnified by eliminating a quarter – that's right a quarter [,] 25 percent of our entire vendor base.  This has been corrected and it's working as planned.

* * *

Fourth, as of today, we have over $600 million in borrowing capacity on our existing credit facility and over $400 million in cash.  And at any pont of time, during any point during the entire year, we've had a minimum of $300 million in cash on hand.

*Id.* at 19-20.

**Also, given the magnitude of [process], system and people changes, we will have other bumps in the road, illustrated by the Elmo conversion.**  That's a reality.

*Id*. at 25.

Questions:

Eric Beder:

> And in terms of the vendors and the payables, what has been the, I guess – what has been the biggest problem with the vendors.  I – should – have they had problems understanding what's going on here or are they just, you know, just want to get paid, I guess, quicker ?

*Id*. at 28.

Conaway:

> Well, I think we had – there was some clearly, Eric, some, you know, communication issues.  And so, that was one piece.  We didn't communicate as quickly as we should.  And then, I think there is a – you know, there was a lot of noise from small group of suppliers.

McDonald:          Yeah, (inaudible) those who were part of the 25 percent (inaudible)

Conaway:

> Yeah, I mean, you got to remember, we cut a quarter of our suppliers.  So those people aren't very happy with us.  So other than that, that's it.  I mean, we're, like we said, right now, **systems fully integrated [a]nd its working fine . . . .** .

McDonald:

> (inaudible) we're fully caught up at this point, as I said.  And, you know, we're on our way.  **I don't see any further integration issues** as relates to the –to the vendors.

Conaway:

> And were going to continue to work on getting competitive on payables [terms].

Beder:

> Right.  Thank you.

*Id.* at 28-29.

> Two individuals on the conference call, Eric Beder, a securities analyst with Ladenberg

46

Thalmann, and Maurice Sabony, with Milberg Factors, were extremely interested in learning as much as they could about the state of Kmart's liquidity given the negative rumors and bad press. (Beder 12/17/07, at TrDep00276; Sabony 2/28/08, at TrDep00212-13.)  Sabony in calling various persons at Kmart, including Treasurer Mc Donald, about past due accounts  had repeatedly been given the eLMO systems problems story line as the only reason for the late payments. (*Id.* At TrDep00200-09 .)  Mr. Beder left the conference call with the impression that the references to "systems integration problems" related to Project eLMO, the same story he had heard during the prior weeks, and that the problem had been fixed.  (Beder 12/17/07, at TrDep00276-78, TrDep00281-82 & TrDep00284.)

Beder's understanding of Conaway and McDonald's answer to his question was that there were only two groups of vendors complaining: those who had been cut, and those who were affected by eLMO.  The implication was that no other vendors were complaining.  (*Id.* at TrDep00287-88.)  Based on what he heard during the conference call, Beder felt that Kmart's liquidity situation was in pretty good shape, which, in part, led to his decision to maintain a "buy" rating for Kmart stock.  (*Id.* at TrDep00289 & TrDep00294.)  To him, what management says can be  more important than the financial documents.  (*Id.* at TrDep00269-70.)  If he had known Kmart was intentionally delaying payments to vendors he would have included that information in his report, because it was material, in that it went to the heart of the effectiveness of the company's turnaround.  (*Id.* at TrDep00294-95.)

In their Complaint the SEC challenged two statements of Mr. Conaway's at the November 27 conference call were misleading:

> 1. We've clearly caused some systems issues, as John mentioned.  During our accounts payable conversion, certain invoices were dropped and has clearly

caused some confusion.

and

2. In response to Eric Beder's question about the biggest problem with vendors and

payables –

. . . And then, I just think there is a – you know, there was a lot of noise from a
small group of suppliers.

Dkt. 1, at p. 10-11.

The jury found both of these statements were false or misleading, material misrepresentations,

and made with the intent to defraud or with reckless disregard for the truth.  (Verdict Form, Dkt.

# 129, at p.7-8.)

From November 27 and continuing into December and January, vendors were still

calling about past-due payments.  (Lindsey 5/18/09 Tr00670-73.)  Mr. Sabony noted that Kmart

never got caught up with its late payments to his clients from November 27 through December

12. (Sabony 2/28/08, at TrDep00216.)  Two days after the conference call, on November 29,

2001, Moreland emailed Archambeau Project SID was suspended and "We're officially done."

(Def. Exh.69.)  (Archambeau 5/13/09, at Tr00518.)  This applied only to Project SID, not the AP

System changes, and even Project SID was started up again the week before Christmas.

(Archambeau 5/13/09, at Tr00512; Gilbert 5/13/09 at Tr00442-43.)  Mr. Gilbert testified that the

Kmart was never within 200 million dollars of being caught up with vendors in 2001. (Gilbert

5/13/09 at Tr00464.)  Kearse also testified that, to his knowledge, Kmart never caught up with its

vendors, and he never said as much to Mr. Conaway.  (Kearse 5/20/09, at  Tr01226-27 &

Tr01269-70.)

## II. DEFENDANT CONAWAY'S LEGAL CHALLENGES:

### A. Claim Three – Aiding and Abetting Kmart's Violation of Section 13(a) of the Exchange Act .[10]

1. Challenge to the Violation of Section 13(a) of the Exchange Act .

Claim Three alleges that Defendant Conaway under Section 20(e) of the Exchange Act aided and abetted Kmart in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 promulgated thereunder.[11]  Section 13(a) of the Exchange Act required every issuer of a security registered pursuant to section 12 of the Act to file with the Securities Exchange Commission such annual and quarterly reports as the Commission may prescribe.  Rule 13a-13 requires such corporations to file a quarterly report Form 10-Q and Rules 12b-20 requires the Form 10-Q to contain such additional material as necessary to make it not misleading.  The instructions under this claim and the verdict findings follow.

---

[10] The jury was charged in the order of the claims set out in the SEC's complaint.  Yet, in retrospect, because Claims Three, Two and One respectively became more and more serious, and because various findings of Claims One and Two build on Claim Three, and Claim One builds on Claim Two,  it would have been preferable to have charged the jury on Claim Three, then Claim Two, and finally Claim One. This would have allowed the explanations of Regulation S-K's Item 303 to be introduced in conjunction with Claim Three where its applicability is agreed upon by all parties.  This is one of multiple situations in this case where the benefit of hindsight raises the painful and humbling question of why did not I or someone think of this or other things at trial.  While not a remedy to the order in which the jury was charged, it seems that consideration of Defendant's Rule 50(b) and 59 motions better proceed with an analysis of Claim Three before Claims Two and One.  Claim One involves the considerable questions of whether the evidence is sufficient to allow a jury to find that Charles Conaway caused the 10b-5 violation and whether he acted with scienter, which issues are separate from the other central question in this case of whether a 10b-5 violation can, in part, be based on a violation of Regulation S-K's Item 303.  Dealing with that difficult issue is clearer in an analysis of whether Kmart violated 10b-5 under Claim Two instead of confusing it with the other troubling issues under Claim One of whether Defendant Conaway caused any 10b-5 violation or acted with scienter.

[11] 15 U.S.C. § 78m(a),17 C.F.R. §  240.12b-20 and § 240.13a-13.

2:05-cv-40263-RHC   Doc # 185   Filed 01/20/10   Pg 50 of 211   Pg ID 12361

**Instruction No. 30:  Claim Three:  Aiding and Abetting – Section 13(a)**

The SEC contends in Claim Three that Mr. Conaway violated Section 20(e) of the Exchange Act by aiding and abetting Kmart's alleged violation of Section 13(a) and Rules 12b-20 and 13a-13.   Section 13(a) and Rule 13a-13 require companies that issue securities to file  a quarterly report on Form 10-Q in accordance with such rules and regulations as the Commission may prescribe.  Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, the issuer shall add such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.  The term "material" has the same meaning as set forth in Instruction 22 at page 30 above.


In order to prevail on Claim Three, the SEC must prove by a preponderance of the evidence:

> First:  That Kmart Corporation committed one or more violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13.

> Second:  That Mr. Conaway had a general awareness that his role was part of an overall activity that was improper.

> Third:  That Mr. Conaway knowingly assisted Kmart in its violation.

> Fourth:  That Mr. Conaway substantially assisted Kmart in its violation. The Second, Third, and Fourth elements under Count Three have the same meaning as for Count Two.

The Second, Third, and Fourth elements incorporated here from Count Two were:

> **Instruction No. 27:  Second Element:  General Awareness**
> The second element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Mr. Conaway had a general awareness that his role was part of an overall activity that was improper.  In order to establish this element, the SEC must show that Mr. Conaway knew or was reckless in not knowing that Kmart's Form 10-Q for the third quarter of 2001 contained material misstatements or omitted material facts necessary to make the statements that were made not misleading.  "Knowledge" and "recklessness" in this context have the same meaning as for Claim One.

> **Instruction No. 28:  Third Element:  Knowing Assistance**
> The third element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Mr. Conaway provided knowing

assistance to Kmart in the alleged violation.  With respect to this third element, the word "knowing" modifies the word "assisted," not "violation."

**Instruction No. 29:  Fourth Element:  Substantial Assistance**

The fourth element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Mr. Conaway provided substantial assistance to Kmart in the alleged violation.

In order to establish this element, the SEC must show that Mr. Conaway's encouragement or assistance was a substantial factor in contributing to the violation.

Claim Three continues:

**Instruction No. 31:  First Element:  A Violation of Section 13(a) and Rules 12b-20 And 13a-13 by Kmart**

The first element that the SEC must prove by a preponderance of the evidence in support of Claim Three is that Kmart violated Section 13(a) and Rules 12b-20 and Rule 13a-13 promulgated thereunder.

The SEC contends that Kmart violated Section 13(a) and Rules 12b-20 and Rule 13a-13 by making false or misleading statements or omissions in its Form 10-Q for the third quarter of 2001.  For a list of the false and misleading statements and omissions at issue with respect to the Form 10-Q, see Instruction 21 at pages 26-27 above.

In order to prove a violation of Section 13(a), the SEC does not need to show that Kmart acted knowingly or recklessly.

Instruction Number 21 states:

The alleged misrepresentations and omissions asserted by the SEC as to Kmart's Form 10-Q for the third quarter of 2001 are as follows:

Statements:

1.      The Form 10-Q stated, "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities."

2.      The Form 10-Q stated, "Inventory increased . . . due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position."

Omissions:

1.      The Form 10-Q did not identify a known material liquidity event that occurred in the third quarter of 2001.

2.      The Form 10-Q did not disclose that Kmart had a material liquidity deficiency during the third quarter of 2001 or the course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency.

3.      The Form 10-Q did not identify the delay in vendor payments as a material change in an internal source of liquidity during the third quarter of 2001.

51

The jury Verdict From indicates:

**CLAIM THREE**
**Aiding and Abetting Section 13(a) of the Securities Exchange Act of 1934 and Rule 12b-20 and 13a-13 Promulgated Thereunder**
     **For each Question below, please refer to the corresponding jury instructions for Claim Three.**

After you have answered questions 1 through 4 below, you will be asked to answer the following question:
     Did Charles Conaway aid and abet one or more violations by Kmart Corporation of Section 13(a) of the Securities Exchange Act of 1934 and Rules 12b-20 and 13a-13 promulgated thereunder as to the Kmart Form 10-Q for the quarterly period ending October 31, 2001?

Do you find by a preponderance of the evidence:

1.    That Kmart violated Section 13(a) and Rules 12b-20 and 13a-13 in its Form 10-Q for the third quarter of 2001 with respect to one or more of the statements or alleged omissions in Question 1 under Claim Two?  (Please base your answer to this question on your answers to Question 1 under Claim Two, except do not consider any of the questions:  "That Kmart acted with intent to defraud or with reckless disregard for the truth?"  As set forth in Instruction No. 31 at page 40, you  do not need to find that Kmart acted knowingly or recklessly in order for Kmart to have violated Section 13(a) and Rules 12b-20 and 13a-13.)
     Answer: Yes \_\_\_\_✔\_\_\_\_\_   No _____

2.    That Charles Conaway had a general awareness that his role was part of an overall activity that was improper?
     Answer: Yes \_\_\_\_✔\_\_\_\_\_   No _____

3.    That Charles Conaway knowingly assisted Kmart in its violation of Section 13(a) and Rules 12b-20 and 13a-13?
     Answer: Yes \_\_\_\_✔\_\_\_\_\_   No _____

4.    That Charles Conaway substantially assisted Kmart in its violation of Section 13(a) and Rules 12b-20 and 13a-13?
     Answer: Yes \_\_\_\_✔\_\_\_\_\_   No _____

Did Charles Conaway aid and abet one or more violations by Kmart Corporation of Section 13(a) of the Securities Exchange Act of 1934 and Rules12b-20 and

13a-13 promulgated thereunder as to the Kmart Form 10-Q for the quarterly period ending October 31, 2001?

Answer: Yes _____✔_____   No _____

Verdict Form, Dkt.# 129, at p. 15-16.

The relevant findings of the jury as to the misstatements and omissions in the MD&A of

the10-Q(3) that are applicable to Kmart's alleged § 13(a) reporting violation under Claim Three

were earlier made by the jury in the response to Question 1 under Claim Two concerning

Kmart's 10b-5 violation.  These findings were as follows (with the **boldface type** added to

clarify which alleged misstatements or omissions each series of questions involved):

Do you find by a preponderance of the evidence:

* * *

a.     With respect to the statement in the Management Discussion & Analysis section of Kmart's Form 10-Q that **"Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities,"** do you find:

　　　i.     That the statement was false or misleading?
　　　　　　Answer: Yes _____✔_____   No _____

　　　ii.    That the statement was material?
　　　　　　Answer: Yes _____✔_____   No _____

* * *

b.     With respect to the statement in the Management Discussion & Analysis section of Kmart's Form 10-Q that **"Inventory increased … due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position,"** do you find:

　　　i.     That the statement was false or misleading?
　　　　　　Answer: Yes _____✔_____   No _____

　　　ii.    That the statement was material?
　　　　　　Answer: Yes _____✔_____   No _____

* * *

53

c.      With respect to the **alleged omission** from the Management Discussion & Analysis section of Kmart's Form 10-Q **that it did not identify a known material liquidity event** that occurred in the third quarter of 2001, do you find:

      i.      That Kmart had a known **material liquidity event** that occurred in the third quarter of 2001?

        Answer:  Yes ____✔____      No _____

      ii.      That Kmart was required to disclose this fact under Item 303 of Regulation S-K?

        Answer:  Yes ____✔____      No _____

      iii.      That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

        Answer:  Yes ____✔____      No _____

      iv.      That the omitted fact was material?

        Answer:  Yes ____✔____      No _____

* * *

d.      With respect to the **alleged omission** from the Management Discussion & Analysis section of Kmart's Form 10-Q **that it did not disclose that Kmart had a material liquidity deficiency** during the third quarter of 2001 or the course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency, do you find:

      i.      That Kmart had a **material liquidity deficiency** during the third quarter of 2001 and, if so, **remedied** that deficiency **by a** course of action involving the **delay of vendor payments?**

        Answer:  Yes ____✔____      No _____

      ii.   That Kmart was required to disclose these facts under Item 303 of Regulation S-K?

        Answer:  Yes ____✔____      No _____

      iii.      That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

        Answer:  Yes ____✔____      No _____

      iv.      That the omitted facts were material?

54

Answer:  Yes _____✔_____          No _____

\* \* \*

e.      With respect to the **alleged omission** from the Management Discussion & Analysis section of Kmart's Form 10-Q **that it did not identify the delay in vendor payments as a material change in an internal source of liquidity** during the third quarter of 2001,

i.      That the **delay in vendor payments** was a material change in an internal source of liquidity during the third quarter of 2001?

Answer:  Yes _____✔_____          No _____

ii.      That Kmart was required to disclose this fact under Item 303 of Regulation S-K?

Answer:  Yes _____✔_____          No _____

iii.      That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

Answer:  Yes _____✔_____          No _____

iv.      That the omitted fact was material?

Answer:  Yes _____✔_____          No _____

*Id.* at p. 9-13.

Again, Defendant's challenges to the sufficiency of the evidence to support the jury's finding that the two statements in Question 1. a.  and   Question 1. b. were false or misleading are discussed in Section III below.  As will be discussed further in that section, the SEC's legal contention is that the MD&A statement on liquidity that included these two sentences was materially misleading because of what it failed to say.   If the jury found the two above statements materially misleading because of what else was not said (and if that finding had sufficient factual support which will be discussed below), then that would constitute a violation of Rule 12b-20 which states:

**Additional information.**
In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.

17 C.F.R. §  240.12b-20 **.**

The jury also found that there were three specific omissions of material fact[12] that were necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?[13]  In the absence of additional findings that these three items were otherwise required to be disclosed by regulation, these omissions also would support a finding of a violation of Rule 12b-20.  But the jury also specifically found that each of these three omitted facts were required to be disclosed under Item 303 of Regulation S-K.[14]  The disclosure requirements for quarterly reports required under section 13(a) of the Exchange Act of 1934 and by Rule 13a-13 are set out in Item 303 of Regulation S-K.[15]  While Defendant challenges the instructions on Item 303, which is discussed

---

[12] The jury was specifically instructed that for omissions under Rule 12b-20 (17 C.F.R. § 240.12b-20), the omitted fact had to be material as defined in Instruction Number  22 which was drawn from *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

[13] VERDICT FORM Claim 2, Questions 1. c. i., iii.  and iv. (a material liquidity event), Questions 1. d. i., iii.  and iv. (a material liquidity deficiency remedied by delay of vendor payments), and Questions 1. d. i., iii.  and iv.(these delays in vendor payments were a material change in an internal source of liquidity).

[14]  VERDICT FORM Claim 2, Question 1 c. i.(a material liquidity event), Question 1 d. i. (a material liquidity deficiency remedied by delay of vendor payments), and Question 1 d. i.(these delays in vendor payments were a material change in an internal source of liquidity).

[15] The proposed  instruction on Claim Three the SEC's initially requested ("Plaintiff's Proposed Instruction No. 34"), like the final one, makes no reference that a Section 13(a) or Rule 13a-13 violation required a showing of a violation of  Item 303 of Regulation S-K.  Defense counsel proposed alternative instructions including one ("Conaway's Proposed Instruction No. 27") that stated the SEC's section 13(b) and Rules 12b-20 and 13a-13 claim was because the

56

below,  if the jury was adequately instructed on the reporting requirements under 303(b) for interim SEC filings, these jury findings would be legally sufficient to support the jury's finding a violation of Regulation 13a-13 on the 2001 filing for the third quarter.

Thus, either an omission under Rule 12b-20 or a failure to disclose information required under Rule 13a-13 and Regulation S-K Item 303 would form a sufficient basis for the jury's finding that Kmart committed one or more violations of Section 13(a) of the Exchange Act in its Form 10-Q for the third quarter of 2001.

2.   Challenge to the Instruction on Item 303 of Regulation S-K.

Portions of Item 303 of Regulation S-K were read to the jury in conjunction with Claim One and Two, and the jury instruction binder given to the jury which included the instructions also included the entire Regulation S-K and the 1989 Release interpreting it with the portions that were read highlighted for the jury.  In that earlier given Instruction Number  21, immediately after the above noted list of the two alleged false and misleading statements and the three alleged omissions at issue with respect to the Form 10-Q, were the following instructions, and the only instructions read to the jury on Item 303 of Regulation S-K:

> With respect to the alleged omissions, you must first find that the omitted facts were required to be disclosed under Item 303 of Regulation S-K and that those omissions were material as defined in Instruction No. 22 on page 30.  For the alleged misleading statements and omissions in the Management Discussion & Analysis, you must determine whether the statements and omissions were

---

MD&A did not comply with the requirements of Item 303(b) and Regulation S-K.   It then quoted all of 303(b) with no mention of the portions of Item 303(a) that needed disclosure if there were material changes from prior quarterly reports.  While defense counsel made numerous formal objections on the record to multiple instructions that were given and objections to several specified proposed defense instruction that were not given, it is not clear that Defendant Conaway objected to above Instruction Numbers 30 or 31, nor to the above quoted portions of the Verdict Form related to Claim Three.

misleading and whether they were material to the period covered by Kmart's third quarter Form 10-Q, the three months ending October 31, 2001. Second, you must find that the failure to include those omitted facts rendered the Management Discussion & Analysis section of Kmart's Form 10-Q for the third quarter of 2001 materially misleading.

What I am about to read to you are selected portions of Item 303 that the SEC contends required the allegedly omitted facts to be disclosed. You will also be provided with a full copy of Item 303 and the relevant SEC guidance.

Item 303.   <u>Management's Discussion and Analysis of Financial Condition and Results of Operations</u>

(a) *Full Fiscal Years*. Discuss registrant's financial condition, changes in financial condition and results of operations. The discussion shall provide information as specified in paragraphs (a)(1), (2), and (3) . . . .

> (1) *Liquidity*. Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency. Also identify and separately describe internal and external sources of liquidity, and briefly describe any material unused sources of liquid assets. . . .

Instructions to Paragraph 303(a). . . .

2. The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

3. The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations. . . .

5. The term "liquidity" as used in this Item refers to the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash. . . .

58

(b) *Interim Periods*. . . . The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item ....

Instructions to Paragraph (b) of Item 303. . . .

3.  The discussion and analysis required by this paragraph (b) is required to focus only on material changes.  . . .

Defense counsel challenge whether  Regulation S-K's Item 303 has any place in the10b-5 instructions on Claims One and Two. This argument will be discussed in detail in the analysis of Claims One and Two where the issues was initially considered in the jury instructions conferences.   In addition to this  objection, Defendant – without questioning that Regulation S-K's Item 303 is relevant to Claim Three –  challenges the adequacy of these instruction on Regulation S-K Item 303, and the sufficiency of the evidence to support various factual findings noted above.

Because the Verdict Form on Claim Three incorporated the jury's answers to question one under Claim Two, which involved findings of violations of Regulation S-K's Item 303, if that instruction is wholly inadequate and misleading it may have prejudiced the jury's finding under Claim Three.   Before considering the instruction on Regulation S-K and Item 303, a review of the standards for setting aside a jury verdict because of improper instructions is in order.

3.      **Jury Instructions.**

a.      Background Law.

"This circuit has set a high standard for reversal of a conviction on the grounds of improper [jury] instructions." *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 787 (6th Cir. 2003), *quoting United States v. Sheffley*, 57 F.3d 1419, 1429 (6th Cir. 1995), *cert. denied*, 516 U.S. 1065 (1996) (even though "jury instructions were erroneous," there was no prejudice to defendant).  As the Sixth Circuit made clear in *Roberts*, the instructions must be "viewed as a whole" and any confusion or error must be "prejudicial."  "Our inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in the law with which to reach a conclusion." *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000).

This court may reverse a judgment on the basis of improper jury instructions only if the instructions, when viewed as a whole, were confusing, misleading and prejudicial." *Roberts,*  325 F.3d at 787 . That is whether, taken as a whole, they given an inadequate understanding of the law.  *Jones v. Federated Fin. Reserve Corp., 144 F.3d 961, 966 (6th Cir. 1998).  Barnes v. Owens-Corning Fiberglass Corp*. 201 F.3d 815,  828 (6TH Cir. 2000) (same; although jury instruction was erroneous; the error was harmless when the instructions were "viewed as a whole"); *O-So Detroit, Inc. v. Home Ins. Co.,* 973 F.2d 498, 502 (6th Cir. 1992) (affirmed in relevant part: "When instructions are challenged on appeal our duty is not to read the instructions word for word in search of an erroneous word or phrase. . . . [W]e find that the inclusion of the erroneous 'must' was harmless.");

60

*Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1181-83 (6th Cir. 1983) (court found

instructions adequate as a whole even though "the district court was less than precise

when it tried to use language the jurors could understand"; "it is not reversible error if the

court refuses to use the exact language counsel requests"); *Lees v. Thermo Electron

Corp.*, 2008 U. S. Dist. LEXIS 103330 at *3 (S. D. Ohio Dec. 12, 2008) (rejecting

contentions that jury was confused by instructions; the trial court "enjoys considerable

latitude in selecting appropriate language" for the jury instructions); s*ee also Thompson,*

407 F.2d at 997 ("A court's instructions should be patterned to fit the case being tried.").

It is well established in the Sixth Circuit that: "courts generally presume the jury

will follow the instructions correctly as given." *Barnes*, 201 F.3d at 822, 827 (6th Cir.

2000). *Accord, e.g., Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005) (same), *citing and

quoting, Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). *See generally,

Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (citing the "rule that juries are presumed

to follow their instructions.")

### b.   Regulation S-K, Item 303.

Defendant first asserts the jury instructions on Regulation S-K Item 303 were

erroneous because the jury was not instructed on what defense counsel attributes to being

my ruling that the Kmart's filing of the 10-Q(3) could be interpreted as an implied

representation that it was in compliance with Item 303.  This discussion was part of the

jury instruction arguments on whether Item 303 could form a basis for a Section 10(b)

and Rule 10b-5 claim and it also is best discussed below in considering the defense

challenges to the instructions on the10b-5 Claims One and Two.

61

(1.)    *Did the Jury Instruction Confuse 303(b) with 303(a) and not require a Change?*

Defendant next argues that because the instructions on Item 303 began with Item 303(a) which only applies to the 10-K annual report and not the quarterly reports, and further because the Verdict Form  tracks the language of Item 303(a) [e.g. material liquidity "event", material liquidity "deficiency", and "internal . . .  source[ ] of liquidity"], that the jury was not adequately instructed that only Item 303(b) applied to quarterly filing, and further that the jury was not sufficiently apprised of the fact that liquidity items noted in Item 303(a) need only be discussed in quarterly reports if there was a "material change" in that quarter from what had earlier been reported.

The Complaint in paragraph 28-34 notes that:  complete and accurate MD&A disclosures were required in Kmart's Form 10-Q(3); disclosure of changes in financial conditions were required including the causes for the material changes in accounts payable and inventory from the end of the prior fiscal year and the third quarter of 2000; and where  material deficiencies are identified then the report must include the course of action the company had taken or proposed to take to remedy the deficiency as well as identify and separately describe internal and external sources of liquidity.  (Dkt. #1) The complaint then states that the MD&A in the 10-Q(3) should have disclosed the August 2001 overbuy as the cause for the $400 million or 6% inventory increase and the $718 million or 28% increase in accounts payable from the third quarter of 2000 which increase was a material deficiency.   The complaint states further that the MD&A in the 10-Q(3) should also have disclosed that the several hundred million dollars in withheld payments from vendors, or "vendor borrowing constituted a material deficiency at

quarter end", and finally that Project SID was a source of liquidity that should have been identified and separately described.

Defendant's first proposed jury Instruction Number 27 on the claim three Section 13(a) violation referred only to Item 303(b). The SEC's first draft Proposed Instruction Number 34 on the section 13(a) claim three was general and did not identify any alleged misleading statements or omission nor refer Regulation S-K or Item 303. When it was determined the specific alleged misstatements and omissions from the complaint needed to be included on all claims, Defendant's Revised Proposed Instruction Number 27 added the two alleged misstatements and regarding the omissions it quoted only the portion on "Liquidity" from Item 303(a) and noted the jury would be provided a copy of Item 303. This proposed defense instruction made no reference to "change" anywhere. In discussing what portions of Regulation S-K needed be included in the instructions, it was determined that because Item 303(b) refers to material changes in items listed in 303(a), that those parts of Item 303(a) should be included in the instruction as well as Item 303(b). When the Defendant's proposed iteration of the instruction dealing with the specific misstatements and omissions and Item 303 was thereafter submitted, defense counsel noted they changed the order from the SEC's prior draft that began with the omissions, and they also "slightly rephrased the omissions so that they track the language of Item 303." (May 27, 2009, Transcript, evening session at Tr02308.) Thus the terms "material liquidity event", "material liquidity deficiency", and "delay of vendor payments" as a "material change in an internal source of liquidity" from the defense draft came to replace the Complaint's terms of "overbuy" and "Project SID." In light of the

63

evidence it did not seem this change would have caused any confusion with the jury who clearly knew that it was the SEC's claim that the August overbuy was the "material liquidity" event in the third quarter of 2001 that created the "material liquidity deficiency" in overdue accounts payables that was remedied by delay of vendor payments, the major and essential component of which was Project SID.[16]

The confusion defense raised is that by starting with the sections on liquidity from Item 303(a) dealing with the annual report before quoting from Item 303(b) the jury would think any requirement from Item 303(a) was necessary in the From 10-Q(3) without the need for them to find that it was a material change from prior reports. Again the Instruction Number 21 concerning Item 303 states:

> What I am about to read to you are selected portions of Item 303 that the SEC contends required the allegedly omitted facts to be disclosed. You will also be provided with a full copy of Item 303 and the relevant SEC guidance.

> Item 303.       Management's Discussion and Analysis of Financial Condition and Results of Operations

> (a) *Full Fiscal Years*. Discuss registrant's financial condition, changes in financial condition and results of operations. The discussion shall provide information as specified in paragraphs (a)(1), (2), and (3) . . . .

---

[16] While there was some question about the various terms used for the "delay of vendor payments" or "slow paying vendors" – i.e. "Project SID," "prioritizing invoices", the "AP System" changes, "managing payables," "stretching vendors" – the only "*material* change in an internal source of liquidity during the third quarter of 2001" and the only "course of action involving the delay of vendor payments taken . . .[that was sufficient] to remedy that [material liquidity] deficiency" was Project SID either alone or in conjunction with the AP System changes. The latter increased in "borrowings" from vendors beyond the contract terms by approximately $300 million (Plf's Exh. 20, p.3, Moreland 4/23/09, at  TrDep00144-47), and SID increased these "borrowings" by approximately $790 million on October 31, 2001, plus or minus 10% according to the undisputed testimony of Assistant Treasurer Mark Moreland and his SID Master Tracking Document exhibit. (Plf's Exh. 289A, Moreland 4/23/09, at TrDep00167 .)

(1) *Liquidity*.  Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way.  If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency.  Also identify and separately describe internal and external sources of liquidity, and briefly describe any material unused sources of liquid assets.  . . .

Instructions to Paragraph 303(a).  . . .

2.  The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

3.  The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations. . . .

5.  The term "liquidity" as used in this Item refers to the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash.  . . .

(b) *Interim Periods*.  . . . The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item . . . .

Instructions to Paragraph (b) of Item 303.  . . .

3.  The discussion and analysis required by this paragraph (b) is required to focus only on material changes . . . .

Throughout the trial the term "third quarter" or "third quarter of 2001" were

repeatedly mentioned in the testimony, and the SEC's arguments and evidence was clear that the Form 10-Q(3) was for an interim period and was not for the full fiscal year filing, which was at times referred to as the Form "10-K." It is inconceivable that this jury, which had some relatively sophisticated members with business work experience, thought that they were dealing with a full fiscal year filing and not an interim filing.  It is also not credible that they did not realize that they were dealing with the requirements for a report for an interim period.  Regarding that interim reports they were told it requires a "discussion of material changes in those items specifically listed in paragraph (a) of this Item" with that message repeated in telling them that the required discussion and analysis focus "only on material changes."  The jury instructions and Verdict Form on the third omission were clear that they had to find that "[t]he Form 10-Q did not identify the delay in vendor payments as a *material change* in an internal source of liquidity during the third quarter of 2001" (emphasis  added).  Why, when the defense counsel were drafting their proposed instruction to "track the language of Item 303," they only included "material change" in the third omission and not the first two omissions cannot likely be known at this time.  It is clear that had they drafted them to include the following bracketed and boldfaced materials, there would have been no objection from the SEC or the Court:

Omissions:

1.      The Form 10-Q did not identify a known [**material change involving a**] material liquidity event that occurred in the third quarter of 2001.

2.      The Form 10-Q did not disclose that Kmart had a [**material change involving a**] material liquidity deficiency during the third quarter

66

of 2001 or the [**material change selecting a**] course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency.

In retrospect, I wish I had added immediately following the reading the above

quoted portions from Item 303(a) and (b):[17]

> Members of the jury, I want to be clear that this case involves an interim SEC filing, the Form 10-Q(3). For such interim filings, Item 303(b) requires disclosures of items such as those dealing with liquidity that are listed in 303(a) for the annual filing, only if there was a material change in those items in the third quarter of 2001 compared to the end of the fiscal year or the third quarter of 2000. Thus you must find for each of the three alleged omissions noted above that what was omitted was a material change involving liquidity from those two prior quarterly periods.

Had defense counsel asked for this or a similar instruction such an addition would not

have been objected to by the SEC nor rejected by the Court. I do not wish to infer that

this was intentionally  an "invited error" given the extraordinary professionalism defense

counsel demonstrated throughout this case and trial, but this appears to be an issue that

defense counsel may have overlooked, which if raised under Fed. R. Civ. P. 51(c) "stating

distinctly the matter objected to and the grounds for the objection" that proposed changes

would have been accepted. While the defense counsel objected to Jury Instruction

Number 21 on other grounds that will be considered later in this opinion, this simply was

not one of the grounds  presented to me in the jury conference, nor in the defense's formal

objections later put on the record prior to charging the jury instructions. Defense counsel

---

[17] During the discussion of this instruction, I expressed my frustration with not having some appeal tested jury instructions when I stated: "I mean, what's making this ~~think~~ [thing] tortuously difficult is we're possibly cobbling up a lot of new law here and that's a lot harder." May 27, 2001, Transcript of the evening session, p. 115, l. 8-10.  That transcript notes that this third session on jury instructions began at 6:36 p.m. after a fill day of trial and ended at 9:43 p.m.. *Id*. at p. 3 and p. 131.

67

objected on the direct examination of Plaintiff's expert, Dr Carmichael, that counsel was

asking about items to be disclosed under Item 303(a), and this case involved 303(b)

(Carmichael 5/21/09, at Tr01431.)  Plaintiff's counsel countered that all of the items to be

disclosed come under 303(a), and "303(b) cross references 303(a) that defense counsel

could raise this distinction on cross examination." (*Id.* at Tr01431-31.)   Defense counsel

did not pursue this issue on cross-examination nor clearly raise it in the jury instruction

conferences. (*Id.* at Tr01474-81.)

It is possible that this issue was not explored on cross-examination of Dr.

Carmichael, nor the focus of sufficient attention in drafting the jury instructions, due to the

fact that the evidence at trial was so clear, and I think unchallenged, that the magnitude of

the liquidity event and liquidity deficiency caused by the August 2001Schwartz overbuy

and Kmart's extraordinary slow pay method of dealing with it and the resulting vendor

complaints, were without precedent in Kmart's history as recalled by many employees

having years of experience working at Kmart.[18] While adding a few days delay in paying

_____

[18] While Mr. Moreland did not have a long work history at Kmart, as others had, he
described Conaway and McDonald approving his new SID program which he described as
unusual in degree and scope. (Moreland  6/27/07, at TrDep00028 & TrDep00032.)  Mr.
Archambeau – who worked for Kmart since 1980, and at headquarters since 1982 – noted
repeatedly that project SID was not done in the past and "This was totally out of the ordinary
from anything we ever done in the past." (Archambeau 5/13/09, at Tr00487-88, Tr00499-500.)
Scott Gilbert, who headed accounts payable, also noted that project SID "was something that has
never been done before" and  he had never seen AP System changes to deal with a liquidity
crisis in his 30 plus years at Kmart. (Gilbert 5/13/2007, at Tr00379 & Tr00392.)  Although
Kmart had a reputation for stretching vendors a few days (Stallkamp 5/18/09, at Tr00838) and
had, at times, delayed payments to vendors, Mr. Kearse, who had worked at Kmart since 1974
noted that the Schwartz overbuy was not a normal seasonal buy and that the liquidity crunch in
the third quarter of 2001 was more severe than normal, and vendors not shipping because of non-
payment was also not normal.  (Kearse 5/20/09, at  Tr01051, Tr01072,Tr01104 &  Tr01124.)
While slow paying vendors had been done before at Kmart adding a day or two (Moreland

vendors may have occurred in the past at Kmart, the magnitude of the delays involved in

Project SID unilaterally adding thirty or more days were without precedent in Kmart's

history.  That these events –  the overbuy,  the resulting liquidity deficiency and the use of

Project SID and the AP System changes  –  were "changes" from any prior Kmart history

can hardly be asserted as a issue of disputed fact.  While defense counsel during trial

dispute the fact that these events were "material" or needed to be disclosed in the Form

10-Q(3),  they do not dispute that such events never occurred in any prior quarterly period

at Kmart and thus they unquestionably were changes from the reporting periods of the 10-

K fiscal report, the prior quarterly report of 2001, and the third quarterly report of 2000.

On the disputed question of whether these events omitted from the 10-Q(3)  were material,

that question was considered by the jury under the "materiality" standard of *Basic v.*

*Levinson,* and the jury rejected the defense arguments that they were not material.

Defendant has not challenged the sufficiency of the evidence supporting that finding but

does challenge the instructions on materiality discussed in subsection (3.) below.

Regardless of how the jury instructions on Item 303 could have been improved

with further refinement, read as a whole the portions read to the jury did state that the

---

6/27/07, at TrDep00032), Mr. Kearse didn't recall it ever being done to the level in the second half of 2001. (Kearse 5/20/09, at Tr01275.)  Even Mr. Conaway acknowledged that he did not recall having to prioritize invoices to manage a liquidity crunch of the previous year or his eight years at CVS Pharmacy .  (Conaway 2/13/08, at TrDep00330-31.) Karen Lindsey, Treasurer McDonald's administrative assistant, who worked at Kmart since 1972 and for Mr. McDonald since September 2000, testified that beginning in September 2001 and continuing into December, she started receiving phone calls from vendors complaining about late payments, though she had never received them before this time.  (Lindsey 5/18/09 at Tr00632-33 & Tr00645-46.)

discussion and analysis required for interim period reports involved 'material changes'

with that point repeated that "[t]he discussion and analysis required by this paragraph (b)

is required to focus only on material changes . . . ." They had a copy of all of Item 303

with the portions read highlighted, and that visual layout made it clear that paragraph(b) of

Item 303 for "Interim periods" covered only material changes.

Had this case dealt with a full fiscal year filing, then there would have been no

need to have included anything from paragraph (b) of Item 303 on "interim filings."

Nearly all of the evidence on multiple topics dealt with the third quarter of 2001. Thus, it

is reasonable to believe that the jury understood that the only reason they were given any

instructions on Item 303(b) on interim filings was because that was the paragraph

applicable to the third quarter of a Kmart's fiscal year. For interim filings, portions of

Item 303(a) need to be included because 303(b) specifically refers to "paragraph (a)."

Thus, it is fair to assume that the jury understood that this case dealt with an interim filing

and that they further understood that if the case dealt with the SEC filing for the full fiscal

year, then paragraph (a) of Item 303 on "*Full Fiscal Year*s" is complete in itself and their

instruction on Item 303 would not need to mention of anything from paragraph (b) on

"*Interim Periods*."

With regard to the jury being confused about whether Item 303(b) required a

change,  the instructions on Item 303, when viewed as a whole, were not confusing,

misleading and prejudicial, and that the jury had an adequate understanding of the law.

(2.)     *Must all Item 303 Disclosures Affect Future Operations?*

Defendant's next challenge to the instruction on Item 303 is based on his argument

that it was far from obvious that Kmart needed to discuss the 2001 liquidity crunch caused by the inventory overbuy or the actions taken in response, including the dely in vendor payments, because as of November 27 2001, the liquidity issue caused by the overbuy was over.  (Dkt. 139, p. 36 of 75, numbered page 21.)

The defense argues that the instructions on Item 303 failed to stress that a disclosure on a liquidity event  was required only when "that will result in … the registrant's liquidity increasing or decreasing in any material way" – in other words, an event that will have material liquidity implications *going forward*. It does not suggest that an event that has been resolved by the time of filing should be disclosed, even in an annual report."  Defendant's counsel argues that:

> Item 303(a)(1) (requiring discussion of known trends or known demands, commitments, events, or uncertainties that "*will result in or that are reasonably likely to result in* the registrant's liquidity increasing or decreasing in any material way," and indicating that, where a material deficiency is identified (*i.e*, a deficiency in liquidity in the future), the registrant should "indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency" (*i.e.*, the course of action that the registrant is implementing to avoid or mitigate the future deficiency)). Instruction 3 to Paragraph 303(a) (which again applies only to annual reports) does not indicate that a deficiency that has been resolved still needs to be discussed in an annual report (indeed it says nothing about deficiencies at all). The verdict form, however, allowed the jury to impose liability based on "a material liquidity deficiency during the third quarter of 2001," without requiring any assessment of whether it constituted a material deficiency *going forward*.

(Dkt. 139, p. 65 of 75, numbered page 50) (emphasis in original).

This is a mixed legal and factual issue that was at the center of Defendant's argument to the jury regarding Kmart's compliance with Regulation S-K Item 303. Defendant argued that given the other assets of inventory or unencumbered real estate

against which Kmart could have borrowed in the third quarter of 2001, and given the short term liquidity problem that was a self inflicted by the overbuy and largely remedied by November 27, there was no material liquidity deficiency going forward that needed to be reported.

To the extent this is an objection to the wording of the instruction on Item 303, like the defense desire for a greater emphasis in the instructions on "material changes," this also was not a concern that was "stating distinctly" at trial under Fed. R. Civ. P. 51(c). But unlike the "material changes" modification that would have been accepted if proposed, this argument would have been rejected because it misstates the law. As noted below, even if the defense theory is correct that the jury should have had additional instructions that they had to find that the effect of the overbuy, the liquidity deficiency and the slow pay means of dealing with it had to be found to affect Kmart's operations going forward, it is hard to seriously question that the jury likely understood these events had a material effect going forward into the fourth quarter and also beyond the November 27, 2001, reporting date because of the extensive evidence that Kmart was not caught up with overdue vendor payments either at the end of the third quarter or on November 27. While Project SID was suspended for two weeks in mid-December, when CFO McDonald checked with Mark Moreland before the November 27 conference call whether Kmart would be caught up with vendors by November 27 he was told they would not be caught up. (Moreland 6/27/07, at TrDep00091.) While Mr. Conaway testified that the AP System changes were initiated prior to the overbuy and were intended to be permanent, that claim is unsupported by any documentation. Mr. Gilbert's testimony that the AP System

72

changes were initiated in response to the overbuy which was considered a short term

problem at the time (Gilbert 5/13/09, at Tr00360-61) is supported by Plaintiff's Exhibits

159 and 135.  Defendant did not attempt to contest Gilbert's testimony that AP System

changes stayed in place into January 2002. (*Id.* at Tr00378).  Other evidence supports a

finding that Kmart was never caught up with the vendor payments it intentionally delayed

(Sabony 2/28/08, at TrDep00193 and Plf. Exh. 200; Archambeau 5/13/09, at Tr00512-13.)

Defense counsel argued that by November 27, 2001, Kmart's liquidity problem

was basically resolved and was not anticipated to be a problem in the future and thus did

not need to be reported on the 10-Q(3). The jury in finding against Defendant rejected this

argument for one or two possible reasons.  First, they reasonably could have determined,

and likely did determine, that the liquidity deficiency was "going forward" and was not

resolved by October 31 nor by November 27, 2001, the date on which the determination

needed to be made of whether there was a material liquidity event and deficiency in the

third quarter.  Alternatively, if they determined the material liquidity event was fully

resolved in the third quarter (i.e. by October 31, 2001), it nonetheless needed to be

disclosed under Instruction 3 to Item 303(a) requiring disclosure of  "matters that have

had an impact on reported operations and are not expected to have an impact upon future

operations."[19]  This language from Instruction 3 to Item 303(a), which was read to the

---

[19] The SEC's 1989 Release on Item 303,  which was the major interpretation of
Regulation S-K's requirements on Management Discussion and Analysis available in 2001,
makes it clear "*Each final determination* resulting from the assessments made by management
*must be objectively reasonable, viewed as of the time the determination is made*" (emphasis
added).  For the 10-Q(3) this objective assessment would be determined based on what Kmart
knew on November 27, 2001.  SEC Interpretation: Management's Discussion and Analysis of
Financial Condition and Results of Operations; Certain Investment Company Disclosures,

jury, seems to refute Defendant's argument that Item 303 requires disclosure of a material

liquidity deficiency only if it is a "material deficiency *going forward*."   Defense counsel

argue that the "will result in or that are reasonably likely to result" language from 303(a)

should be read to exclude a reporting obligation of a known material event that *already*

*had*  resulted in a material liquidity deficiency in the quarter.   But the plausibility of that

interpretation is undercut by the very next sentence which directs that "[i]f a material

deficiency is identified, indicate the course of action that the registrant has taken . . . ."

This clearly contemplates a need to report or identify a *past* liquidity event that did cause

a *past* material liquidity deficiency in the quarter for which a "course of action" was also

selected in the quarter.   Again, Instruction 3 to Item 303(a) makes it clear that *past* events

in the quarter resulting in *past* liquidity deficiencies that were fully resolved in the quarter

must nonetheless be reported.[20] Finally, the defense reading of the "will result in or that

are reasonably likely to result" language  makes no policy sense of informing investors

about a past event causing a material liquidity deficiency that was resolved, because that

information is important to allow them to determine the likelihood of such an event

reoccurring.

        Yet if, as defense counsel suggests, the material deficiency need be one that not

only had an impact on operations for the reported period, but also would have an impact

upon future operations, that most likely was the jury's thinking because the impact of

---

Release Nos. 33-6835; at 13717 (May 18, 1989), [54 FR 22427].

        [20] Again, Instruction 3 to Item 303(a) reads "The discussion and analysis shall focus
specifically on . . . . matters that have had an impact on reported operations and are not expected
to have an impact upon future operations. . . .*"*

project SID and the AP Systems changes, according to the unrefuted evidence from Mark

Moreland's SID Master Tracking document was that the incremental borrowings from

vendors beyond the contract terms from those two systems were commutatively over one

billion dollars at the end of the third quarter "going forward" to the forth quarter and were

still over a half a billion dollars on November 27.[21]  Basing his opinion on the testimony

of witnesses Gilbert, Archambeau, Moreland and the trial documents, Plaintiff's expert

Carmichael made it clear that the liquidity event continued beyond the third quarter of

2001 and was still occurring on November 27, 2001, because there was still $500 million

being held back based on SID and the AP System changes.  (Carmichael 5/27/09, at

Tr01434-36.)  Dr. Carmichael also noted the strain on vendor relations, the risks of their

not shipping or paying vendor allowances, and harm to management integrity

accompanying this "extraordinary" slow pay system and its coverup story were also

material consequences of the slow pay system that continued into the fourth quarter. *(Id.* at

Tr01442-51.)

Defendant and defense expert and former Defendant McDonald testified that

Kmart did not have a material liquidity deficiency in the third quarter because it could

have borrowed against its $8 plus billion in inventory or its other billions in

---

[21] Assistant Treasurer Moreland identified $790 million in incremental borrowings on
October 31, 2001,  under Project SID plus approximately $300 million under the AP Systems
change, and  $263 million under Project SID  on November 28, 2001, plus the $300 million
under the AP Systems change.  He estimated these figures were plus or minus a 10% margin of
error.  (Moreland 4/23/09, at TrDep00167 .) While, Defendant testified that the latter imposed
AP Systems change in terms were not intended to be temporary, but permanent, if that is the case
then such unilateral extension of vendor payment terms of $300 million could, on its own if
Plaintiff's expert Dr. Carmichael's testimony were credited , be a new "internal source of
liquidity" that Item 303 required to be disclosed.

unencumbered real estate. Yet the jury did not accept the existence of alternate means of dealing with the liquidity crisis as relieving Kmart from its obligation under Item 303 to disclose the material change during the third quarter in its internal or external sources of liquidity that Kmart actually selected as the way to deal with its material liquidity deficiency, as Plaintiff's expert, Dr. Carmichael, testified Kmart was required to disclose.[22]

These incremental borrowings from vendors also impacted cash flow not only in the third quarter, but also in the fourth quarter. The overbuy and liquidity deficiency and Project SID created priority demands on available funds to satisfy past due vendor payables if continued shipment of goods was to be maintained. A result of this was to defer the reduction in payments on borrowings under their bank revolver which was generally accomplished in December of each year. The need for Kmart to reinstitute Project SID in late December after a two week suspension adds to the overwhelming evidence that the liquidity deficiency and Project SID had effects going forward.

The jury was told in Instruction 2 to Item 303(a) "[t]he purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined *by evaluating the amounts and certainty of cash flows from operations and from outside sources*" (emphasis added). Assistant Treasurer Moreland, through exhibits

---

[22] Dr. Carmichael testified that the fact that Kmart had alternate means of dealing with its liquidity deficiency in the third quarter of 2001, such as added conventional borrowing, that did not relieve Kmart of its obligation to report "what they did" to deal with this liquidity deficiency. (Carmichael 5/27/09, at Tr01426-27.)

and testimony, showed the jury various forecasts of Kmart's illiquidity on October 10 and

November 9 (Plf. Exh. 7 & 4)  (*i.e.*,exceeding Kmart's borrowing capacity under the bank

revolver) if nothing were done. If cash flows were increased to avoid the illiquidity by

slowing the outflow of cash to vendors through the AP Systems changes and Project SID,

this could be found by the jury, as Dr. Carmichael testified, to be a material change in a

material source of liquidity in the third quarter that needed to be disclosed under Item

303(b).  As Dr. Carmichael testified, the fact that Kmart had alternate means of avoiding

this liquidity deficiency that was forecast by Moreland does not modify the disclosure

obligations under Item 303 to disclose the method of resolving this liquidity shortfall by

the slow pay of vendors through the AP Systems changes and Project SID.

The SEC's 1989 Release on Item 303 [23] which was the major interpretation of

Regulation S-K's requirements on Management Discussion and Analysis available in

2001 in its Introduction does indicate that narrative disclosures in the MD&A have

"particular emphasis" on the future:

> The MD&A requirements are intended to provide, in one section of a
> filing, material historical and prospective textual disclosure enabling
> investors and other users to assess the financial condition and results of
> operations of the registrant, with particular emphasis on the registrant's
> prospects for the future.

*Id.* at p. 3.

It reiterates the need for the narrative in the MD&A is:

> because a numerical presentation and brief accompanying footnotes alone
> may be insufficient for an investor to judge the quality of earnings and the
> likelihood that past performance is indicative of future performance.

---

[23] Release No. 33-6835 (May 18, 1989) [54 FR 22427].

> MD&A is intended to give the investor an opportunity to look at the
> company through the eyes of management by providing both a short and
> long-term analysis of the business of the company.

*Ibid.* quoting Securities Act Release No. 6711 (April 24, 1987) [ 52 FR 13715] at 13717.

The 1989 Release adds:

> [i]t is the responsibility of management to identify and address those key
> variables and other qualitative and quantitative factors which are peculiar
> to and necessary for an understanding and evaluation of the individual
> company.

*Id.* quoting Securities Act Release No. 6349 (September 28, 1981), 23 SEC Docket 962
[not published in the Federal Register] at 964.

While requiring certain historical disclosures to assist in assessing the future

prospects of the company, this release distinguishes and separately lists, among a number

of topics a MD&A might discuss, "long and short-term liquidity and capital resources

analysis" from "prospective information required in MD&A" *Id.* at p. 4.  This suggests

that not all historical data covered in the MD&A need be prospective. Yet, the 1989

Release notes "Events that have already occurred . . .  often give rise to known

uncertainties.*" Id.*   Using this case as an example, a past short-term liquidity event and

deficiency may cause future uncertainties as to their being repeated and/or their retarding

the normal course of paying down the bank credit  revolver in December.

The 1989 Release also discusses and distinguishes between "prospective

information" which must be disclosed and "voluntarily forward looking disclosures"

which, when disclosed with certain disclaimers, are provided "safe harbor" protections

from being actionable if the forecast is in error.[24]

Yet, these provisions of Item 303 dealing with "prospective information" and "voluntarily forward looking disclosures" are simply not applicable in the present case because the (i.) overbuy *liquidity event,* its resulting (ii.) a *liquidity deficiency,* and (iii.) the remedy of the AP systems and Project SID *slow pay means of increasing internal sources of cash or liquidity* to meet other bills as they became due were, without question, *past historical events* on both October 31 and November 27, 2001. This cannot be a disputed issue of fact.  What is a disputed issue is whether these events were material events under *Basic v. Levinson,* and whether (i.) caused (ii.) – i.e. the material liquidity event of the overbuy resulted in a material liquidity deficiency during the quarter, and whether these two events were changes from prior quarters as was the slow pay of vendors to remedy this material liquidity deficiency.  If so, as the jury found, then the overbuy was under Item 303(a)(1) a " . . . known . . . event[]" that resulted "in the registrant's liquidity . . . decreasing in a[] material way" (the "material liquidity deficiency").  If this was a "material change[]" from prior quarters, which on the evidence presented cannot seriously be questioned, then Item 303(b) required the management "discussion and analysis" to "include a discussion of" it under both Item 303(a)(1) and 303(b) because when "a material deficiency is identified, [the MD&A needs to] indicate the course of action that

_____

[24] The 1989 Release distinguishes: (i.) "prospective information" (including a known trend, demand, commitment, event or uncertainty that has not yet occurred) which Item 303 requires to be discussed (unless it is determined not to be reasonably likely to occur) which if it does occur is reasonably likely to have a material effect on the company's financial condition or results of operations; from (ii.) voluntarily forward looking disclosures that are not expected to have such a material effect on the company's financial condition or results of operations.

the registrant has taken . . . to remedy the deficiency. . . . [and a]lso identify and separately

describe ["material changes" in] internal . . . sources of liquidity."

The 1989 Release reinforces this reading of 303(a). Under "**C. Liquidity - Capital**

**Resources**" the 1989 Release states that "Where a material deficiency in short . . . -term

liquidity has been identified, the registrant should disclose the deficiency, as well as

disclos[e] . . . its proposed remedy . . . . "  That section notes that:

> Registrants are expected to use the statement of cash flows . . . in analyzing
> their liquidity, and to present a balanced discussion dealing with cash flows
> from operations. This discussion should address those matters that have
> materially affected the most recent period presented but are not expected to
> have short or long-term implications . . . ."

Again, this makes clear the need to discuss past events that have been resolved and are not

expected to have future implications.  Of particular note in this section is that the very

next sentence gives as an example concerning the "statement of cash flows . . . . from

operations"  "(c) levels of financing provided by suppliers . . . ."  "Suppliers" are clearly

"vendors."  This section does not differentiate on the disclosure obligation being

dependent on whether the levels of financing supplied by vendors is voluntary under

negotiated terms or involuntary and beyond the negotiated terms. Thus, the 1989 Release

makes clear that in discussing a short term liquidity deficiencies in the "most recent

period," one must disclose the deficiency and its proposed remedy, including "levels of

financing provided by suppliers" (*i.e.* vendors), even where the deficiency problem is not

expected to have "short or long-term implications" going forward.

The next section of he 1989 Release on **"D. Material Changes"** notes "

> Some Project registrants did not provide adequate disclosure of the reasons
> for material year-to-year changes in line items . . . .  Instruction 4 to Item

80

303(a) requires a discussion of the causes of material changes from
year-to-year in financial statement line items "to the extent necessary to an
understanding of the registrant's businesses as a whole."

Here the year-to-year changes in Accounts Payable (up $718 million or 28% from
2000) and Inventory (up $440 million or 6% from 2000) would need be disclosed if
material.  The next section on "**E. Interim Period Reporting**" adds:

The second sentence of Item 303(b) states that MD&A relating to interim
period financial statements "shall include a discussion of material changes
in those items specifically listed in paragraph (a) of this Item, except that
the impact of inflation and changing prices on operations for interim
periods need not be addressed." As this sentence indicates, material
changes to each and every specific disclosure requirement contained in
paragraph (a), with the noted exception, should be discussed. This would
include, for example, internal and external sources of liquidity . . . .

*Id.* (footnote omitted.)

These portions of the 1989 Release make it clear that one must report in interim

reports a material liquidity change from year to year or from the prior annual report to the

extent it involves a material deficiency, the course of action taken to remedy it (including

involuntary "levels of financing provided by suppliers" or vendors) even if the remedy is

sufficient so that the material liquidity event is "not expected to have short or long-term

implications." This is consistent with the opinion of the SEC Expert Douglas Carmichael.

Thus, Defendant is incorrect that the jury had to be instructed that the material

liquidity event, liquidity deficiency or slow pay remedy had to have implications going

forward.  Thus, the jury could legitimately have found Item 303(b) required disclosure of

the material liquidity event, material liquidity deficiency and the slow pay remedy even if

it determined it did not effect any quarter beyond the third quarter.

Yet, all of this seems academic, because again, the uncontroverted evidence was that the liquidity deficiency (SID and the AP System changes) likely exceeded one billion dollars on October 31 thus going forward into the fourth quarter and the deficiency was approximately half a billion dollars on November 27, 2001, when the report was filed. Furthermore, as noted above, Dr. Carmichael testified to other aspects of materiality including straining relations with vendors and harming management integrity that also had consequence "going forward."

In addition to instructing the jury only on the sections read to them from Item 303(a) and (b),  possibly it would have been preferable also to have read and highlighted in the jury's copy of the 1989 Release the above discussed sections from the 1989 Release.  Yet, adding those sections from the1989 Release to the instructions read to the jury would not have reduced the likelihood of the jury finding a violation of Item 303 but it would have increased it.  The jury found the Rules and Instructions sufficient.  It cannot be said that these instructions on Item 303(a) and (b), when viewed as a whole, were confusing, misleading and prejudicial. It is believed that the jury had an adequate understanding of the law concerning the interim reporting obligations of Kmart for the third quarter of 2001.

     (3.)    *Was the Instruction on Materiality Confusing?*

Next, Defendants asserts that the instructions and the Verdict Form  "used the term 'materiality' in numerous ways without explaining the differences."  Specifically the defense objects that:

> Jury Instruction No. 21 also quotes Instruction 3 to Item 303, which specifically states that "material events and  uncertainties" include "matters

that have had an impact on reported operations and are not expected to have an impact upon future operations." This definition of "material" is inconsistent with the definition of "material" under Section 10(b), which is set out in Jury Instruction 22. The Court never instructed the jury that it could not consider this alternate "materiality" definition when interpreting the "materiality" definition in Jury Instruction No. 22.

Dkt. # 139, pp. 67-68 of 75, numbered page 52-53.

Again it is doubtful that the jury found the liquidity deficiency and slow pay of vendors was " not expected to have an impact upon future operations" given the largely unrebutted evidence that its magnitude of this incremental "borrowing" from vendors on October 31, 2001 was over a billion dollars, and still about half a billion dollars on November 27, 2001. Yet, this instruction dealt with omissions under Regulation S-K Item 303, and in Instruction Number 21 which specifically required the jury to find "that the omitted facts were required to be disclosed under Item 303 of Regulation S-K *and that those omissions were material as defined in Instruction 22* on page 30" which was the *Basic v. Levinson* definition  (emphasis added). Instruction Number 30 on Claim Three, in referring to material information that may be required by Rule 12b-20, notes that "material" is defined in Instruction Number 22.

It is acknowledged that the SEC in certain releases has specifically noted that "[t]he probability/magnitude test for materiality approved by the Supreme Court in *Basic* ... is inapposite to Item 303 disclosure"; rather, SK-303's disclosure obligations extend considerably beyond those required by Rule 10b-5. (Exchange Act Release No. 34-26831, 54 Fed. Reg. at 22430 n.27.)  Yet, the jury was not told about this lower standard of materiality, but repeatedly required to meet the more stringent *Basic v.*

*Levinson* standard.  Instruction Number 22 was the only instruction the jury was given on materiality, and as note above, juries are presumed to follow their instructions.  There is no convincing argument that the jury applied any standard of materiality other than that of *Basic v. Levinson*  to any of the jury instructions or to any jury Verdict Form  question.  If anyone had an objection regarding the instructions on Claim Three, it would be the SEC who could claim that the instructions raised the bar of materiality for finding a violation of Item 303.  Maintaining one clear instruction on materiality drawn from *Basic v. Levinson* for all claims lessened the likelihood of confusion, and assured the Jury used that standard in considering the Section 10(b) and Rule 10-b(5) claims.  Even though the standard for materiality may have been higher than necessary for Claim Three, the jury specifically found each of the misstatements and omissions to be material. (Verdict Form, Dkt. # 129, Claim Three incorporating Claim Two Question 1.a. ii., 1.b.ii., 1.c iv., 1.d.iv., 1.e.iv.) Thus, it cannot be said that the instruction on materiality as it related either to Item 303 or Section 10(b), when viewed as a whole, was confusing, misleading and prejudicial. It is believed that the jury had an adequate understanding of the law concerning the materiality standard to be applied in this case.

**B.  Claim Two - Aiding and Abetting Kmart's Violation of Section 10(b) of the Exchange Act .**

1.   <u>Jury Findings on Claim Two.</u>

Claim Two alleges that Defendant Conaway under Section 20(e) of the Exchange Act aided and abetted Kmart in violation of Section 10(b) of the Exchange Act  and Rules

10b-5 promulgated thereunder.[25]  The SEC's complaint alleged that the two misstatements

and the three alleged omissions were the same for each of its three claims against

Defendant Conaway.  The jury instructions on the alleged list of misstatements and

omissions on Claim Two, like Claim Three,  incorporated the same list in Instruction

Number 21 used in Claim One.[26]  The Jury findings for Claim Two (which in part were

incorporated in Claim Three) were identical for each of the two alleged misstatements:

that (i.) each statement was false or misleading; and (ii.) the statement was material; with

the additional finding under Claim Two that (iii.) Kmart acted with intent to defraud or

with reckless disregard for the truth. (Dkt. #129,Verdict Form, Claim Two,  Questions 1.

a. i., ii & iii, and Questions 1. b. i., ii & iii.)  The Jury findings for Claim Two regarding

each of the three alleged omissions in the 10-Q(3) were, as noted in the preceding section

on Claim Three:  (i.) that the respective event occurred in the third quarter of 2001; (ii.)

that Kmart was required to disclose this fact under Item 303 of Regulation S-K;  (iii.) that

---

[25] 15 U.S.C. § 78j(b),17 C.F.R. §  240.10b-5.

[26] From Instruction Number 21 (boldface added):

**Statements:**
1.      The Form 10-Q stated, "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities."
2.      The Form 10-Q stated, "Inventory increased . . . due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position."
**Omissions:**
1.      The Form 10-Q did not identify a known **material liquidity event** that occurred in the third quarter of 2001.
2.      The Form 10-Q did not disclose that Kmart had a **material liquidity deficiency** during the third quarter of 2001 **or the course of action involving the delay of vendor payments** taken by Kmart's management to remedy that deficiency.
3.      The Form 10-Q did not identify the **delay in vendor payments as a material change in an internal source of liquidity** during the third quarter of 2001.

the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading; (iv.) that the omitted fact was material; with the additional finding for Claim Two that (v.) Kmart acted with intent to defraud or with reckless disregard for the truth. (Dkt. # 129, Verdict Form , Claim Two,  Questions 1. c. i., ii, iii, iv., & v. , Questions 1. d. i., ii, iii, iv., & v., Questions 1. e. i., ii, iii, iv., & v..)  The jury also found that Charles Conaway had a general awareness that his role was part of an overall activity that was improper, that he knowingly assisted and substantially assisted Kmart in its violation of Section 10(b) and Rule 10b-5. (Dkt. # 129, Verdict Form, Claim Two, Questions 3, 4, & 5.)

       2.    <u>Challenge to Use of the MD&A as a Whole as the Statement Underlying Section 10(b) and Rule 10b-5 Liability.</u>

Defense counsel in their current motion assert that, for the first time in the middle of trial, the SEC changed its theory of the case from challenging the two specifically identified alleged misstatements in the MD&A to contending that the MD&A as a whole was a misleading statement because of three omissions:

> it failed to disclose in the MD&A that [Kmart] had experienced **a material liquidity event** in the third quarter, it had **a material liquidity deficiency** during the third quarter that it remedied by **delaying in vendor payments to vendors,** and that **the delay in vendor payments was a material change in the internal sources of liquidity** during the quarter.

Dkt. 139, p. 46 of 74, numbered page 31. (boldface added.)

Yet, this claim that the MD&A omitted these three items was in the complaint in the section captioned "FALSE AND MISLEADING MD&A".  Paragraphs 29 and 31 make it clear that in addition to the two specific challenged misstatements, the SEC was

also asserting the $850 million overbuy needed to be disclosed in the MD&A as the cause of the material change in inventory and accounts payable [i.e. omission 1., the "material liquidity event"].  Paragraph 31 asserts that hundreds of millions of dollars attributable to Project SID were past due and Paragraph 32 asserts these same  hundreds of millions of dollars of withholding or "borrowing" from vendors via Project SID "constituted a material deficiency at quarter end which should have been identified in the MD&A" [i.e. omission 2., the "material liquidity deficiency" ].  Paragraph 32 continues that "Project SID was a source of liquidity that should have been identified and separately described" [i.e. omission 3., "the delay in vendor payments was a material change in the internal sources of liquidity during the quarter"].[27]

If there was any doubt that Plaintiffs were contending that the entire MD&A was the false and misleading statement under Rule 10b-5 because of omissions , Judge Gadola made that clear in his September 29, 2006, opinion denying Defendant Conaway's and former co-Defendant John McDonald's Rule 12(b)(6) motions.   He repeatedly refers to the "10-Q(3)", "the form" and "the MD&A" in the SEC's complaint and in the omissions claim he found  sufficiently plead. [28]  In addition to Judge Gadola's 2006 Rule 12(b)(6)

---

[27] Again, instead of using the language from the complaint for each omission in the final instructions,  Instruction Number  21 used the terms "material liquidity event," "material liquidity deficiency," and  "the delay in vendor payments was a material change in the internal sources of liquidity during the quarter" which was language from a proposed defense draft of that instruction in which defense counsel "slightly rephrased the omissions so that they track the language of Item 303." (May 27, 2009, Transcript, evening session at p. 63, l. 15-17.)

[28]  In first dealing with Mr. McDonald's claim Judge Gadola states:

Although Defendant McDonald alleges that he cannot determine the time, place, or content of alleged misrepresentation, Plaintiff has sufficiently set forth the facts

on which its claim relies. Plaintiff alleges that Defendant McDonald misled
investors when he signed the *false and misleading Form 10-Q(3)*. This *form*
allegedly failed to fully apprise the investors of the situation Kmart was facing,
in particular it failed to apprise them as to material changes in Kmart's
accounts payable and merchandise inventory, the change in Kmart's liquidity,
and the effects of Project SID on the company's working capital.

Dkt, 24, at p.7, *Securities and Exchange Com'n v. Conaway*, 2006 WL 2828569, 4-(E.D.Mich.)
(E.D.Mich.,2006) (emphasis added).

Judge Gadola next considers the aiding and abetting claims Two and Three against co-
defendant McDonald:

Plaintiff alleges *the form* was false and misleading because it failed to describe
Kmart's material change in accounts payable, in inventory, and in liquidity.
Furthermore, the form failed to describe any significant cause for the material
change. Although Defendant McDonald disputes the materiality of Kmart's
changes, materiality issues are "normally reserved for the jury," *United States v.
DeSantis,* 134 F.3d 760 (6th Cir. 1998) (citing *TSC Indus., Inc. v. Northway, Inc.,*
426 U.S. 438, 449 (1976)).

*Id.* at p. 9., 2006 WL 2828569, 4 (emphasis added).

Defendant Conaway also moves this Court to dismiss Plaintiff's complaint for
failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).
Conaway attacks the motion in the reverse order of McDonald, but his arguments
are substantially similar.

*Id.* at p. 12, 2006 WL 2828569, 6.

* * *

With respect to *the MD & A*, as discussed immediately above, Plaintiff has
sufficiently alleged facts that allow a clear inference that *the MD & A was
false and misleading* and that Defendant CEO Conaway knew the
representations made in *the MD & A did not divulge* the true nature of Kmart's
problems or the remedial actions Kmart had subsequently taken.

*Id.* at p. 12.-13, 2006 WL 2828569, 7(emphasis added).

[A review of the ] facts readily lead to an inference that Defendant Conaway
"knew, or was reckless in not knowing" that *the resulting MD&A, was false
and misleading.*

* * *

88

decision, my March 31, 2009, Rule 56 ruling on the then two Defendants' motions for summary judgment also refers repeatedly to the "MD&A" or the "10-Q(3)" as being the statement that is misleading or incomplete.[29]  Indeed, as Plaintiff's counsel points out

> The Court finds that it is entirely reasonable to infer that as CEO Conaway, . . . knew or was reckless in not knowing that Kmart's subsequent *MD&A was false and misleading.*
>
> * * *
>
> The inference that CEO Conaway's actions led to the subsequent *MD&A failure to describe* Kmart's change in financial position, or the cause of that change, is one that is entirely reasonable and one that is clearly drawn from the facts as pleaded.

*Id.* at pp. 11-12, 2006 WL 2828569, 4 (emphasis added).


    [29] E.g. "These figures alone could be used by a jury to determine that *the MD&A was* misleading and *incomplete.*"

Dkt. # 86 Page 19 of 42, footnote 5,  *Securities and Exchange Com'n v. Conaway,*  2009 WL 902063, 10 (E.D.Mich.,2009),.  (emphasis added).

In discussing a primary finding of a 10b-5 violation regarding Defendant Conaway:

> Yet, there is sufficient circumstantial evidence from which a reasonable juror could conclude that Conaway's course of actions contributed to *the10Q-(3)* – prepared under the new CFO McDonald – *not disclosing the AP System delay and Project SID and the MD&A not adequately disclosing how Kmart was dealing with its liquidity problem in the third quarter of 2001.*

*Id.* at p. 29 of 42,2009 WL 902063, 10   (emphasis added).

In listing what a jury could find on the 10b-5 violation:

> *CEO Conaway* orchestrated a fraudulent and elaborate scheme to stretch payments to vendors, coverup and provide false information to conceal that scheme, and that his actions were central in the perpetration of that scheme and *contributed to the material*  misstatements and *omissions in the MD&A section on liquidity in the Kmart 10-Q(3) for 2001.*

*Id.* at p. 31 of 42, 2009 WL 902063, 15  (emphasis added).

Defendant Conaway's own motion for summary judgment notes the SEC's claim was that Defendant should have caused Kmart to disclose the overbuy which caused a cash crunch dealt with in part by slow pay.[30]  Thus Defendant's objection to a new theory being introduced at trial contending that the MD&A as a whole was a misleading statement is without merit in light of the SEC's complaint and the theories of liability discussed and pursued in this case.[31]

_____

In referring back to these possible 10b-5 findings:

> While there are multiple disputed issues of fact, for reasons similar to why a reasonable jury could have found that *the MD&A involved* false and misleading statements and *did not adequately reveal that Kmart's AP System and Project SID were a primary means for Kmart to cope with its liquidity crisis in the third quarter of FY 2001.*

*Id.* at p. 36 of 42, 2009 WL 902063, 15  (emphasis added).

[30] Defendant's first page of his memorandum supporting his motion for summary judgment states:

> The crux of the SEC's claim is that defendants should have disclosed (or caused Kmart to disclose) that, during the third quarter of 2001, the Chief Operating Officer (who is not a defendant in this action) caused Kmart to purchase $850 million in inventory over plan, which caused Kmart to experience a cash crunch that Kmart dealt with in part by slow-paying its vendors.

Dkt. # 63, p. 13 of 32, p. 1. of text.

> Later the defense memorandum states:

> The SEC's effort to hold Mr. Conaway primarily liable for alleged misstatements and omissions in the MD&A . . . .

*Id.* at p. 21 of 32, page 9 of text.

[31] Defendant argues also that the jury instructions refer to the entire "10-Q" as the statement being challenged, not the MD&A as discussed in the complaint, Judge Gadola's and the October 31, 2009, opinions. Yet, this concern was not expressed during the jury instruction

3.      Challenge to the "implied representation theory of liability."

Defendant contends that the Court adopted an "implied representation theory of liability" and that this theory includes the notion that "a reader of the MD&A would understand the requirements of Item 303." (Dkt. # 139, at p. 49 of 75, p. 32 in text) Defense counsel also asserts that this "implied representation theory" was based on a First Circuit case, *SEC v. Tambone*, 550 F.3d 106 ( 2008), *vacated  pending review en banc* 573 F.3d 54 (1st Cir. 2009), for a supposed separate implied representation theory of liability. (*Id*. at 52 of 75, p. 37 in text.)  Based on these assumptions, Defendant contends that not only is the theory flawed, but of greater significance neither the jury instructions nor the proofs are adequate to support submitting the case to the jury on this theory.

---

conferences, and the instructions could easily have been changed to "the MD&A from the Form 10-Q"  if defense counsel seriously thought it was a significant change.  Because this was not a concern that was "stating distinctly" at trial under Fed. R. Civ. P. 51(c), it is reviewed under the "plain error" standard of Fed. R. Civ. P. 51(d)(2).  The only specific misstatements noted in the jury instructions – and throughout the trial – were from the MD&A portion of the Form 10-Q on "LIQUIDITY AND FINANCIAL CONDITION." Furthermore it is incontestable that the only portion of the Form10-Q that the SEC was challenging was the MD&A on liquidity. Finally, while Instruction Number 21 refers initially to the Form 10-Q, it specifies the MD&A when charging on the omissions: "Second, you must find that the failure to include those omitted facts **rendered the Management Discussion & Analysis section of Kmart's Form 10-Q for the third quarter of 2001 materially misleading."** (boldface added).  Also each question on the jury Verdict Form  began noting "With respect to the statement [or "the alleged omission"] **in the Management Discussion & Analysis section of Kmart's Form 10-Q**" (boldface added), and that Verdict Form  also makes it clear that its was the MD&A that the jury had to find was rendered misleading by the omissions. All of these references make it clear that it was the MD&A that was being challenged by the SEC.  Thus the reference in the jury instructions No. 21 and No. 26 to the "Form 10-Q" instead of "the MD&A section of the Form 10-Q" had no effect in the jury instructions that could conceivably have led to jury confusion or resulted in a different jury verdict. Thus any error did not affect substantial rights as is required by Fed. R. Civ. P. 51(d)(2).

These assumptions arose from the arguments concerning jury instructions and it misses the mark of those discussions although I likely initiated any confusion.  In questioning the SEC on its theory of the MD&A being the misleading statement I first asked Plaintiff's counsel to state their theory as if Item 303 of Regulation S-K did not exist (May 22, 2009, Transcript at Tr01733 & Tr01735-36.)  Unfortunately, the challenged sentence providing the context for this initial question for the SEC's position on the 10(b) claim if Item 303 did not exist was the sentence concerning Kmart's inventory increase in the first 39 weeks which below in this opinion I determine as a matter of law is not materially misleading.[32]  While questioning whether the sentence could be found to be actionable in the absence of Item 303's disclosure requirement on material changes concerning any liquidity event and/or any liquidity deficiency, I next asked the SEC to put Item 303 back into the analysis:

> The tougher problem is when you put that in, does that then create a context, [a] sort of expectancy of a duty to disclose, such as if I were [selling ] a piece of real estate and I fill out the disclosure statements on the conditions of the house, and I don't mention that my septic tank commonly bubbles over sometimes in the fall and I'm selling in the spring so I'm glad I won't have to worry about it until the fall [,]and I don't disclose that in that context, then that would be a fraudulent omission.

*Id*. atTr01739.

The analogy was simply a way of conceptualizing why writing a literally truthful

---

[32] I might best have followed my instincts regarding that sentence from the night of May 22, when I noted " If that was all you were going to the jury on, a common-law fraud case, my bet is eight out of ten judges would say let's not waste the jury's time. No reasonable jury could find that that statement is false or misleading as to what it purports to be."  (May 22, 2009, Transcript at Tr01739.)

statement that purports to be a MD&A under Item 303 of Regulation S-K was similar to

making a literally truthful statement on a real estate disclosure statement.  While the

statement may the truthful as far as it goes, what the statement purports to be  – a real

estate disclosure statement or an Item 303 MD&A statement – creates a context or an

expectancy in the reader of what is expected to be disclosed.  Given this context or

expectancy, then if the statement has a material omission of what is supposed to be in the

statement, a fraud claim properly can be asserted  even for a literally true statement.  At

the follow-up hearing on jury instructions, after I had been provided and read the

*Tambone* case which dealt with a different issue of whether an implied statement could be

inferred from defendants' actions, I returned to the real estate disclosure analogy using the

implied statement concept:

> Clearly in that case, that the disclosure statement, which has nothing but
> truthful statements and makes no mention whatsoever of the septic field
> one way or the other, that in that case, that the mere making of that
> statement, *does that not imply that the seller either is asserting that the*
> *statement meets the standards [f]or disclosures with regard to the sale of a*
> *piece of real estate or implies that they know of no fact, no material fact*
> *that is inconsistent with what they said*. I mean, would that not be an
> actionable fraud case in almost [all] state[s] of the union?

May 26, 2009, Transcript at Tr01844 (emphasis added).[33]

---

[33] While under common law in most jurisdictions, sellers had no duty to disclose latent
defects, many states now require sellers to complete disclosure forms that list various potential
hidden faults.  Whether or not those disclosure statues provide for private rights of action for
buyers, a seller's failure to identify latent defects on that form breaches a duty that is often
actionable under a fraud theory. *See e.g. Rock v. Voshell*, 2006 U.S. Dist. LEXIS 3183, at *29,
2006 WL 1409734 (E.D. Pa. May 18, 2006) (denying summary judgment on common law fraud
claim in connection with real estate purchase arising from failure to disclose latent defects on
real estate disclosure form); *Bauer v. Giannis*, 359 Ill.App.3d 897, 906, 834 N.E.2d 952, 960
(Ill. App. Ct. 2005) (same); *Schmitt v. Snow*, 2005 Ohio 4698, 2005 Ohio App. LEXIS 4320,
2005 WL 2172390  (Ohio Ct. App. Sept. 8, 2005) (same).  As in the present case, the mere non-

The effort was to conceptualize why "half-truths," or statements that are literally true, can, given the context in which they are made, be actionable in fraud for material omissions. In light of the fact that the MD&A is a creation of both a statute and regulation, it could be seen that when one makes what purports to be an Item 303 MD&A statement, that MD&A is an implicit statement, or creates a reasonable expectancy in financial analyst or other investors generally familiar with Item 303's requirements, that the facts and information required to be disclosed by Item 303 were disclosed in the MD&A or such facts do not exist.

Defense counsel contest whether the SEC's Regulation s-K Item 303 can provide a context that would permit such an inference. They cite two cases, *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008), and *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007), which hold that the fact that investors might *infer* something based on a regulatory requirement set out in New York Stock Exchange Rules or in SEC regulations does not give rise to liability under Section 10(b), because that inference on the part of investors does not create an untrue statement or misleading half-truth by the defendant. Yet, in both of these cases there was no statement made by the defendant that

---

disclosure of an item required to be disclosed does not automatically give rise to fraud liability absent the showing of other elements of fraud, but the real estate disclosure statute creates the duty to speak so that material omissions, coupled with reliance and actual damages, constitute actionable fraud. Defense counsel in the Reply brief noted that in Michigan the real estate disclosure form has a specific question on septic tanks. (Dkt. # 153, p. 28 of 48, p. 20 in text, fn. 5). Thus, there would either be a truthful answer or an express misstatement, or if the question was left blank a fraud claim likely would fail for lack of reasonable reliance. While the analogy may not work in Michigan it was just an effort to demonstrate why literally true statements can be actionable because of reasonable inferences drawn from them that are false.

94

could be deemed to be misleading because of what is said or not said.[34]   Neither case

deals with a situation like the present where Kmart unquestionably made a MD&A

statement and the question for this Court is what permissible false inferences might the

jury be allowed to draw from that statement.[35]

 Even without Item 303 existing, as the SEC argues, Kmart's 10-Q(3) MD&A

statement on "LIQUIDITY AND FINANCIAL CONDITION," that mentions no

significant liquidity event or deficiency in the reporting period, could be read as an

implied statement that there was no such material liquidity event or deficiency.

 It is unquestionable that the law of fraud and Sixth Circuit precedents under Rule

10b-5 allow misrepresentations be found based on implied assertions or reasonable

inferences that are false.  In *Helwig v. Vencor, Inc.,* 251 F.3d 540, 561 (6th Cir. 2001)(*en*

---

 [34] *Finnerty* was a criminal Rule 10b(5) a. case in which "The government admits that
Finnerty made no misstatement. . . . . The government has identified no way in which Finnerty
communicated anything to his customers, let alone anything false." *Finnerty,* 533 F.3d at 148-
49. In *Lattanzio*, the civil defendant audit firm, Deloitte & Touche LLP, had made no statement
concerning the quarterly reports of Warnaco Group, Inc. "Warnaco's quarterly statements (the
August 10-Q, the November 10-Q, and the May 10-Q) were filed within the Class Period, but
they did not purport to be audited by Deloitte, did not contain an audit opinion by Deloitte, and
were not attributed to Deloitte when they were disseminated." *Lattanzio* v. *Deloitte & Touche
LLP,* 476 F.3d at 154.  With no statement made, the *Lattanzio* court held that while "federal
securities regulations required that Deloitte 'review' the statements, see 17 C.F.R. §
210.10-01(d)" that regulation did not turn Deloitte's total silence regarding these quarterly
reviews into a statement that could be found to violate Section 10(b) and Rule 10b-5.

 [35] This section II B. deal's with the aiding and abetting claim against Mr. Conaway
regarding Kmart's alleged violation of Section 10(b) and Rule 10b-5.  Unlike the *Finnerty* and
*Lattanzio* cases, there is no dispute in this case that Kmart made the MD&A statement in the
2001 Form 10-Q(3) that is alleged to be misleading. It is acknowledge that there is a major
dispute whether Mr. Conaway made any such statement, which is considered in section II C. of
this opinion and more particularly in section III on the sufficiency of the evidence.

*banc*),[36] the court noted that "even absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects,' " quoting from *Rubin v. Schottenstein,* 143 F.3d 263, 268 (6th Cir.1998) (en banc).

The Sixth Circuit in *Helwig* was dealing with a private securities action involving quarterly SEC filings and other statements and omissions made by Vencor, a long-term health care provider focused on hospital and nursing services.  The Balanced Budget Act, which could have negative implications for medicare payments, was introduced in early February1997. Two versions passed the House and Senate on June 25, 1997, resulting in a conference report July 30 and the Act was finally signed August 5, 1997. In its first- and second-quarter 10-Q's of 1997, the latter filed July 25, 1997, Vencor stated "[m]anagement cannot predict whether such proposals will be adopted or if adopted, what effect, if any, such proposals would have on its business." In the meantime – from at least February 10, 1997, until October 21, 1997 – defendants maintained that they were "comfortable" with projections of fourth-quarter earnings of $0.59 to $0.64 per share and yearly returns between $2.10 to $2.20 for 1997 and $2.60 to $2.65 for 1998. Such sanguine statements led market analysts to recommend Vencor's stock as a "buy."  On October 22, 1997, Vencor lowered its estimates of fourth-quarter earnings due to

---

[36] *Helwig*  was overruled on a different point by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007), which held that the "strong inference of scienter'" requirement of The Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67 (codified at 15 U.S.C. § 78u-4 & -5) (1995), requires only that the inference be at least as compelling as any opposing inference that could be drawn from the pleadings, and not the most plausible of competing inferences" as *Helwig* stated.

"management's recently completed analysis of the Balanced Budget Act of 1997." The

stock price dropped from $42-5/8 per share to $30 per share, a nearly thirty percent

decline. The only statement that was made after the August 5 signing of the Budget Act

was on or about September 25, when the CFO and CEO informed analysts that Vencor

was still "comfortable" with favorable earnings per share figures made before the Budget

Act. Projected earnings per share figures can clearly be found to be material facts to

investors in the total mix of information. These corporate officers had no duty to speak in

September 1997, but they chose to speak on a material issue, and with that came the duty

to speak fully and truthfully. The Court noted that by the Budget Act signing date of

August 5, if not before, the form of the legislation had become fixed and its impact

measurable. In finding Vencor's SEC filings and its September statements actionable

under Section 10(b) and Rule 10b-5, the Court noted what fairly could be called Vencor's

"implied representations" or "implied statements."

> These predictions and opinions contain "at least three implicit factual
> assertions: (1) that the statement is genuinely believed, (2) that there is a
> reasonable basis for that belief, and (3) that the speaker is not aware of any
> undisclosed facts tending to seriously undermine the accuracy of the
> statement." *Schneider v. Vennard (In re Apple Computer Sec. Litig.)*, 886
> F.2d 1109, 1113 (9th Cir.1989).

*Id.* at 557 (emphasis added).[37]

---

[37] The *Helwig* opinion then notes the substantial evidence in the case suggesting these
implied assertions were not true and indicating that defendants consciously disregarded the
warning signs of health care cutbacks. Noting that while not an exact fit, the *Helwig* court, in
considering its federal securities fraud actions, compared principles of common law scienter
requirements for fraud that can be based on reasonable inferences that can be drawn from
statements:

> "A defendant *who asserts a fact* as of his own knowledge or so
> positively *as to imply* that he has knowledge, under the

Another Section 10(b) case, *City of Monroe Employees Retirement Sys. v. Bridgestone, Corp.*, 399 F.3d 651, 675 (6th Cir. 2005), quotes this "implicit factual assertions" language from *Helwig*.  As noted in the following section, the *City of Monroe* case upholds the use of disclosure expectancies stemming from certain accounting standards that, when coupled with statements and omissions in the annual report, constitute implied representations that a jury could find to be false.

Judge Gadola in his September 29, 2006, opinion denying Defendant's motion to dismiss also noted that the MD&A could be found false and misleading based in an inference.[38]  Even *Oran v. Stafford,* 226 F.3d 275 (3rd Cir. 2000), on which the defense relies for another central issue in this case, recognizes that certain statements can be actionable as misleading under Section 10(b) because of an "implicit" representation.[39]

_____

> circumstances when he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have intent to deceive, not so much as to the fact itself, but rather as to the extent of his information."
> PROSSER AND KEATON ON TORTS 741-42 (5th ed.1984) (citations omitted). On the basis of these allegations, we conclude that plaintiffs have produced a strong inference that defendants persisted in making favorable predictions and feigning ignorance of the Budget Act with actual knowledge that their statements were misleading.

*Id.* at 558.  (emphasis added).


[38] " Plaintiff has sufficiently alleged facts that allow a clear inference that the MD & A was false and misleading . . . ."  Dkt, 24, at p.12*, Securities and Exchange Com'n v. Conaway,* 2006 WL 2828569, 4- (E.D.Mich.,2006) (emphasis added).. at pp. 12., 2006 WL 2828569, 7(emphasis added).


[39] *Oran* held that there was liability for an omission under a duty to disclose theory known as the "duty to update" if "the previous statement contained an implicit factual representation. . . ." *Oran*, 226 F.3d at 286.

98

The law on fraud and misrepresentations uses various language to describe implied statements or reasonable inferences which, when false, are actionable – "as if,"[40] "may be interpreted,"[41] "is reasonably understood as implying,"[42] "as though he had represented,"[43]

---

[40] RESTATEMENT (SECOND) OF TORTS § 529. **Representation Misleading Because Incomplete**

> Comment: a. A statement containing a half-truth may be as misleading as a statement wholly false. Thus, a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation *as if* all the facts stated were untrue.

(emphasis added).

[41] RESTATEMENT (SECOND) OF TORTS  § 539 (1977) **Representation Of Opinion Implying Justifying Facts**

> (1) A statement of opinion as to facts not disclosed and not otherwise known to the recipient *may*, if it is reasonable to do so, *be interpreted* by him as an implied statement
>> (a) that the facts known to the maker are not incompatible with his opinion; or
>> (b) that he knows facts sufficient to justify him in forming it.

(emphasis added).

[42] RESTATEMENT (SECOND) OF TORTS  § 539 (1977) **Representation Of Opinion Implying Justifying Facts**

> Comment on Subsection (1):
> a. Frequently a statement which, though in form an opinion upon facts not disclosed or otherwise known to their recipient, *is reasonably understood as implying* that there are facts that justify the opinion or at least that there are no facts that are incompatible with it.

(emphasis added).

[43] RESTATEMENT (SECOND) OF TORTS  § 551. **Liability For Nondisclosure**

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other *as though he had represented* the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(emphasis added).

"purports to tell,"[44] "may fairly be inferred,"[45] "the implication of an assertion that is

---

[44] RESTATEMENT (SECOND) OF TORTS § 551. Liability For Nondisclosure
Comment on Clause (b):
> g. A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it *purports to tell* the whole truth and does not. (See § 529). So also may a statement made so ambiguously that it may have two interpretations, one of which is false. (See §§ 527, 528). When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.

(emphasis added).


[45] RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
> a. Nature of the assertion. A misrepresentation, being a false assertion of fact, commonly takes the form of spoken or written words. Whether a statement is false depends on the meaning of the words in all the circumstances, including *what may fairly be inferred* from them. An assertion may also be inferred from conduct other than words.

(emphasis added).

false,"[46] "the implied assertion ,"[47] "may be inferred," [48]"is equivalent to."[49]  Yet, whatever

---

[46] RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
> b. Half-truths. A statement may be true with respect to the facts stated, but may fail to include qualifying matter necessary to prevent *the implication of an assertion that is false* with respect to other facts.

(emphasis added).

[47] RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
b. Half-truths:
Illustrations:
> 3. A, seeking to induce B to make a contract to buy land, tells B that his title to the land has been upheld in a court decision. A knows that the decision has been appealed but does not tell this to B. B makes the contract. A's statement omits matter necessary to prevent *the implied assertion* that A's title is clearly established, and this assertion is a misrepresentation.

(emphasis added).

[48] RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
> c. Meaning of "fact." An assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events. An assertion limited to future events (see § 2), may be a basis of liability for breach of contract, but not of relief for misrepresentation. However, a promise or a prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts. Thus, from a statement that a particular machine will attain a specified level of performance when it is used, it *may be inferred* that its present design and condition make it capable of such a level. Such an inference may be drawn even if the statement is not legally binding as a promise.

(emphasis added).

[49] RESTATEMENT OF CONTRACTS § 160. When Action Is Equivalent To An Assertion (Concealment)
> Action intended or known to be likely to prevent another from learning a fact *is equivalent to* an assertion that the fact does not exist.

(emphasis added).

the language used to explain why a statement, that may be literally true, is misleading, the concept of implied representation is well established both in common law fraud and under the securities law for Section 10(b).

If what is not said is material, and its omission makes the statement, in light of the circumstances under which it was made, misleading, then if the other requirements for fraud are met, the statement is actionable.  Stated another way, when one makes such a statement the law imposes a duty to speak fully and truthfully on the material omitted fact or face liability. Thus, if errors were made in the instructions it was not because of the "implied representation theory of liability" or any passing infatuation the undersigned might have had with the now vacated *Tambone* case.

In this section on Claim Two the first element the SEC must prove is that Kmart violated Section 10(b) and Rule 10b-5. The SEC contends that Kmart violated Section 10(b) and Rule 10b-5 by making false or misleading statements or omissions in its Form 10-Q(3) is legally viable with or without considering Regulation S-K Item 303. Even if there were no Regulation S-K Item 303 creating certain duties to disclose, following the logic of the SEC under the *Helwig* and *Rubin* cases, a reasonable jury could find Kmart's MD&A of the 10-Q(3) to be materially misleading because "even absent a duty to speak, a party who discloses material facts in connection with securities transactions "assume[s] a duty to speak fully and truthfully on those subjects." *Helwig* 251 F.3d at 561.

The jury was provided the MD&A section on "Liquidity and Financial Condition" from Kmart's 10-Q(2) (Plf. Exh. 93) and urged in the SEC's closing to compare it to the same section of the 10-Q(3) (Plf. Exh. 209) and ask themselves "[w]hat  happened in the

third quarter that didn't happen in the second quarter." (5/29/09 Transcript, at Tr02774-

75.)   While asked to make the comparison, the jury was not provided a compare copy of

the two sections, but a jury comparing those two 2001 quarterly MD&A's would find the

following omissions with additions in bold and shadowed type:

### 10-Q ~~2~~ **3** 2001

LIQUIDITY AND FINANCIAL CONDITION

   Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities. We had working capital of $~~4,325~~ **4,096**,  $~~3,733~~ **4,440**, and $~~3,825~~ **3,751** million at ~~August 1~~ **October** 31, 2001, ~~July 26~~ **October** 25, 2000 and January 31, 2001, respectively. Working capital fluctuates in relation to profitability, seasonal inventory levels net of trade accounts payable (net inventory) and the level of store openings and closings. There were $~~764  million~~ **1.46 billion** borrowings outstanding under our $1.6~~0~~ **0** billion Revolver at the end of the second quarter of fiscal 2001. There were ~~no~~ **$1.37 billion** borrowings outstanding under our existing credit facilities at the end of ~~second~~ **the third** quarter ~~of fiscal~~ 2000.

   Net cash used for operating activities for the ~~26~~ **39**  weeks ended ~~August 1~~ **October** 31, 2001 was $~~154~~ **442** million as compared to net cash provided by operating activities of $~~609~~ **398** million for the same period in 2000. The ~~decrease~~ **increase** in cash ~~provided by~~ **used for** operating activities as compared to the same period of the prior year was primarily the result of lower net earnings, excluding non-comparable items, and higher inventory purchases. Inventory increased by $~~457~~ **1,906** million during the first ~~26~~ **39** weeks of fiscal year  2001 due to ~~normal~~ seasonal inventory fluctuations~~, to support our growing beauty and health care and consumables and edibles product lines,~~ and ~~actions taken~~  to improve our overall in-stock position.

   Net cash used for investing activities was $~~696~~ **1,129** million for the ~~26~~ **39**  weeks ended ~~August 1~~ **October 31**, 2001 compared to $~~389~~ **754** million for the same period in 2000. The increase in cash used for investing activities was primarily due to higher capital expenditures for ~~point-of-sale equipment;~~ **the expansion of Kmart stores to Kmart Super Centers**, ~~stores~~ **construction of** new Kmart ~~Supercenter stores~~ **Super Centers, expansion of midways to improve easier traffic flow for our customers and to increase visibility of promotional items,** and ~~our~~ an investment in ~~BlueLight.com.~~ point-of-sale equipment.

   Net cash provided by financing activities was $~~869~~ **1,536** million for the ~~26~~ **39** weeks ended ~~August 1~~ **October 31**, 2001 compared to net

103

cash ~~used for~~ **provided by** financing activities of $~~231~~ **1,093**  million for the comparable period in 2000. The increase in cash provided was primarily the result of the issuance of $430 million of 9 7/8% Notes due June 2008 and increased borrowings under the Revolver, partially offset by the paydown of **$262 million** Collateralized Mortgage Backed Securities in July.

In July 2001, we terminated the common stock repurchase program that was initiated in April 1999 **and the trust convertible preferred securities repurchase program initiated in February 2000**. We repurchased approximately 22 million shares of common stock at a cost of approximately $255 million **and 2 million shares of trust convertible securities at a cost of approximately $84 million** under the programs.

**On November 15, 2001 we signed an agreement for the renewal of our unsecured 364-Day Credit Facility ("Facility") for the amount of $400 million. The Facility is scheduled to fund concurrent with the expiration of the current facility on or before December 2, 2001.**

We believe that ~~current~~ **future operating cash flows and our** financing arrangements **(including the Facility)**  will be sufficient to meet our liquidity needs for operations and capital demands.

The jury could reasonably conclude from this comparison that Kmart's

"LIQUIDITY AND FINANCIAL CONDITION" statement for the third quarter of 2001

indicates that its liquidity situation in that quarter was much like its liquidity situation in

the second quarter with nothing out of the ordinary having occurred regarding Kmart's

liquidity in the third quarter.  Stated another way, based on the evidence presented to the

jury and its instructions for Kmart to have violated Section 10(b) and Rule 10b-5 by

making false or misleading statements or omissions in its Form 10-Q(3) (Jury Instruction

Number 26 incorporating portions of Instruction Numbers 19-23 on Section 10(b) and

Rule 10b-5 violations)[50], the jury could reasonably conclude that:

---

[50] Jury Instruction Number  26 notes in part: "The first element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Kmart violated Section 10(b) and Rule 10b-5 promulgated thereunder.

The SEC contends that Kmart violated Section 10(b) and Rule 10b-5 by making false or misleading statements or omissions in its Form 10-Q for the third quarter of 2001."

1. this section of the MD&A from the 10-Q(3) implies that nothing of significance happened in Kmart's third quarter of 2001 with regard to Kmart's liquidity;

2. this implication of no significant changes in liquidity was false and misleading given the $850 million Schwartz overbuy moving up Kmart's peak borrowing date and, combined with soft sales, precipitating a half billion to billion dollar liquidity shortfall Kmart experienced in the third quarter of 2001;

3. this implication of no significant changes in liquidity was false and misleading given the extraordinary, covert and unprecedented slow pay scheme Kmart undertook to maintain its liquidity in the third quarter of 2001;

4. such a misrepresentation was material because disclosure of each omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available and a reasonable investor would consider each of the omitted facts important to an investment decision concerning Kmart;

5. Kmart in this section of the MD&A chose to speak on the material issue of its liquidity but it did not "speak fully and truthfully" on that subject;

6. Kmart acted with intent to defraud or with reckless disregard for the truth.

Thus, even without any duties that Regulation S-K Item 303 may have created for

Kmart to make certain disclosures in the MD&A on liquidity in the 10-Q(3), the evidence

is such that the jury could reasonably have found that Kmart violated Section 10(b) and

Rule 10b-5 in the MD&A statement it made on November 27, 2001.   As noted in

footnote 50, the jury did find that each of these MD&A omissions -- the overbuy (the

"material liquidity event"), the liquidity shortfall Kmart experienced (the " material

_____

        While the jury instruction then listed each of the alleged misstatements and omissions separately, these three omissions noted above in the text – the overbuy (a "material liquidity event"), the liquidity shortfall Kmart experienced ("a material liquidity deficiency") and the slow pay scheme ("the delay in vendor payments") – were included in that list and each omission was found by the jury to be a material fact and the jury further found that each such "omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading." (Dkt. # 129, Verdict Form Claim Two Question 1. c. iii., 1. d. iii. & iv. and 1 e. iii. & iv.)

liquidity deficiency") and the slow pay scheme (the "delay in vendor payments") – were material facts and each such "omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading."  They also found each omission was made by Kmart with the intent to defraud or with reckless disregard for the truth. (Verdict Form, Dkt. # 129, Claim Two Question 1. c. v., 1. d. v. and 1 e. v.)

While the jury instructions did not direct the jury on how or why these three omission could be found to make the MD&A materially misleading, nor did the jury Verdict Form  question the jury on how or why they found each omission to be material and how or why they found each omission made the MD&A misleading,  such a degree of detail in the jury instructions and verdict forms is not legally required.  It was hoped that 41 pages of instructions and a 16 page Verdict Form  would be sufficient.  What is important is whether the jury was fairly instructed on what the SEC needed to prove for a Section 10(b) and Rule 10b-5 violation and whether their verdict found such a violation. The next significant inquiry is whether there is a reasonable explanation based on the evidence for how or why they reached such a verdict.  If there are two or more alternate rationales that might reasonably be found to explain the how and why each juror reached his or her decision, our ignorance as to the exact line of logic each juror followed is not a basis to vacate their collective decision, so long as either line of logic is rooted in the evidence and is reasonable under the law.

Thus, based on false and misleading information the jury could have found the "LIQUIDITY AND FINANCIAL CONDITION" section of the 10-Q(3) implied,  the

evidence is sufficient to uphold the jury's finding that Kmart violated Section 10(b) and Rule 10b-5 even in the absence of Regulation S-K Item 303. While the defense disagrees, it seems that adding the requirements of Item 303 to the context or the circumstances in which the jury could consider the MD&A was made as discussed in the next subsection, adds to the possible and reasonable inferences available with regard to the MD&A and reinforces why Kmart's MD&A on liquidity in the Form 10-Q(3) was misleading.

        4.     <u>Challenge to Use of Regulation S-K Item 303 as a Basis of  Section 10(b) and Rule 10b-5 Liability.</u>

Defendant's more significant challenge is to the use of Regulation S-K Item 303 to create an actionable duty to speak under Rule 10b-5 and the related instructions on Claim Two and Claim One.  Defendant argues that a violation of Regulation S-K Item 303 does not give rise to a section 10(b) violation and that some cases say it is of no relevance to a 10b-5 claim as alleged in Claims One and Two.  The SEC, on the other hand, argues that in addition to the duty to "speak fully and truthfully" created by th *Helwig/Rubin* analysis in the prior subsection,  Regulation S-K Item 303, with certain additional findings, can create a duty to speak and can lead to a 10b-5 violation.

Because the three alleged material omissions are identical under either legal theory for explaining why these three omissions made the MD&A on "LIQUIDITY AND FINANCIAL CONDITION" misleading in light of the circumstances under which it was made, it seemed unnecessary to risk confusing the jury by giving them instructions on both the Item 303 duty to speak requirement and then on the *Helwig*/*Rubin* duty to speak fully and truthfully if one chooses to speak on a topic.   The SEC did not want to make a

107

violation of Item 303 a precondition for finding Section 10(b) liability, but rather wanted only to allow the jury to consider Item 303 and whether it was complied with in considering whether the omissions were material. The Commission objected to the defense version of Instruction Number 21 that SEC characterized as making a violation of Item 303 a requirement to finding any of the omissions actionable under 10b-5. (Instructions Conference May 27, 2009, evening, at Tr02296-97.)  While possibly muddled in my own thinking, again I was troubled with giving charges to the jury on the duty to speak stemming from Item 303, for which the SEC had advocated citing the numerous cases discussed below, and then charging  the jury on the alternate SEC theory of the duty to speak truthfully and completely once one spoke on a subject.  I was concerned that using the SEC's alternate theory in the instructions would not "cause anything but confusion." (*Id*. at Tr02298. )   The SEC could argue under Rule 10b-5 that Kmart's MD&A on "LIQUIDITY AND FINANCIAL CONDITION" in the 10-Q(3) was misleading because,  without it disclosing the three omissions, the MD&A suggested nothing out of the ordinary occurred in the third quarter of 2001 with regard to Kmart's liquidity, when in fact there was an extraordinary and unprecedented liquidity crisis that was address by extraordinary and unprecedented means of stretching vendors.   Again because the three omissions were identical under either theory, and because on the Rule 10b-5 claims the jury was going to be required to separately find on the Verdict Form that each omission was material under *Basic v. Levinson* and further find that "the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading," I

determined that the jury also should also be required to make a specific finding that the omitted facts were required by the SEC's Regulation S-K Item 303.[51]  Such findings were clearly necessary under Claim Three, so this was an issue the jury was going to have to address.

Rule 10b-5 b. makes it "unlawful for any person, directly or indirectly . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  Among the "circumstances" under which a MD&A on "LIQUIDITY AND FINANCIAL CONDITION" in a Form 10-Q for an interim quarter is made, is the fact that Item 303 of Regulation S-K sets out certain things that must be disclosed.  If the omissions are sufficiently significant to meet the materiality standard of *Basic, Inc. v. Levinson*, then it seems that if the omissions are also found necessary in order to make the MD&A statement not misleading because of

---

[51]  The SEC was understandably concerned about the jury instruction and Verdict From being too atomistic in the findings required of the jury.  Obviously it wanted the jury to be able to find that, even if one or two of omitted statements taken alone might not be material and thus their omission not sufficient to make the MD&A on liquidity misleading, that when all three omissions were taken as a combination they were material and the omission of all three matters made the MD&A misleading.  Claim Two's Instruction Number 26 on the elements of a Section 10(b) and Rule 10b-5 incorporated the instruction on the elements of a Section 10(b) and Rule 10b-5 from Claim One, Instruction Number 19, which included a required finding that the alleged violator  "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  Instruction Number 21 required the jury to find that "that the failure to include those omitted facts rendered the Management Discussion & Analysis  section of Kmart's Form 10-Q for the third quarter of 2001 materially misleading." While the instructions talked about the omissions as a group, the Verdict Form did require a separate finding as to each omission on whether it was material and on whether its omission made the MD&A misleading "in light of the circumstances under which it was made."  Obviously the jury in considering each omission could consider that the other two matters were also omitted because this fact was part of the"circumstances under which [the MD&A statements and each of its omissions considered individually] were made."

what one would expect the MD&A to include under the requirements of Item 303 of

Regulation S-K , then the omission(s) could form the basis for Section 10(b) and Rule

10b-5 b. liability.

Defendant cites then Judge Alito's opinion in *Oran v. Stafford,* 226 F.3d 275 (3rd

Cir. 2000), and a host of cases citing it, for the proposition that Item 303 of Regulation S-

K is irrelevant to whether there is an actionable omission for purposes of Rule 10b-5.[52]

The "omitted facts" in *Oran,* that the defendant American Home Products ("AHP") did

not make public, involved a failure to disclose when AHP first became aware of certain

European case data and Mayo Clinic case studies that showed a possible adverse link

_____

[52] In their brief Defendant cites the following cases as uniformly holding or at least stating that the failure to comply with Item 303 does not give rise to an actionable omission under Section 10(b) : *Oran v. Stafford,* 226 F.3d 275, 288 (3d Cir. 2000) (affirming dismissal of claim under Section 10(b) because "SK-303 cannot provide a basis for liability"); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 473 (S.D.N.Y. 2006) ("even if the Complaint's allegations were sufficient to establish a violation of [Item 303 of Regulation S-K], the violation alone would be insufficient to establish Defendant's liability under Section 10(b) and Rule 10b-5"); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 583 (E.D. Va. 2006) (alleged violation of Regulation S-K does not establish that defendants had a duty to disclose the information under Section 10(b)); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 828 (S.D. Cal. 2006) ("Plaintiffs' allegations based on SEC Regulation S-K are insufficient to state a Rule 10b-5 claim"); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003) ("even if Plaintiffs could demonstrate a breach of [Item 303], this would not assist in stating a cause of action under section 10(b) for securities fraud"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 632 & n.63 (S.D. Tex. 2003) ("a violation of Item 303 does not establish a duty to disclose that may give rise to liability under § 10(b)"); *In re Pacific Gateway Exch., Inc. Sec. Litig.*, 2002 WL 851066, at *13 (N.D. Cal. Apr. 30, 2002) (plaintiffs could not premise a duty to disclose the slow payment of vendors on alleged failure to comply with Regulation S-K); *In re Quintel Entm't, Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999) ("To the extent that plaintiffs' § 10(b)(5) claim is based only upon alleged violations of Item 303 of Regulation S-K, it must be dismissed for failure to state a claim."); *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 390 (D. Or. 1996) ("because Plaintiffs' lawsuit is brought under Rule 10b-5, [defendant company's] potential duty to disclose must arise from 10b-5, and not from … SK-303.
(Dkt. # 139, pp.  50-51 of 75 , numbered pages 35-36.)

between the two drugs (Pondimin and Redux) that AHP sold and heart-valve disorders.

Yet the facts in *Oran* are significantly different than the present case in several respects.

First, in *Oran* the omitted information about when AHP first learned of adverse

case study data was found by the Third Circuit to be immaterial as a matter of law.

> Prior to [FDA noticing American Home Products Corporation ("AHP") on September 12, 1997, of its own data showing a statistically significant link between Pondimin and Redux and heart-valve disorders], the threat of product liability exposure was purely speculative, and any evidence of when AHP first learned of the adverse Mayo and European data was immaterial as a matter of law.

*Id.* at 286.

In the present case the jury found each of the omitted facts to be material under the *Basic,*

*Inc. v. Levinson* standard, and there is substantial evidence to support these findings.[53]

Second, *Oran* notes that because "AHP never made any prior statement regarding

when it learned of the heart-valve data there can be no duty to correct." The court stated:

> AHP never made any factual representation – implicit or explicit – regarding when it was first placed on notice about potential heart-valve problems. AHP's earlier statements about the Mayo and European data did not relate any incorrect or misleading information about when the company had learned of that data; rather, *they were simply silent on the subject.* In the absence of a misleading prior representation, AHP was under no legal duty to update.

*Id.* at 286 (emphasis added).

In the present case Kmart made an extensive statement on liquidity in its

"LIQUIDITY AND FINANCIAL CONDITION" section of the MD&A but that MD&A

---

[53] While Defendant challenges the conference call statements as not being material as a matter of law, he does not challenge the jury's finding material the thee omissions.

statement made no disclosure of Kmart's liquidity crisis, its cause, nor that it was remedied by an extraordinary and unprecedented means of stretching vendors. As noted above, the jury in this case found that each of the omitted facts was material and that each was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading.

*Oran* and all courts deciding the issue have held that Section 13(a) of the Exchange Act on a Corporation's reporting obligation,  Rule 13a-13 and Regulation S-K Item 303 do not create an implied right of action for a violation of Item 303.  These holdings on the question of whether there is an implied right of action under Section 13(a) of the Exchange Act for a violation of its reporting obligation, involve a different question than whether an implied right of action under Section 10(b) and Rule 10b-5 can be based on a violation of Regulation S-K Item 303.

In analyzing the first question of whether there is an implied right of action under Section 13(a), courts would apply the methodology set out by the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994), that the statutory language is the starting point in every case involving construction of a statute.  It is clear that nothing in Section 13(a) or all of Section 13 of the Exchange Act or in Rule 13a-13 suggest an implied right of action for a violation of Regulations, such as Regulation S-K Item 303, that implements these reporting obligations.[54]  This is a simple non-starter for any implied right of action stemming from

---

[54] Section 13(a) **Reports by issuer of security; contents**

 (a.) Every issuer of a security registered pursuant to section 12 shall file with the Commission, in

112

Section 13(a).

Section 10(b) of the Exchange Act, on the other hand, has more robust language than Section 13(a) in that Section 10(b) makes it "unlawful for any person ... *[t]o use or employ,* in connection with the purchase or sale of any security ...., *any* manipulative or

---

accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security--

1. such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 12, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

2 such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Rule 13a-13, 17 C.F.R. § 240.13a-13
**§ 240.13a-13 Quarterly reports on Form 10-Q (§ 249.308a of this chapter).**

1. (a) Except as provided in paragraphs (b) and (c) of this section, every issuer that has securities registered pursuant to section 12 of the Act and is required to file annual reports pursuant to section 13 of the Act, and has filed or intends to file such reports on Form 10-K (§ 249.310 of this chapter), shall file a quarterly report on Form 10-Q (§ 249.308a of this chapter) within the period specified in General Instruction A.1. to that form for each of the first three quarters of each fiscal year of the issuer, commencing with the first fiscal quarter following the most recent fiscal year for which full financial statements were included in the registration statement, or, if the registration statement included financial statements for an interim period subsequent to the most recent fiscal year end meeting the requirements of Article 10 of Regulation S-X and Rule 8-03 of Regulation S-X for smaller reporting companies, for the first fiscal quarter subsequent to the quarter reported upon in the registration statement . . . .

* * *

(d) Notwithstanding the foregoing provisions of this section, the financial information required by Part I of Form 10-Q shall not be deemed to be "filed" for the purpose of Section 18 of the Act or otherwise subject to the liabilities of that section of the Act, but shall be subject to all other provisions of the Act.

113

*deceptive device* or contrivance *in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors. . . .*"[55] (emphasis added.)  Regulation S-K Item 303 clearly is such a regulation promulgated for the "protection of investors."  Rule 10b-5 b. makes it "unlawful for any person, directly or indirectly . . .  to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."   Regulation S-K Item 303 is part of the circumstances under which a MD&A statement in a quarterly SEC filing is made.

 As noted in *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005):

> In order to be actionable, a misrepresentation or omission must pertain to *material information* that the defendant had a *duty to disclose,* two significant limitations to the general policy of disclosure. See, e.g., *Basic*, 485 U.S. at 238, 108 S.Ct. 978 ("[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant) (emphasis in original omitted); *In Re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1432 (3d Cir.1997) ("[T]here is no general duty on the part of a company to provide the public with all material information."). . . . *A duty to affirmatively disclose "may arise when* there is insider trading, *a statute requiring disclosure,"* or, as relevant to this case, "*an inaccurate, incomplete or misleading prior disclosure.*" *In re Digital Island Sec. Litig*., 357 F.3d 322, 329 n. 10 (3d Cir.2004) (internal quotations omitted).

*Id.* at 669 (emphasis added).

The Third Circuit in *Oran*  also recognized that statutes as well as an incomplete or misleading prior disclosure can provide a duty to disclose. *Oran,* 226 F.3d at 285.  Yet, in

---

15 U.S.C. § 78j

*Oran* where the undisclosed facts were found immaterial as a matter of law, and there were no prior statements on the same subject, neither an Item 303 nor any common law fraud type of duty to disclose existed.

Unlike (i.) the "aiding and abetting" liability for which *Central Bank* found no support in the statutory language of Section 10(b) of the Exchange Act or in Rule 10b-5, and unlike (ii.) the language of Section 13(a) of the Exchange Act on a Corporation's reporting obligations, its Rule 13a-13, or Regulation S-K Item 303 that have no language suggesting an implied right of action for a violation of Item 303, Section 10(b) of the Exchange Act and Rule 10b-5 do provide language suggesting a possible implied right of action for a *deceptive device . . . in contravention of such rules and regulations as the [SEC] may prescribe as necessary . . . for the protection of investors.* Again, Regulation S-K Item 303 is such a regulation for the protection of investors and is part of the circumstances under which an MD&A is made.

As noted in *City of Monroe Employees Retirement System,* while the duty to disclose may be created by statute, an omitted fact is not actionable under Rule 10b-5 unless it is material under the *Basic, Inc.* standard and the omitted material fact was necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

If Kmart had been "simply silent on the subject" of liquidity in its 10-Q(3), as defendant AHP had been on its subject in *Oran,* then, as in *Oran,* there would be no section 10(b) and Rule 10b-5 liability for the three omissions even thought they were

115

material under *Basic*, Inc.[56]  Also, because not all of the information that Item 303 requires

to be disclosed meets the higher standard of materiality of *Basic, Inc.,* failure to disclose

those less significant matters may be a violation of Section 13(a) and Regulation S-K Item

303, but they would not constitute a 10b-5 violation.  The facts of this cases, however,

differ from these two examples and finding 10b-5 liability on these facts is consistent with

one reading of *Oran*.  After finding the non-disclosed matters not material as a matter of

law, the *Oran* opinion explains its reasons for not embracing a Item 303 violation as

automatically triggering at 10b-5 violation:

> Because the materiality standards for Rule 10b-5 and SK-303 differ
> significantly, the "demonstration of a violation of the disclosure
> requirements of Item 303 does *not lead inevitably* to the conclusion that
> such disclosure would be required under Rule 10b-5. *Such a duty to
> disclose must be separately shown.*" *Alfus v. Pyramid Tech. Corp.,* 764
> F.Supp. 598, 608 (N.D.Cal.1991); see also *Sofamor* [*Danek Group, Inc.*],
> 123 F.3d [394 (6th Cir. 1997)] at 402; [other citations omitted] We find this
> reasoning persuasive, and thus hold that *a violation of SK-303's reporting
> requirements does not automatically give rise to a material omission under
> Rule 10b-5* . Because plaintiffs have failed to plead any actionable
> misrepresentation or omission under that Rule, SK-303 cannot provide a
> basis for liability.

*Oran,* 226 F.3d at 288 (emphasis added) .

What is the "separate showing" under "that Rule" (which is Rule 10b-5) that was

missing in *Oran* ?  As noted before, the alleged omissions in *Oran* were not material as a

matter of law and additionally AHP was "simply silent," and thus had not made a

statement that was misleading, under the circumstances, because of the omitted material

---

[56]  Mere silence may, under the circumstances, be a violation of reporting obligations of
Section 13(a) of the Exchange Act and Rules 12b-20 and13a-13 and Regulation S-K Item 303
promulgated thereunder, but it is not a violation of Section 10(b) or Rule 10b-5.

fact.  Both of these "plus factors" missing in *Oran* are involved in the present case – the
jury found each omission material under *Basic, Inc.,* and Kmart was not simply silent, but
chose to make a MD&A statement on liquidity in its Form 10-Q(3), and the jury found for
each of the three omissions that "the omitted fact was necessary in order to make the
Management Discussion & Analysis section of the Form 10-Q, in light of the
circumstances under which it was made, not misleading." (Dkt.# 129, Verdict Form,
Claim Two Questions 1.c iii., 1.d.iii. & 1.e.iii. )

Thus, one could read *Oran* as excluding from a possible 10b-5 universe all of the
Item 303 disclosure requirements that do not meet the materiality standard of *Basic, Inc.*
and limiting 10b-5 liability to cases where is there is a separate showing not only that a
MD&A  statement is made on a topic required by Item 303, but additionally that (i.) the
missing Item 303 fact is material under *Basic, Inc.,*  and (ii.)  that the absence of the fact
makes the MD&A statement misleading "in light of the circumstances under which it was
made."  Here the jury here was required to make both findings which it did. [57]

If courts were to so interpret the interplay of Section 10(b), Rule 10b-5 b. and the
reporting requirements of Regulation S-K Item 303,  would such an interpretation pass the

---

[57]  Items  (i.) the materiality requirement  and (ii.) the absence of the fact makes the
statement misleading are different.  Item (i.) on materiality deals with whether a reasonable
investor  would have found it a significant fact "in the total mix" of what was publically known.
Item (ii.) really deals with the duty to disclose -- the statement is misleading absent the omitted
fact because "in light of the circumstances under which it was made" you would expect the fact
to be stated if the fact existed. In the absence of a duty to disclose, the mere fact an investor
would like to know the information (*i.e.* materiality) does not make non-disclosure actionable
under Rule 10b-5. *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403 (6th Cir. 1997)
("Materiality alone is not sufficient to place a company under a duty of disclosure."). In the
present case the duty to disclose is rooted in Item 303 or, alternatively, in the *Helwig/Rubin*
standard that if you choose to talk on a subject, you must talk truthfully and completely.

second test *Central Bank* set for analyzing the scope of Rule 10b-5 – "to infer how the 1934 Congress would have addressed the issue[s] had the 10b-5 action been included as an express provision in the 1934 Act." *Central Bank,* 511 U.S. at 173. While nearly a cliche, after so any references, is regularly noted that among Congress' objectives in passing the 1934 Act was " 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.' " *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128(1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, (1963)). *S.E.C. v. Zandford,* 535 U.S. 813, 819 (2002).

The 1934 Congress in the Securities Act created a duty to speak in the reporting requirements of section 13(a), and in section 10(b) prohibited deceptive devices in contravention of the SEC's regulations for the protection of investors. Indeed Regulation S-K could be seen as a central pillar of the philosophy of full disclosure the 1934 Congress sought to foster. With regard to a corporation making a MD&A statement on liquidity which purports to be one made in accord with Section 13(a) of the Securities Act, it seem a modest proposition that on the facts of this case the 1934 Congress would have approved, and intended courts to approve, a finding of a Section 10(b) violation when the omitted facts concerning liquidity were required by the Commission's Regulation S-K Item 303, they were material facts under the *Basic*, *Inc.* standard, and omitting each such material fact made the MD&A misleading in suggesting that there was not any changed liquidity event, deficiency or source of liquidity in the quarter. Thus, the facts of this case would also pass this second test set by the Supreme Court in *Central Bank.*

118

The "does not lead inevitably" and "does not automatically" language of *Oran*
leaves unresolved whether the Third Circuit would accept 10b-5 liability in a Regulation
S-K Item 303 situation where there were these "separate showings" as exist in the present
case.  Similarly, the issue is unresolved in the Sixth Circuit.  *In re Sofamor Danek Group,
Inc.,* is the only Sixth Circuit case that discusses Item 303 as a possible source of Section
10(b) liability.  The court determined that, because the defendant had "no way of
knowing" the future impact on operations of the undisclosed matter, the complaint did not
sufficiently allege that the undisclosed matter was required to be disclosed under Item
303.  *In re Sofamor Danek,* 123 F. 3d 394  at 402.  Thus, the Sixth Circuit in *Sofamor
Danek* did not need to resolve the issue of whether Regulation S-K Item 303 can ever
create a duty to speak actionable under Section 10(b) and leaves the question unanswered
with a whimsical "[p]erhaps so." After noting Plaintiff's acknowledgment of the cases
holding that there is no private right of action under the reporting statute Section 13(a) or
the reporting regulation, the opinion raises the 10b-5 issue regarding Item 303:

> The plaintiffs suggest, however, that the absence of a separate cause of
> action "does not preclude plaintiffs from arguing . . . that defendants'
> disclosure duty under the Rule 10b-5 claim may stem from Item 303."
> Perhaps so -- but for reasons similar to those explained above, we do not
> find the argument persuasive.

*Id. at* 403.

The reason "explained above" that the Sixth Circuit did not find the argument
persuasive in *SofamorDanek* was that the undisclosed information was either "soft,"
uncertain, future impact material that was not required to be disclosed under Item 303 or
was information otherwise disclosed or publically available – and thus already in the

119

"total mix" of information and not material. The Court notes that although the company "downplayed" the significance of the FDA warning letter, "any analyst could easily obtain a copy of that letter and could make an independent judgment of its significance." *Id.* at 402. Similarly, the material risk that defendant supposedly kept from the public was in fact disclosed in other public SEC filings of the company: "Each of the company's 10-K forms explicitly mentioned the risk that the FDA might obtain an injunction against any distribution of the [product]." *Id.*

One district court case in this Circuit involving the issue offers little guidance because again the issue was avoided by ruling against Plaintiff on separate grounds. *In re Huffy Corp. Secur. Litig.*, 577 F. Supp. 2d 968, 1019-20 (S.D. Ohio Sept. 17, 2008). The complaint alleged that the company's Class Period Reports on Forms 10-Q filed with the SEC were materially false and misleading in that they failed to disclose known trends, demands, commitments, events and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulations S-K. Without questioning whether Item 303of  Regulation S-K can form the basis for a Rule 10b-5 claim, the *Huffy* court found the allegation to be insufficiently pled because plaintiffs "have [not] indicated what known trends, etc., the Defendants omitted from which 10-Q Reports." *Id.* at 1020.

Other private securities actions seem to have recognized that, even though there is no private right of action for a claim under Item 303 or Section 13(a), Item 303 may provide a duty to disclose and a basis for a claim under Rule 10b-5 for failure to disclose. The Second Circuit in  *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 70 (2d

120

Cir. 2001), reversed a lower court's dismissal of a 10b-5 claim and allowed the case to proceed with Item 303 of Regulation S-K providing the basis for a duty to disclose for Section 10(b) and Rule 10b-5, but that issue was apparently not challenged by the defendant nor briefed by the parties.  In *Scholastic*, the Second Circuit recognized that an alleged failure to disclose material adverse trends in book sales in Scholastic's Form 10-Q MD&A as required by Item 303 would provide the basis for Rule 10b-5 liability.  While the issue discussed above is hardly the "holding" in *Scholastic,* other courts cite it as if it is.  *e.g., In re Corning Inc. Securities Litigation*, 349 F.Supp.2d 698, 715- 17 (S.D.N.Y. 2004), *citing Scholastic; In re Campbell Soup Secur. Litig.*, 145 F.Supp.2d 574, 590-91 (D. N.J. 2001), *citing Scholastic.   See also In re NTL Inc. Securities Litig.,* 347 F.Supp.2d 15, 38-39 (S.D.N.Y. 2004), which states without citing any authority "While a violation of Item 303, in some circumstances, may give rise to a claim under Section 10(b) of the Exchange Act, there is no private cause of action for a violation of Regulation S-K."

In *Corning*, plaintiff alleged that in three Form 10-K's, two Annual Reports, and nine Form 10-Q's, defendant failed to disclose information that would have had a material impact on Corning's financial condition. *In re Corning* , 349 F.Supp.2d at 700-01. The "crux of plaintiff's claim is that Corning . . . *failed to disclose* material information known to Corning regarding . . . potential litigation liability from silicone breast implants in the range of $1 billion." *Id.*  at 702 (emphasis added).   Defendant argued that "Item 303 does not impose any duty," citing various cases. *Id.* at 716. The court rejected this claim, stating that "the Second Circuit in a subsequent case reversed a district court's dismissal of a Rule 10b-5 claim that was based on a defendant's failure to make disclosure allegedly

required under SK-303." *Id.* (citing *Scholastic,* 252 F.3d at 74).

The court in *Corning* stated that it "must consider Item 303 in connection with plaintiffs' claim under Rule 10b-5." Unlike the *Oran* suggestion, the *Corning* court then asserted "that the relevant portions of Item 303 do not really vary from the case law interpreting Rule 10b-5." After further analysis, the court then held that:

> Considering Rule 10b-5 in conjunction with SK-303 and FASB 5, *it is perfectly clear how the law applies to the present case.* If at the time the financial statements . . . were issued, Corning knew of potential liabilities . . . with respect to breast implant lawsuits and non-litigation claims, and knew that these liabilities were potentially of such a size *as to materially affect the future earnings of Corning and the general financial condition of Corning, the law required Corning to disclose this.* Such a disclosure would have undoubtedly taken the form of a charge against income *as well as a description of the circumstances. . . . Failure to make such a disclosure would be failure to state material facts, thus creating liability under Rule 10b-5.*

349 F.Supp.2d at 717 (emphasis added). Yet, the court granted defendants summary judgment not because of any legal argument questioning that Item 303 of Regulation S-K could provide the basis for a 10b-5 violation, but rather but because of a failure of any adequate proof that defendants had any reasonable basis to question Corning's 30 years of research and testing that silicone breast implants were safe and adverse effects the exception, nor any showing that the company could have anticipated the FDA January 1992 moratorium on further sales which caused a significant stock decline.

*Campbell Soup* involved the failure to disclose the effect of loading practices in quarter-end press releases, SEC filings and annual reports. 145 F. Supp. 2d at 581-82. With respect to Item 303, the court noted that the Second Circuit had recently "held that a publisher's failure to disclose trends in declining sales and increasing returns, as required

by Item 303, adequately alleged a securities law violation." *Id.* at 591. The court stated that "[t]he *Scholastic* opinion further bolsters the Court's conclusion that Defendants had a duty to disclose their loading and shipping practices." *Ibid.* The court stated, however, that it had "already held that Plaintiffs had sufficiently pled violations" of Rule 10b-5 and thus did not need an alternate Item 303 basis for 10b-5 liability. *Ibid.* The *Campbell Soup* case is particularly significant because it seems to trumpet the Second Circuit's *Scholastic* decision while acknowledging that Item 303 was "unavailable" to it as an independent avenue to liability because it was a district court in the Third Circuit and was compelled to follow *Oran v. Stafford*.

While these cases cited by Plaintiff in support of its position are fewer in number than those cited by the Defendant, all of the cases, with the exception of *Oran,* share one thing in common – they all seem merely to state their position as a given, some citing *Oran* or *Scholastic* to support their differing results, but none of them provide any analysis of the reasons why Item 303, in certain circumstances, should or should not provide a basis for 10b-5 liability.  For the reasons stated above, it is believed that the facts of this case have the additional "plus factors" that were missing in *Oran* of a prior statement, one or more material omissions that were required by Item 303, and the omissions made the MD&A misleading under the circumstances.  Thus, even the Third Circuit could accept 10b-5 liability in this case.  But if that proposition is wrong, and if *Oran* should be read as always excluding Item 303 from providing a basis for 10b-5 liability, then it is believed that the Sixth Circuit will reject such an extreme position and will rather follow the lead of

123

the Second Circuit in *Scholastic*, possibly articulating some clear limits and guidelines.[58]

While not using Item 303 for the duty to speak, the *City of Monroe* is supportive of this position and particularly instructive in that it uses the expectancies created by accounting standards coupled with what was and was not said in the Annual Report to find implied representations and a duty to speak or face liability if the jury finds the implied representation to be false.  In *City of Monroe*  Bridgestone's 1999 Annual Report was accompanied by an outside auditor's letter stating that it was prepared "in conformity with accounting principles generally accepted in Japan" and the report stated the Japanese financial statements were prepared in accordance with Japanese GAAP and the Firestone financial statements prepared under U.S. GAAP.   Both GAAPs require disclosure of a loss or impairment to assets if probable, and the U.S. GAAP requires disclosure by identification of any loss contingency if it was at least "reasonably possible" but the amount of loss could not be estimated.  *Id.* 399 F.3d at 677.  Using these general statements regarding accounting standards on disclosures and the Annual Report's disclosure of various "Contingent Liabilities" or other risks to the market value of its

───────────────

[58] While there is a real concern that an unrestrained use of Item 303 in conjunction with Rule 10b-5 will lead to a surge in private securities litigation using the "trend" language of Item 303, it is believed that the heightened pleadings requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA") and a rigorous review of the materiality standard under *Basic, Inc.* will provide district courts tools to weed out many, albeit not all,  baseless claims early in the litigation.  Excessive hostility to private securities litigation risks distorting our securities laws and limiting the protections they were intended to provide the investing public.  While marginal to frivolous strike suits to extort settlements impose great private and social costs from the corporations of this country and their officers, a reasonable balance needs to be maintained in the enforcement of federal securities laws.  The courts in *Oran, In re Corning, In re Campbell Soup* and many other cases were able to reject claims where the alleged omissions were not material, though, obviously, these "victories" were at a substantial cost to the "victorious" defendants.

124

stock, the Sixth Circuit treats the 1999 Annual Report as making "[t]he unmistakable representation, under both the Japanese and American GAAP policies, . . . that if a loss or asset impairment was probable, the Annual Report reader would see a discussion of it in some form in the report." *Id.* It goes on to interpret the Annual Report as making what can fairly be characterized as an *implied* "representation that if there were a substantial certainty of such an impairment, that contingency or risk would be disclosed." *Id.* 399 F.3d at 678. It later notes:

> The 1999 Annual Report's simultaneous inclusion of the accounting policies, the listed contingencies, and the absence of any mention of a contingency concerning Firestone tires *constituted a representation* that no loss or asset impairment arising from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was "probable" or "reasonably possible."

*Id.* (emphasis added).

This sentence could as easily have used the term "constituted an implied representation." The Court later refers to the implied "no impairment" representation as being material and noted why "a reasonable jury could find that the facts belied that representation." *Id.*

In addition to this implied "no impairment" of assets representation, the Sixth Circuit then combined FASB 5 of the Financial Accounting Standards Board on probable loss contingencies with the omission from the Annual Report's discussion of "Contingent Liabilities" of any losses due to tire replacements, possible mandated recalls or law suits and then it determined that a jury could find another implied representation of "no loss:"

> The second representation from Bridgestone's 1999 Annual Report that a reasonable jury could conclude was actionable was *its effective representation* that there were no actual, material losses connected to the

125

lawsuits and responses to the regulatory scrutiny of the ATX tires.

*Id.* at 680 (emphasis added).

It notes that this implied representation gave rise to a duty to disclose:

> *Because the 1999 Annual Report represented that there were no actual losses connected to the lawsuits and responses to the regulatory scrutiny* of the ATX tires' failures, *there was a duty to disclose* any material information to the contrary, be it in the form of a reserve, notice of a contingency, or some other form of disclosure.

*Id.* at 681 (emphasis added).

If a combination of these general accounting references with the statements and omissions in Bridgestone's 1999 Annual Report, in light of the disclosure standards drawn from GAAP and FASB, is sufficient to uphold a Rule 10b-5 misrepresentation claim due to material omissions in *City of Monroe*, a similar combination of the introductory and signature pages of the Kmart 10-Q(3) for 2001,[59] selected portions of Item 303 Regulation S-K, and the MD&A statements on "LIQUIDITY AND FINANCIAL CONDITIONS" should support a Rule 10b-5 claim here.  In the present case, the disclosure requirements of Item 303 of Regulation S-K replace the disclosure duties the *City of Monroe* found in various accounting standards, and this regulation is likely no more complicated for

---

[59] The disputed SEC filing begins:

FORM 10-Q
[x] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15d OF THE
SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED
OCTOBER 31, 2001

The Form 10-Q is signed:
"Pursuant to the requirements of the Securities Exchange Act of 1934 . . . ."

126

investment analysts and others who study corporate disclosures for investment or other

purposes to understand.

> The jury was instructed that:

> The purpose of the discussion and analysis shall be to *provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant* as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

Instruction No. 21. (Emphasis added.)

While not read, they were given the 1989 Release on this regulation and Dr.

Carmichael testified to the portion of that Release that the MD&A is "supposed to give the

investor the opportunity to see the company through the eyes of management."

(Carmichael 5/21/09, at Tr01418.)[60]  They were instructed that Item 303(b) required

disclosure of any material changes in items listed in 303(a) which, on item (1) *Liquidity*,

required

identification of

> any known . . . events . . . that . . . are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way.  If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency.  Also identify and separately describe internal and external sources of liquidity . . . .

*Ibid.*

They were also instructed that:

---

[60] Dr. Carmichael was paraphrasing the 1987 Release statement, "The MD&A is intended to give the investor an opportunity to look at the company through the eyes of management," quoted in the 1989 Release.  (Release No. 33-6835 (May 18, 1989) [54 FR 22427] quoting Securities Act Release No. 6711 (April 24, 1987) [ 52 FR 13715] at 13717.)

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations. . . .

*Ibid.*

Dr. Carmichael testified at length about his opinion on the disclosure requirements of Item 303 including a material liquidity event, a material liquidity deficiency and sources of liquidity (Carmichael 5/21/09, atTr01399-422).  He stated his opinion that the Schwartz overbuy of inventory definitely caused a material liquidity event (*Id*. at Tr01423), that there was a material liquidity deficiency in the range of $1 billion  (*Id*. at Tr01426 and  Tr01437-38), and that the vendor payment delays described by Messrs Moreland, Gilbert and Archambeau were an important source of Kmart's liquidity in the third quarter of 2001. (*Id*. at Tr01438-39.)

Given what was and was not said in the Form 10-Q(3) MD&A on liquidity,  given what the jury knew about the disclosure requirements of Regulation S-K Item 303 and what information investors were to be provided, and borrowing the language of the Sixth Circuit in *City of Monroe*, the jury could reasonably find that Kmart's MD&A "*constituted a representation*" that Kmart experienced no material liquidity event, no material liquidity deficiency or no significant change in a material source of liquidity in the third quarter of 2001. Such a jury could further find that those "representations" were false and misleading in the absence of further disclosures.

Even if in my muddled thinking I was wrong in instructing the jury on the 10b-5

claims that they must find the three omissions were required under Item 303 of

Regulation S-K,[61] the jury was not instructed that this was a sufficient finding alone to

impose 10b-5 liability.  Assuming the instructions were given without the requirement of

finding a violation of Item 303 a modified excerpt of  Instruction Number 21 would, in

part,  read:

> With respect to the alleged omissions, you must first find ~~that the omitted facts were required to be disclosed under Item 303 of Regulation S-K and~~ that those omissions  were material as defined in Instruction No. 22 on page 30.  Second, you must find that the failure to include those omitted facts rendered the Management Discussion & Analysis section of Kmart's Form 10-Q for the third quarter of 2001 materially misleading.

Again, Instruction Number 26 on Kmart's violation of Section 10(b) and Rule 10b-5

directed the jury not only to Instruction Number 21 but also to Instruction Number 19 on

the basic elements of a Section(b) and Rule 10b-5 claim on making "an untrue statement

of a material fact or omitt[ing] to state a material fact necessary in order to make the

---

[61] This instruction could be determined to be wrong if an expansive interpretation and acceptance of the reasoning in *Oran* is adopted as precluding Item 303 having any relevance to a 10b-5 claim.  This instruction could also be determined to be wrong even if such an expansive interpretation of *Oran* is rejected and the *Scholastic* line of case is accepted in certain fact situations.  The SEC was correct in its objection to Instruction Number 21 making a finding of an Item 303 violation a necessary element of the 10b-5 claim in this case. For reasons noted in the preceding subsection, the SEC is correct that, even without the existence of Item 303, the jury could  find the "LIQUIDITY AND FINANCIAL CONDITIONS" section of the 10-Q(3) was materially misleading because, when compared to the "Liquidity and Financial Conditions" section of the 10-Q(2) (Plf. Exh. 93), it indicates nothing of significance changed with regard to Kmart's liquidity in the third quarter of 2001.  Thus, without any finding under Item 303, the jury could find Section 10(b) liability under the *Helwig/Rubin* reasoning.  Thus, Instruction Number  21 as given required the jury to make an additional, albeit unnecessary, finding of fact that each omission was required to be disclosed by Item 303. Yet, any such error provides no help to the Defendant because it raised, and did not lower, what the SEC had to prove.  The critical question was whether the instructions a whole and other findings of the jury are sufficient to uphold a 10b-5 violation. For reasons stated in the body of this opinion, it is believed they are.

statements made, in the light of the circumstances under which they were made, not

misleading" and acting "with intent to defraud or with reckless disregard for the truth."

Instruction Number 19 made it clear that the parties stipulated to the existence of the third

and fourth elements on "in connection with the purchase or sale of a security" and use of

"an 'instrumentality of interstate commerce' in connection with the securities transactions

involved in the case."

      If one omits as unnecessary the Item 303 finding from the jury Verdict Form  on

Claim Two, concerning Kmart's alleged violation of Section 10(b) and Rule 10b-5 b., that

leaves:

## CLAIM TWO QUESTION 1

      **[CLAIM TWO QUESTIONS 1. a. AND 1. b. OMITTED & BOLDFACE ADDED ]**

      c.     With respect to the alleged omission from the Management Discussion & Analysis section of Kmart's Form 10-Q that it did not identify a **known material liquidity event** that occurred in the third quarter of 2001, do you find:

          i.     That Kmart had a known material liquidity event that occurred in the third quarter of 2001?

             Answer:  Yes ____✔____   No _____

          ~~ii.~~   ~~That Kmart was required to disclose this fact under Item 303 of Regulation S-K?~~
          ~~Answer:  Yes ____✔____~~   ~~No _____~~

          iii.     That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

             Answer:  Yes ____✔____   No _____

          iv.     That the omitted fact was material?

Answer: Yes _____✔_____     No _____

v. That Kmart acted with intent to defraud or with reckless disregard for the truth?

Answer: Yes _____✔_____     No _____

d.     With respect to the alleged omission from the Management Discussion & Analysis section of Kmart's Form 10-Q that it did not disclose that Kmart had **a material liquidity deficiency** during the third quarter of 2001 or the course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency, do you find:

i.     That Kmart had a material liquidity deficiency during the third quarter of 2001 and, if so, remedied that deficiency by a course of action involving the delay of vendor payments?

Answer: Yes _____✔_____     No _____

~~ii.     That Kmart was required to disclose these facts under Item 303 of Regulation S-K?~~

~~Answer: Yes _____✔_____     No _____~~

iii.     That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes _____✔_____     No _____

iv.     That the omitted facts were material?

Answer: Yes _____✔_____     No _____

v.     That Kmart acted with intent to defraud or with reckless disregard for the truth?

Answer: Yes _____✔_____     No _____

e.     With respect to the alleged omission from the Management Discussion & Analysis section of Kmart's Form 10-Q that it did not identify the **delay in vendor payments as a material change in an internal source of liquidity** during the third quarter of 2001,

131

      i.      That the delay in vendor payments was a material change in an internal source of liquidity during the third quarter of 2001?

            Answer: Yes _____✔_____     No _____

~~ii.~~ ~~That Kmart was required to disclose this fact under Item 303 of Regulation S-K?~~

            ~~Answer: Yes _____✔_____~~     ~~No _____~~

      iii.     That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

            Answer: Yes _____✔_____     No _____

      iv.     That the omitted fact was material?

            Answer: Yes _____✔_____     No _____

      v.     That Kmart acted with intent to defraud or with reckless disregard for the truth?

            Answer: Yes _____✔_____     No _____

2.     That Charles Conaway had a general awareness that his role was part of an overall activity that was improper?

         Answer: Yes _____✔_____     No _____

3.     That Charles Conaway knowingly assisted Kmart in its violation of Section 10(b) and Rule 10b-5?

         Answer: Yes _____✔_____     No _____

4.     That Charles Conaway substantially assisted Kmart in its violation of Section 10(b) and Rule 10b-5?

         Answer: Yes _____✔_____     No _____

Did Charles Conaway aid and abet one or more violations by Kmart

Corporation of Section 10(b) of the Securities Exchange Act of 1934 and
Rule 10b-5 promulgated thereunder as to the Kmart Form 10-Q for the
quarterly period ending October 31, 2001?

Answer: Yes ____✔____     No _____

Thus, it seems that the jury instructions and Verdict Form  –  with or without the

requirement that the jury find that the three omitted facts were required to be disclosed by

Item 303 of Regulation S-K  –  charged the jury on their need to find all of the necessary

elements of a Section 10(b) and Rule 10b-5 violation.   The findings on the Verdict Form ,

under either scenario, support a finding under Claim Two of a Section 10(b) and Rule

10b-5 violation by Kmart and Defendant Conaway aiding and abetting that violation.

The jury findings on each of the three omissions that

(1.) the omitted fact was material, and

(2.) that the omitted fact was necessary in order to make the Management
Discussion & Analysis section of the Form 10-Q, in light of the circumstances
under which it was made, not misleading

are sufficient to establish a Kmart Section 10(b) and Rule 10b-5 violation in Claim Two.

While the Defense would have liked more directed language in Instruction Number

21 to what a reasonable investor would have understood regarding the requirements of

Item 303, it is believed that with the testimony of Dr. Carmichael, the testimony of

investment analyst Beder on what were his concerns regarding the Form 10-Q(3) and the

related conference call, the Form 10-Q(3), the Jury Instructions on what was to be

provided to investors, and the related Verdict Form, the jury had an adequate basis, when

combined with their general knowledge and experience, to determine whether the MD&A

section on "LIQUIDITY AND FINANCIAL CONDITIONS" section of the 10-Q(3) was

133

materially misleading due to the fact that a reasonable investor could read it as indicating

that Kmart experienced no change in the third quarter of 2001 regarding a material

liquidity event, a material liquidity deficiency or a material source of liquidity because

that was the section of the Form where federal regulations required such material changes

to be disclosed.  Thus, it cannot be said that the instructions on the Section 10(b) and Rule

10b-5 in Claim Two, when viewed as a whole, were confusing, misleading or prejudicial.

It is believed that the jury had an adequate understanding of the law concerning the

alleged securities fraud violation standard to be applied in this case.

### C.  Claim One – Defendant Conaway's Violation of Section 10(b) of the Exchange Act .

Defendant's legal arguments on the asserted errors related to jury instructions on

Regulation S-K Item 303 and Section 10(b) and Rule 10b-5, discussed above in relation to

the aiding and abetting Claim Two, are also made with respect to Claim One regarding

Mr. Conaway's primary liability for violations of Section 10(b) and Rule 10b-5.   The

legal analysis and conclusion is the same with respect to both claims.

Under Claim One Mr. Conaway also challenged Instruction Number 20 and the

SEC's case law and facts regarding whether he could be found to have caused the

misstatements or omissions in the Form 10-Q(3) which he did not prepare or sign and

denies having read prior to its filing.  Discussed in greater detail below, the jury was told

that the SEC need not prove that Mr. Conaway signed, drafted, or wrote the Form 10-Q so

long as the SEC proved that he caused the false statement or caused the material

omissions to be made.   Because the cases cited by the government to support a finding of

primary liability against a person who did not directly make the alleged misstatement are

highly fact dependent, it is believed that the Defendant's arguments challenging this Claim One Instruction Number 20 on the facts of this case are best considered in Section III of this opinion along with the Defendant's multiple and substantial other claims that the evidence in this case is insufficient to uphold the jury's findings of liability on any of the claims. **III. DEFENDANT CONAWAY'S CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE.**

### A. Sufficiency of the Evidence Legal Standard.

The Sixth Circuit follows a "policy of reluctance to overturn the jury's verdict" based on the sufficiency of the evidence. *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 821 (6th Cir. 2000). A court may grant such a motion when it is of the opinion that the verdict is against "the clear weight of the evidence." *Id.* at 820. However, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence "unless that verdict was unreasonable," *Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir. 1996). Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper. *See id.* at 1048. "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Duncan v. Duncan, 377 F.2d 49, 52 (6th Cir.1967)* (citation omitted). .

### B. Credibility Issues Regarding Defendant Conaway.

Defense counsel in their reply brief (Dkt. # 153. P. 1) indicate that Mr. Conaway should be granted judgment as a matter of law because of facts independent of Mr. Conaway's credibility. Yet, on Claim One whether there is sufficient evidence to uphold

the jury finding that Mr. Conaway caused the MD&A of the 10-Q(3) not to include the overbuy or the exceptional system of slow paying vendors that Kmart undertook, and whether  he did this with adequate scienter, are fact questions critically dependent on Mr. Conaway's credibility as well as others upon whom he relies. If there is sufficient evidence to uphold Claim One, such evidence would also be adequate to uphold Claims Two and Three.  Clearly, if Mr. Conaway's version of the facts were accepted, the jury would have reached a different result on Claim One and the other two claims.  Thus, before reviewing the sufficiency of the evidence of the three claims it warrants a review of the various areas where, viewing the evidence in the light most favorable to the SEC, the jury could reasonably have found Mr. Conaway to have acted in misleading ways, where they could have found that he outright lied to various individuals or groups, and where the jury could have found that he lied under oath in his deposition or at trial.

The pattern of such misrepresentations could have been found by the jury to chart a clear course of covering up the magnitude of Kmart's liquidity crisis in the third quarter of 2001 triggered in large part by the Schwartz overbuy, a further pattern of covering up the extraordinary steps taken to slow pay vendors, and finally his involvement in contriving and repeatedly publishing a false cover story involving the eLMO systems convention.  The evidence upon which the jury found that Mr. Conaway caused the omissions from the MD&A in the 10-Q(3) rest in a significant degree on what Mr. Conaway said, what he did, what he maintained silence on when others, such as Mr. McDonald, did or said things that could be found to be deceptive.

          1.     *Mr. Conaway's Involvement in Misleading Financial Representations to the Board.*

136

Mr. Conaway clearly knew by the end of August 2001 of the "outrageous" overbuy that "blindsided" his CFO Boyer. By mid-August Assistant Treasurer Moreland was forecasting negative liquidity exceeding $100 million by Kmart's peak borrowing date of November 9. (Plf. Exh 4, at p. 2 & 4.) A negative liquidity of $67 million on October 10 was projected in the August 31, 2001, Liquidity Forecast, which factored in the $850 million August 8 - September 5 incremental overbuy information. (Plaintiff's Exh. 7, at p. 1 & 2.) Moreland indicated this forecast went to the ELT to help determine how to manage Kmart's liquidity problem, and was not given to the Board. (Moreland June 27, 2007, at TrDep00053-56.) An interim liquidity forecast, using a + 5% comparative sales for the third and fourth quarter over the prior year, showed a $ 217 million liquidity cushion on November 9. (Plf. Exh. 5., at p. 2 & 3) The "final" version that went to the Board's Finance Committee in mid-August showed a $544 million liquidity cushion. (Plf. Exh. 6, p. 2 & 4.) Similar optimistic liquidity cushion forecasts were made by John McDonald and Charles Conaway in a September 10 power point presentation to their bankers.

Defense counsel asserted at trial that while companies run a wide variety of positive and negative scenarios on the future, the figures on liquidity given to the Board were the management's best estimate of the realistic forecast. While the jury could possibly accept this as true for the August figures given to the Board, or possibly the September 10 figures given the bankers, a jury's confidence in whether the Board and Kmart's bankers were getting what Kmart's management objectively thought were the most realistic figures could start to erode in light of the Mr. Moreland September 9

137

projections prepared for Mr. Conaway and his ELT showing Kmart exceeded its

borrowing capacity by $455 - $641.8 million on November 7. (Plf. Exhs. 9 & 10.) While

Kmart's rosy hopes for a 3% increase in sales in the third quarter with its new BlueLight

Always strategy might be considered reasonable by the jury as late as September 10 when

Mr. Conaway made his Bank presentation, the jury could legitimately have found that

after the September 11, 2001, terrorist attach even a zero comp sales projection was

optimistic, and thus Moreland's liquidity deficit of over half a billion dollars (with its

$600 million reduction in future receipts of inventory and zero comp sales) was the

scenario that should have guided a forthright CEO, at least in disclosures that could be

made in confidence to his Board of Directors. (Plf. Exh. 12.) (Board Member Stallkamp

testified that certain information could be provided to the Board in confidence that could

be used in overseeing the company for the benefit of the stockholders. Stallkamp 5/18/09

at Tr00774-75.) Thus, while showing a $449 million contraction from the August 10 $544

million liquidity cushion, a jury could find the $96 million liquidity cushion forecast in the

September 17, 2001, Board Package (Plf,. Exh. 65) was not being forthright with the

Board in light of the multiple negative liquidity forecasts being run for Mr. Conaway and

his ELT which the jury could conclude were the more realistic scenarios.

Were this the only evidence of efforts to mislead the Board and others about

Kmart's liquidity situation it might not be worthy of mention. While denied by Mr.

Conaway, the jury could also have believed Board member, and Board Finance

Committee Chairman, Thomas Stallkamp, when he testified that Mr. Conaway did not tell

the Board at the September or the October Board meetings about the Schwartz overbuy

nor about the two extraordinary and unilateral methods of dealing with the liquidity crisis

using the changes in the Accounts Payable System and the Moreland system (i.e. Project

SID).  Mr. Stallkamp testified that it was his belief that all changes in vendor payment

terms discussed with him and the Board in August, September and October had been

negotiated with the vendors.  (Stallkamp 5/18/09, at Tr00730-31, Tr00836,  Tr00754-55,

Tr00758-59, Tr00769-71, & Tr00774.)   Mr. Stallkamp, as who served in various

executive positions in supply and purchasing in his twenty years at Chrysler including its

1980's turnaround, had experience in dealing with past due billings to supply chain

vendors.  (*Id.* at Tr00707-08.) He testified had he been informed about these slow pay

practices at Kmart in the fall of 2001, it would have been significant and he would have

opposed such unilateral action, which beached contractual payment terms and upset

suppliers, particularly for a retail company like Kmart that did not make a product and was

totally dependant on good relations with its vendors to supply product to operate.  ( *Id.* at

Tr00779-81.)

A jury could also conclude that management's October 18 Board package (Plf.

Exh. 114, at p. 27) was not being honest with the Board when it  projected a $158 million

liquidity cushion for Kmart's peak borrowing date.  It was not disclosed that this positive

liquidity cushion was built on unilateral and undisclosed stretching of vendors beyond

terms amounting to over $900 million as of October 18 when this forecast was made.[62]

---

[62] Mr. Moreland noted that the liquidity cushion numbers in October would have been
worse if the effects of Project SID were factored in. (Moreland 6/27/07, at TrDep00074.)
Plaintiff's Exhibits 289A & 20 show $628 million in vendor borrowings under project SID on
October 18 and an estimated additional $300 million in AP System borrowings from hardline
vendors.  Gilbert and Moreland make it clear that the $300 million in AP System delays were in

The jury could conclude that these $900 million were committed funds, and such sums should have been subtracted from the liquidity cushion in order to make an honest presentation to the Board.  Board Member Stallkamp testified that he understood the liquidity cushion to be calculated after all of the bills were paid. (Stallkamp 5/18/09, at Tr00745.)   The jury could also conclude that by early October, those most informed at Kmart had abandoned hopes that improved sales from the prior year would readily bail Kmart out of its liquidity problems. On October 4, 2001, the working group who were deselecting invoices for payment and managing the cash crisis  – Messrs. McDonald and Kearse, Jellinek and Moreland  – believed Kmart faced  negative 3% comparable sales until Thanksgiving and cumulative negative cash flow into December.  (Plf. Exh. 18, at p.2,  Moreland 6/27/07, at  TrDep00072-73.)

2.   Mr. Conaway's Misleading Statements and Actions at Kmart.

a. *The Growing Debt, Vendor "Noise" and Talking Points:* By October 12 it was known that Kmart's sales were flat for September compared to the prior year while Walmart and Target's sales increased. (Plf. Exhs. 71 at p. 1, & 114 at p. 3.)  With the introduction of the AP System changes and Project SID, vendor calls and complaints were escalating.   Growing concerns of vendors gained wider publicity.  The extensive October 25 New York Times article noted payments stopped in September without explanation and questioned if Kmart was seeking "to squeeze vendors." (Def. Exh. 22A at p.  2.)  Two days later Mr. Conaway received an urgent email from CFO Boyer noting the growing

---

addition to the delays caused by prioritizing invoices under Project SID.  (Gilbert 5/13/09, at Tr00404; Moreland 6/27/07, at TrDep00073-74 & Moreland 4/23/09, at TrDep00143-46 & TrDep00150 & TrDep00163-64.)

difficulty in managing "the mounting payment issue with vendors" and "the 'noise level' coming from our vendor community and their factors is increasing." (Plf. Exh. 76.)   He warned Mr. Conaway that increased purchases forecast for November would prevent Kmart being "able to work down our nearly $800 million in past due invoices." Kmart responded to the rumors and vendor complaints with Talking Points to give its merchants and others a consistent story to explain the vendor payment delays.  While Mr. Conaway denied seeing or knowing what was in Talking Points (Plf. Exh. 35), a reasonable jury could conclude that the core message of Talking Points –  blaming the delays in payments to vendors as being caused by terming logic problems in Project eLMO – came out of a November 2, 2001, meeting of Mr. Conaway with the core members of his ELT including Mark Schwartz, Jeff Boyer and Cecil Kearse.  Treasurer McDonald was called up to the meeting to take notes on what became Talking Points.  (McDonald 5/28/09, Tr02646.) The jury could conclude that Mr. Conaway knew that the real reasons vendors were not being paid was Kmart's intentional implementation of the AP System changes and Project SID with his knowledge and concurrence because of Kmart's liquidity problems.

    b. *The November 13 Levin Letter*: The jury could conclude that Mr. Conaway knowingly repeated this false story involving a "breakdown . . . on our hardline and soft line integration" to Jerry Levin, CEO of Sunbeam, in his letter of  November 13. (Plf. Exh. 112.)  It was clear from Mr. Levin's faxed letter of November 12 that he had been told the delays in payment were due to "the difficulty of a major system change" (i.e. eLMO). (Plf. Exh. 107.) The jury could reasonably conclude that because the eLMO conversion project was adding the softlines at Kmart to the eLMO system that already

141

handled the hardlines, that eLMO would not cause a problem with payment of hardline vendors like Sunbeam.[63]   Thus the jury could reasonable conclude that Mr. Conaway's reference to the hardline and soft line computer integration breakdown in his letter to Mr. Levin was a knowing misrepresentation.

c. *Conaway Statement to the New York Times*:  With the second and longer New York Times article of November 8 raising questions of  "Kmart's ability to pay off the money it owes," the jury could conclude that Mr. Conaway's statement to the Times that "Kmart is not short of cash" was another knowing misrepresentation to cover up the liquidity crisis.  (Def. Exh. 23A, at p. 4.)

d. *Conaway's November 14 Voice Mail to his Employees*: There  jury could also reasonably conclude that Mr. Conaway's Voice Mail message to his employees on November 14 that "nothing could be further from the truth" in reference to rumors that Kmart was 1.5 billion dollars behind with its vendors was misleading when Moreland's documents indicated Kmart was behind nearly one billion dollars on November 14.[64]  (Plf. Exh. 318, Nov. 14, 2001, at p. 56.)  The jury could conclude Mr. Conaway made other

---

[63] Mr. Gilbert made it clear that Project eLMO affected only the addition of softline items, nothing in that conversion caused problems in paying invoices excepting a few softline invoicing issues that were corrected before their due date, and nothing in eLMO caused late payments on hardline invoices that were not affected by the conversion. (Gilbert 5/13/09 at Tr00424-26.)  There was no eLMO terming logic problem in project eLMO. (*Id.* at Tr00429-30.) Mr. Archambeau who was responsible for Project eLMO as it related to accounts payable confirmed it hand no effect of Kmart's ability to pay vendors and any softline "glitches" were identified and corrected before the invoice due date. (Archambeau 5/13/09 at Tr00502 & Tr00505-06.)   The eLMO cover story was a "total falsehood." (*Id.* at Tr00506.)

[64] Plaintiff's Exhibits 289A & 20 show $653 million in vendor borrowings under project SID on November 14 and an estimated additional $300 million in AP System borrowings from hardline vendors.

false and misleading statement in that message when, after acknowledging Kmart did

"push suppliers hard," he said:

> The company couldn't be any healthier from a working capital standpoint
> and the realty is [ ] in fact all vendors are almost current. Within the next
> seven to ten days we will be a hundred percent current. We have great
> liquidity.  We have some $250 million of excess in our credit revolver . . . .

(*Id.* at 57.)

In reality on November 14 any remainder on the credit revolver was built on the

nearly billion dollars in overdue invoices and on November 22 Kmart was not "a hundred

percent current" with its vendors, but could be found by the jury to still be over $700

million behind.[65]

e. *Conaway's November 27 Meeting with Employees*: On November 27, the day of

the analyst conference call, many Kmart employees were assembled to hear from Mr.

Conway in person. A videotape of that employee meeting was shown to the jury. (Plf.

Exh. 232 videotape.)  The jury could have found several statements made in that address

to be misrepresentations. After acknowledging "Now the reality is, did we stretch some of

our suppliers too far? Absolutely. That's a fact. The reality is, as we sit today, people are

being paid, and they're being paid based on the terms we negotiated." *Ibid.*  The jury

could find that on November 27 many, if not most, Kmart vendors were not being paid on

negotiated terms.  Mr. Conaway added:

> Now you say, Chuck, where does all the noise come from? Well, clearly
> some of it is we pushed people too hard, we've had some systems issues.

---

[65] Plaintiff's Exhibits 289A & 20 show $479 million in vendor borrowings under project
SID on November 23 and an estimated additional $300 million in AP System borrowings from
hardline vendors.

> The other thing is, people don't realize, we've cut out 25 percent of our
> vendor base.

*Ibid.*

Here, of the three reasons that Conaway identified as causing the noise from

vendors , the jury could find that two were accurate, but the third, suggesting "systems

issues," was yet another effort of Mr. Conaway to push the false eLMO cover story.  Mr.

Conaway added: "We have 600 -- as we stand here today, we have 600 million dollars of

borrowing capacity on our credit facility and 400 million dollars of cash. Right, John? Is

that the number?" (*Ibid*.) The jury could find the $600 million statement to be misleading

and was another Conaway misrepresentation to mask Kmart's liquidity problem  because

on November 27 any existing borrowing capacity on the revolver  was built on over $500

million overdue to Kmart's vendors.[66] The jury could also conclude that Mr. Conaway

misrepresented the facts to his employees when he said:

> Now a lot of businesses, growth businesses, they're actually cash flow
> negative. When you're in a certain spot you can do that. We're not there.
> So the reality of the health of the business, with those facts, we're very
> healthy. We have a very healthy business.

The jury could reasonably find that on November 27, when the overdue vendor invoices

were taken into account, Kmart was "cash flow negative" in reality, and not "a very

healthy business."

f. *Conaway's November 27 Conference Call*: In addition to the Conaway

statements in the November 27 conference call that the SEC specifically challenged as

---

[66] Plaintiff's Exhibits 289A & 20 show $263 million in vendor borrowings under project
SID on November 27 and an estimated additional $300 million in AP System borrowings from
hardline vendors.

misleading in its complaint (and which will be discussed below under the sufficiency of

the evidence analysis) the jury could also have reasonably concluded that Mr. Conaway

made or acquiesced in Mr. McDonald making other misleading statements in that

conference call.

In the conference call, Mr. Conaway repeated the statement made to the employees

group that:

> as of today, we have over $600 million in borrowing capacity over our
> existing credit facility and over $400 million in cash. And at any point of
> time, during any point during the entire year, we've had a minimum of
> $300 million in cash on hand."

Plf. Exh.  242 at p. 20.

Assistant Treasurer Moreland characterized this statement as a "creative way of looking at

the balance sheet." (Moreland 6/27/07, at TrDep00092-93.)  He made it clear that the

$300 million in cash or cash equivalents was not available for use in operations to pay

bills or payroll because this cash was needed to operate the Kmart's 2,000 stores which

each had 20-25 cash registers.  (*Id.* at TrDep00093.)

Mr. McDonald asserted:

> As we discussed last quarter, we're aggressively pursuing competitive
> payment cycles. This is not a blanket policy to extend terms. We are
> working with vendors individually, partnering with them to create the right
> and the best relationship for both parties.

(Plf. Exh. 242,  at p. 17 )

Mr. Moreland testified that this assertion did not characterize what Kmart was doing in the

third quarter with Project SID which was not "partnering with vendors."  (Moreland

6/27/07, at TrDep00092.)

145

The jury could reasonably conclude that these statements were misrepresentations and efforts by Conaway and McDonald, with Conaway's acquiescence,  to mask the true liquidity situation of Kmart in the third quarter of 2001 and to mask the fact that the overwhelming number of vendors who were disgruntled were not being negotiated with over terms, but were being stretched by Kmart's unilateral actions.

 Mr. McDonald noted the new eLMO integration of hardlines and softlines and its "new accounts payable system"

> This system implementation did have some issues along the way. As of today, the majority of the issues related to our accounts payable system . . . have been resolved. We're nearly caught up concerning our processing.

Plf. Exh. 231 and 242, p. 18.

In addition to the portion of the conference call specifically challenged in the complaint, Mr. Conaway also referred to the "systems issues" mentioned by Mr. McDonald and added "This has been corrected and it's working, as planned."  (*Id.* at p. 20.)   The jury could reasonably conclude that, because there was no eLMO systems problems causing accounts payable delays, these were misstatements by McDonald, reiterated by Mr. Conaway, to support the Kmart cover story of Talking Points that the late payments were due to eLMO's systems problems and not because of intentional decisions by Mr. Conaway and his subordinates.  The jury could also have reasonably concluded that when later, in response to Mr. Beder's question, Mr. Conaway repeated "right now, systems fully integrated [a]nd its working fine," that was another misrepresentation supporting the Talking Points cover story that eLMO had systems issues in terming logic that needed to be corrected. (*Id.* at 29.)  Immediately following this

146

Conaway statement, Mr. McDonald added  "we're fully caught up at this point as I said. And, you know, we're on our way. I don't see any further integration issues as relates to the – to the vendors." (*Ibid.*)  The jury could conclude that with Kmart  being over $500 million behind in vendor payments according to Mr. Moreland's exhibits, this was another false statement by Mr. McDonald in which Mr. Conaway acquiesced by his silence.

      g. *Conaway's Lies to his Board*:  In addition to the misstatements the jury could find Mr. Conway made to vendor Levin, to his employees in person and in Voice Mails and to analysts at the conference call, the jury could also find that Mr. Conaway told lies to his Board of Directors.  Board Finance Chair Thomas Stallkamp testified that while increases in inventory were disclosed to the Board in August and later in the September and October Board materials, it was not revealed that this was not with the approval of CEO Conaway and, until November,  he believed it was in accord with the plan.[67] (Stallkamp 5/18/09, at  Tr00729 & Tr00766-68.)    He testified that he learned about the President Mark Schwartz's August $850 dollar overbuy that Conaway had not approved at

---

[67] Although  the August Inventory Summary on page 29 of the 37 page September Board Package noted a negative $825 million  inventory variance to "commitment" or plan, which Mr. Conaway identified as the "overbuy," the jury may not have believed Mr. Conaway in his suggestion that this indicated Mr. Stallkamp was mistaken in saying the Board was not told about the Mark Schwartz unauthorized overbuy until November. (Conaway, 5/27/09 at Tr02122-23, Def. Exh. 119, p 29.)  There is no evidence that this page 27, and Mr. Schwartz's unauthorized overbuy, was discussed at the September Board meeting that had to be shortened and done by telephone due to 9/11's impact on airline transportation. While this Board package exhibit has Mr. Conaway's handwritten notes and things underlined or circled in various sections to show items Mr. Conaway may have wanted to highlight for the Board, this $825 million inventory has no such notation, underlining or circle. The Board minutes (Plf. Exh. 66) make no reference to any overbuy, and Mr. Conaway's September 20, 2001, follow up letter to the Board is similarly silent on any "overbuy," and indeed talks about a need for "an additional $300-500 million more inventory in the immediate term." (Plf. Exh. 113 p.2.)

147

the November Finance Committee meeting the day before the Board meeting.  (*Id. at* Tr00797.)   The Board was upset at this unauthorized purchase at a time when liquidity was tight, and they asked for a meeting alone with CEO Conaway after the Board dinner. Mr. Stallkamp testified that Mr. Conaway told the Board that they had not been informed of this earlier in August, September or October because he was not aware of it then.  (*Id. at* Tr00797.)   The jury could have found that Mr. Conaway lied to the Board about when he learned of the Schwartz overbuy to justify his not earlier explaining to the Board the dimensions of the overbuy and the degree to which it aggravated the liquidity situation in the third quarter.

The jury could also have credited Mr. Stallkamp's testimony over that of Mr. Conaway and found that at a November breakfast meeting, where Mr., Stallkamp expressed concern over the rumors in the press about vendors not being paid on time, that Mr. Conaway told him the eLMO cover story to explain the vendor payment problem. (*Id. at* Tr00801-03.)   The jury could also have believed Mr. Stallkamp that Mr. Conaway repeated this eLMO  IT explanation to the full Board at their November Board dinner and again to Mr. Stallkamp at a second breakfast meeting in December.  (*Id.* at Tr00804-05.)

The jury also might have questioned Mr. Conaway's representation in his December 29, 2001, letter to the Board that, after disclosing sales being off 2.6% in November and down 4% in December,  he stated "As we have now passed our peak borrowing date and we have renegotiated our short term credit facility we are comfortable with our working capital going into fiscal year 2002." (Plf. Exh. 183, p. 2.)  While evidence about Kmart's January 22, 2002, bankruptcy was excluded from the trial, the

148

jurors were aware from the testimony of Mr. Gilbert and Mr. Archambeau that in December after Project SID had been suspended for a couple week, it was necessary to start it up again the week before Christmas, and they interpreted this as meaning Kmart was again short of money.  (Gilbert 5/13/09, at Tr00439-43 & TR00463-4;  Archambeau 5/13/09, at Tr00512.)    Both also testified that Kmart was never completely caught up with its vendors, and while Project SID had a short hiatus in December, the roughly $300 million dollar AP System changes continued through December and into January. (Gilbert 5/13/09, at Tr00439-43 & TR00464; Archambeau  5/13/09, at Tr00513.)   While Mr. Conaway testified that these AP System changes were intended to be permanent, there is no other evidence supporting this nor suggesting this unilateral change was agreed to by the vendors or the Board. (Conaway 5/27/09 at Tr02084-85.)  Again, the AP Systems changes were identified  by Mr. Conaway as an accounts payable management tool separate from the extended dating changes that started payment terms from the date of receipt and not the date of order.  (Conaway 2/13/08, at TrDep00338.)

    3.  <u>Mr. Conaway's Misrepresentations Under Oath.</u>

   In addition to the multiple times the jury could find Mr. Conway acted in deceitful ways while CEO at Kmart, there are an equal number of times the jury could have found he misrepresented matters while under oath.

   The jury could have believed Board member Stallkamp that Mr. Conaway did not inform the Board in August, September, October or November of his decision to unilaterally add days to payment terms without the consent of the vendors. (Stallkamp 5/18/09 at Tr00730-31, Tr00740-41,Tr00773-74,  Tr00779, & Tr00798.) Thus, the jury

could have found that Mr. Conaway was not leveling with them when he suggested in his testimony that he did disclose this to the Board at the September and October telephonic Board meetings. (See text and transcript discussing Conaway 5/27/09 at *Id.* at Tr02116-17 and at  Tr02144 in **I. BACKGROUND FACTS C. Communications with the Board**. above.)

The jury could believe that had Mr. Conaway disclosed to the Board, or to Mr. Stallkamp individually,  that he approved unilateral delays in payments without the consent of the vendors, Mr. Stallkamp would not have forgotten this because he testified that he would have opposed this move and raised it with the Board as to "what's going on."  (Stallkamp 5/18/09, at Tr00741& 00781.)  In support of Mr. Stallkamp's testimony, CFO Boyer, who participated in the August, September and October board meetings, did not believe the Board had been adequately informed about Kmart's unilateral decisions and believed there was a need at the November 20 Board meeting to "have a conversation with the board that would clarify all elements of our cash management system, including Project SID." (Boyer 7/19/07, at TrDep00399-40.)

Similarly, the jury could have disbelieved Mr. Conaway's testimony that his use of the term " manage . . .  account  payables" in paragraph b. of his September 20 letter to the Board meant unilaterally stretching or slow paying vendors "separate and above from supplier terms" as "I explained to them in the September Board Meeting."  (Conaway 5/27/09, at Tr02132.)  The jury could have believed that the most that was actually disclosed to the Board in the fall of 2001 were: (i.)  The "extended dating" unilateral changes with vendor knowledge that Kmart would pay from the date of receipt of goods and no longer from the date of the purchase order; and (ii.) efforts to negotiate with

150

vendors for better, more competitive terms, under the working capital initiative described by Messrs. Moreland, Boyer and Archambeau.  (Moreland 6/27/07, at TrDep00099; Boyer 7/19/07, at TrDep00382-83; Archambeau, 5/13/09 at Tr00470-71.)    Mr. Conaway's handwritten notes  – "extended dating – supplier terms" –  on his September Board package could be interpreted by the jury that these were the two items Mr. Conaway discussed with the Board, and not the unilateral and more dramatic delays in vendor payments imposed by the AP System changes and Project SID. (Def. Exh. 119, at p. 20.)

While disputed by Defendant that the AP System changes were a temporary response to the Schwartz overbuy (Conaway 5/27/09 at Tr02084-85), the jury could conclude that unlike extended dating or the working capital initiative that began before the Schwartz overbuy, the AP System change undertaken in August and September were, like Project SID, a measure taken in response to the Schwartz overbuy in order to maintain Kmart's liquidity.  The testimony of Gilbert, Archambeau and Moreland was that these AP System changes were implemented in mid-August and in early September in response to the cash management problem caused by the August overbuy.  (Plf. Exh. 159, Gilbert 5/13/09, at Tr00359 &  Tr00363; Archambeau 5/13/09 , at Tr00472-73; Moreland 4/23/09, at TrDep00145-45.) Plaintiff's Exhibit 20, page 3, notes "cash flow management changes," including the two waves of the AP System changes, that were instituted "[s]ince August . . . .", and the dates on Plaintiff's Exhibits 159 and 135 support that testimony. At the time he implemented the AP System changes in mid-August, Mr. Gilbert, assistant controller of accounts payable, was told the liquidity problem caused by the Schwartz overbuy was a short term problem that should be resolved by the end of September.

Gilbert 5/13/09 at Tr00361.)  Mr. Archambeau also testified that he believed the AP

System changes were temporary. (Archambeau 5/13/09, at Tr00479.)

The jury could conclude that Mr. Conaway's false testimony on the AP System

changes being permanent was intended to support his defense thesis that Kmart was

caught up with paying its vendors in early December (and thus slow pay was not a

"material" event in the third quarter of 2001). Mr. Archambeau testified that the AP

Systems changes continued throughout 2001 and Mr. Gilbert confirmed that Kmart was

never within 200 million dollars of being caught up with vendors in 2001. (Archambeau

5/13/09, at Tr00512; Gilbert 5/13/09, at  TR00464.)

While Mr. Conaway may have told the Board at the October telephonic meeting

that they were trying to get from a 33 day payment cycle to 38-41 days as his October

Board package notes indicate (Plf. Exh. 27, at sec00125305), the jury could find that there

was no clear disclosure that this was being done unilaterally as opposed to being

negotiated with vendors as Mr. Stallkamp thought. (Conaway 5/27/09, at Tr02143-44.)

The jury could also have disbelieved Mr. Conaway's testimony that he talked with

Mr. Stallkamp at his November breakfast meeting about  "stretching vendors" and

"prioritizing invoices." (*Id.* Tr02145-46.) The jury reasonably could have believed Mr.

Stallkamp's testimony that denied being told about this unilateral program by Mr.

Conaway at the November breakfast meeting and said Mr. Conaway blamed the vendor

payment delays on an unintentional eLMO "IT system glitch" what would be fixed.

(Stallkamp 5/18/09, at Tr00802-03.)

The jury could reasonably determine that the reason that Mr. Conaway was trying

152

to convince them that he had disclosed to the Board and to Mr. Stallkamp the unilateral

imposition of extended terms on vendors was to support his defense premise that Kmart's

slow paying of vendors and Project SID were not a secret.  Having the jury believe Project

SID and intentional slow pay were not a secret would support Mr. Conaway's  defense

theory that he had no desire, and gave no direct or indirect message to Mr. McDonald, that

slow pay or Project SID were not to be disclosed in the MD&A of the 10-Q(3).   While

Kmart may have had a reputation, as Mr. Stallkamp and Mr. Gilbert confirmed (Stallkamp

5/18/2009, at Tr0089, Gilbert 5/13/09 at Tr00453-54.), of being a bit late in paying

vendors such as mailing payment on the due date, the jury could reasonably have credited

the testimony of Ms. Lindsey and  Messrs. Moreland, Gilbert and Archambeau that the

extraordinary and unprecedented slow pay efforts of the AP System Changes and Project

SID were kept to a small group of Kmart employees, and were not generally known at

Kmart or to the public.  (Lindsey 5/18/09, at Tr00638-29 "behind closed doors"; Moreland

6/27/07,  at TrDep00026 "very limited"; Gilbert 5/13/09 at Tr00392 "top secret"

&Tr00488 not "publically" known at Kmart; Archambeau, 5/13/09, at Tr00487-88; see

also Kearse 5/20/09, at Tr01138 "not speaking to cash flow or slow pay would be the best

course.")   The September 2001 "Project SID Process Overview" (Plf. Exh. 11)

presentation to Conaway was headed "***Confidential***" and Mr. McDonald before

leaving took Conaway's copy noting he "did not need to have it." (Moreland 6/27/07, at

TrDep00027.)  Indeed a jury could conclude that Project SID, and probably the AP

System  changes, would not have worked had they been generally known, because if

widely known a far greater number of vendors would likely have stopped or threatened to

stop shipping without prior payment.  The jury could also have determined that maintaining the secrecy of these unilateral efforts was the reason Messrs Conaway, Kearse, McDonald and others on the ELT knew Kmart needed a consistent cover story, which gave birth to Talking Points and the fabricated eLMO terming logic lie.  The fact that the cover story for the one billion dollar slow pay schemes in late-October and in November  began to unravel in the press and in "rumors" at Kmart (Lindsey 5/18/09, at Tr00696)  – possibly leading to Mr. Conaway's November 14 and  27 admission to his employees that Kmart "pushed suppliers hard," or "pushed [vendors] too hard" and "stretch[ed] some of our suppliers too far" (Plf. Exh. 232 videotape)  – does not mean efforts were not made to keep it a secret.

In addition to the jury reasonably concluding that Mr. Conaway was deceiving them in his testimony that Project SID and the bulk of Kmart's unilateral efforts to slow pay vendors were not a secret and were revealed to the Board, the jury could also believe that Mr. Conaway lied to them when he repeatedly asserted that he did not know what vendors were being told and when he told them  "I assume anything that we put in a talking point would be truthful." (Conaway 2/13/08, at TrDep00333,  TrDep00339, TrDep00340, TrDep00341,TrDep00342 & Conaway 5/28/09, at Tr02631.)   The jury could reasonably have determined that Mr. Conaway's "maximum feasible deniability" defense was based in part on his being "out of the loop" in not knowing what was in Talking Points, and thus not knowing what vendors were being told, his belief that whatever McDonald and Kearse came up with in Talking Points was truthful, and his belief, allegedly from his senior vice-president over the $8 billion apparel and jewelry

154

softlines (Nagler 4/18/08, at TrDep00346), that eLMO actually caused major invoices payment problems that was putting her part of the BlueLight Always initiative in jeopardy.  The jury could reasonably conclude that all of these premises were based on Conaway lies.

The jury could reasonably determine that Mr. Conaway knew full well that the major "noise" coming from the vendor community was because of Project SID that he approved the week after Labor Day 2001.  He and the ELT got weekly reports in their discussions concerning liquidity, and his CFO in an October 27 "I'm very worried" email told him that with their being $800 million behind in "past due invoices" "the situation is getting more difficult to manage and the 'noise level' coming from the vendor community and their factors is increasing." (Plf. Exh. 76.)

The jury could reasonably conclude that Mr. Conaway did not believe Project eLMO was causing any significant invoice payment problems, and that he patently lied under oath when he testified that Lorna Nagler told him that "they couldn't process invoices" because of Project eLMO and that her part of  BlueLight Always was in jeopardy because of system integration issues of Project eLMO and the inability to process invoices. (Conaway 2/13/08, at TrDep00334-35.)  Lorna Nagler testified that she had no knowledge of project eLMO causing problems with invoices being paid, and she would have been made aware of that had it been a problem . (Nagler 4/18/08, at TrDep00349.) She was also clear that she never told Mr. Conaway that they "could not process invoices because of Project eLMO" or that her part of BlueLight Always was in jeopardy because of  because of Project eLMO or "eLMO system integration issues." (*Id.*

155

*at* TrDep00351.)

The jury could reasonably conclude that in order to bolster his claim that he did not know what vendors were being told or what was in Talking Points, Mr. Conaway chose to deny his multiple uses of the Talking Points central eLMO lie. Thus, Mr. Conaway denied at trial writing the November 13 letter to Sunbeam's CEO Levin. Regarding the letter to Mr Levin, with what the jury could conclude were eLMO code words – "breakdown . . . on our hardline and soft line integration" – the jury could reasonably believe Mr. Conaway's earlier deposition testimony where he testified that he likely dictated the letter by voicemail from the field. (Plf. Exh. 108; Conaway 1/22/03, at TrDep00309-10.)

In addition the jury could have reasonably concluded that Mr. Conaway lied to them at trial when he denied telling Mr. Stallkamp and the Board that the only reason for the delay in vendor payments was problems with eLMO.  (Conaway 1/22/03 at Tr02147-48.) The jury could reasonably believe the contrary testimony of Mr. Stallkamp that he and later the Board in November were not given any other reason than the eLMO "IT system glitch" story for the vendor payment delays.  (Stallkamp 5/18/09, at Tr00802-05.)

Given the multiple facts that: (i.) this eLMO storyline was the direct product of a November 2 meeting Mr. Conaway had with  Mark Schwartz, Jeff Boyer and Cecil Kearse; (ii.) to which Treasurer McDonald was called up after the meeting to take notes on what became Talking Points (McDonald 5/28/09, Tr02646); (iii.) Conaway's Outlook Calendar for November 2 showed an entry "Vendor Talking Points w/ John, Cecil, Mark,

Jeff" (Plf. Exh. 190 at November 2, 2001); and (iv.) Mr. Conaway on multiple occasions used variants of the eLMO systems integration issues cover story, the jury could reasonably believe that Mr. Conaway was fully aware that Talking Points had the eLMO excuse as its central premise and his denials under oath of knowing what was in Talking Points or what vendors were being told were lies.

Mr. Conaway asserted that the most important thing vendors cared about was when they would be paid, not the reasons they were not being paid.  (Conaway 2/13/08, at TrDep00339)  It is unclear if Mr. Conaway actually believed this or asserted it as an indirect partial justification for Talking Points that was closer to the truth for most vendors that they would be paid by  the "end of November" or "Early December" than it was on why they were not being paid on time.  Yet, if Mr. Conaway actually did believe, as he told the jury, that vendors did think why they were not being paid was not so important to them – and would not threaten or stop shipping if they knew it was because Kmart faced a major cash crisis – then the jury could question why Conaway, Kearse and McDonald went to such an elaborate top down step of getting Talking Points drafted to assure all vendors would be given a consistent and plausible excuse for why vendors were being paid late.

Regarding what vendors were being told when they called to ask about their grossly overdue invoices, it is somewhat unclear if Mr. Conaway thought giving them only the eLMO excuse was a lie, or merely "not disclosing." [68]

_____

[68]  After Mr. Conaway identified 6 things that affected timing of vendor payments – 1. the AP System changes, 2. extended dating to date of receipt of goods, 3. prioritizing invoices (SID), 4. moving softline vendors from 30-60 days, 5. other unspecified policy changes, and 6. eLMO,

Possibly the most significant conflict in the testimony involved the November 8, 2001, meeting with CFO Boyer and Mr. Conaway that led to Boyer's discharge. That morning the New York Times questioned "Kmart's ability to pay off the money it owes," to which Mr. Conaway responded "Kmart is not short of cash." (Def. Exh. 23A, at p. 4.) It was two weeks after Mr. Boyer's "I'm very worried" email to Conaway warning of the increasing vendor "noise level" over Kmart's $800 million delinquency on "past due invoices." (Plf. Exh. 76.) Mr. Boyer testified they went through each of the 27 page PowerPoint document that he provided Mr Conaway and the meeting ended calmly with Mr. Conaway approving Mr. Boyer contacting Jay Henderson, an independent PWC partner in Chicago, to provide a quality review on Kmart's accounting methods for vendor

---

the following exchange took place:

> Q. You would agree, would you not, -- you would agree with me that there is never an appropriate reason that would justify you or Kmart people lying to vendors?
> A. Yeah, I don't think you have to lie. No. I don't think that that's appropriate. That's not necessary. You clearly don't have to disclose everything, but you don't have to  lie to them.
> Q. So in your view if you don't disclose everything that's going on when they ask a question and what you don't disclose would be responsive to their question that's not lying?
> A. No. No, I --
> Q. That's not lying?
> A. If they ask a question, yes. And you determine that you're not going to disclose the information to them, no, that's not disclosing. That's not lying.
> Q. No, no, you are disclosing. You're disclosing one-sixth of the information, eLMO?
> A. Right.
> Q. That's not lying?
> A. Well, that's inaccurate then, yes.
> Q. That's a lie?
> A. If -- if the reason --if that is not directly pertaining to it, yes.

(Conaway 2/13/08, at TrDep00338-00344.)

assessments. (Boyer 7/19/07, at TrDep00395 & at TrDep00411, Plf. Exh. 97.)   Conaway

testified repeatedly that Boyer never got past the Jim Adamson talking points which

would have been the first 8 pages of the 27 page presentation. (Conaway, 5/28/09,  at

Tr02510-13.)  Boyer then raised the allowances issue again, questioned the integrity of

Kmart's PWC chief auditor, Joseph Murphy, and suggested a "strategic bankruptcy."

(Conaway, 5/27/09, at Tr02176-85.)   Mr. Conaway said he realized he had to let Boyer

go. (Conaway, 5/27/09, at Tr02186.)  Far from the calm ending Boyer described, Mr.

Conaway said he told Boyer his claims were serious and his decision making was flawed

concerning Murphy, "[i]rrational", and he had serious concerns about Boyer's ability and

behavior and responsibility as a fiduciary agent for the company. (Id., at Tr02187-88.)

On cross examination, Mr. Conaway specifically denied reviewing the page that covered

"Credibility" issues with the Board, Rating Agencies, Banks and the Street, and which

page also noted Kmart "[m]ay need to plan for bankruptcy filing" as a financing

contingency, and ended "Discuss issues with the Board at November Board Meeting." (Plf.

Exh. 97, at p. 18, JNB 000023, Conaway, 5/28/09, at Tr02512-13.)  He denied that the

writing and doodling on a prior page including an arrow and box at the lower right corner

was his (Plf. Exh. 97, at p. 17, JNB 000020, Conaway, 5/28/09, at Tr02510.)   He also

denied that the arrows and circles on a subsequent page were his. (Plf. Exh. 97, at p. 22,

JNB 000027, Conaway, 5/28/09, at Tr02513-14.) When shown his acknowledged

doodlings on the October Board package, he again denied the November 8 doodles on

Exhibit 97 were his.  (Compare Plf. Exh 27, p. 2, SEC00125305 with Plf. Exh. 97, at p.

22, JNB 000027.)  He said the arrows were different, apparently referring to the solid

159

headed arrows on the October Board Package and non-solid headed arrows on the

November 8 exhibit. Yet, were one to compare November 8 arrows with his

acknowledged doodlings on his September Board package, similar non-solid headed

arrows were found on several pages (Compare Plf. Exh. 97, at p. 22, JNB 000027 with

Def. Exh 119 at DP 027202,  DP 027217, DP 027219, DP 027222, DP 027223.)  Also if

Mr. Conaway was suggesting his arrows had solid headed arrow, one of those is also

found on what was likely his copy of the November 8 Boyer presentation. (Compare Plf.

Exh. 97, at p. 2, JNB 000007.)  On page 27 of the November 8 Boyer presentation, in

handwriting similar to that of Mr. Conaway on his September and October board package,

is written the name "Jay Henderson," the PWC partner in Chicago that Boyer used to

work for and whom he recommended do another review of the vendor allowances issues.

(Boyer 7/19/07, at TrDep00411; Compare Plf. Exh. 97, at p. 22, JNB 000032 with Plf.

Exh 27, p. 2, SEC00125305 & Def. Exh 119, at p. 3-12.)[69]  This is not to suggest the jury

made these arrowhead and handwriting comparison, but given the general similarity of the

doodlings, arrows, circles and small hand writing on each of these three exhibits which the

jury had shown to them at various points in the trial, given the limited number of people

who might have written or made  marks this November 8 Boyer one-on-one presentation,

and given the motive for Mr. Conaway to deny making the multiple markings past page 8

of the exhibit, the jury could reasonably disbelieve Mr. Conaway's denials concerning the

---

[69] Given the limited number of persons who would have had access to this Power Point presentation, and given the fact that Jeff Boyer would likely have no need to make a notation of the name "Jay Henderson," his former work colleague, it is plausible that Mr. Conaway wrote this name on page 27of his copy of the presentation when Boyer mentioned this individual.

handwriting and doodling on the November 8 Boyer exhibit, and further disbelieve his denial of reviewing pages after page 8 as Mr. Boyer testified they did.  The jury could reasonably believe that Mr. Conaway did not want to acknowledge his CFO raising with him on November 8 "Credibility" issues with the Board, Rating Agencies, Banks and Wall Street.  The jury could reasonably believe that Mr. Conaway did not want to acknowledge his CFO raising with him on November 8 the need for a discussion of these financing issues, and likely the hundreds of million in past payments occasioned by Project SID, at the upcoming November 20 Board Meeting.

The jury could reasonably conclude that after Mr. Boyer's  October 27  email and his 27 page PowerPoint presentation to Mr. Conaway on November 8,  Mr. Conaway realized that he had a CFO who was highly scrupulous and  "very worried", not just about how Kmart booked its allowances, but also about Kmart's mountains of debt, and about the non-disclosure to the Board and others of how that debt  was actually being managed through Project SID.  The jury could conclude that Conaway realized that his CFO wanted to start working on improving Kmart's credibility problems at the November 20 Board meeting with a discussion of the financing issues including the "[s]ignificantly negative – close to $500 million negative" cashflow shown on that same page of his presentation. (Plf. Exh. 97, at p. 22, JNB 000032.)  The jury could reasonably believe that Mr. Conaway did not level with them when he said the reason he decided to fire Mr. Boyer was because of his revisiting the allowances issue and questioning the independence of their auditor, Joseph Murphy.  As the jury could recognize, and as testified to by Board member Stallkamp, at this point in Kmart's turnaround efforts, this was a bad time to fire a CFO.

161

(Stallkamp, 5/18/09, atTr00790.) The allowances and Murphy issues could have been

managed by Mr. Conaway with his Board Audit Committee Chair James Adamson and

with his Finance Committee Chair Stallkamp, at least for a couple more months until

Kmart worked its way through the cash crisis it was facing and the new 365 day bank

credit revolver was renewed in December.  The jury could reasonably believe that Mr.

Conaway did not level with them when he said the other reason he decided to fire Mr.

Boyer was because he suggested a "strategic" bankruptcy.  While Mr. Boyer's November

8 presentation did raise the "financing contingency plan" that "may" include the "need to

plan for bankruptcy filing" (Plf. Exh. 97, at p. 18, JNB 000023), and Mr. Boyer may have

identified in that meeting financial advantages bankruptcy relief might bring regarding

Kmart's closed and underperforming stores, the jury could reasonably believe that with

Kmart approaching one billion dollars in past due debt on November 8, that Kmart's

taking contingency plans that may involve bankruptcy was not about a strategic

bankruptcy that was  "ludicrous," "nonsensical, not necessary," as Conaway apparently

suggested to Mr. Stallkamp on November 8 and the Board the next day. (Stallkamp

5/18/09, at Tr00790.)[70]  Rather, the jury could reasonably believe it was a good faith

concern, one that Board member Stallkamp noted he would have made a difference in how

they viewed the Boyer discharge. (*Id.*)  The jury may also have believed that Mr.

Conaway not only exaggerated the "ludicrous" nature of Boyer suggesting a "strategic

bankruptcy" to justify his firing of him, but also exaggerated that Boyer was not a team

_____

[70]  Plaintiff's Exhibits 289A & 20  show $679million in vendor borrowings under project
SID on November 8 and an estimated additional $300 million in AP System borrowings from
hardline vendors.

player, and outright misrepresented the facts that Boyer "asked for a second opinion on an accounting issue outside of the normal channels without anybody's approval." (*Id.* at Tr00789.) The jury could reasonably believe that Mr. Boyer did not go outside the management structure and that he got Mr. Conaway's approval for all reviews of the allowances accounting review, including on November 8 in Conaway's authorizing followup with PWC's Jay Henderson.

The jury could reasonably believe that the central, or "but for," reason Conaway wanted Boyer out as CFO was Conaway's concerns about the degree to which Boyer wanted to level with the Board at the November 20 Board meeting about Project SID and the magnitude of the vendor stretching, the possible disclosure that the eLMO cover story was a lie, and finally, and probably of greatest significant, Mr. Conaway's concerns about how his CFO, after improving his "credibility" with the Board on November 20, would deal with the "credibility" issue with the other three audiences Boyer identified on November 8 – the Rating Agencies, the Banks and Wall Street. (Plf. Exh. 97, at p. 18, JNB 000023.) The disclosures to the Board could be done in confidence, but these three audiences Boyer thought Kmart had credibility problems with were "public." And as Mr. Boyer noted, the November 8 meeting with Mr. Conaway was not intended to discuss telling the public about Kmart's efforts involving stretching vendors, because "[t]he typical time that you would do that is in the preparation of a 10Q, and we had not started the preparation of the 10Q yet." (Boyer 7/19/07, at TrDep00415.) The jury could reasonably believe that as former CFO at CVS Pharmacy and later CFO at its parent corporation Melville Corporation (Conaway 5/27/09, at Tr02009) , Mr. Conway was also

163

well aware of that. Thus, the jury could reasonably conclude that after the November 8

meeting, Mr. Conaway realized the risks he faced to keeping from public disclosure

Project SID, and Kmart's extraordinary means of managing liquidity in the third quarter,

if Boyer remained as CFO in preparing the 10Q for Kmart's third quarter of 2001.   The

jury could reasonable believe, that the real reason Mr. Conaway fired Mr. Boyer was to

avoid the risks that his scrupulous, "very worried" CFO would push for fuller disclosures

on Kmart's liquidity problems and the means of dealing with them in the Form 10Q-(3)

than Mr. Conaway wanted given his belief and hope that the "cash crisis" would soon be

over.

### C.  Challenge to Claim One - Primary Liability for a Violation of Section 10(b) and Rule 10b-5.

Defendant's central and most appealing legal and sufficiency of the evidence

argument is that because "[i]t was undisputed at the trial that Mr. Conaway did not sign,

draft, edit, or even review the Management Discussion & Analysis ("MD&A") portion of

the Form 10-Q," and without contradiction he testified that he did not "tell anyone what

should or should not be included in it" then it follows "there was no evidence that Mr.

Conaway caused any false statements or omissions in the MD&A."  (Dkt.# 139, at p. 5-6.)

The jury was instructed:

> The SEC need not prove that Mr. Conaway personally made the misrepresentation or that he omitted the material fact.

> It is sufficient if the SEC establishes that Mr. Conaway caused the statement to be made or the fact to be omitted.

> The SEC need not prove that Mr. Conaway signed, drafted, or wrote the Form 10-Q filed with the SEC for Mr. Conaway to have made a

misrepresentation or omitted a material fact in the Form 10-Q so long as
you find Mr. Conaway, through his actions or inactions, sufficiently
responsible for what was said in the 10-Q or what was omitted that he
could fairly be said to have caused the false statement or caused the
material omissions to be made.  Mr. Conaway cannot be liable for a
statement based solely on his position in the company.

Jury Instruction No. 20.

In denying the Defendants Rule 50(a) motion while the jury was absent, I

reiterated "Mr. Conaway cannot be found liable for a statement based solely on his

position in the company" but noted that

his position is relevant and[,] when[ ] coupled with certain other actions
and certain acquiescence in the actions of others, can be the basis of
liability.
* * *
Certain roles of individuals and the [ ] power that comes with that
particular role could, in certain circumstances, be so powerful that
a hint becomes a directive to be followed.

5/21/09 Transcript, at Tr01351.

Analogizing to Henry II's lament leading to Archbishop Thomas Beckett's death,[71]

I noted that "Henry had signed no order. Henry had made no plans. Henry had read no

plans made by others for the execution. Henry had given no command. Yet, in the

aftermath, all of England rose up against Henry over this murder." (*Id.* at Tr01352-53.)

Defendant argues in its motions that :

There was, however, no evidence that Mr. Conaway made so much as a
hint that slow pay should be misrepresented in or omitted from the MD&A,
so this cannot be a basis for upholding the jury's verdict.

In fact, the "cues" or "hints" that Mr. Conaway was sending were just the
opposite, and could not have been interpreted as a directive that the slow

---

[71]  "[W]ill know one rid me of this troublesome priest?" (5/21/09 Transcript, at Tr01352.)

165

payment of vendors not be disclosed in the MD&A.

(Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, Dkt. #139, at 12.)

While defense counsel in their current motions argue that the evidence is overwhelming that Mr. Conaway never explicitly or implicitly directed that the slow payment of vendors be kept secret, and no evidence connects Mr. Conaway with the Form 10-Q, they rely on asserted facts and arguments made to the jury and apparently rejected by them. The facts asserted are that key witnesses, particularly former co-defendant McDonald, and Boyer, and Lindsey testified that slow pay was not a secret at Kmart in the third quarter of 2001, and that Conaway even discussed stretching vendors with his employees in blast emails mails and at group employee meetings. (McDonald 2/28/09, at Tr02653 & Tr02656; Boyer 7/19/07, at TrDep00387; Lindsey 5/18/09, at Tr00696.) McDonald even said that Project SID was discussed with employees at the Friday employee rally nearly every Friday. (McDonald 2/28/09, at Tr02656.) He testified he also told Mr. Stallkamp in November about prioritizing invoices after being asked how they were doing with getting caught up with vendors. (*Id*. at Tr02654.)

Yet, the jury could reasonably have disbelieved any testimony that prioritizing invoices and Project SID were not secrets, and the jury could rely on the testimony of Messrs Moreland, Gilbert and Archambeau as well as Lindsey that it was to be kept secret. Because he testified before McDonald, Mr. Stallkamp was not specifically questioned about any November 2001 meeting with McDonald on stretching vendors. Yet, Mr. Stallkamp had testified that he did not know about the intentional prioritizing of invoices or Project SID until the fall of 2002, and concerning the November 2001 press

166

and other rumors on vendor delays, he was satisfied with the only excuse given him which was the delay was caused by a "computer glitch."   (Stallkamp 5/18/09, at Tr00802-05 & Tr00814-14 Tr00851.)    Lindsey, McDonald's Secretary, who took his many calls from vendors, learned about Project SID from overhearing portions of the daily meetings Moreland and Gilbert had in McDonald's office, but she did not disclose that to McDonald because she was not supposed to know about Project SID and it was talked about behind closed doors. (Lindsey 5/18/09, at Tr00635-36 & Tr00638-39 .) She testified that the associates in accounts payable initially believed the late pay was due to the computer conversion, but "after a while" talk and rumors led some to know Kmart was selecting which vendors to pay. (*Id.* at Tr00696.)   In discounting certain of the McDonald testimony, the jury could also consider his potential bias because he had for years been a co-defendant and he settled with the SEC a month before trial because he "just had enough."  (McDonald 2/28/09, Tr02646-47.)  The jury could question McDonald's credibility when he testified he believed the eLMO story was the reason vendors were not being paid. ( *Id*. at Tr02634 & Tr02661.)  Even Mr. McDonald's asserted source for his alleged belief that eLMO was causing the late payment, Cecil Kearse, ultimately acknowledged to the jury that the cash flow problem, and "definitely not" eLMO,  was the cause of late payments. (*Id.*, at Tr02657 & Kearse 5/20/ 02, at Tr01206-07.)[72]  The jury could also have found that McDonald contradicted his earlier testimony that Project SID

_____

[72] Given Treasurer McDonald's close working relationship with Assistant Treasurer Mark Moreland –  who ran Project SID and reported on it regularly –  it would be difficult for a jury to accept that Mr. McDonald did not know that it was Project SID and the AP System changes, and not eLMO, that caused nearly all of the late payments in the third quarter of 2001.

was discussed nearly every Friday at the employees' meeting,  when McDonald later

denied that SID was discussed at the Friday meetings and noted that what was discussed

was about when vendor payments were going to be caught up.  (McDonald 2/28/09, at

Tr02661-62.)

In addition to arguing that the facts are insufficient to uphold a jury finding that

Mr. Conaway caused the misstatements and omissions in the 10-Q(3), the defense lawyers

argue that the SEC's cases also provide insufficient support for such a novel theory of

Defendant's alleged wrongdoing.

> None of the cases on which the Court relied for its holding on summary
> judgment that Mr. Conaway could be primarily liable if he caused the
> statements or omissions to be made even remotely suggests that primary
> liability could be imposed based on a mere hint, or on a perception by the
> actual speaker that the defendant would prefer that something not be
> disclosed.

(Defendant's Renewed Motion for Judgment, Dkt. #139, at p. 14.)

Defense counsel note that the SEC chose not to pursue control person liability

against Mr. Conaway for the actions of Mr. McDonald under Section 20(a) of the

Exchange Act, and thus must establish primary liability not because of Conaway's control

of McDonald, but based solely on Conaway's conduct. The defense team point out that all

of the cases cited by the SEC where primary liability was found even though the statement

at issue was not directly made or publically attributed to the defendant, the defendant

either was the originator of the statement and passed the statement on to a third party,

knowing it would then be communicated to investors, or the defendant created the

statement and was responsible for it having been issued. (Defendant's Reply

Memorandum in Support of His Renewed Motion for Judgment, Dkt. # 153, at p. 6) They

question the SEC's failure to discuss the facts or make any attempt to analogize to the

cases it cites in support of its liability theory.

Those cases are:  *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*,

399 F.3d 651, 686 n.29 (6th Cir. 2005), (primary liability may attach if the plaintiff can

show that the subsidiary "Firestone communicated misleading results to Bridgestone," its

parent, and thus that Firestone "was the originator of Bridgestone's misrepresentations"

about the quality of the Firestone ATX tire);  *In re Kidder Peabody Sec. Litig.*, 10 F. Supp.

2d 398, 407 (S.D.N.Y. 1998) (defendant subsidiary Kidder could be primarily liable for

misrepresentation by parent company, GE, where the Kidder was "the original and

knowing source of"  and  "controlled the content of the information" and "knew or should

have known that misrepresentation would be communicated to investors" by the parent

GE because "[w]hen GE opened its mouth regarding Kidder, Kidder's words came out";

*Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir. 1996) (defendant could be primarily

liable for making false statements to securities analysts and journalists where the

defendant intentionally used these third parties to disseminate false information to the

investing public); *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215, 1225-26 (10th Cir.

1996) (accountant's misrepresentation is actionable as a primary violation if it is shown

that he knew or should have known that his representation would be communicated to

investors); *SEC v. KPMG LLP,* 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006) (engagement

partners in the audit firm of Xerox were sufficiently responsible for audit opinion to be

considered "the source" of the opinion published by Xerox, and primary liability can

attach when "the individual was sufficiently responsible for the entity's speech such that

he could properly be said to have made the false statement), and two Rule 10b-5 a. cases *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1471 (2ⁿᵈ Cir. 1996) and *Scholnick v. Schecter,* 752 F. Supp. 1317 (E.D. Mich. 1990).

While the defense seeks to discount *First Jersey Securities* as not applicable because it involved control-person and scheme liability under Rule 10b-5 a., and not misrepresentation or omission liability under Rule 10b-5 b. as the present case, *First Jersey* did also involve primary liability – and not only control person liability – of Robert Brennan whose role as Chairman of the Board and Chief Executive Officer in orchestrating First Jersey's wrongdoings has some parallels in this case involving Chairman of the Board and Chief Executive Officer Conaway. *Id.* at 1271-72; Conaway 5/27/09, at Tr02010-11.) The *First Jersey* case notes, albeit likely in *dicta* that "[p]rimary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.' "(*Id.* at 1471, citing *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994)).[73] *First Jersey* also found that this central power factor Brennan "orchestrated every facet of First Jersey's branch office network" where the investors were misled. (*Id.* at 1459.) Defense is correct *First Jersey* was a fraudulent device or scheme case under Rule 10b-5

---

[73] *First Jersey* adopts this language but adds "primary liability" from *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517-20(2nd Cir.1994), a 10b-(5) b. case where the two defendants made the misrepresentations. *Azrielli* was decided two weeks before *Central Bank* and may have involved one or more other defendants who did not make the representation but assisted in the fraudulent deal. Because it cites a pre-*Central Bank* aiding and abetting case as support for this language, the *First Jersey* reference to "primary liability" goes beyond the holding of its supporting authority.

a., and not a misstatement/omissions case under Rule 10b-5 b., and thus did not involve

causing a statement to be made as the other cases cited by the SEC. [74]

While each of the Rule 10b-5 b. cases cited by the SEC  involved

misrepresentations and not omissions, there is no principled reason to find that the facts in

these cases exhaust the universe of factual patterns in which one can be found liable for

causing another to make or omit making certain statements.  It might be noted that the

precedential scope of this case will be limited in that Section 302(a) of the

Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745 (2002), now requires a

corporation's principal executive as well as its chief financial officer, to certify the

financial and other information contained in the issuer's quarterly and annual reports.[75]

Thus, legislation, and not a case such as this, restrains future CEO's deniability defense

that they did not prepare or sign deceptive quarterly or annual reports.

### D.    Evidence in the Record Supporting the Jury's Finding that Charles Conaway Caused the Form 10-Q Violations.

1.    <u>Evidence that Charles Conaway Caused the Three Omissions:</u>

In determining defendant Conaway's involvement in both the misleading

---

[74]
It is unclear why the SEC cited generally  *Scholnick v. Schecter,* 752 F. Supp. 1317 (E.D. Mich. 1990), a pre *Central Bank* case involving primary and aiding and abetting scheme liability, and not Rule 10b-5(b) liability, as least as originally pled.

[75] Sections 302(a)(2) and (3) of the Sarbanes-Oxley Act, 15 U.S.C. §§7241(a)(2) and (3), require certification by both the CEO and CFO that a quarterly or annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading; and that the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report.

statements and omissions in Kmart's 2001 Form 10-Q(3), the jury saw a corporate power structure with leadership exercised decisively, and often deceptively, from the top. As Kmart's Chief Executive Officer and Board Chairman, Conaway headed the company's response to the liquidity crisis in the third quarter of 2001 that threatened his historic turnaround efforts. While downplaying at trial his past working relations with John McDonald (Conaway 5/28/09, at Tr02381-82), the jury could have taken Conaway's words literally when in November 2001 he introduced McDonald to Kmart employees twice as being his "right hand person" for eight years at CVS and at Melville Corporation . (Plf. Exh. 318, November 12, 2001, at p. 6.) The jury could have concluded that throughout the period from the Schwartz August overbuy crisis through the November 27 analyst conference call, McDonald was the primary person at Conaway's right hand at each step and he was learning what his boss and benefactor wanted.

A central pillar of the Kmart response to the overbuy was to mask the fact that Kmart did not have the cash it needed to pay debts as they came due. As Treasurer, McDonald worked closely with Assistant Treasurer Mark Moreland and, like CEO Conaway, he knew the dire deficit predictions that Kmart faced if sales did not improve significantly from the prior year. Yet, McDonald churned out optimistic projections for the Board of Directors. It was he who prepared the Liquidity Forecast documents in the September Board Package. (Boyer 7/19/07, at TrDep00381.) He was also involved in the optimistic picture prepared for Kmart's bankers where McDonald made the September 10 presentation in tandem with Mr. Conaway showing comfortable liquidity for Kmart against its revolver. McDonald learned that even after 9/11 with its likely dire

consequences for sales, the lesson from the leader was to cover up the liquidity crisis and

its cause, even from the Board Finance Committee and other members of the Board to

whom Conaway promised liquidity would be his number one priority. (Plf. Exh. 113.)

Conaway wrote those words on September 20, just days after he met with McDonald and

Moreland and gave his full support to the birth of Project SID.  McDonald witnessed

Conaway endorsing Project SID and its "hung up in processing" element that would keep

vendors in the dark.  (Plf. Exh. 11; Moreland 6/27/07, at TrDep00025-26.)   The jury

could conclude that at that meeting Conaway confirmed for both Moreland and McDonald

the need for Project SID to be kept secret to prevent vendors from stopping shipments. (*Id.*

at TrDep00026-27.)  When Moreland indirectly raised the propriety of Project SID,

Conaway and McDonald's comforted him chuckling "that such a scheme is done in every

LBO."  (*Ibid.*) Before leaving Mr. McDonald retrieved the "***Confidential***  Project

SID Process Overview" memo, which the jury could interpret as the effort of a loyal

lieutenant to protect his boss in case the elaborate and deceptive scheme later came under

critical scrutiny.

When Workbench was shut down, this also was a necessary step to blind vendors

to the truth of Project SID.  Later McDonald's Talking Points would falsely blame the

Workbench shutdown as well as late payments to vendors on Project eLMO (Plf. Exh. 35),

even though McDonald knew it was shut down due to the volume of calls from unhappy

vendors to keep them in the dark.  (Conaway 2/13/08, at TrDep00332.)

While there is no evidence McDonald read Conaway's November 13 letter to

Sunbeam's Levin using the eLMO "hard lines and soft lines integration" excuse for late

payment (Plf. Exh.108), it is clear that McDonald knew the eLMO integration cover story which he used in response to the great number of calls he received. (Sabony 2/28/08, at TrDep00203-12; Beder 12/17/07, at TrDep00295; & Plf. Exh.193A.)  Mr. McDonald, on or about November 2, 2001, was called to Mr. Conaway's office to take notes on what became Talking Points. (McDonald 5/28/09, at Tr02645-46.)  The jury could conclude that in detailing the creation of Talking Points to McDonald, Conaway was directing McDonald to fabricate a script based on the eLMO "cover story" for Kmart's merchants and accounts payable people to communicate to vendors. While testifying that he believed Talking Points  was true and eLMO did cause vendor payment problems (McDonald 5/28/09, at Tr02657-58), the jury could conclude that Mr. McDonald, like Moreland, Gilbert, Archambeau and Kearse,  knew that Kmart's cash shortage, AP System changes and Project SID were the causes of vendor payment delays and not Project eLMO.  Indeed Moreland says it was McDonald who fabricated the "750,000 affected invoices" in Talking Points. (Moreland 6/ 27/ 07,  at TrDep00087.)

The jury could also assume that McDonald read the lengthy November 8 New York Times article that questioned "Kmart's ability to pay off the money it owes," to which Mr. Conaway responded "Kmart is not short of cash." (Def. Exh. 23A, at p. 4.)  The jury could conclude that Treasurer McDonald, who regularly met with Moreland and Gilbert on Project SID, knew the actual depths of Kmart's past due debt to its vendors, which involved over $700 million in early November (Plf. Exh. 289A.)  Thus, the jury could have reasonably determine that both on November 8 and on November 2,  Conaway was again reinforcing the lesson to subordinate McDonald that it was okay to lie in order

174

to cover for Kmart's liquidity crisis.  Indeed, the jury could conclude that the lesson of the Conaway New York Times statement and his November 2 Talking Points directive to McDonald was that lies were the expected response of Kmart's executive officers to cover for the liquidity crisis and for the intentional delays in vendor payments.

While there is no evidence that CFO Boyer involved his Treasurer McDonald in preparing the November 8 Power Point presentation for CEO Conaway that raised the "[s]ignificantly negative – close to $500 million negative" cashflow dilemma and urged fuller discussion on Kmart's financing at the November 20 Board meeting to improve credibility with the Board ( Plf. Exh. 97, at p. 22, JNB 000032), the jury could conclude that Mr. McDonald got a powerful message the next day from Conaway's firing of Boyer who, like McDonald, had been brought on at Kmart just months before.   In addition to McDonald being promoted to Boyer's CFO position on November 9, the jury could conclude that McDonald learned how tentative the tenure of that position was if the occupant was not a "team player."[76]

The jury could conclude that McDonald received Conaway's November 14 Voice Mail to his Employees with its "[Kmart] couldn't be any healthier from a working capital standpoint"/"[w]e have great liquidity" assertions. (Plf. Exh. 318, Nov. 14, 2001.) [77] The

---

[76] While one might also assume that Mr. McDonald would realize that Conaway could not possibly fire a second CFO without facing blistering Board and other scrutiny, the jury could conclude that there was nothing in the record indicating Mr. McDonald was as scrupulous as Boyer or a risk taker.

[77] Conaway tells him employees:
The company couldn't be any healthier from a working capital standpoint and the realty is [ ]  in fact all vendors are almost current.  Within the next seven to ten days we will be a hundred percent current. We have great liquidity.  We have

175

jury could also conclude that McDonald knew Kmart was at the time still nearly a billion dollars behind in vendor payments. [78] Thus, the jury could reasonably conclude that Mr. Conaway was again teaching McDonald that the executive officers at Kmart exaggerate or twist the truth when needed to cover Kmart's liquidity problems.

When the new CFO McDonald prepared the Board Package for the November 20 in person Board meeting, it reported an actual liquidity cushion of $97 million for the peak borrowing date of November 7, 2001, as opposed to the $158 liquidity cushion reported in the October Board forecast. (Compare Plf. Exh. 121, at CC-0096859 to Plf. Exh. 114, at p. 27, CC-0013601.)  Again, this liquidity cushion was built on vendor payment delays of Project SID and the AP System changes and the liquidity cushion was not, as the Board understood, computed "after all of the payables were accounted for." (Stallkamp 5/18/09 at  at Tr00745.)  As noted above, the jury could find the total committed funds for past due accounts payables on November 7 to be a billion dollars – $700 million being held back on November 7 under Project SID in addition to the $300 million under the AP System changes.  (Plf. Exh. 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163-64.)  Thus, the jury could conclude that instead of the liquidity cushion of $97 million on November 7 that McDonald reported to the Board, Kmart was illiquid by nearly a billion dollars.

Once elevated to CFO, the jury could conclude that McDonald attended the

---

some $250 million of excess in our credit revolver . . . .
(Plf. Exh. 318, Nov. 14, 2001 at 57.)

[78] Plaintiff's Exhibits 289A & 20  show $653 million in vendor borrowings under project SID on November 14 and an estimated additional $300 million in AP System borrowings from hardline vendors.

November Board functions (Plf. Exh. 121 shows McDonald made a Board Presentation at that meeting), and McDonald likely witnessed Conaway's tardy disclosures to the Board about the unauthorized Schwartz August overbuy.  He may also have witnessed Conaway's lie to the Board about Project eLMO causing the vendor payment delays and Conaway's further lie to the Board that he had not been aware of the Schwartz overbuy in August, September or October.

With the November Board package preparation and the Board meeting completed, with the Board still in the dark about Project SID or about the AP System changes being done without vendor consent, and with the Board comforted by the eLMO "cover story," the jury could conclude that Mr. Conaway had reason for confidence that his new CFO had passed his first test as his "right hand person," proving he was a team player not likely to rock the boat with the Board or others on "credibility" issues and "significantly negative" cashflows as Boyer had threatened.  The jury could conclude that Conaway needed no "one on one" with McDonald to be assured that the next critical documents to be prepared by McDonald – the 10-Q(3) and conference call script  – would make no unwanted disclosures concerning how Kmart had maintained its liquidity in the third quarter of 2001.

The jury could assume Mr. Conaway, as CEO, surely had access to the 10-Q(3) prior to its filing on November 27, notwithstanding his denials of having seen it. Also, as note above, the third quarter 2001 Conference Call Book introduced by Plaintiffs (Plf. Exh. 242), which included a copy of the Form 10-Q(3), contains the final hand-corrected conference script actually used, whereas Defendant's Exhibits 115 and 138 do not contain

177

either the final script nor the Form 10-Q(3). (Compare these exhibits to the actual

conference call transcript, Plf. Exh. 57.)  In my denial of Defendant's Rule 56 motion and

his Rule 50(a) motion, I determined that before facing the questions of a critical audience

in conjunction with the filing of the 10-Q(3), the jury could reasonably conclude that Mr.

Conaway did review the MD&A of the10-Q(3) to assure himself that nothing stated there

was inconsistent with his understanding of what was or was not to be disclosed in the

"LIQUIDITY AND FINANCIAL CONDITION" section.  While that reasoning still

stands, it is not necessary.  Both of those rulings were made before hearing Kurt

Eichenwald's statements that his studies of corporate fraud revealed the common

motivating factor is not greed but arrogance.[79]  Eichenwald's premise fits well the facts of

this case. The jury could have concluded that Mr. Conaway, with an arrogance that comes

with great power, was confident from his prior experiences with McDonald at Kmart and

before, and in reviewing the conference call script that had been prepared by McDonald,

that the MD&A in the10-Q(3), like the script, revealed no Kmart secrets that Conaway

and McDonald had been orchestrating for months, and the eLMO cover story was  still

viable for future use. The jury could find: that the conference call script and the Form 10-

Q were prepared in tandem under McDonald's direction; and that Conaway could be

certain that on an issue as central to the company as the liquidity crisis, the MD&A would

not contradict the statements he would read to the investing public on the conference call.

---

[79] Kurt Eichenwald, Author of THE INFORMANT, A TRUE STORY (Broadway Books 2000)
National Public Radio, WEEKEND EDITION SUNDAY, September 20, 2009, "The Serious Story
Behind The Informant,"  Liane Hanson Interview with Kurt Eichenwald.
http://www.npr.org/templates/player/mediaPlayer.html?action=1&t=3&islist=true&id=10&d=09
-20-2009, last visited September 20, 2009.

Conaway knew McDonald had been a trusted ally at every step in the conception and execution of Kmart's response to the liquidity crisis and the means and lies needed to cover that up.  Given Conaway's many lessons by example, including the importance of being a team player to survive at Kmart, the jury could reasonably conclude that Conaway knew the faithful McDonald would see to it that the Form 10-Q MD&A toed the party line and would not disclose Kmart's August overbuy, its negative impact on liquidity  and the intentional delay in pay scheme in discussing how Kmart handled its liquidity in the third quarter of 2001.[80]

The jury could also note that trusted colleague McDonald took the lead in the conference call in introducing the false eLMO systems integration excuse, noting "[t]his system implementation did have some issues along the way." (Plf. Exh. 57. at p. 18.) Conaway later picks up on this:

> We've clearly [caused] some systems issues, as John  mentioned.  During our accounts payables conversion, certain invoices involved with the integration were dropped and [this] has clearly caused some confusion" and [a]lso, given the magnitude of [process], system and people changes, we will have other bumps in the road, illustrated by the Elmo conversion.

(*Id.* at 19 & 25.)   The jury could also notice how eager, even obsequious, McDonald was during the call to help his boss complete sentences, for instance in Conaway's response to analyst Eric Beder who asked about vendor account payables.[81]  It is McDonald who

---

[80]  The jury, were it asked (which it was not), could find that the actions and examples of Mr. Conaway in dealing with Kmart's liquidity problem in the third quarter of 2001 sent a message to his "right hand person" McDonald that was far clearer that Henry II's lament, "Will no one rid me of this troublesome priest."

[81] Eric Beder:
And in terms of the vendors and the payables, what has been  the, I guess – what

179

reiterates the false statements that "As of the end of the third quarter, our (peak)

[borrowings] were approximately 1.4 billion which is comparable to last year.  We

continue to have ample liquidity under our credit lines, as well as cash on hand of greater

than $300 million." (Plf. Exh. 57, at 16.)  This was less of an exaggeration than

Conaway's statement that day to his employees.[82]

　　　At trial Mr. Conaway and McDonald both outlined the reasons they believed

Kmart was not going to run out of money after the overbuy because of various methods

they had available for raising cash – cutting future receipts, having clearance sales,

borrowing against merchandise or real estate, laying off employees, delaying capital

expenditures. (Conaway 5/27/09, at Tr02077-Tr02083; McDonald 5/28/09, at Tr02649-

---

　　　　　has been the biggest problem with the vendors.  I – should – have they had
　　　　　problems understanding what's going on here or are they just, you know, just
　　　　　want to get paid, I guess, quicker ?
(Plf. Exh. 57., at 28.)
Conaway:
　　　　　Well, I think we had – there was some clearly, Eric, some, you know,
　　　　　communication issues.  And so, that  was one piece.  We didn't communicate as
　　　　　quickly as we should.  And then, I think there is a – you know, there was a lot of
　　　　　noise from small group of suppliers.
McDonald:　　　Yeah, (inaudible) those who were part of the 25 percent (inaudible)
Conaway:
　　　　　Yeah, I mean, you got to remember, we cut a quarter of our suppliers.  So those
　　　　　people aren't very happy with us.  So other than that, that's it.  I mean, we're, like
　　　　　we said, right now, systems fully integrated [a]nd its working fine . . . .
McDonald:
　　　　　(inaudible) we're fully caught up at this point, as I said.  And, you know, we're on
　　　　　our  way.  I don't see any further integration issues as relates to the – the vendors.
*Id.* at 28-29.

　　　[82] Mr. Conaway stated: "We have 600 -- as we stand here today, we have 600 million
dollars of borrowing capacity on our credit facility and 400 million dollars of cash. Right, John?"
(Plf. Exh. 232 videotape)

Tr02652.)  Conaway chose not to pursue additional borrowing from banks because of the costs and because the overbuy problem was considered  "self -inflicted"  and in "six to ten weeks it would be over."  (Conaway 5/27/09, at Tr02081 & Tr02127.)  Yet, as McDonald acknowledged, that depended on sales.  (McDonald 5/28/09, at Tr02648.) And even with a good Thanksgiving, sales did not materialize as hoped.  Given the third quarter sales were below expectations, down 2.2% from the prior year's third quarter, the jury could note that the "six to ten weeks" from early September, peaking in early November, actually ran well beyond ten weeks and into December with venders never fully paid up – not within $200 million.  (Gilbert 5/13/09 at  TR00464.)  This was all known to McDonald and Conaway by the November 20 Board meeting. Thus the jury could conclude that what had begun as a self-inflicted problem that Conaway and his Treasurer McDonald though could be "managed" with SID grew to a billion dollar enterprise that Moreland noted was still not over when McDonald checked with him before the November 27th conference call.  (Moreland 6/27/07, at TrDep00091.)  By the time of filing the 10-Q(3) Conaway and McDonald no longer had the earlier option or the time for secured borrowing or any of the other options they had outlined as being available in September.  Had Conaway chosen any of the alternatives, most of which were relatively public actions, Kmart might have overcome the third quarter liquidity crisis and would not have faced a disclosure problem in late November.  But the decision made in September that was dependent on secrecy and deception, created a disclosure dilemma in November unless one accepts the defense theory that this was not a material liquidity event that required disclosure.  The jury could conclude that both Conaway and McDonald realized in late November that to disclose in

181

the MD&A or conference call either the overbuy and its accelerating the annual liquidity problems or to disclose Project SID and its intentional delay in vendor payments as a source of liquidity in the third quarter would expose their prior lies about why vendors were not being paid, and it would also expose their having kept the Board in the dark about how they were "managing" payables.  These were the "credibility" issues that Boyer wanted to address and the jury could conclude got Boyer fired.

From the above review of the evidence in the light most favorable to the SEC, a jury could reasonable conclude that CEO Conaway taught McDonald well what was expected of him and could conclude that Conaway caused the three material omissions in the MD&A to be made by McDonald. (Dkt. 129, Claim One Questions 3,4, & 5.) Coupling that with the jury's finding that the omissions rendered the MD&A misleading and that Mr. Conaway "acted with intent to defraud or with reckless disregard for the truth," which is discussed in a later section, these findings would support a finding that Mr. Conaway violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.   (*Ibid.*)

Because Rule 10b-5 b. makes it "unlawful for any person, directly or indirectly . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," it seems that if the SEC proves that an individual with scienter caused a statement to omit a material fact necessary to prevent the statement made from being misleading, that person causing the omission could be found liable for a Section 10(b) violation even if s/he did not "make" the statement that was rendered misleading because of the omission. While I have not

found any cases on point, it seems inconceivable that if someone, with scienter, caused a material omission to be made in a statement filed with the SEC resulting in the statement filed being materially misleading, that person could escape securities fraud liability in an SEC enforcement action by a defense that "the 'statement' was 'made' by someone else, whom I got to leave out the material information that made the statement fraudulent."[83]

As the defense points out, the cases cited by the SEC where an individual or entity was found indirectly liable under Rule 10b-5 b. all involved affirmative misstatements, not omissions, and thus each case addressed the conditions needed to find the defendant made the challenged misstatement. See discussion above on *City of Monroe Employees Retirement Sys.*, *In re Kidder Peabody Sec. Litig.*, *Warshaw*, etc. cases.  While indirectly causing a material omission in a statement may be less common than indirectly causing an "untrue statement of material fact," there is no principled reason to exempt from liability the defendant who indirectly caused the omission of a material fact when the harmful consequences to the investing public are the same.  Thus, because the jury in answering the Claim One questions 3,4, and 5  found with respect to each of the charged omissions that Charles Conaway: (i.) made the omission or caused the omission to be made; (ii.) the omission was material, (iii.) was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading;  and (iv.) that Charles Conaway acted with intent to defraud or with reckless disregard for the truth, these findings are sufficient to support their finding that

---

[83] Unlike a private securities fraud action, attribution and reliance are not required elements in SEC enforcement actions. *Compare  Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) and  *SEC v. First Jersey Securities,* 101 F.3d 1450, 1471 (2nd Cir.1996).

Charles Conaway violate Section 10(b) of the Securities Act and Rule 10b-5.

2. <u>Evidence that Charles Conaway Caused a Misstatement in the MD&A.</u>

In addition to its findings on the alleged fraudulent omissions, the jury made further findings under Claim One Questions 1 and 2 with respect to the two alleged affirmative misstatements in the MD&A of he Form 10-Q:

> Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities.

and

> Inventory increased … due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position.

(Plf . Exh. 209, at 13.)

With respect to each alleged misstatement the defense contends that the evidence is insufficient to uphold a the jury's finding that Charles Conaway made the statement or caused the statement to be made.  In addition the defense argues that both statements are factually true, and thus the evidence is insufficient for a jury to find that either statement is materially misleading.

a. *Was there a Materially Misleading Statement ?*

The first alleged misstatement:

> Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities.

(Plf . Exh. 209, at 13.)

Defendant notes that Assistant Treasurer Moreland  testified that this statements was true as did defense expert Avram Tucker. (Moreland 6/27/07, at TrDep00124; Tucker 5/21/09, at Tr01561.)  Mr. Tucker explained slow paying vendors was not a "source"

(where you get cash) of working capital like income from sales or borrowings from banks, but rather a decision about how to spend the cash you have. (Tucker 5/21/09, at Tr01564.) While delaying vendor payments is related to liquidity and managing liquidity, it is not a "source" of liquidity.  (*Id.* at Tr01565.)   According to Mr. Tucker, Kmart's only sources of working capital were – as it stated in the MD&A – cash flows from operations (i.e., sales) and borrowings under its revolver and other credit agreements.  Plaintiff's expert , Dr. Carmichael, defined sources of liquidity as  "how and where do they get the cash to keep operating," giving the same two examples of cash from sales and bank borrowings that Mr. Tucker gave . (Carmichael 5/21/09 at Tr01406-07.)   He later included in such sources of liquidity vendor payment delays as a material source of liquidity during the quarter. (*Id.* at Tr01438-39.)   He did not express a specific opinion that the statement in Kmart's MD&A was false.  Other witnesses suggested that adding days to payment terms were essentially extending the "loans" Kmart was getting from vendors. (Boyer 7/19/07, at TrDep00382; Moreland 6/27/07, at TrDep00011.)  The defense argument is that slow pay is not a primary source of liquidity or working capital, and thus the challenged sentence cannot be found to be materially misleading.

Given the fact that this challenged misstatement on the primary sources of working capital is the first sentence in the MD&A's section on LIQUIDITY AND FINANCIAL CONDITION, and the fact that a jury could conclude that "working capital" and "liquidity" were often used at Kmart to mean the same thing[84] – cash available for

---

[84] Referring to the Mr. Conaway's  "significant progress on several of our working capital initiatives" in his October 12, 2001, letter, Board finance chair Stallkamp interpreted "working capital" to be a synonym for liquidity.  (Stallkamp 5/18/09 at Tr00768, & Plf. Exh. # 71 &180, p.

operating expenses – the jury could have reasonably considered this sentence to assert that

Kmart's primary sources of liquidity in the third quarter were cash flows from operations

and borrowings under its credit revolver.

Statements that are literally true can be misleading when the context in which they

are made is considered.[85] This opening statement in the  LIQUIDITY AND FINANCIAL

_____

2.)  In his September 20, 2001, letter to the Board promising that liquidity would be his number one priority, Mr. Conaway notes at the beginning that cancelling inventory receipts, new accounts payable terms and reducing capital expenditures will help ensure "liquidity" and later refers to these elements as components of "working capital." (Compare Plf. Exh. # 113 p. 1 with p. 3.) In his November 14, 2001, Voice Mail to his employees in nearly the same breath he boast "The company couldn't be any healthier from a working capital standpoint . . . .We have great liquidity."  (Plf. Exh. 318, Nov. 14, 2001, at  at 57.)  Conaway's December 20, 2001, letter to the Board in the same paragraph refers to "our liquidity cushion" and "our  working capital position" in back to back sentences. (Plf. Exh.183, p.2.)  In cross examination at trial on Kmart possible approaches to dealing with its " liquidity problem" including the AP System changes and Project SID, Mr. Conaway was asked "And both intended to address the liquidity crunch during the third quarter of both of them?" to which he responded " Both of them a component of, yeah, managing our working capital plan during that."  While noting  "working capital" is current assets minus current liabilities, defense expert Tucker acknowledged that it is an important measure of liquidity" (Tucker, 5/21/09 at Tr01559, Tr01563 & Tr01566)  Even Defendant's brief on the current motion refers to "liquidity (i.e., working capital)" in arguing why slow paying vendors was not a source of working capital. (Def. Brief Dkt. # 139, at 19.)

[85]  *McMahan v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), reversed a district court's summary judgment noting:

> We disagree with the district court's atomistic consideration of the presentation of the debenture holders' right to tender. The district court concluded that defendants had not misled plaintiffs because the information they included in the written and oral representations was "literally true". We think, however, that when read as a whole, the defendants' representations connoted a richer message than that conveyed by a literal reading of the statements. The central issue on all three claims is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the debentures.

*See also  SEC v. C.R. Richmond Co.*, 565 F.2d 1101, 1106-07 (9th Cir. 1977) (advertisements violated antifraud provisions of Investment Advisors Act because they were "deceptive and misleading in their overall effect even though when narrowly and literally read, no single

CONDITION section of the MD&A is the major statement focusing on how Kmart maintained its liquidity in the third quarter, but makes no mention of an exceptional undertaking involving slow pay that was essential to Kmart's liquidity.

The sentence read as part of that entire section could be found to imply that the company's ordinary operations and existing credit revolver were the only primary sources of liquidity, and further that these two sources provided Kmart with enough liquidity to run the business in that quarter. A reasonable jury could find that Kmart's covert and unilateral slow pay initiatives of the AP System changes and Project SID, involving incremental "borrowings" from vendors of $1.09 billion on October 31,[86] were, as Dr. Carmichael testified, a material source of liquidity for Kmart in the third quarter of 2001. Given the fact that these "loans" from vendors, as Boyer and Moreland called them (Boyer 7/19/07, at TrDep00382; Moreland 6/ 27/ 07,  at TrDep00011), were at their peak approximately 68% of the $1.6 billion credit revolver, a jury could reasonable conclude

_____

statement of material fact was false."). *SEC v. Fitzgerald,* 135 F.Supp.2d 992, 1028 (N.D. Cal. 2001):

> A defendant's statements must be viewed as part of a mosaic to see if those statements, in the aggregate, created a misleading impression. The proper test is not the literal truth or the materiality of each positive statement, but the overall misleading impression that it combines to create.

(quoting *In re Genentech, Inc. Securities Litigation,* 1989 WL 106834 at *3 (N.D. Cal. 1989)). The court in *Genentech* explicitly rejected any requirement that plaintiffs in a securities fraud action "link every alleged omission to an affirmative statement and . . . explain how the omitted fact caused the affirmative statement to be misleading." 1989 WL 106834 at *3.


[86] Plf. Exh. 289 A shows $790 million on October 31, 2001, incremental borrowings from vendors by selecting certain invoices for 30 or more days delay under Project SID, and this figure does not include the additional estimated $300 million of incremental borrowings under the AP Systems changes. (Plf. Exh. 20.)

187

that they were a primary source of liquidity for Kmart in the third quarter of 2001.  Given

the largely undisputed evidence that this extraordinary slow pay system used in the third

quarter of 2001 was different is scope and magnitude from any prior period at Kmart, the

jury could find this to be a material change in sources of liquidity from any prior period at

Kmart.

Part of the context for this sentence for investors and the jury is also Kmart's prior

quarterly statement on liquidity. (Plf. Exh. 93.) When compared to the same section of the

Form 10-Q(2), as the jury was invited to do in closing argument, the sentence could be

read as indicating that during the third quarter of 2001 there had been no material change

in the primary sources of liquidity from the prior quarter of 2001. (*Compare* Plf.  Exhs. 93

with 209.) When read in light of Regulation S-K 303(b) requiring MD&A "discussion of

material changes in those items specifically listed in paragraph (a) of this Item" as the jury

was instructed (Instruction No. 21), the jury could find that this sentence, read with that

entire section on LIQUIDITY AND FINANCIAL CONDITION,  implied there that

during the third quarter of 2001  there had been no material change in Kmart's primary

sources of liquidity from the annual report for prior "*Full Fiscal Year[].*"  The jury in its

Verdict Form  under Claim One, Question 5 e., found the failure to "identify the delay in

vendor payments as a material change in an internal source of liquidity during the third

quarter of 2001" was a material omission.  It cannot be said that Kmart's covert

intentional slow pay scheme was so insignificant that no reasonable jury could have found

it to be material.  Rather the jury could reasonably find that disclosure of the

unprecedented slow pay system would have significantly altered the total mix of

information available to investors and would have been considered important to a

reasonable investor in making an investment decision involving Kmart.  Thus, considered

in context, the jury could reasonably find the sentence "Our primary sources of working

capital are cash flows from operations and borrowings under our credit facilities" to be

materially misleading without inclusion of the extraordinary slow pay system as a third

source of working capital or liquidity in the LIQUIDITY AND FINANCIAL

CONDITION section or elsewhere in the MD&A of the Form 10-Q(3).

> The second challenged sentence is:

> Inventory increased by $1,906  million during the first  39 weeks of fiscal
> year  2001 due to seasonal inventory fluctuations and actions taken  to
> improve our overall in-stock position.

Plf . Exh. 209, at 13.

It was given to the jury in an abbreviated form:

> Inventory increased … due to seasonal inventory fluctuations and actions taken to
> improve our overall in-stock position. . . .

Jury Instruction No. 21 and Verdict Form Claim One Question 1.

Again, while the Schwartz overbuy may have obtained merchandise earlier than

anticipated by Kmart's business plan, it was clearly obtained largely for the launch of

BlueLight Always and thus to improve Kmart's overall in-stock position as much

uncontested testimony demonstrated. (Moreland 6/ 27/ 07, TrDep00124 & TrDep00142;

Kearse 5/20/09 at Tr01254; Stallkamp 5/18/09, at Tr00827; Conaway 5/27/09, at

Tr02066-67.)  Again Moreland and others testified that this sentence was a true statement.

(Moreland 6/ 27/ 07, TrDep00124, Conaway 5/27/09, at Tr02240-41,Tucker 5/21/09, at

Tr01548.)  Defense expert Tucker demonstrated from an exhibit showing Kmart's weekly

189

purchases for both 2000 and 2001 (Def. Exh. 1) that by the end of the third quarter (week

39), the decreases in purchases compared to the prior year for weeks 34-39 more than

offset the excess purchases in the prior weeks 27-33 of that quarter which constituted the

Schwartz overbuy. (Tucker 5/21/09, at Tr01538-40.)  Defense Exhibit Number 1

demonstrates that by the end of the quarter Kmart had cut its receipts in weeks 34-39 by

roughly $949 million from 2000 levels more than enough to offset the $839 million

Schwartz overbuy for weeks 27 through 33.  Kearse testified the cuts in receipts did not

off-set the overbuy (Kearse 5/20/09, at Tr01273-74.)  Stallkamp testified and Kmart's

November Board package shows that Kmart at the end of the quarter still had $600

million more inventory for the year than its plan. (Stallkamp 5/18/09, at Tr00795-96; Plf.

Exh. 118, at CC-0096841.) Yet, that was the result of sales for the quarter being down

2.2%, or $180 million, as well as inventory being up $440 million for the full 39 weeks.

(*Id.* at CC-0096835 & Plf. Exh. 198 at p. 2.)  Defense Exhibit Number 1on Kmart's

purchases by week shows that the increase in inventory receipts over 2000 came from the

first 26 weeks of 2001 and not the third quarter (weeks 27-29) which had $110 million

fewer total receipts than in the third quarter of 2000.[87]

It is true that the Schwartz overbuy may have been a material liquidity event

(moving up the peak borrowing date) as Dr. Carmichael testified, causing a material

liquidity deficiency that Kmart remedied by slow pay of vendors (as well as reducing

---

[87] In an August 17, 2001, letter to the Board of Directors, Mr. Conaway told the Board
that the second quarter ended with $283 million more inventory than the prior year due in large
part to efforts to improve in-stock position for his new BlueLight Always sales initiative.  (Plf.
Exh. 110.)  The Form 10-Q(2) shows inventory increases of $457 million in the first 26 weeks of
the fiscal year. (Plf.  Exh. 93.)

receipts).  As a result, that overbuy, its effects and Kmart's response needed to be disclosed in the liquidity discussion of th MD&A in order to explain, in significant part, why Kmart had an unprecedented liquidity deficiency in that quarter, unlike prior quarters, so inventors could weigh whether this problem was likely to be repeated.  Yet that "failing" of the MD&A was found by the jury in Verdict Form finding in Claim One Question 3 on the omissions – "that Kmart's Form 10-Q . . . did not identify a known material liquidity event that occurred in the third quarter of 2001," which was the Schwartz overbuy.  Nothing in that overbuy in weeks 27-33, which was offset in weeks 34-39, affected the *purposes* of those increases in receipts for the first 39 weeks which were due to  seasonal inventory fluctuations (i.e. build up inventory before the Thanksgiving and Christmas  holiday season) and to improve Kmart's overall in-stock position for its BlueLight Always and other routine sales.

The SEC asserts this sentence is misleading because it implied the purchases were normal, made in the ordinary course of business ("seasonal inventory fluctuations") and that the inflated inventory balance at the end of the quarter was according to plan ("actions taken to improve our overall in-stock position.") Yet, in this 10-Q(3) Kmart omitted the adjective "normal" from "seasonal inventory fluctuations" that was in the 10-Q(2) (*Compare* Plf.  Exhs. 93 with 209 or see compare copy of the 10-Q(2) and 10-Q(3) above in subsection II. B. 3.)

The first challenged sentence dealing with Kmart's  primary sources of working capital being cash flows from operations and borrowings under its bank credit facilities could be found to imply that there is not a third primary source of liquidity.   The jury

191

could reasonably find that, contrary to the implication of this sentence, there was a third primary source of Kmart maintaining third quarter liquidity involving the one billion dollar slow pay scheme. Thus, the jury could find this sentence was materially misleading in suggesting that were only two, and not three, primary sources of liquidity in the third quarter of 2001. Yet, unlike this first challenged sentence, the second challenged sentence does not mask any third reason for why Kmart purchased $1.906 million more inventory in the first 39 weeks than in 2000. Nor does it touch on any topic for which it could be deemed a fraudulent half truth. Had the Schwartz overbuy of weeks 27-33 not been more than offset in weeks 34-39  – e.g had this inventory come in above plan in the final weeks of the third quarter causing the net inventory amount for the quarter to be inflated by those purchases – the SEC's argument would be stronger. But here we are dealing with the sum total of purchases for the first 39 weeks – which nets out the overbuy in weeks 27-33 with the reduced receipts in weeks 34-39. With the net receipts for the third quarter of 2001 being lower than third quarter of 2000, any increase in overall inventory as of October 31, 2001, is as much or more attributed to the 2.2% sales decline in the third quarter of 2001 (which is shown in Kmart's financials) and to increased purchases in the first 26 weeks of 2001 over 2000, than to Schwartz overbuy. Unlike the first challenged sentence that carries with it an implication that there is no a third primary source of working capital or liquidity , this second challenged sentence is not only factually true as far as it goes, but does not carry any false implication concerning liquidity or other matters that can be found materially misleading. Had I given the jury the full sentence instead of the fragment, their determination might have been different. Whether that is the case or not,

192

this finding as a basis for the Section 10(b) liability under Claim One and Claim Two should be vacated as not supported by sufficient evidence.

This is not to say that looking to the "LIQUIDITY AND FINANCIAL CONDITION" section of the MD&A as a whole, and comparing it to the MD&A for the second quarter of 2001, and comparing it to the material liquidity crunch in the third quarter, its cause and the extraordinary slow pay means used, in a substantial part, to deal with it, that the jury could not find the MD&A to be materially misleading as a whole in that it implies nothing significant with respect to liquidity occurred in the third quarter of 2001 compared to the second or other prior quarters.   But again, that failing of the MD&A was found by the jury in Verdict Form  Claim One Questions 2. 3. and 4.  when it found each of three omissions were necessary to be disclosed in order to make the MD&A not misleading.  As noted above, that jury finding can be upheld with or  without consideration of Item 303 of Regulation S-K .

                    b. *Did Conaway Cause the Misstatement* ?

Considering the other argument of Defendant that no jury could reasonably find that Mr. Conaway caused these misstatement to be made, this and the above sufficiency argument on the second alleged misstatement, are the Defendant's arguments causing me the greatest pause.  Viewing the evidence in the light most favorable to the SEC, how is it that a jury could be allowed to find that Mr. Conaway indirectly caused the "primary sources" misstatement to have been made?

The jury could conclude that McDonald, from the behaviors and decisions made by Conaway, knew that in addressing liquidity in the ""LIQUIDITY AND FINANCIAL

193

CONDITION" section of the MD&A, as a team player, he was to continue the Conaway inspired coverup of: (i.)  any material liquidity event such as the Schwartz overbuy occurring in the third quarter of 2001; (ii.) any material deficiency caused thereby, and (iii.) the extraordinary steps taken to maintain liquidity in the delay in vendor payments through the AP System changes and Project SID.  While reductions in new receipts in October offset the Schwartz overbuy of August and early September, the decline in sales of  $180 million or 2.2% for the quarter (down 1.5% for comparable stores) (Plf. Exh. 121, at CC-0096831 & CC-0096834 & CC-0096836; Def. Exh. 5, at CC-0577229), and additional receipts from he first 26 weeks of he fiscal year left CFO McDonald with inventories up $440 million or 5.6% above the prior year (Def. Exh. 5, at CC-0577230) and $600 million over plan (Plf. Exh. 121, at CC-009641-42). Kmart also had an increase in long term debt due within one year (i.e. the 365 day credit revolver) of $183 million or 62% over the prior year and an increase in accounts payable of $718 million up 28% from the $2.56 billion the prior year.  (Def. Exh. 5, at CC-0577230.)  With the dramatic increase in inventory and borrowings under the credit revolver and from vendors through the AP System changes and Project SID (i.e. the $718 million increase in accounts payables), Mr. McDonald had to discuss Kmart's liquidity in the MD&A "to give the investor an opportunity to look at the company through the eyes of management." [88]  Yet, the jury could conclude that Mr. Conaway had created an atmosphere where it was clear to Mr. McDonald knew that his CEO did not want disclosed a major source of Kmart's remaining liquid in the third quarter of 2001 – the extraordinary slow pay methods

---

[88] Securities Act Release No. 6711 (April 24, 1987) [ 52 FR 13715] at 13717.

194

McDonald and Conaway devised and implemented to manage Kmart's liquidity or working capital.

If McDonald were looking for guidance on how to deal in the MD&A with Kmart's dramatic increases in revolver borrowing and in accounts payable in the third quarter of 2001 and how to describe Kmart's liquidity or working capital situation without offending the CEO, he might look to the Form 10Q-(2) that CEO Conaway had signed on August 21, 2001. (Plf. Exh. 93, at p.10 & 14). The jury was invited by Plaintiff's counsel in closing to look at that document and compare it to the 10-Q(3). (Plf. Exh. 209, p.13.)

The "LIQUIDITY AND FINANCIAL CONDITION" sections of Form 10-Q(2) and Form 10-Q(3) both began:

> Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities.

Thus, the jury could find that the "primary sources" statement is identical to the MD&A statement Mr. Conaway made and signed the prior quarter. While a similar sentence may well be found in many prior Kmart MD&As, they were not put in evidence, nor is there any suggestion that such a sentence was misleading in any prior quarterly report. The only MD&A the jury had to compare to that prepared under, approved by and signed by McDonald in November 2001 was the August 2001 MD&A prepared under, approved by and signed by Mr. Conaway. The jury could reasonably conclude that "team player" McDonald, in determining what words to use in describing Kmart's liquidity without the risk of offending his boss, decided to use his boss's very own language from the MD&A in the Form 10-Q(2). To paraphrase *In re Kidder Peabody Sec. Litig.* "[w]hen [Kmart] opened its mouth regarding [liquidity in the Form 10-Q(3) MD&A],

195

[Conaway's] words came out."[89]  Thus, viewed in the light most favorable to the SEC,

there is sufficient evidence for a jury to find that Mr. Conaway caused the alleged

misstatement to be made.

### E.  Were the Conference Call Statements of Mr. Conaway violations of Section 10(b) and Rule 10b-5.

The defense also challenges the sufficiency of the evidence to uphold the jury's

verdict on the two challenged statements from the November 27, 2001, analyst conference

call.  The first was Mr. Conaway's statement,  "We've clearly caused some systems

issues, as John [McDonald] mentioned.  During our accounts payable conversion, certain

invoices involved with the integration were dropped and has clearly caused some

confusion."  (Jury Instruction No. 21; Plf. Exh. 57 at 20) The second alleged misstatement

was in response to an analyst Eric Beder's question, "And in terms of the vendors and the

payables, . . . what has been the biggest problem with the vendors?" to which Mr.

Conaway responded  ". . . And then, I just think there is a – you know, there was a lot of

noise from a small group of suppliers." (Plf. Exh. 57 at 28-29.)

Defense counsel argue that there was no evidence adduced at trial that the

challenged statements were material, or that they were made with fraudulent intent.  They

note that first challenged statement  regarding invoices being "dropped" was drawn from

the conference call scripted remarks that were vetted by the Chief Financial Officer

McDonald, General Counsel, Controller, head of investor relations, other attorneys,

accountants, financial professionals, outside auditor, and all of the Company's Executive

---

[89] *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d at 407.

Vice Presidents.   They note others indicated that eLMO caused invoice problems.

Defense argues that Mr. Conaway's statement about "a lot of noise from a small group of

suppliers" is so vague and non-specific as to be immaterial as a matter of law. *See City of*

*Monroe Employees Ret. Sys.,* 399 F.3d at 669 ("federal courts everywhere have

demonstrated a willingness to find immaterial as a matter of law … statements that are so

vague, [and] so lacking in specificity … that no reasonable investor could find them

important to the total mix of information available") (internal quotation omitted).

These statements cannot be evaluated in isolation from the surrounding facts and

circumstances to which they relate.  The jury could reasonably understand that Mr.

Conaway and McDonald, while acknowledging certain sales and other negative

information in the conference call that could not be masked, wanted to release the Form

10-Q(3) without disclosing the severity of the liquidity crisis in the third quarter, and

without disclosing the magnitude of the extraordinary slow pay system they had initiated.

While vendor payment delays were widely known, and inside Kmart and possibly in the

press the "secret" of Kmart's unilateral action may have begun to unravel and was

suspected by skeptics, the jury could find that Conaway and McDonald – in their own

actions and in their devising Talking Points in early November and in their November 27

remarks  –  were still trying to blame the bulk of the vendor complaints either on Project

eLMO or on the 25% of the Kmart vendors with whom Kmart stopped doing business

which was an added "excuse" for vendor complaints by November 27.  Again, the jury

could reasonably find that Project eLMO was "definitely not" the reason vendors were not

being paid (Kearse 5/20/09, at Tr01206-07; Gilbert 5/13/09, at Tr00505-56; Archambeau

5/13/09, at Tr00502 & Tr00505–06; Moreland 6/ 27/ 07, at TrDep00087). The jury could

further find that Mr. Conaway and McDonald , like Messrs Kearse, Moreland, Gilbert and

Archambeau, knew this and that any eLMO vendor payment problems were "very

isolated" if they existed at all.  (Archambeau 5/13/09,  at Tr00505.)    There was not

introduced into evidence even one documented vendor invoice payment delay caused by

Project eLMO, and the computer conversion according to Archambeau and Gilbert had no

effect on hardlines vendors that made up Kmart's largest group of vendors.[90]

      As noted before, as least two individuals on the conference call, analyst Eric Beder

and factor Maurice Sabony,  were interested in Kmart's liquidity given the negative

rumors and bad press.  (Beder 12/17/07, at TrDep00276;  Sabony 2/28/08, at

TrDep00212-13.)   Both were familiar with the eLMO systems story line prior to

November 27.  (Beder 12/17/07, at TrDep00282 ; Sabony 2/28/08, at TrDep00200-09 .)

In conference call preview notes Mr. Beder prepared for his investment clients the day

before the conference call, he outlines that the "Conference call must be forum to put to

bed continued stream of negative rumors and bad press."  (Plf. Exh. 174, p. 1; Beder

12/17/07, at TrDep002876 .)   He also referenced the  "newspaper reports questioning the

---

[90] Defense counsel point to other disclosures by Conaway earlier in the conference call
noting that  "[a]t the end of the third quarter, we increased the number of vendors participating in
Elmo from 30 to 230 …." (Plf. Exh. 57 at 4.)  They argue that Mr. Conaway made clear in this
statement that eLMO could only affect 1-2 ½ %  of Kmart's 5,000 - 7,000 vendors.  (Conaway
5/27/ 2009, at Tr02219-20.)  It would take a very sophisticated listener to tie this passing
reference on page 4 of the conference call script to either McDonald's statement on eLMO
implementation issues on page 18 or Conaway's accounts payable integration/dropped invoices
statement on page 20 of the script.  Indeed, McDonald, who was responsible for the conference
call script (Conaway 5/27/09, at Tr02214) may not have recognized the implications of this early
reference to the credibility of his Talking Points which clearly used eLMO as the sole excuse for
delays in vendor payments.

financial stability of the company." (*Id.* at TrDep002877.)   His notes state:

> With the continuing uncertainty in the retailing sector, the turnaround story at Kmart has become muddled, as declining comps, a poorly time CFO replacement, a stream of bad press and a string of rumors have served to shake investor confidence in the continuing turnaround at the company.

(Plf. Exh. 174, p. 1.)

Mr. Beder knew that it was these issues regarding Kmart's lack of liquidity that

Mr. Conaway was referring to when he stated:

> Now that John has reviewed the progress we made on working capital, I want to review some facts so everyone is clear and we can eliminate any misinformation that's clearly been circling in the marketplace.

Plf. Exh.57, at p. 19;  Beder 12/17/07, at TrDep00283.

The second of Mr. Conaway's five points in this review was the first challenged statement

and a reference to the vendors that Kmart had cut:

> We've clearly caused some systems issues, as John mentioned.  During our accounts payable conversion, certain invoices were dropped and has clearly caused some confusion. This was magnified by eliminating a quarter -- that's right, a quarter, 25 percent of our entire vendor base. This has been corrected and it's working as planned.

Plf. Exh.57, at p. 20.

Mr. Beder understood the "systems issues" referred to by Conaway and McDonald was

the alleged problems with Project eLMO. (Beder 12/17/07, at TrDep00282 &00284-85.)

Mr. Beder asked his question about "vendors and payables" in order to get a further

confirmation concerning the rumors on why vendors were not getting paid. (*Id.* at

TrDep00286-87.)   The  full response was:

Mr. Conaway:          Well, I think we had -- it was some clearly,
                      Eric, some, you know, communication issues.
                      And so, that was one piece. We didn't

communicate as quickly as we should.  And
then, I just think there is a -- you know, there
was a lot of noise from a small group of
suppliers.

McDonald:     Yeah (inaudible) those who were part of the 25 percent (inaudible)"

Conaway:      Yeah, I mean you got to remember, we cut a quarter of our suppliers. So
those people aren't happy with us.  So other than that, that's it. I mean,
we're, like we said, right now, systems fully integrated [a]nd it's working
fine.

McDonald:

(inaudible) we're fully caught up at this point, as I said.  And, you
know, we're on our way.  I don't see any further integration issues
as relates to the – to the vendors.


Def. Exh. 57, at 29.

Mr. Beder  understood Mr. Conaway's answer as indicating the problem with

vendors related to those vendors Kmart had cut and to those whose payments were

delayed due to the eLMO conversion and this latter problem had not been adequately

communicated to the vendors. (Beder 12/17/07, at  TrDep00287-88.)  Mr. Beder stressed

the importance of what management says.  (*Id.* at TrDep00269-70.)  Based on these

answers Mr. Beder thought Mr. Conaway "squarely address the issues" causing him

concern,  Kmart's liquidity was okay going forward and the late payments problems due

to eLMO "were gone." (*Id.* at TrDep00288-89.)  Because the eLMO problem was

resolved, he did not mention it in his analyst report written the next day after reading the

MD&A and listening to the conference call. (*Id.* at TrDep00291-92.)  That report

maintained a "buy" rating for Kmart stock and noted that the "Conference call was the key

focus . . . . Investors were squarely focused on the conference call which was intended to

200

provide further guidance on the most ambitious turnaround ever attempted in retailing."

(Plf. Exh. 175, at 1; Beder 12/17/07, at TrDep00294.)

Mr. Beder was asked:

> Q. And if Mr. Conaway and Mr. McDonald had indicated that Kmart was intentionally slow paying its vendors without their consent, would you have included that information in your November 28th note?
>
> A. Yes.
>
> Q. And why?
>
> A. It's material. It goes to the heart of how effectively they can turn around the company and whether they have the liquidity to do it. . . . [Liquidity] goes to the heart of whether they can get goods on the shelves and operate their business. . . . .
>
> Q. So, in your -- so, if a company is unable to pay its bills on time, that is something you believe to be important?
>
> A. Yes. It's a major negative.

*Id.* at TrDep00294-95.

The jury could determine that Mr. Conaway's "We've clearly caused some systems issues" statement was a conscious misrepresentation continuing to push the false eLMO excuse for the vendor late payments that Mr. McDonald had introduced in his earlier conference call remarks and which Kmart's merchants and accounts payable personnel had been pushing to the vendors for a month with Talking Points. The jury could determine that the "lot of noise from a small group of suppliers" was the second "excuse" he and McDonald were pushing to explain vendor complaints and mask the real reason for most vendor complaints.

The defense argues this "lot of noise" statement was an impromptu answer to an

201

unanticipated question and thus should be held to a less demanding standard than a prepared statement.  Mr. Conaway got a jury instruction on that so it could be argued in closing.  (Jury Instruction No. 24.)  Yet, the jury could reasonably have rejected this argument because they could find that it was highly anticipated that Conaway might be asked about complaints over late vendor payables given the rumors "circling in the marketplace," as Mr. Conaway noted, and the adverse press speculation.  The jury could also note that the answer was hardly "impromptu" in that it was a summary repetition of Mr. Conaway's scripted second  point to what was "circling in the marketplace" – poor communications with vendors over the eLMO problems and 25% of Kmart's vendors got cut.[91]

The defense notes that these scripted remarks were reviewed by many executives, general counsel and the outside auditor with no cautions or suggested corrections.  Yet, the jury could conclude this was not a certification of the script's accuracy for three reasons.  First, other than McDonald who took the lead on the preparing the script (Conaway 5/27/09, at Tr02214), there is no clear showing that any of the others reviewing it were privy to the nature and scope of the slow pay system nor privy to what the jury could conclude was the illegitimate birth of Talking Points and the fabrications about

---

[91] Compare the quoted  portion in the text (Def. Exh. 57, at 29.) with:

We've clearly caused some systems issues, as John mentioned.  During our accounts payable conversion, certain invoices were dropped and has clearly caused some confusion. This was magnified by eliminating a quarter -- that's right, a quarter, 25 percent of our entire vendor base. This has been corrected and it's working as planned.

Plf. Exh.57, at p. 20.

Project eLMO.  Cecil Kearse, who was privy to both, was apparently not on this review

team.   Thus, the jury could reason that if the true nature and magnitude of the slow pay

scheme and the truth about eLMO not being the real cause for the "noise" from vendors

was kept from Kmart's Board of Directors, it was likely the true nature and magnitude of

slow pay and the truth about eLMO was kept to a "very limited" number of people as

Moreland said about SID. (Moreland 6/27/07, at TrDep00026.)  In house counsel and

Kmart's outside auditor might know nothing more on this issue than Kmart's Board of

Directors.  Second, the wide-spread use of the fabricated  eLMO "cover story" with

Talking Points and other repetitions by Conaway, McDonald and others may have given it

a "life of its own"   – causing it to be believed by others, such as those reviewing the

conference call script, who had no reason to question it.  While eLMO apparently did

generate an erroneous purchase order, there is no evidence this was not caught before the

merchandise was received, nor is there any documented showing of even one softline

invoice payment being delayed due to eLMO. [92]  The third reason the jury might not take

silence of the reviewing audience of the November 27 script as a certification of its

accuracy was the possible chilling effect the precipitous firing of CFO Boyer had on

others who might fear taking any actions that might brand them as not being a "team

player."

As to evidence supporting the materiality of these two "covers" for the primary

reason for vendor discontent, the jury needed nothing more than the testimony of analyst

---

[92] Again, the undisputed evidence is that the eLMO conversion had no adverse effect on
hardline vendors who were already in the system.

Eric Beder who noted the centrality of liquidity and a company's ability to pay its bills on time to Kmart's turnaround chances.  The jury could also conclude that by November 27, 2001, any tardy disclosure of the AP System changes or Project SID  – or disclosing an inability to pay your bills on time –  would be a, as Beder testified, a  major negative regarding Kmart's liquidity, likely causing a disruption in vendor shipments and a greater decline in stock prices than the 11% drop that occurred without this disclosure.  Thus, the jury could conclude that these two "cover" stories were material in the total mix of information available to the investing public because they were presented repeatedly to give comfort to those skeptical about Kmart's having sufficient liquidity to meet its expenses and to mask the "major negative" truth that throughout most of the third quarter of 2001 Kmart did not have enough liquidity to pay its bills on time without stretching vendors and lying about it.

While Mr. Conaway and Kmart in August and September of 2001 might have pursued alternative means of paying its bills other than the extensive slow pay scheme chosen, this does not negate the materiality of the real course of action that they did pursue, nor the materiality of deceptive statements made to mask the truth and quiet the skeptics.  The information being hidden was not otherwise available in the total mix of information other than in unconfirmed rumors.  And instead of confirming the truth of those rumors, Mr. Conaway's admitted in his prepared remarks that his goal was to discredit those rumors and to "eliminate any misinformation that's clearly been circling in the marketplace."  In that conference call, including his responses to Eric Beder's question, Mr. Conaway was successful in satisfying Mr. Beder that the vendor complaints

204

were only from two sources, and the eLMO part was remedied.   In reliance on Mr.

Conaway's reassurance, Mr. Beder maintained his "buy" recommendation.  The jury

could reasonably have concluded that Mr. Beder's recommendation would have been

different, or at least highly qualified, had Mr. Conaway in the conference call not been

successful in his continued deceptions.  Thus, there is sufficient evidence that each of the

statements, considered in context, was material and misleading.


**F.    Evidence in the Record Supporting the Jury's Conclusion that Conaway Acted with Scienter.**

*Scienter* is a "mental state embracing intent to deceive, manipulate or defraud."

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). "Recklessness" satisfies the

*scienter* requirement in the Sixth Circuit. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671,

681-82 (6th Cir. 2004); *In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 550 (6th Cir.

1999); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985); *Mansbach v. Prescott, Ball &*

*Turben*, 598 F.2d 1017, 1024 (6th Cir. 1979). Recklessness is "highly unreasonable

conduct which is an extreme departure from the standards of ordinary care. While the

danger need not be known, it must at least be so obvious that any reasonable man would

have known it." *PR Diamonds*, 364 F.3d at 681 (quoting *Mansbach*, 598 F.2d at 1025).

Defense argues that Mr. Conaway had absolutely no reason to believe that Kmart's

MD&A disclosures were not complete and accurate. (Defense Memorandum, Dkt. #  139

at 20.) While acknowledging he was CFO at CVS and Melville Corporations, he contends

he was not primarily responsible for public disclosures. (*Id.* at 20-21.) At Kmart he asserts

he had reason to rely on the Disclosure Committee that prepared the Form 10-Q(3). (*Id.* at

205

21.)  Relying in part on testimony from his expert Avram Tucker that the liquidity issue caused by the overbuy was over by November 27,[93] he argues that it was far from "obvious" that Kmart needed to discuss the liquidity crunch caused by the inventory overbuy and actions taken in response.  He argues that because the SEC expert and defense expert disagree over whether there was a material liquidity event and deficiency in the third quarter of 2001, his actions were at most negligent, and not reckless or intentional.

Had the defense demonstrated that members of the Disclosure Committee, other than CFO McDonald, knew the true nature and extent of the slow pay scheme of the AP System changes and Project SID, this argument might have carried more weight with the jury.  Similarly, had a legal or accounting expert – fully informed about the underlying facts –  given an opinion before November 27, 2001, that the disclosures were adequate, that also might have had a greater impact on demonstrating Mr. Conaway's good faith belief than did a hired litigation consultant firm whose team was paid several hundred thousand dollars for its after the fact opinion.   While Mr. Conaway denied knowing what was in the MD&A, or had he known, he denied knowing it was not legally adequate, the jury could have rejected this portion of  his 'maximum feasible deniability" defense.   As a MBA from one of the nations leading business schools, and as former CFO of Melville Corporation and CVS who admitted knowing liquidity needed to be discussed in the MD&A (Conaway, 5/28/09, at Tr02402-03), the jury could reasonably assume that Mr.

---

[93] As noted above the cut in receipts in October more than offset the Schwartz overbuy of August as September.  (Def. Exh. 1.)

Conaway knew, or was reckless in his stubborn refusal to acknowledge, that Kmart's

liquidity discussion in its MD&A for the third quarter could not cavalierly ignore the most

significant liquidity crisis in Kmart's history, its causes and the various means of dealing

with it.  The jury could reasonably conclude that while the Schwartz August overbuy had

been off-set by reduced October purchases, that overbuy had moved up Kmart's peak

borrowing date and precipitated an unprecedented material liquidity crunch which was

aggravated by 9/11 and other negatives affecting sales, leaving Kmart with an inventory

glut and a billion dollar backlog of overdue vendor bills at the end of the third quarter.[94]

The jury could conclude that this liquidity crisis was not resolved in the third quarter, nor

by November 27, and conclude further that it would be obvious to any fair minded CEO

that an appropriate discussion and analysis of Kmart's liquidity in the third quarter of

2001 would include the causes and the means of dealing with this unprecedented liquidity

crisis including Kmart's unparalleled slow pay system.  The jury could conclude that Mr.

Conaway knew of the problem, its cause and Kmart's means of dealing with it, and further

knew, or was reckless in not knowing, that these material facts needed to be discussed in

the liquidity portion of the MD&A.  The jury could also find that Mr. Conaway took

multiple and decisive steps, including repeated deceptions, to assure that these disclosures

were not made. The jury may properly regard the Defendant's extensive pattern of

deception, and his discharge of CFO Boyer who repeatedly raised with him Kmart's

enormous backlog of overdue invoices, as evidence that he intended to deceive the

---

[94]  Moreland's Project SID Master Tracking Document shows $790 million overdue
invoices on October 31, 2001, in addition to the $300 million under the AP System changes. (Plf.
Exh. 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163-64.)

investing public in the Form 10-Q's MD&A and on the conference call. *In re Qwest Comm. Intern. Sec. Litigation*, 387 F.Supp.2d 1130, 1147 (D.Colo. 2005). Even if the jury were to credit Conaway's story that he never considered whether he was required to disclose Kmart's liquidity crisis, the jury could well find this level of detachment to be "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *PR Diamonds*, 364 F.3d at 681.

Similarly with regard to the conference call, the jury could reasonably conclude that McDonald and Conaway in their prepared statements and handling of Eric Beder's question wanted, by indirection, to deflect attention from the adverse press rumors and that they both used the eLMO excuse and 25% of disgruntled discontinued vendors as the two pronged cover story to masks the depths of Kmart's liquidity problems in the third quarter. These two "cover stories" that Conaway highlighted helped him and Kmart to discredit the rumors and hide the real reason for the bulk of the "noise" from the vendor base, which Mr. Boyer told Mr. Conaway a month earlier was from "past due invoices" exceeding $800 million because of Project SID. (Plf. Exh. 76.) Mr. Conaway acknowledged that his conference call remarks were to discredit the rumors and "eliminate any misinformation that has been circling in the market place," The jury could conclude that those rumors were true and not "misinformation," and conclude further that Conaway's efforts to counter or eliminate them was a conscious effort to mislead his conference call audience. The jury could conclude these two "covers" were important deceptions as part of the larger deceptions Conaway and McDonald had been orchestrating for months culminating in the misleading and incomplete MD&A, and that

such a consistent pattern of deception was evidence of intent to deceive, manipulate or defraud in the conference call.

### G.   Conaway Aided and Abetted Kmart's Fraud and Disclosure Violations.

Under Sixth Circuit case law, "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *SEC v. Washington Co. Util. Dist.*, 676 F.2d 218, 224 (6th Cir. 1982) (citing *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974)).

For reasons noted above, there is evidence to support the jury's finding that Kmart violated Section 10(b) of the Exchange Act and Rule 10b-5 b., and further that Kmart violated Item 303(b) of Regulation S-K, and thus Section 13(b) of the Exchange Act and Rules 12b-20 and 13a-13.  There is also sufficient evidence for the jury to find that Conaway was aware that his role in concealing Kmart's liquidity crisis and slow pay from the investing public was "part of an overall activity that [was] improper." *Washington Co.*, 676 F.2d at 225. In making this determination, the Sixth Circuit has held that "the surrounding circumstances and expectations of the parties are critical." 676 F.2d at 226. Where a defendant "conducts a transaction of an extraordinary nature, less evidence of his complicity is necessary." *Id.* (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95-96 (5th Cir. 1975)).  The jury could find the implementation and magnitude of Project SID and the Talking Points cover story were extraordinary events unprecedented in Kmart's history.

The record supports a conclusion that Conaway provided "substantial assistance" to Kmart in the commission of the fraud and in the MD&A inadequacies, and his assistance "was knowingly rendered." *Washington Co.*, 676 F.2d at 226-27. From beginning to end, Conaway was at the center of Kmart's response to the liquidity crisis. Conaway approved the vast program of delaying payments to Kmart's vendors in a manner that would appear to have invoices "hung up in processing." (Moreland 6/27/07, at TrDep00087.) He also approved the Project eLMO cover story and used it repeatedly to mislead Kmart's Board of Directors, employees and the investing public about the true source of vendor payment delays. Based on this evidence, the jury could conclude that Conaway was the driving force behind the fraud in its inception, and in the lies and non-disclosures that perpetuated it. Thus, there is sufficient evidence for the jury to find that Mr. Conaway knowingly and substantially assisted Kmart in its violations of Section 10(b) and 13(a) of the Exchange Act.

## IV. CONCLUSION.

Because Mr. Conaway's statements in the conference call, when viewed in the total context of that conference call and his involvement in Kmart's response to the liquidity crisis precipitated by the Schwartz overbuy, including the misrepresentations made by him and others with his knowledge, acquiescence or approval, there is sufficient evidence to uphold the jury's finding of his primary liability on Claim One based on these Conference Call misrepresentations alone.  Thus, there is sufficient evidence to upholding the jury's ultimate verdict on Claim One even without the separate jury findings that Mr. Conaway caused the misstatement and omissions in the MD&A of the Form 10-Q(3). This

210

is not a retreat from the analysis in subsections II.D. 1.and 2.b. above that there is

sufficient evidence to uphold the jury findings that Mr. Conaway caused the misstatement

and omissions in the MD&A of the Form 10-Q(3).

For reasons stated above, neither primary liability of Defendant Conaway under

Section 10(b) of the Exchange Act nor aiding and abetting liability of Defendant Conaway

under Section 10(b) or Section 13(a) of that Act can be imposed based on the Verdict

Form findings on Claim One Question 1. and Claim Two Question 1.b.  The jury's

findings on Verdict Form Claim One Question 1. and Verdict Form  Claim Two Question

1.b. are vacated as not supported by sufficient evidence.  Even with these findings of fact

vacated there remains sufficient evidence to uphold the jury's findings of primary liability

of Mr. Conaway on Claim One and of aiding and abetting liability of Mr. Conaway on

Claims Two and Three.   Thus, all other findings of the jury are upheld as is Defendant

Conaway's liability under Claims One, Two and Three.  Other than noted with respect

Verdict Form findings on Claim One Question 1. and Claim Two Question 1.b.,

Defendant's motion under Rule 50(b) for judgment as a matter of law or, in the

alternative, under Rule 59 for a new trial, is DENIED.

SO ORDERED.


January 20, 2010                                    s:/ Steven D. Pepe
                                                   United States Magistrate Judge


211