UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,
          Plaintiff,                    Case No.: 2:05-CV-40263

vs.

                                 MAGISTRATE JUDGE STEVEN D. PEPE

CHARLES C. CONAWAY, and
JOHN T. McDONALD, JR.
          Defendants.
_____/

**OPINION GRANTING IN PART PLAINTIFF'S MOTION FOR REMEDIES (DKT. # 150)**
**AND**
**DENYING ITS MOTION TO STRIKE (DKT. # 179.)**

## I.    INTRODUCTION

On August 23, 2005, the SEC filed a complaint against Conaway and McDonald alleging

violations of the Securities Exchange Act of 1934. The SEC alleged that Defendants had made

false statements of material facts, or omitted material facts which made their statements

misleading in connection with the MD&A section of Kmart's Form 10-Q(3) filed on November

27, 2001, and during the conference call held that day. A trial was held between May 13 and 29,

2009. On June 1, 2009, a ten person jury found against Defendant Charles Conaway[1] on all

claims. (Dkt. #129). On July 30, 2009, Plaintiff Securities and Exchange Commission ("SEC")

filed a memorandum in support of its request for remedies. (Dkt. #150). Defendant Conaway

filed a response the next day. (Dkt. #171). An evidentiary hearing was held on September 16

_____

[1] Prior to the commencement of trial, co-defendant McDonald entered into a settlement
with the SEC. Defendant Conaway was the only defendant who proceeded to trial.

and 17, 2009.

The SEC is seeking disgorgement of a five million dollar retention loan that it contends was forgiven due to the securities fraud misstatements and omissions of Mr. Conaway and Kmart on November 27, 2001, as well as prejudgment interest on the disgorgement which amounts to $2,698,689 through June 30, 2009,[2] and a civil penalty of $5,000,000. In addition, the SEC seeks an injunction against Mr. Conaway regarding any further violations of the securities laws; (2) a permanent bar against his serving as an officer or director of a public company; and (3) a bar prohibiting Conaway from seeking or accepting any payment, reimbursement, or indemnification from any third party for any portion of the penalty.

## II.     BACKGROUND FACTS

The background facts are adequately stated on many issues in the January 20, 2010, Memorandum Opinion on Defendant's Motion under Rules 50(b) and 59 (Dkt. # 185). Because information concerning Kmart's January 22, 2002, bankruptcy was kept from the jury, additional facts concerning that and other facts related to the remedies were presented at the September hearing.

### A. Mr. Conaway's Employment Agreement and Retention Loan.

On May 25, 2000, Mr. Conaway signed an employment agreement setting out the procedure and standards for his termination for cause. (Plf. Exh. # 501.) Under that agreement Mr. Conaway could be discharged only for cause which is defined as the commission of a felony or if he engaged in "conduct that constitutes willful gross neglect or willful gross misconduct in

---

[2] The prejudgment interest calculation is based on the Internal Revenue Service rates of interest on tax underpayments and refunds.

carrying out his duties under this Agreement, resulting, in either case, in material harm to the Company, unless the executive believed in good faith that such act or nonact was in or not opposed to the best interests of the Company." (*Id.* at p. 1.)  Under the Agreement, he was to receive written notice of actions or omissions for a proposed termination for cause within six months of the alleged wrongdoing.  (*Id.* at p. 11.)    He was to be given 10 days to "cure" if possible, and/or to request  a hearing before the Board which had to be held with in 15 days of the request.  (*Id.* at p. 12.)

On May 15, 2001, Mr. Conaway signed an amended employment agreement, which set out the terms for certain stock options and a five million dollar retention loan payable February 1, 2006, with a minimum interest rate, which loan was to be forgiven if Mr. Conaway remained employed at Kmart through January 31, 2006. (Plf. Exh. # 501.) In addition to completing the years of service requirement for loan forgiveness, he did not have to repay the loan and any accumulated interest in the case of a "Loan Forgiveness Event." (*Id.* at §2(c), pp.3-4.) Such an event is defined as a termination of employment that would cause Mr. Conaway's stock options to vest early. (*Ibid.*) Under his original employment agreement, if Mr. Conaway was constructively terminated, his stock options "at the time of termination [of employment] shall become fully vested." (Plf. Exh. # 501, at §11(d)(ii)(H), p. 13.) The contract further defines "constructive termination" to include the removal of Mr. Conaway from his position as Chairman of the Board or Chief Executive Officer of Kmart.  (*Id*. at§1(g)(iii) & § 3(a), p. 2-3.)


### B. Kmart's 2002 Bankruptcy

Despite the programs implemented to deal with the liquidity crisis, it became apparent in

early January of 2002 that Kmart would need to file for bankruptcy.  Because of this, the Board

sought to show it was actively engaged and confident in the Company and Charles Conaway was

replaced as  Board Chairman in January of 2002 by Board Audit Committee Chairman James

Adamson, who had been on the Board of Directors since 1997. (Adamson 10/17/07 Deposition,

Plf. Remedies Exh. 19, Dkt. 183-21, at TrDep00424-25.)   In considering the change in

management,  the Board had a major discussion and was divided on whether to remove Charles

Conaway as CEO as well as Board Chairman. (*Id. at* TrDep00424 & TrDep00446)   Mr.

Adamson believed that Mr. Conaway should be fired. (*Ibid.*) As a compromise on January 15,

2002, the Board voted to replace Conaway as Chairman of the Board with Mr. Adamson, with

Mr. Conaway allowed to continue as CEO.  (*Id.* at TrDep00446; Stallkamp 9/16/09, at

Tr02970.).

Kmart filed for bankruptcy a week later on January 22, 2002.  On March 11, 2002, the

Board made the decision to remove Conaway as CEO and replace him with Mr. Adamson who

served as CEO until January 2003 and as Board Chairman until May of that year when Kmart

emerged from bankruptcy.  (Adamson 10/17/07 at TrDep00425 &  TrDep00446; Stallkamp

9/16/09, at  Tr02971). At the time the Board felt that it was necessary to "make a wholesale

change in management, and . . . to move on from all of the past management practices."

(Stallkamp 9/16/09, at  Tr02971.)   On March 11, 2002, and Kmart entered into a Separation

Agreement in which it was agreed that Conaway's discharge was not "for cause" and that his

retention loan was forgiven and the note cancelled. (Plf. Exh. # 289, Dkt. 183-18.)  On that date,

the Board was not yet aware of any negative liquidity projections generated by Mark Moreland

for Mr. Conaway and his Executive Leadership Team (ELT) during the third quarter of 2001, nor

were they aware of Project SID, the AP systems changes, or the extent of the Project eLMO cover story and its falsity. (*Id.* at Tr02972-74.) It was around this time that the Board requested its outside counsel, Skadden Arps conduct an investigation into the circumstances surrounding Kmart's bankruptcy. (*Id.* at 21).

Like Board member Stallkamp, Mr. Adamson testified that in the fall of 2001, and apparently at the January and March 2002 Board meetings on management changes, he (i.) was not aware of the many Moreland negative liquidity projections (*e.g.* Plf. Exh. # 9's $455 million deficit on November 7, 2001, Plf. Exh.# 10's $641 million deficit on November 7, Plf. Exh. # 16's $ 1 billion shortfall on October 24, 2001), (ii.) believed all references by Mr Conaway to seeking better dating or other terms with vendors was done by negotiations and not unilaterally, and (iii.) had no knowledge of either the AP Systems changes or Project SID slow-pay initiatives. (Adamson 10/17/07 at TrDep00427-34 & TrDep00439.) While acknowledging that he did not expect the Board to be shown all financial scenarios Kmart's management ran, he noted the Board should have been apprised of a scenario showing a dramatic difference between the $96 million in the liquidity cushion forecast in the September Board package and Exhibit 16 showing a billion dollar negative liquidity (Plf. Exh. # 16). (*Id.* at TrDep00456.)

He testified similar to Mr. Stallkamp, that while the Board was informed of Kmart's efforts to negotiate better payment terms with vendors, he was not informed of any unilateral efforts of Kmart to delay payments under such programs as Project SID (Plf. Exh. # 11) or the AP System Changes (Plf. Exh. # 20), nor did he have any reason to believe any other Board members were aware of such activities. (*Id.* at TrDep00431 & TrDep00433-34 & TrDep00438-39.) Also like Stallkamp, he noted that had he been informed of such unilateral efforts, he would

have opposed them as not a good idea violating contractual relationship and harming a personal relationships with vendors. (*Id.* at TrDep00432 & TrDep0044) "[T]his would not be a way that you'd want to build long-term relationships with your vendors." (*Id.* at TrDep00441.) In addition to risking vendor's stopping goods shipments, it was an "irrational act" of management that signaled a "major liquidity problem" for management. (*Id.* at TrDep00432, TrDep0044 &TrDep00448.) Had he been aware of the slow pay system of Project SID, he would have determined the cause of the liquidity problem and "what would be necessary to increase the cushion or the liquidity outside of doing something like this." (*Id.* at TrDep00433.)

Like Mr. Stallkamp, Mr. Adamson first became aware of Project SID when the Skadden internal investigation was presented to the Board in the fall of 2002. (*Ibid.*) To his knowledge, no one on the Board was aware of it prior to this. (*Id.* at TrDep00433-34.) Stallkamp had relayed to Adamson Mr. Conaway's statement that the rumbling from vendors was because of " a systems problem and it would all be rectified and it would be back to normal." (*Id.* at TrDep00443.) Like Stallkamp, Mr. Adamson confirm that "working capital" means "roughly the same thing as liquidity," and that when Mr Conaway wrote the Board on December 20 that "we are comfortable with our working capital position going into fiscal year 2002" (Plf. Exh. # 123), he was comforted and he had no awareness that Kmart had reinstituted Project SID that same week. (Adamson 10/17/07 at TrDep00445.) Mr. Adamson testified that the first time he because aware of the Schwartz inventory overbuy of roughly $850 million was at a Board meeting in Detroit, possibly in November 2001, and the Board was very upset. (*Id.* at TrDep00449.) Mr. Adamson also stated that he did not feel he was provided enough information about Kmart's liquidity in the fall of 2001 for him to fully discharge his duties to the company's

shareholders, "[b]ecause the liquidity position that we were shown as a board was dramatically different than what management felt it really was." (*Id.* at TrDep00447-48.) He accepted what Mr. Conaway gave the Board and had they been given all of the relevant information, "I believe we could have taken a lot of actions that potentially would have saved Kmart from filing for bankruptcy . . . . we came very close, even at the last minute, from being able to renegotiate a credit facility so we would not have had to file bankruptcy." (*Id.* at TrDep00448.) He noted the importance of working with vendors, banks and employees when facing a cash problem . While skeptical whether after 9/11 Kmart could get any additional funding by sale/leasebacks, he did believe that additional funds would have been available through secured borrowings against inventory and possibly real estate. (*Id.* at TrDep00434 & TrDep00455-56.)

In November 2002, the internal investigation into the bankruptcy was completed and the results reported to the Board. While defense objected to the admission of this document and it was not admitted, it was at that time that the Board first learned about the negative liquidity forecasts, the existence of Project SID and the extent to which Project eLMO had been used as a "cover story." (Stallkamp 9/16/09Tr02981-82.) Mr. Stallkamp was disappointed by the report because it revealed that misinformation had been given to the Board which was surprised by the revelations. (*Id.* at Tr02982 & Tr02984.) In light of the investigation results, during a February 11, 2003, meeting the Board discussed the possibility of recharacterizing Conaway's termination as "for cause." (Plf. Exh. # 505; Stallkamp 9/16/09 at Tr02984-87.) During the meeting, counsel for Conaway addressed the Board and opined that the standard of conduct required to meet the definition of a "for cause" termination under Conaway's employment agreement was a very high one that could not be met under the circumstances presented. The Board ended the

meeting with much discussion, but no final decision wanting to have a point of Michigan law checked, although Stallkamp recalled that they did, in fact, decide Conaway's termination should be "for cause" which decision he supported. (*Id.* at Tr02987-88.)

On February 24, 2003, the Board met again and unanimously approved the language to be added to the amended disclosure statement included with the Company's Chapter 11 filing. (Stallkamp 9/16/09, at Tr02990-91 & Tr02997.) The amendment stated in part that the Board

> concluded that there is credible and persuasive evidence to support a finding that Mr. Conaway engaged in conduct that should support the commencement of Trust Claims against Mr. Conaway and which may also be subsumed within the contractual definition of "cause" as that term is defined in the termination provisions of Mr. Conaway's prior employment agreement with the Company.

Plf. Exh. # 506.

Because Kmart was in bankruptcy proceedings, the Board could no longer take action directly against Mr. Conaway, and it was the Kmart Creditors Trust that had the power to act. (Stallkamp 9/16/09, at Tr02991.) The Board reaffirmed its earlier decision not to seek approval of the bankruptcy court to approve the employment-related agreements with Mr. Conaway and the company demanded repayment of the special retention loan to Conaway. (*Id.* at Tr02992.) The disclosure statement also noted that there was "credible and persuasive evidence" regarding Conaway's involvement with Project SID, the eLMO cover story, and his failure to disclose the extent of Kmart's liquidity problems. The Board felt it was necessary to change his termination to a "for cause" basis because they were "misled by information that [Conaway] gave [them]." (Stallkamp 9/16/09 , at Tr02992 & Tr02995.) The Board also reaffirmed that the appropriate mechanism for pursuing any claims against Conaway to pay back his retention loan would be through the Kmart Creditors Trust. (Plf. Exh. # 506; Stallkamp 9/16/09, at Tr02994-95).

Mr. Stallkamp testified that had he discovered the facts a year earlier, he would have supported the same movement against Mr. Conaway and the Board would have made Conaway's discharge "for cause." (*Id.* at Tr02995-97.) Mr. Stallkamp acknowledged that Mr. Conaway took actions that he thought were in the best interest of Kmart, and without identifying the retention loan the Board sought back, Mr. Conaway did not personally profit from the actions he took regarding Kmart's liquidity in 2001. (Id.Tr02998-99.)

Stallkamp testified that if he and the Board had been presented with the information contained in the Skadden report in November of 2001, Mr. Conaway's termination would have been "for cause." (*Id.* at Tr02996). According to Kmart's public filings, Conaway's compensation from his 22 months of service from May 30, 2000 to March 11,2002 amounted to $2,605,556 salary, $8,087,890 in bonuses for 2000, $736,700 in other forms of annual compensation or $11,430,146 of which $238,703 was for 2003, as well as $2,042,200 other compensation in 2001, plus $ 307 life insurance premium, $4,049,708 in severance payment plus the $5 million loan forgiveness in 2002. (Ex. A to Dkt. # 183-18 at 71.) This does not include the additional $12,692,950 in stock options and restricted stock grants for 2000 and 2001 which value was presumably lost in the January 2002 bankruptcy. The SEC is not seeking in disgorgement any of the 2003 salary or the severance payment, but solely the $5 million retention loan plus prejudgment interest on it. Following his termination, Conaway filed a claim against the Kmart trustee in bankruptcy for an additional $19,635,003 which was later settled for a payment of approximately $1 million.

## C.     The Arbitration Decision

On June 17, 2004, the Kmart Creditors Trust ("the Trust"), as assignee of all of Kmart's

causes of action against its former officials, filed a demand for arbitration against Conaway. The Trust claimed that during the 20 months that Conaway served as CEO and Chairman of the Board at Kmart, he breached his fiduciary duties to the Company by engaging in "numerous and repeated instances of negligence and gross mismanagement, all of which seriously damaged Kmart." The Trust claimed that Conaway caused Kmart to be damaged in the amount of approximately $1.7 billion, including the $5 million retention loan. An evidentiary hearing was held between May 2 and 24, 2005.

On July 25, 2005, the arbitration panel issued its decision, relying heavily on the business judgment rule in finding that Mr. Conaway could not be held liable on many of the Trust's claims. (Def. Remedies Exh 1, Dkt. 173-3,) The panel also found that Conaway was entitled to keep his retention loan because, in part, the Board did not fire him for cause, which would have required repayment of the loan under the employment agreement, but rather he was constructively discharged when removed from his position as Board Chairman in January 2002. Defense counsel notes among the findings of the arbitration panel were:

> As a result of our deliberations, we find, in summary, no basis to hold Conaway personally liable for Kmart's misfortunes . This is not a case of fraud, deliberate mismanagement, or corporate looting . The evidence shows that Conaway acted at al l times in good faith and in what he believed to be the best interests of Kmart . He made a determined, albeit unsuccessful, attempt to accomplish what he was hired to do — to stop Kmart's long decline relative to its major competitors, to turn the company around , and to restore it to its former position as one of the nation's preeminent retailers .
> . . . . No credible evidence has been presented of stealing corporate funds, of fraud, or even of neglect of duty or gross mismanagement. Some of Conaway's decisions did not work out well, but on the record before this panel, on all business matters for which the Trust seeks to recover, Conaway's conduct qualifies for protection under the business judgment rule, which is designed to insulate decisions of corporate officials from claims of liability based on hindsight evaluations of the results of those decisions.

*Id.* at 9.

Toward the end of the first year, they addressed that promised amendment by entering into a formal amendment to Conaway's employment agreement on May 15, 2001. Among other things, the amendment granted to Conaway a loan of $5 million payable in approximately five years with interest . The agreement provided, however, that the loan would be forgiven in full by the company if Conaway remained employed through January 31, 2006, or if the Company should give Conaway earlier written notice of non-extension of his contract, or if Conaway should be constructively terminated by the Company.  As defined in the employment agreement, "constructive termination" included, *inter alia,* "a material reduction or material adverse change in [Conaway's ]responsibilities, duties, authority". After Kmart filed for Chapter 11 in January 2002, the Board designated Adamson to function as Interim Chairman in place of Conaway. As of March 11, 2002, Kmart and Conaway entered into a separation agreement which recited Conaway's constructive termination and forgave Conaway's $5 million retention loan . Had Conaway been terminated "for cause", he would have been required to repay the loan .

*Id.* at 20.

The Trust's suggestion that the May 21, 2001 agreement is void because Conaway had not disclosed the problems of the inventory overbuy, project SID, and the liquidity crunch, borders on the ludicrous because all of those events occurred later in the year, after the amended agreement had been executed . Even if the board might have been able to fire Conaway for cause, it did not do so . Instead, it acknowledged that his position had been constructively terminated and it affirmatively agreed to forgive the loan . Finally, whether the bankruptcy court approved the separation agreement is irrelevant, because Conaway had clearly been subjected to a constructive termination, which by itself, under the original employment agreement, required forgiveness of the loan.

*Id.* at 21.

* * *

In short, the Trust's attacks on Conaway's retention loan have failed. Conaway is entitled to keep the loan.

*Id*. at 22.

## III.    LEGAL ISSUES

## A.    The Arbitration Decision and Issue Preclusion.

While at the hearing on summary judgment I thought the arbitration panel decision might

have some preclusive effect on the remedies stage of this case, it appears upon further consideration and research that would stretch issue preclusion law against a non-party to the arbitration beyond permissible limits. Thus, the SEC, in this enforcement action, is not bound by the determination of the arbitration panel which did not address the question of whether Mr. Conaway violated the securities laws nor other questions to be resolved in these remedies proceedings. This is not like a securities class action case that is subject to arbitration in which the SEC might have the opportunity to intervene and participate. There has been no showing that suggests the SEC could have been involved in the arbitration of the Kmart Creditors Trust's multiple claims. Even though the disgorgement remedy on Conaway's five million dollar retention loan the SEC is seeking is similar to one of the multiple claims of the Creditors Trust pursued in the arbitration, the factual question involved is slightly different – whether the securities violations caused Mr. Conaway to benefit from forgiveness of the retention loan versus did Kmart constructively discharge Mr. Conaway on January 15, 2002, thereby triggering a loan forgiveness event, and did Kmart agree on March 11, 2002, that Conaway's discharge was not "for cause" and that his retention loan should be cancelled. One of the issue to be resolved in this remedy proceeding is whether either the January 15 or March 11, 2002, agreements would have been the same or occurred at all if Mr. Conaway on November 27, 2001, had not violated federal securities laws.

It is the SEC's position that had there been no securities fraud on November 27, 2001, Kmart's Board would have learned enough about (i.) the lengthy coverup of Kmart's liquidity problems, (ii.) the lies to vendors and Board members to mask (iii.) an extraordinary slow pay regime authorized by Mr. Conaway, that the Board would have fired Mr. Conaway for cause. If

it is found that but for the November 27 securities violations, the Board would have removed Mr. Conaway from both his Board Chairmanship and CEO position for cause, would there have been a constructive termination on January 15, 2002, when the Board removed him solely as Board Chairman? Had Mr. Conaway been fired for cause would there have been a March 11, 2002, Separation Agreement with Kmart that his discharge was not for cause, and would there have been an agreement by Kmart that the retention loan was forgiven and the note cancelled? Both of these questions depend on the fact and the timing of the Board's action to remove Mr. Conaway for cause. The historical events of January 15 and March 11, 2002, upon which the Arbitration Panel relied in denying the claims of the Creditors Trust might well not have occurred had Mr. Conaway not violated securities laws on November 27, 2001, keeping investors and his Board in the dark about a number of important facts that might well have altered the course of events had they been known earlier.

To hold that an arbitration proceeding, in which the SEC was not party, acts as an issue precluding bar to the SEC's seeking disgorgement of the proceeds of the retention loan as a remedy for a securities violation, would be similar to saying that had the Kmart Creditors Trust entered into a settlement with Mr. Conaway ratifying the Board's action of forgiving his loan and agreeing he had not violated any securities law and had always acted in good faith and in Kmart's best interest, the SEC would be checkmated and could make no further move to enforce the securities laws. Both propositions are unsupported in law and would be against sound public policy.[3]

_____

[3] The SEC in its remedies brief notes its inability to find any case in which a court even considered the possibility that the SEC could be precluded from enforcing the Exchange Act's antifraud provisions based on the result of an AAA arbitration to which it was not a party.

The various exceptions to the basic rule is that a nonparty is not bound by a prior litigation or arbitration are set out in the federal practice treatise of Professors Wright, Miller and Cooper.[4]  The Supreme Court in *Taylor v. Sturgell*,128 S.Ct. 2161 (2008), identifies six exceptions to the rule against nonparty preclusion.[5]  A review of the standards from these two

It cites *Artman v. Prudential-Bache Securities, Inc.*, 670 F. Supp. 769, 773 (S. D. Ohio 1987), for the proposition that claim or issue preclusion requires: "(1) identity of issues; (2) actual litigation of the issue in the prior litigation proceeding; (3) the determination of the issue in the prior litigation or proceeding must have been a critical and necessary part of the judgment in the earlier proceeding; and, (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the early proceedings."

[4] 18A C. Wright, A. Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4448-4456 and 18B FEDERAL PRACTICE AND PROCEDURE § 4475.1 (2d ed.)

[5] The Supreme Court in *Taylor* explained:

Though hardly in doubt, the rule against nonparty preclusion is subject to exceptions. For present purposes, the recognized exceptions can be grouped into six categories. . . .First, "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." . . . . For example, "if separate actions involving the same transaction are brought by different plaintiffs against the same defendant, all the parties to all the actions may agree that the question of the defendant's liability will be definitely determined, one way or the other, in a 'test case.' " . . .

Second, nonparty preclusion may be justified based on a variety of pre-existing "substantive legal relationship[s]" between the person to be bound and a party to the judgment. . . . Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor. . . .  These exceptions originated "as much from the needs of property law as from the values of preclusion by judgment." . . . .

Third, we have confirmed that, "in certain limited circumstances," a nonparty may be bound by a judgment because she was "adequately represented by someone with the same interests who [wa]s a party" to the suit. . . . . Representative suits with preclusive effect on nonparties include properly conducted class actions, . . .  and suits brought by trustees, guardians, and other fiduciaries . . . .

sources suggests that on the facts of this case the SEC should not face issue preclusion on any factual or legal findings of the Arbitration panel.   The *Taylor* opinion seems to close the door on any expansion of "virtual representation" beyond the six exceptions for adequate representation it recognized.   The Court notes that this more restricted approach to "virtual representation" had been the position of the Sixth Circuit in  *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 193 F.3d 415 (6th Cir.  1999).[6]  *Taylor v. Sturgell*, 128 S.Ct. at 2173.

---

> Fourth, a nonparty is bound by a judgment if she "assume[d] control" over the litigation in which that judgment was rendered. . . .  Because such a person has had "the opportunity to present proofs and argument," he has already "had his day in court" even though he was not a formal party to the litigation. . . .
>
> Fifth, a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy. Preclusion is thus in order when a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior adjudication.  . . . . And although our decisions have not addressed the issue directly, it also seems clear that preclusion is appropriate when a nonparty later brings suit as an agent for a party who is bound by a judgment. . . . .
>
> Sixth, in certain circumstances a special statutory scheme may "expressly foreclos[e] successive litigation by nonlitigants ... if the scheme is otherwise consistent with due process." . . . . Examples of such schemes include bankruptcy and probate proceedings, . . . and quo warranto actions or other suits that, "under [the governing] law, [may] be brought only on behalf of the public at large".
>
> Reaching beyond these six established categories, some lower courts have recognized a "virtual representation" exception to the rule against nonparty preclusion. Decisions of these courts, however, have been far from consistent.

*Taylor v. Sturgell*,128 S.Ct. 2161, 2172-73 (2008)(Footnotes and other citations of authority omitted)

[6] *Becherer* described

15

The third privity category-adequate or "virtual" representation-requires " 'an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues.' " . . . . . This third category may also be established by a nonparty's express agreement to be bound by or acquiescence to a party's representation.. . . . However, absent an express agreement to be bound, an agreement should not be inferred " 'except upon the plainest circumstances.' " This case does not involve an express agreement to be bound. In the class action setting, as detailed below, logic dictates, and our precedent requires, that the issue of acquiescence be determined in light of Fed.R.Civ.P. 23.

*Becherer,* 193 F.3d at 423 (Citations omitted). The Sixth Circuit cautious restraint on the expanded use of virtual representation was noted later its opinion when considering the preclusive effects on non-parties when a case is dismissed before the class is certified. The Sixth Circuit notes its holding in *Bittinger v. Tecumseh Prods. Co.,* 123 F.3d 877, 882 (6th Cir.1997), which "rejected application of the doctrine of virtual representation in a class action case because it was an 'unruly standard' that would effect 'an end run around the limitations of Rule 23.' " *Becherer,* 193 F.3d at 427.

In reaching that conclusion, in lieu of principles of virtual representation, we relied on section 41 of the Restatement (second) of Judgments as more consistent with the requirements of Rule 23 and the governing Supreme Court precedent. The Restatement provides:
Person Represented by a Party
(1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:

(a) The trustee of an estate or interest of which the person is a beneficiary; or

(b) Invested by the person with authority to represent him in an action; or

(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or

(d) An official or agency invested by law with authority to represent the person's interest; or

(e) The representative of a class of persons similarly situated,

16

The three cases cited by defense counsel on the question of issue preclusion against a non-party are not persuasive. *Matter of L&S Indus., Inc.*, 989 F.2d 929 (7th Cir. 1993), denied finding virtual representation because

> an identity of claims is not equivalent to an identity of interests. And privity here turns on an identification of interests. Only non-party interests adequately represented in a prior proceeding can be subject to res judicata.

*Matter of L&S Indus., Inc.*, 989 F.2d at 934.

After the Trustee prevailed in a bankruptcy adversarial proceeding against the principal, the Seventh Circuit in *L&S Industies* found no virtual representation of the guarantor's interests by the principal in that bankruptcy proceeding because the guarantor's *interests* were different from those of the principal, even though there were some overlapping factual and legal claims.

*Bates v. Township of Van Buren*, 459 F.3d 731, 734 (6th Cir. 2006), a 2-1 opinion, applies Michigan law and again notes that privity requires an identity of interests and not just some overlapping similar factual and legal claims. *Bates* cites *Phinisee v. Rogers,* 229 Mich.App. 547, 582 N.W.2d 852, 854-55 (1998), in which the court held that an illegitimate child's paternity claim was not barred by *res judicata* due to her mother's failed paternity suit because the mother and daughter did not share a substantial identity of interests. A child interests include possible Social Security benefits, inheritance rights and not just immediate

---

> designated as such with the approval of the court, of which the person is a member.

*Becherer,* 193 F.3d at 427.

support payments as was the mother's interest. *Bates* also seems to acknowledges that Michigan's "privity" or virtual representation law may be more lenient on accepting virtual representation than the federal law in the Sixth Circuit. *Bates*, 459 F.3d at 737. *Bates* cites an earlier opinion in *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1060 (6th Cir.1995), that reversed a lower court's liberal application of virtual representation. The Sixth Circuit noted that "[t]he question of virtual representation is one of fact and is to be kept within 'strict confines.'. . . Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues."

Defense also cite *Central Transport, Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 259 (6th Cir. 1991), for the unquestioned proposition that arbitration decisions also have preclusive effect. But *Central Transport* applied preclusion against a party in the earlier arbitration, thus it is of limited assistance here where the issue preclusion is being urged against a non-party to the earlier arbitration.

**B.     Legal Standards Regarding the SEC's Remedies Claims**

**1.     *Burden of Proof***

In an SEC enforcement action, the SEC need prove the elements of its case only "by a preponderance of the evidence, and may use direct or circumstantial evidence to do so." *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004); *SEC v. First Fin. Group of Texas*, 645 F.2d 429, 434 (5th Cir. 1981); *SEC v. Moran*, 922 F. Supp. 867, 888 (S.D.N.Y. 1996). This standard applies to remedies as well as liability. *Steadman v. SEC*, 450 U.S. 91, 103 (1981) (upholding preponderance-of-the-evidence standard in an SEC administrative proceeding).

## 2. *Permanent Injunction Against Future Violations of the Securities Laws*

Section 21(d)(1) of the Exchange Act (15 U.S.C. § 78u(d)(1)) authorizes the Court, upon a "proper showing," "to enjoin" any "acts or practices constituting a violation of any provision under this title [or] the rules or regulations thereunder." As the Sixth Circuit noted in *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984), "injunctions based upon the securities laws are primarily intended to protect the investing public from future misconduct." Because the basis "is statutory rather than equitable, the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief." *Id.* "[P]roof of irreparable harm and inadequacy of legal remedies need not be shown." *Id.*

The test for whether an injunction should be issued is "whether the SEC [has] shown a reasonable and substantial likelihood that [the defendant], if not enjoined, would violate the securities laws in the future." *Youmans*, 729 F.2d at 415. The Sixth Circuit considers seven factors in determining whether injunctive relief is appropriate: "(1) the egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances, if any, against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations, and (7) the defendant's age and health." *Id.* No single factor by itself is determinative. *Id.*

## 3. *Public Company Officer and Director Bar*

Section 21(d)(2) of the Exchange Act (15 U.S.C. § 78u(d)(2)) authorizes the Court to prohibit a defendant from serving as an officer or director of a publicly held company. The statute provides:

> [T]he court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 10(b) of this title . . . from acting as an officer or director of any issuer . . . if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

15 U.S.C. § 78u(d)(2).

In assessing unfitness to serve as an officer or director, courts typically consider: (1) the egregiousness of the violations; (2) the likelihood that the misconduct will recur; (3) the defendant's role or position when he engaged in the fraud; (4) the degree of scienter; (5) the defendant's economic stake in the violation; and (6) the defendant's repeat offender status. *See SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). Moreover, courts should weigh the "loss of livelihood and the stigma attached to the permanent exclusion from the corporate suite" against the likelihood of future misconduct. *Id.* at 142.

### 4. *Disgorgement*

Congress has expressly recognized the Commission's right to disgorgement of ill-gotten gains. "Once the equity jurisdiction of a Court has been invoked on a showing of a securities violation, the Court possesses the necessary power to fashion an appropriate remedy. Thus, the Commission may request that the Court order certain equitable relief, such as the disgorgement (giving up) of illegal profits." H.R. Rep. 98-355, at 7 (1983) reprinted in 1984 U.S.C.C.A.N. 2274, 2280.

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *SEC v. Hughes Capital*, 124 F.3d 449, 455 (3d Cir. 1997), quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). "The effective enforcement of the federal securities laws requires that the SEC be able to

make violations unprofitable." *SEC v. Manor Nursing Centers., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972). *See also SEC v. Lipson*, 278 F.3d 656 (7th Cir. 2002); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir. 1988); *SEC v. Randy*, 38 F. Supp. 2d 657, 673-74 (N.D. Ill. 1999). Court may add prejudgment interest to the disgorgement amount to avoid a defendant benefitting for the use of his ill-gotten gains interest free. *SEC v. Blatt,* 583 F.2d at 1335 (disgorgement is "the amount with interest by which the defendant profited from his wrongdoing"). Most courts use the interest rate applied by the Internal Revenue Service for unpaid balances. *SEC v. Randy,* 38 F.Supp.2d at 674.; *SEC v. Bocchino, ,*WL 31528472, at *3 (S.D.N.Y. Nov. 8, 2002) ("the district court generally calculates prejudgment interest by using the Internal Revenue Service rates for underpayment of taxes under 17 U.S.C. § 201.600(b)").

Calculation of the defendant's economic gain need not be exact, and determination of the appropriate amount is left to the sound discretion of the trial court. "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged. . . . The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation.' . . ." *SEC v. First Jersey Sec. Corp.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996), quoting *SEC v. Patel*, 61 F.3d at 139 (2d Cir. 1995).

**5.** ***Prejudgment Interest***

A decision to award prejudgment interest, and at what rate, like the decision to grant disgorgement, is in the broad discretion of the district court. *First Jersey Secs., Inc.,* 101 F.3d at 1476. Like disgorgement, an award of prejudgment interest is intended to prevent the defendant from profiting from his or her illegal conduct. *SEC v. Sargent,* 329 F.3d 34, 40 (1st Cir.2003). In

other words, it prevents the defendant from receiving "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran,* 944 F.Supp. 286, 295 (S.D.N.Y.1996). In deciding whether to award prejudgment interest, the court considers the following factors: (1) the need to fully compensate the wronged party for actual damages suffered; (2) the relative fairness of an award; (3) the remedial purpose of the statute involved; and (4) other general principles deemed relevant by the court. *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 613 (2d Cir.1994). In an enforcement action brought by the Commission, "the remedial purpose of the statute takes on special importance." *First Jersey Secs., Inc.,* 101 F.3d at 1476.

 *S.E.C. v. Marker* 427 F.Supp.2d 583 (M.D.N.C.,2006).

## 6.    *Civil Money Penalty*

Congress incorporated penalties into the securities laws when it enacted the Securities Law Enforcement Remedies Act of 1990 (the "Remedies Act").  The Remedies Act is now codified at Section 21(d)(3)(A) of the Exchange Act (15 U.S.C. § 78u(d)(3)(A)).  In enacting the Remedies Act, Congress explained its purpose in careful and succinct terms.  Congress gave the Commission authority to seek civil penalties in part because it considered the existing remedy of disgorgement to be insufficient.  "Since disgorgement merely requires the return of wrongfully obtained profits, it does not impose any meaningful economic cost on the law violator.  The Committee, therefore, concluded that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise would provide great financial returns to the violator."  S. Rep. 101-337 (1990) *reprinted in* 1990 WL 263550 (Leg. Hist.).

The Remedies Act provides for three penalty tiers.  In the absence of fraud, a first tier

penalty applies.  15 U.S.C. § 78u(d)(3)(B)(i).  A second tier penalty applies where the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 78u(d)(3)(B)(ii).  A third tier penalty applies where the violation involved "fraud, deceit, manipulation . . ." and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 78u(d)(3)(B)(iii).

## IV.  ANALYSIS

## A. Findings of Fact

While Courts relax somewhat the standard for a precise measure of any profits obtained as a result of a securities violation, the SEC has the burden of proof by a preponderance of the evidence as to the existence of the defendant obtaining some pecuniary benefit as a result of the securities violation.  In the present case where the SEC is seeking disgorgement of Mr. Conway's May 2001, $5 million retention loan, there is no problem with precision as to the amount of the alleged benefit, the dispute lies solely over whether the forgiveness of this $5 million retention loan was a result of the securities fraud by Mr. Conaway.  For purposes of this remedies consideration, this Court is bound by the jury's specific findings that Mr. Conaway was primarily liable for violating Section 10(b) of the Exchange Act and Rule 10b-5 based on: (i.) a misstatement in the MD&A of the 10-Q(3); (ii.) three omissions in the 10-Q(3); as well as (iii.) two statements he made at the November 27, 2001, conference call. In addition he aided and abetted Kmart in its violation of Section 10(b) of the Exchange Act and Rule 10b-5 through the same three wrongful acts on November 27, 2001, and  he aided and abetted  Kmart in its violation of Section 13(b) of the Exchange Act and Rules 12b-20 and 13a-13 in the misstatement

in the MD&A of the 10-Q(3) and its three omissions. As noted in the Memorandum Opinion on Defendant's Motion under Rules 50(b) and 59 (Dkt. # 185), whether there was sufficient evidence that Mr. Conaway committed these violations and whether he acted with adequate scienter are fact questions critically dependent on Mr. Conaway's credibility. While the jury was asked a great number of specific questions in the Verdict Form concerning their findings, there are many factual questions on which they did not make specific findings. Thus, additional findings of fact consistent with the jury's findings are necessary and appropriate in this remedies stage of the proceedings.

Based on the evidence presented at trial and at the September 16 and 17, 2009, hearing I make the following findings of fact. In order to assist the Sixth Circuit in understanding the evidence upon which these findings of fact are based I make substantial references to exhibits and testimony upon which I have relied. While at times my narrative notes "I find" or "I find more credible," these stylistic statements are not meant to limit my findings of fact to statements with such predicates because all of what follows I find to be the facts of this case.

The securities violations in this case that are supported by substantial evidence involve one misrepresentation and three omissions in the MD&A of the November 27, 2001, 10-Q(3) and two fraudulent statements in the Conference Call with analysts and others of that date. Those two statements were misleading because they furthered a coverup of the three material omissions that the jury found in the MD&A. I find that the conference call statements that the jury found to be misleading were conscious efforts of Mr. Conaway to blame the "noise" or discontent from Kmart's vendors as being due to two problems – a terming logic glitch in the conversion to a new computer system, Project eLMO, which delayed vendor payments that had

24

to be cleared and paid by "hand", and the second source of vendor discontent was the 25% of Kmart's vendors it was discontinuing.   The first of these explanations for vendor discontent was a false statement and the second, while having an element of truth, was used in a materially deceptive fashion by Mr. Conaway along with the Project eLMO lie to camouflage and quiet rumors "circling in the marketplace," to use Mr. Conaway's phrase, as to the true reason the bulk of Kmart's vendors were upset.  The truth that was being concealed was that these vendors were intentionally being stretched on payment because of an exceptionally difficult liquidity problem Kmart was experiencing in the third quarter of 2001.

Mr. Conway's August 17, 2001, letter to the Board estimated Kmart's liquidity cushion in early November's peak borrowing period would increase "from $200 to nearly $600 million." (Plf. Exh. # 110.)  The August 17 liquidity forecast that went to the Board showed a $544 million liquidity cushion.  (Plf. Exh. # 6, p. 2 & 4.)  Mr. Conaway by this time was aware of the Schwartz overbuy that he characterized as "totally unacceptable" and "Reckless." (Plf. Exh. # 188, p. 3.)   Assistant Treasurer Mark Moreland prepared an August 15, 2001, scenario forecast for Mr. McDonald, at a time when he thought the Schwartz overbuy was only $ 400 million, that showed a negative $135 million liquidity projected for a November 9 peak borrowing date.  Mr. Moreland prepared an August 31 liquidity forecast for Mr. McDonald and the Executive Leadership Team (which included Mr. Conaway) showing negative liquidity on October 10 considering the $850 million overbuy and projected positive comparable sales of 8% from the prior year for September, October and November.  (Plf. Exh. # 7.)  Mr. Moreland  prepared another forecast for the ELT assuming no improvement in sales from the prior year, and it revealed company needing "about $455 million of incremental borrowing capacity" to avoid

illiquidity. (Plf. Exh.# 9; Moreland 6/27/07, at TrDep00058.)   If sales were down 3% from the prior year, then the November 7 deficit would reach  $641.8 million. (Plf. Exh. # 10.)  With a $600 million reduction in future receipts of inventory and zero comp sales, a forecast Moreland prepared for the ELT shortly after September 5 showed a liquidity deficit of $597 million on October 24. (Plf. Exh. # 12; Moreland 6/27/07, at TrDep00062.)  Negative 3% comparable sales forecast a deficit exceeding one billion dollars on that date.  (Plf. Exh. # 16.) The actual sales for Kmart in the third quarter were down 2.2% overall, down 1.5% for comparable stores, from the prior year.[7]

While Defendant testified that the AP System changes were not a temporary response to the Schwartz overbuy and were commenced in July or early August (Conaway 5/27/09 at Tr02084-85), I find more credible the testimony of Messrs. Gilbert, Archambeau and Moreland that, unlike extended dating[8] or the working capital initiative[9] to negotiate better vendor payment terms that were begun before the Schwartz overbuy, the AP System changes were undertaken in August and September and, like Project SID, they were in response to the Schwartz overbuy in

---

[7] Plf. Exhs.  65, p. 22, 114, p. 4,183, p. 1, 121 at CC0098731 & CC0098734-35 .

[8] Extended dating was the Kmart change to adopt the industry practice and have the start date for payment terms begin to run from the date when the goods were received instead of the date of the purchase order. (Kearse 5/20/0, at Tr01259.)

[9]  The "working capital initiative" involved efforts to negotiate longer payment terms in the Vendor Authorization Forms used to set payment terms.  It had been undertaken in prior quarters and may have reached the limits of what was possible on better negotiated terms by the third quarter of 2001.  (Moreland 6/27/07, at TrDep00099; Boyer 7/19/07, at TrDep00382-83; Archambeau, 5/13/09, at Tr00470-71.)

order to maintain Kmart's liquidity, and they were intended to be temporary.[10]

Given the substantial number of ELT meetings in August and September dealing with the liquidity problem caused by the Schwartz overbuy and the negative liquidity scenarios Moreland was preparing for the ELT, it is inconceivable that CEO Conaway was not aware of the AP System changes and that they proved inadequate to deal with the liquidity problem.

In the week of September 3, 2001, Mr. Conaway met with Moreland and McDonald and approved the "confidential" "Project SID Process Overview" (Plf. Ex.# 11; Moreland 6/27/07, at TrDep00023-24; McDonald 4/23/09, at Tr02426-28; Conaway 5/27/09, at Tr02426-29.) Conaway was very supportive of Project SID because the "hung up in processing" mechanism of stretching vendors would not be obvious to the vendors. (Moreland 6/27/07, at TrDep00025-26.) Mr. Conaway asked that it be put into place as quickly as possible and McDonald and Conaway made it clear it was to be disclosed only a "very limited" number of people. (*Id.* at TrDep00026 & TrDep00028 .)[11] While press rumors and Kmart employee suspicions may have caused the

_____

[10] The testimony of Gilbert, Archambeau and Moreland was that these AP System changes were implemented in mid-August and in early September in response to the cash management problem caused by the August overbuy. (Plf. Exh. # 159, Gilbert 5/13/09, at Tr00359 & Tr00363; Archambeau 5/13/09 , at Tr00472-73; Moreland 4/23/09, at TrDep00145-45.) The dates on Plaintiff's Exhibits # 159 and # 135 support that testimony. At the time he was asked to implement the AP System changes in mid-August, Mr. Gilbert, assistant controller of accounts payable, was told the liquidity problem caused by the Schwartz overbuy was a short term problem that should be resolved by the end of September. (Gilbert 5/13/09, at Tr00361.) Mr. Archambeau also testified that he believed the AP System changes were temporary. (Archambeau 5/13/09, at Tr00479.) Plaintiff's Exhibit 20, page 3, notes "cash flow management changes," including the two waves of the AP System changes, that were instituted "[s]ince August . . . ."

[11] McDonald's and Conaway's concern, as expressed to Moreland, "was that if vendors understood that there was a liquidity crisis occurring, that they may not ship goods; and it could cause . . . a very bad public relations issue with the company." (*Id.* at TrDep00026-27.) I find this to be their concerns and part of the reasons they wanted Kmart's intentional slow pay

secrecy of these intentional slow pay schemes to begin to unravel by late October and early

November, it was the intent of Mr. Conaway to keep it a secret to avoid increasing the risks

vendors would not ship product, and Mr. Conaway lied to the jury when he indicated

otherwise.[12]

The amount of money held back for vendor payments under the AP System changes,

which continued through the end of the year, was approximately $300 million.[13]  The amount of

funds held back from vendor payments under Project SID are accurately stated within a plus or

minus 10% margin of error in Moreland's Project SID Master Tracking Document. (Plf. Exh. #

289A.)  The $300 million held back under the AP System changes continued throughout the fall

---

schemes to be kept secret.

[12] The testimony of Ms. Lindsey and  Messrs. Moreland, Gilbert and Archambeau was that the extraordinary and unprecedented slow pay efforts of the AP System changes and Project SID were kept to a small group of Kmart employees, and were not generally known at Kmart or to the public.  (Lindsey 5/18/09, at Tr00638-29 "behind closed doors"; Moreland 6/27/07,  at TrDep00026 "very limited"; Gilbert 5/13/09 at Tr00392 "top secret" &Tr00488 not "publically" known at Kmart; Archambeau, 5/13/09, at Tr00487-88; see also Kearse 5/20/09, at Tr01138 "not speaking to cash flow or slow pay would be the best course."  While rumors and suspicious in the press and at Kmart grew by November, what Mr. Conaway sought to accomplish in his November 27 conference call statements was to counter such rumors or "eliminate any misinformation that's clearly been circling in the marketplace." To do this, Mr. Conaway reiterated the eLMO excuse ("During our accounts payable conversion, certain invoices were dropped and has clearly caused some confusion") and added his new excuse for vendor noise that the confusion caused by the eLMO conversion  "was magnified by eliminating a quarter -- that's right, a quarter, 25 percent of our entire vendor base. This has been corrected and it's working as planned."  (Plf. Exh. # 57, at p.19-20.)

[13] Gilbert 5/13/09, at Tr00373-75.  Moreland also estimated the amounts held back by the AP System changes were in the range of $300 million. (Plf. Exh. #  20, at p. 3; Moreland 4/23/09 at TrDep00145-46.)

of 2001 and into January 2002.  This approximate $300 million withheld under the AP System changes was in addition to the amounts held back under Project SID.[14]

The September 11, 2001, terrorist attack  required the September 18 Board meeting to be held by telephone. (Plf. Exh. #  66.)  While the September 2001 Board Package  (Plf. Exh. # 65, p. 19) shows a $96 million liquidity cushion forecast, down $449 million from the August 10 forecast of a $544 million liquidity cushion on Kmart's peak borrowing date, the Board was not informed that this liquidity forecast was dependent on funds being held back under the AP System changes and Project SID.[15]  Without this information being provided to the Board, this $96 million liquidity cushion forecast was misleading and it suggests that this liquidity cushion was computed after all of the bills were "accounted for" or paid,  as Board member Stallkamp understood it.  (Stallkamp 5/18/09, at Tr00745.)  While Mr. Conaway likely discussed extended dating and the working capital initiative to negotiate better vendor payment terms at the September Board meeting, Mr. Conaway in the Board Package and what was discussed at that meeting did not make clear to the Board either the unauthorized Schwartz overbuy or the slow pay schemes of the AP System Changes and Project SID.  While the September Board package did show $825 million inventory over "Commitment" (*i.e.* Plan), there is no convincing evidence that the significance of this for Kmart's liquidity was made clear to the Board nor that the inventory build up was not simply an effort to improve in-stock position for Mr. Conaway's new

_____

[14]  Gilbert 5/13/09, at Tr00404; Moreland 6/27/07, at TrDep00073-74 & Moreland 4/23/09, at TrDep00143-46 & TrDep00150 & TrDep00163-64.

[15] The Moreland Master Tracking Exhibit (Plf. Exh. #  289A) does not reveal what was being held back prior to September 18, 2001, when the amount was $55 million.

BlueLight Always sales initiative.[16]

By the September 18, 2001, Board meeting, Mr. Conaway and his ELT members should have realized that in the aftermath of the September 11 attacks, zero comp sales or worse were probable for the quarter.[17] Assuming zero comp sales and a $600 million reduction in future receipts of inventory, Moreland's projections prepared for the ELT revealed a liquidity deficit of over half a billion dollars in mid-October, 2001. (Plf. Exh. # 12.) Indeed it was such dire projections that led McDonald and Conaway to initiate the AP System changes and Project SID. In this time frame the weekly meetings of the ELT spend at least 15 or 20 minutes talking about Kmart's liquidity. (Boyer 7/19/07, at TrDep00379.) The likely negative liquidity scenario Kmart was facing could have been revealed to the Board of Directors in confidence. Such data was information essential for them to exercise their oversight function and to assist Kmart's top management in how best to deal with this liquidity problem. While it might have taken additional time and cooperation from Kmart's vendor community and lenders, Kmart in

--------

[16] In an August 17, 2001, letter to the Board of Directors, Mr. Conaway told the Board that the second quarter ended with $283 million more inventory than the prior year due in large part to efforts to improve in-stock position for his new BlueLight Always sales initiative (Plf. Exh. # 110.) In his September 20, 2009, letter to the Board following the September telephonic Board meeting Mr. Conaway identified "canceling of receipts" and new accounts payable terms as means of managing liquidity, yet, he also noted Kmart's inventory "in stock, while improved, is well below our ultimate goal" and there was a probable need for "an additional $500-800 million more inventory in the immediate term." (Plf. Exh. # 113, p 2.)

[17] While the economic consequences of 9/11 were less severe and prolonged than many predicted, they were negative in the third quarter of 2001. GDP growth was already low in the first half of 2001 and data published in October showed that GDP actually contracted during the third quarter of 2001, but positive growth resumed in the fourth quarter. *The Economic Effects of 9/11: A Retrospective Assessment*, Congressional Research Service September 27, 2002, Report for Congress, from the Summary page preceding the table of contents. http://www.au.af.mil/au/awc/awcgate/crs/rl31617.pdf . (Last accessed February 7, 2010.)

September, October and November of 2001 likely could have obtain substantial additional secured borrowings against its $8 billion in inventory, and possibly against its $1 billion in real estate.[18] Defense Expert Avram Tucker noted Kmart's existing credit agreements allowed them to ask for an additional $500 million and Kmart could have accelerated the $3 billion secured credit facility they were working on for the next year.[19] Even Mr. Conaway acknowledged "We had billions and billions of borrowing capacity of which Jeff led and agreed with, to execute on." (Conaway 5/27/2009 , atTr02186.) In addition to cutting future inventory receipts to help manage the liquidity problem, CFO Jeff Boyer's preferred method of remedying the liquidity problem was to increase the credit revolver by additional borrowings secured by inventory, which is a "fairly easy thing to do" and "can be done pretty expeditiously." (Boyer 7/19/07, at TrDep00383-85 & TrDep00394.) Mr. Conaway opposed that but did consider possibly getting a secured credit facility in 2002. (*Id*. at TrDep00385 & TrDep00394.)

In his October 12, 2001, letter to the Board, Mr. Conaway noted September sales were flat from the prior year adding that "the economic effect of the [9/11/] tragedy will likely continue through the Christmas season . . . ." (Plf. Exh. # 71.) Mr. Conaway's letter notes that Kmart ended September with $1.1 billion more merchandise than the prior year related largely to "efforts to improve in-stock and support the BlueLight Always launch" but also identifying an effort to reduce inventory by the end of the third quarter. (Plf. Exh. # 71, p.2.) The Board

---

[18] Carmichael 5/21/09, at Tr01480-81; Adamson 10/17/2007, at TrDep00434 & TrDep00455-56.

[19] Tucker 5/21/09, at Tr01576-77. Mr. Tucker thought it would take at least three weeks to get additional bank lending but that additional capital or other expenses might be cut or additional cash on hand used in the short run. Tucker 5/22/09, at Tr01676

package for the October 23 telephonic meeting, again showed inventory up $1.1 billion from the prior year and projected comp sales down a half a percent for the quarter. (Plf. Exh. # 114, at pp. 13 & 17.)  Yet, an October 4 document prepared for the ELT by a working group consisting of Messrs. McDonald and Kearse, Jellinek and Moreland (who were deselecting invoices for payment and managing the cash crisis and thus were those most informed at Kmart about managing the liquidity crisis) had a far more gloomy projection of a negative 3% comparable sales until Thanksgiving and cumulative negative cash flow into December. (Plf. Exh. # 18, at p.2; Plf. Exh. # 20, at p. 2;  Moreland 6/27/07, at  TrDep00072-73.)  This information was not shared with the Board of Directors. Rather the October Board package showed the liquidity cushion was improved at $158 million.  (Plf. Exh 114, at p.27.)  Again, this figure showing residual borrowing capacity from the banks was misleading because the Board was not informed that it was built on additional "borrowings" from Kmart's vendors through delayed payments that on October 23 were approximately $682 million under Project SID and an additional $300 million under the AP System changes. (Plf. Exhs.# 289A and # 20.)   Again, at the October meeting the Board was not informed  of either of these two slow pay schemes nor that much of the increase in inventory was the Schwartz overbuy involving merchandise received earlier than plan and without Conaway's authorization.  Any discussion of managing payables at the October meeting, like the September meeting, left the Board with the impression that such activities were being undertaken through negotiations, and not unilaterally.[20]

---

[20]  Mr. Stallkamp testified that it was his belief that all changes in vendor payment terms discussed with him and the Board in August, September and October had been negotiated with the vendors.  (Stallkamp 5/18/09, at Tr00730-31, Tr00836,  Tr00754-55, Tr00758-59, Tr00769-71, & Tr00774.)

Two days after the October 23rd Board meeting the New York Times published an extensive article noting Kmart vendor payments being stopped in September without explanation and questioned if Kmart was seeking "to squeeze vendors." (Def. Exh. 22A, at p. 2.) Two days later CFO Boyer sent his "I'm very worried" email to Mr. Conaway noting the growing difficulty in managing "the mounting payment issue with vendors" and "the 'noise level' coming from our vendor community and their factors is increasing." (Plf. Exh. # 76.) He warned Mr. Conaway that increased purchases forecast for November would prevent Kmart from being "able to work down our nearly $800 million in past due invoices."

Kmart, with the knowledge and approval of Mr. Conaway on November 2, 2001, responded to the press rumors and vendor "noise level" with the "AP System Issues Talking Points" (hereinafter "Talking Points") blaming the delays in payments to vendors as being caused solely by terming logic problems in Project eLMO. (Plf. Exh. # 35.) While Project eLMO did generate an extraneous purchase order of $109 million, which error was likely caught before delivery of the goods, it would not have affected vendor payments. (Archambeau 5/13/09, at Tr00507; Gilbert 5/13/09, at Tr00428.) I find no documentary or any convincing evidence that Project eLMO caused even one vendor payment to be delayed.[21]

_____

[21] Mr. Archambeau and Moreland, who did the initial draft of Talking Points for the working group of McDonald, Kearse, and Jellinek, noted each of the Talking Points regarding eLMO causing delays in payments were false, a fabricated "storyline" or script to tell the vendors. (Archambeau 5/13/09, at Tr0050610; Moreland 6/ 27/ 07, at TrDep00085-87.) The eLMO conversion "was very successful." (Archambeau 5/13/09, at Tr00522.) Like Mr. Gilbert, Mr. Archambeau also testified the conversion did not affect hard line vendors and thus could not cause any delays in invoice payments on hardline invoices which were the majority of purchases. (*Id.* at Tr00505.) While it was possible a softline invoice might slip through their controls during the eLMO conversion, if that occurred it was "very isolated." (*Id.* at Tr00505.) ELT member Cecil Kearse, who was reluctant to acknowledge that many statements contained in the Talking Points were not true because of his involvement in the creation of Talking Points, ultimately

While denying at trial that he helped christen Talking Points at a November 2 meeting to which Mr. McDonald was summonsed, in a 2005 deposition Mr., Conaway acknowledged that he approved "a course of conduct" of vendors being provided "the explanation that the reason for the slow payments was a computer mistake." (Conaway 2/10/ 2005, at TrDep00314.) I find this earlier admission more credible than his testimony at trial. I find that Mr. Conaway on November 2 approved of Kmart's using Project eLMO in Talking Points as the sole excuse for vendor complaints over late payments. I find that he knew on November 2 that Project eLMO was not a significant or legitimate explanation for why vendor payments were being delayed, because Mr. Conaway knew that the cause of delays in vendor payments vendor was the intentional slow pay caused by Project SID and the AP System changes. I find that Mr. Conaway's testimony at trial that he talked with Mr. Stallkamp at his early November breakfast meeting about "stretching vendors" and "prioritizing invoices" is not true. (Conaway 5/27/09, at Tr02145-46.) I find more convincing Mr. Stallkamp's testimony that denied being told by Mr. Conaway about this unilateral program to stretch vendors at the November breakfast meeting. I find that the sole reason Mr. Conaway gave Mr. Stallkamp about the rumors of delays in vendor payments was an unintentional eLMO "IT system glitch" that would be fixed. (Stallkamp 5/18/09, at Tr00802-03.) I find that Mr. Conaway knowingly lied to Mr. Stallkamp at that November breakfast meeting.

A second major article in the November 8, 2001, New York Times questioned "Kmart's ability to pay off the money it owes," to which Mr. Conaway responded "Kmart is not short of

admitted that eLMO was "definitely not the reason why [vendors] weren't getting paid." (Kearse 5/20/09, at Tr01207.)

cash." (Def. Exh. 23A, at p. 4.) That same day CFO Boyer had a 60-90 minute one on one meeting with Mr. Conaway in which Mr. Boyer went through each of the 27 page PowerPoint presentation. For reasons noted in the January 20 opinion, I find Mr. Boyer's testimony more credible than that of Mr. Conaway concerning that meeting. I find that the meeting ended calmly with Mr. Conaway at least leading Mr. Boyer to believe he had approved contacting Jay Henderson, an independent PriceWaterhouseCooper ("PWC") partner in Chicago, to provide a quality review on Kmart's accounting methods for vendor allowances. (Boyer 7/19/07, at TrDep00395 & at TrDep00411, Plf. Exh. # 97.) While Mr. Boyer raised again the allowances issue (Plf. Exh. # 97, at p. p. 20, JNB 000025), to the annoyance of Mr. Conaway who thought that issues had been resolved, Mr. Boyer's concern was not an "[i]rrational" attack on Mr. Murphy's integrity as Mr. Conaway characterized it, but a "good faith" – albeit possibly a bit scrupulous – concern that the PWC earlier review of the allowances issue, apparently under Mr. Murphy's direction, was his evaluating his own work and not necessarily a neutral evaluation. While CFO Boyer did raise that Kmart "[m]ay need to plan for bankruptcy filing" (Plf. Exh. # 97, at p. 18, JNB 000023), this was not presented as merely a "strategic bankruptcy" as Mr. Conaway characterized what Boyer said (Conaway, 5/27/09, at Tr02176-85), but was a realistic concern given Kmart's difficult liquidity position that ended in bankruptcy eleven weeks later.

Mr. Conaway testified that he and Boyer never got beyond the Jim Adamson talking points which would have been the first 8 pages of the 27 page presentation.(Conaway, 5/28/09, at Tr02510-13.) After raising the allowances issue, the independence of Kmart's PWC accountant and the "strategic bankruptcy," Mr. Conaway testified that he realized he had to let Boyer go. (Conaway 5/27/09, at Tr02186.) Several reasons lead me to believe that Mr. Conaway

was not telling the truth when he said they never got beyond the Adamson talking points in the first 8 pages when Boyer expressed his concerns over Joe Murphy's independence, Kmart's allowances and bankruptcy.   First, for reasons noted here and in the January 20 opinion, I find it more likely than not that Plaintiff's Exhibit 97 was Mr. Conaway's copy of the Boyer November 8, 2001, presentation and this exhibit had Mr. Conaway's markings on multiple pages after page 8.[22]  The three issues that Mr. Conaway testified caused him on November 8 to determine that Mr. Boyer had to be fired were Boyer's revisiting of the allowances issue, questioning the integrity and independence of Kmart's lead PWC auditor, Joseph Murphy, and suggesting  "we should do a strategic bankruptcy to fix our capital structure." (Conaway at 5/27/2009 Tr02183-85.)  Mr. Boyer acknowledged he might have  discussed a "strategic bankrupty" "some months

---

[22] There is no evidence that anyone other than Mr. Boyer and Mr. Conaway had a copy of this power point presentation (Boyer 7/19/07, at TrDep00395). While Mr. Conaway denied certain "doodlings" on Plaintiff's Exhibit # 97 were his (Conaway 5/28/2009, at  Tr02512), of these two witnesses who were involved with this document the evidence is that only Mr. Conaway had a penchant for doodling as found on two pages of Exhibit # 97. (Compare  Exhibit # 97, at p. 15, JNB000020 & p. 22, JNB000027, with Conaway's September Board Package, Def. Exh. # 119, at the unnumbered  page after  p. 1, CC 1114555, the unnumbered page after page 24, CC 1114583,  and the unnumbered page after p. 25, CC 1114585, and his October Board Package, Plf. Exh. 27, at p. 2, K 244435.)  Plaintiff's Exhibit # 97 has handwriting/printing sufficiently similar to Conaway's writing on his September and October Board Packages to be Conaway's, and while there was a change of writing instrument and/or handwriting on page 2, JNB000007, there is a solid headed arrowhead on that page similar to five such arrowheads found in the Conaway's copy of the September and October Board Packages.  (Def. Exh.# 119, at first page, and page after  p. 1, CC 1114555, page 21, CC 1114576, page after page 24, CC 1114583,  and his October Board Package, Plf. Exh. # 27, at p. 2, K244435.)  Mr. Conaway suggested at trial that a non-solid headed arrowhead on Plaintiff 's Exhibit # 97, p. 20, JNB 000027, was not his because  "that arrow is different than how I do arrows," apparently referring to his doing solid headed arrowheads. (Plf. Exh. #  97, at p. 22, Conaway, 5/28/09, at Tr02513-14.)  As noted above five such solid arrowheads are found on Mr. Conaway's copies of the September and October Board Packages. Such a solid arrowhead is also found on page 2 of the Boyer November 8, 2001, power pont presentation. (Plaintiff 's  Exhibit 97, CC JNB000007.)

earlier" but Boyer's November 8 document notes only "May need to plan for bankruptcy filing." (Boyer 7/19/07, at TrDep00414; Plf. Exh. 97. at JNB 000023.)  I find Mr. Boyer's testimony credible that he and Mr. Conaway went through his presentation "page by page" because Boyer went to the extra effort of preparing a PowerPoint presentation to "make sure we covered all the points" in the meeting and "didn't forget any."  (Boyer 7/19/07, at TrDep00395 &  TrDep00408.) The possibility of a plan for bankruptcy is not in the first 8 pages, but on page 18. (Plf. Exh. # 97. at JNB 000023.) Similarly the allowances issue is not found in the first 8 pages, but in the last 8 pages, which pages have what are Conaway's doodlings and later the handwritten name "Jay Henderson" whom Boyer had worked with at PWC and whom he recommended to do the allowances issue review. (Plf. Exh. #  97. at JNB 000025-31.)  Thus, while acknowledging that he and Boyer discussed possible bankruptcy and the allowances issues, Mr. Conaway denies reviewing the pages of Mr. Boyer's PowerPoint presentation that covered those two issues.

Mr. Conaway specifically denied reviewing the page on "Implications/Next Steps" (Conaway, 5/28/09, at Tr02512-13.)   That page warns that Kmart would not meet its financing covenants to the banks, its cash flow was "close to $500 million negative,"  leading to "Credibility" issues with the "Board, Rating Agencies, Banks and [Wall] Street." (Plf. Exh. # 97, at p 18,  JNB 000023.) This page then recommended a need to develop financial contingency plans including a fundamental restructuring of financing, a possible need to plan for bankruptcy, and the need to"[d]iscuss issues with the Board at the November Board Meeting."   In his direct testimony at trial Mr. Conaway testified that on November 8, 2001, he and Boyer discussed possible bankruptcy.  (Conaway, 5/27/09, at Tr02185-86) Yet, the next day, when confronted with Plaintiff's Exhibit # 97 and the question "Now, do you see the bottom where it says 'May

need to plan for bankruptcy filing' . . . . You don't recall discussing that with him at this meeting?," Mr. Conaway adamantly asserted: "We did not discuss it. We didn't go through anything past  the Jim Adamson talking points and the three points that we talked about." (Conaway, 5/28/09, at Tr02512.)  Yet, the three points he referred to from his testimony the day before included bankruptcy.  Directing Mr. Conaway's attention to the sentence on that page: "Discuss issues with the Board at the November Board meeting," he was asked if that included the "the concerns that he [Boyer] had expressed in his October 27 ["I'm very worried"] e-mail and other concern."  Mr. Conaway responded.

> Well, I would assume that Jeff would want to talk to – again, we didn't go through this package past Adamson.
> So, after Jeff discussed again that our accounting system, how we booked for allowances was wrong – although this time he wasn't talking about a restatement. He just thought it was wrong. I would assume that if that's true, we would have to talk to the Board about that.
> We would also have to talk to the Board about that our lead audit partner was not independent and had been unethical.
> So, I would assume all of the comments that we talked about during that, if he felt he was still going to be employed, would be talked about in November.

*Id.* at Tr02513.

While not specifically discussing Project SID at the meeting,  when asked to explain why he had concern about credibility with the Board, Mr. Boyer noted that there were certain things related to financing the Board was not aware of.  (Boyer 7/19/07, at TrDep00398.)  Boyer knew that if they were going to recommend an alternative secured financing plan, it would have to be explained "why that is" given the Board's understanding that Kmart's capital/financial structure was appropriate. (*Id.* at TrDep00399.)  You "have to . . .  [t]ell them why it's not appropriate, which means getting into funding sources, such as Project SID." (*Ibid.*)  His "goal" in listing

"Discuss issues with the Board at November Board Meeting" was "to have a conversation with the board that would clarify all elements of our cash management system, including Project SID." (*Ibid.*) Both Boyer, who attended and made Board presentations, and Assistant Treasurer Moreland, who prepared financial materials for the ELT and Board, did not believe "that the board had a sense that Kmart was unilaterally not paying its vendors on time as part of its cash management program in the third quarter?" (*Id.* at TrDep00399-400; Moreland 6/ 27/ 07, at TrDep00055 & TrDep00088-89.) I find Boyer and Moreland's testimony on this to be credible, and I believe Mr. Conaway attempted to mislead the jury in his testimony suggesting that he disclosed unilateral slow pay to the Board at the September and October meetings.[23]

Boyer admitted that he did not explicitly tell Mr. Conaway that they had to tell the Board about stretching vendors nor did he tell Conaway of the need to tell the public about stretching vendors noting that "[t]he typical time that you would do that is in the preparation of a 10Q, and we had not started the preparation of the 10Q yet." (Boyer 7/19/07, at TrDep00415.)

I find that Mr. Conaway was attempting to mislead the jury when he denied reviewing with Boyer this important page of the PowerPoint presentation that raised Kmart's critical financial structure, its half a billion dollar negative cash flow, credibility problems with the Board, banks and investors and urged fuller disclosures at the November 20 board meeting. I find that Mr Conaway, as well as Mr. Boyer, knew that a fuller discussion with the Board concerning Kmart's financial structure as a prelude to discussing an alternative secured financing

---

[23] Again, Board member Stallkamp testified that his understanding throughout the fall of 2001 was that efforts to get more favorable vendor payment terms was done by negotiations and not unilaterally or without vendor consent. (Stallkamp 5/18/09, at Tr00708 & Tr00730.)

plan, that involved more secured borrowing, would entail a discussion of Kmart's intentional slow pay schemes that had grown much larger that originally anticipated.[24]  I find that Mr. Conaway at trial did not want to acknowledge his CFO raising with him on November 8 the need for a discussion of these troubling financing issues with the Board in order to camouflage his real reasons for firing Boyer.  Mr. Conaway realized that he had a highly scrupulous CFO who was "very worried" about the mountains of debt occasioned by the slow pay scheme and who wanted to make fuller disclosures at the November 20 Board meeting in order to improve the credibility of Kmart's top management with its Board.  Mr. Conaway realized that this CFO was also concerned about Kmart's credibility with bankers, rating agencies and investors.  As former CFO  at CVS Pharmacy and later CFO at its parent corporation Melville Corporation (Conaway 5/27/09, at Tr02009), Mr. Conaway was also well aware that the MD&A of a quarterly statement had to discuss the corporation's liquidity.   (Conaway 5/28/09, at Tr02403.)  Mr. Conaway knew, or was in a reckless state of denial in not knowing, that any fair and accurate description of Kmart's liquidity situation "through the eyes of management" could not have omitted some reference to the billion dollar liquidity machine he, McDonald, Moreland, and Conaway's "franchise" Gilbert had built with the slow pay of vendors.   He also knew on November 8 that if his "very worried" and scrupulous CFO Boyer wanted to have a fuller discussion with the Board on November 20 on Kmart's "[s]ignificantly negative cash flow"  and need for fundamental restructuring of Kmart's financing plan, this same CFO, who was in charge of drafting the 10-Q(3) and its MD&A on liquidity and concerned about credibility with banks, rating agencies and

---

[24] On November 8, Plaintiff's Exhibits 289A and 20 indicate that Kmart was still nearly a billion dollars behind in its vendor payments –  $679 million under SID and $300 million under the AP System changes..

investors, may want to make disclosures on how Kmart maintained liquidity in the third quarter of 2001 that Mr. Conaway did not want disclosed.

After the November 8 meeting, Conaway first contacted Board Audit Committee Chairman James Adamson and relayed to him the three reasons for firing Boyer – revisiting the allowances issue, questioning PWC Murphy's independence and suggesting a strategic bankruptcy. (Conaway 5/27/2009, at Tr02188.) Mr. Conaway noted that Adamson's "initial response was you got to fire Jeff [Boyer] immediately." (*Id.* at Tr02189.) Thereafter he call Board Finance Committee Chairman Thomas Stallkamp and told him he was going to discharge Boyer because: (i.) he was not a team player; (ii.) was not working well with other members of management, (iii.) had gone around the CEO ("CFO" (sic) in transcript) and "asked for a second opinion on an accounting issue outside of the normal channels without anybody's approval," and (iv.) was making "ludicrous or irrational statements about thinking about strategic bankruptcy" which Mr. Conaway told Stallkamp was "nonsensical, not necessary." (Stallkamp 5/18/09, at Tr00789-90.) Stallkamp realized that firing the CFO was the CEO's decision, but he thought it was a bad idea because of the timing in Kmart's turnaround efforts just before the holidays and the speculation that it would cause with the investing public. (*Id.* at Tr00790-91.) He also noted that had the Board been told that Boyer had presented a "real need to plan for a possible bankruptcy," as opposed to an instrumental "strategic bankruptcy," he would not have considered that a legitimate basis for firing Boyer. (*Id.* atTr00793.)

At a special telephonic Board meeting on November 9, 2001, Mr. Conaway gave the same reasons for firing Boyer, which the Board approved alone with the elevation of Treasurer John McDonald to the CFO position.. (*Id.* at Tr00792; Plf. Exh. 116.) I find that while Mr.

Boyer may have discussed a "strategic bankruptcy" months earlier, his presentation on November 8, 2001, on bankruptcy was a reasonable suggestion to plan for that possibility after 9/11 and in light of Kmart having approximately a billion dollars in committed funds due to its vendors. I find credible Boyer's testimony regarding the November 8 discussion of the allowances issue and PWC's Joseph Murphy, that while a sensitive topics, it did not lead to the heated exchange and hostile ending that Conaway asserts. I find that whether he intended to honor the commitment or was merely stringing Boyer along until he could line up support to fire him, Conaway led Boyer to believe on November 8 that he approved his getting PWC's Jim Henderson to do another review on the allowances issue. I see no reason Boyer would want to misrepresent these facts, while I see clear reasons why Mr. Conaway would want to exaggerate Boyer's shortcomings in order to justify his getting rid of him because of the threat he posed. I also find no evidence to support Mr. Conaway's statement to Mr. Stallkamp that Boyer went outside of Kmart's chain of command and "asked for a second opinion on an [allowances] accounting issue outside of the normal channels without anybody's approval." (Stallkamp 5/18/09, at Tr00789.) [25] I find that Mr. Conaway realized the risks that Mr. Boyer posed to: (i.) Conaway's desire to keep from his Board and the public disclosures about Kmart's extraordinary slow pay schemes to managing liquidity in the third quarter of 2001, (ii.) the continuing viability of "Talking Points" and the eLMO excuse, and finally (iii.) Conaway's credibility with Stallkamp, Adamson and other Board members if Boyer remained as CFO in preparing the November Board package and presentation and in preparing the 10Q for Kmart's third quarter of

---

[25] Mr. Adamson indicated his belief that Mr. Boyer should have confronted to Murphy before seeking a review by Jay Henderson. (Adamson 10/17/07, at TrDep00455 .)

2001. I agree with Mr. Stallkamp that this was a bad time in Kmart's attempted turnaround to take the dramatic gesture of firing a CFO who had been on the job only six months. Given this, whatever real whining or equivocating Boyer may have done over Murphy and the allowances issue or any desires of his to plan for a bankruptcy – strategic or legitimate as it proved to be eleven weeks later – the allowances issue and the bankruptcy concerns of Boyer could easily have been managed backstage by Mr. Conaway with stern warnings to Boyer backed by Adamson's and Stallkamp's reinforcement (their Audit and Finance Committees had frequent interaction with Boyer). Kmart could have easily gotten through the 2001 holiday season without Conaway "rocking the boat" with an abrupt CFO discharge. I find that given the risks to Kmart's turnaround by a precipitous firing of Boyer, there had to be a more significant reason that motivated Mr. Conaway to make this risky move. I find that the real reason Mr. Conaway fired Mr. Boyer was to avoid the risks that Boyer would continue to push for fuller disclosures on Kmart's liquidity problems and the means of dealing with them in the November 20 Board meeting and again in the Form 10Q-(3) – disclosures far broader and more candid than Mr. Conaway wanted given his belief and hope that the "cash crisis" would soon be over.[26] I find

---

[26] Referring to what I find to be a feigned frustration with Boyer mentioning bankruptcy on November 8, Mr. Conaway at trial railed against a "strategic bankruptcy":

> Well, it concerned me because we were directly
> violating our fiduciary responsibl[ity] to the shareholders.
> You know, we had significant liquidity. We had billions
> and billions of borrowing capacity of which Jeff led and
> agreed with, to execute on. Our stock was, you know, $7 a share.
> Within two weeks from where I met to Jeff, two to three weeks,
> we were going to have a billion dollars projected of liquidity and
> cash. And he's talking about a strategic bankruptcy. You
> can't do that. You can't just go into bankruptcy because
> you think it will be easier. You can't do that. That's
> violating your fundamental fiduciary responsibility as an

that Mr. Conaway exaggerated and distorted the facts concerning: (i.) Boyer going outside the

chain of command to get another review on the allowances issue; (ii.) Boyer's concerns about

Joseph Murphy; (iii.) Boyer not being a "team player" and not working well with other members

of management[27]; and (iv.)  Boyer solely suggesting a "strategic bankruptcy" which Conaway

could ridicule as "ludicrous," "nonsensical, not necessary." (Stallkamp 5/18/09, at Tr00790.)[28]  I

find that Mr. Conaway exaggerated and distorted these characterizations about Mr. Boyer in

order to line up the support of critical Board members Adamson and Stallkamp whose support

was important to Mr. Conaway justifying to the full Board this precipitous and risky decision to

fire Kmart's CFO.  I find that had Mr. Conaway made a fair presentation to the Board of the sum

---

officer in the company. But, especially, as a chief
executive officer and chief financial officer.

(Conaway 5/27/2009, at Tr02186-87.)  Two weeks after November 8 was November 22), when Kmart was still approximately $850 behind in vendor payments under Project SID and the AP System changes.  (Plf. Exhs,. 189A and 20.) Three weeks after November 8 was November 29 when the figures were approximately a half a billion dollars of "committed funds" needed to coer past due vedor payments. (*Ibid.*)  Instead of the billion dollars of projected liquidity Mr. Conaway referred to on May 27, 2009, Kmart's Weekly Treasurer's Report for November 21 and November 28, 2001, show only a $26.7 million and $470 million liquidity cushion available on those two dates, and again these liquidity cushion amounts did not take into account the hundreds of millions in committed funds in overdue vendor payments.  (Plf.  Exh.  63.)


[27] There was not any testimony or other evidence suggesting that Mr. Boyer had any problems with other members of Kmart's management.  Any assertion by Mr. Conaway that Mr. Boyer was not a team player would be correct only if one assumes that to play on Mr. Conaway's team meant one would make misrepresentations and take whatever steps were necessary to paper over and keep from the public, or even the Board, disclosures about the true nature and extent of Kmart's liquidity problems in the third quarter of 2001 and the extraordinary slow pay schemes devised to deal with them.

[28]  Plaintiff's Exhibits 289A & 20  show $679million in vendor borrowings under project SID on November 8 and an estimated additional $300 million in AP System borrowings from hardline vendors.

and substance of his November 8 meeting with Mr. Boyer, the Board would not have supported the discharge of Boyer.[29]

The evidence indicates that Conaway was in his office midday November 11, 2001, when the Jerry Levin 12:33 p.m. fax was sent to him. (Plf. Exh. # 107.)[30] At trial Mr. Conaway denied writing the response to Sunbeam's CEO which letter used the phoney eLMO excuse of "the breakdown . . . on our hard lines and soft lines integration." (Plf. Exh. # 108.)[31] In a 2003 deposition, he suggested he dictated the response by phone from the field. (Conaway 1/23/03, at TrDep00309-10.) When asked, "Were you intending to imply that the reason that he hadn't been paid was related to the integration of the hard and soft lines?" He responded "Yes, yes. That's implied in this letter," and went onto explain that the systems issues at Kmart were bigger than the overbuy problem that was one of short duration that they could manage. (*Ibid*.) While stating that he did not specifically recall this letter, he did note in his 2003 deposition that it was his response, and he later stated, "I was writing him to communicate to him of what I thought was going to be the resolution. . . . I was just trying to communicate to him where we were and when we thought we would be caught up." (Conaway 1/23/03, at TrDep003112.) While the

---

[29] Had he been informed that the plan for bankruptcy was a good faith concern, which I find it was, Board member Stallkamp noted he would have made a difference in how they viewed the Boyer discharge. (Stallkamp 5/18/09, at Tr00790.)

[30] His calendar shows Mr. Conaway had a November 12, 2001, breakfast meeting at the Townsend Hotel near Kmart's headquarters, a "1:00-1:30 pm Martha Stewart call," an afternoon flight to New York to receive an award returning that night to Michigan, and he flew to Orlando on the morning of November 13 when the response letter to Levin was dated. (Plf. Exh. # 190.)

[31] The eLMO excuse was unquestionably a phoney excuse with respect to Sunbeam which sold hardline products. Hardline products were already on the eLMO system in the fall of 2001 and the conversion to add softline products had no effect of vendor payments for hardline projects. (Gilbert 5/13/09, at Tr00424-26; Archambeau 5/13/09, at Tr00505.)

Conaway response to Sunbeam's CEO Levin was likely a joint effort,[32] and may not have been totally dictated from the field, I find that Mr. Conaway was aware of what was in his response to this CEO of another major U.S. corporation. If the Levin letter was sufficiently significant to get a "fyi" notation to Mr. Conaway, I find its response was of similar significance to be brought to his attention.[33]

Central to Mr. Conaway's defense was his claim that the extraordinary slow pay schemes Kmart undertook to deal with its third quarter liquidity problems were not a secret. If the AP System changes and Project SID were not a secret, then he could not have been motivated to keep it a secret when the MD&A was drafted in November of 2001. Two other elements of his defense were that he did not know what vendors were being told, and that he did think the that eLMO caused substantial problems with vendors being paid late. If eLMO did cause significant vendor payment delays, then a jury would be less inclined to believe that the Project eLMO story line was intentionally fabricated to cover up the "secret" real reason vendor payments were being delayed. Also, if Conaway knew what vendors were being told as expressed in Talking Points, he would know that the *sole* excuse being given to vendors was the eLMO excuse which would demonstrate his knowledge that vendors were not being told the whole truth. As noted in the

---

[32] The Conaway copy of the Levin letter notes John McDonald got Jeff Stark involved in the response, and it was copied to Head Merchant Cecil Kearse. (Plf. Exh 107.) The text of the response also indicates that Mr. Conaway "talked to Cecil" about the problem. (Plf. Exh. # 108.)

[33] In his earlier deposition when asked about the response letter's reference to "the breakdown . . . on our hard lines and soft lines integration," he was asked "Were you intending to imply that the reason that he hadn't been paid was related to the integration of the hard and soft lines?" (Conaway 1/23/03, at TrDep00310.) He responded,"Yes, yes. That's implied in this letter." (*Ibid*.)

January 20 Rule 50(b) opinion, it is unclear if Mr. Conaway thought giving them only the eLMO excuse was a lie, or merely "not disclosing."[34]

But in this case we are not dealing with Talking Points being only a "half-truth" making it misleading because of what was not disclosed. For reasons noted above I find, and likely the jury found, that the eLMO excuse in Talking Points was false, a total fabrication. I further find that Mr. Conaway knew it was a false cover story.[35] For reasons stated in the

---

[34] After Mr. Conaway identified 6 things that affected timing of vendor payments – 1. the AP System changes, 2. extended dating to date of receipt of goods, 3. prioritizing invoices (SID), 4. moving softline vendors from 30-60 days, 5. other unspecified policy changes, and 6. eLMO, the following exchange took place:

> Q. You would agree, would you not, -- you would agree with me that there is never an appropriate reason that would justify you or Kmart people lying to vendors?
> A. Yeah, I don't think you have to lie. No. I don't think that that's appropriate. That's not necessary. You clearly don't have to disclose everything, but you don't have to lie to them.
> Q. So in your view if you don't disclose everything that's going on when they ask a question and what you don't disclose would be responsive to their question that's not lying?
> A. No. No, I --
> Q. That's not lying?
> A. If they ask a question, yes. And you determine that you're not going to disclose the information to them, no, that's not disclosing. That's not lying.
> Q. No, no, you are disclosing. You're disclosing one-sixth of the information, eLMO?
> A. Right.
> Q. That's not lying?
> A. Well, that's inaccurate then, yes.
> Q. That's a lie?
> A. If -- if the reason --if that is not directly pertaining to it, yes.

(Conaway 2/13/08, at TrDep00338-00344.)

[35] Multiple facts support a finding that Mr. Conaway knew the eLMO cover story was false and that he knew it was the centerpiece of Talking Points: (i.) the eLMO storyline was the direct product of a November 2 meeting Mr. Conaway had with Mark Schwartz, Jeff Boyer and Cecil Kearse; (ii.) to which Treasurer McDonald was called up after the meeting to take notes on what became Talking Points (McDonald 5/28/09, Tr02646); (iii.) Conaway's Outlook Calendar

January 20 Rule 50(b) opinion, I find that Mr. Conaway also lied when he said he learned about

eLMO causing problems with vendor payments from Lorna Nagler (Conaway 2/13/08, at

TrDep00334-35, 5/27/09 at Tr02162-63.)  Ms. Nagler, who had no motivation to lie, testified to

the contrary, and I find her testimony more credible than that of Mr Conaway.[36]

Board Finance Chair Thomas Stallkamp testified that while increases in inventory were

disclosed to the Board in August and later in the September and October Board materials, it was

not revealed that this was not with the approval of CEO Conaway and, until November, he

believed it was in accord with the plan.[37] (Stallkamp 5/18/09, at  Tr00729 & Tr00766-68.)   He

_____

for November 2 showed an entry "Vendor Talking Points w/ John, Cecil, Mark, Jeff" (Plf. Exh. #
190 at November 2, 2001); and (iv.) Mr. Conaway on multiple occasions used variants of the
eLMO systems integration issues cover story –  in his letter to Sunbeam's Levin, twice in
breakfast meetings with Thomas Stallkamp, in his November Board meeting, in his November
27 conference call remarks.

[36] Lorna Nagler testified that she had no knowledge of project eLMO causing problems
with invoices being paid, and she would have been made aware of that had it been a problem .
(Nagler 4/18/08, at TrDep00349.) She was also clear that she never told Mr. Conaway that they
"could not process invoices because of Project eLMO" or that her part of BlueLight Always was
in jeopardy because of  because of Project eLMO or "eLMO system integration issues." (*Id. at*
TrDep00351.)

[37] Although  the August Inventory Summary on page 29 of the 37 page September Board
Package noted a negative $825 million  inventory variance to "commitment" or plan, which Mr.
Conaway identified as the "overbuy," I discredit Mr. Conaway trial testimony suggesting that
Mr. Stallkamp was mistaken in saying the Board was not told about the Mark Schwartz
unauthorized overbuy until November. (Conaway, 5/27/09 at Tr02122-23, Def. Exh. 119, p 29.)
There is no evidence that this page 29, and Mr. Schwartz's unauthorized overbuy, was discussed
at the September Board meeting that had to be shortened and done by telephone due to 9/11's
impact on airline transportation. While this Board package exhibit has Mr. Conaway's
handwritten notes and things underlined or circled in various sections to show items Mr.
Conaway may have wanted to highlight for the Board, this $825 million inventory has no such
notation, underlining or circle. The Board minutes (Plf. Exh. #  66) make no reference to any
overbuy, and Mr. Conaway's September 20, 2001, follow up letter to the Board is similarly
silent on any "overbuy," and talks about a need for "an additional $300-500 million more
inventory in the immediate term." (Plf. Exh. #  113 p.2.)

testified that he learned about the President Mark Schwartz's August $850 dollar overbuy that Conaway had not approved at the November Finance Committee meeting the day before the Board meeting. (*Id. at* Tr00797.)[38] The Board was upset at this unauthorized purchase at a time when liquidity was tight, and they asked for a meeting alone with CEO Conaway after the Board dinner. Mr. Stallkamp testified that Mr. Conaway told the Board that they had not been informed of this earlier in August, September or October because he was not aware of it then. (*Id.* at Tr00797.) I find that Mr. Conaway lied to the Board about when he learned of the Schwartz overbuy to justify his not earlier explaining to the Board the dimensions of the overbuy and the degree to which it aggravated the liquidity situation in the third quarter.

The November Board package showed a deterioration in liquidity from $158 million in October's package to $97 million on the peak borrowing date. I find this figure to be misleading without a disclosure that it was built on committed funds for past due accounts payables on November 7 of approximately one billion dollars.[39]

---

[38] At the remedies hearing Mr. Stallkamp thought this might have occurred at the December Board meeting (Stallkamp 9.16.2009, at Tr02969 & Tr02999-03000), unlike his testimony at trial that place it at the November Board meeting. Mr. Adamson also noted the Schwartz inventory overbuy ws disclosed at an in person meeting in Detroit "it would be, I guess the next one we had in Detroit was November." (Adamson 10/17/07, at TrDep00449.) Because the November Board meeting was the first in person meeting in Detroit after September 11, I find that this disclosure occurred at the November Board meeting. The Arbitration Panel (at p. 15-16) notes that a controversial retention loan of $2.25 million was paid to Schwartz in December just weeks before Schwartz was fired. Neither Mr. Stallkamp nor Adamson note the meeting involving at which the Conaway made disclosures regarding the Schwartz overbuy were at a meeting in which Conaway discussed firing Schwartz.

[39] Approximately $700 million being held back on November 7 under Project SID in addition to the $300 million under the AP System changes. (Plf. Exh. # 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163-64.)

I credit Mr. Stallkamp's testimony over that of Mr. Conaway and find that at a November breakfast meeting, where Mr. Stallkamp expressed concern over the rumors in the press about vendors not being paid on time, Mr. Conaway told him the eLMO cover story to explain the vendor payment problem. (*Id. at* Tr00801-03.) Mr. Stallkamp testified further that Mr. Conaway repeated this eLMO IT explanation to the full Board at their November Board dinner and again to Mr. Stallkamp at a second breakfast meeting in December. (*Id.* at Tr00804-05.)

When he received the October 12 letter from Conaway referring to ending September with $1.1 billion more inventory than the prior year, Mr. Stallkamp thought it was related to BlueLight Always and he was not told it was acquired without the approval of Mr Conaway. (*Id.* at Tr00766-67; Plf. Exh. #180.) The November Board Package showed that the $1.1 billion inventory over plan had been cut to $600 billion over plan by the end of October. ( *Id.* at 168, Plf. Exh.# 121, at p. CC 0096841.)

In making these findings of fact on the remedies issue, many of my determinations are based, in part, on my questioning Mr. Conaway's credibility because of what I find to be his misrepresentations at trial. I find credible the testimony of Board members Stallkamp and Adamson that they were not informed in the fall of 2001 of Mr Conaway's decision to unilaterally add days to payment terms without the consent of the vendors. I find that Mr. Conaway was incorrect in his testimony that he did disclose this to the Board at the September and October telephonic Board meetings. (See text and transcript discussing Conaway 5/27/09 at *Id.* at Tr02116-17 and at Tr02144 in **I. Background Facts C. Communications with the Board** of the January 20, opinion.) I find that had Mr. Conaway disclosed to the Board, or to Mr. Stallkamp individually, that he approved unilateral delays in payments without the consent of the

vendors, neither Mr. Stallkamp nor Mr. Adamson would have forgotten this because each testified that he would have opposed this move.   (Stallkamp 5/18/09, at Tr00741& 0078; Adamson 10/17/07, at TrDep0044 & TrDep00448 .)  As noted above both Mr. Boyer and Moreland also did not believe that the Board had been adequately informed about the intentional slow pay systems. (Boyer 7/19/07, at TrDep00399-40; Moreland 6/ 27/ 07, at TrDep00055 & TrDep00088-89.)

In addition to finding that Mr. Conaway was deceptive at trial in his testimony that Project SID and the bulk of Kmart's unilateral efforts to slow pay vendors were not a secret, I find that Mr. Conaway also lied when he repeatedly asserted that he did not know what vendors were being told and when he earlier testified that "I assume anything that we put in a talking point would be truthful." (Conaway 2/13/08, at TrDep00333,  TrDep00339, TrDep00340, TrDep00341,TrDep00342 & Conaway 5/28/09, at Tr02631.) I find that in the fall of 2001 Mr. Conaway knew the major "noise" coming from the vendor community was because of Project SID that he approved the week after Labor Day 2001. I find that Mr. Conaway did not believe Project eLMO was causing any significant invoice payment problems.  Mr. Conaway lied at trial when he denied telling Mr. Stallkamp and the Board that the only reason for the delay in vendor payments was problems with eLMO.  (Conaway 1/22/03 at Tr02147-48.) [40]

## B.      Findings Regarding Disgorgement

In determining whether there was a causal connection between Mr. Conaway's securities violations and his being able to retain his $5 million retention loan, we must consider what

---

[40] Mr. Stallkamp testified that he and later the Board in November were not given any reason other than the eLMO "IT system glitch" story for the vendor payment delays.  (Stallkamp 5/18/09, at Tr00802-05.)

would have been the situation had the misrepresentations and three omissions not be made on November 27, 2001. Ordinarily in a civil fraud case involving material omissions the plaintiff is relieved of having the burden of proving reliance, and the burden is shifted to the defendant to prove that had the disclosures been made, the plaintiff would have acted in the same fashion. Here, because of the actions and omissions of Defendant Conaway, the court is deprived of much evidence on what the Board of Directors at Kmart would have done had there been no misstatements and omissions in the MD&A of the 10-Q and at the Conference call.

While it is true, as Defense expert Tucker demonstrated, that much bad financial data was disclosed in the 10-Q(3) and in the conference call that cause a bond rating downgrade by Standard and Poor's and a decline in stock prices, I find that the negative reaction would have been significantly worse had Kmart and Mr. Conaway made truthful disclosures about the magnitude of the liquidity crisis in the third quarter of 2001 including its extensive slow pay systems.[41] I find that stock analyst Eric Beder and others in the investment field and factors such as Maurice Sabony, were relying on what Kmart and Mr. Conaway disclosed on November 27, 2001. Both were familiar with the eLMO systems story line prior to November 27. (Beder 12/17/07, at TrDep00282 ; Sabony 2/28/08, at TrDep00200-09 .) Mr. Beder noted in his

_____

[41] The SEC at the remedies hearing and in a subsequent filing have moved to strike two of Defense Expert's Opinions in his Remedies testimony. (Dkt. # 179.) I find that the defense counsel in its closing arguments on Remedies could have made the same arguments Mr. Tucker makes from other evidence in the record that Mr. Tucker uses. I find that the defense did disclose the evidence upon which Mr. Tucker relies and did disclose the bulk of the Tucker opinions prior to the Remedies hearing. Thus, I do not find sufficient prejudice to the SEC from allowing Mr. Tucker's testimony to stand. I agree that Mr. Tucker's area of expertise is related to his ability to analyze numbers in assessing a company's economic health, and he has no particular expertise on how investors or markets would have reacted had there been no securities fraud on November 27, 2001.

conference call preview notes prepared for his investment clients the day before the conference

call, that the "Conference call must be forum to put to bed continued stream of negative rumors

and bad press."  (Plf. Exh. # 174, p. 1; Beder 12/17/07, at TrDep002876 .)    He also referenced

the  "newspaper reports questioning the financial stability of the company."  (*Id.* at

TrDep002877.)   His notes state:

> With the continuing uncertainty in the retailing sector, the turnaround story at
> Kmart has become muddled, as declining comps, a poorly time CFO replacement,
> a stream of bad press and a string of rumors have served to shake investor
> confidence in the continuing turnaround at the company.

 Plf. Exh. #  174, p. 1.

Had the MD&A and Mr. Conaway made proper disclosures about the impact of the

Schwartz overbuy, and the extensive slow pay schemes to deal with it, Mr. Beder, and likely

other analyst, would either not have maintained his "buy" recommendation for Kmart stock, or

would have highly qualified it.

I find that while Mr. Tucker is correct that efforts could have been made to give a

positive spin to disclosures about using Project SID to deal with the "short term liquidity

crunch."

I am not convinced by his assertion that on November 27, 2001, Kmart had positive liquidity.

His opinion is based on the premise that against its available revolver of $470 million, only the

$263 of committed funds under Project SID were past due on November 27, 2001, which accepts

the Plaintiff's theory that the additional $300 million in "borrowings" from vendors under the

AP Systems changes could be ignored.  I find that these unilateral changes under the AP Systems

changes, like Project SID, were never agreed to by vendors nor approved by the board, and that

the AP System changes continued throughout 2001. Had there not been securities violations on

November 27, 2001, truthful and complete disclosures would have also increased doubts about the eLMO excuse, and factors such as Sabony and other factors and vendors would have had greater distrust in the credibility of Kmart and the integrity of its top executives. I further find that had there been no securities violations by Mr. Conaway and Kmart on November 27, 2001, a substantial number of institutional and some individual investors would have sold their Kmart stock and avoided the financial loss that came to many when Kmart went bankrupt in January 2002. Thus, these investors experienced significant losses due to the securities violation.

While the defense expert testified extensively that it was not the Schwartz overbuy, or Project SID that led to Kmart's January 22, 2002, bankruptcy, but other unrelated factors occurring in December and early January related to the Enron bankruptcy, poor December sales, a January 2nd negative analysis by Prudential Securities Wayne Hood predicting Kmart's bankruptcy made the perfect storm causing Kmart's fall. Yet, there is no need to find that the Schwartz overbuy (which was offset by reductions in October purchases) and Kmart's actions related to it caused Kmart's bankruptcy. These were just two of many factors that may have weakened Kmart. What does seem apparent was that Mr. Conaway's choice to keep the relevant facts concerning the Schwartz overbuy and the economic crunch it caused from the Board of Directors in September and October deprived them from urging Kmart's executive to find other ways that than stretching vendors to deal with the liquidity crunch and to take alternate steps to obtain secured financing when it was still possible. Such actions in September, October or November may well have enabled Kmart to have weathered the harsher storms that came in

December with poor sales and the Enron bankruptcy impact on credit availability.[42] Whether

disclosures as late as November 27, 2001, by proper MD&A disclosures would have given

Kmart enough time to counter the harm done to its credit and to its credibility with vendors and

lending  institutions in order to have avoided the January 2002 bankruptcy cannot be known.

Defense expert notes that while Kmart's projected $2 billion liquidity cushion on the November

20 Board Package[43] was not realized due to poorer than expected December sales, Kmart did end

the year with $641.4 million on its $1.68 billion credit revolver on January 2, 2002 and $421

million in investments.  (1/2/2002 Weekly Treasurer's Report).   Yet, that same Weekly

Treasurer's Report shows that in the prior year instead of still having outstanding borrowings of

$809.6 million at the end of 2001, Kmart had paid off its entire credit revolver.  The Weekly

Treasurer's Reports for the fall of 2001 show that from September 5 –  October 31, 2001 (weeks

31-39) Kmart made $828.6 million fewer payments on its accounts payable than in the prior year

as a consequence, in major part, of the AP System Changes and Project SID. (Plf. Exh. #  63.)

Compared to the end of the third quarter of 2000, the consolidated balance sheets of the 2001 10-

Q  showed an increase of 62% of long term debt due within one year ($478 million v. $295

million) and an increase of 28% or $ 718 million in trade accounts payable ($3,273 million v.

$2,555) with an increase of $440 million in inventory. (Plf. Exh 198, October 31, 2001,

---

[42] Ford Motor Company by timely borrowing against  nearly everything it owned,
including it famous blue oval logo, was able to avoid the bankruptcy fate of General Motors and
Chrysler in the economic storms of 2008-9.
http://www.nytimes.com/2009/04/09/business/09ford.html  &
http://emac.blogs.foxbusiness.com/2009/04/07/the-outlook-for-ford-motor/

[43]  Plf. Exh. #  121, at p. 14, CC-0096861 ($1.74 billion liquidity cushion and projected
321 million in cash/investments on December 27. )

Consolidated Balance Sheet)   Yet, even with the major reduction in receipts of merchandise in October lowering accounts payable,[44] Kmart's  slow pay schemes in the Third Quarter required Kmart to pay $808.9 million more from November 7 –  December 26, 2001 (weeks 40-47) on its accounts payable than in the prior year for those weeks.  With these increased payments to vendors needing to be made, Kmart has fewer uncommitted dollars to pay down its credit revolver as it had in 2000, and on December 26 it still owed $909.6 million compared to the prior year when nothing was still owed. (Plf. Exh. # 63.)  It was in the week just before Christmas  that Kmart restarted Project SID. (Archambeau 5/13/09, at Tr00512; Gilbert 5/13/09 at Tr00442-43.)   Mr. Gilbert testified that the Kmart was never within 200 million dollars of being caught up with vendors in 2001and Mr. Kearse also acknowledged that Kmart never caught up with its vendors in 2001. (Gilbert 5/13/09 at Tr00464; Kearse 5/20/09, at  Tr01226-27 & Tr01269-70.)

Had Mr. Conaway and Kmart not committed its securities frauds on November 27, 2001, the MD&A disclosures would have disclosed that an unauthorized $850 overbuy by Schwartz moved up Kmart's peak borrowing date and caused a liquidity problem that Kmart dealt with by significantly cutting receipts of new inventory in late September and all of October and by slow paying vendors.  While accompanied with statements that this was a one time self  inflicted wound that had largely been dealt with successfully, it would have confirmed and not dispelled rumors "clearly been circling in the marketplace" that Mr. Conaway said in the November 27,

---

[44] Defense Exhibit Number 1 demonstrates that by the end of the quarter Kmart had cut its receipts in weeks 34-39 (August 8- September 19, 2001) by roughly $949 million from 2000 levels more than enough to offset the $839 million Schwartz overbuy for weeks 27 through 33 (September 26 to October 31, 2001).

2001, conference call that he had wanted to counter, and not confirm. (Plf. Exh. # 57, at p. 19; Beder 12/17/07, at TrDep00283.)  If Mr. Conaway had not made his misrepresentations to counter those rumors, he would have confirmed them, and likely faced a more targeted question by Mr. Beder or another person, such as factor Maurice Sabony who was still owed $7.3 million on November 27 (Plf. Exh. # 200), as to whether there was any truth to the eLMO excuse that had been given to vendors by Kmart to explain the delays in payment.  While Board members Adamson and Stallkamp did not listen to the conference call, they likely would have read about it in the New York Times (or the Wall Street Journal) the next morning, given the two prior Times articles on Kmart's financial problems that a truthful MD&A and conference call would have largely confirmed.  Had there not been the securities frauds, as noted above, analysts and the stock market would have had a more negative reaction, and Kmart would likely have lost Beder's "buy" recommendation.   While defense expert Tucker is correct that certain positive spin could have accompanied the revelations, I find convincing Plaintiff's Expert Carmichael's testimony that Kmart's longstanding unilateral slow paying of vendors, which on November 27 still exceeded $500 million  (Plf. Exh. # 20 & 289A; Carmichael 5/27/09, at Tr01434-36), harmed Kmart by straining vendor relations, risked their not shipping or paying vendor allowances, and harmed the management's integrity which would make future borrowings  more difficult . (*Id.* at Tr01442-51.)   I find that these factors would clearly have been recognized by Board members Adamson and Stallkamp who would have shared them with other members of the Board.  I find that Mr. Stallkamp, and likely Mr. Adamson, would immediately have recognized the damage these revelations would have done to Kmart's vendor relations and Kmart's integrity and its standing with not only vendors, but with its lenders, its stockholders

and with stock analysts. I find that Mr. Stallkamp and Mr. Adamson would have been surprised and greatly disappointed that they first learned of this in a SEC filing and related conference call (or in a press article on the call) and not in the confidence of a Board meeting. I find that Mr. Stallkamp would have immediately been suspicious that not only had Mr. Conaway and Kmart's senior management not adequately informed the Board of the depths of Kmart's liquidity problems in the third quarter, but that Mr. Conaway lied to him and other Board members. If Mr. Adamson wanted Mr. Conaway fired from both the Board Chairmanship but also his CEO position in January of 2002 when he first learned about the likely bankruptcy, I find that upon the revelations of November 27, 2001, had here been no securities fraud, he would have considered attempting to limit the harm and possibly restore as sense of forthright control at Kmart and repair its damaged integrity by a discharge of Mr. Conaway from both positions and possibly seeking the discharge of others. I find Mr. Stallkamp would have supported such action and their pursuing a discharge for cause would have been supported by the full Board. Whether they would have immediately discharged Mr. Conaway from his Chairman position and CEO position (after giving the appropriate notices, opportunity for a "cure" – which would not likely be possible – and a hearing) or whether they would have tried to get through the holidays while undertaking an investigation need not be decided.[45] I find that the Board would have sought legal advice on how to proceed with a discharge "for cause," as they did before making their final decision in February 2003. The Board would have sought an independent

---

[45] It seems that a suspension of Mr. Conaway's duties pending investigation would constitute a "constructive termination" under his employment agreement (Plf. Exh. # 501, at §1(g)(iii) & § 3(a), p. 2-3.)

investigation on an expedited basis given the needs to act promptly to restore Kmart's integrity

and to avoid bankruptcy.   In short order, discussions with Messrs. McDonald, Moreland,

Gilbert, Archambeau, Kearse and Boyer would have revealed the many negative liquidity

documents Moreland generated for the ELT as well as his Project SID Master Tracking

Document  and estimates of the AP System changes impact.  It would also have revealed that the

Project eLMO "cover story" was false and intentionally made the central element of Talking

Points because it was so congruent with the "hung up in processing" that Mr. Conaway found so

attractive in Moreland's "Project SID Process Overview." (Plf. Ex. 11; Moreland 6/27/07, at

TrDep00026.)  I find that such an investigation would have demonstrated to Mr. Stallkamp and

Mr. Adamson and the other Board members that Mr. Conaway did not keep them adequately

informed about the liquidity situation of Kmart in the September and October time frame when

they might have urged other means of dealing with it including getting additional secured

borrowings.  I find that Mr. Stallkamp and the Board would determine that Mr. Conaway

authorized not only Project SID, but also the false eLMO cover story used in Talking Points.  I

find that Mr. Stallkamp, Mr. Adamson, and the other Board members would have concluded that

Mr. Conaway intentionally lied to them when he gave the false eLMO cover story when asked

about rumors of vendors being intentionally stretched, and that he never adequately informed

them in the September, October or November Board meetings or in Board materials about the

intentional slow pay schemes Conaway authorized, nor about the negative liquidity projections

that Moreland had run for him and the ELT.  While the unauthorized Schwartz Overbuy was

disclosed to the Board at the November 20 Board meeting in Detroit,  I find that Mr. Stallkamp,

Mr. Adamson, and the other Board members would have concluded that Mr. Conaway

intentionally lied to them when he told them in a meeting with Mr. Conaway that he was not aware of the Schwartz overbuy in August, September or October.

When the Board received the Skadden Arps investigative report in the fall of 2002, after checking certain legal matters and giving Mr. Conaway's lawyer a hearing, it unanimously decided that Mr. Conaway's discharge should have been "for cause." Mr. Stallkamp testified that the Board membership was the same in 2001 as in 2002 and 2003. I find that the Board could have discovered all of the information noted in the prior paragraph, much of which was likely in the Skadden report.[46] Kmart would still have been facing the risks of bankruptcy during this period, and I find that Mr. Adamson and Mr. Stallkamp, and likely other on the Board, would have recognized that Mr. Conaway's acts and omissions in September, October and November 2001, deprived Kmart of its ability to deal more openly with its vendors and to get additional secured borrowings in the fall of 2001 that might have made it possible for Kmart to have avoided bankruptcy in January of 2002. I find that they may well have determined that the November 9 firing of Mr. Boyer was based on exaggerations to hide the true reason for the firing – that Mr. Boyer wanted to make fuller disclosures to the Board at its November meeting. It is likely any competent investigation would have surfaced in short order Mr. Boyer's November 8, 2001, 27 page Power Point with its warnings to Mr. Conaway of Kmart's cash flow being "close to $500 million negative," Boyer's concerns over "Credibility" with the "Board, Rating Agencies, Banks and [Wall] Street", and Boyer recommendations for developing financial contingency plans including a fundamental restructuring, a possible need to plan for bankruptcy,

---

[46] As noted before, defense counsel objected to admission of the Skadden report. And it was not put in evidence.

and the need to "[d]iscuss issues with the Board at the November Board Meeting." (*Id.* at JNB 000023.) (Plf. Exh. # 97.) That document would have triggered in the minds of Mr. Adamson and Stallkamp, and likely all of the Board members, questions about just why were these concerns of CFO Boyer not brought to the Board's attention at its November meeting or before. But even without the Board considering the real reason Mr. Conaway wanted Mr. Boyer out, I find that the Kmart Board would have given Mr. Conaway notice of its intent to terminate him for cause, that he would have had a hearing on it as his contract required, and the Board would have terminated him from his positions as Chairman of the Board and CEO "for cause." I find Mr. Conaway's failure to keep his Board fully apprised of the Schwartz overbuy in a timely fashion, and its impact on Kmart liquidity, and on the slow pay schemes of Project SID and the AP Systems changes constitutes willful gross neglect or willful gross misconduct in carrying out his duties under his employment agreement. I find further that these omissions and actions resulted in material harm to Kmart in depriving its Board of critical information necessary for them to exercise their oversight functions for the benefits of Kmart's stockholders, and it deprived the Board of the opportunity to urge alternative ways of dealing with the liquidity crunch and in seeking alternate sources of secured borrowings at a time that might have prevented Kmart's bankruptcy. I further find that Mr. Conaway could not have believed and did not believe "in good faith" that his concealing such information from the Board, and more particularly his lying to the Board with the contrived eLMO excuse when asked about the rumors related to delays in vendor payments, "was in or not opposed to the best interests of the Company." (Plf. Exh. # 501, at p. 1.) I find that with a discharge "for cause" from both his Board Chairman and his CEO positions had there been no securities violation on November 27,

2001, there would have been no January 2002 constructive termination that would have triggered a loan forgiveness event nor would there have been a March 11, 2002, Separation Agreement forgiving the retention loan or determining Conaway's discharge was not for cause.[47]  I find that with Mr. Conaway having been fired "for cause" had there been no securities violation on November 27, 2001, he would have been obliged to repay the $5 million retention loan with interest.

The SEC cites the case of *S.E.C. v. Black*, 2009 WL 1181480 N.D. Ill., 2009, in which the court accepted the SEC's theory  had the defendant Black not committed a securities violation by covering up certain Non-Competition and Supplemental Payments made to him that should have been disclosed in a January 31, 2002, Proxy Questionnaire, Hollander International's Board of Directors would have terminated Black's position as CEO and discontinued any further direct or indirect compensation.  At issue were certain  management fees paid by Hollander International to corporations controlled by Black.   As evidence supporting its theory, the SEC used the fact that International did terminate  Black when it finally did discover the self dealing that he had covered up.  As is the case here, the information that should have been disclosed, while of a nature that would have led to defendant Black's termination, was not directly related

---

[47] Again, it should be noted that the SEC is not seeking disgorgement of any of  the $4,039,708.93 in severance payments Mr. Conaway received under the March 11, 2002, Separation Agreement.  Had litigation ensued after a termination for cause, and arbitration held on more narrow issues of the cause found in this opinion undertaken,  Kmart's bargaining endowments -- or that of any Trustee in bankruptcy – in resolving such claims in a settlement would have been significantly increased from the bargaining power the Board had in March 2002 with its limited information due to the securities fraud of Mr. Conaway.

to the management fees that were disgorged.[48]

I find that the $5 million retention loan was not like salary earned by past services. It was not money to which the defendant would have been entitled irrespective of his fraud. Kmart still held Conaway's promissory note obligating him, under certain conditions, to repay the money with interest unless there was a loan forgiveness event or unless he completed the terms of service. While the terms of service were not contingent on any specific benchmarks, they did anticipate continued service of Mr. Conaway through January of 2006 without his having given the Board grounds to discharge him for cause. (Plf. Exh. # 501). Thus, as of November 27, 2001, Mr. Conaway had a legal obligation to repay the retention loan with interest if certain conditions were not met. Accordingly, the cases cited by defense counsel dealing with disgorgement of salary payments are not applicable to this case.[49]

I find there to be a causal connection between the defendant's fraudulent conduct on November 27, 2001, and the benefit he received when the repayment obligation on his retention loan plus interest was forgiven either by his removal as Board Chairman in January of 2002 or in

---

[48] The court noted:
Following the November 2003 finding that Black had improperly arranged for the Non-Competition and Supplemental Payments, International forced Black out and terminated its relationship with him within two months. It is a reasonable inference therefrom that International would have promptly terminated its relationships with Black had he, as required by the securities laws he violated, made a full and accurate disclosure of the transactions in the 2002 Proxy Questionnaire. Therefore, the burden shifts to Black to show that would not have occurred.
*S.E.C. v. Black*, 2009 WL 1181480 N.D. Ill.,2009, at * 3 .

[49] *SEC v. Resnick,* 604 F. Supp. 2d 773 (D. Md. 2009), *SEC v. Todd,* 2007 WL 1574756 (S.D. Cal. May 30, 2007) *SEC v. Savino*, 2006 WL 375074 (S.D.N.Y. Feb. 16, 2006).

his March 11, 2002, Separation Agreement, both times being when the Board was not fully aware of the true facts concealed on November 27.

## C.      Findings Regarding Prejudgment Interest

In deciding whether to award prejudgment interest, courts considers the following factors: (1) the need to fully compensate the wronged party for actual damages suffered; (2) the relative fairness of an award; (3) the remedial purpose of the statute involved; and (4) other general principles deemed relevant by the court. *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 613 (2d Cir.1994). In an enforcement action brought by the Commission, "the remedial purpose of the statute takes on special importance." *First Jersey Secs., Inc.,* 101 F.3d at 1476.

*S.E.C. v. Marker* 427 F.Supp.2d 583 (M.D.N.C.,2006).

While the first factor does not apply in an SEC enforcement action, given the nature of the offense, and the remedial purpose of the securities laws to encourage full disclosures for the integrity of out markets and the protections of stockholders, I find that prejudgment interest on the $5 million disgorgement to be fair and appropriate. While disgorgement and prejudgment interest are not intended to be punitive, disgorgement of unjust benefits and interest thereon do serve a deterrent function. [50]  I find that the proposed calculations of the SEC for prejudgment

---

[50] Acts of deceit and concealment by executive corporate officers who are paid millions of dollars for their services contributes to public cynicism about corporate America and erodea the public trust not only in large corporations, but also of the effectiveness of governmental regulation to curb such abuses. Thus, it is appropriate that benefits unjustly obtained include the user value or interest on such funds while held by the wrong doer in order  to demonstrate that such wrongdoing will note be rewarded.

interest on the disgorgement figure of $5,000,000 are appropriate, and that amounts to $2,698,689 through June 30, 2009. (Plf. Exh. # 509.)  Additional prejudgement interest is due from July 1, 2009 through he end of that year, and the SEC is requested to provide those figures with the proposed judgment.  Judgment interest rate will begin on the judgment in the current quarter so a December 31, 2009, date should end the prejudgment interest amount.


       **D.**       **Findings Regarding Civil Penalty**

The SEC seeks a civil penalty of $5,000,000, being the amount of pecuniary gain Mr. Conaway realized through his securities fraud. The penalty for a third-tier violation may not exceed (1) $120,000 for a natural person or (2) the gross amount of the defendant's pecuniary gain, whichever is larger, and applies where the violation involved "fraud, deceit, manipulation . . ." and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 78u(d)(3)(B)(iii).

I find that the securities fraud in this case did involve fraud, deceit and manipulation. Conaway's actions continued to mask facts that demonstrated Kmart was a materially weaker company in November 2001 than the public was led to believe.  His failing to disclose the degree of Kmart financial problems deprived Kmart of valuable time to deal with its funding needs, and deprived stockholders of knowledge concerning their holdings. I find that the November 27, 2001, securities frauds indirectly resulted in substantial losses to those Kmart stockholders who did not sell their Kmart stock prior to Kmart's bankruptcy (and those who purchased Kmart stock after November 27, 2001 ) and who would have sold (or who would not have purchased Kmart stock) had Beder and other analysts provided a highly qualified "buy, a "neutral" or a

"sell" recommendation which I find they would have done had they been provided complete and accurate information on November 27, 2001, as required by the federal securities laws. I also find that the securities violations of November 27, 2001, created a significant risk of substantial losses to other persons including those who would have sold Kmart stock upon more negative market or analyst reactions had the proper disclosures been made, as well as to all Kmart stockholders in that the failure to provide the required disclosures deprived the Board of Directors of Kmart of the opportunity to demand Kmart management take prompt remedial actions regarding its vendors and deprived Kmart of valuable time that could have been directed to obtaining secured lending that might have avoided the need for bankruptcy. As Mr. Adamson testified, in January 2002 they came very close to obtaining the needed bridge loan that he believed would have avoided the bankruptcy, and had Kmart had another month to deal with its problems such funding might have been achievable.

Thus, I find that this case involves a Third Tier violation. Considering the disgorgement and the substantial prejudgment interest on the disgorged amount, and for considerations noted below on the injunctive relief the SEC seeks, I believe that an appropriate penalty need not be as severe as the SEC seeks. But I determine that the $120,000 statutory penalty amount, even if tripled with a separate statutory penalty for each of the three securities violations in claims one, two and three, is not a sufficient penalty given the facts of this case. Like the courts in *SEC v. Michel*, 2008 WL 516369, *3 (N.D. Ill. 2008) and *SEC v. Collins*, 2003 WL 21196236, *10 (N.D. Ill. 2003), I find a $2.5 million penalty equal to half of economic benefit Mr. Conaway realized

is an appropriate remedy.[51]  I make this finding upon the assumption that Mr. Conaway will not seek or obtain any payment, reimbursement, or indemnification from any third party for any portion of the penalty.  I find that the remedial purpose of any such fine would be highly diluted if it were born by any third party. Defense counsel challenges the authority of this Court to bar receipt of any such third party payments, and the SEC has provided no authority to make such a bar.  While I find no problem with an insurance carrier covering Mr. Conaway's defense costs, I find that the punitive value of the penalty would be greatly eroded against the public interest were it paid by a third party.  Thus, I find that the penalty should be the full $5 million amount disgorged if Mr. Conaway receives any payment, reimbursement, or indemnification from any third party for any portion of the penalty.

**D.      Findings Regarding Injunctive Relief and Officer and Director's Bar**

Combining the overlapping considerations courts consider for an injunctive against future securities violations and for a officer and director's bar the following factors are relevant:

(1) the egregiousness of the violations;

(2) the isolated or repeated nature of the violations;

---

[51] The parties have stipulated that all legal fees and related costs and expenses incurred by Mr. Conaway in connection with the SEC's investigation and this civil action have been indemnified or paid by insurance or other third party.  Thus, Mr. Conaway has not incurred the legal expenses of defending his actions, which expenses would have had additional deterrent effect.  It should again be noted that the SEC did not seeking disgorgement of any of  the $4,039,708.93 in severance payments Mr. Conaway received under the March 11, 2002, Separation Agreement.  Had litigation ensued after a termination for cause, and arbitration held on more narrow issues of the cause found in this opinion undertaken,  Kmart's bargaining endowments -- or that of any Trustee in bankruptcy – in resolving such claims in a settlement would have been significantly increased from the bargaining power the Board had in March 2002 with is limited information due to the securities fraud of Mr. Conaway.  That information was available to Kmart's representatives in bankruptcy when Mr. Conaway compromised his $19 million dollar claim in bankruptcy for $1 million.

(3) the degree of scienter involved;

(4) the sincerity of the defendant's assurances, if any, against future violations;

(5) the defendant's recognition of the wrongful nature of his conduct;

(6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations;

(7) the defendant's age and health;

(8) the defendant's role or position when he engaged in the fraud;

(9) the defendant's economic stake in the violation.

I find the violation to be serious and clearly wrong, but they do not approach the level of egregiousness found in many SEC cases. While Mr. Conaway's course of conduct causing the securities violations spanned several months, the actual violations were basically an isolated incident on a single day involving various deceptions and critical omissions, but all related to a single wrongful course of conduct. Defense counsel argues the degree of scienter was at most reckless. While the evidence was largely circumstantial, and thus can be characterized as "thin" on the quantum of proofs, once a fact finder determines that the evidence is more probable than not, then findings can be made with binding effect even in a close case. Had there not been my findings concerning the November 8-9, 2001, discharge of Jeffrey Boyer, I would be more convinced that Mr. Conaway was at most reckless and not more predatory and malicious. I find Mr. Conaway treated his Board of Directors with a degree of arrogance and disdain and he manifested what federal judges in the civil rights area would call deliberate indifference to the securities laws of this country. If the fact that there was not greater clarity as to the liquidity disclosure obligations in this case directs that this case involved no more than recklessness, I

find it to be at the far edge of such recklessness bordering on knowing and intentional wrongdoing. While Mr. Conaway testified to his respect and the caution he would pay to securities law obligations in the future if he were to serve as an officer or director of a public corporation, he did not acknowledge his wrongdoing. Defense correctly notes that should not be used against him because of the right to contest the SEC's claims in a court of law. Respecting that right, which is grounded in our constitution, I would, however, note the outer limits of this right that it does not license false testimony under oath in asserting a defense. In this opinion and in my January 20, 2010, opinion, I have noted the multiple areas that I find Mr. Conaway gave false testimony under oath, and the reasons I believe the jury, without question, found that he had given false testimony under oath. Mr. Conaway as CEO played a central role in the securities violations. Yet, I do acknowledge that it was not economic gain that motivated him, even though he did benefit from the retention loan being forgiven. Mr. Conaway is young and in good health, thus his future opportunities to serve as an officer or director are not limited by either of those factors. Yet, being young, I find Mr. Conaway is able to learn from his mistakes. I was initially thinking that any injunction or officers and directors bar should be limited in time given the likelihood of his learning an important lesson. I was considering a ten year injunction or bar from the time of the offense. Yet, in reality I cannot find that there is a realistic likelihood that Mr. Conaway in the short term will be hired to serve as an office or director of a publically traded corporation given the serious damage to his reputation this case and the jury's findings have caused him. A ten year injunction or officers and directors bar would go to November 27, 2011, not much beyond the likely date this case will complete its review in the Sixth Circuit. I find that if the jury's verdict and my sanctions are upheld on

review, Mr. Conaway will realize more strongly than now that what he did was wrong, and not just ten jurors and one judge feel that way. In such a case, I feel the lessons learned, the hardships to him and his family, the disgorgement and the penalty, the damage to his reputation will be enough to deter any future securities violations by Mr. Conaway. If the jury's determination or my disgorgement and/or penalty are overturned, and Mr. Conaway prevails, maybe then the lesson will not be learned and an injunction and bar might well be needed when no longer legally available. Based on the assumption that some or all of the decisions of this court will stand the test of an appeal, I find that no injunction or officers and directors bar is needed in this case.

V. CONCLUSIONS

For the reasons noted above, the SEC's motion for remedies (Dkt. # 150) is GRANTED IN PART as detailed above, and its motion to strike (Dkt. # 179) is DENIED. The SEC is directed to provide a interest calculations on the disgorgement through December 31, 2009, and a proposed judgment consistent with this opinion and the jury's verdict and submit it on or before March 1, 2010.

SO ORDERED.

February 25, 2010                              s:/ Steven D. Pepe
Ann Arbor, Michigan                            United States Magistrate Judge